**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*,[1] | ) | Case No. 23-00623 (TJC) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | **EXPEDITED RELIEF** |
|  | ) | **REQUESTED** |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO (I) PAY PREPETITION WAGES, COMPENSATION, AND EMPLOYEE BENEFITS, (II) CONTINUE CERTAIN EMPLOYEE BENEFIT PROGRAMS IN THE ORDINARY COURSE, AND (III) GRANTING RELATED RELIEF

Mercy Hospital, Iowa City, Iowa ("Mercy") and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby move (the "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), granting the relief described below. In support thereof, the Debtors rely upon the *Declaration of Mark E. Toney in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"),[2] filed concurrently herewith. In further support of the Motion, the Debtors respectfully represent as follows:

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number or business identification number, as applicable, are: Mercy Hospital, Iowa City, Iowa (0391), Mercy Services Iowa City, Inc. (1044), and Mercy Iowa City ACO, LLC (9472). The location of Mercy's corporate headquarters and the Debtors' service address is 500 E. Market Street, Iowa City, IA 52245.

[2]  Capitalized terms used but not otherwise defined in the Motion shall have the meanings ascribed to them in the First Day Declaration.

**RELIEF REQUESTED**

1. By the Motion, the Debtors seek entry of the Interim Order and the Final Order authorizing, but not directing, the Debtors (a) to pay, perform, and/or honor, as applicable, prepetition obligations to their employees and independent contractors, including accrued prepetition wages, salaries, overtime, and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "Employee Compensation Claims"); (b) to honor and continue in the ordinary course of business until further notice (but not assume under Bankruptcy Code section 365(a)), certain of the Debtors' vacation, sick time, and holiday time policies, medical, personal, and military leave policies, and employee benefit plans, programs, policies, and procedures (collectively, the "Employee Benefit Obligations"), and to pay all fees and costs in connection therewith, except as otherwise set forth herein; (c) to reimburse Employees (as defined below) for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); (d) to pay all prepetition withholdings and payroll-related taxes associated with the Employee Compensation Claims and the Employee Benefit Obligations (the "Employee Tax Obligations"); (e) to maintain the Workers' Compensation Program (as defined herein) postpetition in the ordinary course of business and to pay any prepetition amounts related thereto (the "Workers' Compensation Obligations"); (f) honor and continue in the ordinary course of business until further notice (but not assume under Bankruptcy Code section 365(a)), the Debtors' 457 Plan and Pension Plan, and 401(k) Plan (as defined herein, respectively), including paying all administrative fees and employee contributions, if any, (the "Employee Retirement Obligations"); (g) to maintain the Employee Bonus Program (as defined herein) and pay all prepetition amounts related thereto (the "Employee Bonus Obligations" and, collectively with the Employee Compensation Claims, the Employee Benefit

Obligations, the Employee Expense Obligations, the Employee Tax Obligations, the Workers'

Compensation Obligations, and the Employee Retirement Obligations, the "Prepetition Employee

Obligations"), all in accordance with prepetition practices.

2.      In total, the Debtors estimate that the following prepetition amounts related to the

Prepetition Employee Obligations are outstanding as of the Petition Date:

| Relief Sought | Approximate Prepetition Amount Due Within 30 Days of the Petition Date | Approximate Total Prepetition Amount Outstanding |
|---|---|---|
| *Employee Compensation* | | |
| Employee Compensation | $2,900,000 | $2,900,000 |
| Independent Contractors | $35,000 | $35,000 |
| Payroll Taxes – Employer Portion | $900,000 | $900,000 |
| Reimbursable Business Expenses | $75,000 | $75,000 |
| *Employee Benefit Obligations* | | |
| Payroll Software | $50,000 | $50,000 |
| Vision Plans | $22,500 | $22,500 |
| Dental Plans | $20,000 | $20,000 |
| Medical Claims | $135,000 | $135,000 |
| Medical Plan Administration Fees | $60,000 | $60,000 |
| Health Savings Plans Administration Fees | $56,350 | $56,350 |
| Workers' Compensation Program | $10,000 | $10,000 |
| Life and AD&D Insurance | $13,500 | $13,500 |
| Supplemental Life and AD&D Insurance | $30,600 | $30,600 |
| Other Voluntary Insurance Programs | $80,000 | $80,000 |
| Disability Insurance | $65,000 | $65,000 |
| 401(k) Plan – Employer Portion | $90,000 | $90,000 |
| Tuition Reimbursement | $0 | $5,000 |
| COBRA Benefits | $9,000 | $9,000 |
| Employee Assistance Program | $2,000 | $2,000 |
| Employment Retirement Obligation Fees | $1,250 | $1,250 |
| Physician Staffing Agencies | $387,000 | Unknown[3] |
| Employee Bonus Programs | $44,750 | $683,250 |
| *Time-Off Benefits* | | |
| Paid Time Off Program | $0 | $2,400,000 |
| **Total Prepetition Employee Obligations** | $4,986,950 | $7,643,450 |

---

[3]   The Debtors have not received all invoices and are continuing to reconcile information regarding outstanding amounts.

3.      By the Motion, and as discussed in greater detail herein, the Debtors seek authority, but not direction, to pay the foregoing prepetition amounts, including prepetition amounts owed to the Physician Staffing Agencies (defined herein), which provide locums tenens physicians to the Debtors, so that the Debtors can meet their physician staffing needs.  The Debtors also seek authority, but not direction, to continue, modify, change, or discontinue the various programs, policies, and benefits described herein in the ordinary course of business during the pendency of the Chapter 11 Cases.

4.      Finally, the Debtors request that the Interim Order and the Final Order authorize the Debtors' banks and other financial institutions (collectively, the "Banks") to receive, process, honor, and pay any and all checks and other forms of payment drawn on the Debtors' bank accounts, including fund transfers and electronic payment requests, to the extent they relate to any of the foregoing and to rely on the Debtors' direction to pay amounts authorized under the Motion, provided that sufficient funds are available in the applicable accounts to make such payments.

## JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Northern District of Iowa (the "Court") has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Public Administrative Order* entered by the United States District Court for the Northern District of Iowa. This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

6.      The legal predicates for the relief requested herein are sections 105(a), 362(d), 363(b), 507(a), and 541(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

7.      The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

## BACKGROUND

### I.      The Chapter 11 Cases

8.      On the date hereof (the "Petition Date"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors have requested that the Chapter 11 Cases be jointly administered.

9.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

10.      To date, the Office of the United States Trustee for the Northern District of Iowa (the "U.S. Trustee") has not appointed any official committee in the Chapter 11 Cases, nor has any trustee or examiner been appointed.

11.      Additional information regarding the Debtors and the Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of the Chapter 11 Cases, is set forth in the First Day Declaration.

### II.      The Prepetition Employee Obligations

####      A.      Employees and Employee Compensation

#####           i.      Employees

12.      The Debtors' workforce comprises a total of approximately 1,122 employees,[4] including nurses, certified nursing assistants, licensed practical nurses, caregivers, janitorial

---

[4]      This information is provided as of August 3, 2023.

workers, receptionists, corporate-level personnel, administrative, security, engineering, and other staff (collectively, the "Employees"), categorized as follows:

> (a)    approximately 206 full-time salaried employees (the "Salaried Employees");
>
> (b)    approximately 495 full-time hourly employees (the "Hourly Employees" and, together with the Salaried Employees, the "Full-Time Employees");[5]
>
> (c)    approximately 204 part-time employees (the "Part-Time Employees"); and
>
> (d)    approximately 217 on-call employees (the "On-Call Employees")[6]

13.    All of the Employees are employed at the Debtors' facilities.

**ii.    Employee Compensation**

14.    The Debtors incur obligations to their Employees for, among other things, wages, overtime,[7] and salaries (the "Employee Compensation") earned on a salaried or hourly basis. Additionally, the Debtors pay certain employees based on "work relative value units" and quality measurements. Employees are paid in arrears every two weeks on Friday by check, or direct deposit into their bank accounts. The Debtors' aggregate payroll averages approximately $2.9 million per pay period. The Debtors' next scheduled payroll dates for Employees is August 11, 2023.

---

[5]    Working 32 hours or more a week is considered full time. Full-Time Employees include Weekend option employees, which work 50 out of 52 weekends a year, and Flex full-time employees, which may work more or less than 40 hours a week depending on patient volume and the Debtors' needs.

[6]    Working less than 32 hours a week is considered part time.

[7]    Hourly Employees are paid overtime for hours worked in excess of their assigned hourly workweek. Overtime for certain positions is computed based upon a 40-hour, seven-day workweek. For other positions, overtime is computed on an 80-hour, 14-day workweek. Overtime is assigned based on an 8/80 or 0/40 workweek to employees. For non-exempt personnel designated as working an 8/80 overtime pay plan, all productive hours worked (e.g., hours that were actually worked) in excess of eight hours in any workday, or 80 hours in the 14-day period, are considered overtime and compensated at the rate of one and one-half times the employee's base hourly rate of pay and in some instances a rate of two times the employee's base hourly rate of pay. For non-exempt personnel designated as working a 0/40 overtime pay plan, all productive hours worked in excess of 40 in the workweek (Sunday through Saturday) are considered overtime and compensated at the rate of one and one-half times the employee's base hourly rate of pay.

15.     As of the Petition Date, the Debtors estimate that approximately $2.9 million (including payroll taxes and withholdings) is currently due and owing on account of accrued, but unpaid, Employee Compensation for work performed prior to the Petition Date (the "Unpaid Employee Compensation") and seek authority to pay such amounts.  None of the Debtors' Employees are owed more than $15,150 on account of prepetition Employee Compensation. Failure to pay the Unpaid Employee Compensation would result in financial hardship for many Employees and likely would lead to numerous departures across the Debtors' organization, thereby putting at risk the health and safety of the Debtors' patients.  In light of the central role played by the Employees in the operation of the Debtors' business, and the costs, difficulties, and attendant risks associated with filling sudden vacancies—particularly those roles requiring specialized skills and training or familiarity with the Debtors' patients or facilities—the Debtors seek authority to make payments on account of Unpaid Employee Compensation and to continue to pay Employee Compensation in the ordinary course of business postpetition consistent with past practices.

### iii.    Physician Staffing Agencies

16.     To supplement the staffing of their facilities by the Employees and ensure sufficient specialists are available, the Debtors obtain the services of various physicians through agencies (collectively, the "Locums Physicians") provided by Weatherby, Barton Associates, Hayes Locums, and Locum Tenens, LLC all of which are locum tenens agencies, (the "Physician Staffing Agencies").  The Locums Physicians are necessary for the Debtors to provide the appropriate level of care for their patients.  The Physician Staffing Agencies invoice the Debtors based upon the number of hours worked by the Locums Physicians and, in turn, the Physician Staffing Agencies pay the Locums Physicians wages and other amounts to which the Locums Physicians are entitled. Currently, the Debtors utilize the services of approximately twenty-one (21) Locums Physicians.

Historically, on average, the Debtors have paid the Physician Staffing Agencies approximately $387,000 each month. If the Physician Staffing Agencies are unable or unwilling to provide the Debtors with the necessary Locums Physicians, the Debtors may not have sufficient physicians or specialists to meet the healthcare needs of their patients, which obviously would have a substantial and adverse impact on the Debtors' business and prospects in the Chapter 11 Cases.

17.     The Debtors are continuing to receive and reconcile invoices relating to the Physician Staffing Agencies. The Debtors estimate that they will require approximately $387,000 all of which will be due and owing in the first 30 days of the Chapter 11 Cases. Accordingly, the Debtors request authority to pay the Physician Staffing Agencies all prepetition amounts due and owing, continue to pay the Physician Staffing Agencies in the ordinary course of business postpetition, and continue to utilize the Locums Physicians provided by the Physician Staffing Agencies, as necessary or appropriate in the ordinary course of business.

### iv.   Independent Contractors

18.     The Debtors also utilize the services of approximately six (6) independent contractors (the "Independent Contractors"). The Independent Contractors provide a myriad of services including providing guidance on medical and administrative issues and overseeing the medical services provided to the patients. On average, the Debtors pay approximately $43,000 per month for the services of Independent Contractors. As of the Petition Date, the Debtors owe approximately $35,000 on account of accrued, but unpaid, amounts to Independent Contractors, all of which will come due and owing in the first 30 days of the Chapter 11 Cases (collectively, the "Unpaid Independent Contractor Amounts"). None of these Independent Contractors is owed more than $15,250. The Debtors seek authority, but not direction, to pay the Unpaid Independent

Contractor Amounts in the ordinary course of business and to continue to pay the Independent

Contractors for their services in the ordinary course of business on a postpetition basis.

### v.      Payroll Taxes

19.      Applicable statutory authority requires the Debtors to match and pay from their

own funds additional amounts for Social Security, Medicare taxes, and federal and state

unemployment insurance (collectively, the "Payroll Taxes").  As of the Petition Date, the Debtors

estimate that they owe approximately $900,000 on account the employer portion of Payroll Taxes,

all of which will come due within the first 30 days of the Chapter 11 Cases (the "Unpaid Payroll

Taxes").  By the Motion, the Debtors request authority to pay and remit the Unpaid Payroll Taxes

in the ordinary course of business and consistent with past practice and to continue paying and

remitting the Payroll Taxes in the ordinary course on a postpetition basis.

### vi.      Payroll Processing Software

20.      The Debtors use UKG and Kronos for their payroll and human resources software

(the "Payroll Software").  The Debtors make a monthly payment of approximately $50,000 for use

of the Payroll Software.  The Debtors require the use of the Payroll Software to avoid interruptions

of the Debtors' payroll system, which would interrupt the Debtors' operations.  By the Motion, the

Debtors request authority to pay prepetition payments for use of the Payroll Software consistent

with the Debtors' past practices.

### vii.      Garnishments and Other Withholding Obligations

21.      During each applicable payroll period, the Debtors routinely deduct certain

amounts from Employee Compensation, including, without limitation, (a) the Employee portion

of payroll taxes; (b) garnishments, child support, service charges, and similar deductions; and

(c) other pre- and post-tax deductions payable pursuant to certain of the Employee Benefit

Obligations discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) Plan contributions, and miscellaneous deductions). On average, the Debtors deduct a total of approximately $2.4 million from Employee Compensation per month, which the Debtors, or various third-party administrators discussed below, then forward to the appropriate third-party recipients.

22.    The Debtors routinely withhold from Employee paychecks amounts that the Debtors are required to transmit to third parties. Examples of such withholdings include social security, FICA, Medicare, federal, state, and local income taxes, garnishments, 401(k) Plan contributions, voluntary employee paid benefit premiums, and Employee healthcare contributions (collectively, the "Employee Taxes"). Specifically, health and benefit deductions and 401(k) Plan contributions are withheld from Employee Compensation, then funded to the applicable third-party administrator or insurance carrier by the Debtors. Garnishments and the Employee portion of the Payroll Taxes are withheld by the Debtors and remitted to the applicable entities. Social security, FICA, Medicare, and federal, state, and local income taxes are computed by the Debtors and the applicable amounts are withheld from Employee Compensation. The Debtors withdraw funds from the Debtors' bank accounts for such withholdings, along with the employer share of FICA and Medicare, and unemployment taxes, and remit those amounts to the applicable entities. The Debtors believe that the Employee Taxes, to the extent that they remain in the Debtors' possession, constitute funds held in trust and therefore are not property of the Debtors' bankruptcy estates. Thus, the Debtors believe that they have authority to direct the Employee Taxes to the appropriate parties, and, by the Motion, the Debtors are requesting authorization to continue to withhold and remit such amounts on a postpetition basis in the ordinary course of business.

**B.       Time Off Benefits**

23.       Prior to the Petition Date, the Debtors offered their Employees other forms of compensation, including paid time off for holidays, personal holidays, vacations, and other time off (collectively, the "PTO Benefits").  These forms of compensation are usual, customary, and necessary if the Debtors are to retain qualified employees to operate their businesses.

24.       PTO Benefits accrue on an hourly basis, accruing on each hour worked up to 80 hours per pay period.  The hourly accrual rate is based upon length of service with the Debtors as set forth in the table below.  For recruitment reasons, certain employees may accrue PTO at a higher level than dictated by their anniversary date.  A total number of accrued hours, or cap, applies to PTO Benefits.

| Anniversary | Eligible Accrued Days Possible Each Year | Cap (hours) |
|---|---|---|
| 0 – 4 Anniversary | 24 days per year | 240 |
| 4 – 9 Anniversary | 29 days per year | 280 |
| 9 – 20 Anniversary | 34 days per year | 320 |
| 20 Anniversary and on | 35 days per year | 360 |

25.       Accrued PTO Benefits can be used for the following three categories of time off, (a) vacations, (b) holidays, and (c) personal days.

**i.       Sick Days & Medical Leave**

26.       The Debtors offer Eligible Employees (as defined below) paid sick leave benefits ("Sick Days") for periods of temporary absence due to illnesses or injuries.  Sick Days accrue on an hourly basis up to six days per year.  Sick Days can be used in minimum increments of one-tenth hour and may only be used for the employee's own absence due to illness or injury.  Unused Sick Days are not paid to Employees upon termination of employment.

27.       The Debtors seek to continue their Sick Days and medical leave policies in the ordinary course of business postpetition consistent with past practices.

### ii.    Military Leave

28.    Employees will be granted an unpaid military leave of absence ("Military Leave") if inducted into the armed forces of the United States.  Additionally, for "summer camp" or emergency duty, a reservist or National Guard member may have a leave of absence with partial pay not to exceed 10 days annually with the employee providing a note signed by the commanding officer specifying the amount of military pay received to compute the difference between what such employee receives from military service and what he or she would have received for his or her usually scheduled number of days on hospital duty.  Military Leave may be granted for a period of up to five years, subject to certain exceptions under applicable laws.  An Employee may use any Sick Days or PTO Benefits as part of the approved period of Military Leave.  The Debtors continue to provide Employee Benefits to any Employee on Military Leave for 30 days, after which point the Employee becomes responsible for paying to participate in those programs.  The Debtors seek to continue their Military Leave policy in the ordinary course of business postpetition in accordance with prepetition practices.

### iii.    Other Time Off Policies

29.    The Debtors also maintain policies for requests by Employees for time off from work as the result of, among other things, jury duty,[8] family and medical leave,[9] and bereavement leave[10] (collectively, the "Other Time Off Policies").  The Debtors do not make any cash payments for unused Other Time Off Benefits upon an Employee's termination or departure.  By this Motion,

---

[8]    The Debtors offer paid time off to Full-Time Employees in the event the Employee is a legally summoned juror. Unless in violation of a court order, employees are expected to work on assigned shifts if the employee is not required to report for jury duty.  Employees must submit proof of jury duty compensation to the payroll manager.
[9]    The leave for Other Time Off Policies runs concurrently with the PTO Benefits.
[10]   The Debtors offer paid time off to Full-Time Employees in the event the Employee experiences a loss of an immediate family member for a maximum of two days per calendar year.

the Debtors seek to continue their Other Time Off Policies in the ordinary course in accordance with prepetition practices.

### C.    Reimbursable Business Expenses

30.    The Debtors have expense reimbursement policies for certain travel, lodging, ground transportation, meals, and phone, automobile usage (gas, mileage, tolls, and parking), and miscellaneous business expenses (collectively, the "Reimbursable Expenses").  The Reimbursable Expenses are ordinary course business expenses that certain of the Debtors' Employees incur in performing their job functions, including traveling to clinics in surrounding communities and professional expenses, such as reimbursement for continuing medical education credits, dues, and fees.  On average, the Debtors pay approximately $75,000 per month to Employees with respect to Reimbursable Expenses.[11]

### D.    Employee Benefit Obligations

31.    Prior to the Petition Date, the Debtors offered Employees who are hired for a position that works twenty hours per week or more (the "Eligible Employees"), various standard employee benefits including, without limitation, (a) medical, dental, vision, and prescription drug benefits, (b) life and accidental death and dismemberment insurance, (c) voluntary disability benefits,[12] and (d) miscellaneous other voluntary benefits provided to the Eligible Employees in the ordinary course of business (collectively, the "Employee Benefits").  Such Employee Benefits are administered pursuant to consolidated plans, programs, and policies that cover the Employees. The amounts set forth below reflect the approximate cost of such Employee Benefits.  Failure to

---

[11]    Employees are likely to submit reimbursement requests for prepetition expenses after the Petition Date, as the Debtors ask that reimbursement requests be submitted every two to four weeks and sometimes submission delays occur. Reimbursable Expenses are incurred by Employees with the understanding that they will be reimbursed.

[12]    As discussed below, Full and Part-Time Employees who work a minimum of 20 hours per week are eligible to participate in voluntary disability benefits, including short- and long-term disability insurance, accident insurance, critical illness insurance, group auto and home insurance, and group legal services.

continue the Employee Benefit Obligations could cause Employees to experience severe hardship and likely would lead to significant attrition.  In light of the critical role the Employees play in providing care to the Debtors' patients, the Debtors wish to avoid imposing such a hardship. Accordingly, as set forth below, the Debtors are seeking authority, but not direction, to continue paying the Employee Benefit Obligations in the ordinary course of business, regardless of whether such obligations arose pre- or postpetition, and to continue providing the Employee Benefit Obligations in the ordinary course of business postpetition.

### i.    Health Benefit Programs

32.    The Debtors provide Eligible Employees and their dependents with medical, dental, vision, and prescription drug benefits (collectively, the "Health Benefit Programs").  Coverage is effective the first day of the month following date of hire.

### 1.    Medical Plans

33.    The Debtors' medical and prescription drug benefits programs (collectively, the "Medical Plans") are self-funded and are administered through Wellmark Blue Cross Blue Shield ("Wellmark").  The Medical Plans, which include HMO, PPO, and high deductible health plans, provide coverage of, among other medical costs, outpatient and inpatient services, preventative care, physician services, wellness services, hospice care, and prescription drugs.  Approximately 599 Eligible Employees participate in the Medical Plans.

34.    The cost of the Medical Plans is borne partially by the Eligible Employees through payroll deductions with the remainder funded by the Debtors.  Employee contributions are deducted from their paychecks to pay for that month's coverage.  The Debtors withhold from participants' Employee Compensation approximately $96,132 per month on account of the

Medical Plans, depending on the level of coverage selected and the number of dependents covered under the Medical Plans.

35.    Medical claims are processed by Wellmark and the Debtors reimburse Wellmark on a weekly basis for claims paid by Wellmark, which average approximately $135,000 per week. As of the Petition Date, the Debtors estimate that they have accrued approximately $135,000 on account of outstanding prepetition claims submitted under the Medical Plans, all of which will come due and owing within the first 30 days of the Chapter 11 Cases.  The Debtors also pay Wellmark a monthly administration fee of approximately $30,945.  In total, the Debtors pay on average approximately $60,000 in fees to Wellmark per month to provide the Medical Plans, including administration fees and expenses due to claims management.

36.    By the Motion, the Debtors seek authorization to continue to provide the Medical Plans, including paying any prepetition amounts that may be owed in connection therewith and paying amounts related thereto on a postpetition basis in the ordinary course of business.  In addition, the Debtors seek authority to remit any funds withheld from participants' Employee Compensation on account of prepetition obligations for Medical Plans, to continue deducting and withholding premiums from participants' Employee Compensation for Medical Plans, and to continue remitting such withheld amounts on a postpetition basis in the ordinary course of business.

## 2.    Health Savings Plans

37.    Eligible Employees also have the option to enroll in a Healthcare Savings Account (each, a "HSA"), Health Care Flexible Spending Account (each, a "Health Care FSA"), and/or a Dependent Care account FSA (each, a "Dependent Care FSA" and, together with the HSA and Health Care FSA, the "Health Savings Plans") administered by HealthEquity WageWorks ("WageWorks").  Under the Health Savings Plans, the Debtors offer their Eligible Employees the

ability to contribute a portion of their pre-tax compensation to an FSA or Dependent Care FSA to pay for health benefits and eligible out-of-pocket health care premiums and expenses. The Debtors match Employee contributions to the Health Savings Plans. On average, the Debtors pay approximately $55,000 per month to WageWorks, Inc. with respect to the HSA. Approximately 364 Eligible Employees have an HSA, Health Care FSA, or Dependent Care FSA. The Employees' contributions to the Health Savings Plans are withheld through payroll deductions.

38.    The Debtors pay a monthly administrative fee of approximately $1,350 per related to the Health Savings Plans. To the extent there are any outstanding administrative fees owed to WageWorks as of the Petition Date, the Debtors seek authority, but not direction, to continue to pay all prepetition amounts due under the Health Savings Plans as and when they come due and to continue to honor their obligations thereunder in the ordinary course of business during the Chapter 11 Cases.

### 3.    COBRA

39.    The Debtors maintain an account with WageWorks to provide health insurance benefits (the "COBRA Benefits") under the Consolidated Omnibus Budget Reconciliation Act ("COBRA") to employees who have been terminated. Approximately nine (9) former employees are currently receiving COBRA Benefits. The Debtors do not pay for the COBRA Benefits; rather, such costs are paid by the former employees. The Debtors pay an administrative fee to WageWorks. WageWorks deducts its monthly administrative fee before remitting former employee COBRA payments to the Debtors.

40.    As of the Petition Date, the Debtors estimate that approximately $9,000 is currently due and owing on account of accrued, but unpaid, COBRA benefits prior to the Petition Date (the "Unpaid COBRA Benefits"). The Debtors seek authority to pay the Unpaid COBRA Benefits and continue to administer the COBRA Benefits in the ordinary course of business.

### 4.      Employee Assistance Program

41.      The Debtors provide an employee assistance program (the "Employee Assistance Program") at no cost to Eligible Employees.  Eligible Employees are automatically entitled to receive a variety of benefits and support under the Employee Assistance Program, including short-term counseling and wellness programs, provided through Synchrony ("Synchrony").  By the Motion, the Debtors seek authorization to continue to provide the Employee Assistance Program on a postpetition basis in the ordinary course of business and pay any obligations related thereto.

### 5.      Dental Plan

42.      The Debtors' dental benefits plans (collectively, the "Dental Plans") are self-funded and are administered through Delta Dental of Iowa ("Delta Dental").  The cost of the Dental Plans is borne partially by the Eligible Employees through payroll deductions with the remainder funded by the Debtors.  Approximately 610 Eligible Employees participate in the Dental Plans.  The Debtors withhold from participants' Employee Compensation between $4.00 and $39.26 per month on account of the Dental Plans, depending on the number of dependents covered under the Dental Plans.  The Debtors remit that amount to Delta.  In total, the Debtors pay on average approximately $38,326 per month to provide the Dental Plans, which includes employee portion hat is collected by the Debtors.

43.      As of the Petition Date, the Debtors estimate that they owe approximately $20,000 in connection with the Dental Plans (the "Unpaid Dental Plan Amount"), all of which will become due and owing within the first 30 days of the Chapter 11 Cases.  By the Motion, the Debtors seek authorization to continue to provide the Dental Plans on a postpetition basis in the ordinary course of business, including remitting the Unpaid Dental Plan Amount to Delta Dental.

### 6.    Vision Plan

44.     The Debtors offer two vision plans (the "Vision Plans") through Avesis, Inc.

("Avesis") and Eye Physicians and Surgeons, LLP ("Eye Physicians"), the cost of which is borne

by the Eligible Employees through payroll deductions.  Approximately 417 Eligible Employees

participate in the Vision Plan.  The Debtors withhold from participants' Employee Compensation

between $7.50 and $25.54 per month on account of the Vision Plan, depending on the number of

dependents covered under the Vision Plan.  The Debtors remit that amount to the Vision Plans.  In

total, the Debtors withhold on average approximately $6,575 per month to provide the Vision

Plans.

45.     As of the Petition Date, the Debtors estimate that they owe approximately $22,500

in connection with the Vision Plan (the "Unpaid Vision Plan Amount"), all of which will become

due and owing within the first 30 days of the Chapter 11 Cases.  By the Motion, the Debtors seek

authorization to continue to provide the Vision Plan on a postpetition basis in the ordinary course

of business, including remitting the Unpaid Vision Plan Amount to Avesis and Eye Physicians.

### ii.    Employee Education Obligations

### 1.    Tuition Reimbursement Program

46.     Full-Time and Part-Time Employees may receive tuition assistance for successfully

completing approved courses.  Credit courses taken from an accredited college, university, or

community college are approved.  Eligible Employees may receive tuition assistance for one

certification per fiscal year.  To be eligible, an employee must have (a) completed 90 days of

employment with the Debtors, and (b) successfully completed the approved course with a Grade

C or better, a "pass" in a pass/fail course, or a certificate of completion.

47.     Full-Time Employees may receive 90% of tuition and fees, up to $2,500, each fiscal

year.  Part-Time Employees may receive 50% of tuition and fees, up to $1,250, each fiscal year.

Books and materials are not covered by the Tuition Assistance Program (the "Tuition Reimbursement Program"). As a condition for participation in the Tuition Reimbursement Program, the Employee must continue to be eligible for the Tuition Reimbursement Program. If an Employee becomes ineligible or is terminated within two years of receiving tuition reimbursement, such Employee will be required to pay back the tuition reimbursement.

48.     As of the Petition Date, two (2) Employees participate in the Tuition Reimbursement Program and the Debtors estimate that they owe approximately $5,000 on account of the Tuition Reimbursement Program (the "Tuition Reimbursements"), all of which will become due and owing in the first 30 days of the Chapter 11 Cases. By the Motion, the Debtors request authority to pay the Tuition Reimbursements in the ordinary course of business and consistent with past practice and to continue honoring obligations related to the Tuition Reimbursement Program in the ordinary course on a postpetition basis.

### iii.     Insurance Benefits

49.     The Debtors provide Eligible Employees access to certain insurance benefit programs (collectively, the "Insurance Programs"). Coverage is effective the first day of the month following the first day of employment.

### 1.     Life and AD&D Insurance

50.     Eligible Employees automatically receive basic life insurance coverage and basic accidental death and dismemberment insurance (the "Life and AD&D Insurance") through Reliance Standard ("Reliance") at no cost to the Employee. The benefit amount equals the Employee's annual base salary up to a maximum of $300,000. The Debtors pay approximately $4,500 per month for Life and AD&D Insurance.

51.     As of the Petition Date, the Debtors owe approximately $13,500 on account of the Life and AD&D Insurance (the "Unpaid Life and AD&D Insurance Obligations"), all of which

will become due and owing within the first 30 days of the Chapter 11 Cases. By the Motion, the

Debtors seek authorization to continue to provide the Life and AD&D Insurance on a postpetition

basis in the ordinary course of business, including paying the Unpaid Life and AD&D Insurance

Obligations.

### 2.      Supplemental Life and AD&D Insurance

52.      Eligible Employees, also may purchase additional coverage for voluntary life and

accidental death and dismemberment insurance and dependent life and accidental death and

dismemberment insurance (the "Supplemental Life and AD&D Insurance") through Reliance, all

at the Employee's cost.  Such amounts are withheld by the Debtors from the Employee

Compensation.  Approximately 277 Eligible Employees elect to participate in the Supplemental

Life and AD&D Insurance program.

53.      As of the Petition Date, the Debtors estimate that they currently hold approximately

$30,600 on account of the Supplemental Life and AD&D Insurance (the "Unpaid Supplemental

Life and AD&D Insurance Obligations"), all of which will become due and owing within the first

30 days of the Chapter 11 Cases.  By the Motion, the Debtors seek authorization to continue to

provide the Supplemental Life and AD&D Insurance on a postpetition basis in the ordinary course

of business, including remitting the Unpaid Supplemental Life and AD&D Insurance Obligations

to Reliance.

### 3.      Disability Insurance Plans

54.      Eligible Employees, have the option of enrolling in employee-paid short-term or

long-term disability insurance (together, the "Disability Insurance Plans"), which are offered

through Reliance Standard ("Reliance") and paid by Employees through payroll deductions.  A

portion of employees' long-term disability is paid by the Debtors as a benefit, with 66.97% of base

annual salary to a maximum of $15,000 per month.  The Debtors withhold from participants'

Employee Compensation various amounts per month, depending on the age and salary of the participant, on account of the Disability Insurance Plans.  Approximately 446 Eligible Employees participate in the Disability Insurance Plans.

55.    As of the Petition Date, the Debtors owe approximately $65,000 on account of the Disability Insurance Plans (the "Unpaid Disability Insurance Obligations"), all of which will become due and owing within the first 30 days of the Chapter 11 Cases.  By the Motion, the Debtors seek authorization to continue to provide the Disability Insurance Plans on a postpetition basis in the ordinary course of business, including paying the Unpaid Disability Insurance Obligations to Reliance.

### 4.    Other Voluntary Insurance Programs

56.    Eligible Employees, as well as Full and Part-Time Employees who work more than 20 hours per week, also may purchase additional coverage for voluntary accident insurance, voluntary critical illness insurance, hospital indemnity insurance, and accident insurance (collectively, the "Other Voluntary Insurance Programs") through Reliance Standard, all at the Employee's cost.  Approximately 366 Eligible Employees participate in at least one of the Other Voluntary Insurance Programs.

57.    As of the Petition Date, the Debtors hold approximately $80,000 on account of the Other Voluntary Insurance Programs (the "Unpaid Other Voluntary Insurance Obligations"), all of which will become due and owing within the first 30 days of the Chapter 11 Cases.  By the Motion, the Debtors seek authorization to continue to provide the Other Voluntary Insurance Programs on a postpetition basis in the ordinary course of business, including remitting the Unpaid Other Voluntary Insurance Obligations to Reliance Standard.

### iv.     Employee Bonus Programs

58.     The Debtors believe it is important to attract and retain good employees. Accordingly, the Debtors maintain several employee bonus programs.  To attract employees, the Debtors provide a referral bonus of $750 or $2,000 (the "Referral Bonus") to employees who refer a potential employee who is subsequently hired.  The Referral Bonus is paid after the referred employee has been employed by the Debtors for ninety days.

59.     The Debtors also provide a retention bonus ("Retention Bonus") to incentivize employees to maintain employment.  The Retention Bonus are paid to employees who continue to remain employed by the Debtors.  The Retention Bonus includes a bonus of up to 10% of gross wages to the Debtors' hospitalist medical team if they remain employed each year through July 1. As of the Petition Date, fifteen (15) Employees are receiving Retention Bonus for a total amount of $460,000, approximately $34,000 of which will become due and owing in the first 30 days of the Chapter 11 Cases.  These bonuses are provided to ensure that the hospital retains skilled employees to meet patient needs.

60.     The Debtors also provide a sign-on bonus of up to $10,000 (the "Sign-On Bonus" and together with the Referral Bonus, and the Retention Bonus, the "Employee Bonus Program") to incentivize potential employees to join the Debtors as an employee.  The Sign-On Bonus is paid incrementally to the new employee over time in the employee's regular paychecks.

61.     As of the Petition Date, fifteen (15) Employees are receiving Retention Bonuses, six (6) employees are receiving Referral Bonuses, and forty-four (44) Employees are receiving a Sign-On Bonus for a total amount of $683,250 (the "Employee Bonus Obligations").  Taken together, approximately $47,750 of which will become due and owing in the first 30 days of the Chapter 11 Cases.  By the Motion, the Debtors seek authorization to continue to provide the

Employee Bonus Program on a postpetition basis in the ordinary course of business, including

paying the Employee Bonus Obligations as they come due, subject to entry of the Final Order.

### E.    Workers' Compensation Programs

62.    In the ordinary course of business, the Debtors maintain workers' compensation

insurance at the levels required by statute by each state in which the Debtors conduct business (the

"Workers' Compensation Program").  The Workers' Compensation Program is administered by

Sedgwick Claims Management Services, Inc.  ("Sedgwick") and is self-funded by the Debtors.

Under the Workers' Compensation Program, the Debtors pay all amounts related to workers'

compensation claims up to a per-claim deductible of $500,000 per claim, in addition to a fixed

annual premium for losses that exceed the deductible.  Workers' compensation expenses in excess

of $500,000 per claim are paid by an insurance policy issued by Safety National.

63.    As of the Petition Date, the Debtors estimate that they have accrued approximately

$1,836,436 on account of outstanding, prepetition claims submitted, and incurred but not received

occurrences, pursuant to the Workers Compensation Program.  By this Motion, the Debtors seeks

authority to pay any prepetition amounts owed on account of the Workers' Compensation

Program.  The Debtors also seek to continue offering the Workers Compensation Program and to

pay amounts related thereto on a Postpetition basis in the ordinary course of business.  To ensure

that the Debtors remain in compliance with applicable state law, the Debtors seek authority to

continue to maintain the Workers' Compensation Program postpetition in the ordinary course of

business and to pay any prepetition amounts related thereto.  The Debtors also pay Sedgwick a

renewal premium of approximately $35,588 that is billed on a quarterly basis.  The next renewal

premium payment is due in September for the period from October through December

**F.    Retirement Plans**

**i.    401(k) Plan**

64.    The Debtors offer certain Employees the ability to participate in a 401(k) retirement plan (the "401(k) Plan"), administered by Vanguard Fiduciary Trust Company.  (the "401(k) Plan Administrator"), which provides Employees with a tax-effective way to save for retirement. Employees who are at least 18 years of age are eligible to participate.  Employees may make elective contributions to the 401(k) Plan (the "Employee 401(k) Contributions") and such contributions are 100% vested.  The Debtors make a matching contribution equal to 100% of the first 1% of an Employee's eligible compensation that they contribute to the 401(k) Plan, plus 50% of the next 5% that they contribute (maximum total match of 3.5%).  Mercy Hospital is also responsible for "ad hoc fees" for such things as paying investment advisor fees, special statement fees, and funding correction issues.

65.    The Debtors believe that they owe approximately $90,000 in prepetition amounts in connection with the Debtors' matching contribution obligations related to the 401(k) Plan (the "Unpaid 401(k) Obligations"), all of which will come due and owing in the first 30 days of the Chapter 11 Cases.  By the Motion, the Debtors are requesting authorization to pay the prepetition Unpaid 401(k) Obligations and continue to process the ongoing 401(k) obligations on a postpetition basis in the ordinary course of business, including withholding and remitting Employee 401(k) Contributions and other 401(k) Plan obligations.  For the avoidance of doubt, the Debtors are not requesting authority to make ongoing matching contributions.

**ii.    Pension Plan**

66.    Mercy Hospital is the sponsor of a church pension plan (the "Pension Plan") to provide retirement benefits for certain eligible employees who terminate their employment after a

period of service with Mercy Hospital.  Principal Financial ("Principal") administers the benefits of the Pension Plan.  Additionally, Marquette Associates ("Marquette") is the plan investment manager that manages the Pension Fund's investments.  Principal and Marquette are paid from the Pension Plan assets.  Mercy Hospital makes contributions to a trust fund, and those contributions and the income earned by the trust fund are used to pay the benefits under the Pension Plan. Historically, Mercy Hospital has contributed to the Pension Plan, but Mercy Hospital does not intend to make further contributions to the Pension Plan.  Mercy Hospital partially froze the Pension Plan prior to 2016 and then froze the Pension Plan such that participants in the Pension Plan do not accrue additional benefits based on service or compensation paid after December 31, 2016.

67.    The Pension Plan is a vital entitlement and key retention tool to help retain the Debtors' workforce.  Further, beneficiaries of the Pension Plan rely on those benefits as their primary or only form of retirement savings.  Failure to continue administering the pension obligations to current retirees would indicate to current Employees that their promised benefits were no longer guaranteed, which would likewise be severely harmful to morale.  Therefore, it is essential that the Debtors continue administering the Pension Plan, to the extent required. Accordingly, by the Motion, the Debtors seek authorization to administer the Pension Plan and continue honoring any obligations related to the Pension Plan on a postpetition basis in the ordinary course of business consistent with past practices.

### iii.    457 Plan

68.    Mercy Hospital is also the sponsor of the Mercy Hospital 457(b) Deferred Compensation Plan (the "457 Plan").  Mercy Hospital maintains the 457 Plan for a select group of approximately fifteen (15) participants to provide retirement benefits.  Vanguard serves as the

trustee (the "<u>457 Trustee</u>") of the 457 Plan.  The 457 participants elect to defer compensation as

contributions to the 457 Plan and those contributions and earned interest from the held funds are

used to pay the benefits under the 457 Plan.  The 457 Trustee is paid from the assets in the 457

Plan trust.  Mercy pays a 457 Plan administration fee of $5,000 annually, which is billed quarterly.

The next installment is due October 1, 2023.  Marquette provides investment advisory guidance

which is paid by Mercy with the next installment due October 1, 2023.  Accordingly, by the

Motion, the Debtors seek authorization to administer the 457 Plan and continue honoring any

obligations related to the 457 Plan on a postpetition basis in the ordinary course of business

consistent with past practices.

### BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

**I.  Sufficient Cause Exists to Authorize the Debtors to Honor the Prepetition Employee Obligations.**

**A.  Certain Prepetition Employee Obligations Are Entitled to Priority Treatment.**

69.  Bankruptcy Code sections 507(a)(4) and 507(a)(5) entitle a substantial portion of

the Prepetition Employee Obligations to priority treatment.  Bankruptcy Code section 507(a)(4)

grants priority to employee claims for "wages, salaries, or commissions, including vacation,

severance, and sick leave pay" earned within 180 days before the Petition Date up to $15,150 per

employee.  11 U.S.C. § 507(a)(4).  Similarly, Bankruptcy Code section 507(a)(5) provides that

claims for contributions to certain employee benefit plans also are afforded priority treatment to

the extent of the number of employees covered by each plan multiplied by $15,150, less any

amounts paid pursuant to Bankruptcy Code section 507(a)(4), plus any amounts paid by the estate

on behalf of such employees to any other employee benefit plan.  *Id.* § 507(a)(5).  To the extent

such claims are afforded priority status, the Debtors are required to pay these claims in full to

confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(B).  Thus, granting the relief sought herein

should only affect the timing of certain payments to the Employees and should not negatively affect recoveries for general unsecured creditors and will help maintain employee morale. *See In re Wehrenberg. Inc*., 260 B.R. 468, 469 (E.D. Mo. 2001) (authorizing payment of prepetition claims to certain parties necessary to realize a successful bankruptcy process).

**B.     Payment of Certain Prepetition Employee Obligations is Appropriate Under Bankruptcy Code Section 541(d) and is Required by Law.**

70.     The Debtors seek authority to pay the Employee Taxes and Payroll Taxes to the appropriate third-party entities.  These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks.  The payment of Employee Taxes and Payroll Taxes will not prejudice the Debtors' estates because such withholdings are held in trust for the benefit of the related payees and, thus, do not constitute property of the Debtors' estates. *See* 11 U.S.C. § 541(d); *Chiu v. Wong*, 16 F. 3d 306, 310 (8th Cir. 1994) (holding that an estate does not have an equitable interest in property held in trust and only holds "bare legal title to the trust res subject to a duty to reconvey it to the rightful owner") .  Further, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. *See* 26 U.S.C. §§ 6672, 7501(a); Iowa Code § 422.16; *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Indeed, certain of these deductions are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b).  Because the Employee Taxes and Payroll Taxes are not property of the

Debtors' estates, the Debtors request that the Court authorize them, through third-party administrators (as applicable), to transmit the Employee Taxes and Payroll Taxes to the proper parties in the ordinary course of business.

71.     Similarly, state laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Payment of all amounts associated with the Workers' Compensation Program, whether incurred before or after the Petition Date, is therefore crucial to the Debtors' continued operations and the success of the Debtors' Chapter 11 Cases.

**C.     Payment of the Prepetition Employee Obligations and Prepetition Claims of the Physician Staffing Agencies is Proper Pursuant to the Doctrine of Necessity.**

72.     A bankruptcy court's power to authorize the pre-plan satisfaction of prepetition claims whose payment is critical to the debtor's business is firmly established under the "doctrine of necessity," which "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989).[13] Although the "doctrine of necessity" pre-dates the Bankruptcy Code, *see Miltenberger v. Logansport Ry. Co.*, 106 U.S. 286, 309 (1882), the modern application of the doctrine of necessity is grounded in specific provisions of the Bankruptcy Code, including sections 105(a), 1107(a), and

---

[13]     *See also In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); *In re Friedman's Inc.*, No. 09-10161 CSS, 2011 WL 5975283, at *3 (Bankr. D. Del. Nov. 30, 2011) ("[N]ormally, a debtor only pays pre-petition, unsecured claims through a confirmed plan of reorganization . . . most courts will allow such payments under the 'doctrine of necessity,' if the debtor establishes that in its business judgment making such payments is critical to the survival of the debtor's business."); *In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) ("The Supreme Court, the Third Circuit and the District of Delaware all recognize the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11."); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("[T]he court can permit the pre-plan payment of prepetition obligations when essential to the continued operation of the debtor."); *In re Eagle-Pitcher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) ("[T]o justify payment of a prepetition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the chapter 11 process.").

1108.  *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (fiduciary duties implicit in Bankruptcy Code section 1107(a) justify the "preplan satisfaction of a prepetition claim" where necessary to preserve going concern value); *In re Fansteel, Inc.*, Case No. 16-01823 (ALS) (Bank. S.D. Iowa Feb. 22, 2017) (authorizing payment of full and part-time employees for pre-petition obligations).  As described herein, payment of the Prepetition Employee Obligations and the prepetition amounts owed to the Physician Staffing Agencies are essential to the continued operation of the Debtors' businesses.

73.     The Employees include, among others, nurses, certified nursing assistants, licensed practical nurses, caregivers, janitorial workers, receptionists, corporate-level personnel, and other staff who provide care to the Debtors' patients on a daily basis, as well as other staff members who maintain the operations of the Debtors' facilities in the ordinary course.  The Independent Contractors are medical directors who provide a myriad of services to the Debtors, including providing guidance on medical policy at the facilities, overseeing the medical services provided to the patients, and consulting with nurses with respect to the condition of the Debtors' patients.  Without the services of the Employees and Independent Contractors, the Debtors simply would not be able to operate and care for their patients.

74.     The majority of the Employees and Independent Contractors rely exclusively on the Prepetition Employee Obligations to satisfy their daily living expenses.  If amounts owed are not received or other benefits are delayed, the Employees and Independent Contractors may be exposed to significant financial hardship and, in some cases, will be unable to meet their basic needs, which may make it impossible for them to continue working for the Debtors.  This would be particularly detrimental to the Debtors now, given the retention and staffing issues the Debtors currently are experiencing as a result of COVID-19.  Failure to pay the Prepetition Employee

Obligations likely would cause a significant exodus of Employees and an inability to retain the services of the Independent Contractors, which would effectively shut down the Debtors' operations and risk the health and safety of the patients under their care.  Therefore, in order to maintain Employee morale, limit attrition, protect the health and safety of the Debtors' patients, and generally minimize the adverse effects of the commencement of the Chapter 11 Cases, it is necessary to continue providing ordinary course wages and benefits to the Employees and compensation to the Independent Contractors.

75.     Similarly, the Physician Staffing Agencies also is critical to the Debtors' business and operations.  As discussed above, the Physician Staffing Agencies provide Locums Physicians to enable the Debtors to staff certain physicians and specialists that the Debtors require to meet the healthcare needs of their patients.  If the Physician Staffing Agencies are unable or unwilling to provide the Debtors with the necessary Locums Physicians, the Debtors may not have sufficient physician staffing to meet their patients' healthcare needs, which would have a substantial and adverse impact on the Debtors' business and prospects in the Chapter 11 Cases.  Therefore, the Debtors believe that payment of the prepetition amounts owed to the Physician Staffing Agencies are a necessary and critical element of the Debtors' efforts to preserve value and will provide the Debtors with the requisite physician staffing needed to maintain their operations and care for their patients during the Chapter 11 Cases.  Accordingly, the Debtors request that the Court authorize the Debtors to pay all prepetition amounts due to the Physician Staffing Agencies, and to continue to use the Physician Staffing Agencies to provide necessary staffing on a postpetition basis.

## II.     A Limited Waiver of the Automatic Stay for Workers' Compensation Claims is Appropriate Here.

76.     Bankruptcy Code section 362(a)(1) operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of this title . . .

11 U.S.C. § 362(a)(1).  Bankruptcy Code section 362, however, permits a debtor or other party-in-interest to request a modification or termination of the automatic stay for "cause."  11 U.S.C. § 362(d)(1).

77.     The Debtors seek authorization, under Bankruptcy Code section 362(d), to permit their Employees to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum.  The Debtors believe that cause exists to modify the automatic stay because staying their Employees' workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and lead to unnecessary attrition.   In addition, and as noted above, if the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states.  Accordingly, the Debtors request a limited waiver of the automatic stay for purposes of allowing the Workers' Compensation Program to proceed in the ordinary course of business after the Petition Date.

**III.    Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.**

78.     The Debtors have sufficient funds to pay the amounts described in the Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, the proposed debtor-in-possession financing, and anticipated access to cash collateral.  Under the Debtors' existing cash management system, the Debtors have made arrangements to readily identify checks or wire transfer requests relating to the Prepetition Employee Obligations, as applicable.  Accordingly, the Debtors believe that checks or wire transfer requests, other than those

relating to authorized payments, will not be honored inadvertently.  Therefore, the Debtors request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in the Motion.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

79.     The Court may grant the relief requested in the Motion immediately if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003; *see also In re First NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm).   In the context of preliminary injunctions, the Eighth Circuit has acknowledged that a continuing harm which cannot be adequately redressed by final relief on the merits fulfills the language "immediate and irreparable harm".  *See*, *e.g.*, *Brady v. Nat'l Football League*, 640 F.3d 785, 792 (8th Cir. 2011) (holding that lockout of football players caused continuing injury warranting an injunction).  The harm also must be actual and imminent, not speculative or unsubstantiated.  *See*, *e.g.*, *S.J.W. ex rel Wilson v. Lee's Summit R–7 Sch. Dist*., 696 F.3d 771, 779 (8th Cir.2012) ("Speculative harm does not support a preliminary injunction").  The Debtors submit that, for the reasons already set forth herein, the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.

80.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in the Motion is necessary for the Debtors to operate without interruption and to preserve value for

their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief. Moreover, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a).

## **RESERVATION OF RIGHTS**

81.    Nothing in the Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise or requirement to pay any claim or other obligation; (d) granting third-party-beneficiary status, bestowing any additional rights on any third party, or being otherwise enforceable by any third party.

## **NOTICE**

82.    The Debtors will provide notice of the Motion to: (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the Iowa Department of Revenue; (d) the United States Attorney for the Northern District of Iowa; (e) the Centers for Medicare & Medicaid Services; (f) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (g) counsel for the Master Trustee and Trustee; (h) counsel for the Bondholder Representative; (i) UKG; (j) the Debtors' benefit providers; (k) the Federal Trade Commission; (l) Marquette Associates, Inc.; (m) Vanguard Fiduciary Trust Company; (n) Principal Financial; and (o) all parties entitled to notice pursuant to Bankruptcy Rule 2002. The Debtors submit that no other or further notice is required.

## <u>NO PRIOR REQUEST</u>

83.     No previous request for the relief sought herein has been made to this or any other court.

*[Remainder of page intentionally left blank]*

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter the Interim and Final

Orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively,

granting the relief requested herein and such other and further relief as may be just and proper.

Dated: Cedar Rapids, Iowa                    **NYEMASTER GOODE, P.C.**
       August 7, 2023

*/s/ Roy Leaf*
Roy Leaf, AT0014486
625 First Street SE, Suite 400
Cedar Rapids, IA 52401-2030
Telephone:   (319) 286-7002
Facsimile:   (319) 286-7050
Email:      rleaf@nyemaster.com

- and -

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (*pro hac vice* pending)
Daniel M. Simon (*pro hac vice* pending)
Emily C. Keil (*pro hac vice* pending)
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone:   (312) 372-2000
Facsimile:   (312) 984-7700
Email:      fperlman@mwe.com
           dsimon@mwe.com
           ekeil@mwe.com

- and -

Jack G. Haake (*pro hac vice* pending)
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
Telephone:   (214) 295-8000
Facsimile:   (972) 232-3098
Email:      jhaake@mwe.com

*Proposed Counsel for Debtors and*
*Debtors-in-Possession*