**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | ) | Case No. 23-00623 (TJC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF ORDER (I)(A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS TO PROVIDE STALKING
HORSE BID PROTECTIONS, (C) SCHEDULING AN AUCTION AND APPROVING
THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING THE
ASSUMPTION AND ASSIGNMENT PROCEDURES AND (E) SCHEDULING A SALE
HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
(II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

**COMES NOW**, Mercy Hospital, Iowa City, Iowa ("Mercy") and certain of its affiliates

and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases

(collectively, the "Debtors"), hereby move (the "Motion") for entry of an order substantially in the

form attached hereto as **Exhibit A** granting the relief described below.  In support thereof, the

Debtors rely upon the *Declaration of Mark E. Toney in Support of Chapter 11 Petitions and First

Day Pleadings* (the "First Day Declaration").[1]  In further support of the Motion, the Debtors

respectfully represent as follows:

**RELIEF REQUESTED**

1.      By this Motion, the Debtors request entry of the Bidding Procedures Order,

substantially in the form attached hereto as **Exhibit A**:

---

[1]      Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the
First Day Declaration.

(a)     approving bidding procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), to be used in connection with the sale (the "Sale") of substantially all of the Debtors' assets (collectively, the "Assets");

(b)     authorizing the Debtors to provide a break-up fee and expense reimbursement to the State of Iowa, on behalf of the State University of Iowa (the "Stalking Horse Bidder");

(c)     scheduling an auction (the "Auction") for the Assets and scheduling the hearing to approve the Sale;

(d)     approving the form and manner of notice of the proposed sale hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2** (the "Sale Notice");

(e)     authorizing procedures governing the potential assumption and assignment of the Debtors' executory contracts and unexpired leases in connection with the Sale (each a "Potential Assumed Contract" and together, the "Potential Assumed Contracts");

(f)     approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under an applicable Potential Assumed Contract and (B) certain other information regarding the potential assumption and assignment of Potential Assumed Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Potential Assumption and Assignment Notice"); and

(g)     granting related relief.

2.     Concurrent with the ongoing marketing of the Acquired Assets, the Debtors and the Stalking Horse Bidder executed that certain Asset Purchase Agreement, dated as of August 7, 2023 (as amended, supplemented, or modified prior to the date hereof, the "Stalking Horse Agreement") [2], attached as **Exhibit B** to this Motion and pursuant to which the Debtors have agreed to sell substantially all of their Assets, subject to higher and better offers.

---

[2]     To the extent there are any discrepancies between the Stalking Horse Agreement and any summary of terms set forth in this Motion, the terms of the Stalking Horse Agreement shall prevail.

**JURISDICTION AND VENUE**

3.     The United States Bankruptcy Court for the Northern District of Iowa (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Public Administrative Order referring bankruptcy cases entered by the United States District Court for the Northern District of Iowa.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.     The statutory predicates for the relief requested in this Motion are sections 105(a), 363, 365, 503(b), and 507(a)(2) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

5.     The Debtors confirm their consent to the entry of a final order by the Court in connection with the Motion in the event that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**BACKGROUND**

**I.     The Chapter 11 Cases**

6.     On August 7, 2023 (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors have requested that these Chapter 11 Cases be jointly administered.

7.     The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

8.     To date, the Office of the United States Trustee for the Northern District of Iowa (the "U.S. Trustee") has not appointed an official committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed.

## II.    Background

9.     The Debtors have commenced the Chapter 11 Cases to pursue the sale of all or substantially all of their assets pursuant to section 363 of the Bankruptcy Code to maximize the value of their estates and the recoveries of their stakeholders.

10.    Soon to celebrate its 150th year of service, Mercy is a Catholic-based Iowa nonprofit corporation that operates an acute care community hospital (the "Hospital") and clinic located in Iowa City, Iowa.  The Hospital currently has 194 licensed beds and operates an emergency room with over 30,000 visits per year.  The Debtors, through the Hospital and its clinics, provide a broad range of other healthcare services, including cardiovascular care, bariatric care, high-definition robotic surgery, behavioral and mental health services, pain management, urological services, obstetrics and gynecological services, and many other forms of specialized care.

11.    In addition to the Hospital, the Debtors own or operate 18 primary and specialty clinics through its subsidiary, Mercy Services.  The off-campus clinic sites are located in various towns and communities in the surrounding geographic region, primarily south and east of Iowa City.

12.    The Debtors' workforce is comprised of approximately 1,122 employees, including nurses, certified nursing assistants, licensed practical nurses, caregivers, janitorial workers, receptionists, corporate-level personnel, and other staff.  Further, the Debtors employ over 90 physicians.  With these employed providers, the medical staff is comprised of 365 individuals,

including voluntary community doctors and other contracted providers.  All told, the Debtors are the fifth largest employer in Iowa City.

13.    Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the First Day Declaration.

### A.    Initial Sale Efforts

14.    In June 2021, the Debtors retained H2C Securities, Inc. ("H2C") as their investment banker to assist in the search for a long-term strategic partner.  Following its retention, H2C collaborated with existing management to explore a range of potential transactions, including a merger, affiliation, partnership or other similar type of arrangement.  In doing so, the Debtors with the assistance of H2C ran a process that would best enable a partnership with another healthcare provider and would maintain the Debtors' role as an essential healthcare provider to the community.

15.    In particular, H2C prioritized potential candidates that would have the resources to maintain and continue the Debtors' operations and to manage their balance sheet liabilities.  H2C initially identified a number of potential candidates that met the criteria above and would potentially be interested in partnering with a non-profit community hospital in Iowa City.  In addition, on June 30, 2021, the Debtors announced to the organization and the market that the Debtors were seeking a long-term partner.  During this time, three parties submitted initial indications of interest.  One of these parties was the Stalking Horse Bidder.

16.    H2C subsequently conducted management presentations (and prepared related materials) and otherwise engaged with each of the three entities that submitted indications of interest.  In addition, the Debtors formed a strategic planning committee consisting of certain board

members and physicians to assess any potential transaction.  After due diligence and considerable negotiations with two of the entities, the Debtors were unable to reach an agreement with any of the parties at that time.

### B.    The Stalking Horse Bidder Submits Offer to Debtors

17.    In late 2022, the Debtors re-engaged with the Stalking Horse Bidder regarding a potential strategic acquisition of the Debtors.  The Debtors spent significant resources in the winter months of late 2022 and early 2023, with the Stalking Horse Bidder conducting extensive due diligence on the Debtors.   In early February 2023, the Stalking Horse Bidder submitted a draft stalking horse asset purchase agreement that contemplated a potential bankruptcy filing and asset sale.

18.    Upon receiving the transaction documents from the Stalking Horse Bidder, the Debtors, through their then management team and financial advisors, met in-person in February 2023 with their largest bondholder Preston Hollow Community Capital, Inc. ("Preston Hollow"). At such meeting, Preston Hollow was informed of the offer from the Stalking Horse Bidder. Preston Hollow took the position that the Debtors should not engage with the Stalking Horse Bidder under the terms of the proposal because the proceeds would be insufficient to pay Preston Hollow's debt in full.  And although the Debtors asked Preston Hollow on many occasions to speak directly with the Stalking Horse Bidder to encourage the Stalking Horse Bidder to increase or negotiate its offer, Preston Hollow refused.  Recognizing the inherent risks in moving forward with a transaction that is not supported by the Debtors' bondholders, and in light of the desire of the Debtors to establish a productive working relationship with Preston Hollow, the Debtors broke off discussions with the Stalking Horse Bidder.

C.    **Additional Marketing Efforts**

19.    ToneyKorf Partners, LLC ("ToneyKorf Partners") was retained effective April 3, 2023, by the Debtors to provide interim management services to Mercy.  ToneyKorf Partners, under the leadership of Mark E. Toney, engaged in near-daily discussions with Preston Hollow regarding key financial initiatives, operational stabilization actions and improvements, strategic partner discussions, and other critical developments.

20.    The new management team again pursued new strategic partners.  For instance, in the Spring of 2023, the Debtors and Preston Hollow began lengthy discussions with a potential strategic partner.  The three parties jointly engaged a financial advisor to help assess and evaluate a strategic transaction for the Debtors. Such discussions, however, did not result in a viable transaction.

D.    **Terms of the Stalking Horse Bid**

21.    In July 2023, the Debtors re-initiated negotiations with the Stalking Horse Bidder on a potential path forward.  After careful consideration, including an analysis of all viable alternatives, and following intensive negotiations with the Stalking Horse Bidder, the Debtors determined that filing the Chapter 11 Cases to effectuate a sale of substantially all of the Debtors' assets was the best option for the Debtors.

22.    In particular, the Debtors and the Stalking Horse Bidder have agreed upon the Stalking Horse Agreement, which is subject to higher and better offers and approval of the Court. The Stalking Horse Agreement sets forth the terms upon which the Stalking Horse Bidder proposes to acquire the Assets, assume certain liabilities, and offer employment to the Debtors' employees. The Stalking Horse Agreement is attached hereto as **Exhibit B**.

23.    In particular, the Stalking Horse Agreement provides for a purchase price of $20,000,000, and commits the Stalking Horse Bidder to assume significant liabilities (including

accrued vacation of the Debtors' employees), and pay cure amounts with respect to all contracts being assumed as part of the contemplated transaction. The Stalking Horse Bidder will provide a deposit in the amount of $2,000,000 (ten percent of the purchase price).

24. Following the closing, the Stalking Horse Bidder intends (i) to establish an advisory board for Mercy, to include primarily independent members of the community, with such composition, roles, and responsibilities to be agreed upon by the parties prior to closing; (ii) that Mercy will have its own Chief Administrative Officer with responsibility for Mercy's operations, who will report to the Chief Executive Officer of University of Iowa Health Care; and (iii) to make certain strategic and routine capital investments in the acquired facilities, including, in the Stalking Horse Bidder's sole determination, updating and/or replacing some or all the IT hardware, software and related equipment used at the facilities, subject to such investments meeting the Stalking Horse Bidder's business case criteria, including documented business need and financial feasibility.

25. To ensure continuity of care in the community, subject to any applicable law or accreditation requirements, the Stalking Horse Bidder has agreed that the medical staff members of the Hospital who are in good standing at the time of closing shall maintain medical staff privileges at the Hospital and that faculty appointment will not be required to be or remain on the medical staff at the Hospital. Following the closing of the transaction contemplated in the Stalking Horse Agreement, the Stalking Horse Bidder will determine a plan to best clinically integrate the Hospital's employed and affiliated physicians with the Stalking Horse Bidder's physician services so as to provide the best possible services to residents of the community while using physician resources most efficiently.

E.    **Bidding Procedures**

i.    **Overview**

26.    Although the Debtors have already undergone a substantial marketing effort (as described herein), the Debtors propose to solicit potential qualified bids for the purchase of the Assets and conduct an Auction (if necessary).  Therefore, the Assets will either be sold pursuant to the Stalking Horse Agreement with the Stalking Horse Bidder or a higher and better winning bid at the Auction.

27.    The Debtors will continue the marketing process for the sale of their Assets. Specifically, the Debtors, with the assistance of H2C and their other advisors, intend to market the Assets to potential buyers, including, without limitation, those potential buyers previously approached, by (a) engaging potential buyers and investors that may have an interest in bidding for the Assets, (b) delivering updated materials to such interested parties, (c) managing and providing access to a data room of confidential information on the Assets to interested parties, and (d) providing customized information packets to potential purchasers as appropriate.

28.    The Bidding Procedures are designed to promote a competitive and efficient sale process. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Assets on a schedule consistent with the deadlines under the Bidding Procedures and the Debtors' chapter 11 strategy.

29.    The Bidding Procedures describe, among other things, procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction, if any, the selection and approval of the ultimately successful bidder, and the deadlines with respect to the foregoing Bidding Procedures.

30.    The Bidding Procedures also provide that, in the event the Stalking Horse Bidder is not declared the winning bidder at the Auction and this Court approves an alternative transaction, the

Debtors will pay the Stalking Horse Bidder a break-up fee (the "Break-up Fee") and reasonable expenses incurred by the Stalking Horse Bidder prior to the conclusion of the Auction up to $400,000 (the "Expense Reimbursement"). The Break-up Fee will be in the amount of 4% of the Purchase Price (as defined in the Stalking Horse Agreement). Until paid, and only upon the approval, closing and funding of an Alternative Transaction (as defined in the Stalking Horse Agreement), the Break-Up Fee and Expense Reimbursement (collectively, the "Bid Protections") will be allowed as an administrative claim pursuant to sections 503(b), 507(a)(2) and/or 507(b) of the Bankruptcy Code.

31.    In the event of an Auction, the Bidding Procedures provide that the initial overbid shall be in an amount equal to, or greater than, $21,300,000 (the "Initial Overbid") and minimum bid increments thereafter of $100,000.

32.    The Bidding Procedures are reasonable and designed with the objective of generating the best value for the Assets, while affording the Debtors maximum flexibility to execute asset sales in a quick and efficient manner. The Debtors are confident that the Bidding Procedures and the other relief requested herein satisfy the requirements of section 363 of the Bankruptcy Code and will facilitate the sale of the Assets for the best value for the benefit of the Debtors and their stakeholders.

### ii.    Noticing Procedures

33.    The Debtors propose the following noticing procedures (the "Noticing Procedures"):

(a)    Sale Notice. Within three Business Days after entry of the Bidding Procedures Order, or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail upon the following parties or, in lieu thereof, their counsel, if known: (i) the Notice Parties (as defined herein); (ii) all entities known to have expressed an interest in a transaction with respect to the purchase of the Assets; (iii) the Internal Revenue Service; (iv) all known taxing authorities to which the Debtors are subject; (v) all entities known or reasonably believed to have asserted a Lien on any of the Assets; (vi) counterparties to the Debtors' executory contracts and unexpired leases; and (vii) those entities and individuals appearing

on the Debtors' creditor matrix. On or about the same date, the Debtors shall publish the Sale Notice on the Debtors' case information website at https://dm.epiq11.com/mercyhospital (the "Case Information Website")).

(b)  Sale Objection Deadline. The deadline to file an objection with the Court to the Sale, and all objections relating to the Stalking Horse Bidder (if any), the conduct of the Auction or the Sale (collectively, the "Sale Objections") is **4:00 p.m.** (prevailing Central Time) on **September 20, 2023** (the "Sale Objection Deadline").

(c)  Bid Deadline. Any individual or entity that desires to make a proposal, solicitation, or offer (each, a "Bid") shall transmit such proposal, solicitation, or offer via email (in pdf or similar format) so as to be **actually received** on or before **September 19, 2023 by 5:00 p.m.** (prevailing Central Time) (the "Bid Deadline") by the Debtors and their advisors specified in the Bidding Procedures. Any Bid must be submitted in writing and must conform to the Bid Requirements set forth in the Bidding Procedures.

(d)  Notice of Determination of Qualified Bids. At least one Business Day prior to the Auction, the Debtors will (i) notify each Qualified Bidder (as defined in the Bidding Procedures) that has timely submitted a Qualified Bid (as defined in the Bidding Procedures) that its Bid is a Qualified Bid.

(e)  Provisions Governing the Auction. If the Debtors receive no Qualified Bids other than that submitted by the Stalking Horse Bidder, the Debtors, in their sole discretion, shall (i) notify all Potential Bidders and the Court in writing that (A) the Auction is cancelled and (B) the Stalking Horse Bidder made the Successful Bid, and (ii) the Debtors shall seek authority at the Sale Hearing to consummate the transaction contemplated by the Stalking Horse Agreement. If the Debtors receive two (2) or more Qualified Bids, the Debtors will conduct the Auction.

(f)  Notice of Auction Results. Promptly following the selection of the winning Bid and the back-up Bid, the Debtors shall file a notice identifying such Bids (the "Notice of Auction Results") with the Court and cause such notice to be published on the Case Information Website, which shall constitute definitive proof that the Debtors have closed the Auction.

34.    The Noticing Procedures and Bidding Procedures constitute adequate and reasonable notice of the key dates and deadlines for the sale process, including, among other things, the applicable objection deadline, the Bid Deadline and the time and location of the Auction and the hearing before this Court to consider a potential sale (the "Sale Hearing"). Accordingly, the Debtors request that the Court find that the Noticing Procedures are adequate and appropriate under

the circumstances and comply with the requirements of Bankruptcy Rule 2002 and Local

Bankruptcy Rule 2002-1.

**F.      Assumption and Assignment Procedures**

35.      In connection with the Sale, the Debtors anticipate that they will assume and assign

to the winning bidder (or its designated assignee(s)) certain of the Potential Assumed Contracts

pursuant to section 365(b) of the Bankruptcy Code. Accordingly, the Debtors hereby seek approval

of the proposed Assumption and Assignment Procedures set forth herein, which, among other

things, (a) outline the process by which the Debtors will serve notice to all contract counterparties

regarding the proposed assumption and assignment, related cure claims, if any, and information

regarding the winning bidder's adequate assurance of future performance and (b) establish

objection and other relevant deadlines and the manner for resolving disputes relating to assumption

and assignment of the Potential Assumed Contracts. The proposed Assumption and Assignment

Procedures are as follows:

(a)      <u>Potential Assumed Contract List</u>.

    (i)      No later than three Business Days after entry of the Bidding Procedures Order, the Debtors shall file with the Court a list of Potential Assumed Contracts (the "<u>Potential Assumed Contract List</u>").

    (ii)      If it is discovered that an executory contract or unexpired lease should have been included on the Potential Assumed Contract List but was not (such contract, a "<u>Previously Omitted Contract</u>"), or in the event that the Debtors seek to modify a Cure Cost (as defined below), the Debtors will promptly file with the Court a revised Potential Assumed Contract List.

    (iii)      Pursuant to section 2.5 of the Stalking Horse Agreement, the Stalking Horse Bidder at any time prior to the Sale Hearing may determine that any Potential Assumed Contract shall be assumed or not assumed by the Debtors.  In the event of a dispute regarding assumption and assignment of, or the proposed Cure Costs (as defined herein) to be paid in respect of, any Potential Assumed Contract, the Stalking Horse Bidder shall have the right to designate any Potential Assumed Contract as an excluded contract at any time prior to the Closing Date (as defined in the Stalking Horse Agreement) in the event any such dispute is not resolved to the Stalking Horse Bidder's

satisfaction by entry of a final order of the Court (or upon the consensual resolution of such dispute as may be agreed to by the Stalking Horse Bidder and such counterparty to the Potential Assumed Contract).

(b)    <u>Potential Assumption and Assignment Notice</u>. Simultaneously with the filing of the Potential Assumed Contract List (or any revised Potential Assumed Contract List), the Debtors will serve on each relevant contract counterparty the Potential Assumption and Assignment Notice, which shall identify the applicable cure amount (each a "<u>Cure Cost</u>"), if any, with respect to each Potential Assumed Contract that the Debtors believe is required to be paid to the applicable contract counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code.

(c)    <u>Assumption and Assignment Objections</u>.

(i)    <u>Objection Deadlines</u>. Any contract counterparty may object to the proposed assumption or assignment of a Potential Assumed Contract, the Debtors' proposed Cure Cost, if any, or the ability of a Stalking Horse Bidder to provide adequate assurance of future performance (an "<u>Assumption and Assignment Objection</u>"). All Assumption and Assignment Objections must (A) be in writing, (B) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Bankruptcy Rules, (C) state, with specificity, the legal and factual bases thereof, including, if applicable, the cure claims the contract counterparty believes is required to cure defaults under the relevant Assumed Contract and supporting materials evidencing the same, (D) be filed by no later than **4:00 p.m.** (prevailing Central Time) on **September 20, 2023** (the "<u>Assumption and Assignment Objection Deadline</u>"), and (E) be served on the Debtors' Advisors (as defined in the Bidding Procedures) and the Notice Parties.

(ii)    <u>Resolution of Assumption and Assignment Objections</u>. The Court will hear and determine any properly and timely filed and served Assumption and Assignment Objection at the Sale Hearing. If such objection has not been resolved prior to the closing of the Sale (whether by an order of the Court or by agreement with the contract counterparty), the winning bidder(s) shall pay as soon as reasonably practicable after the closing date any disputed Cure Cost pursuant to an order of the Court or mutual agreement between the Debtors, the winning bidder(s) and the applicable contract counterparty.

(iii)    <u>Failure to File Timely Assumption and Assignment Objection</u>. If a contract counterparty fails to properly and timely file and serve an Assumption and Assignment Objection in accordance with these Assumption and Assignment Procedures, the contract counterparty shall be forever barred from asserting any objection with regard to the assumption or assignment

of its Potential Assumed Contract and the contract counterparty will be deemed to have consented to the assumption by the Debtors and assignment to the winning bidder of the Potential Assumed Contract. Notwithstanding anything to the contrary in the Potential Assumed Contract or any other document, the Cure Costs set forth in the Potential Assumption and Assignment Notice in the absence of a timely filed Assumption and Assignment Objection shall be the only amount necessary to cure outstanding defaults under the applicable Potential Assumed Contract under section 365(b) of the Bankruptcy Code arising out of or related to any events occurring prior to the closing of the sale, whether known or unknown, due or to become due, accrued, absolute, contingent or otherwise, and the contract counterparty shall be forever barred from asserting any additional cure or other amounts with respect to such Potential Assumed Contract against the Debtors, the winning bidder, back-up bidder or the property of any of them.

(iv)     Cure Costs:  The Cure Costs fixed by the Bankruptcy Court with respect to any Potential Assumed Contract shall be paid by the winning bidder directly to the counterparty to such Potential Assumed Contract as promptly as practicable after approval of the assumption and assignment. Further, the winning bidder shall provide adequate assurance of future performance under the Potential Assumed Contract, as may be required by the Bankruptcy Court. In either event, the order approving assumption and assignment shall provide that upon payment of the applicable Cure Costs, such counterparty shall not have any remaining claim against the Debtors or their estates related to any default under any such Potential Assumed Contract.

(d)     Post-Auction Adequate Assurance Objection. Following the Auction, the Debtors shall serve the Notice of Auction Results on each contract counterparty that received a Potential Assumption and Assignment Notice at the same time as such Notice of Auction Results is filed with the Court and published on the Case Information Website. Objections of any contract counterparty related solely to the identity of and adequate assurance of future performance provided by the winning bidder at Auction (an "Adequate Assurance Objection") must (i) be in writing, (ii) comply with the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules, (iii) state, with specificity, the legal and factual bases thereof, (iv) be filed by no later than the Sale Hearing or, if earlier, fourteen days following service of the Notice of Auction Results (the

14

"Adequate Assurance Objection Deadline"), and (v) be served on the Debtors' Advisors and the Notice Parties.

(e)    Reservation of Rights. The inclusion of a Potential Assumed Contract, or Cure Costs with respect thereto, on a Potential Assumption and Assignment Notice or the Potential Assumed Contract List shall not constitute or be deemed a determination or admission by the Debtors, the winning bidder(s), or any other party in interest that such contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all of their rights, claims and causes of action with respect to each Potential Assumed Contract listed on the Potential Assumption and Assignment Notice and Potential Assumed Contract List. The Debtors' inclusion of any Potential Assumed Contract on the Potential Assumption and Assignment Notice and Potential Assumed Contract List shall not be a guarantee that such Potential Assumed Contract ultimately will be assumed or assumed and assigned.

## BASIS FOR RELIEF REQUESTED AND APPLICABLE AUTHORITY

### I.    The Bidding Procedures are Fair, Appropriate and Should Be Approved

36.    The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's estate: maximizing the value of sale proceeds received by the estate. *See Burtch v. Ganz (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to maximize and protect the value of the estate's assets); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564–65 (8th Cir. 1997) (recognizing that the main goal of any proposed sale of property of a debtor's estate is to maximize value). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181

F.3d 527, 537 (3d Cir. 1999)(*O'Brien*) (noting that bidding procedures that promote competitive

bidding provide a benefit to a debtor's estate); *Official Comm. of Subordinated Bondholders v.*

*Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing

that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

37.    The Bidding Procedures provide for an orderly, uniform, and appropriately

competitive process through which interested parties may submit offers to purchase the Debtors'

Assets. The Debtors have structured the Bidding Procedures to promote active bidding by

interested parties and to obtain the highest or otherwise best offer reasonably available for such

Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a

fair and transparent manner that will encourage participation by financially capable bidders with

demonstrated ability to consummate a timely sale. Courts have approved procedures similar to the

proposed Bidding Procedures in connection with chapter 11 asset sales. *See Cycle Force Group,*

*LLC*, No. 21-00571-als11 (Bankr. S.D. Iowa); *Foods, Inc. dba Dahl's Foods*, No. 14-02689-11

(Bankr. S.D. Iowa); *Newton Mfg. Co.*, No. 15-01128-11 (Bankr. S.D. Iowa); *Wellman Dynamics*

*Corp.*, No. 16-01825-als11 (Bankr. S.D. Iowa); *Sivyer Steel Corp.*, No. 18-00507-als11 (Bankr

S.D. Iowa). Accordingly, the Bidding Procedures should be approved because, under the

circumstances, they are reasonable, appropriate and in the best interests of the Debtors, their estates

and all parties in interest.

**II.    The Proposed Bid Protections Should Be Approved**

38.    "It has become increasingly common in section 363 sales of significant portions of

an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event

that the sale is not consummated." 3 COLLIER ON BANKRUPTCY § 363.03[7] (15th rev. ed.

2002). Bankruptcy courts have identified at least two instances in which bidding incentives and

protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary

to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C.* (*In re Tama Beef Packing, Inc.*) 290 B.R. 90, 97 (8th Cir. BAP 2003) (*Tama I*) (quoting *O'Brien*, 181 F.3d at 533). Second, if the availability of the break-up fee and expense reimbursement were to induce a bidder to research the value of the debtors and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id.*; *see also In re Reliant Energy Channel View LP*, 594 F.3d 200, 206-08 (3d Cir. 2010).

39.     Further in *Wintz Companies*, the United States Bankruptcy Appellate Panel of the Eighth Circuit held that when considering break-up fees, "the test is whether the bankruptcy court, in its discretion, properly determines that the proposed fee, and the transaction as a whole, make economic sense and are in the best interest of the bankruptcy estate and its creditors." *In re Wintz Companies*, 230 B.R. 840, 846–47 (B.A.P. 8th Cir. 1999), aff'd, 219 F.3d 807 (8th Cir. 2000); *see also In re SpecialtyChem Prods. Corp.*, 372 B.R. 434, 439 (E.D.Wis. 2007) (Break-up fees are allowed when they "(1) arise[] from a transaction with the debtor-in-possession; and (2) [are] beneficial to the debtor-in-possession in the operation of the business").

40.     The Eighth Circuit in *Reagan* also allowed for a break-up fee when it considered situations in which break-up fees are useful during a sale. *In re Reagan*, 403 B.R. 614, 619 (B.A.P. 8th Cir. 2009), aff'd, 374 F. App'x 683 (8th Cir. 2010). In *Reagan*, the Court stated, "[s]talking horse bids may generate interest in the assets and create a sense of confidence in the value of the assets among prospective buyers who might assume that a willing buyer has conducted due diligence. *Id.* at 618 n.3. In the event that the stalking horse bidder is outbid, courts often approve break-up fees to compensate

the stalking horse for the 'cost' of showing its hand before the auction, conducting due diligence and otherwise facilitating the creation of a market. *Id.* (citations omitted).

41.    In *Tama* I, the United Stated Bankruptcy Appellate Court in the Eighth Circuit used the *O'Brien* analysis from the Third Circuit Court of Appeals. *Tama I.,* 290 B.R. at 96. The Court analyzed three established tests used to determine whether break-up fees are permitted: (1) the business judgment test; (2) the best interests of the estate test; and (3) the administrative claim test. *Id.* at 97. The Court in *Tama I* agreed with the Third Circuit's rationale that there is no justification for applying a break-up fee any different than an application for administrative expenses. *Id.* Therefore, in *Tama I*, the Bankruptcy Appellate Court for the Eighth Circuit reviewed the following nine factors set forth by the Third Circuit in *O'Brien* as relevant in deciding whether to award a break-up fee:

(a) the presence of self-dealing or manipulation in negotiating the break-up fee;

(b) the reasonableness of the break-up fee relative to the purchase price;

(c) whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

(d) the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(e) the correlation of the fee to a maximum of value of the debtor's estate;

(f) the support of the principal secured creditors and creditors' committees for the break-up fee;

(g) the benefits safeguard to the debtor's estate; and

(h) the substantial adverse impact of the break-up fee on unsecured creditors where such creditors oppose the break-up fee.

*See id.; see also O'Brien*, 181 F.3d at 536.

18

42.    The proposed Break-up Fee falls squarely within the *O'Brien* factors. Further, the Break-up Fee is reasonable in relation to the size of the proposed sale and under the facts and uncertainties of this transaction.  Such Break-Up Fee is an amount similar to break-up fees or expense reimbursements approved in other Chapter 11 cases. *See, e.g.*, *In re: Otter Tail Ag Enters., LLC*., 2011 WL 231274 (Bankr.D.Minn. Jan. 7, 2011) (approving a fee of $1 million or 1.59% of the stated purchase price); *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) (approving a break-up fee of $250,000.00 as part of the purchase and sale Agreement); *In re ContinentalAFA Dispensing Co.*, 416 B.R. 661, 663 (Bankr. E.D. Mo. 2009) (approving a break-up fee of 3.6% of the purchase price); *In re Foods, Inc*., No. 14-02689-11 (Bankr. S.D. Iowa Dec. 03, 2014) (approving a break-up fee of $315,000 as reasonable); *In re Bertucci's Holdings, Inc.,* Case No. 18-10894 (MFW) (Bankr. D. Del. May 7, 2018) (approving break-up fee of $750,000 or 4.4% of the cash portion of the purchase price and expense reimbursement up to $245,000); *In re The Weinstein Co. Holdings LLC*, Case No. 18-10601 (MFW) (Bankr. D. Del. April 6, 2018) (approving break-up fee of 3% of cash purchase price or $9.3 million and expense reimbursement of up to 1.5% of the cash purchase price ($4.650 million), with right to seek an amount up to 2% of the cash purchase price ($6.2 million) if the sale hearing is delayed.

43.    Break-up fees are a fair and reasonable percentage of the proposed purchase price. *In re Tama Beef Packing, Inc*., 321 B.R. 496, 497–98 (B.A.P. 8th Cir. 2005) (*Tama II*). In *Tama II*, the Court distinguished between break-up fees and simple administrative expenses by stating, "break-up fees often surface, i.e., in conjunction with a 'stalking horse's' unsuccessful bid.  Depending on the circumstances and the terms of the transaction, an unsuccessful stalking horse bidder may seek reimbursement of its actual expenses or it may seek a break-up fee which is designed to compensate the unsuccessful bidder for the risk and costs incurred in advancing the competitive bidding process." *Id.*; *see also In re President Casinos, Inc*., 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) ("A break-up

fee that is greater than the actual cost and expenses of the prospective purchaser should constitute a

fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the

risk, effort, and expenses of the prospective purchaser.").

44.    Here, the Break-up Fee is a fair and reasonable percentage of the proposed purchase

price (4%), and is reasonably related to the proposed purchaser's risks, efforts, and expenses. *See In

re Tama Beef Packing, Inc.,* 312 B.R. 192, 194 (Bankr. N.D. Iowa 2004), cited approvingly but

reversed on other grounds, *Tama II*, 321 B.R. at 498 ("In the context of bankruptcy law, the average

range of reasonableness for break-up fees and expenses is 1-4% of the purchase price, although a

few courts have found higher percentages to be reasonable.").  Courts in other jurisdictions have

routinely approved similar break-up fees. *See, e.g.,  In re Specialty Retail Shops Holding Corp,*

No. 19-80064-TLS (Bankr. D. Neb. Jan. 17, 2019) (approving a 3% breakup fee and $1,000,000

million expense reimbursement in connection with a $60,000,000 sale); *In re Agspring Mississippi*

*Legion, LLC,* No. 21-11238 (CTG) (Bankr. D. De. Oct. 14, 2021) (approving a breakup fee of

$915,000 and expense reimbursement of $610,000 in connection with a $30,500,000 sale); *In re*

*Nortel Networks Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) (approving

$650,000 break-up fee and up to $400,000 expense reimbursement in connection with $17.65

million sale, or 5.9% of the total purchase price); *In re Global Home Products,* Case No. 06-10340

(KG) (Bankr. D. Del. July 14, 2006) (approving a break-up fee of 3.3%, or $700,000.00, in

connection with approximately $21,000,000 sale); *In re Filene's Basement, Inc., et al.,* Case No.

09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (approving break-up fee and expense

reimbursement of 3.68%, or $810,000.00 in connection with sale of debtor's assets for purchase

price of $22,000,000.00); *In re Point Blank Solutions, Inc., et al.,* Case No. 10-11255 (PJW)

(Bankr. D. Del. Oct. 5, 2011) (approving break-up and expense reimbursement of 3.75% or

$750,000.00 in connection with sale of debtor's assets for purchase price of $20,000,000.00). The presence of the Break-up Fee confers a benefit on the Debtors' estates.

45.     The Bid Protections contemplated by the Bidding Procedures also satisfy the *O'Brien* factors in that the Break-Up Fee enables the Debtors to secure an adequate floor for the assets and insist that competing bids be materially higher or otherwise better than the bid of the Stalking Horse Bidder—a clear benefit to the Debtors' estates. The Bid Protections have been negotiated by the Stalking Horse Bidder and are a requirement of the Stalking Horse Agreement. Without the Court authorizing the Debtors to offer the Bid Protections, the Debtors might lose the opportunity to obtain the highest or otherwise best offer for the assets and would potentially lose the downside protection that could be afforded by the existence of a Stalking Horse Bidder.

46.     Finally, the Break-up Fee does not hamper any other party's ability to offer a higher or better bid for the Assets. Given the size of the Break-up Fee relative to the anticipated total amount of consideration provided for the Assets, and relative to the "overbid" requirements set forth in the Bidding Procedures, the fee is not so large as to have a "chilling effect" on other prospective bidders' interest in the Assets. *See In re Wintz Companies,* 230 B.R. at 847; *Tama I.*, 290 B.R. at 96.

47.     Furthermore, because the timely sale of the Assets is required and the Auction process is the most beneficial means for the Debtors' estates to maximize the value of the assets, the Bid Protections constitute actual and necessary costs and expenses of preserving the Debtors' estates.

48.     Accordingly, the Debtors submit that the Bid Protections have a sound business purpose, are fair and appropriate under the circumstances, and should be approved.

**III.     The Proposed Sale Satisfies the Requirements of Section 363 of the Bankruptcy Code**

49.     Ample authority exists for approval of the sale contemplated by this Motion. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and

a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although that provision does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of a debtor's estate, courts have approved the authorization of a sale of a debtor's assets if such sale is based upon the sound business judgment of the debtor. *See, e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 389-390 (6th Cir. 1986); *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

50.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)). Where a debtor demonstrates a valid business justification for a decision, it is presumed that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Integrated Res*., 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (De1.1985)).

### A.    The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale

51.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to preserve the value of the estate for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143,

147–48 (3d Cir. 1986); *Food Barn Stores*, 107 F.3d at 564–65 (recognizing the paramount goal of any proposed sale of property of estate is to maximize value).

52.     As explained above and in the First Day Declaration, a strong business justification exists for the sale of the assets. An expeditious sale of the assets is required to maximize the value of the Debtors' assets and recoveries for the Debtors' stakeholders.

### B.     The Noticing Procedures Are Reasonable and Appropriate

53.     The Noticing Procedures described above and in the Bidding Procedures are reasonably calculated to provide all of the Debtors' known creditors and all other parties in interest with adequate, timely notice of, among other things, the proposed sale, Bidding Procedures, the Bid Deadline, the Auction, and the Sale Hearing.   Additionally, the Sale Notice and proposed service thereof is in compliance with Local Rule 6004-1.

### C.     The Proposed Bidding Procedures Will Produce a Fair and Reasonable Purchase Price for the Assets

54.     The proposed Bidding Procedures will produce a fair and reasonable purchase price for the Assets.

55.     The Bidding Procedures are designed to facilitate a robust and competitive bidding process. The Debtors are poised to commence a competitive bidding process to maximize the value of the assets sold at the Auction. The Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare all Bids to determine which Bids are in the best interests of the Debtors' estates and their stakeholders, while allowing the Debtors appropriate degrees of discretion to determine the winning bidder. A sale governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Assets, but also the highest or otherwise best value for the Assets, which will inure to the benefit of all parties in interest in the Chapter 11 Cases.

23

### D.    The Winning Bidder Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

56.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) of the Bankruptcy Code states the following:  "The reversal or modification on appeal of an authorization under [section 363(b) of the Bankruptcy Code] . . . does not affect the validity of a sale . . . entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal." 11 U.S.C. § 363(m). Section 363(m) fosters the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." *Cinicola v. Scharffenberger*, 248 F.3d 110, 121 n.13 (3d Cir. 2001) (quoting *Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 647–48 (3d Cir. 1997)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal.").

57.    While the Bankruptcy Code does not define "good faith," the Third Circuit has held that "the phrase encompasses one who purchases in 'good faith' and for 'value.'" *Abbotts Diaries*, 788 F.2d at 147 (explaining that to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders); *see also In re Bedford Springs Hotel, Inc.*, 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); *In re Perona Bros., Inc.*, 186 B.R. 833, 839 (D.N.J. 1995).

58.      In other words, a party would have to show fraud or collusion between the buyer

and the debtor in possession, the trustee or other bidders to demonstrate a lack of good faith.

*See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d

269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [buyer]'s good faith

status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the

trustee, or an attempt to take grossly unfair advantage of other bidders.") (quoting *In re Rock Indus.

Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). Due to the absence of a bright-line test for

good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a

bidder's] conduct in the course of the sale proceedings." *In re Pisces Leasing Corp.*, 66 B.R. 671,

673 (E.D.N.Y. 1986) (quoting *Rock Indus. Mach. Corp.*, 572 F.2d at 1998).

59.      The Debtors submit that a winning bidder under the Bidding Procedures (whether

or not the Stalking Horse Bidder), would be a "good faith purchaser" within the meaning of section

363(m) of the Bankruptcy Code.  It is expected that, as is customary, qualified bidders will engage

counsel and other professional advisors to represent their respective interests in determining the

terms of their Bids and with respect to the sale process generally.

60.      Further, as set forth above, the Bidding Procedures are designed to produce a fair

and transparent competitive bidding process. Each qualified bidder participating in the Auction

must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any

of the assets. Any asset purchase agreement with a winning bidder executed by the Debtors will

be negotiated at arm's length and in good faith. Accordingly, the Debtors seek a finding that any

winning bidder (including the Stalking Horse Bidder) is a good faith purchaser and is entitled to

the full protections afforded by section 363(m) of the Bankruptcy Code.

61.    Based on the foregoing, the Debtors submit that they have demonstrated that the

proposed Sale is a sound exercise of the Debtors' business judgment and should be approved as a

good faith transaction.

## IV.    The Assets Should Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances Under Section 363(f) of the Bankruptcy Code

62.    In the interest of attracting the best offers, the Assets will be sold free and clear of

any and all liens, claims, interests, and other encumbrances, in accordance with section 363(f) of

the Bankruptcy Code, with any such liens, claims, interests, and encumbrances attaching to the

proceeds of the applicable sale.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell

assets free and clear of liens, claims, interests, and encumbrances if any one of the following

conditions is satisfied:

(a)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)    such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002)

("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions

are met, the debtor has the authority to conduct the sale free and clear of all liens."); *Citicorp*

*Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same).

63.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a) of the

Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that

is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. §

105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of claims] is within the court's equitable powers when necessary to carry out the provisions of [the Bankruptcy Code].").

64.     The Debtors submit that the Sale of the Assets free and clear of liens, claims, interests and encumbrances will satisfy one or more of the requirements under section 363(f). To the extent a party objects to the sale on the basis that it holds a prepetition lien or encumbrance on the assets, the Debtors believe that (i) that such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property, under section 363(f)(3) of the Bankruptcy Code; (ii) any such party could be compelled to accept a monetary satisfaction of such claims, under section 363(f)(5) of the Bankruptcy Code, or (iii) that such lien is in bona fide dispute, under section 363(f)(4) of the Bankruptcy Code.

65.     In particular, several courts have held that the phrase "money satisfaction of such interest" in subsection (f)(5) means a payment constituting less than full payment of the underlying debt.  *See In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002) ("Section 363(f)(5) does not require that the sale price for the [p]roperty must exceed the value of the interests, but rather, only that the mechanism exists to address extinguishing the lien or interest without paying such interest in full.") (citing *In re Grand Slam U.S.A., Inc.*, 178 B.R. 460, 463 (E.D. Mich. 1995)); *In re Healthco Int'l, Inc.*, 174 B.R. 174, 176 (Bankr. D. Mass. 1994).  In other words, under section 363(f)(5), a property can be sold free and clear of liens if a legal or equitable proceeding exists (such as an applicable mechanism under the Bankruptcy Code) under which a lienholder can be compelled to accept less than full payment in satisfaction of its lien.

66.     Courts have also held that the word "value" as it is used in section 363(f)(3) equates with the word "value" as it is used in section 506(a) of the Bankruptcy Code, meaning the value of any lien would be limited to the amount by which the claim is actually secured. *See, e.g., In re Bos. Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 712-713 (Bankr. W.D. Tex. 1989); *In re Oneida Lake Dev., Inc.*, 114 B.R. 352, 356-357 (Bankr. N.D.N.Y. 1990); *In re WPRV–TV, Inc.*, 143 B.R. 315, 320 (D.P.R. 1991); *Milford Group, Inc. v. Concrete Step Units, Inc. (In re Milford Group, Inc.)*, 150 B.R. 904, 906 (Bankr. M.D. Pa. 1992); *In re Collins*, 180 B.R. 447, 450–51 (Bankr. E.D. Va. 1995).

67.     Moreover, the Debtors will send the Sale Notice to any known purported prepetition lienholders. If such lienholders do not object to the proposed sale, then their consent should reasonably be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim or encumbrance on any of the Assets timely objects to this Motion, such party shall be deemed to consent to any Sale approved at the Sale Hearing. *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (highlighting that by not objecting to a sale motion, a creditor is deemed to consent to the relief requested).

68.     The purpose of a sale order authorizing the transfer of assets free and clear of all claims, liens and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction, or may submit reduced Bid amounts, to the detriment of the Debtors' stakeholders. Accordingly, the Debtors request that the Court authorize the sale of the assets free and clear of any liens, claims, interests, and encumbrances (with the exception of permitted encumbrances and assumed liabilities), in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims,

interests, and encumbrances attaching to the proceeds thereof in the same order of relative priority, with the same validity, force, and effect as prior to such.

## V.   The Assumption and Assignment Procedures Should Be Approved

69.   Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or unexpired lease. *See, e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (noting that assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding that a debtor's decision to assume or reject an executory contract is governed by business judgment standard and may only be overturned if the "decision was the product of bad faith, whim or caprice") (citations omitted). The "business judgment" test in this context only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate. *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).

70.   Here, any assumption of the Potential Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such contracts is necessary to the Debtors' ability to obtain the best value for their assets. The assumption and assignment of Potential Assumed Contracts will be a critical component of the value of any Bid (just as it is in the Stalking Horse Agreement). Given that consummation of the Sale is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of Potential Assumed Contracts is an exercise of sound business judgment and, therefore, should be approved.

71.   The consummation of any Sale involving the assignment of a Potential Assumed Contract will be contingent upon the Debtors' compliance with the applicable requirements of

section 365 of the Bankruptcy Code.  In particular, the Debtors' assumption and assignment of any Potential Assumed Contract will be contingent upon payment of the Cure Costs and effective only upon the closing of an applicable sale. As set forth above, the Debtors propose to file with the Court and serve on each contract counterparty a Potential Assumption and Assignment Notice, which will set forth the Debtors' good faith calculations of Cure Costs, if any, with respect to each contract listed. Contract counterparties will have a meaningful opportunity to raise any objections to the proposed assumption of their respective Contracts prior to closing of the Sale.

72.    Further, section 365(k) of the Bankruptcy Code provides that assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment. 11 U.S.C. § 365(k). Pursuant to Section 365(k), the Debtors will therefore be relieved from any liability for any breach of any Potential Assumed Contract after an assignment to the winning bidder.  As such, the assumption of any Potential Assumed Contract constitutes an exercise of the Debtors' sound business judgment.

73.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract if "adequate assurance of future performance by the assignee of such contract or lease is provided." The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (explaining that adequate assurance of future performance does not mean an absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) (finding that, "[a]lthough no single solution will satisfy every

case, the required assurance will fall considerably short of an absolute guarantee of performance"). Among other things, adequate assurance may be provided by evidencing the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605–06 (Bankr. S.D.N.Y. 1986) (highlighting that adequate assurance of future performance is present when the prospective assignee of a lease has financial resources and has expressed willingness to devote sufficient funding to the business to give it a strong likelihood of succeeding).

74.     Here, as set forth above and in the Bidding Procedures, for a Bid to qualify as a Qualified Bid, a potential bidder must include with its Bid information regarding its ability (and the ability of its designated assignee, if applicable) to perform under any contracts proposed to be assumed. Each affected contract counterparty will have an opportunity to object to the ability of the winning Bidder to provide adequate assurance as set forth herein. To the extent necessary, the Debtors will present facts at the Sale Hearing to hear an Assumption and Assignment Objection to show the financial wherewithal, willingness and ability of the winning bidder to perform under the Potential Assumed Contracts.

75.     In addition, to facilitate the assumption and assignment of  Potential Assumed Contracts, the Debtors further request that the Court find that all anti-assignment provisions contained therein, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such Assumed Contract, to be unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.

## IMMEDIATE AND UNSTAYED RELIEF IS NECESSARY

76.     The Court may grant the relief requested in the Motion immediately if the "relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003; *see also In re First*

*NLC Fin. Servs., LLC*, 382 B.R. 547, 549 (Bankr. S.D. Fla. 2008) (holding that Rule 6003 permits entry of retention orders on an interim basis to avoid irreparable harm). In the context of preliminary injunctions, the Third Circuit has interpreted the language "immediate and irreparable harm" to refer to a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages are inadequate. *See*, *e.g.*, *Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 F. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). The harm also must be actual and imminent, not speculative or unsubstantiated. *See*, *e.g.*, *Acierno v. New Castle Cty.*, 40 F.3d 645, 653-55 (3d Cir. 1994). The Debtors submit that, for the reasons already set forth herein, the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.

77.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As described above, the relief that the Debtors seek in the Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates. Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief. Moreover, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a).

## **RESERVATION OF RIGHTS**

78.     Nothing in the Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation,

or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise or requirement to pay any claim or other obligation; or (d) granting third-party-beneficiary status, bestowing any additional rights on any third party, or being otherwise enforceable by any third party.

## NOTICE

79.     The Debtors will provide notice of the Motion to: (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the Iowa Department of Revenue; (d) the United States Attorney for the Northern District of Iowa; (e) the Centers for Medicare & Medicaid Services; (f) the parties included on the Debtors' consolidated list of their 30 largest unsecured creditors; (g) counsel for the Master Trustee and Trustee; (h) counsel for the Bondholder Representative; (i) counsel for the Stalking Horse Bidder; (j) counsel for any statutory committee appointed in the Chapter 11 Cases; (k) the Federal Trade Commission; and (l) all parties entitled to notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtors submit that no other or further notice is required.

## NO PRIOR REQUEST

80.     No previous request for the relief sought herein has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that this Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein, and granting such other and further relief as the Court may deem just and proper.

Dated: Cedar Rapids, Iowa
August 9, 2023

**NYEMASTER GOODE, P.C.**

*/s/ Roy Leaf*
Roy Leaf, AT0014486
625 1st Street SE, Suite 400
Cedar Rapids, IA 52401-2030
Telephone:     (319) 286-7002
Facsimile:     (319) 286-7050
Email:          rleaf@nyemaster.com

- and -

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (admitted *pro hac vice*)
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:          fperlman@mwe.com
                dsimon@mwe.com

- and -

Jack G. Haake (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:          jhaake@mwe.com

*Proposed Counsel for Debtors and
Debtors-in-Possession*