## EXHIBIT B

### Redline

*Execution Version*

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**MERCY HOSPITAL, IOWA CITY, IOWA**

**MERCY SERVICES IOWA CITY, INC., AND**

**MERCY IOWA CITY ACO, LLC**

**AS SELLERS**

**AND**

**STATE OF IOWA, ON BEHALF OF THE STATE UNIVERSITY OF IOWA,**

**AS BUYER**

**August 7, 2023**

## TABLE OF CONTENTS

**Page No.**

ARTICLE I - DEFINITIONS .................................................................................................. 1

    1.1    Definitions. ..................................................................................................... 1

ARTICLE II - TRANSACTIONS AT CLOSING ................................................................. 11

    2.1    Purchase and Sale. ....................................................................................... 11
    2.2    Excluded Assets. .......................................................................................... 13
    2.3    Assumed Liabilities. .................................................................................... 15
    2.4    Excluded Liabilities. .................................................................................... 15
    2.5    Assignment of Contracts. ............................................................................ 17
    2.6    Purchase Price and Other Commitments. .................................................... 18
    2.7    Adjustments to Acquired Seller Facilities and Purchased Assets. .............. 19
    2.8    Closing. ........................................................................................................ 20
    2.9    Actions of Sellers at Closing. ...................................................................... 20
    2.10    Actions of Buyer at Closing. ....................................................................... 21

ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLERS ...................... 22

    3.1    Corporate Capacity, Authority and Consents. ............................................ 22
    3.2    Binding Agreement. ..................................................................................... 23
    3.3    Subsidiaries. ................................................................................................. 23
    3.4    Assets. .......................................................................................................... 23
    3.5    Licenses and Accreditations. ....................................................................... 23
    3.6    Regulatory Compliance. .............................................................................. 24
    3.7    Compliance Program. .................................................................................. 25
    3.8    Material Contracts. ...................................................................................... 25
    3.9    Real Property. .............................................................................................. 26
    3.10    Insurance. ..................................................................................................... 27
    3.11    Intentionally Omitted. .................................................................................. 28
    3.12    Employee Relations. .................................................................................... 28
    3.13    Litigation and Proceedings. ......................................................................... 28
    3.14    Third-Party Reimbursement. ....................................................................... 28
    3.15    Tax Liabilities. ............................................................................................. 29
    3.16    Absence of Changes. ................................................................................... 30
    3.17    Intellectual Property; Data Privacy and Security. ....................................... 30
    3.18    Environmental. ............................................................................................. 32
    3.19    Financial Statements. ................................................................................... 32
    3.20    Brokers. ........................................................................................................ 33
    3.21    Affiliate Transactions. ................................................................................. 33
    3.22    Bank Accounts. ............................................................................................ 33

ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYER ...............33

    4.1    Capacity, Authority, and Consents. ...............33
    4.2    Binding Agreement. ...............33
    4.3    Litigation and Proceedings. ...............34
    4.4    Availability of Funds. ...............34
    4.5    Representations of Sellers. ...............34

ARTICLE V - COVENANTS OF THE PARTIES ...............34

    5.1    Access. ...............34
    5.2    Delivery and Updates of Schedules. ...............34
    5.3    Operating Covenants. ...............35
    5.4    Negative Covenants. ...............35
    5.5    Bankruptcy Court Approval; Executory Contracts. ...............36
    5.6    Approvals. ...............36
    5.7    Notices. ...............36
    5.8    Post-Closing Filings and Access to Information. ...............37
    5.9    Employee Matters. ...............37
    5.10   Misdirected Payments; Transitional Matters. ...............38
    5.11   Billing and Collection; Allocation of Certain Payments. ...............39
    5.12   Waiver of Bulk Sales Law Compliance. ...............42
    5.13   Closing of Financials. ...............42
    5.14   Exclusivity. ...............43
    5.15   Confidentiality; Restrictive Covenants. ...............43
    5.16   Cost Reports. ...............44
    5.17   Title Abstracts and Surveys. ...............45
    5.18   Email Addresses. ...............46

ARTICLE VI - CONDITIONS TO CLOSING ...............46

    6.1    Conditions to Obligations of Buyer and Sellers. ...............46
    6.2    Conditions to Obligations of Buyer. ...............46
    6.3    Conditions to Obligations of Sellers. ...............47

ARTICLE VII - TERMINATION ...............48

    7.1    Grounds for Termination. ...............48
    7.2    Effect of Termination. ...............49

ARTICLE VIII - BANKRUPTCY MATTERS ...............50

    8.1    Sale Procedures Motion. ...............50
    8.2    Bid Procedures. ...............50
    8.3    Bid Protections. ...............51
    8.4    Marketing Process. ...............51
    8.5    Sale Related Court Filings. ...............51

ARTICLE IX - GENERAL PROVISIONS ................................................................ 51

    9.1    Survival. ................................................................................................. 51
    9.2    Certain Tax Matters. ............................................................................. 51
    9.3    Additional Assurances. ......................................................................... 52
    9.4    Choice of Law; Jurisdiction. ................................................................ 52
    9.5    WAIVER OF JURY TRIAL. ............................................................... 53
    9.6    Benefit, Assignment and Third-Party Beneficiaries. ........................... 53
    9.7    Cost of Transaction. ............................................................................. 53
    9.8    Waiver of Breach. ................................................................................ 53
    9.9    Notice. .................................................................................................. 54
    9.10   Severability. ......................................................................................... 54
    9.11   Interpretation. ....................................................................................... 55
    9.12   Entire Agreement, Amendments and Counterparts. ............................. 55
    9.13   Personal Liability. ................................................................................ 55
    9.14   Disclosure Generally. ........................................................................... 55
    9.15   Public Announcements. ......................................................................... 55
    9.16   Specific Performance. .......................................................................... 56

EXHIBITS
Exhibit A       Seller Facilities
Exhibit B       Acquired Seller Facilities
Exhibit C       Excluded Seller Facilities
Exhibit D       Form of Bill of Sale
Exhibit E       Form of Assignment and Assumption
Exhibit F       Form of Landlord Estoppel

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into as of August 7, 2023 (the "***Effective Date***"), by and among (i) Mercy Hospital, Iowa City, Iowa, an Iowa non-profit corporation ("***Mercy Hospital***"); (ii) Mercy Services Iowa City, Inc., an Iowa corporation ("***Mercy Services***"); (iii) Mercy Iowa City ACO, LLC, an Iowa limited liability company ("***MIC ACO***" and collectively with Mercy Hospital and Mercy Services, "***Sellers***" and each, a "***Seller***"); and (iv) State of Iowa, on behalf of the State University of Iowa ("***Buyer***").  Sellers and Buyer are collectively referred to as the "***Parties***" and each individually as a "***Party***."

## RECITALS

**WHEREAS**, Sellers own and operate an acute care hospital in Iowa City, Iowa known as "Mercy Hospital" (the "***Hospital***") and certain other health care facilities and clinics identified on Exhibit A (together with the Hospital, the "***Seller Facilities***") and since the Hospital first opened its doors in 1873, it has grown over the generations and provides award-winning care that has been recognized on a national level in furtherance of its mission to transform the health of its communities and its vision to set the standard for a personalized and radically convenient system of health services;

**WHEREAS**, each Seller has filed or will file a voluntary petition (collectively, the "***Bankruptcy Case***") pursuant to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Iowa (the "***Bankruptcy Court***");

**WHEREAS**, in furtherance of Seller's historical vision and mission, each Seller desires to sell and assign to Buyer, and Buyer desires to purchase from the applicable Seller, all of the Purchased Assets on the terms and conditions set forth herein, free and clear of all Encumbrances (other than Permitted Encumbrances) in accordance with Sections 105, 363, and 365 and other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and

**WHEREAS**, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Order (as defined herein) by the Bankruptcy Court under, *inter alia*, Sections 105, 363, and 365 of the Bankruptcy Code, approving the sale of the Purchased Assets to Buyer.

**NOW, THEREFORE**, in consideration of the promises, covenants, representations, and warranties hereinafter set forth, the Parties agree as follows:

## ARTICLE I - DEFINITIONS

1.1    **Definitions.**

As used in this Agreement, the following terms have the following meanings (unless otherwise expressly provided herein):

"***Abstracts***" is defined in Section 5.17.

"***Accounts Receivable***" means all accounts, notes, interest and other receivables of each Seller, and all claims, rights, interests and proceeds related thereto, arising from the rendering of services to inpatients and outpatients at the Seller Facilities, billed and unbilled, recorded and unrecorded (including any accounts previously written off or charged off as bad debts), for services provided by the Seller Facilities whether payable by private pay patients or Third-Party Payors, or by any other source, including the right to receive an amount equal to the value of all accounts receivable arising from the rendering of services and provision of medicine, drugs, and supplies to patients at the Seller Facilities

1

relating to Medicare, Medicaid, TRICARE, and other third-party patient claims of Sellers due from beneficiaries or governmental Third-Party Payors.

"***Accrued Vacation***" means obligations and liabilities with respect to accrued but unused vacation leave (including employer FICA and any other estimated employer taxes thereon).

"***Acquired Seller Facilities***" means those Seller Facilities identified on Exhibit B.

"***Actions***" means any claim, cause of action, litigation, action, suit, arbitration, proceeding, investigation, audit, inquiry, or right in action that has been brought by any Person.

"***Affiliate***" means, with respect to a Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person.   The term "***control***" used in the preceding sentence means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of equity interests, by Contract or otherwise.

"***Agreement***" means this Asset Purchase Agreement, as from time to time amended, restated, modified, or otherwise supplemented in accordance with its terms, including the Exhibits and Schedules attached hereto.

"***Allocation Schedule***" is defined in Section 9.2(b).

"***Alternative Transaction***" means the sale, transfer, or other disposition, directly or indirectly, including through an asset sale, share sale, merger, or other similar transaction, including any plan of reorganization or plan of liquidation, or resulting from an auction, of any material portion of the Purchased Assets or all or substantially all of the equity interests of any Seller or any Subsidiary or parent company owning any Purchased Assets, in a single transaction or a series of transactions, with one or more persons other than Buyer and/or its Affiliates.

"***Article III Schedules***" is defined in ARTICLE III.

"***Assignment and Assumption***" is defined in Section 2.9(c).

"***Assumed Contracts***" is defined in Section 2.5(a).

"***Assumed Liabilities***" is defined in Section 2.3.

"***Available Contracts***" is defined in Section 2.5(a).

"***Auction***" is defined in Section 8.2.

"***Avoidance Actions***" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of Sellers arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

"***Bankruptcy Case***" is defined in the Recitals of this Agreement.

"***Bankruptcy Code***" means Title 11 of the United States Code, Sections 101, *et seq.* (11 U.S.C. § 101, *et seq.*).

"***Bankruptcy Court***" is defined in the Recitals of this Agreement.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure.

"***Bid Deadline***" is defined in <u>Section 8.2</u>.

"***Bid Procedures***" is defined in <u>Section 8.1</u>.

"***Bid Protections***" is defined in <u>Section 8.3</u>.

"***Bill of Sale***" is defined in <u>Section 2.9(b)</u>.

"***Break-Up Fee***" is defined in <u>Section 8.3</u>.

"***Budget***" is defined in Section 2.6(a)(ii).

"***Business Transaction***" is defined in <u>Section 5.14</u>.

"***Buyer***" is defined in the Preamble.

"***Buyer Plans***" is defined in <u>Section 5.9(b)</u>.

"***Capital Lease Liability***" means the aggregate amount of all obligations with respect to capital leases that are designated as Assumed Contracts as of the Closing Date pursuant to <u>Section 2.5(a)</u>.

"***Cash Purchase Price***" is defined in <u>Section 2.6(b)</u>.

"***Closing***" is defined in <u>Section 2.8</u>.

"***Closing Date***" is defined in <u>Section 2.8</u>.

"***Closing of Financials***" is defined in <u>Section 5.13</u>.

"***Closing Time***" is defined in <u>Section 2.8</u>.

"***CMS***" means the Centers for Medicare and Medicaid Services.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Contract***" means any contract, agreement, insurance policy, capitalized lease, license, sublicense, lease, sublease, sales order, purchase order, instrument, or other binding commitment, whether written or oral.

"***Corridor Radiology***" is defined in <u>Section 2.1(p)</u>.

"***Cure Amounts***" means the amount required to be paid with respect to each Assumed Contract to cure all defaults under such Assumed Contract to the extent required by Section 365 of the Bankruptcy Code and to otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Sellers and assignment to Buyer of each such Assumed Contract.  <u>Schedule 1.1(a)</u> sets forth the estimated Cure Amounts as of the Effective Date.

"***Cure Notice***" is defined in <u>Section 2.5(b)</u>.

"***Deeds***" is defined in <u>Section 2.9(n)</u>.

"~~***Deposit***~~" ~~is defined in Section 2.6(a).~~

"***Deposit Escrow Agreement***" is defined in <u>Section 2.6(a)(i)</u>.

"***Effective Date***" is defined in the Preamble.

"***Employee Benefit Plans***" means collectively, each "employee pension benefit plan" and "employee welfare benefit plan" as those terms are defined in Section 3(2) and 3(1) of ERISA (whether or not subject to ERISA), employment, change in control, stock option or other equity-based compensation, phantom equity, employee stock ownership, employee stock purchase, deferred compensation, severance pay, vacation, bonus or other incentive or other benefit or compensation agreement, arrangement, Contract, plan, program or policy, currently maintained by, sponsored in whole or in part by, or contributed to by any of Sellers or their Affiliates or with respect to which any of Sellers or their Affiliates have any liability for the benefit of any current or former employees and their respective dependents, spouses, or other beneficiaries.

"***Encumbrances***" means any and all mortgages, claims, liens, interests, pledges, security interests, leases, subleases, licenses, rights of way, easements, rights of first refusal, options, restrictions, covenants, reservations or similar matters (including successor liability to the fullest extent permitted by Law), whether or not of record, or encroachments of any nature whatsoever, or any conditional sale contracts, title retention contracts, or other agreements or arrangements to give or to refrain from giving any of the foregoing, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, contingent or non-contingent, material or non-material, known or unknown.

"***End Date***" is defined in <u>Section 7.1(e)</u>.

"***Environmental Laws***" mean all Laws concerning pollution, public or worker health and safety, and protection of the environment.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***Escrow Agent***" is defined in <u>Section 2.6(a)(i)</u>.

"***Excluded Assets***" is defined in <u>Section 2.2</u>.

"***Excluded Contracts***" is defined in <u>Section 2.5(a)</u>.

"***Excluded Liabilities***" is defined in <u>Section 2.4</u>.

"***Excluded Seller Facilities***" means those Seller Facilities identified on <u>Exhibit C</u>.

"***Expense Reimbursement***" is defined in <u>Section 8.3</u>.

"***Facility Employees***" means each individual employed by Sellers and providing services to the Seller Facilities, including employees who are on leave of absence.

"***Facility IP***" means all of the Intellectual Property used in the operation of the Seller Facilities, including such Intellectual Property owned by Sellers or other Intellectual Property which is used by Sellers in the operation of the Seller Facilities but owned by a third party.

"***Final Order***" means an order of the Bankruptcy Court that has not been reversed, modified, or stayed, and as to which the time for appeal has expired, and the deadline for filing any motion or petition for review, rehearing or certiorari has expired, and as to which no appeal, motion or petition for review, rehearing or certiorari is pending. An order or judgment shall be deemed a Final Order, notwithstanding the possibility that a motion may be filed relating to such order or judgment pursuant to Bankruptcy Code §502(j), Bankruptcy Rule 3008, Bankruptcy Rules 9023 and 9024, Federal Rule of Civil Procedure 59 and 60, or any analogous statute or rule.

"***Finance Team***" is defined in Section 5.13.

"***First Interim Certificate***" is defined in Section 2.6(a)(ii).

"***First Interim Deposit***" is defined in Section 2.6(a)(ii).

"***First Interim Period***" is defined in Section 2.6(a)(ii).

"***Fundamental Representations***" means the representations and warranties set forth in Section 3.1 (Corporate Capacity, Authority and Consents), Section 3.2 (Binding Agreement), Section 3.3 (Subsidiaries), Section 3.4 (Assets), Section 3.6 (Regulatory Compliance), Section 3.20 (Brokers), and Section 3.21 (Affiliate Transactions).

"***Governing Documents***" means, for any Person, such Person's Articles of Incorporation, Certificate of Formation, Certificate of Limited Partnership, Bylaws, Partnership Agreement, Limited Liability Company Agreement, or other similar documents relating to the formation and/or governance of the business and affairs of such Person.

"***Governmental Authority***" means any federal, state, local, foreign, or municipal government; any governmental or quasi-governmental authority; and any body exercising or entitled to exercise any administrative, executive, judicial, regulatory, legislative, or taxing authority, including any arbitrator (public or private).

"***Government Patient Receivables***" shall mean all accounts receivable with respect to Government Reimbursement Programs arising from the rendering of services and provision of medicine, drugs and supplies to patients at the Acquired Seller Facilities.

"***Government Reimbursement Programs***" shall mean any programs funded or administered by a Governmental Authority, or contractor(s) thereof, for the purpose of paying for health care services. Such programs include Medicare, Medicaid, TRICARE, and similar or successor programs with or for the benefit of designated federal or state residents.

"***Healthcare Laws***" means, collectively, any and all Laws governing the licensure or regulation of healthcare providers, professionals, facilities, or payors or otherwise governing or regulating the provision of, or payment for, healthcare services, the sale of controlled substances or other pharmaceuticals, medical devices or supplies and the like.  Without limiting the generality of the foregoing, Healthcare Laws include Section 1128B(b) of the Social Security Act, as amended; 42 U.S.C. § 1320a-7b(b), commonly referred to as the "Federal Anti-Kickback Statute"; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; Section 1877 of the Social Security Act, as amended; the Medicare statute, 42 U.S.C. §§ 1395-1395lll, including without limitation 42 U.S.C. § 1395nn and related regulations, commonly referred to as the "Stark Law"; the federal False Claims Act, 31 U.S.C. § 3729 et seq.; the Medicaid statute, 42 U.S.C. §§ 1396-1396v; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the mandatory and permissive exclusion authorities, 42 U.S.C. § 1320a-7; the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a; the administrative False Claims Law, 42 U.S.C. § 1320a-7b(a); the Conditions for Medicare Payment, 42 C.F.R. Part 424; the Health Insurance Portability and

Accountability Act of 1996, 42 U.S.C. § 1320d et seq., as amended by the Health Information Technology for Economic and Clinical Health Act, enacted as Title XIII of the American Recovery and Reinvestment Act of 2009, Public Law 111-5; the Patient Protection and Affordable Care Act; the Health Care Fraud Enforcement Act of 2009; the Federal Controlled Substances Act, 21 U.S.C. §§ 801 et seq.; the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 301 et seq.; any state or local statutes or regulations concerning the dispensing and sale of controlled substances; all Laws relating to the provision of, or billing or payment for health care items or services, or relating to health care information and all applicable amendments, implementing regulations, rules, ordinances, judgments, and orders; any similar state and local statutes, regulations, rules, ordinances, judgments, and orders; and all applicable federal, state, and local licensing, certificate of need, regulatory and reimbursement statutes, corporate practice of medicine and physician fee splitting regulations, rules, ordinances, orders, and judgments applicable to healthcare service providers.

"***HHS***" means the U.S. Department of Health and Human Services.

"***Hospital***" is defined in the Recitals of this Agreement.

"***Interim Deposit***" and "***Interim Deposits***" are defined in Section 2.6(a)(ii).

"***Initial Deposit***" is defined in Section 2.6(a)(i).

"***Initial Overbid***" is defined in Section 8.3.

"***Intellectual Property***" means all intellectual property or proprietary rights arising under the Laws of any jurisdiction throughout the world, including (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissues, divisions, continuations, continuations-in-part, renewals, extensions, and foreign counterparts and equivalents thereof, (ii) all trademarks, service marks, logos, trade names, corporate names, and other source identifiers whether registered or unregistered (as the case may be), as well as all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith, (iii) registrations for internet domain names, (iv) all rights protected by copyright law, including rights in registered and unregistered works of authorship, all rights to copy, distribute, modify, publicly perform, and publicly display such works, and all applications, registrations, and renewals in connection therewith, (v) all rights in trade secrets and confidential information, (vi) all rights in software, data, and collections of data, and (vii) all rights in websites, social media accounts, social media hashtags and identifiers, and all content used in or relating to the same.

"***Interim Period***" is defined in Section 5.1.

"***Inventory***" means all inventories of supplies, drugs, food, janitorial and office supplies, and other disposables and consumables located at the Seller Facilities or used in connection with the operation of the Seller Facilities.

"***IRS***" means the Internal Revenue Service.

"***Knowledge***" of Sellers (and any similar expression, including the expression "Sellers' Knowledge") means, as to a particular matter, the actual knowledge after due inquiry of: (i) Thomas Clancy, Chief Executive Officer; (ii) Mark Toney, Chief Restructuring Officer; (iii) Jim Porter, Chief Financial Officer; (iv) Chris Karambelas, Senior Vice President, Operations; (v) Chad Kruse, Director of Compliance and Policy; (vi) Kim Volk, VP of Patient Care Services and Chief Nursing Officer; (vii)

Justine Bierman, Executive Director, Information Technology; (viii) Anthony Corley, CPA, Controller; and (ix) Peg Brubaker, Chief Human Resources Officer.

"***Landlord Estoppels***" is defined in <u>Section 2.9(s)</u>.

"***Latest Balance Sheet***" is defined in <u>Section 3.19(a)</u>.

"***Law***" means any federal, state, local or other statute, law (including common law), constitution, ordinance, regulation, rule, or Order of any Governmental Authority.

"***Leased Real Property***" is defined in <u>Section 2.1(c)</u>.

"***Leases***" is defined in <u>Section 2.1(f)</u>.

"***Lookback Date***" means January 1, 2017.

"***MAAP Liability***" means any amount owed by any Seller to CMS or its designee in respect of Medicare Accelerated and Advance Payments, including any repayment obligations pursuant to any loan, repayment plan, or deferred payment plan related thereto.

"***Material Adverse Effect***" means a change, development, event, or occurrence that has or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on the financial condition, properties, assets, liabilities, business, or results of operations of the Acquired Seller Facilities, taken as a whole, or would adversely affect the ability of Sellers to execute or deliver this Agreement, to perform any of their obligations under this Agreement, or to consummate any of the transactions contemplated by this Agreement.  Notwithstanding the foregoing, a Material Adverse Effect shall not include any change, development, event or occurrence resulting from:  (i) any actual or proposed change in Law or accounting standards or the interpretation or implementation thereof; (ii) any change that is generally applicable to the healthcare industry or the acute care hospital industry in the State of Iowa; (iii) the entry into this Agreement or the announcement or pendency of the transactions contemplated hereby; (iv) any action taken by Sellers or their Affiliates that is required to be taken by this Agreement; (v) any omission to act or action taken with the express prior written consent of Buyer; (vi) any change in general business, economic, geopolitical or financial market conditions; (vii) any national or international political event or occurrence, including acts of war or terrorism; (viii) any natural disaster or calamity; or (ix) any matters arising in connection with the filing or prosecution of the Bankruptcy Case; except, with respect to the foregoing clauses (i), (ii), (vi), (vii), and (viii), if such change, development, event or occurrence has or would reasonably be expected to have a disproportionate effect on the operation of the Acquired Seller Facilities relative to other businesses operating in the industry in which the Acquired Seller Facilities operate.

"***Material Contract***" is defined in <u>Section 3.8(a)</u>.

"***Medicare Provider Number***" is defined in <u>Section 5.11(a)</u>.

"***Mercy Foundation***" is defined in <u>Section 2.2(k)</u>.

"***Mercy Hospital***" is defined in the Preamble.

"***MIC ACO***" is defined in the Preamble.

"***Mercy Services***" is defined in the Preamble.

"*Minimum Overbid Increment*" is defined in Section 8.3.

"*MS-DRG*" is defined in Section 5.11(e).

"*MS-DRG Patients*" is defined in Section 5.11(e).

"*MS-DRG Straddle Patients*" is defined in Section 5.11(e)(i).

"*National Provider Identifier*" means the unique 10-digit identifier assigned to a healthcare provider by the National Plan and Provider Enumeration System.

"*OIG*" means the Office of the Inspector General of HHS.

"*Operations*" is defined in Section 2.6(a)(ii).

"*Operating Expenses*" means the sum of all cash payments made by Sellers during the applicable period related to the health care operations of the Acquired Seller Facilities in the Ordinary Course of Business (excluding, for the avoidance of doubt, (i) all professional fees, (ii) all other costs and expenses related to the Bankruptcy Case, (iii) medical malpractice settlements, (iv) other operating charges, interest and other charges on debt, and (v) payments otherwise agreed to in writing by Buyer.

"*Operating Loss Certificates*" is defined in Section 2.6(a)(iii).

"*Operating Losses*" means the amount by which Operating Expenses exceed Operating Revenues during the applicable period.

"*Operating Revenues*" means the sum of all cash receipts of Sellers during the applicable period from Third-Party Payors, patients, and other Persons and internally generated operating receipts (excluding, for the avoidance of doubt, any funds received from Mercy Foundation or any joint ventures other than Corridor Radiology).

"*Order*" means any award, writ, injunction, judgment, order, ruling, decision, directive, settlement, or similar determination entered, issued, made, or rendered by any Governmental Authority.

"*Ordinary Course of Business*" shall mean the operation of the Acquired Seller Facilities in the ordinary course consistent with past practice as well as (and subject to) the Bankruptcy Case and all Orders entered in connection therewith.

"*Owned Real Property*" is defined in Section 2.1(a).

"*Party*" is defined in the Preamble.

"*Payor Agreements*" is defined in Section 3.14(b).

"*Permits*" means all licenses, permits, franchises, certificates, rights, registrations, approvals, authorizations, consents, provider numbers, waivers, exemptions, releases, variances, certificates of authority, accreditations, or Orders issued by any Governmental Authority.

"*Permitted Encumbrances*" means any (i) Encumbrances that relate to Taxes, assessments and governmental charges or levies not yet due or payable; (ii) mechanic's, materialman's and similar statutory liens for sums incurred in the Ordinary Course of Business not yet due and payable; (iii) leasehold interests of the owners of Leased Real Property, (iv) zoning regulations and other Laws affecting the Real Property which are imposed by any Governmental Authority having jurisdiction over

such Real Property (but excluding violations thereof); (v) existing easements, covenants, conditions, rights-of-way, restrictions and other encumbrances (other than monetary liens) set forth in the Title Commitment(s) which, taken individually or as a whole, do not materially impair the present ownership, use or operations of the Owned Real Property for their current use, in Buyer's reasonable discretion; (vi) with respect to the Leased Real Property, (A) the terms, conditions, and provisions of Real Property Leases, (B) any lien, Encumbrance, or other matter affecting title to the fee estate underlying such Leased Real Property that does not materially affect the permitted use of the Leased Real Property, (C) Encumbrances in favor of lessors under Real Property Leases, or encumbering the interests of such lessors (or other holders of superior interests), and (D) any right, title or interest of a lessor, sublessor or licensor under any of the Real Property Leases; and (vii) those Encumbrances listed on Schedule 1.1(b), in each case other than any liens existing as of the Closing with respect to Taxes, assessments, charges or levies imposed by a Governmental Authority.  For the avoidance of doubt, the Encumbrances disclosed on Schedule 3.4(a) shall not be deemed Permitted Encumbrances.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, trust, association, or organization, including any Governmental Authority.

"**Personal Property**" is defined in Section 2.1(e).

"**Personal Property Leases**" is defined in Section 2.1(f).

"**Petition Date**" is defined in Section 8.2.

"**PIP Payments**" is defined in Section 5.11(e)(iii).

"**Post-Closing Receivables**" is defined in Section 5.11(d).

"**Pre-Closing Receivables**" is defined in Section 5.11(c).

"**Prepaid Assets**" means all advance payments, prepayments, prepaid expenses and deposits which were made with respect to the operation of the Seller Facilities or the Purchased Assets, including deposits for leases and utilities, but excluding any deposits or other prepayments for leases that are Excluded Contracts.

"**Proceeding**" means any contest, application, assessment, suit, demand, claim, grievance, complaint, inquiry, notice of violation, hearing, request for information, audit, or investigation, at law or in equity, whether civil, criminal, administrative, by or before any Governmental Authority, arbitrator or mediator, or notice of any of the foregoing.

"**Purchase Price**" is defined in Section 2.6(b).

"**Purchased Assets**" is defined in Section 2.1.

"**Real Property**" is defined in Section 2.1(c).

"**Real Property (Landlord) Leases**" is defined in Section 2.1(d).

"**Real Property Leases**" is defined in Section 2.1(d).

"**Real Property (Tenant) Leases**" is defined in Section 2.1(c).

"***Record Retention Period***" means, with respect to each Acquired Seller Facility, the number of years which the applicable Seller is required to maintain medical records under applicable Law.

"***Representatives***" means, with respect to any Person, the officers, directors, principals, employees, agents, auditors, advisors, legal counsel, bankers and other representatives of such Person.

"***Restrictive Covenants***" is defined in Section 5.15(b).

"***Retained Facility Employees***" is defined in Section 5.9(a).

"***Sale Hearing***" means any hearing set by the Bankruptcy Court to approve a sale pursuant to this Agreement.

"***Sale Motion***" means the motion, supporting papers, notices and form of orders, all in form and substance reasonably acceptable to Buyer in its reasonable discretion, seeking approval and entry of the Sale Procedures Order and the Sale Order.

"***Sale Order***" means a Final Order of the Bankruptcy Court, in form and substance acceptable to Sellers and Buyer, *inter alia*, (i) approving the sale of the applicable Purchased Assets to Buyer free and clear of any and all Encumbrances (other than Permitted Encumbrances), (ii) approving the assumption and assignment of the Assumed Contracts to Buyer, and (iii) finding that Buyer is a "good faith purchaser" for purposes of Section 363(m) of the Bankruptcy Code.

"***Sale Procedures Hearing***" means any hearing set by the Bankruptcy Court to approve entry of the Sale Procedures Order.

"***Sale Procedures Order***" is defined in Section 8.1.

"***Seller***" is defined in the Preamble.

"***Seller 401(k) Plans***" is defined in Section 5.9(b).

"***Seller Billing Numbers***" is defined in Section 5.11(b).

"***Seller Church Plan***" means the Mercy Hospital, Iowa City, Iowa Employees' Pension Plan, as amended and restated effective January 1, 2016.

"***Seller Cost Reports***" is defined in Section 5.16(a).

"***Seller Facilities***" is defined in the Recitals.

"***Sellers' Transition Receivables***" is defined in Section 5.11(e)(vii).

"***Straddle Patients***" is defined in Section 5.11(e).

"***Subsequent Interim Certificate***" shall have the meaning set forth in Section 2.6(a)(iii).

"***Subsequent Interim Deposit***" shall have the meaning set forth in Section 2.6(a)(iii).

"***Subsequent Interim Period***" shall have the meaning set forth in Section 2.6(a)(iii).

"***Subsidiary***" means, with respect to any Person, any corporation, partnership, limited liability company, joint venture or other legal entity of any kind of which such Person (either alone or through or

together with one or more of its other Subsidiaries), owns, directly or indirectly, 50% or more of the capital stock or other equity interests the holders of which are (a) generally entitled to vote for the election of the board of directors or other governing body of such legal entity or (b) generally entitled to share in the profits or capital of such legal entity.

"***Tax***" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), intangible, escheat, unclaimed or abandoned property, national insurance, unemployment, disability, real property, personal property, sales, use, transfer, registration, value-added, alternative or add on minimum, estimated or other tax levy, duty, impost or similar charge imposed or collected by any Governmental Authority, including any interest, penalty or addition thereto, whether disputed or not.

"***Tax Returns***" means any return, report, statement, form or other document (including elections, declarations, amendments, schedules, information returns or attachments thereto) filed or required to be filed with any Governmental Authority with respect to Taxes.

"***Third-Party Payor***" means any Person (including the Government Reimbursement Programs, any entity authorized to provide health insurance (or property, casualty, or life insurance covering health benefits) in the State of Iowa, any health maintenance organization, or any employer authorized in accordance with applicable Law to self-insure its workers' compensation risk) that pays for or reimburses at least a portion of the healthcare expenses of its beneficiaries.

"***Title Commitments***" is defined in <u>Section 5.17</u>.

"***Title Company***" means First American Title Insurance Company, unless otherwise agreed by the Parties.

"***Title Policy***" is defined in <u>Section 2.9(q)</u>.

"***Transaction Agreements***" means each of this Agreement, the Assignment and Assumptions, the Bills of Sale, and the Escrow Agreement.

"***Transactions***" means, collectively, the transactions contemplated by the Transaction Agreements.

"***Transfer Consent***" is defined in <u>Section 2.5(e)</u>.

"***Transfer Taxes***" is defined in <u>Section 9.2(a)</u>.

"***Transferred Employees***" is defined in <u>Section 5.9(a)</u>.

"***Transition Period***" is defined in <u>Section 5.11(b)</u>.

"***Transition Services***" is defined in <u>Section 5.11(e)</u>.

"***Vacation Liability***" is defined in <u>Section 5.9(a)</u>.

"***WARN Act***" is defined in <u>Section 3.12</u>.

"***Weekly Budget Report***" is defined in Section 5.3(f).

## ARTICLE II - TRANSACTIONS AT CLOSING

**2.1    Purchase and Sale.**

Subject to the terms and conditions of this Agreement, at the Closing and effective as of the Closing Time, each Seller shall sell, assign, transfer, and deliver to Buyer, and Buyer shall acquire, all of each Seller's right, title, and interest to the following assets (all such assets other than the Excluded Assets, the "***Purchased Assets***"), free and clear of any and all Encumbrances other than the Permitted Encumbrances:

(a)    all of the real property owned in fee, together with all plant, buildings, structures, installments, improvements, fixtures, betterments, and additions situated thereon, identified on Schedule 2.1(a) (collectively, the "***Owned Real Property***"), including all of Sellers' rights, privileges, and easements appurtenant to and for the benefit of the Owned Real Property, and all of Sellers' development rights relating to the Owned Real Property, easements, rights of way, or appurtenances of Sellers relating to or used in connection with the ownership, operation, use, occupancy, or enjoyment of the Owned Real Property;

(b)    all construction in progress related to the Acquired Seller Facilities and recorded on the books and records of Seller;

(c)    all of the leasehold interests of each Seller in all real property that is leased to each Seller as lessee or tenant identified on Schedule 2.1(c) (collectively, the "***Leased Real Property***" and together with the Owned Real Property, the "***Real Property***") pursuant to any lease, sublease, occupancy agreement, or other contractual obligation (collectively, the "***Real Property (Tenant) Leases***");

(d)    all of the interests of each Seller as lessor in and to each lease, sublease, or other contractual obligation under which the Real Property is occupied or used by a third party, including, without limitation, the lessor's interest in any and all agreements and guaranties relating to such leases, subleases, occupancy agreements, or other contractual obligations as identified on Schedule 2.1(d) (collectively, the "***Real Property (Landlord) Leases***" and together with the Real Property (Tenant) Leases, the "***Real Property Leases***");

(e)    all of the tangible personal property owned or, to the extent assignable or transferrable by the applicable Seller, leased, subleased, or licensed, by each Seller and used in connection with the operation of the Seller Facilities, including, without limitation, equipment, furniture, furnishings, fixtures, machinery, tools, supplies, telephones, office equipment, and leasehold improvements (the "***Personal Property***");

(f)    all of the interests of each Seller as lessee in and to each lease, sublease, license, or other contractual obligation under which the Personal Property is used by each Seller with respect to the operation of the Seller Facilities, to the extent such lease, sublease, license, or other contractual obligation is an Assumed Contract (collectively, the "***Personal Property Leases***" and together with the Real Property Leases, the "***Leases***");

(g)    all Inventory used in connection with the operation of the Seller Facilities (other than the portions of Inventory disposed of, or expended, as the case may be, by Sellers after the Effective Date and prior to the Closing in the Ordinary Course of Business);

(h)    all Prepaid Assets;

(i)    all intangible personal property owned by Sellers and primarily used in connection with the operation of the Seller Facilities, including all right, title, and interest in and to all Facility IP,

together with (i) all registrations and applications to register, and all rights to register, any of the foregoing, together with all renewals, extensions, and foreign counterparts of, and other registrations or applications claiming priority to, any of the foregoing, (ii) all royalties, income, and payments now owing or in the future due to the owner of any of the foregoing with respect to any of the foregoing, (iii) all damages and rights to sue and enforce any of the foregoing, including any damages and rights to sue for any past, present, or future infringement, dilution, misappropriation, or violation of any of the foregoing, (iv) all other proprietary rights and interests in any of the foregoing, (v) all data relating to any of the foregoing in any form or medium, and (vi) all copies and tangible embodiments of any of the foregoing, in any form or medium;

(j)      computer software, programs and hardware or data processing equipment, data processing system manuals and licensed software materials that are used in connection with the operation of one or more of the Seller Facilities;

(k)      all financial and operational records used in connection with the operation of the Seller Facilities (including all equipment records, construction plans and specifications, medical and administrative libraries, documents, catalogs, books, records, files, and operating manuals);

(l)      all medical staff and personnel records relating to medical staff members and Facility Employees providing services at or with respect to the Seller Facilities or who accept employment with Buyer in accordance with Section 5.9 of this Agreement (including, without limitation, peer review materials);

(m)      all patient and medical records used in connection with the operation of the Seller Facilities;

(n)      all insurance proceeds relating to the physical condition of the Purchased Assets, to the extent not expended on the repair or restoration of the Purchased Assets prior to the Closing;

(o)      the Assumed Contracts;

(p)      to the extent transferable, subject to Section 2.7(b), Mercy Hospital's membership interest in Corridor Radiology, LLC, an Iowa limited liability company ("***Corridor Radiology***"), and all of Mercy Hospital's rights attendant thereto under the Operating Agreement of Corridor Radiology, LLC, dated October 1, 2012, as amended;

(q)      to the extent transferable, all Permits held by Sellers relating to the ownership, development, or operation of the Acquired Seller Facilities, including the Medicare and Medicaid provider agreements for the Acquired Seller Facilities;

(r)      all claims or causes of action relating to or arising from any of the Purchased Assets, including, without limitation, any Avoidance Actions relating to or arising from any of the Purchased Assets;

(s)      all telephone and facsimile numbers, post office boxes and directory listings used in connection with the Acquired Seller Facilities;

(t)      to the extent transferable, Sellers' National Provider Identifiers relating to the Acquired Seller Facilities;

(u)      all other rights, properties and assets of Sellers which are primarily used in connection with the operation of the Acquired Seller Facilities; and

(v)     the assets, properties, and rights identified on <u>Schedule 2.1(v)</u>.

**2.2     Excluded Assets.**

The Purchased Assets shall specifically exclude the following assets, rights, business, claims, or properties of Sellers (collectively, the "***Excluded Assets***"):

(a)     all current and non-current cash and cash equivalents, securities, investments, endorsements, bond funds and other funds created by bond indentures, financial assurances, and certificates of deposits (including, for the avoidance of doubt, any such assets held by Mercy Foundation);

(b)     all Accounts Receivable for services rendered prior to the Closing Date, including Pre-Closing Receivables and Sellers' Transition Receivables;

(c)     all intercompany receivables between Sellers and any of their respective Affiliates;

(d)     all claims or receivables on account of employee advances;

(e)     all of Sellers' assets owned, used or held for use by Sellers solely in connection with the operation of any Excluded Seller Facility or any healthcare facility or clinic other than the Acquired Seller Facilities;

(f)     all of the real property, together with all plant, buildings, structures, installments, improvements, fixtures, betterments and additions situated thereon, associated with the Excluded Seller Facilities;

(g)     assets and liabilities under medical malpractice risk pools, any self-insured trust, and workers compensation and employee retirement programs;

(h)     except as specified in <u>Section 5.10(d)</u>, all of Sellers' or any of their Affiliates' proprietary manuals, marketing materials, policy and procedure manuals, standard operating procedures and marketing brochures, data and studies or analyses not used at the Acquired Seller Facilities;

(i)     all Excluded Contracts;

(j)     the Intellectual Property set forth on <u>Schedule 2.2(j)</u>;

(k)     except as set forth in <u>Section 2.1(p)</u>, any membership interest, capital stock, interest as a non-profit corporate member, partnership interest, limited liability company interest, or other equity or ownership interest held by any Seller in any other Person, including, for the avoidance of doubt, (i) Mercy Hospital's interest as the sole corporate member of Mercy Hospital Foundation, an Iowa non-profit corporation ("***Mercy Foundation***"); (ii) Mercy Hospital's interest as the sole member of MIC ACO; (iii) Mercy Hospital's capital stock in Mercy Services; (iv) Mercy Hospital's membership interest in Iowa City Ambulatory Surgical Center, L.L.C., an Iowa limited liability company; (v) Mercy Hospital's membership interest in Eastern Iowa Rehabilitation Hospital, LLC, an Iowa limited liability company; (vi) Mercy Services' membership interest in Progressive Rehabilitation Associates, L.L.C., an Iowa limited liability company; and (vii) Mercy Services' membership interest in Melrose Retirement Community, L.L.C., an Iowa limited liability company.

(l)     the sponsorship of and all assets maintained pursuant to or in connection with any Employee Benefit Plan or any other benefit or compensation plan, program, policy, Contract, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by any

of Sellers or any of their Affiliates or with respect to which any of Sellers or any of their Affiliates has any current or contingent liability or obligation, including, for the avoidance of doubt, the Seller Church Plan;

(m)     all minute books and organizational records relating to Sellers and their Affiliates and all other books and records (including personnel records) that a Seller is required by Law to retain in its possession; provided, that copies of such books and records shall be made available to Buyer upon reasonable request to the extent permitted by applicable Law;

(n)     all insurance policies and rights thereunder (including any prepaid expenses with respect to insurance policies);

(o)     those pharmaceuticals that cannot, by Law, be sold by Sellers to Buyer;

(p)     all claims, rights, interests, and proceeds with respect to state or local Tax payments, refunds, and credits (including but not limited to property Tax refunds and charity Tax credits) related to the operations of the Seller Facilities or the Purchased Assets with respect to periods ending prior to the Closing Time, and the right to pursue appeals of same;

(q)     except set forth in Section 2.1(r), all claims, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment of Sellers and their Affiliates with respect to periods prior to the Closing Time, and any payments, awards or other proceeds resulting therefrom;

(r)     all avoidance, recovery, subordination, or other claims, actions or remedies that may be brought by or on behalf of Sellers, their bankruptcy estates, or other authorized parties-in-interest under the Bankruptcy Code or applicable non-bankruptcy Law, including claims, actions, or remedies under §§ 502, 510, 542, 544, 545, and 547 through and including 553 and 724(a) of the Bankruptcy Code or under similar local, state, federal or foreign statutes and common law, including fraudulent-transfer Laws;

(s)     all religious artifacts;

(t)     the rights of Sellers and their Affiliates under this Agreement;

(u)     any receipts or receivables (i) relating to supplemental, disproportionate share or waiver payments, or Medicaid GME funding with respect to time periods prior to the Closing Time; (ii) relating to the Seller Cost Reports or Agency Settlements (whether resulting from an appeal by Sellers or otherwise) and other risk settlements with respect to time periods prior to the Closing Time, (iii) which result from Sellers' pursuit of one or more appeals pertaining to Medicare, Medicaid (including, without limitation, disproportionate share hospital program payments) or TRICARE with respect to periods prior to the Closing Time, (iv) relating to participation in any group purchasing organization (including any Tax refunds, rebates or fee sharebacks for purchases made prior to Closing) with respect to periods prior to the Closing Time,  (v) with respect to "meaningful use" attestations, (vi) relating to Federal disaster awards with respect to time periods prior to the Closing Time; (vi) with respect to Medicaid funding adjustments with respect to time periods prior to the Closing Time; or (vii) relating to employee retention credits with respect to time periods prior to the Closing Time; and

(v)     the assets, properties, and rights set forth on Schedule 2.2(v).

**2.3     Assumed Liabilities.**

Subject to the terms and conditions of this Agreement, at the Closing and effective as of the Closing Time, Sellers shall assign to Buyer and Buyer shall assume, perform and discharge only the

following liabilities, obligations, and duties of Sellers relating to the operation of the Acquired Seller Facilities (all such liabilities, collectively, the "***Assumed Liabilities***"):

(a)     all liabilities, obligations, and duties of Sellers under the Assumed Contracts solely to the extent arising from and after the Closing Date (but excluding, without limitation, any liability or obligation relating to or arising out of such Assumed Contracts as a result of any breach by a Seller under such Assumed Contracts occurring prior to the Closing);

(b)     all Cure Amounts;

(c)     all liabilities, obligations, and duties with respect to the Real Property Leases solely to the extent arising from and after the Closing Date (but excluding any liability or obligation relating to or arising out of the Real Property Leases as a result of any breach by a Seller under such Real Property Leases occurring prior to the Closing);

(d)     the Vacation Liability;

(e)     the Capital Lease Liability; and

(f)     other specifically assumed liabilities set forth in Schedule 2.3(f).

## 2.4    Excluded Liabilities.

Buyer does not assume, and under no circumstances shall Buyer be obligated to pay, discharge, perform or assume any debt, obligation, expense or liability of Sellers or any Affiliates thereof other than the Assumed Liabilities (such debts, obligations, expenses, or liabilities other than Assumed Liabilities, collectively, the "***Excluded Liabilities***").  Without limiting the foregoing, Buyer does not assume or agree to pay, discharge, perform or assume the debts, obligations, expenses, or liabilities of Sellers with respect to, arising out of or relating to the following Excluded Liabilities:

(a)     any liabilities owed by a Seller to an Affiliate of Seller;

(b)     any liabilities arising from any of the Excluded Assets;

(c)     all trade and accounts payable;

(d)     (i) all Tax liabilities of Sellers whenever incurred, and (ii) all Tax liabilities relating to the Purchased Assets for any taxable period (or portion thereof) ending on or prior to the Closing Date;

(e)     all indebtedness for borrowed money of Sellers (for avoidance of doubt, other than the Capital Lease Liability);

(f)     all guarantees of third-party indebtedness made by Sellers and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit;

(g)     all liabilities for overpayments owed to any Third-Party Payor, including, without limitation, those arising out of fraudulent or negligent billing practices and those resulting from or relating to any violation of Law or Contract with a Third-Party Payor, in each case to the extent arising from or relating to services provided before the Closing;

(h)     all liabilities arising out of or relating to any actual or alleged noncompliance by any Seller or any Affiliate of a Seller with any Law;

(i)        (i) all Proceedings pending on or before the Closing Date against Sellers or to the extent against or giving rise to liabilities or obligations of the Seller Facilities (even if instituted after the Closing Date) and (ii) all liabilities arising out of any Action commenced against any Seller or any predecessor or Affiliate of Sellers after the Closing, in each case, to the extent arising out of or relating to acts or omissions of Sellers prior to Closing;

(j)        all liabilities related to any malpractice claims or claims for negligence, recklessness, or willful, wanton, or intentional acts or omissions arising out of or relating to any services provided prior to Closing by any Seller, any Facility Employee, or any healthcare professional providing services at, for, or on behalf of any Seller Facility;

(k)        all liabilities or obligations to any current or former corporate member or owner of capital stock or other equity interests of Sellers or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of Sellers, any current or former holder of indebtedness for borrowed money of Sellers or, in respect of obligations for indemnification or advancement of expenses, any current or former officer or director of Sellers;

(l)        the sponsorship of and any current or contingent liabilities or obligations at any time arising under, pursuant to, or in connection with any Employee Benefit Plan or any other benefit or compensation plan, program, policy, Contract, agreement, or arrangement at any time maintained, sponsored or contributed to or required to be contributed to by any of Sellers or any of their Affiliates, or with respect to which any of Sellers or any of their Affiliates has any current or contingent liability or obligation (including, for the avoidance of doubt, the sponsorship of and any current or contingent liabilities or obligations at any time arising under the Seller Church Plan);

(m)        all liabilities pursuant to the WARN Act relating to any action or inaction of Sellers prior to or upon the Closing;

(n)        subject to Section 2.7(c), all MAAP Liability of Sellers;

(o)        except with respect to the Vacation Liability assumed by Buyer pursuant to Section 5.9(a), all liabilities and obligations arising from events occurring or conditions existing or occurring prior to the Closing Date relating to Facility Employees including, without limitation, accrued salaries, wages, vacation leave, sick leave, payroll Taxes, retirement plan payables, and any obligations relating to any Employee Benefit Plan, liability for any Equal Employment Opportunity Commission claim, wage and hour claim, unemployment compensation claim or workers' compensation claim or personnel policy, or claim for on-the-job injuries;

(p)        all liabilities with respect to employment, termination of employment, compensation, severance, and employee benefits of any nature owed to any Facility Employee or any other current or former officer, manager, director, member, employee, or independent contractor (or any of their respective dependents or beneficiaries) of a Seller or any of its Affiliates relating to or arising out of such individual's employment or service (or the termination of employment or service) with a Seller or any of its Affiliates or any of its predecessors, whether or not such individual becomes a Transferred Employee, including, without limitation, any obligation to pay or provide any Facility Employee or other current or former officer, manager, director, member, employee, or independent contractor (or any of his or her respective dependents or beneficiaries) of a Seller or any of its Affiliates, any severance or change in control payments, transaction bonuses, retiree benefits, salary, wages, or commissions;

(q)        all costs, fees, and expenses incurred by Sellers in connection with the administration of the Bankruptcy Case or the negotiation, execution, and consummation of the transactions contemplated by this Agreement, including all liabilities for any legal, accounting, investment banking, reorganization,

restructuring (including bankruptcy administrative expenses), brokerage, or similar fees or expenses incurred by Sellers in connection with, resulting from or attributable to the transactions contemplated by this Agreement or the Bankruptcy Case;

(r)      all liabilities of Sellers or any predecessor or Affiliate of Sellers based upon such Person's acts or omissions occurring after the Closing;

(s)      all liabilities of Sellers to Buyer, its Affiliates, and their respective agents, advisors, and representatives under the Transaction Agreements or otherwise;

(t)      all liabilities arising out of the ownership or operation of the Purchased Assets, Seller Facilities, or the Business relating to Environmental Laws, to the extent arising from facts, conditions, or circumstances first caused or first created prior to the Closing; and

(u)      all liabilities or obligations to the extent relating to the ownership, possession, or use of the Excluded Assets, including executory Contracts and Real Property Leases that are not Assumed Contracts, or the ownership, possession, or use of the Purchased Assets to the extent arising prior to the Closing.

**2.5      Assignment of Contracts.**

(a)      Schedule 2.5(a) sets forth a list of all executory Contracts and Real Property Leases relating to the Acquired Seller Facilities or the Purchased Assets to which one or more of Sellers are party (the "*Available Contracts*"), which Schedule 2.5(a) may be updated from time to time prior to the Sale Hearing to add or remove any Contracts inadvertently included or excluded from such schedule. Prior to the Sale Procedures Hearing, Buyer, in its sole discretion by written notice to Sellers, shall designate in writing which Available Contracts Buyer preliminarily wishes Sellers to assume and assign to Buyer (the "*Assumed Contracts*"), subject to the right of Buyer, at any time prior to the Sale Hearing, to determine that any Available Contract shall be an Assumed Contract or an Excluded Contract. All Available Contracts of Sellers that are listed on Schedule 2.5(a) and which Buyer does not designate in writing for assumption shall not be considered Assumed Contracts or Purchased Assets and shall automatically be deemed "*Excluded Contracts*."

(b)      Within three (3) business days of entry of the Sale Procedures Order, Seller shall file with the Bankruptcy Court and serve upon all counterparties to the Assumed Contracts a notice (the "*Cure Notice*"), in form and substance satisfactory to Buyer, setting forth the Cure Amounts for all such Assumed Contracts and providing such counterparties with an opportunity to object to such Cure Amounts or to Buyer's Assumption and Assignment of such Assumed Contracts.

(c)      In the event of a dispute regarding assumption and assignment of, or the proposed Cure Amount to be paid in respect of, any Contract proposed to be an Assumed Contract as set forth in Schedule 2.5(a), Buyer shall have the right to designate any Assumed Contract as an Excluded Contract at any time prior to the Closing Date in the event any such dispute is not resolved to Buyer's satisfaction by entry of a Final Order of the Bankruptcy Court (or upon the consensual resolution of such dispute as may be agreed by Buyer and such counterparty). Upon an election by Buyer to designate such previously Assumed Contract as an Excluded Contract in accordance herewith, Buyer shall have no liability or other obligation whatsoever to Sellers or the counterparty to such contract, until such contract has been assumed and assigned by order of the Bankruptcy Court.

(d)      To the maximum extent permitted by the Bankruptcy Code, Sellers shall use commercially reasonable efforts to assume and transfer and assign all Purchased Assets to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code as of the Closing Date, including taking all actions required by the Bankruptcy Court to obtain a Final Order containing a finding that the proposed

assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(e)     Sellers shall transfer and assign all Assumed Contracts to Buyer, and Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to the Sale Order.  Except as to Assumed Contracts assigned pursuant to Section 365 of the Bankruptcy Code, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party or Governmental Authority (each, a "***Transfer Consent***"), would constitute a breach or in any way adversely affect the rights of Buyer or Sellers thereunder and Buyer shall assume no obligations or liabilities under any such Purchased Asset except as set forth in the last sentence of this Section 2.5(e).  Sellers shall advise Buyer in writing at least five (5) business days prior to the Closing with respect to any Purchased Asset which Sellers know or have substantial reason to believe will or may not be subject to assignment to Buyer hereunder at the Closing.  Without in any way limiting Sellers' obligation to obtain all consents and waivers necessary for the sale, transfer, assignment, and delivery of the Assumed Contracts and the Purchased Assets to Buyer hereunder, if such Transfer Consent is not obtained or such assignment is not attainable pursuant to Section 365 of the Bankruptcy Code, to the extent permitted and subject to any approval of the Bankruptcy Court that may be required, Sellers and Buyer will cooperate in a mutually agreeable arrangement under which Buyer would obtain the rights and benefits and assume the obligations thereunder in accordance with this Agreement.

(f)     At Closing, (i) Sellers shall, pursuant to the Sale Order and the Assignment and Assumptions and other transfer and assignment documents reasonably requested by Buyer, assume and assign, or cause to be assigned, to Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned, (ii) subject to Section 2.5(b), Buyer shall pay promptly all Cure Amounts (if any) in connection with such assumption and assignment (as set forth in this Agreement, any filing with the Bankruptcy Court, as agreed to by Buyer and the contract counterparty, or as determined by the Bankruptcy Court), and (iii) Buyer shall assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Sale Order and the Assignment and Assumptions.

**2.6     Purchase Price and Other Commitments.**

(a)     Deposits.

(i)     ~~(a)~~ **Initial** Deposit.  Buyer shall deposit (or cause the deposit of) Two Million Dollars ($2,000,000) (the "***Initial Deposit***") within two business days following the Effective Date pursuant to that certain Escrow Agreement of even date herewith among the Title Company ("***Escrow Agent***"), Mercy Hospital and Buyer (the "***Deposit Escrow Agreement***").  At the Closing, the Initial Deposit shall be credited towards payment of the Purchase Price and paid to Sellers.  If this Agreement is terminated by Sellers prior to Closing pursuant to Section 7.1(d) or Section 7.1(i), then within two business days of such termination, Mercy Hospital and Buyer shall deliver a joint written instruction to Escrow Agent authorizing Escrow Agent to release from escrow the entire Initial Deposit, by wire transfer of immediately available funds to an account designated by Mercy Hospital to Escrow Agent, to be retained by Mercy Hospital.  In all other circumstances, if this Agreement is terminated in accordance with the terms of this Agreement prior to Closing, then within two (2) business days of such termination, Mercy Hospital and Buyer shall deliver a joint written instruction to Escrow Agent authorizing Escrow Agent to release all funds held in escrow, including any interest or earnings thereon, to Buyer by wire transfer of immediately available funds to an account designated by Buyer.

(ii)     **First Interim Deposit Pending the Closing**.  On or before November 15, 2023, Sellers shall provide to Buyer an updated 13-week cash flow analysis (the "***Budget***") and a certificate

(the "*First Interim Certificate*"), prepared in good faith and duly executed by the Chief Restructuring Officer or Chief Financial Officer of Sellers, in a form reasonably acceptable to Buyer, setting forth, in reasonable detail as may be requested by Buyer, a good faith estimate of the Operating Expenses, Operating Revenues, and Operating Losses (together, the "*Operations*") of Sellers and shall specifically include the two-week period beginning at 12:01 a.m. on Friday, December 1, 2023 and ending at 11:59 p.m. on Thursday, December 14, 2023 (the "*First Interim Period*").  On or before November 30, 2023, Buyer shall make a deposit in the amount of the estimated Operating Losses for the First Interim Period as set forth on the First Interim Certificate, to be paid to Mercy Hospital by wire transfer of immediately available funds to an account designated by Mercy Hospital (the "*First Interim Deposit*").  The amount of the First Interim Deposit shall be held in an account solely owned and controlled by Mercy Hospital and shall be used by Mercy Hospital only for the payment of Operating Expenses of the Acquired Seller Facilities from December 1, 2023 through the First Interim Period.

(iii)    **Subsequent Interim Deposits Pending the Closing**.  On Tuesday of every other week until the Closing or the termination of this Agreement in accordance with Article VII, beginning with Tuesday, December 12, 2023, Buyer and Sellers shall meet and Sellers shall provide Buyer an updated Budget and a certificate (a "*Subsequent Interim Certificate*", and all such Subsequent Interim Certificates together with the First Interim Certificate, the "*Operating Loss Certificates*"), prepared in good faith and duly executed by the Chief Restructuring Officer or Chief Financial Officer of Sellers, in a form reasonably acceptable to Buyer, setting forth, in reasonable detail as may be requested by Buyer, a good faith estimate of the Operations of Sellers and shall specifically include the immediately subsequent two-week period beginning at 12:01 a.m. on the following Friday and ending at 11:59 p.m. on the second Thursday thereafter (the "*Subsequent Interim Period*") (i.e., the first Subsequent Interim Period will begin at 12:01 a.m. on Friday, December 15, 2023 and end at 11:59 p.m. on Thursday, December 28, 2023). On or before the Friday on which each such Subsequent Interim Period begins, Buyer shall make a deposit in the amount of the estimated Operating Losses for the applicable Subsequent Interim Period as set forth on the applicable Subsequent Interim Certificate, to be paid to Mercy Hospital by wire transfer of immediately available funds to an account designated by Mercy Hospital (each, a "*Subsequent Interim Deposit*" and together with the First Interim Deposit, the "*Interim Deposits*"). The amount of each Subsequent Interim Deposit shall be held in an account solely owned and controlled by Mercy Hospital and shall be used by Mercy Hospital only for the payment of Operating Expenses of the Acquired Seller Facilities during the applicable Subsequent Interim Period.

(iv)    **Accounting for Interim Deposits**.  Beginning with the First Interim Certificate delivered on November 15, 2023, Seller shall provide Buyer with a weekly accounting of Sellers' actual Operations for the most recently-completed one-week period ending at 11:59 p.m. on the immediately preceding Thursday.  Sellers shall answer all reasonable questions of Buyer and provide Buyer such additional information and supporting documentation as Buyer may request relating to the information set forth on the then-current Operating Loss Certificate, Budget, or weekly accounting of Operations, and Buyer and Sellers shall work in good faith to resolve any disagreements related thereto.  To the extent that the amount of actual Operating Losses for a two-week period is more or less than Sellers' estimated Operating Losses for such two-week period, such positive or negative difference shall be rolled forward and taken into account in calculating the estimated Operating Losses on the next Operating Loss Certificate.

(b)    **Purchase Price.**  At the Closing, the aggregate consideration to be paid by Buyer for the Purchased Assets (the "*Purchase Price*"), in addition to the assumption of the Assumed Liabilities, shall be an amount equal to cash (the "*Cash Purchase Price*") in the amount of Twenty-Eight Million Dollars ($~~20,000,000~~28,000,000), minus (A) the amount of the Initial Deposit, plus (B) the Cure Amounts, plus (C) the aggregate amount of Operating Losses incurred by Debtors during the period beginning on December 1, 2023 and ending on the Closing Date, minus (D) the aggregate amount of all Interim Deposits made by Buyer.  At least five (5) business days before the Closing Date, Sellers shall deliver to

Buyer a statement setting forth, in reasonable detail as may be requested by Buyer, the aggregate Operating Expenses, Operating Revenues, and Operating Losses of Sellers during the period beginning on December 1, 2023 and ending on the Closing Date.

(c)     **Hospital Operations**.  Following the Closing, Buyer intends (i) to establish an advisory board for the Hospital, to include primarily independent members of the community, with such composition, roles, and responsibilities to be agreed upon by the Parties prior to Closing; (ii) that the Hospital will have its own Chief Administrative Officer with responsibility for the Hospital's operations; and (iii) to make certain strategic and routine capital investments in the Acquired Seller Facilities, including, in Buyer's sole determination, updating and/or replacing some or all the IT hardware, software and related equipment used at the Acquired Seller Facilities, subject to such investments meeting Buyer's business case criteria, including documented business need and financial feasibility.  In furtherance of the foregoing, Buyer's strategic and routine capital expenditures with respect to the Acquired Seller Facilities over the five (5)-year period following the Closing Date will include no less than Twenty-Five Million Dollars ($25,000,000) toward (A) information technology infrastructure; (B) physical plant infrastructure including, but not limited to, the Hospital's roof, parking facilities, and plant equipment; and (C) medical equipment.

(d)     **Medical Staff**.  To ensure continuity of care in the community, subject to any applicable Law or accreditation requirements, Buyer agrees that, following the Closing, the medical staff members of the Hospital who are in good standing as of the Closing Date shall maintain medical staff privileges at the Hospital as of the Closing and that faculty appointment will not be required to be or remain on the medical staff at the Hospital.  At the Closing, the medical staff will be subject to the medical staff bylaws of the Hospital then in effect, as amended from time to time.  Following the Closing, the Hospital will maintain an open medical staff, and medical staff admitting privileges will remain in place under the existing medical staff bylaws of the Hospital; provided, however, that the medical staff bylaws of the Hospital may be modified, in Buyer's reasonable discretion, to better align with the medical staff bylaws of Buyer to ensure that processes and information-sharing between medical staffs are as consistent as reasonably possible.  Further, following the Closing, Buyer will determine a plan to best clinically integrate the Hospital's employed and affiliated physicians with Buyer's physician services so as to provide the best possible services to residents of the community while using physician resources most efficiently.

(e)     **Charity Care**.  Following the Closing, Buyer will not discriminate in the provision of services at the Hospital on the basis of a patient's ability to pay and will ensure that the Hospital will continue its charity care policies and procedures or implement commensurate policies that are consistent with Buyer's charity care policies.

**2.7     Adjustments to Acquired Seller Facilities and Purchased Assets.**

(a)     Notwithstanding anything to the contrary set forth in this Agreement, Buyer may, in Buyer's sole discretion and at any time prior to Closing, (i) remove any Seller Facility from Exhibit B, and any such removed Seller Facility shall at that time become an Excluded Seller Facility and will be deemed included on Exhibit C; and (ii) designate any asset, right, or property of any Seller as an Excluded Asset, notwithstanding the inclusion of such asset, right, or property as a Purchased Asset pursuant to this Agreement.  In each case, Buyer shall deliver written notice to Sellers of its election to remove such Seller Facility from Exhibit B or designate such asset, right, or property as an Excluded Asset (as applicable) in accordance with the provisions of Section 9.9.

(b)     If Buyer is not able to acquire Mercy Hospital's membership interest in Corridor Radiology (including all governance rights of Mercy Hospital therein) at the Closing for any reason, including, without limitation, the failure to obtain any approval, authorization, or consent of any third

party, then Sellers will promptly remit to Buyer any proceeds (less out-of-pocket expenses reasonably related to the collection thereof) that any Seller receives in connection with the disposition of Mercy Hospital's membership interest in Corridor Radiology, whether such proceeds are received before or after the Closing Date.

(c)      In the event that the Sale Order does not transfer the Purchased Assets free and clear of the MAAP Liability, and Seller receives any funds described in <u>Section 2.2(u)</u>, Seller shall remit such amounts received (less out-of-pocket expenses reasonably related to the collection thereof) to Buyer, up to, and solely to the extent of, the amount of the MAAP Liability attaching to Buyer or for which Buyer becomes responsible.

**2.8     Closing.**

Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated pursuant to this Agreement (the "***Closing***") shall take place at the offices of Buyer on the later of (a) January 31, 2024, (b) five (5) business days after satisfaction of the conditions set forth in <u>ARTICLE VI</u> (other than those conditions that by their nature are to be satisfied at the Closing but subject to the satisfaction of such conditions at the Closing), and (b̶c) such other time or place as Buyer and Sellers may agree (the "***Closing Date***").  The Closing shall be deemed to have occurred and to be effective as between the Parties as of 12:01 a.m. Iowa City, Iowa time on the Closing Date (the "***Closing Time***").  The Closing will take place remotely by electronic mail or other electronic exchange of documents, among and between the Parties and/or their respective counsel.

**2.9     Actions of Sellers at Closing.**

At the Closing and unless otherwise waived in writing by Buyer, Sellers shall deliver or cause to be delivered to Buyer the following:

(a)      the Purchased Assets, by making the Purchased Assets available to Buyer at their present location;

(b)      a Bill of Sale in the form attached as <u>Exhibit D</u> (the "***Bill of Sale***"), executed by each Seller in favor of Buyer;

(c)      an Assignment and Assumption Agreement in the form attached as <u>Exhibit E</u> (the "***Assignment and Assumption***"), executed by each Seller in favor of Buyer;

(d)      copies of resolutions duly adopted by the Board of Directors (or similar governing body) of each Seller authorizing and approving such Seller's execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement, duly certified by an officer of each Seller;

(e)      certificates of existence and good standing of each Seller from the state of its incorporation or formation, each dated the most recent practicable date prior to the Closing Date;

(f)      a non-foreign affidavit of each Seller, dated as of the Closing Date, in form and substance consistent with the Treasury Regulations issued pursuant to Section 1445 of the Code stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(g)      certificates of title with respect to any vehicles included in the Purchased Assets duly executed by the applicable Seller;

(h)    certificates of an officer of Mercy Hospital certifying the satisfaction of the conditions to Closing set forth in Section 6.2(a) and Section 6.2(b);

(i)    certificates of incumbency for the respective officers of Sellers executing this Agreement and the other Transaction Agreements;

(j)    fully executed termination agreements for all management agreements (other than any management agreements that Buyer has designated as an Assumed Contract pursuant to Section 2.5(a)) with respect to the operation of the Acquired Seller Facilities, in a form reasonably satisfactory to Buyer and in full force and effect;

(k)    transition services agreement(s) between Seller and Buyer or Buyer's designee for wind-down of Sellers' operations following the Closing, each in form and substance satisfactory to Buyer and Seller (the "***Transition Services Agreements***"), executed by Seller and the applicable counterparties thereto;

(l)    copies of all medical records for the applicable Record Retention Period prior to the Closing and a patient index relating to the Acquired Seller Facilities, in each case in digital or electronic format;

(m)    to the extent required by applicable Law, the Drug Enforcement Administration (DEA) Powers of Attorney in a form satisfactory to Buyer, executed by or on behalf of Sellers in favor of Buyer;

(n)    with respect to each parcel of Owned Real Property, one or more special warranty deeds from the applicable Seller, as grantor, in favor of Buyer, as grantee, in recordable form, subject only to the Permitted Encumbrances (the "***Deeds***");

(o)    with respect to each parcel of Owned Real Property, a Declaration of Value statement from the applicable Seller reporting the consideration paid by Buyer to the applicable Seller in connection with said parcel of Owned Real Property;

(p)    with respect to each parcel of Owned Real Property, if applicable, a Groundwater Hazard Statement from the applicable Seller;

(q)    with respect to the Owned Real Property, one or more duly executed title affidavits in form reasonably required by the Title Company to issue an extended coverage ALTA Owner's Policy of Title Insurance in favor of Buyer (the "***Title Policy***"), subject only to the Permitted Encumbrances;

(r)    with respect to the Owned Real Property, such other affidavits, transfer tax and documentary stamp documents, and other documents reasonably required by the Title Company to record the Deeds in the applicable jurisdictions and to issue the Title Policy;

(s)    with respect to each Real Property (Tenant) Lease, a duly executed Landlord's Estoppel in substantially the form attached hereto as Exhibit F (the "***Landlord Estoppels***");

(t)    an updated detailed patient census list dated no earlier than three (3) days prior to the Closing Date; and

(u)    a certified copy of the Sale Order.

**2.10     Actions of Buyer at Closing.**

At the Closing and unless otherwise waived in writing by Sellers, Buyer shall deliver or cause to be delivered to Sellers the following:

(a)      the Cash Purchase Price, by wire transfer of immediately available funds to an account designated in writing by Mercy Hospital;

(b)      the Bill of Sale, executed by Buyer;

(c)      the Assignment and Assumption, executed by Buyer;

(d)      a certificate of an officer or duly authorized representative of Buyer certifying the satisfaction of the conditions to Closing set forth in Section 6.3(a) and Section 6.3(b);

(e)      certificates of incumbency for the officer of Buyer executing this Agreement and the other Transaction Agreements; and

(f)      the Transition Services Agreements, executed by Buyer; and

(g)      an access easement to Parcel #1010166009 located on North Dodge Street, Iowa City, Iowa 52245 for purposes of accessing the parking lot that comprises Parcel #1010166008 located on E. Bloomington Street, Iowa City, Iowa 52245, in form and substance reasonably acceptable to Buyer and Sellers, executed by Buyer.

**ARTICLE III - REPRESENTATIONS AND WARRANTIES OF SELLERS**

Except as set forth in the Schedules to this ARTICLE III ("*Article III Schedules*"), as of (i) the Effective Date and the Closing Date, with respect to representations and warranties that are not qualified by an Article III Schedule, (ii) the Sale Procedures Hearing date and the Closing Date, with respect to representations and warranties that are qualified by an Article III Schedule, and (iii) as of the date specified therein with respect to any representation or warranty speaks as of another date, Sellers represent and warrant to Buyer the following:

**3.1     Corporate Capacity, Authority and Consents.**

Each Seller is duly organized and validly existing in good standing under the Laws of the state of its formation or incorporation with the requisite organizational power and authority to enter into this Agreement and each of the Transaction Documents, to perform its respective obligations hereunder and thereunder, to own, lease, and operate its properties and to conduct its business as now being conducted. Each Seller is duly qualified or licensed to do business as a foreign entity and is in good standing in each jurisdiction in which the nature of the business conducted by it makes such qualification or licensing necessary, except where the failure to be so duly qualified, licensed, and in good standing would not, individually or in the aggregate, have a Material Adverse Effect.  Sellers have made available to Buyer a complete and correct copy of the Governing Documents of each Seller as in effect on the Effective Date. Subject to the entry of the Sale Procedures Order or the Sale Order, the execution, delivery, and performance of this Agreement and all other Transaction Agreements to which any Seller is or will become a party and the actions to be taken by each Seller in connection with the consummation of the Transactions:

(a)      are within the organizational powers of such Seller, are not in contravention of applicable Law or the terms of the applicable Governing Documents;

(b)       except as otherwise expressly herein provided or as set forth in <u>Schedule 3.1(b)</u>, do not require any approval or consent of, or filing with, any Governmental Authority;

(c)       will not violate any Order or Law to which such Seller or any of the Purchased Assets are subject;

(d)       will not, with or without notice or lapse of time or both, result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any Material Contract to which any Seller is a party or otherwise bound; and

(e)       will not result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on any properties or material assets of Sellers.

**3.2      Binding Agreement.**

The execution, delivery, and performance of this Agreement and each of the Transaction Documents to which each Seller is or will become a party by each Seller and the consummation of the transactions contemplated hereby and thereby have been, or will be when delivered, duly authorized and approved by all requisite entity action of such Seller.  No other corporate or organizational proceedings on the part of Sellers are necessary to approve and authorize the execution and delivery of the Transaction Documents to which Sellers are a party and the consummation of the transactions contemplated thereby.  Subject to the entry of the Sale Order, this Agreement and each other Transaction Agreement to which each Seller is or will become a party are and will constitute the valid and legally binding obligations of such Seller, and are and will be enforceable against such Seller in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**3.3      Subsidiaries.**

Except as set forth on <u>Schedule 3.3</u>, Sellers have no Subsidiaries and do not own any interests in any other Person.

**3.4      Assets.**

(a)       Sellers own valid and marketable title to, or possess valid leasehold interests in, all of the Purchased Assets.  One or more Sellers have sole custody and control of all of the Purchased Assets, except with respect to any Permitted Encumbrances or as otherwise set forth on <u>Schedule 3.4(a)</u>.

(b)       Subject to the entry of the Sale Order, the Purchased Assets are free and clear of all Encumbrances except Permitted Encumbrances.

(c)       Except as would not materially impair the present ownership, use, or operations of the Purchased Assets, the Purchased Assets are in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the Ordinary Course of Business.

(d)       The Purchased Assets are sufficient for the continued conduct of the Acquired Seller Facilities after the Closing in substantially the same manner as currently conducted and constitute all of the assets, including all Contracts, Permits and properties, necessary to operate the Acquired Seller Facilities as presently conducted.

**3.5** **Licenses and Accreditations.**

(a)      Sellers hold all Permits required to be held by them to own, occupy, and operate the Acquired Seller Facilities as they are currently being operated, including, without limitation, all pharmacies, laboratories, and other ancillary service lines located at the Acquired Seller Facilities or operated for the benefit of the Acquired Seller Facilities for which a Seller is required to hold separate Permits.  Schedule 3.5(a) sets forth a list of such Permits (collectively, the "***Material Permits***"), and the corresponding number of licensed beds (if applicable), that are material to the ownership and operation of the Acquired Seller Facilities, copies of which have been made available to Buyer, and all of which are valid and in full force and effect.  All of the Material Permits are valid, binding and in full force and effect.  Schedule 3.5(a) sets forth a list of all survey and inspection deficiencies of the Acquired Seller Facilities that have been identified by any Governmental Authority and are yet to be corrected.  Sellers and the Acquired Seller Facilities, as applicable, are, and at all times since the Lookback Date have been, in material compliance with the terms of the Material Permits.  There are no agreements entered into by any Seller relating to any Material Permit that preclude or materially limit Sellers from operating the Acquired Seller Facilities and carrying on the operations of the Acquired Seller Facilities as currently conducted.  There is no pending or, to the Knowledge of Sellers, threatened Proceeding by or before any Governmental Authority to revoke, cancel, rescind, suspend, materially modify, or refuse to renew the Material Permits.  No event has occurred and no facts exist with respect to any Material Permit that would allow or is reasonably likely to result in the suspension, revocation, or termination of same, nor have Sellers or the Acquired Seller Facilities received any written notice or other communication regarding any material violation of any Material Permit.  Sellers have delivered or made available to Buyer accurate and complete copies of all survey reports, deficiency notices, plans of correction, and related correspondence received by Sellers or the Acquired Seller Facilities since the Lookback Date in connection with the Permits owned or held by Sellers.

(b)      Sellers hold all certificates of need and similar approvals necessary for Sellers to own and operate the Acquired Seller Facilities and the Purchased Assets and to carry on the operations as currently conducted.  Sellers and the Acquired Seller Facilities, as applicable, are, and at all times since the Lookback Date have been, in material compliance with the terms and conditions of any such certificates of need and similar approvals.  Each such certificate of need is valid and in good standing and not subject to meritorious challenge.

(c)      Schedule 3.5(c) sets forth an accurate and complete list of all Joint Commission accreditations and other accreditations held by Sellers with respect to the Acquired Seller Facilities.  All such accreditations are and shall be current and in full force and effect as of the Effective Date and as of the Closing Date.  Except as otherwise disclosed in Schedule 3.5(c), no event has occurred or other fact exists with respect to such accreditations that allows, or after notice or the lapse of time or both, would allow, for the revocation, material limitation or termination of any such accreditations.  There is no pending or, to Sellers' Knowledge, threatened Proceeding by any accrediting body to revoke, cancel, rescind, suspend, restrict, materially modify, or not renew any such accreditation.  Sellers have delivered a copy of each Acquired Seller Facility's most recent Joint Commission accreditation reports and any reports, documents, or correspondence relating thereto to Buyer.

**3.6** **Regulatory Compliance.**

(a)      Except as set forth on Schedule 3.6(a), Sellers, the Acquired Seller Facilities, and the Purchased Assets are, and at all times during the 10-year period preceding the Effective Date have been, in compliance in all material respects with all applicable Laws including all Healthcare Laws.  During the 10-year period preceding the Effective Date, no Seller has received any notice from any

Governmental Authority regarding any actual or alleged violation of, or failure on the part of any Seller to comply in all material respects with, any applicable Law.

(b)     During the 10-year period preceding the Effective Date, Sellers have not been investigated by any Governmental Authority with respect to any alleged violation of Law, nor has any Seller or any of the Acquired Seller Facilities received any written, or to Sellers' Knowledge, oral communication from a Governmental Authority, Third-Party Payor, or other Person alleging that any Seller, any of the Acquired Seller Facilities, or any of the Purchased Assets are not in material compliance with any Law, other than statements of deficiencies from a Governmental Authority received in the Ordinary Course of Business.

(c)     Without limiting the generality of the foregoing, during the 10-year period preceding the Effective Date, Sellers have not, directly or indirectly, offered, paid or received, or made arrangements to offer, pay or receive, any remuneration, in cash or in kind, to any past, present or potential customers, past or present suppliers, patients, medical staff members, contractors or Third-Party Payors in order to obtain business or payments from such Persons that would reasonably be expected to subject Sellers to any material damage or penalty in any civil, criminal, or governmental litigation or proceeding.  During the 10-year period preceding the Effective Date, none of the officers, directors, agents, or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)) of Sellers has been excluded from any Third-Party Payor program or been subject to sanction or been convicted of a crime in connection with any state or federal healthcare program or under any Healthcare Laws, nor is any such exclusion or conviction pending or, to the Knowledge of Sellers, threatened.

(d)     There are no pending or, to the Knowledge of Sellers, threatened disciplinary or corrective actions or appeals involving physician applicants, active medical staff members, or affiliated health professionals under the medical staff bylaws at any Seller Facility.  Sellers have made available to Buyer copies of the bylaws, rules, and regulations of the medical staff of each Seller Facility maintaining the same and its executive committee.  Notwithstanding the foregoing provisions, Sellers shall not be required to disclose any information pursuant to this Section 3.6(d) where such disclosure is prohibited by Law or such disclosure would, or could reasonably be expected to, jeopardize any applicable privilege or protection including, without limitation, peer review or any other privilege which is available under applicable Law.  No medical staff members of any Seller Facilities have had their privileges revoked, suspended, or reduced since the Lookback Date.

(e)     Sellers have not, at any time during the 10-year period preceding the Effective Date, made and are not in the process of making a voluntary self-disclosure under the Self-Referral Disclosure Protocol established by the Secretary of HHS pursuant to Section 6409 of the Patient Protection and Affordable Care Act, under the self-disclosure protocol established and maintained by the OIG, or under any United States Attorney or other Governmental Authority.  No such self-disclosure made by any Seller (regardless of when made) remains unresolved or could lead to any future liability or obligation for any Seller or Buyer.

**3.7     Compliance Program.**

The Acquired Seller Facilities have implemented compliance programs and have conducted their operations in material accordance with such compliance programs.  Sellers have made available to Buyer copies of the Acquired Seller Facilities' current compliance program materials, including: all program descriptions; compliance officer and committee descriptions; compliance committee meeting minutes and reports for the last two years; compliance policies; hotline and other logs or databases of compliance issues, reviews or investigations for the last two years; training and education materials; auditing and monitoring protocols; reporting mechanisms; and disciplinary policies.  No Seller (a) has reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority, (b) is a

party to a Corporate Integrity Agreement with the OIG, (c) since the Lookback Date, has been served with any search warrant, subpoena, or civil investigative demand from any Governmental Authority related to participation in any Governmental Reimbursement Program, or (d) has been to such Seller's Knowledge a defendant in any *qui tam*/False Claims Act litigation.  For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the OIG applicable to Hospital's operations.

**3.8      Material Contracts.**

(a)      Schedule 3.8(a) sets forth a complete list as of the Effective Date of the following Contracts to which a Seller is a party, in each case relating in whole or in part to one or more of the Acquired Seller Facilities (such Contracts set forth or required to be set forth on Schedule 3.8(a), the "***Material Contracts***" and each a "***Material Contract***"):  (i) Contracts involving the lease of equipment or personal property that require payments by or to a Seller of greater than $50,000 during the remaining term or on an annual basis and any other capitalized lease obligations; (ii) employment Contracts; (iii) Contracts with respect to patents, trademarks, trade names, or service names; (iv) collective bargaining agreements; (v) partnership or joint venture agreements, and any other Contracts relating to the ownership of, investments in or loans and advances to any Person, including minority equity investments; (vi) Contracts containing a covenant on the part of a Seller not to compete or which provide for "exclusivity" or any similar requirement in favor of any Person other than Sellers; (vii) Contracts with any hospitals, ambulatory surgery centers, or other healthcare facilities; (viii) Contracts with any physicians, physician groups, or other providers of healthcare services; (ix) any other Contracts that involve payments, performance of services or provision of items in an amount exceeding $50,000 or that cannot be canceled by the applicable Seller, without penalty, on ninety (90) days' notice or less; (x) Contracts relating to the acquisition or disposition by any Seller outside the Ordinary Course of Business of any material assets or any material business (whether by merger, sale or purchase of stock, sale or purchase of assets or otherwise) to the extent any actual or contingent material obligations of any Seller thereunder remain in effect; (xi) Contracts with any Governmental Authority; (xii) Contracts relating to the settlement of any Proceeding which imposes any material payment or other material obligations on any Seller after the Effective Date; (xiii) Contracts relating to borrowed money or other indebtedness or the mortgaging, pledging or otherwise placing an Encumbrance on any material asset or group of material assets of any Seller or any letter of credit arrangements, or any guaranty therefor; (xiv) powers of attorney or other similar Contracts or grant of agency; (xv) Contracts (A) providing for the license or provision of any Intellectual Property for use in connection with any of the Acquired Seller Facilities (excluding Contracts for the licensing of any generally commercially-available, off-the-shelf software from third parties not exceeding $100,000), or (B) relating to the development of any Intellectual Property for use in connection with any of the Acquired Seller Facilities, or the settlement of any Intellectual Property-related dispute with respect to any of the Acquired Seller Facilities; or (xvi) any other Contracts that are otherwise material to the assets, operations or financial condition of any Seller. Sellers have made available to Buyer true and correct copies of all of the Material Contracts, in each case, together with all amendments, waivers or other changes thereto and Schedule 3.8(a) contains an accurate and complete description of all material terms of all oral Contracts referred to therein.

(b)      Except as set forth on Schedule 3.8(b), each Material Contract is in full force and effect and there are no defaults thereunder on the part of any party thereto, and no Seller is in material default in the performance, observance, or fulfillment of any of its obligations, covenants or conditions contained in any Material Contract to which it is a party or by which it or its property is bound, except as a result of the commencement of the Bankruptcy Case, the insolvency or financial condition of a Seller or any other reason set forth in Section 365(b)(2) or 365(e)(1) of the Bankruptcy Code.  Each Material Contract was entered into at arm's length and in the Ordinary Course of Business and, subject to the Sale Order and the assignment of each Material Contract by the applicable Seller in accordance with applicable Law, is a

valid and binding obligation of the applicable Seller and, to the Knowledge of Sellers, the other parties thereto and is in full force and effect in accordance with its terms.

**3.9    Real Property.**

(a)    Schedule 2.1(a) sets forth a true and complete list of all Owned Real Property.  Sellers have good and marketable title in fee simple to all Owned Real Property, free and clear of all Encumbrances other than the Permitted Encumbrances.  Schedule 2.1(d) identifies each of the Real Property (Landlord) Leases and the non-Seller parties thereto.  Sellers have made available to Buyer true and complete copies of all such Real Property (Landlord) Leases.  Except as set forth in Schedule 2.1(d), there are no tenants or other Persons occupying any space in the Owned Real Property.

(b)    Schedule 2.1(c) sets forth a description of all of Sellers' leasehold interests in the Leased Real Property and identifies each of the Real Property (Tenant) Leases and the non-Seller parties thereto. Sellers have made available to Buyer true and complete copies of all of such Real Property (Tenant) Leases.  Except as set forth in Schedule 2.1(c), Sellers do not lease, license or otherwise occupy any other property as tenant, licensee or otherwise, other than the Leased Real Property.

(c)    Except as otherwise set forth in Schedule 3.9(c), (i) each Real Property Lease is in full force and effect and is the valid, binding and enforceable obligation of the applicable Seller and, to the Knowledge of Sellers, the other parties thereto in accordance with its terms; (ii) no Seller has given or received written notice of any material default under a Real Property Lease that currently remains outstanding and uncured, except as a result of the commencement of the Bankruptcy Case, the insolvency or financial condition of a Seller or any other reason set forth in Section 365(b)(2) or 365(e)(1) of the Bankruptcy Code; (iii) no party to any Real Property Lease has exercised any termination rights with respect thereto; (iv) subject to the entry of the Sale Order, the assignment of the Real Property Leases to Buyer or any Affiliate thereof shall not require the consent of any other party to such Real Property Leases, will not result in a breach of or default under any Real Property Lease, or otherwise cause such Real Property Lease to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the Closing; (v) Sellers' current possession and quiet enjoyment of the Leased Real Property under such Real Property (Tenant) Leases has not been disturbed; (vi) Sellers do not currently owe any outstanding and unpaid brokerage commissions or finder's fees with respect to any of the Real Property Leases; (vii) no party to any Real Property Lease is an Affiliate of any Seller; and (viii) there are no liens or encumbrances on the leasehold estate or interest created by any such Real Property Lease other than Permitted Encumbrances.

(d)    There do not exist any actual or, to the Knowledge of Sellers, threatened condemnation or eminent domain proceedings that materially affect any Real Property, and no Seller has received any notice, oral or written, of the intention of any Governmental Authority to take or use any Real Property.

(e)    There are no contractual or legal restrictions that preclude or restrict the ability to use any Real Property by Sellers for the current use of such Real Property. There are no material latent defects or material adverse physical conditions affecting the Real Property. All buildings, fixtures, improvements and other structures on the Real Property are adequately maintained and are in good operating condition and repair for the requirements of the use as currently conducted.

(f)    None of the Owned Real Property or any condition or activity thereon, any buildings, fixtures, improvements and other structures located thereon, or the current use, operation or maintenance thereof is (A) in violation of any applicable Law, (B) in violation of the terms of any restrictive covenant or other encumbrance. To the extent that the use and operation of any Owned Real Property is a non-conforming use as of the Closing Date, the right to continue such non-conforming use is not restricted or terminated upon the consummation of the Transactions. All easements, cross easements,

licenses, air rights, and rights-of-way or other similar property interests, whether express or implied, if any, necessary for the full utilization of the Owned Real Property for its current uses and purposes have been obtained and are in full force and effect without default thereunder.  The Owned Real Property has a legal right of access to and from such parcel.  Neither the Owned Real Property nor any part thereof are subject to any purchase options or other similar rights in favor of third parties. There are no material encroachments on the Owned Real Property and the improvements on the Owned Real Property do not encroach upon any easement area or any adjoining land or adjoining street.

(g)     Sellers have made available to Buyer copies of all title abstracts, title opinions, title policies, title commitments, surveys, and all other material documents bearing on the status of title to the Owned Real Property in their possession or control.

**3.10    Insurance.**

Attached as Schedule 3.10 is a list and description of all insurance policies, including all self-funded plans or trusts, maintained by or for the benefit of any Seller or with respect to any of the Acquired Seller Facilities, including an indication of whether each such policy is "occurrence based" or "claims made".  All such policies and plans or trusts are in full force and effect with no premium or contribution arrearage.

**3.11    Intentionally Omitted.**

**3.12    Employee Relations.**

There is no pending or, to the Knowledge of Sellers, threatened employee strike, work stoppage, walkout, lockout, picketing or other material labor dispute concerning or involving the Facility Employees, and no such event has occurred since the Lookback Date.  Except as set forth on Schedule 3.12, (a) no Seller is a party to or bound by any collective bargaining agreement or other Contract or bargaining relationship with any labor union, labor organization, or employee representative body, and no such agreement or relationship is currently being negotiated with respect to the Facility Employees; (b) since the Lookback Date, no written or, to Sellers' Knowledge, oral demand has been made for recognition by a labor organization by or with respect to any Facility Employees; (c) no union organizing activities by or with respect to any Facility Employees are taking place, and to the Knowledge of Sellers, no such activities have taken place since the Lookback Date; and (d) none of the Facility Employees is represented by any labor union or organization in connection with their employment with Sellers.  Sellers have satisfied any notice and bargaining obligations with any labor union, labor organization, or employee representative body as required by applicable Law, collective bargaining agreement, or Contract in connection with the Transactions.   Since the Lookback Date, Sellers have promptly, thoroughly and impartially investigated all employment discrimination and sexual harassment allegations of, or against, any Facility Employee and, with respect to each such allegation with potential merit, Sellers have taken prompt corrective action in accordance with applicable Law.  Except as would not result in material liability, (i) each individual who is performing or since the Lookback Date has performed services for the business and who is or was classified and treated by Sellers as an independent contractor or other non-employee service provider is and was properly classified and treated as such for all applicable purposes, and (ii) since the Lookback Date, Sellers have fully and timely paid all wages, salaries, wage premiums, commissions, bonuses, severance payments, expense reimbursements, fees, and other compensation that has come due and payable to Facility Employees and other workers providing services to the business under applicable Law, Contract, or policy.  Since the Lookback Date, Sellers have not failed to provide advance notice of layoffs or terminations as required by the Worker Adjustment and Retraining Notification Act of 1988, as amended, and all similar state or local Laws (the "***WARN Act***"), and no actions that would require notice pursuant to the WARN Act are currently contemplated, planned, or announced.  Schedule 3.12 sets forth a list of involuntary terminations by

Sellers in the ninety (90) days immediately preceding the Closing Date, including location, date, and number of employees impacted.  The Facility Employees are sufficient in number and skill to allow Buyer to operate the business after the Closing Date in substantially the same manner as it was operated by Sellers immediately prior to the Closing.

**3.13    Litigation and Proceedings.**

Except as set forth on Schedule 3.13, there are no and since the Lookback Date there have been no Actions pending or, to the Knowledge of Sellers, threatened against any of the Sellers or their Affiliates or any of their respective properties or assets, including the Purchased Assets, at law or in equity, or before or by any Governmental Authority.  With respect to the Seller Facilities, no Seller has received written notice of, and there are no, Orders of a court of competent jurisdiction outstanding against any Seller or any of their respective properties or assets that materially restrict the operation of the Seller Facilities.  There is no Action pending or, to the Knowledge of Sellers, threatened against Sellers or their Affiliates which seeks to prevent or delay consummation of the Transactions, seeks damages in connection with Transactions or would impair the ability of Sellers to perform their obligations under this Agreement.

**3.14    Third-Party Reimbursement.**

(a)    The Acquired Seller Facilities are certified to participate in the Medicare, Medicaid, and TRICARE programs with valid and current provider or supplier agreements under such programs.  Except as set forth on Schedule 3.14(a), the Acquired Seller Facilities are in compliance with the terms and conditions of participation in the Medicare, Medicaid, and TRICARE programs and are not subject to any pending or, to the Knowledge of Sellers, threatened Actions with respect to participation in such programs, other than routine audits and investigations conducted through the Medicare Recovery Audit Contractor programs.  Schedule 3.14(a) sets forth a list of all National Provider Identifiers and all provider numbers of Sellers with respect to the Acquired Seller Facilities under the Government Reimbursement Programs.

(b)    Schedule 3.14(b) sets forth a list of all agreements between any Seller, on the one hand, and any Third-Party Payor, on the other hand ("***Payor Agreements***").  Sellers have delivered or made available accurate and complete copies of all such Payor Agreements to Buyer.  Sellers are in material compliance with the terms, conditions, and provisions of the Payor Agreements including, without limitation, requirements related to dual eligibility.  No events or facts exist that jeopardize the validity or enforcement of, or the continued reimbursement under (in accordance with the terms thereof), any Payor Agreement.  There is no Proceeding pending, or, to Sellers' Knowledge, threatened, involving a Government Reimbursement Program or other Third-Party Payor, that involves a Seller or an Acquired Seller Facility's participation in any Government Reimbursement Programs or other Third-Party Payor programs.  Neither Sellers nor, to Sellers' Knowledge, any of their employees, officers, or directors have committed a violation of any Law relating to Government Reimbursement Programs or other Third-Party Payor programs.

(c)    Since the Lookback Date, Sellers and their Affiliates have timely filed all cost reports in respect of the Seller Facilities, and such reports accurately reflect, in all material respects, the information to be included thereon.  Copies of all such cost reports filed by or on behalf of a Seller since the Lookback Date have been provided or made available to Buyer.  Except as set forth on Schedule 3.14(c), there are no pending Actions, adjustments or audits relating to such cost reports.  Sellers are not subject to any pending but unassessed Medicare or Medicaid claim payment adjustments, except to the extent Sellers have established reserves for such adjustments in accordance with Sellers' accounting

policy for establishing any such reserves and that are reflected on the consolidated financial statements of Sellers.

**3.15    Tax Liabilities.**

(a)    All Tax Returns including, without limitation, income Tax Returns, payroll Tax Returns, unemployment Tax Returns and franchise Tax Returns, for periods prior to and including the Closing Date which are required to be filed by Sellers with any Governmental Authority in respect of Sellers have been timely filed in the manner provided by Law, and each Tax Return is correct and complete in all material respects and accurately reflects in all material respects the Tax liabilities of Sellers for the periods or other matters covered by such Tax Return.

(b)    Except as set forth on <u>Schedule 3.15(b)</u>, all Taxes owing by Sellers have been paid when due and there is no pending tax examination or audit or other Proceeding of, nor any action, investigation or claim asserted against Sellers by any taxing authority in respect of Sellers.

(c)    Since the Lookback Date, no claim has been made in writing by a Governmental Authority in a jurisdiction where Sellers do not file Tax Returns that any Seller is or may be subject to taxation by that jurisdiction.

(d)    None of Sellers or Buyer will be required to include any amount in taxable income for any Tax period (or portion thereof) ending after the Closing Date, including pursuant to Section 481, as a result of transactions or events occurring, sales or receipts received, or accounting methods employed, prior to the Closing.

(e)    Sellers have not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(f)    No Seller (i) has been a member of an affiliated group filing a consolidated federal income Tax Return or any state, local, or non-U.S. equivalent thereof, or (ii) has liability for the Taxes of any Person under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local, or foreign Law), as a transferee or successor, or by contract, or otherwise.

(g)    There are no Encumbrances for Taxes (other than Taxes to be paid at Closing and the Permitted Encumbrances) upon any of the Purchased Assets.

**3.16    Absence of Changes.**

Except as expressly contemplated by this Agreement, as disclosed in the Financial Statements, as required in connection with the Bankruptcy Case or as otherwise disclosed in the Article III Schedules, (i) no Material Adverse Effect has occurred since June 30, 2022, and (ii) no Seller has, since June 30, 2022, (a) amended or restated, or approved the amendment or restatement of, the Governing Documents of such Seller; (b) made, revoked or changed any material Tax election or method of Tax accounting, entered into any settlement or compromise of any material Tax liability, surrendered any right to claim a material Tax refund, entered into any closing agreement relating to Taxes, consented to any claim or assessment relating to Taxes or waived or extended the statute of limitations for any such claim or assessment; (c) settled or compromised any material pending or threatened Action; (d) sold, transferred, leased, optioned, or otherwise disposed of any material assets except in the Ordinary Course of Business; (e) granted or incurred any obligation for any increase in the compensation of any of the Facility Employees (except (x) as required by applicable Law or the terms of an Employee Benefit Plan or (y) in the Ordinary Course of Business); (f) received any written notice from any Governmental Authority of any material liability, potential liability or claimed liability based on any violation of Law by a Seller; (g) instituted any material change in a Seller's accounting practices or methods (except as required by

applicable Law or GAAP); (h) made any loans, advances, or capital contributions to, or investments in, any other Person; (i) other than in the Ordinary Course of Business, terminated, entered into, amended in any material respect, or waived any material rights under, any Assumed Contract; (j) offered any new discount, rebate, chargeback, credit, or other financial or contractual incentive outside the Ordinary Course of Business; (k) (A) delayed or postponed the payment of any accounts payable or commissions or agreed or negotiated with any party to extend the payment date of any accounts payable or commissions other than in the Ordinary Course of Business, or (B) accelerated the collection of (or discount) any accounts or notes receivable other than in the Ordinary Course of Business; (l) incurred, created, or became obligated with respect to any liabilities or obligations which constitute Assumed Liabilities outside the Ordinary Course of Business; (m) pledged any Purchased Assets or ownership or membership interests of any Seller in any of the Acquired Seller Facilities as collateral; (n) discharged any current or non-current liabilities relating to the Acquired Seller Facilities which constitute Assumed Liabilities other than in the Ordinary Course of Business and on terms according to existing loan and/or note agreements of Sellers; (o) implemented any employee layoffs, early retirement programs, reductions in force, or other voluntary or involuntary employment termination programs affecting employees that could require notice under the WARN Act; (p) entered into, terminated, or modified any collective bargaining agreement or other Contract with any labor union, labor organization, or other employee representative body; or (q) agreed or committed in writing or orally to take any of the foregoing actions.

**3.17    Intellectual Property; Data Privacy and Security.**

(a)    Except as set forth on Schedule 3.17(a):  (i) Sellers have not received any written notice that the conduct of the business of the Seller Facilities is infringing on or has misappropriated or otherwise violated the Intellectual Property rights of any Person, and, to Sellers' Knowledge, the conduct of the business of the Seller Facilities has not infringed, misappropriated, or otherwise violated the Intellectual Property rights of any Person, and (ii) to Sellers' Knowledge, there is no infringement or misappropriation, or other violation by any Person of the Facility IP.

(b)    Schedule 3.17(b) includes a true and complete list of all registered, issued, or applied for Intellectual Property included in the Facility IP (including domain name registrations).  All such Facility IP is subsisting and, to Sellers' Knowledge, valid and enforceable.  Sellers own all right, title and interest in and to such Facility IP, free and clear of any Encumbrances, other than Permitted Encumbrances. Except as set forth in Schedule 3.17(b), the Facility IP includes all Intellectual Property owned by or licensed to Sellers or their Affiliates and used in connection with, or necessary to operate, the Seller Facilities.

(c)    Since the Lookback Date, Sellers have used commercially reasonable efforts (i) to protect, maintain, and preserve the Facility IP, including the confidentiality of the material trade secrets that are included in the Facility IP, and (ii) to secure ownership of any Intellectual Property developed by employees or contractors in the course of their employment with, or engagement by, Sellers in connection with the business of the Seller Facilities.

(d)    Sellers use, and at all times since the Lookback Date have used, commercially reasonable efforts to protect the confidentiality, integrity, and security of the information technology and network and communications equipment, systems, software, and infrastructure owned by the Sellers or provided by Affiliates or third parties and primarily used in connection with the Seller Facilities (the "***Facilities Systems***") and to prevent any unauthorized use, access, interruption, or modification of the Facilities Systems.  Except as set forth in Schedule 3.17(d), such Facilities Systems (i) are sufficient for the current needs of the business of the Seller Facilities, and (ii) are in sufficiently good working condition to support the operation of the business of the Seller Facilities as presently conducted.  Since the Lookback Date, there have been no unauthorized intrusions, failures, breakdowns, continued substandard performance, or other adverse events affecting any such Facilities Systems that have caused any

substantial disruption of or interruption in or to the use of such Facilities Systems or to the business of the Seller Facilities.  Sellers and their Affiliates maintain commercially reasonable disaster recovery and business continuity plans, procedures, and facilities in connection with the operation of the business of the Seller Facilities, have taken commercially reasonable steps in compliance therewith, and have taken commercially reasonable steps to test such plans and procedures on a periodic basis.

(e)     Sellers comply with, and at all times since the Lookback Date have complied with, in all material respects, all of the following, in each case to the extent relating to data privacy, protection, or security, consumer protection, security breach notification, or to the collection, use, processing, storage, protection, security, transfer, or disposal of personally identifiable information, protected health information, or other sensitive or protected data:  (i) all applicable Laws and any related security breach notification requirements; (ii) Sellers' own respective rules, policies, and procedures; (iii) industry standards applicable to the industries in which the Seller Facilities operate or to which the Seller Facilities are otherwise subject (including the Payment Card Industry Data Security Standard, if applicable); and (iv) applicable provisions of Contracts to which any Seller is bound (collectively, the "*Data Security Requirements*").  Neither the execution nor delivery of this Agreement nor the consummation of the Closing will result in a material breach or material violation of, or constitute a material default under, any Data Security Requirement.  Since the Lookback Date, no Seller (to the extent related to the business of the Seller Facilities) has experienced any incident in which confidential or sensitive information, payment card data, personally identifiable information, protected health information, or other protected information relating to individuals was or may have been stolen or improperly accessed, including any breach of security and no Seller has been the subject of any claim, proceeding, or investigation by a Governmental Authority with respect thereto.

**3.18     Environmental.**

(a)     With respect to the Purchased Assets, Sellers are, and since the Lookback Date have been, in compliance in all material respects with all Environmental Laws, which compliance has included obtaining and complying in all material respects with all Permits required pursuant to Environmental Laws.

(b)     Sellers, with respect to the Purchased Assets, have not received any written notice regarding any actual or alleged material violation of, or material liability under, Environmental Laws, which remains unresolved.

(c)     With respect to the Purchased Assets, to the Sellers' Knowledge, no Seller or any other Person to the extent giving rise to liability for Sellers, has disposed of, released, exposed any Person to, or owned or operated any facility or property contaminated by any hazardous or toxic substance, material, or waste in a manner that has given or would give rise to any material liabilities (contingent or otherwise) of any Seller pursuant to any Environmental Law.

(d)     Sellers have made available to Buyer copies of all material environmental audits, assessments, and reports and all other material documents bearing on environmental, health or safety liabilities in their possession or control relating to the Purchased Assets.

**3.19     Financial Statements.**

(a)     Sellers have made available to Buyer (i) the audited consolidated balance sheet of Sellers with respect to the Seller Facilities as of June 30, 2020, June 30, 2021, and June 30, 2022, and the related statements of income and cash flows (or the equivalent) for the fiscal years then ended; and (ii) the unaudited consolidated balance sheet of Sellers with respect to the Seller Facilities as of January 31, 2023 (the "*Latest Balance Sheet*"), and the related statements of income and cash flows (or the

equivalent) for the seven (7)-month period then ended (collectively, the "*Financial Statements*"). Each of the Financial Statements (including in all cases the notes thereto, if any) is accurate and complete, is consistent with the books and records of Sellers (which, in turn, are accurate and complete in all material respects), fairly presents, in all material respects, the financial condition and operating results of Sellers and has been prepared in accordance with GAAP consistently applied throughout the periods covered thereby, subject in the case of the unaudited financial statements to normal year-end adjustments and the absence of footnote disclosures (none of which footnote disclosures would, alone or in the aggregate, be materially adverse to the business, operations, assets, liabilities, financial condition, operating results, value, cash flow, or net worth of Sellers taken as a whole).

(b)      Except as set forth on Schedule 3.19(b), Sellers do not have or will not have any obligation or liability (whether accrued, absolute, contingent, unliquidated, or otherwise, whether or not known to Sellers, whether due or to become due and regardless of when or by whom asserted) arising out of any transaction entered at or prior to the date hereof, or any action or inaction at or prior to the date hereof, or any state of facts existing at or prior to the date hereof, other than (a) liabilities reflected on the Latest Balance Sheet, (b) liabilities and obligations which have arisen after the date of the Latest Balance Sheet in the Ordinary Course of Business (none of which is a liability for breach of contract, breach of warranty, tort, infringement, violation of law, claim or lawsuit), (c) obligations under Material Contracts (but not liabilities for any breach of any such Material Contracts occurring on or prior to the Closing Date) and (d) liabilities and obligations that would not be material to the Purchased Assets.

## 3.20    Brokers.

Except for H2C Securities Inc. and Toney Korf, no Person is entitled to any brokerage, financial advisory, finder's, or similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Sellers.

## 3.21    Affiliate Transactions.

Except as disclosed on Schedule 3.21, no officer, director, governing body member, stockholder, partner, or Affiliate, as applicable, of any Seller or any predecessor or Affiliate of any Seller or any individual related by marriage or adoption to any such individual or any entity in which any such Person owns any beneficial interest is a party to any agreement, Contract, commitment or transaction with any Seller or has any interest in the Purchased Assets or any property, real or personal or mixed, tangible or intangible of any Seller or owns, or licenses (whether or not to Sellers), any assets or properties (tangible or intangible) used in the operation of the Seller Facilities or provides any service to the Seller Facilities.

## 3.22    Bank Accounts.

Schedule 3.22 lists all bank accounts, safety deposit boxes, and lock boxes (designating each authorized signatory with respect thereto) of each Seller.

### ARTICLE IV - REPRESENTATIONS AND WARRANTIES OF BUYER

As of the Effective Date and as of the Closing Date, except as set forth in the Schedules to this ARTICLE IV, Buyer represents and warrants to Sellers the following:

## 4.1    Capacity, Authority, and Consents.

Buyer is validly existing under the Laws of the State of Iowa with the requisite power and authority to enter into this Agreement, to perform its obligations hereunder and to conduct its business as now being conducted. The execution, delivery, and performance of this Agreement and all other

agreements referenced herein to which Buyer is or will become a party and the actions to be taken by Buyer in connection with the consummation of the transactions contemplated herein:

(a)     are within the powers of Buyer, are not in contravention of applicable Law, and have been duly authorized by all appropriate action;

(b)     except as otherwise expressly provided herein or as set forth on <u>Schedule 4.1(b)</u>, do not require any approval or consent of, or filing with, any third party or any Governmental Authority;

(c)     except as otherwise expressly provided herein, will not result in any material breach or contravention of, nor permit the acceleration of the maturity of or termination of or constitute a default under, the terms of any material indenture, mortgage, contract, agreement, or other instrument to which Buyer is a party or otherwise bound that could be reasonably expected to materially impair Buyer's ability to fulfill its obligations under this Agreement; and

(d)     will not violate any Law to which Buyer is subject.

**4.2     Binding Agreement.**

This Agreement and all other Transaction Agreements to which Buyer is or will become a party pursuant to this Agreement are and will constitute the valid and legally binding obligations of Buyer, and are and will be enforceable against Buyer in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited, or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.3     Litigation and Proceedings.**

There are no Actions pending or, to Buyer's knowledge, threatened against Buyer, or any governing Persons thereof, at Law or in equity, or before or by any Governmental Authority, which seeks to prevent or delay consummation of the Transactions, seeks damages in connection with Transactions, or would impair the ability of Buyer to perform its obligations under this Agreement.

**4.4     Availability of Funds.**

Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price and will at the Closing have immediately available funds in cash which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

**4.5     Representations of Sellers.**

Buyer acknowledges that it is purchasing the Purchased Assets on an "AS IS, WHERE IS" basis, and that Buyer is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Sellers other than as expressly set forth in <u>ARTICLE III</u>.

**ARTICLE V - COVENANTS OF THE PARTIES**

**5.1     Access.**

From and after the Effective Date until the Closing or the earlier termination of this Agreement (the "***Interim Period***"), Sellers shall (a) provide Buyer and its Representatives reasonable access upon reasonable notice to and, as applicable, the right to inspect, the plants, properties, employees, books, and

records of the Seller Facilities and (b) furnish Buyer with such additional financial and operating data and other information as to the business and properties of the Seller Facilities as reasonably requested, including copies of the updated Financial Statements within thirty (30) days following each calendar month during the Interim Period; provided, however, that such access shall be coordinated through persons as may be designated in writing by Sellers for such purpose. Notwithstanding the foregoing, all disclosures of information shall be consistent with all common interest agreements, joint defense agreements, and any other confidentiality or nondisclosure agreements entered into between the Parties. Buyer's right of access and inspection shall be exercised during normal business hours and in such a manner as not to interfere unreasonably with the operations of the Seller Facilities.

**5.2    Delivery and Updates of Schedules.**

Except with respect to the Article III Schedules that are contemplated under Sections 3.5, 3.6, 3.7, 3.13, and 3.14, which shall be delivered by Sellers as of the Effective Date contemporaneously with the execution of this Agreement, Sellers shall deliver all Article III Schedules in a form acceptable to Buyer no later than two (2) business days prior to the Sale Procedures Hearing (the "***Initial Schedules***"). For the avoidance of doubt, no Initial Schedule will be deemed to be a part of this Agreement unless Buyer accepts such Initial Schedule in writing. After the Sale Procedures Hearing and no later than five (5) business days prior to the Closing Date, Sellers shall supplement or update any and all Article III Schedules with respect to any matter of which Sellers become aware which would cause a breach or inaccuracy of the representations and warranties set forth herein. No supplemental or amended disclosures pursuant to this Section 5.2 shall (x) be deemed to amend or supplement any of the Article III Schedules contemplated hereby, (y) be deemed to have cured any breach of any representation or warranty or covenant made in this Agreement or to satisfy any condition, or (z) limit or otherwise affect the remedies available hereunder to Buyer.

**5.3    Operating Covenants.**

During the Interim Period, except with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed) or as required by this Agreement, applicable Law, or a Bankruptcy Court Order, each Seller shall:

(a)    carry on its businesses in respect of the Seller Facilities and the Purchased Assets in the Ordinary Course of Business in all material respects;

(b)    perform its obligations relating to or affecting the Seller Facilities and the Purchased Assets in all material respects in the Ordinary Course of Business (including timely payment of accounts payable, purchasing and maintaining appropriate levels of Inventory based, with respect to such Inventory, on historical practices, maintenance of Sellers' books and records, performing all material maintenance and repairs, making capital expenditures and collecting Accounts Receivable);

(c)    keep in full force and effect current insurance policies, self-funded plans or trusts or other comparable insurance relating to or affecting the Seller Facilities and the Purchased Assets; ~~and~~

(d)    use its commercially reasonable efforts to (i) comply in all material respects with all Laws applicable to the Seller Facilities and the Purchased Assets, (ii) keep in force all Permits necessary for the operation of the Seller Facilities and the Purchased Assets, (iii) maintain and preserve its business organizations intact and retain the current Facility Employees (excluding terminations of employment in the Ordinary Course of Business other than with respect to the senior management of any Seller Facility), and (iv) maintain its relationships and goodwill with physicians, suppliers, customers and others having business relations with the Seller Facilities; and

(e)      on a weekly basis beginning on November 10, 2023, provide Buyer with an operational key performance indicators (KPI) report, to include (i) posted charges by inpatient and outpatient, (ii) patient days, (iii) surgeries, (iv) clinic visits, and (v) worked hours; and

(f)      on a weekly basis beginning on November 10, 2023, provide Buyer with a weekly report (the "*Weekly Budget Report*"), certified by Sellers' Chief Financial Officer and in the same form as the Budget, indicating all receipts received and disbursements made by Sellers in the week ending the prior Friday compared to the Budget and detailing any variances of more than 10% from the disbursements and receipts in the Budget.

**5.4      Negative Covenants.**

During the Interim Period, except as required by Law or as expressly contemplated by this Agreement or as ordered by the Bankruptcy Court, Sellers shall not, with respect to the Seller Facilities, the Purchased Assets or the Assumed Liabilities, without the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed):

(a)      amend, terminate, or enter into any Contract, except with respect to any such Contract that is amended, terminated, or entered into in the Ordinary Course of Business and that, over the term of such Contract involves less than $50,000 or can be terminated without cause by a Seller on ninety (90) days' notice or less without penalty;

(b)      increase compensation payable or to become payable, increase benefits provided to, make any bonus payment to, or otherwise enter into one or more bonus agreements with, any Facility Employee, except (i) as required by applicable Law, Contract, or the terms of an Employee Benefit Plan, (ii) in the Ordinary Course of Business in accordance with existing personnel policies and consistent with prior practice, or (iii) with respect to any retention bonuses which are to be paid in full prior to the Closing Date and for which Buyer will assume no liability or obligations with respect thereto;

(c)      sell, assign, lease or otherwise transfer or dispose of any Purchased Asset, any ownership interests of Sellers in any of the Seller Facilities, or any property, plant, or equipment used in connection with the operation of the Seller Facilities, in each case except in the Ordinary Course of Business; or

(d)      take any action that, if taken after December 31, 2020, would violate Section 3.16 in any material respect.

**5.5      Bankruptcy Court Approval; Executory Contracts.**

(a)      Sellers and Buyer acknowledge that this Agreement and the sale of the Purchased Assets and the assumption of the Assumed Liabilities are subject to (i) the receipt of higher and/or better bids at or prior to the auction (if any), and (ii) the entry of the Sale Order.  Buyer acknowledges that Sellers must take reasonable steps to demonstrate that they have sought to obtain the highest or otherwise best price for the Purchased Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about the Purchased Assets to prospective bidders, entertaining higher and/or better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Purchased Assets, conducting an auction in accordance with the Sale Procedures Order.

(b)      If Buyer is the successful bidder for the Acquired Seller Facilities, Sellers shall use commercially reasonable efforts to gain approval by the Bankruptcy Court of the purchase and sale of the Purchased Assets and the assumption and assignment of all Assumed Contracts contemplated hereby to

the extent required by Sections 363 and 365 and all other applicable provisions of the Bankruptcy Code within the terms of the Sale Procedures Order and Sale Order.

(c)     Sellers shall make reasonable good faith efforts to consult and cooperate with Buyer regarding (i) any material pleadings, motions, notices, statements, applications, schedules, reports, or other papers to be filed or submitted by Sellers in connection with or related to this Agreement (including, without limitation, any pleadings relating to the Sale Procedures Order or Sale Order), (ii) any discovery taken in connection with the Sale Order (including any depositions), and (iii) any hearing relating to the Sale Order, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

## 5.6     Approvals.

(a)     Sellers and Buyer shall each use commercially reasonable efforts to obtain all authorizations, consents, actions, orders, and approvals of, and to give all notices to and make all filings with, all Governmental Authorities and third parties that are, may be or become necessary for their execution and delivery of, and the performance of their obligations under, this Agreement and the consummation of the Transactions, and will cooperate fully with the other Parties in promptly seeking to obtain all such authorizations, consents, actions, orders, and approvals, giving such notices, and making such filings.

(b)     Notwithstanding anything to the contrary in this Agreement, each of the Parties will consult with and consider in good faith the other Parties in connection with any filing, communication, defense, litigation, negotiation, or strategy and, to the extent reasonably practicable and to the extent permitted by Law, give the other Parties the opportunity to attend and participate in any material meeting or conference with any Governmental Authority either in person or by telephone or videoconference, or, in connection with any proceeding by a private party, with any other Person relating to any antitrust Law regarding the Transactions. If there is a disagreement among the Parties about antitrust strategy as it relates to the Transactions, Buyer's decision shall control.

## 5.7     Notices.

Without limiting the Parties' representations or warranties in this Agreement, Sellers, on the one hand, and Buyer, on the other hand, shall promptly notify the other of (provided, that any matters disclosed in any such notice and/or update (and not pursuant to Section 5.2) shall not be deemed to have (i) amended this Agreement, including any Article III Schedules, (ii) qualified any representations and warranties of Sellers or Buyer, as applicable, or (iii) cured any misrepresentation or breach of the representations or warranties or satisfied any conditions of Sellers or Buyer, as applicable, that otherwise might have existed hereunder by reason of such matter):

(a)     any notice or other communication received from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(b)     any material notice or other material communication received from any Governmental Authority in connection with the Transactions;

(c)     any Proceeding commenced relating to the Seller Facilities or Purchased Assets of which it receives notice or any other fact, circumstance, event or action, the existence, occurrence or taking of which, individually or in the aggregate, (i) would reasonably be expected to have a Material Adverse Effect or a material adverse effect on Buyer's ability to consummate the Transactions, (ii) has resulted in, or would reasonably be expected to result in any material breach of a representation or warranty made by

a Party hereunder not being true and correct, or (iii) would reasonably be expected to result in the failure of any of the conditions set forth in <u>5.17</u> to be satisfied; and

(d)     any Proceeding which in any manner challenges or seeks to prevent, enjoin, alter, or materially delay the Transactions.

**5.8     Post-Closing Filings and Access to Information.**

(a)     After the Closing, each of Sellers and Buyer shall promptly deliver to the other Parties upon reasonable notice copies of any post-Closing filings, financial statements, or reports that may be required to be prepared and delivered to any Governmental Authority as a result of the consummation of the transactions described herein, in each case at the sole cost and expense of the requesting Party or Parties.

(b)     Each of Sellers and Buyer acknowledges that, subsequent to the Closing, Sellers may need access to information or documents in the control or possession of Buyer for the purposes of concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of third-party claims. Accordingly, Buyer shall, for a period of seven (7) years after the Closing, and indefinitely with respect to any Governmental Authority or third-party claims, maintain in accordance with retention requirements under applicable Law and make reasonably available to Sellers and their respective Representatives and/or Governmental Authorities, upon written request and reasonable advance notice and at the expense of Sellers, such documents and information as may be available relating to the Acquired Seller Facilities for periods prior to the Closing Date to the extent necessary to facilitate concluding the transactions herein contemplated, audits, compliance with Laws, and the prosecution or defense of claims (other than claims between the Parties). Each Party shall cooperate with the other in connection with the handling of any such post-Closing matters as may reasonably be requested.

**5.9     Employee Matters.**

(a)     Effective as of the day prior to the Closing Date, Sellers or their Affiliates shall terminate the employment of all of the Facility Employees currently employed by Sellers or their Affiliates (except for those Facility Employees identified on <u>Schedule 5.9</u>) (the "***Retained Facility Employees***"), and Buyer, subject to all applicable Buyer policies, including the completion of a satisfactory background screening, will make offers of employment, for employment effective as of the day following the Closing Date, to substantially all Facility Employees (other than the Retained Facility Employees) who are in active status and currently in good standing. Employee offers will be made according to the compensation terms set by Buyer, applicable collective bargaining agreements in effect at the time of Closing, and all applicable Laws. Each employee will be reviewed for appropriate classification within Buyer's employment policies and procedures, and will be classified accordingly. All employees who accept employment with Buyer (the "***Transferred Employees***") shall be eligible for benefits offered by Buyer to employees of that employee's classification. With respect to each Transferred Employee, Buyer shall assume Sellers' or their Affiliates' liability to such Transferred Employee for any personal time, holiday time, and Accrued Vacation as of the Closing Date, up to a maximum of 384 hours per employee (the "***Vacation Liability***"), by granting to each Transferred Employee, as of the date of hire with Buyer, an amount of accrued vacation with Buyer that is equal to the accrued personal time, holiday, and Accrued Vacation hours balance of such Transferred Employee as of the Closing Date (but no more than 384 hours for any Transferred Employee).

(b)     Buyer shall use commercially reasonable efforts to cause each of the benefit plans maintained by Buyer in which Transferred Employees are eligible to participate following the Closing (the "***Buyer Plans***") that is a group health plan in which any Transferred Employee becomes eligible to

participate in the plan year in which the Closing occurs to waive all limitations as to pre-existing conditions and waiting periods for such plan year with respect to participation and coverage requirements for any Transferred Employees and their eligible dependents.

(c)    Buyer shall not assume any obligations of Sellers related to any of Sellers' or their Affiliates' Employee Benefit Plans or any other benefit or compensation plan, program, policy, Contract, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by any of Sellers or any of their Affiliates or with respect to which any of Sellers or any of their Affiliates has any current or contingent liability or obligation.  Sellers and their Affiliates shall be solely responsible for satisfying the continuation coverage requirements of Section 4980B of the Code for all individuals who are "M&A qualified beneficiaries" as such term is defined in Treasury Regulation §54.4980B-9.

(d)    Nothing in this Section 5.9, express or implied, shall confer upon any Person other than the Parties any rights or remedies, including any third-party beneficiary rights, or shall be construed to (i) establish, amend, terminate or modify any compensation or benefit plan, program, policy, Contract, agreement or arrangement; (ii) limit the ability of Buyer or any of its Affiliates to amend, modify or terminate any compensation or benefit plan, program, policy, Contract, agreement or arrangement; (iii) create any right in any Transferred Employee or any other Person to any employment or service with Buyer or any of its Affiliates or to any particular term or condition of employment or service with Buyer or any of its Affiliates; or (iv) limit the ability of Buyer or any of its Affiliates to terminate the employment or service of any Person at any time and for any or no reason.

## 5.10    Misdirected Payments; Transitional Matters.

(a)    Sellers agree that Buyer, from and after the Closing Date, shall have the right and authority to collect for Buyer's own account the proceeds generated by the operation of the Purchased Assets from and after the Closing Time which shall be transferred to Buyer as provided herein.

(b)    Any asset (including payments of Accounts Receivable for the Seller Facilities, Pre-Closing Receivables, or Sellers' Transition Receivables) or liability, all other remittances, and all mail and other communications, that are determined by this Agreement to be or otherwise relate to the Excluded Assets and that is or comes into the possession, custody, or control of Buyer shall forthwith be transferred, assigned, or conveyed by Buyer to Sellers as promptly as reasonably practicable.  Such communications shall include Notices of Program Reimbursement or similar notices of payment settlements, payment demands, or other documents from Third-Party Payors.  Without limiting the generality of the foregoing, and subject to the terms of this Agreement, to the extent there are any misdirected funds forwarded to Buyer by any third parties, which misdirected funds are paid in respect of the performance of services or sale of goods by or on behalf of the Seller Facilities prior to the Closing Date, Buyer shall remit such misdirected funds, or cause such misdirected funds to be remitted, to Sellers within twenty (20) days after receipt thereof, to an account(s) designated by Sellers.  Until such transfer, assignment, and conveyance, Buyer shall not have any right, title or interest in or obligation or responsibility with respect to such asset or liability except that Buyer shall hold such asset in trust for the benefit of Sellers.  Buyer shall have no right to set-off such funds against other obligations asserted by Buyer to be owed by Sellers hereunder or under any Transaction Agreement.

(c)    Any asset or any liability, all other remittances, and all mail and other communications that are determined by this Agreement to be or otherwise relate to the Purchased Assets, and that is or comes into the possession, custody, or control of Sellers (or their successors-in-interest or assigns, or their respective Affiliates) shall forthwith be transferred, assigned or conveyed by Sellers (or their respective successors-in-interest or assigns and their respective Affiliates) to Buyer as promptly as reasonably practicable.  Without limiting the generality of the foregoing, and subject to the terms of this

Agreement, to the extent there are any misdirected funds forwarded to Sellers (or their successors-in-interest or assigns, or their respective Affiliates) by any third parties, which misdirected funds are paid in respect of the performance of services by or on behalf of the Acquired Seller Facilities from and after the Closing Date, Sellers shall remit such misdirected funds, or cause such misdirected funds to be remitted, to Buyer within twenty (20) days after receipt thereof, to an account(s) designated by Buyer. Until such transfer, assignment, and conveyance, Sellers (and their successors-in-interest and assigns and their Affiliates) shall not have any right, title, or interest in or obligation or responsibility with respect to such asset or liability except that Sellers shall hold such asset in trust for the benefit of Buyer. Sellers shall have no right to set-off such funds against other obligations asserted by Sellers to be owed by Buyer hereunder or under any Transaction Agreement.

(d)    For a period of one hundred eighty (180) days after the Closing Date, Sellers shall permit Buyer to use the policy and procedure manuals of Sellers that relate to or affect patient care and safety at the Acquired Seller Facilities; provided, however, that Buyer (i) shall, as soon as reasonably practicable after the Closing Date, work to adopt or implement its own policy and procedure manuals that relate to or affect patient care and safety at the Acquired Seller Facilities; (ii) shall indicate that such policies and procedure manuals as used by Buyer in the operation of the Acquired Seller Facilities are policies and procedures of Buyer; and (iii) acknowledges that Sellers do not make any representations or warranties with respect to the content of such manuals.

**5.11    Billing and Collection; Allocation of Certain Payments.**

(a)    Buyer and Sellers will cooperate with each other to take the steps necessary to allow Buyer (or its designated billing agent) to bill Medicare electronically on and after the Closing Date and for Buyer to obtain access to remittance advices and other related materials in connection with any such post-Closing claims submitted by Buyer for services rendered at the Acquired Seller Facilities on and after the Closing Date; provided, however, that Buyer acknowledges and agrees that Sellers may continue to use the Medicare provider number for the Hospital as assigned by CMS (the "***Medicare Provider Number***") after the Closing Date for a period of ninety (90) days to bill for Pre-Closing Receivables.

(b)    Each Seller grants to Buyer a license to use such Seller's billing identification information (which information shall include, without limitation, such Seller's name, Medicare and related Medicaid and TRICARE provider numbers, NPIs, federal employer identification numbers, and such other information as may be reasonably necessary) (collectively, "***Seller Billing Numbers***") for purposes of submitting claims to Medicare, Medicaid, and TRICARE. Each such license shall be effective (i) for purposes of Medicare, until CMS and the applicable Medicare Administrative Contractor approve Buyer's Medicare change of ownership application and issue approval acknowledging that Buyer may be reimbursed for claims submitted using Buyer's billing identification information; and (ii) for purposes of Medicaid and any other Government Programs, until the applicable Medicaid program(s) or program agent(s) approves Buyer's provider enrollment application and/or approves assignment of the applicable provider enrollment contract and issues the appropriate notice acknowledging that Buyer may be reimbursed by the applicable Medicaid or other Government Reimbursement Program for claims submitted using Buyer's identification information (the longer of such periods, the "***Transition Period***"). During the Transition Period, Sellers (or their Affiliates) shall not act to: (A) terminate any of their billing identification information except as required by applicable Law; (B) close any accounts used by Sellers as of the Closing Date for purposes of receiving reimbursement; or (C) cancel any electronic funds transfer agreements with respect to Medicare, Medicaid, TRICARE, or any other Government Reimbursement Program. All accounts receivable and monies collected in the name of Buyer or the Acquired Seller Facilities pursuant to this Section 5.11(b) for services rendered by Buyer on or after the Closing Date shall belong to Buyer. During the Transition Period and for a period of thirty (30) days

thereafter, Sellers shall afford Buyer and its representatives with view-only access to all deposit accounts into which any Medicare, Medicaid, or TRICARE payments or reimbursements are deposited.

(c)     To the extent that payments received by any Party for medical, surgical, behavioral, diagnostic, or other professional health services rendered and medicine, drugs, and supplies provided either specifically indicate on the accompanying remittance advice or other supporting documentation, or if the Parties otherwise agree, that they relate to the patients discharged by the Seller Facilities prior to the Closing Date (the "***Pre-Closing Receivables***"), the payments shall be retained by Sellers or forwarded by Buyer to Sellers or their designee by Buyer in accordance with <u>Section 5.10(b)</u> (and until so paid, shall hold in trust for the benefit of Sellers).

(d)     To the extent that payments received by any Party for medical, surgical, behavioral, diagnostic, or other professional health services rendered and medicine, drugs, and supplies provided either specifically indicate on the accompanying remittance advice or other supporting documentation, or if the Parties otherwise agree that they relate to the patients admitted at the Acquired Seller Facilities on or after the Closing Date (the "***Post-Closing Receivables***"), the payments shall be retained by Buyer or forwarded to Buyer or their designee by Sellers in accordance with <u>Section 5.10(c)</u> (and until so paid, shall hold in trust for the benefit of Buyer).

(e)     As of the Closing Date, Buyer intends to take assignment of Mercy Hospital's Medicare Provider Number with respect to Hospital. Buyer and Sellers each agree to remit to the other the other's allocable share (calculated pursuant to the procedures set forth in this <u>Section 5.11(e)</u>) of payments received by it from patients, Third-Party Payors, or other Persons with respect to Government Patient Receivables and other accounts receivable relating to the rendering of services and provision of medicine, drugs, and supplies ("***Transition Services***") to patients whose medical care is paid for, in whole or in part, by Medicare, Medicaid, TRICARE, or any other Third-Party Payor who pays on a Medicare Severity Diagnosis Related Group ("***MS-DRG***"), case rate, or other similar arrangement, and who are admitted to the Hospital before the Closing Date but who are not discharged until after the Closing Date ("***Straddle Patients***"). Payments pursuant to this <u>Section 5.11(e)</u> shall be made in accordance with <u>Section 5.11(e)(v)</u>.

(i)     With respect to any Medicare, Medicaid, TRICARE, and other diagnostic related group Straddle Patient, as soon as practicable after the Closing Date, Sellers shall deliver to Buyer a statement itemizing patients of the Hospital whose medical care is paid for, in whole or in part, by any Third-Party Payor who pays on a MS-DRG, case rate, or other similar basis (the "***MS-DRG Straddle Patients***"). Sellers' portion of the collections for each such MS-DRG Straddle Patient shall be (I) the amount equal to the payments actually received by any of the Parties in respect of such MS-DRG Straddle Patient multiplied by a fraction, the numerator of which shall be the total days the MS-DRG Straddle Patient was an inpatient prior to the Closing Date, and the denominator of which shall be the total days the MS-DRG Straddle Patient was an inpatient at Seller Facilities, minus (II) any deposits, deductibles, or co-payments made by such MS-DRG Straddle Patient to Sellers that constitute Excluded Assets. Any payments received by Buyer in respect of Sellers' portion such collections shall be remitted to Sellers in accordance with <u>Section 5.11(e)(v)</u>. Buyer's portion of the collections for each such MS-DRG Straddle Patient shall be the aggregate amount of payments actually received by any of the Parties with respect to such MS-DRG Straddle Patient minus the portion allocated to Sellers in accordance with the immediately preceding sentence. Any payments received by Sellers relating to Buyer's allocable share of such claims shall be remitted to Buyer in accordance with <u>Section 5.11(e)(v)</u>.

(ii)     With respect to collections for cost-based Straddle Patients, Sellers shall be allocated an amount equal to (I) the payments actually received by any of the Parties in respect of each cost-based Straddle Patient (including any deposits, deductibles, or co-payments that constitute the Excluded Assets) multiplied by a fraction, the numerator of which shall be the total number of days prior

to the Closing Date on which Sellers provided the Transition Services to such patient, and the denominator of which shall be the total number of days with respect to such patient's stay at the Hospital, minus (II) any deposits, deductibles, or co-payments made by such cost-based Straddle Patient to Sellers that constitute the Excluded Assets.  Any payments received by Buyer in respect of Sellers' portion such collections shall be remitted to Sellers in accordance with Section 5.11(e)(v).  Buyer's portion of the collections for each such cost-based Straddle Patient shall be the aggregate amount of payments actually received by any of the Parties with respect to such Straddle Patient minus the portion allocated to Sellers in accordance with the immediately preceding sentence.  Any payments received by Sellers relating to Buyer's allocable share of such claims shall be remitted to Buyer in accordance with Section 5.11(e)(v).

(iii)   If Buyer receives any periodic interim payments ("**PIP Payments**") from the Medicare or Medicaid program or costs paid for on a pass-through basis, such as capital costs, associated with the operations of the Hospital relating solely to periods prior to the Closing Date, Buyer shall tender the amount applicable to the period prior to the Closing Date to Sellers within ten (10) business days of receipt.  Likewise, if Sellers receive from Medicare or Medicaid any PIP Payments or pass-through costs associated with the operations of Hospital relating solely to periods on or after the Closing Date, Sellers shall tender the same to Buyer within ten (10) business days of receipt.  It is the intent of the Parties that Buyer and Sellers shall receive PIP Payments and pass-through cost payments (including capital costs) applicable to the period of time the Hospital are owned by such Party.

(iv)   If any Party receives any amount from patients, Third-Party Payors, or other Persons based on a "per case" reimbursement methodology which does not constitute a Government Patient Receivable, and which relates to services rendered wholly or partially by the other Party, the Party receiving such amount shall remit to such other Party in accordance with Section 5.11(e)(v) the other Party's allocable share of such amount, determined in the manner provided in Section 5.11(e)(i) as if such patient were a MS-DRG Straddle Patient for which the Hospital was being reimbursed based on a diagnostic related group methodology.  If any Party receives any amount from patients, Third-Party Payors, or other Persons which do not constitute Government Patient Receivables and which relate to services rendered wholly or partially by the other Party, whether resulting from payments based on capitation or other methodology, the Party receiving such amount shall remit the other Party's allocable share of such payment to such other Party in accordance with Section 5.11(e)(v).  If any Party receives any amount not otherwise described in this Section 5.11(e) from any Person which, under the terms of this Agreement, belongs to the other Party, the Party receiving such amount shall remit such amount to the other Party in accordance with Section 5.11(e)(v).

(v)   Payments owed by Buyer to Sellers or by Sellers to Buyer under this Section 5.11(e) (other than amounts governed by Section 5.11(e)(iii)) shall be made bi-monthly, on the tenth (10th) day of each month, for payments received by Sellers or Buyer, as applicable, on or between the sixteenth (16th) day and the last day of the previous month, and on the twenty-fifth (25th) day of each month, for payments received by Sellers or Buyer, as applicable, on or between the first (1st) day and fifteenth (15th) day of that month, in each case accompanied by copies of remittances and other supporting documentation as is reasonably requested by the other Party.  For purposes of the preceding sentence, a payment will be deemed to be "received" by a Party on the later of (A) the date that cash is received into the applicable Party's bank account or the applicable Party receives a check in respect of the applicable payment or (B) the date that the applicable Party receives the remittance advice in respect of the applicable payment.  Any other payments required to be made by Sellers to Buyer or by Buyer to Sellers as a result of (I) a notice of program reimbursement with respect to the operations of Seller Facilities or (II) other notice from a Governmental Reimbursement Program or other Third-Party Payor with respect to Transition Services shall be made within ten (10) days after the receipt of any such notice, as applicable.

(vi)     The Parties acknowledge that all charges for outpatient services rendered at the Acquired Seller Facilities shall be made (A) by Sellers for all periods prior to the Closing Date and (B) by Buyer for all periods on and after the Closing Date.

(vii)     The amounts payable to Sellers under this Section 5.11(e) are referred to herein as the "*Sellers' Transition Receivables*."

(f)     Sellers will cause their lenders to (i) acknowledge and agree that they do not have any lien or security interest in the Post-Closing Receivables or any proceeds thereof, and will not include any deposits representing Post-Closing Receivables made to Sellers' bank accounts as collateral for any lien or security interest that their lender may have against Sellers or any Affiliate of Sellers, and (ii) file an amendment to each UCC-1 financing statement filed by their lender which includes the Post-Closing Receivables or any proceeds thereof as collateral under such financing statement, which amendment shall remove and delete the Post-Closing Receivables or any proceeds thereof from the collateral description under each such financing statement.

(g)     Buyer shall reasonably cooperate with Sellers for a period of one hundred and twenty (120) days after the Closing Date in Sellers' efforts to collect all Accounts Receivable for services rendered prior to the Closing Date, including Pre-Closing Receivables to be paid over to Sellers in accordance with Section 5.11 and Sellers' Transition Receivables.  Any such amounts shall be retained by Sellers or forwarded by Buyer to Sellers or their designee in accordance with Section 5.10(b) (and until so paid, shall hold in trust for the benefit of Sellers).

(h)     Buyer shall use commercially reasonable efforts to provide to Sellers and their Representatives all information reasonably available to it identifying the source of the amounts of any Accounts Receivable for services rendered prior to the Closing Date, including Pre-Closing Receivables and Sellers' Transition Receivables, so as to permit Sellers to correctly apply such amounts to their accounts receivable.  In addition, upon reasonable request, Buyer shall permit Sellers and their Representatives (at Sellers' sole cost) to audit, access, and copy any of their records relating thereto; *provided* that any such audit, access, and copy shall be conducted during normal business hours and in a manner so as not to interfere unreasonably with the conduct of the business of Buyer.

## 5.12     Waiver of Bulk Sales Law Compliance.

Buyer hereby waives compliance by Sellers with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in the State of Iowa and all other similar Laws applicable to bulk sales and transfers.

## 5.13     Closing of Financials.

Sellers shall cause their business and finance Representatives after the Closing Time (the "*Finance Team*") to complete (or take such action as shall be necessary for Buyer or Sellers to complete) the standardized closing of Sellers' financial records for the Seller Facilities through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "*Closing of Financials*").  Sellers shall cause the Finance Team to use their good faith efforts to complete the Closing of Financials by no later than the date which is thirty (30) days after the Closing Date.

## 5.14     Exclusivity.

If an auction is conducted for any of the Purchased Assets and Buyer is the successful bidder at the conclusion of such auction, or if no Qualified Competing Bid (as defined in the Sale Procedures Order) is received on or before the Bid Deadline, then from and after the conclusion of the auction or the

Bid Deadline, as applicable, no Seller shall, and Sellers shall cause each of their respective Affiliates and Representatives not to, directly or indirectly, (i) submit, solicit, initiate, encourage, or discuss any proposal or offer from any Person (other than Buyer and its Affiliates in connection with the transactions contemplated hereby) or enter into any agreement or accept any offer relating to or consummate any purchase or sale of any Purchased Assets (other than the purchase and sale of inventory in the Ordinary Course of Business) or any similar transaction or business combination involving the Seller Facilities or the Purchased Assets (each of the foregoing transactions, a "***Business Transaction***"), or (ii) furnish any information with respect to, assist or participate in or facilitate in any other manner any effort or attempt by any Person (other than Buyer and its Affiliates) to do or seek to do any of the foregoing.  Sellers agree to notify Buyer immediately if any Person makes any proposal, offer, inquiry, or contact with respect to a Business Transaction.  Notwithstanding anything to the contrary herein, this Section 5.14 shall not require any of the Sellers or its board of directors, board of managers, or similar governing body to take any action or to refrain from taking any action with respect to a Business Transaction to the extent such Seller or governing body determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

**5.15     Confidentiality; Restrictive Covenants.**

(a)     Following the Closing, Sellers shall maintain as confidential and shall not use or disclose (except to their Affiliates and Representatives or as requested or required by Law or as authorized in writing by Buyer) (i) any information or materials relating to the Acquired Seller Facilities or Sellers' operation thereof, and (ii) any materials developed by Buyer or any of their Representatives.  Except as otherwise permitted and provided above, in the event any Seller is requested or required by Law to disclose any such confidential information, such Seller shall promptly notify Buyer (to the extent not prohibited by Law) in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with Buyer (at Buyer's sole cost and expense) to obtain a protective order and otherwise preserve the confidentiality of such information consistent with applicable Law.  Information subject to the confidentiality obligations in this Section 5.15(a) does not include any information which (x) is or becomes generally available to or known by the public (other than as a result of its disclosure in breach of this Agreement), or (y) becomes available on a non-confidential basis from a Person who is not actually known by Sellers to be bound by a confidentiality agreement with Buyer or its Affiliates, or who is not otherwise prohibited by a duty of confidentiality to Buyer from transmitting the information.  Notwithstanding anything to the contrary in this Section 5.15(a), nothing in this Agreement shall restrict Sellers' (A) use of the confidential information described in this Section 5.15(a) or (B) disclosure of such confidential information to any of their Affiliates or Representatives, in each case, in connection with any claims brought by or against Sellers in connection with this Agreement (including claims between the Parties hereto).

(b)     Each Seller hereby acknowledges that it is familiar with such Seller's trade secrets and with other confidential information relating to the Seller Facilities.  Each Seller acknowledges and agrees that Buyer may be irreparably damaged if it were to provide services to or otherwise participate in the business of any Person competing with Sellers in a similar business and that any such competition by such Seller (or its subsidiaries, parents, and each of their respective officers, directors, employees, Affiliates and assigns) may result in a significant loss of goodwill by Buyer.  Each Seller further acknowledges and agrees that the covenants and agreements set forth in this Section 5.15 were a material inducement to Buyer to enter into this Agreement and to perform its obligations hereunder, and that Buyer would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto if any Seller breached the provisions of this Section 5.15.  Therefore, each Seller agrees, in further consideration of the amounts to be paid hereunder, that until the fifth anniversary of the Closing, such Seller shall not (and shall cause its subsidiaries, parents, and each of their respective officers, directors, employees, Affiliates and assigns not to) directly or indirectly (i) own any interest in,

build, or operate an acute care hospital or inpatient or outpatient hospital facility within a radius of twenty (20) miles from any of the Acquired Seller Facilities or (ii) use, or permit any other Person to use, any Intellectual Property of any Seller (including, without limitation, names or logos) in connection with the ownership or operation of any health care facility or business in the State of Iowa.  Such Seller acknowledges that the geographic area, scope, and duration of the restrictions set forth above are reasonable and necessary to protect the goodwill of the Acquired Seller Facilities being sold by Sellers pursuant to this Agreement.

(c)        Each Seller further agrees that during the Interim Period and following the Closing until the fifth anniversary of the Closing it shall not (and shall cause its Affiliates and subsidiaries not to) directly, or indirectly through another Person, (i) induce or attempt to induce any employee of the Acquired Seller Facilities to leave the employ of the Acquired Seller Facilities, or in any way interfere with the relationship between Buyer, the Acquired Seller Facilities and any employee thereof, or (ii) hire any person who was an employee of the Acquired Seller Facilities at any time during the one (1)-year period immediately prior to the date on which such hiring would take place; provided, however, that solicitations in general advertisements (and the hiring of persons other than employees with a title of vice president, director and above, who respond to such general advertisements) which do not target such persons shall not constitute a breach of this Section 5.15(c).

(d)        If, at the time of enforcement of the covenants contained in Sections 5.15(b) and 5.15(c) (the "***Restrictive Covenants***"), a court shall hold that the geographic area, scope, or duration of the restrictions stated herein are unreasonable under circumstances then existing, the Parties agree that the maximum geographic area, scope, or duration reasonable under such circumstances shall be substituted for the stated geographic area, scope, or duration and that the court shall be allowed and directed to revise the restrictions contained herein to cover the maximum geographic area, scope, or duration permitted by Law.  Sellers have consulted with legal counsel regarding the Restrictive Covenants and based on such consultation have determined and each hereby acknowledges that the Restrictive Covenants are reasonable in terms of duration, scope, and area restrictions and are necessary to protect the substantial investment in the Acquired Seller Facilities made by Buyer hereunder.  If any Seller or a member, owner, Subsidiary, parent of a Seller or any of its respective Affiliates, assigns, or Representatives breaches, or threatens to commit a breach of, any of the Restrictive Covenants, Buyer shall have the right and remedy, which is in addition to, and not in lieu of, any other rights and remedies available to Buyer or any of its Affiliates at Law or in equity, to seek to have the Restrictive Covenants specifically enforced by any court of competent jurisdiction, it being agreed that any breach or threatened breach of the Restrictive Covenants may cause irreparable injury to Buyer and that money damages may not provide an adequate remedy to Buyer.  In the event of any breach or violation by any Seller of any of the Restrictive Covenants, the time period of such covenant shall be tolled until such breach or violation is resolved.

**5.16    Cost Reports.**

(a)        Sellers, at their own cost and expense, will prepare and timely file all cost reports relating to the Seller Facilities for periods ending at or prior to the Closing Time or required as a result of the consummation of the Transactions, including, without limitation, terminating cost reports relating to the Medicare, Medicaid, TRICARE, and Third-Party Payors which settle on a cost report basis (the "***Seller Cost Reports***").

(b)        Buyer shall forward to Sellers any and all correspondence relating to any Seller Cost Reports within ten (10) business days after receipt by Buyer.  Buyer shall remit any receipts of funds relating to Seller Cost Reports or the settlement thereof promptly after receipt by Buyer (and in all events

within ten (10) business days) and shall forward to Sellers any demand for payments relating to Seller Cost Reports or the settlement thereof within ten (10) business days after receipt by Buyer.

(c)     Sellers shall forward to Buyer any and all correspondence relating to Buyer's cost reports and Seller Cost Reports within ten (10) business days after receipt by Sellers.  Sellers shall remit any receipts of funds relating to Buyer's cost reports or the settlement thereof promptly after receipt by Sellers (and in all events within ten (10) business days) and shall forward to Buyer any demand for payments related to Buyer's cost reports or the settlement thereof within ten (10) business days after receipt by Sellers.

(d)     Sellers shall retain all rights to and obligations in respect of Seller Cost Reports and settlements thereof to the extent relating to periods ending at or prior to the Closing Time including any amounts receivable or payable in respect of such reports.  Such rights shall include, without limitation, the right to appeal any Medicare, Medicaid, and TRICARE determinations relating to such Seller Cost Reports.

(e)     Buyer, upon reasonable notice, during normal business hours and at the sole cost and expense of Sellers, will reasonably cooperate with Sellers in regard to the preparation, filing, handling, and appeals of Seller Cost Reports or the settlement thereof.  Sellers, upon reasonable notice, during normal business hours and at the sole cost and expense of Buyer, will reasonably cooperate with Buyer in regard to the preparation, filing, handling, and appeals of Buyer's cost reports. Notwithstanding the foregoing, except as required by law, Sellers shall not open, re-file, or amend any Seller Cost Report without the prior written consent of Buyer, which consent shall not be unreasonably withheld, conditioned, or delayed.  Sellers shall retain the originals of Seller Cost Reports, correspondence, work papers, and other documents relating to Seller Cost Reports and settlements thereof for the time periods prescribed by Law.  Sellers will furnish copies of the Seller Cost Reports, correspondence, work papers and other documents to Buyer upon reasonable request.  After the Closing Date, Sellers will reasonably cooperate with Buyer, at the sole cost and expense of Buyer, to the extent that Buyer has questions about, or otherwise needs pertinent information relating to, the Seller Cost Reports.  Sellers, at their own cost and expense, will timely prepare and file any other required reports for the Seller Facilities under state and local law with respect to any reportable period ending prior to the Closing Time.

**5.17    Title Abstracts and Surveys.**

Within thirty (30) days of the Effective Date, Sellers shall provide, at Sellers' cost and expense, updated title abstracts continued through the Effective Date of this Agreement and to the Title Company for each parcel of Owned Real Property (the "***Abstracts***"). The abstract continuations shall be performed by an abstractor selected by Sellers, and subject to Buyer's reasonable prior approval. The Title Company will then review and perform any supplemental title searches as necessary, in order to deliver current ALTA title commitments (the "***Title Commitments***") to Buyer for Buyer's review and approval. At Buyer's cost and expense, Buyer may obtain new or updated ALTA land title surveys for one or more parcels of Owned Real Property. At or prior to Closing, Sellers must take action to fulfill all requirements indicated in the Title Commitments in order to permit Title Company to issue the Title Policy and must take all action necessary to terminate or release, to Buyer's satisfaction, any matters disclosed in the Title Commitments that are not Permitted Encumbrances.  Without limiting the foregoing, prior to Closing, Sellers shall provide such documentation and take such other actions as may be reasonably necessary to evidence Mercy Hospital's ownership of any parcels of Owned Real Property that are titled in the name of Mercy Facilities, Inc. such that the Title Company can issue the Title Policy and Mercy Hospital can transfer such parcels to Buyer as of the Closing.

5.18    **Email Addresses.**

Sellers and Buyer shall cooperate in good faith to establish a system to ensure that emails directed to Transferred Employees at their email addresses existing immediately prior to the Closing shall be accessible to the Transferred Employees, either directly or through a technical redirection process to new email addresses.  Sellers shall maintain this system for a period of one (1) year from the Closing, or such shorter period as the Parties may agree.  Sellers hereby grant to Buyer an exclusive, irrevocable, royalty-free license for the Transferred Employees to continue to use their pre-existing email addresses for such one-year period.  Sellers agree that they will not reassign the email address for any Transferred Employee for a period of two (2) years after the expiration of the license granted pursuant to this Section 5.18.  For the avoidance of doubt, the content of any emails, as well as any and all attachments thereto, shall be treated as confidential information that is subject to Section 5.15(a).  Further, Sellers agree that they shall not, and they shall cause the employees, officers, directors, and representatives of Sellers and Sellers' Affiliates not to, access or view the contents of such emails and/or attachments.

## ARTICLE VI - CONDITIONS TO CLOSING

6.1    **Conditions to Obligations of Buyer and Sellers.**

The obligations of Buyer and Sellers to consummate the Closing are subject to the satisfaction, on or before the Closing, of each of the following conditions unless waived in writing by each of the Parties:

(a)    There must not be issued and in effect on the Closing Date any Order or Law restraining, enjoining, or otherwise prohibiting or making illegal the consummation of the Transactions.

(b)    The Bankruptcy Court shall have entered the Sale Order, which shall (i) be in full force and effect, (ii) not be subject to any stay or appeal, (iii) not have been materially modified without the written consent of Buyer and Sellers (not to be unreasonably withheld, conditioned, or delayed), (iv) not have been reversed or vacated, and (v) unless waived by Buyer, shall be a Final Order.

6.2    **Conditions to Obligations of Buyer.**

The obligations of Buyer to consummate the Transactions are subject to the satisfaction, on or prior to the Closing Date, of each of the following further conditions unless (but only to the extent) waived in writing by Buyer:

(a)    The representations and warranties of Sellers contained in ARTICLE III other than the Fundamental Representations shall be true and correct in all respects (other than in Section 3.16(i) without giving effect to any limitation or qualification as to "materiality" or "Material Adverse Effect" set forth therein) on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specified date, which need only be true and correct as of such date), except for the failure of such representations and warranties to be true and correct which would not, in the aggregate, result in a Material Adverse Effect.  Each Fundamental Representation shall be true and correct (without giving effect to any limitation or qualification as to "materiality" or "Material Adverse Effect" set forth therein) in all material respects on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specified date, which need only be true and correct in all material respects as of such date).

(b)    Sellers shall have performed in all material respects the covenants and agreements contained in this Agreement to be complied with or performed by Sellers on or before the Closing Date.

(c)      Buyer shall have received each of the items set forth in Section 2.9.

(d)      Since the Effective Date, there shall have been no Material Adverse Effect.

(e)      There shall have been no material issues relating to Sellers' Medicare or Medicaid Cost Reports, Permits, or other compliance with Healthcare Laws resulting in a liability regarding the Purchased Assets, the Acquired Seller Facilities, or Sellers' operation of the Acquired Seller Facilities.

(f)      The Acquired Seller Facilities shall be in good standing with all applicable non-governmental Third-Party Payors, and Buyer shall have received evidence or assurances, in form and substance satisfactory to Buyer, that Buyer will be able to include the Acquired Seller Facilities within the scope and purview of Buyer's contracts with all material non-governmental Third-Party Payors of Buyer as of or immediately following the Closing Date.

(g)      There shall be no pending, ongoing, or threatened litigation regarding the Acquired Seller Facilities or Sellers' operation of the Acquired Seller Facilities that is not subject to the "free and clear" provisions of the Sale Order.

(h)      Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that the Parties have obtained from applicable Governmental Authorities the approvals and consents necessary to issue the Material Permits in the name of Buyer to effect the transactions set forth in this Agreement and to enable Buyer to operate the Acquired Seller Facilities and Purchased Assets;

(i)      Buyer shall have entered into transition services agreements with such material third parties as may be necessary to continue to operate the Acquired Seller Facilities following the Closing, each in form and substance satisfactory to Buyer;

(j)      Other than Permitted Encumbrances, Sellers shall convey the Purchased Assets free and clear of all Encumbrances with respect to Sellers or the Purchased Assets, prior to or contemporaneous with the Closing, including, without limitation, the removal of such Encumbrances disclosed on Schedule 3.4(a); and

(k)      The Title Company shall be irrevocably committed to issue the Title Policy in favor of Buyer (together with all endorsements and affirmative coverages required by Buyer and in an amount determined by Buyer), to be used after Closing as of the date and time of recording of the applicable Special Warranty Deed(s), insuring Buyer's interest in the Owned Real Property free and clear of all liens and Encumbrances other than the Permitted Encumbrances. The base premium for the extended ALTA coverage in favor of Buyer in the amount determined by Buyer, will be at Sellers' cost, and any endorsements to the Title Policy elected by Buyer will be at Buyer's cost.

**6.3**      **Conditions to Obligations of Sellers.**

The obligations of Sellers to consummate the Transactions described herein are subject to the satisfaction, on or prior to the Closing Date, of each of the following further conditions unless (but only to the extent) waived in writing by Sellers:

(a)      The representations and warranties of Buyer contained in ARTICLE IV shall be true and correct in all respects (without giving effect to any limitation or qualification as to "materiality" set forth therein) on and as of the Closing Date (except for representations and warranties that expressly speak only as of a specified date, which need only be true and correct as of such date), except for the failure of such representations and warranties to be true and correct which would not, in the aggregate, result in a material adverse effect on Buyer's ability to consummate the Transactions.

(b)      Buyer shall have performed in all material respects the covenants and agreements contained in this Agreement, the Sale Order, or the Sale Procedures Order to be complied with or performed by Buyer on or before the Closing Date.

(c)      Sellers shall have received each of the items set forth in <u>Section 2.10</u>.

## ARTICLE VII - TERMINATION

**7.1      Grounds for Termination.**

This Agreement may be terminated at any time prior to the Closing:

(a)      by the mutual written consent of Sellers and Buyer;

(b)      by Buyer, if any Seller breaches or fails to perform in any respect any of its representations, warranties, or covenants contained in this Agreement such that a condition in <u>Section 6.1</u> or <u>Section 6.2</u> is incapable of being satisfied before the End Date, and such breach either (i) is not capable of being cured on or before the End Date or (ii) has not been cured by Sellers to Buyer's reasonable satisfaction within fourteen (14) days of Buyer's written notice to Sellers of such breach, or if it otherwise becomes reasonably apparent that a condition in <u>Section 6.1</u> or <u>Section 6.2</u> is incapable of being satisfied before the End Date (whether or not resulting from a breach of this Agreement by Sellers); <u>provided</u>, that no cure period shall extend past the End Date; <u>provided</u>, <u>further</u>, that Buyer shall not have the right to terminate this Agreement pursuant to this <u>Section 7.1(b)</u> if Buyer is then in material breach of any of its representations, warranties, covenants, or agreements contained in this Agreement;

(c)      by Buyer, if the Bankruptcy Court fails to enter the Bid Procedures Order in form and substance reasonably acceptable to Buyer designating Buyer as the "stalking horse" purchaser for the Acquired Assets and approving the Bid Protections;

(d)      by Sellers, if Buyer breaches or fails to perform in any respect any of its representations, warranties, or covenants contained in this Agreement such that a condition in <u>Section 6.1</u> or <u>Section 6.3</u> is incapable of being satisfied before the End Date, and such breach either (i) is not capable of being cured on or before the End Date; or (ii) has not been cured by Buyer to Sellers' reasonable satisfaction within fourteen (14) days of Sellers' written notice to Buyer of such breach, or if it otherwise becomes reasonably apparent that a condition in <u>Section 6.1</u> or <u>Section 6.3</u> is incapable of being satisfied before the End Date (whether or not resulting from a breach of this Agreement by Buyer); <u>provided</u>, that no cure period shall extend past the End Date; <u>provided</u>, <u>further</u>, that Sellers shall not have the right to terminate this Agreement pursuant to this <u>Section 7.1(d)</u> if any Seller is then in material breach of any of representations, warranties, covenants, or agreements contained in this Agreement;

(e)      by either Sellers, on the one hand, or Buyer, on the other hand, if the Closing has not occurred on or before February 29, 2024 (the "***End Date***"); <u>provided</u>, <u>however</u>, that the right to terminate this Agreement pursuant to this <u>Section 7.1(e)</u> shall not be available if the failure of the Party so requesting termination to fulfill any obligation under this Agreement shall have been the primary cause of the failure of the Closing to occur on or before the End Date;

(f)      by Buyer, upon the appointment of a trustee or examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code, or upon the commencement of or at any point during any Proceeding (other than the Bankruptcy Case) relating to the Transactions that, in Buyer's reasonable discretion, is reasonably likely to (i) result in an Order precluding or prohibiting the consummation of the Transactions or (ii) require Buyer to incur material expenses to defend or otherwise respond to;

(g)　　　by either Sellers, on the one hand, or Buyer, on the other hand, upon the dismissal of the Bankruptcy Case or the conversion of the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code;

(h)　　　by either Sellers, on the one hand, or Buyer, on the other hand, if, at the end of the auction contemplated by the Sale Procedures Order, Buyer's bid is not determined to be the winning bid or the next-best bid or back-up bid (as determined pursuant to the Sale Procedures Order);

(i)　　　by Sellers if (i) all the conditions set forth in Section 6.1 and Section 6.2 have been satisfied (other than those conditions that by their nature or terms are to be satisfied at the Closing, but subject to satisfaction of those conditions at the Closing), (ii) Buyer is required to consummate the Closing pursuant to Section 2.8, (iii) Buyer fails to consummate the Closing within five (5) days following the date it was required to do so pursuant to Section 2.8, (iv) Sellers give irrevocable written notice to Buyer at least three (3) business days prior to such termination stating that Sellers will terminate this Agreement pursuant to this Section 7.1(i) if the Closing is not consummated within such three (3) business day period, (v) Sellers stood ready, willing and able to consummate the Closing during such three (3) business day period, and (vi) Buyer fails to consummate the Closing within such three (3) business day period; provided that Sellers shall not have the right to terminate this Agreement pursuant to this Section 7.1(i) if any Seller is then in material breach of any of its covenants, agreements, representations or warranties set forth in this Agreement;

(j)　　　by Sellers if the Initial Deposit is not timely paid by or on behalf of Buyer in accordance with Section 2.6(a)(i); provided, however, that the right to terminate this Agreement under this Section 7.1(j) must be exercised, if exercisable, prior to the payment of the Initial Deposit; or

(k)　　　by Buyer if the Initial Schedules are not acceptable in its discretion.

In the event of termination by Buyer or Sellers pursuant to this Section 7.1, written notice thereof (describing in reasonable detail the basis therefor) shall be delivered to the other Parties.

**7.2　　Effect of Termination.**

(a)　　　Except as otherwise provided in this Section 7.2, in the event of a termination of this Agreement pursuant to Section 7.1, this Agreement shall forthwith become null and void and of no further force and effect (other than the provisions of Section 2.6(a)(i) (Initial Deposit), this ARTICLE VII (Termination), ARTICLE IX (General Provisions), and Section 8.3 (Bid Protections), all of which shall survive termination of this Agreement), and there shall be no liability on the part of any Party hereto or any of its Affiliates to any other Person resulting from, arising out of, relating to, or in connection with this Agreement or any other Transaction Agreement; provided, however, that nothing in the preceding sentence shall relieve any Party hereto from any liability for fraud or willful breach of this Agreement prior to termination, with "willful" meaning an intentional action or omission known and intended to be a breach hereof; provided, further, that in no event shall Buyer be required to (x) pay an aggregate amount in excess of the Initial Deposit; or (y) pay any amount of monetary damages if Mercy Hospital has (A) received the Initial Deposit following release of the Initial Deposit to Mercy Hospital in accordance with the provisions of Section 2.6(a)(i) or (B) the Closing has occurred (including pursuant to an order for specific performance in the circumstances permitted by Section 9.16).

(b)　　　Without limiting Sellers' right to specific performance prior to termination of this Agreement solely to the extent provided in, and subject to the terms and conditions of, Section 9.16, Mercy Hospital's right to receive the Deposit from Buyer pursuant to, and subject to the terms and conditions of, Section 2.6(a)(i) shall be the sole and exclusive remedy of any Seller against Buyer for any monetary damages suffered by any Seller, or any liability or obligation of any kind of Buyer, in each

case, caused by, arising out of, relating to, or in connection with (A) any breach or threatened or attempted breach of this Agreement or any Transaction Agreement, (B) any failure or threatened or attempted failure of Buyer to comply with their obligations under this Agreement or any other agreement, certificate or other document entered into between the parties pursuant to the terms of this Agreement, (C) any failure to consummate any of the transactions contemplated by this Agreement, or (D) this Agreement, any other agreement, certificate, or other document entered into between the Parties pursuant to the terms of this Agreement, the transactions contemplated hereby or the failure of any of the transactions contemplated hereby to be consummated or the termination of this Agreement, in each case, including in any litigation under any legal theory, whether sounding in law (whether for breach of contract, in tort or otherwise) or in equity (the items referred to in the foregoing clauses (A) through (D), the "***Potential Claims***").  No Seller shall be entitled to bring, and shall in no event support, facilitate, encourage, or take any action other than opposing, the bringing of, any litigation against Buyer or any of its Affiliates with respect to, arising out of, relating to, or in connection with any Potential Claim or otherwise with respect to the transactions contemplated by this Agreement and Sellers shall dismiss with prejudice any then pending litigation by any Seller against Buyer or any of its Affiliates as promptly as practicable after such termination (and in no event later than three (3) days following such termination).

## ARTICLE VIII  - BANKRUPTCY MATTERS

**8.1    Sale Procedures Motion.**

Within five (5) business days of the Effective Date, Sellers shall file a motion in form and substance acceptable to Buyer seeking entry of an Order (the "***Sale Procedures Order***"): (a) setting forth the deadlines, processes, and procedures that will be used to market and sell the Acquired Assets (the "***Bid Procedures***"); (b) designating Buyer as the "stalking horse" purchaser for the Acquired Assets; and (c) approving the Bid Protections.

**8.2    Bid Procedures**.

The Sale Procedures Order shall provide, among other things, that: (a) the deadline for prospective purchasers other than Buyer to submit a competing bid for some or all of the Acquired Assets (the "***Bid Deadline***") shall be no later than forty-five (45) days following the date on which the Bankruptcy Case is filed (the "***Petition Date***"); (b) that for any bid to be deemed a Qualified Competing Bid (as defined in the Sale Procedures Order) such bid, including any credit bid, must be in writing and accompanied by a cash deposit in an amount no less than 10% of the purchase price set forth in such bid as well as evidence of (i) the financial wherewithal of the bidder and (ii) the bidder's prior experience owning/operating comparable facilities or such other applicable experience; (c) in the event Sellers receive a Qualified Competing Bid on or before the Bid Deadline, Sellers shall hold an auction (the "***Auction***") to determine the winning bidder for the Acquired Assets no later than fifty (50) days after the Petition Date and shall provide written copies of all materials submitted by all bidders to all parties entitled to attend the Auction no later than two (2) business days prior to the Auction; (d) each bid must clearly set forth the purchase price in U.S. dollars to be paid for the proposed purchased assets, including identifying separately any cash and non-cash components, and the cash component of such purchase price shall equal at least the sum of the Bid Protections (defined below); (e) any Qualified Bidder (as defined in the Sale Procedures Order) who has a valid, perfected, and undisputed lien on any of the Proposed Purchased Assets (a "***Secured Creditor***") that seeks to credit bid all or a portion of the value of such Secured Creditor's claims, within the meaning of and subject to section 363(k) of the Bankruptcy Code, shall have the right to credit bid its secured claim only with respect to the collateral by which such Secured Creditor is secured; and (f) at least two (2) business days prior to the Auction, the Sellers will notify Buyer of the terms of the highest Qualified Bid and the identity of all Qualified Bidders that intend to participate in the Auction.

**8.3**     **Bid Protections**.

The Sale Procedures Order shall provide that, in the event Buyer is not declared the winning bidder at the Auction and the Bankruptcy Court approves an Alternative Transaction, Sellers shall be required to pay to Buyer a fee in the amount of 4% of the Purchase Price (the "***Break-Up Fee***") and reimbursable expenses incurred by Buyer prior to the conclusion of the Auction up to $400,000 (the "***Expense Reimbursement***").    Subject to approval of the Bankruptcy Court, the Break-Up Fee and Expense Reimbursement shall be allowed administrative expense claims against Sellers' bankruptcy estates pursuant to Sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code. The Sale Procedures Order shall also provide, subject to the approval of the Bankruptcy Court, in the event of an auction, for an initial overbid protection in an amount equal to $21,300,000 (the "***Initial Overbid***") and minimum bid increments thereafter of $100,000 (the "***Minimum Overbid Increment***", together with the Initial Overbid, the Expense Reimbursement, and the Break-Up Fee, the "***Bid Protections***"). For the avoidance of doubt, the Bid Protections shall only constitute administrative expense claims upon the closing and funding of an Alternative Transaction and shall be paid to Buyer by Sellers immediately following the closing of such Alternative Transaction. No further or additional order from the Bankruptcy Court shall be required to give effect to such provisions relating to the terms of payment of the Break-Up Fee and Expense Reimbursement.

8.4     **Marketing Process**.

Between the time the Sale Procedures Motion is filed and either (i) the date the Auction is held or (ii) in the event no Qualified Competing Bid (as defined in the Sale Procedures Order) is submitted, the Bid Deadline, Sellers may contact, through whatever means are reasonable, other potential purchasers for the Acquired Assets and engage in discussions with such potential purchasers that would be higher and better than reflected in this Agreement.

8.5     **Sale Related Court Filings**.

Two (2) business days prior to filing any papers or pleadings in the Bankruptcy Case that relate primarily to this Agreement or Buyer, including all pleadings intended to be filed on the Petition Date, or as soon as reasonably practicable under the circumstances, Sellers shall provide Buyer with a copy of such papers or pleadings for review and comment; provided the foregoing shall in all events be consistent with this Agreement in all material respects. Sellers shall consider such changes thereto as reasonably requested by Buyer or its representatives.

## ARTICLE IX - GENERAL PROVISIONS

**9.1     Survival.**

The Parties, intending to modify any applicable statute of limitations, agree that (a) the representations and warranties of the Parties contained in this Agreement and in any certificate delivered pursuant hereto shall terminate effective as of the Closing and shall not survive the Closing for any purpose, and thereafter there shall be no liability on the part of, nor shall any claim be made by, any Party or any of their respective Affiliates in respect thereof, and (b) after the Closing, there shall be no liability on the part of, nor shall any claim be made by, any Party or any of its respective Affiliates in respect of any covenant or agreement to be performed prior to the Closing contained in this Agreement and in any certificate delivered pursuant hereto.

**9.2     Certain Tax Matters.**

(a)     All transfer, documentary, sales, use, stamp, registration, and other such similar Taxes and fees, including penalties and interest, if any, (but exclusive of any income, gross receipts, franchise,

capital or similar Taxes), incurred in connection with this Agreement and the transactions contemplated herein (each a "***Transfer Tax***" and, collectively, "***Transfer Taxes***") shall be borne and paid by the respective Party upon which such Transfer Tax is imposed under applicable Law.  Each Party agrees to cooperate with such other Parties in the timely completion, execution and filing of any documentation required or exemptions allowed by any local, state or other Governmental Authority in connection with the Transfer Taxes.  Buyer and Sellers shall cooperate in providing each other with any appropriate certification and other similar documentation relating to exemption from Transfer Taxes (including any appropriate resale exemption certifications), as provided under applicable Law.

(b)     Sellers and Buyer each agree that the Purchase Price (including for the Assumed Liabilities and any other items required to be taken into account for income Tax purposes) shall be allocated among the Purchased Assets purchased pursuant to this Agreement in accordance with Section 1060 of the Code and Schedule 9.2(b).  Within sixty (60) days after Closing, Buyer shall provide to the Sellers a schedule (the "***Allocation Schedule***") allocating the Purchase Price in accordance with the foregoing and shall consider in good faith any reasonable comments provided by Sellers.  Buyer and Sellers shall work in good faith to resolve any disputes related to the Allocation Schedule and if they cannot do so within a reasonable period of time such dispute shall be resolved by a nationally recognized accounting firm mutually selected by Buyer and Sellers.  The costs of such accounting firm associated with resolving such dispute shall be borne equally by Buyer and Sellers.  Buyer and Sellers each agree to file IRS Form(s) 8594 and all federal, state and local income Tax Returns in accordance with the Allocation Schedule, as finally determined, and none of them shall thereafter take an income Tax Return position inconsistent with such allocation unless such inconsistent position shall arise out of or through an audit or other inquiry or examination by the IRS or other Tax authority.  Sellers and Buyer each agree to provide the other promptly with any other information required to complete the Allocation Schedule.

(c)     Each Party shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement such amount as it is required to deduct and withhold with respect to the making of such payment under the Code or other applicable Tax Law.  Any such amounts that are deducted or withheld shall be treated as having been paid to the Person in respect of which such deduction and withholding was made.

**9.3     Additional Assurances.**

The provisions of this Agreement shall be self-operative and shall not require further agreement by the Parties except as may be herein specifically provided to the contrary; provided, however, at the request of a Party, the other Party or Parties shall execute such additional instruments and take such additional action as the requesting Party may reasonably request to effectuate this Agreement.  In addition, and from time to time after the Closing Date, Sellers and Buyer shall each execute and deliver such other instruments of conveyance and transfer, and take such other actions as any Party may reasonably request, to more effectively convey and transfer full right, title and interest to, vest in, and place Buyer in legal and actual possession of the Purchased Assets.  This Agreement shall continue to be binding and shall not be invalidated by appointment of a trustee or examiner with expanded powers, confirmation of a plan, conversion, or dismissal.

**9.4     Choice of Law; Jurisdiction.**

(a)     This Agreement and all disputes or controversies arising out of or relating to this Agreement or the Transactions (whether in contract or tort) shall be governed by and construed in accordance with the Laws of the State of Iowa, without regard to conflicts of law principles.

(b)     Except as otherwise expressly provided in this Agreement or any of the other Transaction Agreements, and without limitation of any Party's right to appeal any Order of the

Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes arising out of or in connection with this Agreement or the Transactions or disputes relating hereto; and (b) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that if the Bankruptcy Case is closed, any Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement, the other Transaction Agreements or the Transactions shall be brought in a federal court located in District of the Northern District of Iowa and that any cause of action arising out of this Agreement or any of the other Transaction Agreements shall be deemed to have arisen from a transaction of business in the State of Iowa, and each of the Parties hereby irrevocably consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in any such court or that any such Proceeding which is brought in any such court has been brought in an inconvenient forum.  Process in any such Proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court.

**9.5      WAIVER OF JURY TRIAL.**

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**9.6      Benefit, Assignment and Third-Party Beneficiaries.**

Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns; provided, however, that no Party may assign this Agreement without the prior written consent of the other Party except that Buyer may assign this Agreement and/or any of their rights hereunder to any Affiliate of Buyer or in connection with any subsequent disposition or transfer of all or any portion of the Purchased Assets in any form of transaction, without the prior written consent of Sellers.  The Parties acknowledge that Buyer may assign ownership and title to certain of the Purchased Assets to certain designees of Buyer, such that more than one entity may own the Purchased Assets at Closing; provided, further, that no such assignment shall serve to release Buyer from their obligations or any liability hereunder.  This Agreement is intended solely for the benefit of the Parties and is not intended to, and shall not, create any enforceable third-party beneficiary rights.

**9.7      Cost of Transaction.**

Except as expressly provided herein, all costs and expenses incurred in connection with negotiating, preparing, and executing the Transaction Agreements shall be paid by the Party incurring such cost or expense.

**9.8      Waiver of Breach.**

The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision hereof.  Any agreement on the part of any Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

**9.9** **Notice.**

Any notice, demand, or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered with signed receipt, when delivered by facsimile or other electronic means with electronic confirmation of delivery (unless not delivered on a business day or delivered after 5:00 p.m. Central Time on a business day, in which case such delivery shall be deemed effective on the next succeeding business day), when delivered by overnight courier with signed receipt, or when delivered by registered United States mail, with postage prepaid and return receipt requested, addressed to the addresses below or to such other address as any Party may designate, with copies thereof to the respective counsel thereof as notified by such Party.

Buyer:                University of Iowa
                      Attn: Associate Vice President for Legal Affairs for UI
                      Health Care
                      200 Hawkins Drive, 1349 JCP
                      Iowa City, Iowa 52242

With a copy (which shall not constitute notice) to:

                      Polsinelli PC
                      150 N. Riverside Plaza, Suite 3000
                      Chicago, Illinois 60606
                      Attn:  Linas Grikis
                      Email:  lgrikis@polsinelli.com


Sellers:              Mercy Hospital, Iowa City, Iowa
                      500 E. Market Street
                      Iowa City, Iowa 52245
                      Attn: Mark Toney


With a copy (which shall not constitute notice) to:

                      McDermott Will & Emery LLP
                      444 W. Lake Street, Suite 4000
                      Chicago, IL 60606-0029

                      Attn: Felicia Perlman, Megan Rooney, and Daniel Simon


**9.10** **Severability.**

In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, which shall be and remain in full force and effect, enforceable in accordance with its terms, and such invalid, illegal, or unenforceable term automatically will be amended so that it is valid, legal and enforceable to the maximum extent permitted by applicable Law, but as close to the Parties' original intent as is permissible.

**9.11    Interpretation.**

In the interpretation of this Agreement, except where the context otherwise requires, (a) "including" or "include" does not denote or imply any limitation, (b) "$" refers to United States dollars, (c) the singular includes the plural, and vice versa, and each gender includes each other gender, (d) captions or headings are only for reference and are not to be considered in interpreting this Agreement, (e) "Section" refers to a section of this Agreement, unless otherwise stated in this Agreement, (f) "Exhibit" refers to an exhibit to this Agreement (which is incorporated herein by reference), unless otherwise stated in this Agreement, (g) "Schedule" refers to a schedule to this Agreement, unless otherwise stated in this Agreement and incorporates any attachments thereto (which are incorporated herein by reference), (h) all references to times are times in Iowa City, Iowa, (i) "day" refers to a calendar day unless expressly identified as a "business day," which means any day that is not a Saturday, Sunday, or official federal holiday in the United States, and (j) "made available to Buyer" or similar phrases means information included in a virtual data room maintained by Hammond Hanlon Camp LLC to which Buyer and its representatives have had access as of fifteen (15) business days prior to the Effective Date or Closing Date, as applicable.

**9.12    Entire Agreement, Amendments and Counterparts.**

This Agreement supersedes all previous contracts, agreements, and understandings between the Parties regarding the subject matter hereof and constitutes the entire agreement existing between or among the Parties respecting the subject matter hereof and no Party shall be entitled to benefits other than those specified herein.  As between or among the Parties, no oral statements or prior written material not specifically incorporated herein shall be of any force and effect, and no Party is relying on any such oral statements or prior written material.  All prior representations or agreements, whether written or oral, not expressly incorporated herein are superseded and no changes in or additions to this Agreement shall be recognized unless and until made in writing and signed by all Parties.  This Agreement may be executed in counterparts, each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.  Signatures received via facsimile or other electronic transmission shall be accepted as originals.

**9.13    Personal Liability.**

This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any direct or indirect equity holder of any Party or any officer, director, employee, investor, or other Representative of any Party.

**9.14    Disclosure Generally.**

Notwithstanding anything to the contrary contained in the Article III Schedules or in this Agreement, the information and disclosures contained in any Article III Schedule shall be deemed to be disclosed and incorporated by reference in any other Schedule as though fully set forth in such Article III Schedule for which applicability of such information and disclosure is reasonably apparent on its face. The fact that any item of information is disclosed in any Article III Schedule shall not be construed to mean that such information is required to be disclosed by this Agreement.  Such information and the dollar thresholds set forth herein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar terms in this Agreement.

**9.15    Public Announcements.**

Prior to the commencement of the Bankruptcy Case, the Parties will cooperate in good faith to develop a joint communications strategy with respect to the Transactions.  Except as required by Law or in connection with the Bankruptcy Case, no Seller nor Buyer shall issue any press release or public

announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Parties hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed, or conditioned.  Prior to making any public disclosure required by applicable Law, the disclosing Parties shall give the other Parties a copy of the proposed disclosure and reasonable opportunity to comment on the same. Notwithstanding the foregoing, Buyer shall not be restricted from making any public announcements or issuing any press releases after the Closing.

**9.16    Specific Performance.**

(a)    Each of the Parties acknowledges and agrees that the other Parties would be damaged irreparably if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, subject to Section 9.16(b), Buyer agrees that Sellers will be entitled, and Sellers agree that Buyer will be entitled, to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its terms and provisions in any action instituted in the Bankruptcy Court or any other court of the United States or any state thereof having jurisdiction over the Parties and the matter, subject to Section 9.4 and Section 9.5, in addition to any other remedy to which the non-breaching Party may be entitled, at law or in equity.

(b)    Notwithstanding the foregoing, Sellers' right to obtain an injunction, specific performance, or other equitable relief of Buyer's obligation to consummate the Closing (but not the right of Sellers to obtain an injunction, specific performance, or other appropriate form of equitable relief, for any other reason) shall be subject to the requirement that (i) all of the conditions set forth in Sections 6.1 and 6.2 have been satisfied (other than those conditions that by their nature are to be satisfied at the Closing) and Buyer has failed to complete the Closing by the date the Closing is required to have occurred pursuant to Section 2.8 of this Agreement, and (ii) Sellers have irrevocably confirmed in a written notice delivered to Buyer that if specific performance is granted, Sellers stand ready, willing and able to consummate the Closing.

(c)    For the avoidance of doubt, under no circumstances shall Sellers be entitled to receive both a grant of specific performance or other equitable remedies of the sort described in this Section 9.16 and any monetary damages, including payment or retention of all or any portion of the Initial Deposit.

*(Signature Pages Follow)*

IN  WITNESS  WHEREOF,  the  Parties  have  caused  this  Asset  Purchase  Agreement  to  be
executed by their authorized officers as of the Effective Date.

SELLERS:

Mercy Hospital, Iowa City, Iowa

By:_____
Name:  Mark Toney
Title:  Chief Restructuring Officer

Mercy Services Iowa City, Inc.

By:_____
Name:  Mark Toney
Title:  Authorized Signatory

Mercy Iowa City ACO, LLC

By:_____
Name:  Mark Toney
Title:  Chief Restructuring Officer

BUYER:

State of Iowa, on behalf of the State University of Iowa

By:_____
Name:  Mark Braun
Title:  Executive Director, Board of Regents, State of Iowa

**Exhibit A**

**SELLER FACILITIES**

| Facility | Name/Location | Designation | Description | Address |
|---|---|---|---|---|
| **Mercy Hospital** | | | | |
| Hospital | Mercy Hospital | Owned | Acute Care Hospital | 500 E. Market Street, Iowa City, IA 52245 |
| Hospital – ED Parking and Entrance | Mercy Hospital | Owned | Acute Care Hospital Parking and Entrance | 230 N. Gilbert Street, Iowa City, IA 52245 |
| **Mercy Medical Office Building II** | | | | |
| Medical Office Building | MOB II | Owned | Vacant/IT storage/Shell Basement/LINAC Vault | 601 Bloomington St. Iowa City, IA 52245 |
| **Mercy Medical Plaza** | | | | |
| Medical Office Building | Mercy Medical Plaza (MOB I) | Owned | Bariatric Surgery Cancer Care Gastroenterology General Surgery Neurology Pulmonary and Sleep Medicine Cardiology Home Health | 540 E. Jefferson St. Iowa City, IA 52245 |
| **Mercy Clinics** | | | | |
| Medical Office | Kalona | Owned | Family Medicine | 503 3rd Street, Kalona, IA 52247 |
| Medical Office | West Liberty | Owned | Family Medicine | 1401 Crees Street, West Liberty, IA 52776 |
| Medical Office | Williamsburg | Owned | Family Medicine | 819 South Highland Street, Williamsburg, IA 52361 |

Exhibit A-1

| Type | Location | Owned/Leased | Department | Address |
|---|---|---|---|---|
| Medical Office | Mercy Services Tipton | Owned | Family Medicine | 56 Cedar St, Tipton, IA 52772 |
| Medical Office | Muscatine | Leased | Family Medicine | 2104 Cedarwood Dr |
| Medical Office | Coralville | Leased | Pediatrics 1st Floor OB/GYN/Lab/Internal Med 2nd | 2769 Heartland Dr |
| Medical Office | Coralville | Leased | Parking | 2769 Heartland Dr |
| Medical Office | Iowa City | Leased | Family Practice Internal Medicine Occupational Health Basement | 269 N 1st |
| Medical Office | Solon | Leased | Family Medicine | 510 W Main St |
| Medical Office | West Branch | Leased | Family Medicine | 206 Cookson Dr |
| Medical Office | Coralville | Leased | Family Medicine | 2055 Oakdale Rd |
| Medical Office | Iowa City | Leased | Behavioral Health | 1067 Ryan Ct |
| Medical Office | Iowa City | Leased | Urology | 2943 Northgate Dr |
| **Miscellaneous** | | | | |
| Parking - Parcel # 1010166009 | | Owned | | North Dodge Street, Iowa City, IA 52245 |
| Parking – Parcel | | Owned | | E. Bloomington Street, Iowa City, IA 52245 |

Exhibit A-2

| #1010166008 | | | |
|---|---|---|---|
| Parking | Flat Lot | Owned | 611 E. Market Street, Iowa City, IA 52245 |
| Parking | Flat Lot | Owned | 619 E. Market Street, Iowa City, IA 52245 |
| Parking | Parking | Owned | 127 North Dodge Street, Iowa City, IA 52245 |
| Parking | Parking | Owned | 209 North Dodge Street, Iowa City, IA 52245 |
| Parking | Parking | Owned | 629 E. Market Street, Iowa City, IA 52245 |
| Lot - Parcel # 1010404003 | | Owned | North Dodge Street, Iowa City, IA 52245 |
| Future parking bldg demolished in 2020 | | Owned | 625 E. Market St, Iowa City, IA 52245 |
| Future parking bldg demolished in 2019 | | Owned | 603 E. Market St, Iowa City, IA 52245 |
| Land – Parcel #011126004 | | Owned | E. Rainbow Dr, West Liberty, IA 52776 |

Exhibit A-3

**Exhibit B**

**ACQUIRED SELLER FACILITIES**

| Facility | Name/Location | Designation | Description | Address |
|---|---|---|---|---|
| **Mercy Hospital** | | | | |
| Hospital | Mercy Hospital | Owned | Acute Care Hospital | 500 E. Market Street, Iowa City, IA 52245 |
| Hospital – ED Parking and Entrance | Mercy Hospital | Owned | Acute Care Hospital Parking and Entrance | 230 N. Gilbert Street, Iowa City, IA 52245 |
| ~~Mercy Medical Office Building II~~ | | | | |
| ~~Medical Office Building~~ | ~~MOB II~~ | ~~Owned~~ | ~~Vacant/IT storage/Shell Basement/LINAC Vault~~ | ~~601 Bloomington St. Iowa City, IA 52245~~ |
| **Mercy Medical Plaza** | | | | |
| Medical Office Building | Mercy Medical Plaza (MOB I) | Owned | Bariatric Surgery Cancer Care Gastroenterology General Surgery Neurology Pulmonary and Sleep Medicine Cardiology Home Health | 540 E. Jefferson St. Iowa City, IA 52245 |
| **Mercy Clinics** | | | | |
| Medical Office | Kalona | Owned | Family Medicine | 503 3rd Street, Kalona, IA 52247 |
| Medical Office | West Liberty | Owned | Family Medicine | 1401 Crees Street, West Liberty, IA 52776 |
| Medical Office | Williamsburg | Owned | Family Medicine | 819 South Highland Street, Williamsburg, IA 52361 |

Exhibit B-1

| Type | City | Ownership | Use | Address |
|---|---|---|---|---|
| Medical Office | Mercy Services Tipton | Owned | Family Medicine | 56 Cedar St, Tipton, IA 52772 |
| Medical Office | Muscatine | Leased | Family Medicine | 2104 Cedarwood Dr |
| Medical Office | Coralville | Leased | Pediatrics 1st Floor OB/GYN/Lab/Internal Med 2nd | 2769 Heartland Dr |
| Medical Office | Coralville | Leased | Parking | 2769 Heartland Dr |
| Medical Office | Iowa City | Leased | Family Practice Internal Medicine Occupational Health Basement | 269 N 1st |
| Medical Office | Solon | Leased | Family Medicine | 510 W Main St |
| Medical Office | West Branch | Leased | Family Medicine | 206 Cookson Dr |
| Medical Office | Coralville | Leased | Family Medicine | 2055 Oakdale Rd |
| Medical Office | Iowa City | Leased | Behavioral Health | 1067 Ryan Ct |
| Medical Office | Iowa City | Leased | Urology | 2943 Northgate Dr |
| **Miscellaneous** | | | | |
| Parking - Parcel # 1010166009 | | Owned | | North Dodge Street, Iowa City, IA 52245 |
| Parking - Parcel | | Owned | | E. Bloomington Street, Iowa City, IA 52245 |

Exhibit B-2

| ~~#101016008~~ | | | |
|---|---|---|---|
| Parking | Flat Lot | Owned | 611 E. Market Street, Iowa City, IA 52245 |
| Parking | Flat Lot | Owned | 619 E. Market Street, Iowa City, IA 52245 |
| Parking | Parking | Owned | 127 North Dodge Street, Iowa City, IA 52245 |
| Parking | Parking | Owned | 209 North Dodge Street, Iowa City, IA 52245 |
| Parking | Parking | Owned | 629 E. Market Street, Iowa City, IA 52245 |
| Lot - Parcel # 101404003 | | Owned | North Dodge Street, Iowa City, IA 52245 |
| Future parking bldg demolished in 2020 | | Owned | 625 E. Market St, Iowa City, IA 52245 |
| Future parking bldg demolished in 2019 | | Owned | 603 E. Market St, Iowa City, IA 52245 |
| Land – Parcel #0112126004 | | Owned | E. Rainbow Dr, West Liberty, IA 52776 |

Exhibit B-3

**Exhibit C**

## EXCLUDED SELLER FACILITIES

~~None.~~

| Facility | Name/Location | Designation | Description | Address |
|---|---|---|---|---|
| **Mercy Medical Office Building II** | | | | |
| Medical Office Building | MOB II | Owned | Vacant/IT storage/Shell Basement/LINAC Vault | 601 Bloomington St, Iowa City, IA 52245 |
| Parking – Parcel #1010166008 | | Owned | | E. Bloomington Street, Iowa City, IA 52245 |

Exhibit C-1

**Exhibit D**

**FORM OF BILL OF SALE**

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to the terms and conditions of that certain Asset Purchase Agreement dated as of [_____], 2023 (the "***Asset Purchase Agreement***") by and among Mercy Hospital, Iowa City, Iowa, an Iowa non-profit corporation ("***Mercy Hospital***"), Mercy Services Iowa City, Inc., an Iowa corporation ("Mercy ***Services***"), Mercy Iowa City ACO, LLC, an Iowa limited liability company ("***MIC ACO***" and collectively with Mercy Hospital and Mercy Services, "***Sellers***" and each, a "***Seller***") and State of Iowa, on behalf of the State University of Iowa ("***Buyer***" and, together with Sellers, the "***Parties***"), each Seller hereby unconditionally and irrevocably grants, transfers, sells, assigns, conveys, and delivers to Buyer, its successors and assigns forever, all of such Seller's rights, titles, and interests, in, to and under the Purchased Assets owned or leased by such Seller pursuant to this bill of sale, dated as of [•], 2023 (this "***Bill of Sale***") and subject to the terms of the Asset Purchase Agreement, free and clear of all Encumbrances other than Permitted Encumbrances, TO HAVE AND TO HOLD the Purchased Assets with all appurtenances thereto, effective at the Closing pursuant to the Asset Purchase Agreement.

A.      Undefined capitalized terms herein are defined in the Asset Purchase Agreement.

B.      Notwithstanding anything to the contrary contained herein, none of the Excluded Assets shall be included in the Purchased Assets.

C.      This Bill of Sale shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns.

D.      This Bill of Sale is being executed solely pursuant to the Asset Purchase Agreement to give effect to the transactions contemplated by the Asset Purchase Agreement.  Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Asset Purchase Agreement.  To the extent that any provisions of this Bill of Sale conflicts or is inconsistent with the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern.

E.      Nothing in this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to, any person, firm or corporation other than Buyer and its successors and assigns any remedy or claim under or by reason of this instrument or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements in this instrument shall be for the sole and exclusive benefit of Buyer and its successors and assigns.

F.      The provisions of <u>ARTICLE IX</u> of the Asset Purchase Agreement are hereby incorporated into this Bill of Sale, *mutatis mutandis*.

*(Signature Page Follows)*

IN WITNESS WHEREOF, this Bill of Sale is being executed and delivered by Sellers as of the date first written above.

SELLERS:

Mercy Hospital, Iowa City, Iowa


By:_____
Name:_____
Title:  _____

Mercy Services Iowa City, Inc.


By:_____
Name:_____
Title:  _____



Mercy Iowa City ACO, LLC


By:_____
Name:_____
Title:  _____

BUYER:

State of Iowa, on behalf of the State University of Iowa


By:_____
Name:_____
Title:_____

**Exhibit E**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement, dated as of [•], 2023 (this "***Agreement***"), is by and among Mercy Hospital, Iowa City, Iowa, an Iowa non-profit corporation ("***Mercy Hospital***"), Mercy Services Iowa City, Inc., an Iowa corporation ("Mercy ***Services***"), Mercy Iowa City ACO, LLC, an Iowa limited liability company ("***MIC ACO***" and collectively with Mercy Hospital and Mercy Services, "***Assignors***" and each, an "***Assignor***") and State of Iowa, on behalf of the State University of Iowa ("***Assignee***" and, together with Assignors, the "***Parties***").

**RECITALS**

A.      Assignors and Assignee are parties to that certain Asset Purchase Agreement dated as of [_____], 2023 (the "***Asset Purchase Agreement***"), pursuant to which Assignee has agreed to purchase the Purchased Assets and assume the Assumed Liabilities on the terms and subject to the conditions of the Asset Purchase Agreement, including <u>Sections 2.1</u> and <u>2.3</u> thereof; and

B.      In accordance with the terms of the Asset Purchase Agreement, Assignors and Assignee have agreed to enter into this Agreement, providing for (a) Assignors' sale, conveyance, grant, assignment, transfer and delivery to Assignee of all of Assignors' right, title and interest in, under and to the Purchased Assets (including, without limitation, the Assumed Contracts), (b) Assignee's acceptance of such sale, conveyance, grant, assignment, transfer and delivery, and (c) Assignee's assumption of all of the Assumed Liabilities, in each case on the terms and subject to the conditions of the Asset Purchase Agreement.

**AGREEMENT**

The parties, intending to be legally bound, agree as follows:

**1.      Definitions.**   Undefined capitalized terms herein are defined in the Asset Purchase Agreement.

**2.      Assignment**.   Assignors hereby sell, convey, grant, assign, transfer and deliver to Assignee as of the date hereof, all of their right, title and interest in, under and to the Purchased Assets (including, without limitation, the Assumed Contracts) free and clear of all Encumbrances other than the Permitted Encumbrances in accordance with and subject to the terms and conditions of the Asset Purchase Agreement, effective at the Closing pursuant to the Asset Purchase Agreement (the "***Assignment***").

**3.      Acceptance and Assumption**.   Assignee hereby, effective at the Closing pursuant to the Asset Purchase Agreement, (a) purchases, acquires and accepts the sale, conveyance, grant, assignment, transfer and delivery of Assignors' right, title and interest in, under and to the Purchased Assets (including, without limitation, the Assumed Contracts) free and clear of all Encumbrances other than the Permitted Encumbrances, and (b) assumes and agrees to pay, perform and discharge when due, and shall be liable with respect to the Assumed Liabilities in accordance with and subject to the terms and conditions of the Asset Purchase Agreement.  For the avoidance of doubt, Assignee does not, and will not by assumption of the Assumed Liabilities or acceptance of the Assignment, assume any Excluded Assets or Excluded Liabilities, all of which will remain the sole responsibility of Assignors as set forth in the Asset Purchase Agreement.

**4.**     **Parties in Interest**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

**5.**     **Terms of Asset Purchase Agreement**.  The scope, nature, and extent of the Assumed Liabilities are expressly set forth in the Asset Purchase Agreement.  Nothing contained herein will itself change, amend, extend, or alter (nor should it be deemed or construed as changing, amending, extending, or altering) the terms or conditions of the Asset Purchase Agreement in any manner whatsoever.  This instrument does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Asset Purchase Agreement.  In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms of this Agreement, the terms of the Asset Purchase Agreement will govern.

**6.**     **Other Provisions**.  The provisions of <u>ARTICLE IX</u> of the Asset Purchase Agreement are hereby incorporated into this Agreement, *mutatis mutandis*.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

ASSIGNORS:

Mercy Hospital, Iowa City, Iowa

By:_____
Name:_____
Title:  _____

Mercy Services Iowa City, Inc.

By:_____
Name:_____
Title:  _____

Mercy Iowa City ACO, LLC

By:_____
Name:_____
Title:  _____

ASSIGNEE:

State of Iowa, on behalf of the State University of Iowa

By:_____

Exhibit E-2

Name:_____

Title:_____

**Exhibit F**

**FORM OF LANDLORD ESTOPPEL**

State of Iowa, on behalf of the State University of Iowa
[_____]
[_____]

_____ ___, 2023 (the "Effective Date")

Re:    [Lease reference] (the "Lease") by and between _____ ("Landlord") and _____ ("Tenant") for the premises located at _____ (the "Premises").

To Whom It May Concern:

Landlord, having the power and authority to do so, hereby states, certifies and affirms to State of Iowa, on behalf of the State University of Iowa ("Buyer"), that the following statements are true, correct and complete as of the Effective Date:

1.    The Lease contains the entire agreement between Landlord and Tenant with respect to the subject matter thereof, and has not been modified, amended, supplemented or superseded, except as specifically stated above.

2.    The Lease is in full force and effect.  There are no other agreements or understandings, whether written or oral, between Tenant and Landlord with respect to the Lease or the Premises.

3.    Landlord is the fee owner of the Premises and no other person or entity has any ownership interest or rights, conditional or otherwise, in the fee interest in the Premises.  The current address of the Premises is: _____.

4.    No third party has any option or preferential right to purchase all or any part of the Premises or the fee interest in the Premises from Landlord.

5.    Landlord has not assigned, conveyed, transferred, sold, encumbered or mortgaged its interest in the Premises, and there is no deed of trust, mortgage or other security instrument the foreclosure of which (or other exercise of rights pursuant thereto) would or could result in the termination of the Lease.

6.    Landlord has not received written notice of any pending eminent domain proceedings or other governmental actions or any judicial actions of any kind against its interest in the Premises.

7.    Landlord has received no written notice from any insurance company, fire underwriting bureau or from any federal, state or municipal agency, board, bureau or office requiring or recommending any repairs, replacements or alterations to the Premises.

8.    No actions, whether voluntary or involuntary, are pending or threatened against, or contemplated by, Landlord under any bankruptcy, insolvency or similar laws of the United States or any state thereof.

9.      To the best of Landlord's current actual knowledge (with no duty of investigation or inquiry whatsoever), both Tenant and Landlord have performed all of their respective obligations under the Lease and Landlord has no current actual knowledge (with no duty of investigation or inquiry whatsoever) of any event which with the giving of notice, the passage of time or both would constitute a default under the Lease.

10.      To the best of Landlord's knowledge, no disputes between Landlord and Tenant with respect to the Lease are presently pending.  To the best of Landlord's knowledge, there are no defaults on behalf of Tenant, nor are there any defaults that with the passage of time would become known, except:_____.

11.      The term of the Lease commenced on _____, and ends on _____. Tenant has ____ remaining options to extend the Lease term.

12.      The current monthly Base Rent for the Premises is $_____, which has been paid through _____.  The current monthly Additional Rent payments for the Premises is $_____, which has been paid through _____.  The annual assessments payable by Tenant is $_____. Real estate taxes for the Premises are paid by [Landlord/Tenant] and are paid in full as of _____. The current monthly Ground Rent for the Premises is $_____, which has been paid through _____.

13.      Landlord currently holds a Security Deposit under the Lease in the amount of $_____.

14.      Use of the Premises by Buyer for medical office use will not violate the terms of the Lease or to the actual knowledge of Landlord, with no duty to investigate, any recorded instruments against the Premises.

15.      The provisions of this Estoppel Certificate shall inure to the benefit of Buyer and their respective designee, successors and assigns.  Landlord acknowledges that Buyer will act in reliance upon the truth and accuracy of the statements contained herein and that this Estoppel Certificate is delivered in connection with the purchase of certain interests in Tenant.

16.      The undersigned is authorized to execute this Estoppel Certificate on behalf of Landlord.

IN WITNESS WHEREOF, Landlord has executed and delivered this Estoppel Certificate as of the Effective Date.

**LANDLORD:**

By:_____
Name:_____
Title:_____

Document comparison by Workshare Compare on Saturday, November 4, 2023
12:16:38 PM

| Input: | |
|---|---|
| Document 1 ID | iManage://work.polsinelli.law/ACTIVE/87670479/15 |
| Description | #87670479v15<work.polsinelli.law> - Project Redwood - Asset Purchase Agreement |
| Document 2 ID | iManage://work.polsinelli.law/ACTIVE/91524661/9 |
| Description | #91524661v9<work.polsinelli.law> - UI/Mercy - Asset Purchase Agreement Amendments |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 71 |
| Deletions | 16 |
| Moved from | 0 |
| Moved to | 0 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 87 |