# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re:<br><br>MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*,<br><br>                      Debtors. | Chapter 11<br><br>Case No. 23-00623 (TJC)<br><br>Joint Administration Requested<br><br>**Re: Docket No. 26** |

### RESPONSE BY SECURED BONDHOLDER REPRESENTATIVES TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO ENTRY OF THE PROPOSED FINAL CASH COLLATERAL ORDER

Computershare Trust Company, N.A., as Master Trustee (the "Master Trustee"), and Preston Hollow Community Capital, Inc., as Bondholder Representative (collectively with the Master Trustee, the "Secured Bondholder Representatives"), hereby submit their response[1] to the *Official Committee Of Unsecured Creditors' Objection to Entry of the Proposed Final Cash Collateral Order* [Docket No. 448] (the "Objection") filed by the Official Committee of Unsecured Creditors (the "Committee"), and respectfully state as follows:

### PRELIMINARY STATEMENT

1. On August 8, 2023, the Court entered its *Interim Order Granting Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting*

---

[1] This response incorporates by reference the Secured Bondholder Representatives' previously filed (i) *Objection to Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief*, [Docket No. 35], and (ii) *Reservation of Rights of Secured Bondholder Representatives to Debtors' Motion for Entry of Order (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief* [Docket No. 435] (the "Reservation"), and all exhibits and attachments thereto. Since the Committee filed the Objection, the Secured Bondholder Representatives have been in discussions with the Committee surrounding the terms of a consensual second interim order on the cash collateral motion that, if agreed to, would obviate the need for a contested and/or evidentiary hearing at this time. While the Secured Bondholder Representatives are hopeful they will be able to reach agreement with the Committee, they file this response so as to preserve all of their rights with respect to the November 6, 2023 hearing on the Motion.

*Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief* (Docket No. 38, the "Interim Order"). Since that time, the final hearing on the Debtor's cash collateral motion (Docket No. 26, the "Motion")[2] has been continued *four times*, and the Secured Bondholder Representatives have been without the protections of a final cash collateral order for the first *three months* of this case.

2. In the intervening time period, the Debtors and the Secured Bondholder Representatives have engaged in extensive, good faith negotiations over the terms, conditions and adequate protections relating to the Debtors' continued consensual use of the Master Trustee's Prepetition Collateral on a final basis, and have reached agreement. That agreement, embodied in the form of final cash collateral order filed with the Court on November 1, 2023 (Docket No. 434, the "Proposed Final Order"), provides a framework not only for the Debtors' consensual use of Cash Collateral, but also for the windup of these Chapter 11 Cases, including milestones for the filing and confirmation of a Chapter 11 plan of liquidation.

3. The terms of the Proposed Final Order are typical and customary of final cash collateral orders entered in large, complex Chapter 11 case in the Eighth Circuit and elsewhere, and satisfy the Debtors' statutory duties under Bankruptcy Code section 363(c)(2). 11 U.S.C. § 363(c)(2).

4. The Committee objects to the Proposed Final Order, as agreed to by the Debtors and the Secured Bondholder Representatives, and instead advocates for an alternative order that would gut the adequate protection measures already approved by the Court in the Interim Order. The Committee seeks to place the entire risk of these Chapter 11 Cases on the Secured Bondholder Representatives, requiring them to finance continued losses with their Prepetition Collateral while

---

[2] Unless otherwise defined herein, all capitalized terms have the meanings ascribed to such terms in the Motion.

-2-

denying them necessary and customary replacement liens. For the avoidance of doubt, the Secured Bondholder Representatives ***do not*** consent to the use of their Cash Collateral to the extent that the adequate protections provided in the agreed-upon Proposed Final Order are modified or subverted, as proposed by the Committee. The Committee's proposed adequate protection regime would ensure that the Secured Bondholder Representatives are left with an unprotected collateral shortfall, which is antithetical to the mandatory statutory requirements under Bankruptcy Code section 363(c)(2). 11 U.S.C. § 363(c)(2).

5. The Objection provides no legal or factual basis for the denial of the Debtors' Motion, and is premised upon (i) a gross mischaracterization of the scope and nature of the Master Trustee's liens and security interests, (ii) a demonstrably false assertion that the Secured Bondholder Representatives have suffered no diminution in value during these Chapter 11 Cases, and (iii) unsubstantiated (and incorrect) assertions about the Debtors' cash burn, accounts receivable values, and financial condition.

6. Moreover, the Objection seeks an advisory opinion from the Court, based upon on a wholly inadequate and incomplete evidentiary record, regarding the diminution in value that the Secured Bondholder Representatives may suffer prospectively at the end of these Chapter 11 Cases. The Committee's attempt to adjudicate the amount of prospective diminution now, based upon its suppositions about what may or may not happen in the months ahead regarding the potential sale to the University, a potential plan of liquidation, recoveries on other assets that have not yet been marketed, let alone monetized, is misguided and inappropriate. The very purpose of adequate protection under the Bankruptcy Code – indeed, its *raison d'etre* – is to protect secured creditors from future circumstances and outcomes which are inherently uncertain. That is why diminution is determined at the end of case, not the middle, and it need not be litigated at all to the

extent that the treatment of Secured Bondholder Representatives' claims are resolved pursuant to a consensual Chapter 11 plan of liquidation.

7. It is a fruitless and unnecessary exercise for the Court to conduct a trial on collateral valuation issues midway through the Chapter 11 Cases in the context of the Debtors' cash collateral Motion, and it would be inappropriate and violative of due process rights to do so on this record and three-days' notice to the Secured Bondholder Representatives. Embarking on expensive and protracted litigation over speculative future diminution risks at this stage – before the parties have even begun negotiations over a potential consensual plan of liquidation – does not serve the interests of the Debtors, its creditors and other stakeholders (including the Committee's own constituents).

8. The Court should grant the Debtor's Motion and enter the Proposed Final Order approving the consensual Cash Collateral arrangement negotiated between the Debtors and the Secured Bondholder Representatives. The Proposed Final Order preserves the Committee's right to investigate and challenge the Secured Bondholder Representatives liens and security interests, and even preserves the Committee's right investigate and bring affirmative claims against the Secured Bondholder Representatives (if any such claims exist).

**ARGUMENT**

A. **The Committee Mischaracterizes the Master Trustee's Liens and Security Interests**

9. The Committee's argument about the supposed minimal need for adequate protection is based upon its faulty premise that the Master Trustee's liens and security interests attach only to "accounts receivable and real estate." (Objection, p. 3.) The Committee makes this broad assertion without any analysis or reference to the underlying financing documents. It is

beyond peradventure that the Master Trustee's first priority liens and security interests attach to substantially all of Mercy's tangible and intangible assets. It is an "all assets" pledge.

10. As is set forth in the governing security documents for the bond financing transactions, and detailed in the Master Trustee's proof of claim (Claim No. 10132), the Master Trustee's liens and security interests attach to:

- "All furniture, furnishings, machinery, goods, tools, supplies, appliances, general intangibles, contract rights, accounts, accounts receivable, franchises, licenses, certificates and permits, and *all other personal property of any kind or character whatsoever as defined in and subject to the provisions of the Iowa Commercial Code*, whether tangible or intangible, other than fixtures, which are now or hereafter owned by Corporation … together with all accessories, replacements and substitutions thereto or therefor *and the proceeds thereof …*"[3] (Emphasis added.)

- "All accounts and assignable general intangibles now owned or hereafter acquired by any Member of the Obligated Group regardless of how generated, and all proceeds therefrom, whether cash or non-cash, all as defined in Article 9 of the Uniform Commercial Code, as amended, of the state in which such Member has its primary place of business …"[4]

- "All the rents, issues, uses, profits, accounts receivable, condemnation awards, insurance proceeds and other rights and interests now or hereafter belonging or in any way pertaining to the Mortgagors interest in the Land …"[5]

- "[A]ll other revenues, rents, earnings, issues and income and profits arising or to arise out of or to be received or had of and from the properties hereby mortgaged or intended so to be or any part thereof and all the estate, right, title, interest and claims, at law or in equity which the Mortgagor now or may hereafter acquire or be or become entitled to in and to the aforesaid properties and any and every part thereof."[6]

- Mercy's real property constituting its campus at 500 East Market Street, Iowa City, Iowa, including the buildings, structures, additions, improvements, equipment, fixtures, and personal property located thereon.

- All of the Mercy's limited liability membership and partnership interests in the Debtor's direct subsidiaries and joint ventures.

---

[3] Reservation, Exhibit F, Article I, pp.3-4.
[4] Reservation, Exhibit E, Article I, p.3.
[5] Reservation, Exhibit F, Article G, p.3.
[6] Reservation, Exhibit F, p.4.

- All of the Mercy's contract-based rights and claims against its affiliates and/or third parties.

11. The Committee focuses its entire analysis on the diminution of the Secured Bondholder Representatives' accounts receivable, but ignores the fact that all of the Cash Collateral held by the Debtors as of the Petition Date – over **$4.1 million** – has also been consumed by the Debtors. *See Declaration of Peter Chadwick of Berkeley Research Group, LLC in Support of the Response by Secured Bondholder Representatives to Official Committee of Unsecured Creditors' Objection to Entry of the Proposed Final Cash Collateral Order*, attached hereto as Exhibit A, ¶ 5 (the "Chadwick Declaration"). The Committee makes no attempt to quantify the diminution in the value of Mercy's joint venture interests, also subject to the Master Trustee's pre-petition security interest. The Committee makes no attempt to quantify the diminution in the value of Mercy's inventory and supplies, also subject to the Master Trustee's pre-petition security interest.

12. The Committee asserts that the Master Trustee does not have a security interest in the Debtor's primary accounts, *see* Objection ¶ 6, but purposefully ignores the fact that the Master Trustee has a perfected security interest in all of Mercy's "revenues," "earnings," "income," "profits," "accounts" (as broadly defined under Iowa Code § 554.9102(1)(b)), "accounts receivable," and all proceeds and products of the foregoing. So, unless the Committee is alleging that the $4.1 million in cash that the Debtors held on the Petition Date was found in a paper bag under the Burlington Street Bridge, it is clearly either the Secured Bondholder Representatives' Prepetition Collateral, Cash Collateral, and/or the proceeds or products of their Prepetition Collateral. The Committee makes no attempt to address this. A deposit account control agreement is not required, as a matter of law, to perfect a security interest in the proceeds of a secured creditor's collateral. *See*, *e.g.*, Iowa Code §§ 554.9315(1)(b), 554.9315(2)(b) & 554.9315(3).

B.  **The Bondholders are Entitled to Adequate Protection as a Matter of Statutory and Constitutional Law**

13. Section 363(c)(2) of the Bankruptcy Code prohibits the Debtors from using cash collateral "unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e), in turn, requires "adequate protection" of the secured creditor's interest in the cash collateral to the extent that the debtor is permitted to use cash collateral without the consent of its secured creditor. *See* 11 U.S.C. § 363(e) (requiring a bankruptcy court to "prohibit or condition such use … as is necessary to provide adequate protection of such interest"). Adequate protection is premised on "the basic constitutional requirement that a creditor's interest in property cannot be in any respect impaired or subjected to increased risk without assurance that the creditor will realize the benefit of its bargain." *In re Magnus*, 50 B.R. 241, 243 (Bankr. D.N.D. 1985).

14. The terms of 11 U.S.C. § 363(e) are mandatory. Typically, the Debtor bears the burden to show that its adequate protection obligation is met. *See* 11 U.S.C. § 363(p); *see also In re Plabell Rubber Prods., Inc.,* 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Here, the burden is on the Committee, as the objecting party.

15. The Committee asserts that the Secured Bondholder Representatives are not entitled to the adequate protection sought in the Proposed Final Order because, in the Committee's view, "there has been no diminution in value." Objection, ¶ 5. It is a ludicrous suggestion. As detailed in the Chadwick Declaration, there has been a diminution in value of the Secured Bondholder Representatives' Prepetition Collateral –with regard to Mercy's accounts receivable and cash alone – of approximately **$30.9 million** from the August 7th Petition Date through October 31st. Chadwick Declaration, ¶ 7.

16. The substantial diminution in the Secured Bondholder Representatives' Prepetition Collateral is even demonstrated by the chart on page 4 of the Committee's Objection (although, upon information and belief, the figures on that chart are not correct). The Committee's own chart shows that the value of Mercy Hospital's prepetition accounts receivable has been reduced from approximately $23.7 million to approximately $8.3 million through October 31st, which equates to a loss of **$15.4 million**. Adding to that figure the $4.1 million in cash held by Mercy Hospital as of the Petition Date, the aggregate diminution to date (based upon the Committee's own accounts receivable figures) is **$19.5 million**.

17. The Committee's assertion that "the total accounts receivable balance declined by only approximately $496,000" is disingenuous and misleading. Objection, ¶ 24. The Committee is including *post-petition* accounts receivable in that figure. The Committee's chart shows that Mercy Hospital's pre-petition accounts receivable balance has been diminished by approximately **$15.4 million** in *three* months. The only reason the Secured Bondholder Representatives have not yet suffered a shortfall in their recovery is because of the fulsome replacement liens granted by the Court in the Interim Order.

18. Nonetheless, the Committee argues that the final cash collateral order should only grant replacement liens on Mercy's accounts receivable. Based upon the Committee's own figures, however, this suggested approach to replacement liens would have resulted in a **$15.9 million** collateral shortfall as of October 31st. Chadwick Declaration, ¶ 5. Accordingly, the Committee's Objection actually proves that adequate protection, as set forth the Proposed Final Order, is necessary.

19. Other key assumptions behind the Committee's analysis are also incorrect. For example, the Committee asserts that the accounts receivable balance has been level and,

accordingly, "there has been virtually no diminution in value." Objection, ¶ 5. But, once again, the Committee conflates pre-petition and post-petition accounts receivable. As detailed in the Chadwick Declaration, the Debtors' operating budget and financial projections demonstrate declining accounts receivable balances through November and beyond due to reduced patient volumes and census and other factors. Chadwick Declaration, ¶¶ 9-10.

20.     In addition, the Committee blithely asserts that the Secured Bondholder Representatives' "risk profile" has been "bettered" by the Mercy Hospital Foundation settlement and the prospective sale of the Debtors' assets to the University. Objection, ¶ 3. This assertion ignores the fact that the Debtors will continue to fund all disbursements – operating losses, professional fees and other administrative claims – through November 30th. According to the Debtors' operating budget and projections, the Debtors will consume $9 million in cash through the week ending Friday, December 1st. Chadwick Declaration, ¶ 8. It further ignores the fact that the Foundation settlement places limitations on use of the Foundation funds contributed to Mercy Hospital. Lastly, the sale transaction is subject to a myriad of closing conditions set forth in the University's asset purchase agreement, including regulatory approval. The Committee suggests that the Secured Bondholder Representatives should cross their fingers and hope that everything turns out well. But the trajectory of this case is far from certain. Notably, in prior hearings before this Court, Debtors' counsel has aptly described it as "melting ice cube."

21.     Given the material diminution of the Secured Bondholder Representatives' Prepetition Collateral to date, and the historical trend in declining cash and receivables during 2023 and into 2024, there is significant risk that the Secured Bondholder Representatives will experience continued erosion of their collateral values and recoveries. Section 363(c)(2) requires that the Secured Bondholder Representatives be adequately protected.

### C. The Adequate Protections Set Forth in the Proposed Final Order are Customary and Appropriate

22. The Proposed Final Order is the product of extensive good faith, arms'-length negotiations between the Debtors and the Secured Bondholder Representatives. And, in an effort to address certain of the Committee's concerns, the Proposed Final Order already includes concessions in the Committee's favor including: (a) a proposed Carve-Out for budgeted Committee professional fees, which are proposed to be senior to the liens and claims of the Secured Bondholder Representatives; (b) an investigation budget of $50,000, funded with Cash Collateral and/or adequate protection collateral, for the Committee to investigate liens of and claims against the Secured Bondholder Representatives; and (c) a Challenge Deadline thirty days after entry of the Proposed Final Order (which will be over three and a half months since the Committee was formed on August 15, 2023 [Docket No. 107]) for the Committee to bring lien challenges or claims against the Secured Bondholder Representatives. While the Committee would of course prefer to cherry pick those portions of the Final Order it would change, the Court should decline to do so for at least the following reasons:

23. First, the proposed replacement liens, supplemental liens, and superpriority claims are necessary to adequately protect the Secured Bondholder Representatives, and this Court should refuse to narrow them. If the Committee had its way, the sole form of adequate protection liens and claims offered to the Secured Bondholder Representatives would be replacement liens and claims on Mercy Hospital's post-petition accounts receivable. Yet, the Secured Bondholder Representatives' Prepetition Liens extend to much more than real estate, personal property, and accounts receivable and include, without limitation, all rents, issues, uses, profits, insurance proceeds and other rights and interests belonging or in any way pertaining to the "Mortgaged Land," as defined in the Mortgage, and all accounts, general intangibles, contract rights, and all

other personal property of any kind or character whatsoever as defined in the Iowa Commercial Code, together with all accessories, replacements and substitutions thereto or therfor and the proceeds thereof. *See, e.g.*, Claim No. 10132. More expansive adequate protection liens and claims, as reflected in the Proposed Final Order, are needed in order to adequately protect these interests.

24. For example, as reflected in the Chadwick Declaration, at least **$30.9 million** in Prepetition Collateral (cash and accounts receivable) has been used to fund the Chapter 11 Cases, whereas as of October 31, 2023, there was only approximately **$15 million** in post-petition Mercy accounts receivable. Chadwick Declaration, ¶¶ 4, 7. To the extent value of the pre-petition cash and accounts receivable has been diminished, such diminution is clearly not adequately protected by a replacement lien limited to Mercy Hospital's post-petition accounts receivable. Even the Committee's own accounting of pre- versus post-petition accounts receivable balances demonstrates that a lien on accounts receivable alone would be insufficient to adequately protect against diminution in value since the Petition Date. *See* Objection, ¶ 5. And, there is a high likelihood that post-petition accounts receivable will further decline given seasonal and historical trends, and will taper off entirely after the sale of Mercy Hospital closes. Chadwick Declaration, ¶¶ 9-10.

25. Second, the Debtors are well within their sound business judgment to agree to waive section 506(c) and 552(b) claims in exchange for other concessions by the Secured Bondholder Representatives, including consent to the use of Cash Collateral, a budget that provides for the payment of all necessary operating expenses and professional fees, and the Carve-Out. Such waivers are appropriate given the critical nature of the Debtors' business and, therefore, the need for use of cash collateral, and are not at all unusual in final financing orders in this district

and within the Eighth Circuit. *See, e.g., In re South American Beef, Inc.*, No. 22-01341 (ALS) (Bankr. S.D. Iowa Feb. 1, 2023) [Docket No. 160] (final cash collateral order including 506(c) and 552(b) waivers); *In re Deerfield Retirement Community, Inc.*, No. 14-00052 (ALS) (Bankr. S.D. Iowa Jan. 23 & 24, 2014) [Docket Nos. 58 & 62] (same); *In re Gordmans Stores, Inc.*, No. 17-80304 (TLS) [Docket No. 333] (Bankr. D. Neb. Apr. 7, 2017) (same); *In re Allens, Inc. and All Veg, LLC*, No. 13-73597 (BTB) [Docket No. 297] (Bankr. W.D. Ark. Dec. 16, 2013) (same); *In re MTN 364 US Fidelis, Inc.*, No. 10-41902-705, 2009 WL 10815075 (Bankr. E.D. Mo. Sept. 24, 2010) (same). Given the critical nature of the Debtors' business and, therefore, the need for use of Cash Collateral, the Debtors' waivers of section 506(c) and 552(b) claims are reasonable.

26. Finally, it is also customary for a final cash collateral order to include a "challenge" or "investigation" period for parties-in-interest to investigate the secured lenders' liens and any claims that may exist against such secured lender. A typical challenge deadline is 60-75 days from Committee formation. In these Chapter 11 Cases, the Committee was formed on August 15, 2023 and the requested Challenge Deadline is on or about December 6. By that date, the Committee will have had approximately 113 days – almost double the amount of time afforded in most cases – to investigate liens of and claims against the Prepetition Secured Lenders. The proposed Challenge Deadline is reasonable and necessary in order for the parties to pursue a plan process.

### D. The Committee's Attempt to Seek a Preliminary, Prospective Adjudication of Diminution is Inappropriate and Unsupported by the Current Record

27. As set forth in detail in the Senior Bondholder Representatives' *Motion in Limine by Secured Bondholder Representatives to Exclude the Testimony of Narendra Ganti* filed contemporaneously herewith, the Objection, and the accompanying Ganti Declaration, were not filed until Friday, November 3 – *one* business day before the Court's hearing on the Debtor's Motion. Prior to this point, the Secured Bondholder Representative had no notice of the issues to

be presented at the hearing nor of the "evidence" the Committee intended to provide in support. Despite this lack of notice, the Secured Bondholder Representatives served a Notice of Deposition of Mr. Ganti for Saturday, November 4, 2023 and the Committee agreed to produce Mr. Ganti for only *one hour* of testimony. In the deposition, Mr. Ganti admitted that he had no involvement in putting together the *only piece of evidence* submitted by the Committee in its Objection – an unsourced chart purporting to analyze the accounts receivable of the Debtors at several points in time. Mr. Ganti testified he has *done nothing* to understand Mercy's revenue cycle management, and as such has no basis for providing testimony in support of any analysis of the value of the Debtors' accounts receivable.

28. The Committee has provided no basis on which to conclude that Mr. Ganti is qualified as an expert on the topic of his testimony – the accounts receivable of the Debtors – nor has the Committee provided *any* substantive, admissible evidence thereon. It is clear that the Committee's evidence supporting their Objection is misleading and incomplete, and as such any value that it might have is outweighed by its prejudicial impact, especially on *three-days' notice* to the Secured Bondholder Representatives. To accept Mr. Ganti's "evidence" at this stage in the case and on this procedural posture would be violative of the Secured Bondholder Representatives' due process rights.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Master Trustee and the Bondholder Representative respectfully request that the Debtors' Motion be granted, that the Proposed Final Order be entered, and that the Committee's Objection be overruled.

Date:  November 5, 2023  **WHITFIELD & EDDY, P.L.C.**

*/s/ Peter J. Chalik*

Peter J. Chalik  (Iowa Bar No. AT0013036)
699 Walnut St., Suite 2000
Des Moines, Iowa 50309
Telephone: (515) 288-6041
Email: *Chalik@whitfieldlaw.com*

-and-

**MINTZ, LEVIN, COHN, FERRIS GLOVSKY AND POPEO, P.C.**

William W. Kannel (admitted *pro hac vice*)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
Email: WKannel@mintz.com

Nathan F. Coco (admitted *pro hac vice*)
Megan Preusker (admitted *pro hac vice*)
Kaitlin R. Walsh (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
Telephone: (212) 935-3000
Email: NFCoco@mintz.com
 MPreusker@mintz.com
 KRWalsh@mintz.com

## CERTIFICATE OF SERVICE

    I certify that a copy of the foregoing document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing dated November 5, 2023.

                                                              */s/ Peter J. Chalik*