**Exhibit A**



1         IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF IOWA
2
                       Case No. 23-00623 (TJC)
3
                                              :
4                                             :
                                              :
5                                             :
                                              :
6                                             :
     IN RE:                                   :
7                                             :
                                              :
8    MERCY HOSPITAL, IOWA CITY, IOWA, et al., :
                                              :
9                                             :
     Debtors.                                 :
10                                            :
                                              :
11                                            :
                                              :
12                                            :

13          --------------------------------------
          DEPOSITION UNDER ORAL EXAMINATION OF:
14                     NARENDRA GANTI
                    November 4, 2023
15                   -----------
          REPORTED BY:   JENNIFER L. WIELAGE, CCR, RPR, CRR
16                   -----------

17

18

19

20

21

22
     JOB #  24255
23

24

25

1          TRANSCRIPT of the remote deposition of the

2     above-named witness, called for Oral Examination in

3     the above-entitled matter, said deposition being

4     taken pursuant to Federal Court Rules, by and before

5     JENNIFER L. WIELAGE, Certified Shorthand Reporter and

6     Notary Public, License No. XI01916, on Saturday,

7     November 4, 2023, commencing at 3:30 in the forenoon.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

    A P P E A R A N C E S:

2

    MINTZ, LEVIN, COHN, FERRIS
3    919 Third Avenue
    New York, New York 10022
4    (212) 935-3000
    BY:  KAITLIN R. WALSH, ESQ.
5    krwalsh@mintz.com
    BY:  NATHAN COCO, ESQ.
6    ncoco@mintz.com
    Attorneys for Computershare Trust Company, Preston
7    Hollow Capital

8    SILLS CUMMIS & GROSS, P.C.
    One Riverfront Plaza
9    Newark, New Jersey 07102
    (973) 643-7000
10    BY:  ANDREW SHERMAN, ESQ.
    asherman@sillscummis.com
11    BY:  BORIS MANKOVETSKY, ESQ.
    bmankovetsky@sillscummis.com
12    Attorneys for Creditors Committee

13    MCDERMOTT WILL & EMERY
    333 SE 2nd Avenue
14    Suite 4500
    Miami, FL 33131-2184
15    (305) 358 3500
    BY:  BENJAMIN C, ESQ.
16    bpaulsen@mwe.com
    Attorneys for Mercy Hospital

17

18    ALSO PRESENT - JAMES JARMON, Videographer

19

20

21

22

23

24

25

```
 1                      I  N  D  E  X

 2


 3

        W I T N E S S
 4
      Testimony of:
 5

 6   NARENDRA GANTI                        PAGE NO.

 7
     EXAMINATION BY MS. WALSH:                  6
 8

 9


10
                    E X H I B I T S
11

12    NUMBER            DESCRIPTION            PAGE

13
      Exhibit 1      Notice of Deposition        8
14    Exhibit 2      Objection of the            9
                     Unsecured Creditor's
15                   Committee to the
                     Proposed Final Cash
16                   Collateral Order
      Exhibit 3      Declaration                12
17    Exhibit 4      Email                      23

18

19           PREVIOUSLY MARKED EXHIBITS

20
     NUMBER            DESCRIPTION            PAGE
21

22

23

24

25
```

```
 1                      DEPOSITION SUPPORT INDEX
                 DIRECTION TO WITNESS NOT TO ANSWER
 2
                           Page  Line
 3


 4
               REQUEST FOR PRODUCTION OF DOCUMENTS
 5
                           Page   Line
 6


 7
                            STIPULATIONS
 8

 9                         Page     Line

10

11                        QUESTION MARKED

12                         Page     Line

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2          MS. WALSH:  We'd like the rough as

3   soon as possible and then the final as soon as

4   possible, too, please.

5          MR. SHERMAN:  Similarly, if we can

6   get the rough also.

7          THE REPORTER:  And the final as soon

8   as possible?

9          MR. SHERMAN:  Yes.

10          MR. PAULSEN:  Yeah, I think us as

11   well, as soon as possible.  Everyone, everyone wants

12   this transcript.

13          THE REPORTER:  Do all counsel agree

14   to the remote swearing in of the witness?

15          MS. WALSH:  Yes.

16          MR. SHERMAN:  Yes.

17          MR. PAULSEN:  Yes.

18   NARENDRA GANTI, FTI, 8251 Greensboro Drive, Suite

19   400, McLean, VA 22102, having been first duly sworn

20   according to law, testifies as follows:

21   EXAMINATION BY MR. WALSH:

22          Q.     Good afternoon.  My name is Kaitlyn

23   Walsh.  I represent ComputerShare Trust Company NA as

24   Master Trustee and Preston Hollow Community Capital

25   Inc. as bondholder representatives in this matter.

1    Collectively, we refer to ourselves as the Secured

2    Bondholder Representatives.

3              Can you please state your full name

4    for the record?

5         A.        Narendra Ganti.

6         Q.        Have you been deposed before,

7    Mr. Ganti?

8         A.        Yes.

9         Q.        So I know we have limited time here

10    today, so I won't waste time going through the normal

11    rules of the road, but just at a high level, you

12    understand that you need to answer audibly as there's

13    a court reporter here, right?

14         A.        Yes.

15         Q.        And to the extent you don't

16    understand any of my questions, please just let me

17    know and I will rephrase them.  Okay?

18         A.        Yes.

19         Q.        And unless your attorney instructs

20    you not to answer -- and if you understand my

21    questions, you're required to answer my question.

22              Do you understand that?

23         A.        Yes.

24         Q.        Okay.  Are you aware of anything that

25    could impact your ability to testify truthfully

1    today, Mr. Ganti?

2            A.        No.

3            Q.        Have you taken any medication that

4    could impede your ability to testify?

5            A.        No.

6                    MS. WALSH:  James, can we please pull

7    up Exhibit 1 and I'd like to mark this as Exhibit 1?

8                    (Exhibit 1, Notice of Deposition, was

9            marked for Identification by the court

10            reporter.)

11                    MS. WALSH:  And this is the Notice of

12    Deposition.

13    BY MS. WALSH:

14            Q.        Mr. Ganti, have you seen this before?

15            A.        Yes, last -- yesterday afternoon, I

16    believe.  Well, I have an earlier version.  I have

17    the one that says noon, but yes.

18            Q.        And you understand that you're here

19    providing testimony in connection with this Notice of

20    Deposition, correct?

21            A.        Correct.

22            Q.        And you are here providing testimony

23    in support of the committee's objection to the entry

24    of the Debtor's final cash collateral order, correct?

25            A.        Correct.

1       MS. WALSH:   We can take this down,

2   please.  Can we please pull up Exhibit No. 2 and I'd

3   like to mark it as Exhibit No. 2 as well, please.

4                   (Exhibit 2, Objection of the

5           Unsecured Creditor's Committee to the

6           Proposed Final Cash Collateral Order, was

7           marked for Identification by the court

8           reporter.)

9   BY MS. WALSH:

10      Q.      And Mr. Ganti, can you see that on

11  the screen?

12      A.      Yes.

13      Q.      And that is the Objection of the

14  Unsecured Creditor's Committee to the Proposed Final

15  Cash Collateral Order, correct?

16      A.      Correct.

17      Q.      And have you seen this document

18  before?

19      A.      Yes, I have.

20      Q.      Were you involved in the preparation

21  of this document?

22      A.      Somewhat.

23              MR. SHERMAN:   I object only to the

24  extent that -- to the extent you're asking for

25  attorney-client work product, but only to the extent

1   that the witness can answer without divulging any

2   work product or privileged information.

3          A.      Well, there's a declaration of mine

4   at the end of this document, 448, so I was involved

5   in that.

6   BY MS. WALSH:

7          Q.      Okay.

8                  MS. WALSH:  Let's turn to page 4 of

9   this document, please.  And I'm interested in the

10  chart.

11         A.      Yes.

12         Q.      Thank you.

13                 Mr. Ganti, were you involved in

14  putting this chart together?

15         A.      No, I was not.

16         Q.      Do you know what this chart is?

17         A.      I do, yes.

18         Q.      What is this chart?

19         A.      It's an analysis of accounts

20  receivable at Mercy Hospital and Mercy Clinics at

21  several points in time; one is at the petition date,

22  which is 8/7/2023.  The other is at the end of

23  August, 8/31.  Then at the end of the September and

24  at the end of October; the most recent one there.

25                 Q.      And you testified that you did not

1   put this chart together, correct?

2        A.        Correct.

3        Q.        Did anyone at FTI put this chart

4   together?

5        A.        No.

6        Q.        Do you know who put the chart

7   together?

8        A.        Well, can I ask a clarifying

9   question?

10       Q.        Certainly.

11       A.        Are you talking about just the

12   physical aspect of putting something in a document or

13   actually the -- where the numbers came from?

14       Q.        I'm interested in where the numbers

15   came from --

16       A.        Okay.

17       Q.        -- that comprise the chart?

18       A.        Well, where the numbers came from, it

19   came from the Debtors and specifically their

20   restructuring advisors at ToneyKorff.  So we received

21   this chart from Jim Porter, who is at ToneyKorff and

22   he's also the CFO of Mercy.

23                 MS. WALSH:  Can we please take this

24   document down and pull Exhibit 3?  And I'd like to

25   mark it -- I think it's Tab 3 and I'd like to mark it

1    as Exhibit 3, please.

2                    (Exhibit 3, Declaration, was marked

3            for Identification by the court reporter.)

4    BY MS. WALSH:

5            Q.      And Mr. Ganti, do you see this

6    document on your screen?

7            A.      Yes.

8            Q.      And is this the declaration -- as far

9    as you can tell from seeing the first page, is this

10   the declaration that you submitted in support of the

11   objection?

12           A.      Yes.

13           Q.      Can we please go down to Paragraph 8

14   of this document?

15                   And you see there, Mr. Ganti, in the

16   first line, it reads:  Second, between the Petition

17   Date and October 31, 2023, Mercy Hospital's total

18   accounts receivable balance declined by only

19   approximately $496,000.

20                   And then in parenthetical, 23,714,184

21   minus 23 thousand 218,077.

22                   MR. SHERMAN:  Objection.  Kaitlyn, I

23   think you meant 23,218,077.

24                   MS. WALSH:  I certainly did.  I'm

25   sorry if I misstated.

1  BY MS. WALSH:

2         Q.        So for clarity of the record, the

3  numbers that I'm referring to are in the

4  parenthetical in the second line of Paragraph 8 of

5  your declaration, the 23,714,184.

6                   Where did that number come from?

7         A.        It came from the same analysis

8  prepared by ToneyKorff and from books and records of

9  the Debtors.

10        Q.        So let's break that down.  So did

11 that come -- did that come from ToneyKorff directly?

12        A.        Well, they're the ones who sent us

13 the -- sent us and others, sent FTI, excuse me, and

14 others, that spreadsheet that summarized the accounts

15 receivable which you showed on the previous exhibit,

16 whatever that exhibit was.

17        Q.        Okay.  So when you say it came from

18 the Debtor's books and records, is that based on an

19 assumption?

20        A.        Yes.

21        Q.        But so from your knowledge, the

22 23,714,000 number, that approximate number, that is

23 the amount of the pre-petition AR according to

24 ToneyKorff, correct?

25        A.        From the spreadsheet that they sent

1    us of accounts receivable, yes.

2          Q.       Okay.  And that was the spreadsheet

3    that we just looked at in the prior exhibit, in

4    Exhibit 2, correct?

5          A.       Correct.

6          Q.       Do you have any further information

7    regarding the source of this number, other than it

8    came --

9          A.       No, I haven't gone back --

10               THE VIDEOGRAPHER:  Ms. Walsh froze.

11               (A discussion was held off the

12          record.)

13               MS. WALSH:  Jennifer, can you please

14    read back the last question?  I don't remember where

15    I was exactly.

16               (Designated question was read back.)

17    BY MS. WALSH:

18          Q.       So referring to the $23.7 million

19    pre-petition AR number, do you have any further --

20    any other information regarding the source other than

21    it came from the Debtors?

22          A.       No, no.

23          Q.       Do you know if it is a gross or a net

24    balance?

25          A.       It's a net balance by the hospital

1    and clinics.

2        Q.      Were there any adjustment -- so to

3    get to that net balance, were there any adjustments

4    made to get to that number?

5        A.      Yes.  There were adjustments to get

6    from the gross AR to the number you were just

7    referring to in that number, yes.

8        Q.      What were the adjustments that were

9    made to get to the 23.7 net number?

10       A.      Again, that was not done by FTI.  It

11   was done by the Debtors.  So they adjusted based

12   on -- I'm assuming historical collections of gross AR

13   to get to that AR, so they adjust that to get to the

14   net AR.

15       Q.      So you don't have any knowledge about

16   what adjustments were made to get to that net

17   knowledge; is that correct -- withdrawn.

18               You don't have any knowledge

19   regarding what adjustments were made to get to that

20   net number, correct?

21       A.      Correct.

22       Q.      And is it correct -- withdrawn.

23               And do you have any knowledge as to

24   why those adjustments were made?

25       A.      Well, generally, the --

1          MR. SHERMAN:  Objection to form.  I'm

2     not sure how somebody can even answer that question.

3     BY MS. WALSH:

4          Q.      Okay.  So is it fair to say that

5     since you don't have any knowledge about what

6     adjustments were made, you don't have any knowledge

7     about why those adjustments were made?

8          MR. SHERMAN:  Objection to form.

9     BY MS. WALSH:

10         Q.      Do you understand the question?

11         MR. SHERMAN:  I don't understand the

12    question.  I don't know how the witness can

13    understand the question.

14         MS. WALSH:  Well, I didn't ask you,

15    Mr. Sherman, whether or not you understand the

16    question.  Your objection is on the record.

17         MR. SHERMAN:  Thank you.

18         A.      I'm -- repeat the question, please?

19    BY MS. WALSH:

20         Q.      Sure.  So I was just trying to

21    understand if you have any knowledge as to why the

22    Debtor made the adjustments that it did to the number

23    in order -- to the gross number in order to get to

24    the net number?

25         A.      Well, in most healthcare cases,

1  there's -- both of the Debtors have kind of a rack

2  rate, a gross charge that they bill for services, but

3  then they negotiate discounts and other things with

4  insurance companies.

5              So the gross AR is based on their

6  rate and then they adjust it to get to what they can

7  bill the insurance company or Medicare and Medicaid.

8              So that's generally across the

9  healthcare industry.  So I'm guessing this is what

10  they're doing here also.

11       Q.       Okay.  So you're making an

12  assumption?

13       A.       Based on experience with other

14  healthcare entities, yes.

15       Q.       Mr. Ganti, what have you done to

16  understand revenue cycle management at Mercy?

17              MR. SHERMAN:   Objection to the form.

18  This is going far beyond the scope of what's in the

19  declaration.  The declaration doesn't at all attest

20  to Mr. Ganti's knowledge of how the numbers.  He just

21  said he received the numbers.

22              MS. WALSH:   Mr. Ganti purports to

23  testify regarding the amount of accounts receivable

24  and is providing testimony regarding the change in

25  accounts receivable from pre-petition to

1    post-petition, so it is completely within the scope

2    of his Declaration as to the accounts receivable.  I

3    know we have limited time today, so I don't know if

4    we should be getting into an argument about this at

5    this time, but, you know, it is absolutely clear from

6    the declaration that his testimony relates to

7    accounts receivable.  So I'm asking him about his

8    knowledge on accounts receivable about which he

9    purports to provide testimony in this declaration.

10              MR. SHERMAN:  And the testimony and

11    what's in his declaration is the receivables as

12    reported to him by the Debtor.  So he's working with

13    the Debtor's numbers, so --

14              MS. WALSH:  If that's the answer,

15    that's the answer.  So I'm asking him has he done

16    anything to understand the revenue cycle management

17    at Mercy.  If the answer is no, then that's fine.

18    And we'll move on.

19              THE DEPONENT:  No, let's move on.

20    BY MS. WALSH:

21         Q.      Let me just restate the question for

22    the record.

23              Have you done anything to understand

24    the revenue cycle management at Mercy?

25         A.      No.

1       Q.      Have you taken any steps to

2   understand the value of the AR at Mercy?

3       A.      I don't know what that question

4   means.

5       Q.      Have you done any independent

6   analysis of the numbers provided by the Debtor of the

7   AR?

8       A.      Again, what -- I don't know what

9   analysis you're asking about.  I mean that's a wide

10  range of stuff.  I don't know what specific analysis

11  you're referring to.

12      Q.      Do you know how Mercy accounts for

13  the treatment of gross billings to net accounts

14  receivables?

15              MR. SHERMAN:  I think it's asked and

16  answered.  Objection to the form.

17      A.      I -- no, I don't.

18  BY MS. WALSH:

19      Q.      And to clarify for the record, you

20  have not performed your own valuation of the Mercy

21  Hospital total accounts receivable, correct?

22      A.      Again, when you say "valuation," I'm

23  not sure what you're referring to.

24      Q.      Well, have you done -- have you

25  undertaken any analysis of the accounts receivable?

1     A.        Again, you're asking a very

2  open-ended, wide question.  I don't know -- I mean

3  I've looked at analysis, looked at the adjustments

4  they made to get from gross to net, compared it over

5  the -- what they've done the last few months to make

6  sure they haven't changed their assumptions and they

7  hadn't so I've looked at that.  I looked at the aging

8  of it, of the AR, to see how it was aging.  So I've

9  done things like that.

10     Q.        Okay.  Anything else?

11     A.        I think that's -- yeah, that's it,

12  because I got this analysis, just like everyone else

13  did, two days ago.

14     Q.        Who performs the revenue cycle

15  management functions at Mercy?

16          MR. PAULSEN:  I'm going to -- I'll

17  jump in with an objection to form there.

18     A.        I don't know.  When you say "who,"

19  are you talking about a specific individual, the name

20  of an individual?

21  BY MS. WALSH:

22     Q.        Well, are you aware that Revology is

23  an outsourced RCM provider?

24     A.        My understanding is they're not

25  providing services to Mercy right now.

 1          Q.        And what is that understanding based

 2     on?

 3          A.        Speaking with ToneyKorff.

 4          Q.        And as of when is your understanding

 5     that Revology is no longer providing services?

 6          A.        I'm not sure.

 7          Q.        Are you aware of limitations in the

 8     revenue cycle management process that may have a

 9     material impact on collections of account receivable?

10                    MR. SHERMAN:   Objection to the form.

11          A.        I don't understand the question.

12     BY MS. WALSH:

13          Q.        Are you aware of challenges that were

14     faced by a hospital in managing accounts receivable

15     that may have a material impact on the ability to

16     collect?

17                    MR. PAULSEN:   Objection to form.

18                    MR. SHERMAN:   I will join that

19     objection as well.

20                    Nar?  Okay.  You're still there.

21                    THE DEPONENT:   I thought you objected

22     to the question.  Do I have to answer it?

23                    MS. WALSH:  Yes, sorry, unless you're

24     instructed not to answer, your counsel will object to

25     my questions and you can still answer.

1        A.        Can you repeat the question again?

2                  MS. WALSH:   Jennifer, can you read

3     back the question, please?

4                  (Designated question was read back.)

5        A.        So you're talking about Mercy

6     specifically or hospitals in general?

7     BY MS. WALSH:

8        Q.        Thank you for the clarification.   I'm

9     speaking about hospitals in general and then I would

10    like to know about Mercy specifically.

11       A.        Well, yes, most hospitals healthcare

12    entities have --

13                 (A discussion was held off the

14          record.)

15       A.        So, yes, so most hospitals and

16    healthcare entities have issues around when they file

17    claims, there's claims denial by the insurance, the

18    payers, there's issues with medical necessity.   So

19    there's a whole process of filing claims with the

20    insurance companies and Medicare and Medicaid.

21                 Sometimes, the claim and the payment

22    is denied for various reasons, whether it's medical

23    necessity, credentialing or any other myriad of

24    reasons that the insurance company might have an

25    issue with the procedure performed.

1       Q.      And do you have any knowledge

2   regarding the particular circumstance at Mercy that

3   would be limitations that would have a material

4   impact on collections of accounts receivable?

5       A.      No, I don't have any knowledge of any

6   impact on collections.

7               MS. WALSH:  Can we please pull up

8   Exhibit 7 -- or, I think it's marked as Tab 7 and

9   then mark it as Exhibit 4.

10              (Exhibit 4, Email, was marked for

11          Identification by the court reporter.)

12              MR. SHERMAN:  Kaitlyn, for the

13  record, these exhibits you're referring to, were they

14  circulated in advance?  Because I haven't seen

15  anything you're marking as an exhibit other than

16  those three documents that were prior pleadings.

17              MS. WALSH:  No, they were not

18  circulated in advance.

19              MR. SHERMAN:  Okay.

20  BY MS. WALSH:

21      Q.      And can we please scroll down -- now,

22  this is an email from -- well, let's scroll down a

23  little bit.  I want to go down to an email from

24  September 29, 2023.  Okay.  So that right there is --

25  right here is perfect.

1          So Mr. Ganti, do you see -- now I

2     understand you have not seen this document before.

3     I'll represent to you that this is an email exchange

4     between BRG and Revology who was handling the RCM

5     process at Mercy.

6               MS. WALSH:  And actually if we can

7     scroll down a little bit further, a little bit more.

8     I apologize.  I lost my copy of this.  Bear with me,

9     please.  Let's scroll up a little bit more.  I'm

10    looking for an email from Seth Calkins.

11              MR. SHERMAN:  So the record is clear,

12    we object to the introduction of this document.  You

13    can obviously question him about it if he knows

14    anything about him, and obviously we've never seen

15    this before either.

16              MR. PAULSEN:  I join in that

17    objection.  Also, Kaitlyn, this exhibit on the link

18    is coming up as just an email.  Is there a way that

19    we can get the PDF uploaded for the exhibit link?

20              MS. WALSH:  Yes.

21              MR. SHERMAN:  Because it's not

22    opening on my computer.

23              MS. WALSH:  Yeah.

24              THE VIDEOGRAPHER:  Yeah, I can try to

25    convert it.

1  BY MS. WALSH:

2       Q.      Okay.  Can you scroll up a little bit

3  more?  Keep going.  It's a chart.  Here it is.  Here

4  it is.  That's perfect.  Mr. Ganti, recognizing --

5  I'm assuming you have not seen this document before,

6  correct?

7       A.      Correct.

8       Q.      So I just want to draw your attention

9  to the AR as of August 7th column here.  And if you

10 look down at the bottom, it has a net AR balance of

11 35,004,325.

12              Do you see that?

13      A.      Yes.

14              MS. WALSH:  We'll scroll up just so

15 we can let Mr. Ganti see who this email is from,

16 please.

17 BY MS. WALSH:

18      Q.      Okay.  And do you see this is from

19 Mr. Calkins?

20      A.      Uh-huh, yes.

21      Q.      And do you know Mr. Calkins?

22      A.      I do not.

23      Q.      So I'll represent to you that he is

24 with Revology who was the RCM manager at Mercy.

25              Does it surprise you that they would

1   have a different number for the pre-petition AR than

2   what was provided by ToneyKorff?

3                   MR. SHERMAN:   Objection to the form.

4                   MR. PAULSEN:   Objection to the form.

5        A.        Yeah, I don't know how Seth Calkins

6   is, but I'm also reading the email where he says:

7   Thanks for speaking with me.   I walked through how we

8   could look at new charges since 8/7 and apply some

9   loose assumptions.

10                  So I don't know what he did to get to

11  those numbers.   But he applied some loose

12  assumptions.

13  BY MS. WALSH:

14       Q.        So is it fair to say that there are

15  different ways to calculate AR as of a given point in

16  time?

17                  MR. SHERMAN:   Object to the form.

18       A.        Sure, because Seth is using some

19  different assumptions.   I don't know how valid they

20  are.   And they tend to be loose -- the assumptions

21  don't seem to be based on anything because he said

22  they're loose assumptions.

23                  So yeah, I'm sure he could get any

24  number he wants based on assumptions.

25       Q.        But you don't have familiarity about

1   the assumptions applied by the Debtors, right?

2                   MR. SHERMAN:  Objection to form.

3                   MR. PAULSEN:  Objection.

4        A.        Nope, not --

5                   MR. SHERMAN:  Object to form.

6                   MS. WALSH:  Can you please take this

7   document down?

8   BY MS. WALSH:

9        Q.        Mr. Ganti, do you agree that the

10  Debtors collected approximately 40.4 million in net

11  patient receipts post-petition?

12       A.        I agree that it's 40.4 from petition

13  date to the week ending October 27th, yes.

14                  MS. WALSH:  Can we please pull back

15  Exhibit 3?  And can we please go to Paragraph 7?

16  BY MS. WALSH:

17       Q.        I'd like to turn your attention to

18  the second sentence, Mr. Ganti, which states:

19  "Rather, the Debtor's cash position to the extent of

20  any possible degradation can be supported by funds

21  through the foundation settlement or investment

22  account as necessary."

23                  Do you see that?

24       A.        Yes.

25       Q.        And can you explain that statement,

1    please?

2         A.      Yeah, there's a -- another entity

3    Mercy Foundation which has assets, somewhere 17 or

4    $18 million in unrestricted assets, temporarily

5    restricted and firmly restricted and there's a

6    settlement in place between I believe the Debtors,

7    the Committee, the Foundation and the Bondholders

8    that the Foundation would support the operations of

9    the Hospital by providing unrestricted assets that it

10   has.  And they've already supported the Hospital by

11   providing $2.2 million in cash.

12        Q.      And do you understand that there's a

13   limit on this support that the Foundation will be

14   providing the Hospital?

15        A.      I believe it's the amount of the

16   unrestricted cash is what they're going to support,

17   yes.

18        Q.      And you mentioned the investment

19   account, as well, correct?

20        A.      Yes.  So when they filed, they had a

21   separate investment account that had about $11.8

22   million in investments and that has been used also to

23   fund professional fees in the case so far.

24        Q.      Do you know the aggregate amount of

25   funds withdrawn from the Debtors' investment account

1   from the petition date?

2           A.      It's about $5.3 million, give or

3   take.

4           Q.      Is it your understanding that

5   approximately 3 million was paid to fund professional

6   fees before the investment account was assessed?

7                   MR. SHERMAN:  Objection to the form.

8                   MS. WALSH:  Withdrawn, please.

9   BY MS. WALSH:

10          Q.      Is it your understanding that

11  approximately 3 million was paid to fund professional

12  fees before the investment account was accessed by

13  the Debtors?

14                  MR. SHERMAN:  Objection to the form.

15          A.      I -- I'm not aware of that.

16  BY MS. WALSH:

17          Q.      Do you know the aggregate amount of

18  funds that have been paid into the professional fee

19  reserve established under the interim cash collateral

20  order through October 31st?

21          A.      No, it's through -- I only know

22  through October 27th from the budget to actual and I

23  believe it's somewhere around $5.1 or 2 million.

24          Q.      And where did those funds come from?

25          A.      That came -- I believe that came from

1   the investment account because the investment account

2   went down about the same amount as the professional

3   fee reserve account.

4           Q.        Okay.  So -- and what do you base

5   that understanding on?

6           A.        By looking at the cash flows provided

7   by ToneyKorff.

8           Q.        In Paragraph 9 of your declaration,

9   if we could go down just a little bit, please.

10          In Paragraph 9 of your declaration,

11  you attest that you believe it is unlikely that the

12  Master Trustee's cash collateral will be material

13  depleted as the cases progress.

14          Correct?

15          A.        Correct.

16          Q.        On what do you base this belief of

17  unlikelihood of material depletion of the Trustee's

18  collateral?

19          A.        Well, one there's going to be funds

20  coming in from the Foundation.  The cash flow

21  forecast projects another $4 and a half million

22  coming in the month of November, that's one.  Second,

23  starting, I guess November 30 or December 1, whatever

24  that date is, the winning buyer, the University of

25  Iowa Hospital and Clinics has agreed to fund

1   operating losses of the Debtor going forward until I

2   believe end of January when they think they'll close

3   on the transaction.  And there's also the

4   investment -- there's still -- I'd have to -- 11 and

5   -- somewhere around $6 million or something --

6   somewhere in that in the investment account also that

7   can be used -- be used to fund professional fees.

8          Q.      Have you reviewed the Debtors' cash

9   collateral budget in support of the final cash

10  collateral hearing?

11         A.      I'm sorry.  Repeat the question.

12         Q.      Sure.  Have you reviewed the Debtors'

13  cash collateral budget in support of the final cash

14  collateral order?

15         A.      I was provided one -- a version of a

16  budget, yes.

17         Q.      Are you aware that the Debtor has

18  forecast receipts to the client by more than 15%?

19         A.      I am aware, yes.

20         Q.      And if the Debtors correct that

21  there's a 15% decline in revenue, wouldn't that

22  impact the amount of the accounts receivable?

23                 MR. SHERMAN:  Objection as to form.

24         A.      If the -- if it was actually going to

25  decline, it could have an impact, but I'm not sure,

1   but I don't believe it will decline, because they're

2   collecting cash from services provided at least 30

3   days ago and they haven't had any declination in any

4   collections over the last 12 weeks of the case

5   post-petition.  They've been averaging $3.4

6   million -- if you take the 40 million in receipts and

7   divide it by 12, you get about 3.4 million on average

8   per week of collections.

9               Now, there's some variations from

10  week to week.  There's no reason why there should be

11  a decline of 15% over the next four weeks.

12       Q.      If the Debtors are correct in

13  their --

14       A.      I don't believe they're correct.  So

15  I can't answer the question.  I don't think they're

16  right.  I don't know -- there's no reason why the

17  receipts should decline the last four weeks of when

18  they're responsible for funding losses.

19       Q.      So isn't it possible then that the

20  Debtors' analysis of their pre -- the amount of their

21  pre-petition AR is also incorrect?

22               MR. PAULSEN:  Objection to form.

23               MR. SHERMAN:  Objection to the form.

24       A.      One has nothing to do with the other.

25  One is just an assumption that they decided to take a

1    reduction to be conservative in projections.

2    BY MS. WALSH:

3         Q.      But you testified that the Debtor

4    also applied a set of assumptions to go from a gross

5    number to a net number with respect to AR, correct?

6                 MR. PAULSEN:  Objection to form.

7         A.      Correct.

8                 MS. WALSH:  I'm sorry.  I couldn't

9    hear.

10                THE REPORTER:  What was the answer?

11        A.      That they did apply a factor to get

12   from gross to net, yes, they do.

13   BY MS. WALSH:

14        Q.      So you're not challenging the

15   assumptions that the Debtor is an applying to their

16   AR analysis, but you are challenging their

17   assumptions that they're applying in their forecast

18   analysis, correct?

19                MR. PAULSEN:  Objection to form.

20                MR. SHERMAN:  Join in the objection.

21        A.      I believe, based on what they've --

22   historical collections post-petition, they are being

23   conservative in their assumptions on cash collections

24   over the next couple of weeks, yes.

25

1   BY MS. WALSH:

2         Q.        Also in that same paragraph 9 of your

3   declaration, you cite the -- the sale of the Debtors'

4   assets to the University as being a positive for the

5   hospital, correct?

6         A.        Yes.

7         Q.        And in fact, in Paragraph 10 of your

8   declaration, Romanette iii, you cite the expected

9   stability that the pending sale is likely to bring;

10  is that right?

11        A.        Yes.

12        Q.        On what do you base this belief of

13  the stability?

14        A.        Well, one, the University is a much

15  larger institution with much more financial

16  resources.  And then speaking with ToneyKorff,

17  there's been some uncertainty with the sale process

18  and they told us in our calls that some of the

19  employees were concerned that they weren't sure what

20  was going to happen to the hospital, whether it was

21  going to be bought by the bondholders, the University

22  or some other outcome.  So this gives a certainty to

23  know that the University is a buyer.  I believe at

24  the auction and maybe in the press I saw that Dave

25  Gordon, who represents the University for Polsinelli

1    said that there's going to be no change in head count

2    or any reductions in employment once the University

3    closes on the transaction and the University also

4    promised to invest $25 million over the next five

5    years to help with capital expenditures and

6    technology improvement.  So I believe those are all

7    positive steps in stabilizing the operations of Mercy

8    Hospital.

9         Q.      Are you aware of the potential that

10   some doctors view the sale of the hospital to the

11   University as unfavorable and may threaten to leave?

12             MR. SHERMAN:  Objection to the form.

13             MR. PAULSEN:  Objection.

14        A.      I have not spoken to any doctors.

15   No.  I am not aware.

16   BY MS. WALSH:

17        Q.      If the University were to not take

18   certain staff, what impact would that have on the

19   sale in your view?

20             MR. SHERMAN:  Objection to the form.

21             MR. PAULSEN:  Objection to form.

22        A.      I have no idea.  I don't know what

23   staff you're talking about.  I don't know how I can

24   answer that question.

25        Q.      Well, I'm trying to explore the

1    extent of your knowledge regarding the expected

2    stability that you're testifying about in Paragraph

3    10, so I just want to get an idea of whether, you

4    know, you have any information regarding, you know,

5    all the possible outcomes of this acquisition?

6              MR. SHERMAN:  Objection.  I don't

7    think -- is there a question in there?  I didn't hear

8    a question.

9         A.     I have not played out every outcome

10    if that's what you're asking.  I don't know how I

11    could, but I have not.

12    BY MS. WALSH:

13         Q.     But you have no way of knowing that

14    this transaction will actually lead to -- well,

15    withdrawn.

16              So do you have any way of knowing

17    whether this transaction will actually close?

18              MR. SHERMAN:  Objection to the form.

19         A.     I have -- no, it's -- no, I don't

20    know.

21    BY MS. WALSH:

22         Q.     When you don't -- oh, withdrawn.  I

23    apologize.  I did not mean to speak over you.

24         A.     No, I don't know.

25         Q.     And you don't have any way of

1   knowing, with any degree of certainty, of what the

2   impact of this sale will be on the Hospital, right?

3                    MR. SHERMAN:   Objection to form.

4                    MR. PAULSEN:   I'll join in that

5   objection as well, sorry.

6          A.        I know that this hospital has been --

7   has had been up for sale, if that's the right word,

8   for at least 18 months or longer or some transaction

9   that's been happening, so they've -- the staff and

10  management and employees and doctors and everyone

11  else have had uncertainty for the last two years.  So

12  I think this finally brings some certainty, the fact

13  that they will be part of a much larger and more

14  financially viable entity than they have been for the

15  last two years as part of the process that the

16  Debtors' investment bankers have engaged in.

17         Q.        In the last sentence of Paragraph 9,

18  you state that:  "I believe it is unlikely that the

19  master Trustee's cash collateral will be material

20  depleted as these Chapter 11 cases progress."

21                    Do you see that?

22         A.        Yes.

23                    MR. SHERMAN:   I think the term is

24  "materially depleted," not "material depleted,"

25  that's in Paragraph 9.

1    BY MS. WALSH:

2         Q.        And did you do any analysis to

3    determine the degree to which you believe the Master

4    Trustee's collateral may be depleted in these cases

5    going forward?

6         A.        Well, the AR that was at petition

7    date to the end of October for the hospital only went

8    down by 500,000 and there hasn't been any significant

9    changes in census over the last two, three months.

10   So if the amount of AR only declined by 496,000, it's

11   less than -- it's probably about a percent and a half

12   of the pre-petition AR and there's been no change in

13   census.  And we're also in the busy season for

14   healthcare with flu, RSV, Covid, all that stuff, the

15   normal stuff that happens during the winter months.

16   I don't anticipate anything materially happening in

17   the next four weeks.

18              MS. WALSH:  Can we go off the record

19   for a moment, please?

20              (A brief recess was taken.)

21   BY MS. WALSH:

22        Q.        One clarifying question.  Mr. Ganti,

23   just to confirm a question that I believe that I

24   asked you already but just to confirm that I have it,

25   do you know the actual amount that was paid into the

1    professional fee reserve to date?

2              A.        I believe it's about 5 --

3                        MR. SHERMAN:   Objection to the form.

4              A.        I believe it's about $5.1 million.

5    BY MS. WALSH:

6              Q.        Mr. Ganti, based on the assumed

7    availability of the Foundation funds and the funds in

8    the investment account being available to the

9    Hospital, do you believe it is necessary for the

10   Debtors to continue to access the Trustee's cash

11   collateral?

12                       MR. PAULSEN:   Objection to form.

13             A.        I'm not sure what you're asking.

14   BY MS. WALSH:

15             Q.        Well, in your declaration and in your

16   testimony here today, we've talked quite a bit about

17   the availability of funds from the Foundation and

18   from the investment accounts, correct?

19             A.        Correct.

20             Q.        And so my question is:   Given the

21   availability of those funds, is it necessary for the

22   Debtor to continue to have access to the Trustee's

23   cash collateral going forward?

24                       MR. PAULSEN:   Same objection.

25                       MR. SHERMAN:   Yeah, I join in the

1    objection.

2          A.      One, the investment account is only

3    being used for professional fees, so it's not used to

4    help with the operations of the hospital and the

5    assets of the foundation will help with the

6    operations of the hospital.  So I don't think that's

7    completely sufficient.  I think the Debtors would

8    still need access to cash collateral.

9          MS. WALSH:  Thank you very much,

10   Mr. Ganti.  I really appreciate your time, especially

11   today, on a Saturday.

12          THE DEPONENT:  I had nothing better

13   to do.  This is fun.  Just kidding.

14          (Deposition concluded at 4:31 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1        UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF IOWA
2

3        I, Jennifer L. Wielage, CCR No. 30X100191600,

4    Certified Court Reporter, certify:

5        That the foregoing proceedings were taken

6    before me at the time and place therein set forth, at

7    which time the witness was put under oath by me;

8        That the testimony of the witness, the

9    questions propounded, and all objections and

10   statements made at the time of the examination were

11   recorded stenographically by me and were thereafter

12   transcribed;

13       That a review of the transcript by the

14   deponent was not requested;

15       That the foregoing is a true and correct

16   transcript of my shorthand notes so taken.

17       I further certify that I am not a relative or

18   employee of any attorney of the parties, nor

19   financially interested in the action.

20       I declare under penalty of perjury under the

21   laws of Iowa that the foregoing is true and correct.

22       Dated this 4th day of November 2023.

23   *Jennifer L. Wielage*

24   Jennifer L. Wielage, CCR, RPR, CRR

25

## WORD INDEX

**< $ >**
**$11.8**  28:*21*
**$18**  28:*4*
**$2.2**  28:*11*
**$23.7**  14:*18*
**$25**  35:*4*
**$3.4**  32:*5*
**$4**  30:*21*
**$496,000**  12:*19*
**$5.1**  29:*23*  39:*4*
**$5.3**  29:*2*
**$6**  31:*5*

**< 0 >**
**07102**  3:*9*

**< 1 >**
**1**  4:*12*  8:*7, 8*  30:*23*
**10**  34:*7*  36:*3*
**10022**  3:*3*
**11**  31:*4*  37:*20*
**12**  4:*16*  32:*4, 7*
**15**  31:*18, 21*  32:*11*
**17**  28:*3*
**18**  37:*8*

**< 2 >**
**2**  4:*14*  9:*2, 3, 4*  14:*4*
  29:*23*
**2023**  1:*14*  2:*7*  12:*17*
  23:*24*  41:*22*
**212**  3:*4*
**218,077**  12:*21*
**22102**  6:*19*
**23**  4:*17*  12:*21*
**23,218,077**  12:*23*
**23,714,000**  13:*22*
**23,714,184**  12:*20*
  13:*5*
**23.7**  15:*9*
**23-00623**  1:*1*
**24255**  1:*16*
**27th**  27:*13*  29:*22*
**29**  23:*24*
**2nd**  3:*13*

**< 3 >**

**3**  4:*16*  11:*24, 25*
  12:*1, 2*  27:*15*  29:*5,*
  *11*
**3.4**  32:*7*
**3:30**  2:*7*
**30**  30:*23*  32:*2*
**305**  3:*15*
**30X100191600**  41:*3*
**31**  12:*17*
**31st**  29:*20*
**33131-2184**  3:*14*
**333**  3:*13*
**35,004,325**  25:*11*
**3500**  3:*15*
**358**  3:*15*

**< 4 >**
**4**  1:*14*  2:*7*  4:*17*
  10:*8*  23:*9, 10*
**4:31**  40:*14*
**40**  32:*6*
**40.4**  27:*10, 12*
**400**  6:*19*
**448**  10:*4*
**4500**  3:*14*
**496,000**  38:*10*
**4th**  41:*22*

**< 5 >**
**5**  39:*2*
**500,000**  38:*8*

**< 6 >**
**6**  4:*6*
**643-7000**  3:*9*

**< 7 >**
**7**  23:*8*  27:*15*
**7th**  25:*9*

**< 8 >**
**8**  4:*12*  12:*13*  13:*4*
**8/31**  10:*23*
**8/7**  26:*8*
**8/7/2023**  10:*22*
**8251**  6:*18*

**< 9 >**
**9**  4:*14*  30:*8, 10*  34:*2*

**37**:*17, 25*
**919**  3:*3*
**935-3000**  3:*4*
**973**  3:*9*

**< A >**
**ability**  7:*25*  8:*4*
  21:*15*
**above-entitled**  2:*3*
**above-named**  2:*2*
**absolutely**  18:*5*
**access**  39:*10, 22*  40:*8*
**accessed**  29:*12*
**account**  21:*9*  27:*22*
  28:*19, 21, 25*  29:*6, 12*
  30:*1, 3*  31:*6*  39:*8*
  40:*2*
**accounts**  10:*19*
  12:*18*  13:*14*  14:*1*
  17:*23, 25*  18:*2, 7, 8*
  19:*12, 13, 21, 25*
  21:*14*  23:*4*  31:*22*
  39:*18*
**acquisition**  36:*5*
**action**  41:*19*
**actual**  29:*22*  38:*25*
**adjust**  15:*13*  17:*6*
**adjusted**  15:*11*
**adjustment**  15:*2*
**adjustments**  15:*3, 5,*
  *8, 16, 19, 24*  16:*6, 7,*
  *22*  20:*3*
**advance**  23:*14, 18*
**advisors**  11:*20*
**afternoon**  6:*22*  8:*15*
**aggregate**  28:*24*
  29:*17*
**aging**  20:*7, 8*
**ago**  20:*13*  32:*3*
**agree**  6:*13*  27:*9, 12*
**agreed**  30:*25*
**al**  1:*8*
**amount**  13:*23*  17:*23*
  28:*15, 24*  29:*17*  30:*2*
  31:*22*  32:*20*  38:*10,*
  *25*
**analysis**  10:*19*  13:*7*
  19:*6, 9, 10, 25*  20:*3,*
  *12*  32:*20*  33:*16, 18*

**38**:*2*
**ANDREW**  3:*10*
**ANSWER**  5:*1*  7:*12,*
  *20, 21*  10:*1*  16:*2*
  18:*14, 15, 17*  21:*22,*
  *24, 25*  32:*15*  33:*10*
  35:*24*
**answered**  19:*16*
**anticipate**  38:*16*
**apologize**  24:*8*  36:*23*
**applied**  26:*11*  27:*1*
  33:*4*
**apply**  26:*8*  33:*11*
**applying**  33:*15, 17*
**appreciate**  40:*10*
**approximate**  13:*22*
**approximately**  12:*19*
  27:*10*  29:*5, 11*
**AR**  13:*23*  14:*19*
  15:*6, 12, 13, 14*  17:*5*
  19:*2, 7*  20:*8*  25:*9, 10*
  26:*1, 15*  32:*21*  33:*5,*
  *16*  38:*6, 10, 12*
**argument**  18:*4*
**asherman@sillscummi**
**s.com**  3:*10*
**asked**  19:*15*  38:*24*
**asking**  9:*24*  18:*7, 15*
  19:*9*  20:*1*  36:*10*
  39:*13*
**aspect**  11:*12*
**assessed**  29:*6*
**assets**  28:*3, 4, 9*  34:*4*
  40:*5*
**assumed**  39:*6*
**assuming**  15:*12*  25:*5*
**assumption**  13:*19*
  17:*12*  32:*25*
**assumptions**  20:*6*
  26:*9, 12, 19, 20, 22, 24*
  27:*1*  33:*4, 15, 17, 23*
**attention**  25:*8*  27:*17*
**attest**  17:*19*  30:*11*
**attorney**  7:*19*  41:*18*
**attorney-client**  9:*25*
**Attorneys**  3:*6, 12, 16*
**auction**  34:*24*
**audibly**  7:*12*
**August**  10:*23*  25:*9*

availability  39:7, 17, 21
available  39:8
Avenue  3:3, 13
average  32:7
averaging  32:5
aware  7:24  20:22  21:7, 13  29:15  31:17, 19  35:9, 15

< B >
back  14:9, 14, 16  22:3, 4  27:14
balance  12:18  14:24, 25  15:3  25:10
bankers  37:16
BANKRUPTCY  1:1
base  30:4, 16  34:12
based  13:18  15:11  17:5, 13  21:1  26:21, 24  33:21  39:6
Bear  24:8
belief  30:16  34:12
believe  8:16  28:6, 15  29:23, 25  30:11  31:2  32:1, 14  33:21  34:23  35:6  37:18  38:3, 23  39:2, 4, 9
BENJAMIN  3:15
better  40:12
beyond  17:18
bill  17:2, 7
billings  19:13
bit  23:23  24:7, 9  25:2  30:9  39:16
bmankovetsky@sillscu
mmis.com  3:11
bondholder  6:25  7:2
Bondholders  28:7  34:21
books  13:8, 18
BORIS  3:11
bottom  25:10
bought  34:21
bpaulsen@mwe.com  3:16
break  13:10
BRG  24:4
brief  38:20

bring  34:9
brings  37:12
budget  29:22  31:9, 13, 16
busy  38:13
buyer  30:24  34:23

< C >
calculate  26:15
Calkins  24:10  25:19, 21  26:5
called  2:2
calls  34:18
Capital  3:7  6:24  35:5
Case  1:1  28:23  32:4
cases  16:25  30:13  37:20  38:4
Cash  4:15  8:24  9:6, 15  27:19  28:11, 16  29:19  30:6, 12, 20  31:8, 9, 13  32:2  33:23  37:19  39:10, 23  40:8
CCR  1:15  41:3, 24
census  38:9, 13
certain  35:18
Certainly  11:10  12:24
certainty  34:22  37:1, 12
Certified  2:5  41:4
certify  41:4, 17
CFO  11:22
challenges  21:13
challenging  33:14, 16
change  17:24  35:1  38:12
changed  20:6
changes  38:9
Chapter  37:20
charge  17:2
charges  26:8
chart  10:10, 14, 16, 18  11:1, 3, 6, 17, 21  25:3
circulated  23:14, 18
circumstance  23:2
cite  34:3, 8

CITY  1:8
claim  22:21
claims  22:17, 19
clarification  22:8
clarify  19:19
clarifying  11:8  38:22
clarity  13:2
clear  18:5  24:11
client  31:18
Clinics  10:20  15:1  30:25
close  31:2  36:17
closes  35:3
COCO  3:5
COHN  3:1
Collateral  4:16  8:24  9:6, 15  29:19  30:12, 18  31:9, 10, 13, 14  37:19  38:4  39:11, 23  40:8
collect  21:16
collected  27:10
collecting  32:2
collections  15:12  21:9  23:4, 6  32:4, 8  33:22, 23
Collectively  7:1
column  25:9
come  13:6, 11  29:24
coming  24:18  30:20, 22
commencing  2:7
Committee  3:12  4:15  9:5, 14  28:7
committee's  8:23
Community  6:24
companies  17:4  22:20
Company  3:6  6:23  17:7  22:24
compared  20:4
completely  18:1  40:7
comprise  11:17
computer  24:22
Computershare  3:6  6:23
concerned  34:19
concluded  40:14
confirm  38:23, 24

connection  8:19
conservative  33:1, 23
continue  39:10, 22
convert  24:25
copy  24:8
correct  8:20, 21, 24, 25  9:15, 16  11:1, 2  13:24  14:4, 5  15:17, 20, 21, 22  19:21  25:6, 7  28:19  30:14, 15  31:20  32:12, 14  33:5, 7, 18  34:5  39:18, 19  41:15, 21
counsel  6:13  21:24
count  35:1
couple  33:24
COURT  1:1  2:4  7:13  8:9  9:7  12:3  23:11  41:1, 4
Covid  38:14
credentialing  22:23
Creditors  3:12
Creditor's  4:14  9:5, 14
CRR  1:15  41:24
CUMMIS  3:8
cycle  17:16  18:16, 24  20:14  21:8

< D >
date  10:21  12:17  27:13  29:1  30:24  38:7  39:1
Dated  41:22
Dave  34:24
day  41:22
days  20:13  32:3
Debtor  16:22  18:12  19:6  31:1, 17  33:3, 15  39:22
Debtors  1:9  11:19  13:9  14:21  15:11  17:1  27:1, 10  28:6, 25  29:13  31:8, 12, 20  32:12, 20  34:3  37:16  39:10  40:7
Debtor's  8:24  13:18  18:13  27:19
December  30:23
decided  32:25

**Declaration** 4:*16*
10:*3* 12:2, *8*, *10* 13:*5*
17:*19* 18:2, *6*, *9*, *11*
30:8, *10* 34:*3*, *8*
39:*15*
**declare** 41:*20*
**declination** 32:*3*
**decline** 31:*21*, *25*
32:*1*, *11*, *17*
**declined** 12:*18* 38:*10*
**degradation** 27:*20*
**degree** 37:*1* 38:*3*
**denial** 22:*17*
**denied** 22:*22*
**depleted** 30:*13*
37:*20*, *24* 38:*4*
**depletion** 30:*17*
**DEPONENT** 18:*19*
21:*21* 40:*12* 41:*14*
**deposed** 7:*6*
**DEPOSITION** 1:*13*
2:*1*, *3* 4:*12* 5:*1* 8:*8*,
*12*, *20* 40:*14*
**DESCRIPTION** 4:*12*,
*19*
**Designated** 14:*16*
22:*4*
**determine** 38:*3*
**different** 26:*1*, *15*, *19*
**DIRECTION** 5:*1*
**directly** 13:*11*
**discounts** 17:*3*
**discussion** 14:*11*
22:*13*
**DISTRICT** 1:*1* 41:*1*
**divide** 32:*7*
**divulging** 10:*1*
**doctors** 35:*10*, *14*
37:*10*
**document** 9:*17*, *21*
10:*4*, *9* 11:*12*, *24*
12:6, *14* 24:2, *12*
25:5 27:*7*
**DOCUMENTS** 5:*1*
23:*16*
**doing** 17:*10*
**draw** 25:*8*
**Drive** 6:*18*
**duly** 6:*19*

**< E >**
**earlier** 8:*16*
**either** 24:*15*
**Email** 4:*17* 23:*10*, 22,
23 24:*3*, *10*, *18* 25:*15*
26:*6*
**EMERY** 3:*13*
**employee** 41:*18*
**employees** 34:*19*
37:*10*
**employment** 35:*2*
**engaged** 37:*16*
**entities** 17:*14* 22:*12*,
*16*
**entity** 28:2 37:*14*
**entry** 8:*23*
**especially** 40:*10*
**ESQ** 3:*4*, *5*, *10*, *11*, *15*
**established** 29:*19*
**et** 1:*8*
**exactly** 14:*15*
**EXAMINATION**
1:*13* 2:2 4:6 6:*21*
41:*10*
**exchange** 24:*3*
**excuse** 13:*13*
**Exhibit** 4:*12*, *14*, *16*,
*17* 8:7, *8* 9:2, *3*, *4*
11:*24* 12:*1*, *2* 13:*15*,
*16* 14:*3*, *4* 23:*8*, *9*, *10*,
*15* 24:*17*, *19* 27:*15*
**EXHIBITS** 4:*19*
23:*13*
**expected** 34:*8* 36:*1*
**expenditures** 35:*5*
**experience** 17:*13*
**explain** 27:*25*
**explore** 35:*25*
**extent** 7:*15* 9:*24*, *25*
27:*19* 36:*1*

**< F >**
**faced** 21:*14*
**fact** 34:7 37:*12*
**factor** 33:*11*
**fair** 16:*4* 26:*14*
**familiarity** 26:*25*
**far** 12:*8* 17:*18* 28:*23*

**Federal** 2:*4*
**fee** 29:*18* 30:*3* 39:*1*
**fees** 28:*23* 29:*6*, *12*
31:7 40:*3*
**FERRIS** 3:*1*
**file** 22:*16*
**filed** 28:*20*
**filing** 22:*19*
**Final** 4:*15* 6:*3*, 7
8:*24* 9:6, *14* 31:*9*, *13*
**finally** 37:*12*
**financial** 34:*15*
**financially** 37:*14*
41:*19*
**fine** 18:*17*
**firmly** 28:*5*
**first** 6:*19* 12:*9*, *16*
**five** 35:*4*
**FL** 3:*14*
**flow** 30:*20*
**flows** 30:*6*
**flu** 38:*14*
**follows** 6:*20*
**forecast** 30:*21* 31:*18*
33:*17*
**foregoing** 41:*5*, *15*, *21*
**forenoon** 2:*7*
**form** 16:*1*, *8* 17:*17*
19:*16* 20:*17* 21:*10*,
*17* 26:*3*, *4*, *17* 27:2, *5*
29:7, *14* 31:*23* 32:*22*,
*23* 33:6, *19* 35:*12*, *20*,
*21* 36:*18* 37:*3* 39:*3*,
*12*
**forth** 41:*6*
**forward** 31:*1* 38:*5*
39:*23*
**foundation** 27:*21*
28:*3*, 7, 8, *13* 30:*20*
39:*7*, *17* 40:*5*
**four** 32:*11*, *17* 38:*17*
**froze** 14:*10*
**FTI** 6:*18* 11:*3*
13:*13* 15:*10*
**full** 7:*3*
**fun** 40:*13*
**functions** 20:*15*
**fund** 28:*23* 29:*5*, *11*
30:*25* 31:*7*
**funding** 32:*18*

**funds** 27:*20* 28:*25*
29:*18*, *24* 30:*19* 39:*7*,
*17*, *21*
**further** 14:*6*, *19* 24:*7*
41:*17*

**< G >**
**GANTI** 1:*14* 4:6
6:*18* 7:*5*, 7 8:*1*, *14*
9:*10* 10:*13* 12:*5*, *15*
17:*15*, *22* 24:*1* 25:*4*,
*15* 27:*9*, *18* 38:*22*
39:6 40:*10*
**Ganti's** 17:*20*
**general** 22:6, *9*
**generally** 15:*25* 17:*8*
**getting** 18:*4*
**give** 29:*2*
**given** 26:*15* 39:*20*
**gives** 34:*22*
**go** 12:*13* 23:*23*
27:*15* 30:*9* 33:*4*
38:*18*
**going** 7:*10* 17:*18*
20:*16* 25:*3* 28:*16*
30:*19* 31:*1*, *24* 34:*20*,
*21* 35:*1* 38:*5* 39:*23*
**Good** 6:*22*
**Gordon** 34:*25*
**Greensboro** 6:*18*
**GROSS** 3:*8* 14:*23*
15:6, *12* 16:*23* 17:*2*,
*5* 19:*13* 20:*4* 33:*4*,
*12*
**guess** 30:*23*
**guessing** 17:*9*

**< H >**
**half** 30:*21* 38:*11*
**handling** 24:*4*
**happen** 34:*20*
**happening** 37:*9*
38:*16*
**happens** 38:*15*
**head** 35:*1*
**healthcare** 16:*25*
17:*9*, *14* 22:*11*, *16*
38:*14*
**hear** 33:*9* 36:*7*

**hearing** 31:*10*
**held** 14:*11* 22:*13*
**help** 35:*5* 40:*4, 5*
**high** 7:*11*
**historical** 15:*12*
33:*22*
**Hollow** 3:*7* 6:*24*
**HOSPITAL** 1:*8*
3:*16* 10:*20* 14:*25*
19:*21* 21:*14* 28:*9, 10,*
*14* 30:*25* 34:*5, 20*
35:*8, 10* 37:*2, 6* 38:*7*
39:*9* 40:*4, 6*
**hospitals** 22:*6, 9, 11,*
*15*
**Hospital's** 12:*17*

**< I >**
**idea** 35:*22* 36:*3*
**Identification** 8:*9*
9:*7* 12:*3* 23:*11*
**iii** 34:*8*
**impact** 7:*25* 21:*9, 15*
23:*4, 6* 31:*22, 25*
35:*18* 37:*2*
**impede** 8:*4*
**improvement** 35:*6*
**incorrect** 32:*21*
**independent** 19:*5*
**INDEX** 5:*1*
**individual** 20:*19, 20*
**industry** 17:*9*
**information** 10:*2*
14:*6, 20* 36:*4*
**institution** 34:*15*
**instructed** 21:*24*
**instructs** 7:*19*
**insurance** 17:*4, 7*
22:*17, 20, 24*
**interested** 10:*9*
11:*14* 41:*19*
**interim** 29:*19*
**introduction** 24:*12*
**invest** 35:*4*
**investment** 27:*21*
28:*18, 21, 25* 29:*6, 12*
30:*1* 31:*4, 6* 37:*16*
39:*8, 18* 40:*2*
**investments** 28:*22*

**involved** 9:*20* 10:*4,*
*13*
**IOWA** 1:*1, 8* 30:*25*
41:*1, 21*
**issue** 22:*25*
**issues** 22:*16, 18*

**< J >**
**JAMES** 3:*18* 8:*6*
**January** 31:*2*
**JARMON** 3:*18*
**JENNIFER** 1:*15* 2:*5*
14:*13* 22:*2* 41:*3, 24*
**Jersey** 3:*9*
**Jim** 11:*21*
**JOB** 1:*16*
**join** 21:*18* 24:*16*
33:*20* 37:*4* 39:*25*
**jump** 20:*17*

**< K >**
**KAITLIN** 3:*4*
**Kaitlyn** 6:*22* 12:*22*
23:*12* 24:*17*
**Keep** 25:*3*
**kidding** 40:*13*
**kind** 17:*1*
**know** 7:*9, 17* 10:*16*
11:*6* 14:*23* 16:*12*
18:*3, 5* 19:*3, 8, 10, 12*
20:*2, 18* 22:*10* 25:*21*
26:*5, 10, 19* 28:*24*
29:*17, 21* 32:*16*
34:*23* 35:*22, 23* 36:*4,*
*10, 20, 24* 37:*6* 38:*25*
**knowing** 36:*13, 16*
37:*1*
**knowledge** 13:*21*
15:*15, 17, 18, 23* 16:*5,*
*6, 21* 17:*20* 18:*8*
23:*1, 5* 36:*1*
**knows** 24:*13*
**krwalsh@mintz.com**
3:*5*

**< L >**
**larger** 34:*15* 37:*13*
**law** 6:*20*
**laws** 41:*21*

**lead** 36:*14*
**leave** 35:*11*
**level** 7:*11*
**LEVIN** 3:*1*
**License** 2:*6*
**limit** 28:*13*
**limitations** 21:*7* 23:*3*
**limited** 7:*9* 18:*3*
**Line** 5:*1, 9, 12* 12:*16*
13:*4*
**link** 24:*17, 19*
**little** 23:*23* 24:*7, 9*
25:*2* 30:*9*
**longer** 21:*5* 37:*8*
**look** 25:*10* 26:*8*
**looked** 14:*3* 20:*3, 7*
**looking** 24:*10* 30:*6*
**loose** 26:*9, 11, 20, 22*
**losses** 31:*1* 32:*18*
**lost** 24:*8*

**< M >**
**making** 17:*11*
**management** 17:*16*
18:*16, 24* 20:*15* 21:*8*
37:*10*
**manager** 25:*24*
**managing** 21:*14*
**MANKOVETSKY**
3:*11*
**mark** 8:*7* 9:*3* 11:*25*
23:*9*
**MARKED** 4:*19* 5:*11*
8:*9* 9:*7* 12:*2* 23:*8,*
*10*
**marking** 23:*15*
**Master** 6:*24* 30:*12*
37:*19* 38:*3*
**material** 21:*9, 15*
23:*3* 30:*12, 17* 37:*19,*
*24*
**materially** 37:*24*
38:*16*
**matter** 2:*3* 6:*25*
**MCDERMOTT** 3:*13*
**McLean** 6:*19*
**mean** 19:*9* 20:*2*
36:*23*
**means** 19:*4*

**meant** 12:*23*
**Medicaid** 17:*7* 22:*20*
**medical** 22:*18, 22*
**Medicare** 17:*7* 22:*20*
**medication** 8:*3*
**mentioned** 28:*18*
**MERCY** 1:*8* 3:*16*
10:*20* 11:*22* 12:*17*
17:*16* 18:*17, 24* 19:*2,*
*12, 20* 20:*15, 25* 22:*5,*
*10* 23:*2* 24:*5* 25:*24*
28:*3* 35:*7*
**Miami** 3:*14*
**million** 14:*18* 27:*10*
28:*4, 11, 22* 29:*2, 5,*
*11, 23* 30:*21* 31:*5*
32:*6, 7* 35:*4* 39:*4*
**mine** 10:*3*
**MINTZ** 3:*1*
**minus** 12:*21*
**misstated** 12:*25*
**moment** 38:*19*
**month** 30:*22*
**months** 20:*5* 37:*8*
38:*9, 15*
**move** 18:*18, 19*
**myriad** 22:*23*

**< N >**
**name** 6:*22* 7:*3*
20:*19*
**Nar** 21:*20*
**NARENDRA** 1:*14*
4:*6* 6:*18* 7:*5*
**NATHAN** 3:*5*
**ncoco@mintz.com** 3:*6*
**necessary** 27:*22* 39:*9,*
*21*
**necessity** 22:*18, 23*
**need** 7:*12* 40:*8*
**negotiate** 17:*3*
**net** 14:*23, 25* 15:*3, 9,*
*14, 16, 20* 16:*24*
19:*13* 20:*4* 25:*10*
27:*10* 33:*5, 12*
**never** 24:*14*
**New** 3:*3, 9* 26:*8*
**Newark** 3:*9*
**noon** 8:*17*

Nope 27:4
normal 7:10 38:15
NORTHERN 1:1
41:1
Notary 2:6
notes 41:16
Notice 4:12 8:8, 11, 19
November 1:14 2:7
30:22, 23 41:22
NUMBER 4:12, 19
13:6, 22 14:7, 19
15:4, 6, 7, 9, 20 16:22, 23, 24 26:1, 24 33:5
numbers 11:13, 14, 18 13:3 17:20, 21
18:13 19:6 26:11

< O >
oath 41:7
object 9:23 21:24
24:12 26:17 27:5
objected 21:21
Objection 4:14 8:23
9:4, 13 12:11, 22
16:1, 8, 16 17:17
19:16 20:17 21:10, 17, 19 24:17 26:3, 4
27:2, 3 29:7, 14
31:23 32:22, 23 33:6, 19, 20 35:12, 13, 20, 21 36:6, 18 37:3, 5
39:3, 12, 24 40:1
objections 41:9
obviously 24:13, 14
October 10:24 12:17
27:13 29:20, 22 38:7
oh 36:22
Okay 7:17, 24 10:7
11:16 13:17 14:2
16:4 17:11 20:10
21:20 23:19, 24 25:2, 18 30:4
once 35:2
ones 13:12
open-ended 20:2
opening 24:22
operating 31:1
operations 28:8 35:7

40:4, 6
ORAL 1:13 2:2
Order 4:16 8:24
9:6, 15 16:23 29:20
31:14
outcome 34:22 36:9
outcomes 36:5
outsourced 20:23

< P >
P.C 3:8
p.m 40:14
PAGE 4:6, 12, 19
5:1, 9, 12 10:8 12:9
paid 29:5, 11, 18
38:25
Paragraph 12:13
13:4 27:15 30:8, 10
34:2, 7 36:2 37:17, 25
parenthetical 12:20
13:4
part 37:13, 15
particular 23:2
parties 41:18
patient 27:11
PAULSEN 6:10, 17
20:16 21:17 24:16
26:4 27:3 32:22
33:6, 19 35:13, 21
37:4 39:12, 24
payers 22:18
payment 22:21
PDF 24:19
penalty 41:20
pending 34:9
percent 38:11
perfect 23:25 25:4
performed 19:20
22:25
performs 20:14
perjury 41:20
petition 10:21 12:16
27:12 29:1 38:6
physical 11:12
place 28:6 41:6
played 36:9
Plaza 3:8
pleadings 23:16

please 6:4 7:3, 16
8:6 9:2, 3 10:9
11:23 12:1, 13 14:13
16:18 22:3 23:7, 21
24:9 25:16 27:6, 14, 15 28:1 29:8 30:9
38:19
point 26:15
points 10:21
Polsinelli 34:25
Porter 11:21
position 27:19
positive 34:4 35:7
possible 6:3, 4, 8, 11
27:20 32:19 36:5
post-petition 18:1
27:11 32:5 33:22
potential 35:9
pre 32:20
preparation 9:20
prepared 13:8
pre-petition 13:23
14:19 17:25 26:1
32:21 38:12
PRESENT 3:18
press 34:24
Preston 3:6 6:24
previous 13:15
PREVIOUSLY 4:19
prior 14:3 23:16
privileged 10:2
probably 38:11
procedure 22:25
proceedings 41:5
process 21:8 22:19
24:5 34:17 37:15
product 9:25 10:2
PRODUCTION 5:1
professional 28:23
29:5, 11, 18 30:2
31:7 39:1 40:3
progress 30:13 37:20
projections 33:1
projects 30:21
promised 35:4
Proposed 4:15 9:6, 14
propounded 41:9
provide 18:9

provided 19:6 26:2
30:6 31:15 32:2
provider 20:23
providing 8:19, 22
17:24 20:25 21:5
28:9, 11, 14
Public 2:6
pull 8:6 9:2 11:24
23:7 27:14
purports 17:22 18:9
pursuant 2:4
put 11:1, 3, 6 41:7
putting 10:14 11:12

< Q >
QUESTION 5:11
7:21 11:9 14:14, 16
16:2, 10, 12, 13, 16, 18
18:21 19:3 20:2
21:11, 22 22:1, 3, 4
24:13 31:11 32:15
35:24 36:7, 8 38:22, 23 39:20
questions 7:16, 21
21:25 41:9
quite 39:16

< R >
rack 17:1
range 19:10
rate 17:2, 6
RCM 20:23 24:4
25:24
read 14:14, 16 22:2, 4
reading 26:6
reads 12:16
really 40:10
reason 32:10, 16
reasons 22:22, 24
receipts 27:11 31:18
32:6, 17
receivable 10:20
12:18 13:15 14:1
17:23, 25 18:2, 7, 8
19:21, 25 21:9, 14
23:4 31:22
receivables 18:11
19:14

received  11:20  17:21
recess  38:20
recognizing  25:4
record  7:4  13:2
14:12  16:16  18:22
19:19  22:14  23:13
24:11  38:18
recorded  41:11
records  13:8, 18
reduction  33:1
reductions  35:2
refer  7:1
referring  13:3  14:18
15:7  19:11, 23  23:13
regarding  14:7, 20
15:19  17:23, 24  23:2
36:1, 4
relates  18:6
relative  41:17
remember  14:14
remote  2:1  6:14
repeat  16:18  22:1
31:11
rephrase  7:17
REPORTED  1:15
18:12
Reporter  2:5  6:7, 13
7:13  8:10  9:8  12:3
23:11  33:10  41:4
represent  6:23  24:3
25:23
representatives  6:25
7:2
represents  34:25
REQUEST  5:1
requested  41:14
required  7:21
reserve  29:19  30:3
39:1
resources  34:16
respect  33:5
responsible  32:18
restate  18:21
restricted  28:5
restructuring  11:20
revenue  17:16  18:16,
24  20:14  21:8  31:21
review  41:13
reviewed  31:8, 12

Revology  20:22  21:5
24:4  25:24
right  7:13  20:25
23:24, 25  27:1  32:16
34:10  37:2, 7
Riverfront  3:8
road  7:11
Romanette  34:8
rough  6:2, 6
RPR  1:15  41:24
RSV  38:14
Rules  2:4  7:11

< S >
sale  34:3, 9, 17
35:10, 19  37:2, 7
Saturday  2:6  40:11
saw  34:24
says  8:17  26:6
scope  17:18  18:1
screen  9:11  12:6
scroll  23:21, 22  24:7,
9  25:2, 14
SE  3:13
season  38:13
Second  12:16  13:4
27:18  30:22
Secured  7:1
see  9:10  12:5, 15
20:8  24:1  25:12, 15,
18  27:23  37:21
seeing  12:9
seen  8:14  9:17
23:14  24:2, 14  25:5
sent  13:12, 13, 25
sentence  27:18  37:17
separate  28:21
September  10:23
23:24
services  17:2  20:25
21:5  32:2
set  33:4  41:6
Seth  24:10  26:5, 18
settlement  27:21
28:6
SHERMAN  3:10
6:5, 9, 16  9:23  12:22
16:1, 8, 11, 15, 17
17:17  18:10  19:15
21:10, 18  23:12, 19

24:11, 21  26:3, 17
27:2, 5  29:7, 14
31:23  32:23  33:20
35:12, 20  36:6, 18
37:3, 23  39:3, 25
Shorthand  2:5  41:16
showed  13:15
significant  38:8
SILLS  3:8
Similarly  6:5
somebody  16:2
Somewhat  9:22
soon  6:3, 7, 11
sorry  12:25  21:23
31:11  33:8  37:5
source  14:7, 20
speak  36:23
Speaking  21:3  22:9
26:7  34:16
specific  19:10  20:19
specifically  11:19
22:6, 10
spoken  35:14
spreadsheet  13:14, 25
14:2
stability  34:9, 13
36:2
stabilizing  35:7
staff  35:18, 23  37:9
starting  30:23
state  7:3  37:18
statement  27:25
statements  41:10
STATES  1:1  27:18
41:1
stenographically
41:11
steps  19:1  35:7
STIPULATIONS  5:1
stuff  19:10  38:14, 15
submitted  12:10
sufficient  40:7
Suite  3:14  6:18
summarized  13:14
SUPPORT  5:1  8:23
12:10  28:8, 13, 16
31:9, 13
supported  27:20
28:10

sure  16:2, 20  19:23
20:6  21:6  26:18, 23
31:12, 25  34:19
39:13
surprise  25:25
swearing  6:14
sworn  6:19

< T >
Tab  11:25  23:8
take  9:1  11:23  27:6
29:3  32:6, 25  35:17
taken  2:4  8:3  19:1
38:20  41:5, 16
talked  39:16
talking  11:11  20:19
22:5  35:23
technology  35:6
tell  12:9
temporarily  28:4
tend  26:20
term  37:23
testified  10:25  33:3
testifies  6:20
testify  7:25  8:4
17:23
testifying  36:2
Testimony  4:1  8:19,
22  17:24  18:6, 9, 10
39:16  41:8
Thank  10:12  16:17
22:8  40:9
Thanks  26:7
things  17:3  20:9
think  6:10  11:25
12:23  19:15  20:11
23:8  31:2  32:15
36:7  37:12, 23  40:6,
7
Third  3:3
thought  21:21
thousand  12:21
threaten  35:11
three  23:16  38:9
time  7:9, 10  10:21
18:3, 5  26:16  40:10
41:6, 7, 10
TJC  1:1
today  7:10  8:1  18:3

39:*16*  40:*11*
**told**  34:*18*
**ToneyKorff**  11:*20, 21*
13:*8, 11, 24*  21:*3*
26:*2*  30:*7*  34:*16*
**total**  12:*17*  19:*21*
**transaction**  31:*3*
35:*3*  36:*14, 17*  37:*8*
**transcribed**  41:*12*
**TRANSCRIPT**  2:*1*
6:*12*  41:*13, 16*
**treatment**  19:*13*
**true**  41:*15, 21*
**Trust**  3:*6*  6:*23*
**Trustee**  6:*24*
**Trustee's**  30:*12, 17*
37:*19*  38:*4*  39:*10, 22*
**truthfully**  7:*25*
**try**  24:*24*
**trying**  16:*20*  35:*25*
**turn**  10:*8*  27:*17*
**two**  20:*13*  37:*11, 15*
38:*9*

**< U >**
**Uh-huh**  25:*20*
**uncertainty**  34:*17*
37:*11*
**understand**  7:*12, 16,*
*20, 22*  8:*18*  16:*10, 11,*
*13, 15, 21*  17:*16*
18:*16, 23*  19:2  21:*11*
24:2  28:*12*
**understanding**  20:*24*
21:*1, 4*  29:*4, 10*  30:5
**undertaken**  19:*25*
**unfavorable**  35:*11*
**UNITED**  1:*1*  41:*1*
**University**  30:*24*
34:*4, 14, 21, 23, 25*
35:*2, 3, 11, 17*
**unlikelihood**  30:*17*
**unrestricted**  28:*4, 9,*
*16*
**Unsecured**  4:*14*  9:5,
*14*
**uploaded**  24:*19*

**< V >**

**VA**  6:*19*
**valid**  26:*19*
**valuation**  19:*20, 22*
**value**  19:2
**variations**  32:*9*
**various**  22:22
**version**  8:*16*  31:*15*
**viable**  37:*14*
**Videographer**  3:*18*
14:*10*  24:*24*
**view**  35:*10, 19*

**< W >**
**walked**  26:7
**WALSH**  3:*4*  4:*6*
6:*2, 15, 21, 23*  8:*6, 11,*
*13*  9:*1, 9*  10:*6, 8*
11:*23*  12:*4, 24*  13:*1*
14:*10, 13, 17*  16:*3, 9,*
*14, 19*  17:22  18:*14,*
*20*  19:*18*  20:*21*
21:*12, 23*  22:*2, 7*
23:*7, 17, 20*  24:*6, 20,*
*23*  25:*1, 14, 17*  26:*13*
27:*6, 8, 14, 16*  29:*8, 9,*
*16*  33:*2, 8, 13*  34:*1*
35:*16*  36:*12, 21*  38:*1,*
*18, 21*  39:*5, 14*  40:*9*
**want**  23:*23*  25:*8*
36:*3*
**wants**  6:*11*  26:*24*
**waste**  7:*10*
**way**  24:*18*  36:*13, 16,*
*25*
**ways**  26:*15*
**week**  27:*13*  32:*8, 10*
**weeks**  32:*4, 11, 17*
33:*24*  38:*17*
**well**  6:*11*  8:*16*  9:*3*
10:*3*  11:*8, 18*  13:*12*
15:*25*  16:*14, 25*
19:*24*  20:22  21:*19*
22:*11*  23:22  28:*19*
30:*19*  34:*14*  35:*25*
36:*14*  37:*5*  38:*6*
39:*15*
**went**  30:2  38:*7*
**we're**  38:*13*
**we've**  24:*14*  39:*16*
**wide**  19:9  20:2

**WIELAGE**  1:*15*  2:5
41:*3, 24*
**winning**  30:*24*
**winter**  38:*15*
**withdrawn**  15:*17, 22*
28:*25*  29:8  36:*15, 22*
**witness**  2:2  5:*1*
6:*14*  10:*1*  16:*12*
41:*7, 8*
**word**  37:*7*
**work**  9:*25*  10:2
**working**  18:*12*

**< X >**
**XI01916**  2:6

**< Y >**
**Yeah**  6:*10*  20:*11*
24:*23, 24*  26:*5, 23*
28:2  39:*25*
**years**  35:5  37:*11, 15*
**yesterday**  8:*15*
**York**  3:*3*

## WORD LIST

**< $ >**
**$11.8** *(1)*
**$18** *(1)*
**$2.2** *(1)*
**$23.7** *(1)*
**$25** *(1)*
**$3.4** *(1)*
**$4** *(1)*
**$496,000** *(1)*
**$5.1** *(2)*
**$5.3** *(1)*
**$6** *(1)*

**< 0 >**
**07102** *(1)*

**< 1 >**
**1** *(5)*
**10** *(2)*
**10022** *(1)*
**11** *(2)*
**12** *(3)*
**15** *(3)*
**17** *(1)*
**18** *(1)*

**< 2 >**
**2** *(6)*
**2023** *(5)*
**212** *(1)*
**218,077** *(1)*
**22102** *(1)*
**23** *(2)*
**23,218,077** *(1)*
**23,714,000** *(1)*
**23,714,184** *(2)*
**23.7** *(1)*
**23-00623** *(1)*
**24255** *(1)*
**27th** *(2)*
**29** *(1)*
**2nd** *(1)*

**< 3 >**
**3** *(8)*
**3.4** *(1)*
**3:30** *(1)*

**30** *(2)*
**305** *(1)*
**30X100191600** *(1)*
**31** *(1)*
**31st** *(1)*
**33131-2184** *(1)*
**333** *(1)*
**35,004,325** *(1)*
**3500** *(1)*
**358** *(1)*

**< 4 >**
**4** *(6)*
**4:31** *(1)*
**40** *(1)*
**40.4** *(2)*
**400** *(1)*
**448** *(1)*
**4500** *(1)*
**496,000** *(1)*
**4th** *(1)*

**< 5 >**
**5** *(1)*
**500,000** *(1)*

**< 6 >**
**6** *(1)*
**643-7000** *(1)*

**< 7 >**
**7** *(3)*
**7th** *(1)*

**< 8 >**
**8** *(3)*
**8/31** *(1)*
**8/7** *(1)*
**8/7/2023** *(1)*
**8251** *(1)*

**< 9 >**
**9** *(6)*
**919** *(1)*
**935-3000** *(1)*
**973** *(1)*

**< A >**
**ability** *(3)*

**above-entitled** *(1)*
**above-named** *(1)*
**absolutely** *(1)*
**access** *(3)*
**accessed** *(1)*
**account** *(13)*
**accounts** *(17)*
**acquisition** *(1)*
**action** *(1)*
**actual** *(2)*
**adjust** *(2)*
**adjusted** *(1)*
**adjustment** *(1)*
**adjustments** *(10)*
**advance** *(2)*
**advisors** *(1)*
**afternoon** *(2)*
**aggregate** *(2)*
**aging** *(2)*
**ago** *(2)*
**agree** *(3)*
**agreed** *(1)*
**al** *(1)*
**amount** *(10)*
**analysis** *(12)*
**ANDREW** *(1)*
**ANSWER** *(15)*
**answered** *(1)*
**anticipate** *(1)*
**apologize** *(2)*
**applied** *(3)*
**apply** *(2)*
**applying** *(2)*
**appreciate** *(1)*
**approximate** *(1)*
**approximately** *(4)*
**AR** *(20)*
**argument** *(1)*
**asherman@sillscummi s.com** *(1)*
**asked** *(2)*
**asking** *(7)*
**aspect** *(1)*
**assessed** *(1)*
**assets** *(5)*
**assumed** *(1)*
**assuming** *(2)*
**assumption** *(3)*
**assumptions** *(12)*

**attention** *(2)*
**attest** *(2)*
**attorney** *(2)*
**attorney-client** *(1)*
**Attorneys** *(3)*
**auction** *(2)*
**audibly** *(1)*
**August** *(2)*
**availability** *(3)*
**available** *(1)*
**Avenue** *(2)*
**average** *(1)*
**averaging** *(1)*
**aware** *(9)*

**< B >**
**back** *(6)*
**balance** *(5)*
**bankers** *(1)*
**BANKRUPTCY** *(1)*
**base** *(3)*
**based** *(9)*
**Bear** *(1)*
**belief** *(2)*
**believe** *(18)*
**BENJAMIN** *(1)*
**better** *(1)*
**beyond** *(1)*
**bill** *(2)*
**billings** *(1)*
**bit** *(7)*
**bmankovetsky@sillscu mmis.com** *(1)*
**bondholder** *(2)*
**Bondholders** *(2)*
**books** *(2)*
**BORIS** *(1)*
**bottom** *(1)*
**bought** *(1)*
**bpaulsen@mwe.com** *(1)*
**break** *(1)*
**BRG** *(1)*
**brief** *(1)*
**bring** *(1)*
**brings** *(1)*
**budget** *(4)*
**busy** *(1)*
**buyer** *(2)*

< C >
calculate *(1)*
Calkins *(4)*
called *(1)*
calls *(1)*
Capital *(3)*
Case *(3)*
cases *(4)*
Cash *(21)*
CCR *(3)*
census *(2)*
certain *(1)*
Certainly *(2)*
certainty *(3)*
Certified *(2)*
certify *(2)*
CFO *(1)*
challenges *(1)*
challenging *(2)*
change *(3)*
changed *(1)*
changes *(1)*
Chapter *(1)*
charge *(1)*
charges *(1)*
chart *(10)*
circulated *(2)*
circumstance *(1)*
cite *(2)*
CITY *(1)*
claim *(1)*
claims *(3)*
clarification *(1)*
clarify *(1)*
clarifying *(2)*
clarity *(1)*
clear *(2)*
client *(1)*
Clinics *(3)*
close *(2)*
closes *(1)*
COCO *(1)*
COHN *(1)*
Collateral *(16)*
collect *(1)*
collected *(1)*
collecting *(1)*
collections *(8)*

Collectively *(1)*
column *(1)*
come *(4)*
coming *(3)*
commencing *(1)*
Committee *(5)*
committee's *(1)*
Community *(1)*
companies *(2)*
Company *(4)*
compared *(1)*
completely *(2)*
comprise *(1)*
computer *(1)*
Computershare *(2)*
concerned *(1)*
concluded *(1)*
confirm *(2)*
connection *(1)*
conservative *(2)*
continue *(2)*
convert *(1)*
copy *(1)*
correct *(32)*
counsel *(2)*
count *(1)*
couple *(1)*
COURT *(9)*
Covid *(1)*
credentialing *(1)*
Creditors *(1)*
Creditor's *(3)*
CRR *(2)*
CUMMIS *(1)*
cycle *(5)*

< D >
date *(7)*
Dated *(1)*
Dave *(1)*
day *(1)*
days *(2)*
Debtor *(8)*
Debtors *(20)*
Debtor's *(4)*
December *(1)*
decided *(1)*
Declaration *(17)*
declare *(1)*

declination *(1)*
decline *(5)*
declined *(2)*
degradation *(1)*
degree *(1)*
denial *(1)*
denied *(1)*
depleted *(5)*
depletion *(1)*
DEPONENT *(4)*
deposed *(1)*
DEPOSITION *(9)*
DESCRIPTION *(2)*
Designated *(2)*
determine *(1)*
different *(3)*
DIRECTION *(1)*
directly *(1)*
discounts *(1)*
discussion *(2)*
DISTRICT *(3)*
divide *(1)*
divulging *(1)*
doctors *(3)*
document *(12)*
DOCUMENTS *(2)*
doing *(1)*
draw *(1)*
Drive *(1)*
duly *(1)*

< E >
earlier *(1)*
either *(1)*
Email *(9)*
EMERY *(1)*
employee *(1)*
employees *(2)*
employment *(1)*
engaged *(1)*
entities *(3)*
entity *(2)*
entry *(1)*
especially *(1)*
ESQ *(5)*
established *(1)*
et *(1)*
exactly *(1)*
EXAMINATION *(5)*

exchange *(1)*
excuse *(1)*
Exhibit *(24)*
EXHIBITS *(2)*
expected *(2)*
expenditures *(1)*
experience *(1)*
explain *(1)*
explore *(1)*
extent *(6)*

< F >
faced *(1)*
fact *(2)*
factor *(1)*
fair *(2)*
familiarity *(1)*
far *(3)*
Federal *(1)*
fee *(3)*
fees *(5)*
FERRIS *(1)*
file *(1)*
filed *(1)*
filing *(1)*
Final *(8)*
finally *(1)*
financial *(1)*
financially *(2)*
fine *(1)*
firmly *(1)*
first *(3)*
five *(1)*
FL *(1)*
flow *(1)*
flows *(1)*
flu *(1)*
follows *(1)*
forecast *(3)*
foregoing *(3)*
forenoon *(1)*
form *(26)*
forth *(1)*
forward *(3)*
foundation *(9)*
four *(3)*
froze *(1)*
FTI *(4)*
full *(1)*

fun *(1)*
functions *(1)*
fund *(5)*
funding *(1)*
funds *(9)*
further *(4)*

< G >
GANTI *(21)*
Ganti's *(1)*
general *(2)*
generally *(2)*
getting *(1)*
give *(1)*
given *(2)*
gives *(1)*
go *(6)*
going *(13)*
Good *(1)*
Gordon *(1)*
Greensboro *(1)*
GROSS *(11)*
guess *(1)*
guessing *(1)*

< H >
half *(2)*
handling *(1)*
happen *(1)*
happening *(2)*
happens *(1)*
head *(1)*
healthcare *(6)*
hear *(2)*
hearing *(1)*
held *(2)*
help *(3)*
high *(1)*
historical *(2)*
Hollow *(1)*
HOSPITAL *(20)*
hospitals *(4)*
Hospital's *(1)*

< I >
idea *(2)*
Identification *(4)*
iii *(1)*
impact *(9)*

impede *(1)*
improvement *(1)*
incorrect *(1)*
independent *(1)*
INDEX *(1)*
individual *(2)*
industry *(1)*
information *(4)*
institution *(1)*
instructed *(1)*
instructs *(1)*
insurance *(5)*
interested *(3)*
interim *(1)*
introduction *(1)*
invest *(1)*
investment *(14)*
investments *(1)*
involved *(3)*
IOWA *(6)*
issue *(1)*
issues *(2)*

< J >
JAMES *(2)*
January *(1)*
JARMON *(1)*
JENNIFER *(6)*
Jersey *(1)*
Jim *(1)*
JOB *(1)*
join *(5)*
jump *(1)*

< K >
KAITLIN *(1)*
Kaitlyn *(4)*
Keep *(1)*
kidding *(1)*
kind *(1)*
know *(34)*
knowing *(3)*
knowledge *(13)*
knows *(1)*
krwalsh@mintz.com
*(1)*

< L >
larger *(2)*

law *(1)*
laws *(1)*
lead *(1)*
leave *(1)*
level *(1)*
LEVIN *(1)*
License *(1)*
limit *(1)*
limitations *(2)*
limited *(1)*
Line *(6)*
link *(2)*
little *(6)*
longer *(1)*
look *(2)*
looked *(5)*
looking *(2)*
loose *(4)*
losses *(2)*
lost *(1)*

< M >
making *(1)*
management *(6)*
manager *(1)*
managing *(1)*
MANKOVETSKY
*(1)*
mark *(5)*
MARKED *(7)*
marking *(1)*
Master *(4)*
material *(7)*
materially *(2)*
matter *(2)*
MCDERMOTT *(1)*
McLean *(1)*
mean *(3)*
means *(1)*
meant *(1)*
Medicaid *(2)*
medical *(2)*
Medicare *(2)*
medication *(1)*
mentioned *(1)*
MERCY *(21)*
Miami *(1)*
million *(16)*
mine *(1)*

MINTZ *(1)*
minus *(1)*
misstated *(1)*
moment *(1)*
month *(1)*
months *(4)*
move *(2)*
myriad *(1)*

< N >
name *(3)*
Nar *(1)*
NARENDRA *(4)*
NATHAN *(1)*
ncoco@mintz.com *(1)*
necessary *(3)*
necessity *(2)*
need *(2)*
negotiate *(1)*
net *(14)*
never *(1)*
New *(4)*
Newark *(1)*
noon *(1)*
Nope *(1)*
normal *(1)*
NORTHERN *(2)*
Notary *(1)*
notes *(1)*
Notice *(4)*
November *(5)*
NUMBER *(19)*
numbers *(9)*

< O >
oath *(1)*
object *(5)*
objected *(1)*
Objection *(40)*
objections *(1)*
obviously *(2)*
October *(6)*
oh *(1)*
Okay *(15)*
once *(1)*
ones *(1)*
open-ended *(1)*
opening *(1)*
operating *(1)*

operations  (4)
ORAL  (2)
Order  (8)
outcome  (2)
outcomes  (1)
outsourced  (1)

< P >
P.C  (1)
p.m  (1)
PAGE  (9)
paid  (4)
Paragraph  (10)
parenthetical  (2)
part  (2)
particular  (1)
parties  (1)
patient  (1)
PAULSEN  (15)
payers  (1)
payment  (1)
PDF  (1)
penalty  (1)
pending  (1)
percent  (1)
perfect  (2)
performed  (2)
performs  (1)
perjury  (1)
petition  (5)
physical  (1)
place  (2)
played  (1)
Plaza  (1)
pleadings  (1)
please  (25)
point  (1)
points  (1)
Polsinelli  (1)
Porter  (1)
position  (1)
positive  (2)
possible  (7)
post-petition  (4)
potential  (1)
pre  (1)
preparation  (1)
prepared  (1)
pre-petition  (6)

PRESENT  (1)
press  (1)
Preston  (2)
previous  (1)
PREVIOUSLY  (1)
prior  (2)
privileged  (1)
probably  (1)
procedure  (1)
proceedings  (1)
process  (5)
product  (2)
PRODUCTION  (1)
professional  (8)
progress  (2)
projections  (1)
projects  (1)
promised  (1)
Proposed  (3)
propounded  (1)
provide  (1)
provided  (5)
provider  (1)
providing  (8)
Public  (1)
pull  (5)
purports  (2)
pursuant  (1)
put  (4)
putting  (2)

< Q >
QUESTION  (28)
questions  (4)
quite  (1)

< R >
rack  (1)
range  (1)
rate  (2)
RCM  (3)
read  (4)
reading  (1)
reads  (1)
really  (1)
reason  (2)
reasons  (2)
receipts  (4)
receivable  (15)

receivables  (2)
received  (2)
recess  (1)
recognizing  (1)
record  (10)
recorded  (1)
records  (2)
reduction  (1)
reductions  (1)
refer  (1)
referring  (6)
regarding  (8)
relates  (1)
relative  (1)
remember  (1)
remote  (2)
repeat  (3)
rephrase  (1)
REPORTED  (2)
Reporter  (10)
represent  (3)
representatives  (2)
represents  (1)
REQUEST  (1)
requested  (1)
required  (1)
reserve  (3)
resources  (1)
respect  (1)
responsible  (1)
restate  (1)
restricted  (2)
restructuring  (1)
revenue  (6)
review  (1)
reviewed  (2)
Revology  (4)
right  (9)
Riverfront  (1)
road  (1)
Romanette  (1)
rough  (2)
RPR  (2)
RSV  (1)
Rules  (2)

< S >
sale  (7)
Saturday  (2)

saw  (1)
says  (2)
scope  (2)
screen  (2)
scroll  (6)
SE  (1)
season  (1)
Second  (4)
Secured  (1)
see  (10)
seeing  (1)
seen  (6)
sent  (4)
sentence  (2)
separate  (1)
September  (2)
services  (4)
set  (2)
Seth  (3)
settlement  (2)
SHERMAN  (37)
Shorthand  (2)
showed  (1)
significant  (1)
SILLS  (1)
Similarly  (1)
somebody  (1)
Somewhat  (1)
soon  (4)
sorry  (5)
source  (2)
speak  (1)
Speaking  (4)
specific  (2)
specifically  (3)
spoken  (1)
spreadsheet  (3)
stability  (3)
stabilizing  (1)
staff  (3)
starting  (1)
state  (2)
statement  (1)
statements  (1)
STATES  (3)
stenographically  (1)
steps  (2)
STIPULATIONS  (1)
stuff  (3)

submitted  (1)
sufficient  (1)
Suite  (2)
summarized  (1)
SUPPORT  (8)
supported  (2)
sure  (11)
surprise  (1)
swearing  (1)
sworn  (1)

< T >
Tab  (2)
take  (7)
taken  (6)
talked  (1)
talking  (4)
technology  (1)
tell  (1)
temporarily  (1)
tend  (1)
term  (1)
testified  (2)
testifies  (1)
testify  (3)
testifying  (1)
Testimony  (9)
Thank  (4)
Thanks  (1)
things  (2)
think  (13)
Third  (1)
thought  (1)
thousand  (1)
threaten  (1)
three  (2)
time  (10)
TJC  (1)
today  (5)
told  (1)
ToneyKorff  (9)
total  (2)
transaction  (5)
transcribed  (1)
TRANSCRIPT  (4)
treatment  (1)
true  (2)
Trust  (2)
Trustee  (1)

Trustee's  (6)
truthfully  (1)
try  (1)
trying  (2)
turn  (2)
two  (4)

< U >
Uh-huh  (1)
uncertainty  (2)
understand  (17)
understanding  (6)
undertaken  (1)
unfavorable  (1)
UNITED  (2)
University  (10)
unlikelihood  (1)
unrestricted  (3)
Unsecured  (3)
uploaded  (1)

< V >
VA  (1)
valid  (1)
valuation  (2)
value  (1)
variations  (1)
various  (1)
version  (2)
viable  (1)
Videographer  (3)
view  (2)

< W >
walked  (1)
WALSH  (63)
want  (3)
wants  (2)
waste  (1)
way  (4)
ways  (1)
week  (4)
weeks  (5)
well  (23)
went  (2)
we're  (1)
we've  (2)
wide  (2)
WIELAGE  (4)

winning  (1)
winter  (1)
withdrawn  (6)
witness  (7)
word  (1)
work  (2)
working  (1)

< X >
XI01916  (1)

< Y >
Yeah  (8)
years  (3)
yesterday  (1)
York  (2)