**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, | ) | |
| IOWA CITY, IOWA, *et al.,* | ) | Case No. 23-00623C |
| | ) | |
| Debtors. | ) | Jointly Administered |

**OBJECTION OF THE ACTING UNITED STATES TRUSTEE TO THE DEBTORS' FIRST MONTHLY FEE APPLICATION OF MCDERMOTT WILL & EMERY, LLP**

**JURISDICTION, VENUE, AND STATUTORY PREDICATE**

1. The Court has jurisdiction over this Objection and the Sale Motion pursuant to 28 U.S.C. §§157 and 1334. Venue is proper pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicate for the relief sought herein is 11 U.S.C. §§330 and 331, as well as Fed. R. Bankr. P. 2016. The United States Trustee has standing to raise, appear and be heard on this Objection pursuant to 11 U.S.C. §307; 28 U.S.C. § 581 *et seq.*

**PROCEDURAL BACKGROUND**

2. On August 7, 2023, Mercy Iowa City ACO, LLC, Mercy Hospital, Iowa City, Iowa, and Mercy Services Iowa City, Inc., (hereinafter "Mercy" or "Debtors") filed three individual chapter 11 bankruptcy petitions that are being Jointly Administered under case number 23-00623.

3. The Debtors continue to operate as debtors-in-possession under §§1107 and 1108 of the Bankruptcy Code.

4. McDermott Will & Emery, LLP (McDermott) filed its Application to Employ on August 23, 2023. On September 14, 2023, the Court entered an Order allowing retention of McDermott effective August 7, 2023.

5. McDermott reported that it was paid pre-petition $3,141.170.00 by the Debtors from February 28, 2023, through August 4, 2023. Doc. 189 page 14. In addition, McDermott also received a prepetition retainer of $761,951.00.

6. On September 14, 2023, the Interim Compensation Order was entered by the Court. Doc. 224. It provided that a Retained Professional may file and serve Monthly Fee Applications, and any objections must be filed within 14 days of service. On October 20, 2023, the UST requested and was granted a 1-week extension to the time to object and was granted a second 1-week extension to November 6, 2023. *See* Doc. 406 and Doc. 428.

7. On Wednesday, November 1 the UST met and conferred with members of the McDermott team in good faith to attempt to resolve identified objectionable items. In light of the meeting, the UST has resolved certain objections, but continues to have objections detailed below.

8. The Debtors' *First Monthly Fee Application of McDermott Will & Emery LLP, Counsel to the Debtors and Debtors-In-Possession, For Allowance of Compensation and Reimbursement of Expenses* was filed on October 9, 2023, seeking payment of $738,318 (80% of $922,897.50 in fees billed) and expenses of $4,741.38. McDermott is charging a blended rate of $1,273.49/hour. *See* Doc. 348.

9. The fees at issue in the First Monthly Application were incurred in a three (3) week period from August 7, 2023, through August 31, 2023. Payment for fees and expense is sought pursuant to 11 U.S.C. §§330 and 331.

10. In its Retention Application McDermott represented that all their prepetition fees and expenses were paid or waived as follows:

> "McDermott has further advised the Debtors that, as a result of the application of the retainer to the Prepetition Services Payment, all fees and expenses due to McDermott for the period prior to the Petition Date were paid in full or otherwise waived and McDermott holds no prepetition claims against the Debtors." (Doc. 148, paragraph 23).

11. On October 9, 2023 McDermott paid itself $18,223.76 for its pre-petition fees and expenses post-petition without application or court order. The payment was made from the retainer being held in the IOLTA account. See Footnote 2 (Doc. 348) which states:

> "Following entry of an order authorizing McDermott's retention, McDermott received additional invoices for prepetition expenses, including expenses related to travel, lien searches, and Westlaw fees, totaling $15,870.76 as well as additional time billed prepetition totaling $2,353.00 for a total of $18,223.76. **McDermott has applied those prepetition fees and expenses to its existing retainer of $761,951.00, the balance of which is now $743,727.24.**" (emphasis added).

## ARGUMENT

12. McDermott's requests for compensation should be carefully examined by the Court to determine whether the services were reasonable and necessary to the administration of the estate and to determine whether the applicants exercised reasonable billing judgment.

13. McDermott should be required to explain to the court why they paid themselves for prepetition fees and expenses post-petition from the IOLTA account without application and court order. Further, those funds must be immediately returned to the estate.

14. 11 U.S.C. § 330 requires that compensation be for actual and necessary services and makes the exercise of "billing judgment" a mandatory requirement in bankruptcy fees matters. The U.S. Supreme Court in *Hensley v. Eckerhart* noted that attorneys are obligated to make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary. 461 U.S. 424, 103 S. Ct. 1933, 76 L.Ed.2d 40 (1983). If such requests are found in a fee application, they are disallowed by the court as unnecessary.

15. 11 U.S.C. §330 permits the court to award compensation that is less than the amount requested in the Application. The bankruptcy court has broad power and discretion to award or deny attorney fees under § 330(a).

16. In this jurisdiction, the court follows the Loadstar method to calculate fee allowances. The Loadstar method takes into account the number of hours reasonably expended multiplied by a reasonable hourly rate, in order to reach the appropriate calculation of fees. To determine the reasonable rates and hours, the Bankruptcy Code directs courts to consider factors including: the time spent, the rates charged, the necessity of the services for administration of the case; the reasonableness of the amount of time spent in light of the complexity, importance and nature of the problem, issue or task addressed, and the reasonableness of the requested compensation compared to the customary compensation charged by comparably skilled practitioners in non-bankruptcy cases. When counsel seeks approval of fees under § 330, it is their burden to meet this standard and show they are entitled to fees. *See In re Agriprocessors*, 2009 Bankr. LEXIS 3916 at *3-4 (Bankr. N.D. Iowa 2009); *citing In re Peterson*, 251 B.R. 359, 364 (B.A.P. 8th Cir. 2000).

17. The applicant bears the burden of demonstrating "the value of his or her services in relation to a particular case." *In re Pothoven*, 84 B.R. 579, 584 (Bankr. S.D. Iowa 1988). This burden is not to be taken lightly, especially given that every dollar expended on legal fees results in a dollar less that is available for distribution to creditors or use by debtor." *In re Pettibone Corp.*, 74 B.R. 293, 299- 300 (Bankr. N.D. Ill. 1987) (internal citations omitted).

*Billing Judgment:*

18. A review of the Application reflects that there was a significant amount of conferencing, reviewing, and revising each other's work. The Application is replete with conferences where

multiple partners and associates were involved in the intraoffice conferences. An accurate exercise of good billing judgment would result in a reduction of the actual amount charged to the Debtor as such overbilling is not warranted.

19. As this court has noted in *VeroBlue Farms USA, Inc.*, a "factor to be considered is 'whether billing judgment was exercised to avoid duplicate or unnecessary services. Billing judgment is reflected in staffing a file in a manner that efficiently provides the most cost-effective representation necessary to a client's interest without redundant, duplicative, and unnecessary services." *VeroBlue Farms USA, Inc. v. Cassels Brock & Blackwell LLP (In re VeroBlue Farms USA, Inc.)*, 2023 Bankr. LEXIS 1071, at *17 (Bankr. N.D. Iowa April 19, 2023) (internal citations omitted).

20. During the first day hearings on August 8, 2023, this Court noted that it would be reviewing the fees charged in the case. The Court specifically observed the number of attorneys appearing on behalf of the Debtor at the hearing and cautioned that he would be reviewing the fees billed in the case in light of the number of professionals present at the hearing. Despite this caution, McDermott's fee application is replete with duplication of effort and overstaffing with multiple attorneys reviewing, revising, and conferencing on multiple issues.

21. McDermott continues to have multiple attorneys appear at hearings. As an example, on August 25, 2023 the court conducted a telephonic hearing regarding motions to continue two motions (Motion to Appoint Examiner and Motion on Sell/Sale of Property and Bid Procedures, *see* Doc. 162). Four attorneys appeared for the Debtor (D. Simon, E. Keil, J. Haack) and local counsel K. Stanger.  J.Haake billed to prepare for and attend the hearing. (.5) E. Kiel billed to prepare for and participate in the hearing (.6) and then corresponded with D. Simon about the hearing (.2) and D. Simon charged to prepare for and attend the hearing (1.2) and conferred with

local counsel K. Stanger afterwards. McDermott's total charges calculated at the attorney's various rates, was $5,509 for this one hearing. This excludes any billing by local counsel.

22. While outside the application period, the UST notes in a recent telephonic hearing regarding a Motion to Appoint a Pensioner's Committee, four (4) attorneys appeared for the Debtor, including two partners from the McDermott firm (D. Simon and F. Pearlman) and two attorneys from the local counsel's firm. (K. Stanger and R. Leaf). A partner from the McDermott firm used the hearing to announce that the Debtor had determined the University of Iowa was the winning bidder, not the Bondholders. Although the information was important to the case and drastically changed the course of the case moving forward, the hearing was entirely unrelated to the news. Further, the amount of attorneys representing the Debtor who were merely monitoring the proceedings evidence a clear pattern of overbilling and overstaffing that should not be reflected in future fee applications. As this is the first Application for Compensation for the McDermott firm in the case, the issue is ripe now for decision and a resolution that should govern attorney practices for the remainder of the case is needed.

*Overstaffing:*

23. McDermott's Retention Application (Doc. 148) lists name and rates of the six "McDermott professionals currently performing, or expected to perform, material work in the Chapter 11 cases." They listed two partners ( F. Perlman, D. Simon), and three associates (J Haake, E. Keil, R. Trickey) and paralegal (J. Jones).

24. McDermott's Fee Application, on the contrary, reflects that it had twenty-four (24) individuals that worked on the case instead of the six professionals listed in the Retention Application. This included eight (8) partners, eight (8) associates, one (1) paralegal, one (1) discovery consultant, three (3) technology managers and three (3) technology data analysts billing

the estate for services for a total of 724.7 hours in the first three weeks of the case. The UST understands it is the position of McDermott that this is proving to be an incredibly large, complicated, and litigious case, the current application reflects a remarkable number of professionals billing the estate; many accomplishing the same or similar tasks. The retention of McDermott inevitably includes the retention of the entire McDermott team, but the current Application shows a complete lack of teamwork, resulting in just more professionals billing the estate rather than each professional adding something new, unique, and necessary to the resolution of this case.

25. Curiously, there is only one staff member, D. Northrup, with the designation of "paralegal" who billed the estate. He billed the fewest hours (1.3) of all the McDermott attorneys and staff during the application period, despite billing at a considerably lower rate.

26. The UST has identified billing entries that reflect work completed by an attorney that would be better suited to a paralegal who bills at a substantially lower rate. These items include preparing drafts of routine documents, such as appearances, filing documents with the court, and preparing documents for uploading to Epiq. The associate charges an hourly rate of $1,105.00, whereas the paralegal rate is $670.00. The UST notes that the paralegal's billing rate exceeds the hourly rate for seasoned bankruptcy attorneys in the N.D. of Iowa; however, it is far more preferrable for a paralegal work to accomplish tasks within their scope of duties wherever possible, rather than asking an associate who bills at nearly twice the rate to accomplish the same tasks.

27. Another example of overstaffing and duplication of effort on ever the most minor of tasks can be found on entries dated August 16, 2023: An associate, drafted an appearance for partner D. Simon (.1) then corresponded with the partner and paralegal re: "same." (.1). The paralegal charged

to review the notice of appearance (.1) and corresponded with the associate re: issues related to the "same" (.2). The cost for this one appearance was $422.30.

28. This court has held that "secretarial work performed by lawyers" is not compensable. *In re Agriprocessors, Inc.*, 2009 Bankr. LEXIS 3916, 2009 WL 4823808, at * 2 (Bankr. IA. 2009). The UST requests a reduction in the Application Award for overstaffing by having associates perform non-attorney tasks.

*Intra-Office Conferences and Duplication:*

29. While not controlling law in the Northern District, most Iowa attorneys follow the advice of *In re Pothoven* which asks attorneys to use their best billing judgment as required by the Code. *In re Pothoven*, 84 B.R. 579, 584-85 (Bankr. S.D. Iowa 1988). *Pothoven* also notes that "the bankruptcy estate should not bear the cost of compensating each attorney present at an intra-office conference. . ." *Pothoven*, 84 B.R. 579 at 585.

30. The UST has noticed a pattern in this application; each time an item is filed or updated on the docket or within the attorney's own calendaring system, intra-office conferences are conducted with each attorney billing for the update. This excessive use of intra-office conferences does not exhibit best billing judgment and should not be compensated. The attorneys bill for the same conferences with each other, reviewing each other's drafts, editing drafts, reviewing edits, reviewing the same documents received from other parties, attending the same hearings, and generally performing duplicative work. "Fees are not allowed for simply reviewing the work product of another or for duplicative billing by attorneys involved in intra-office conferences." *In re Agriprocessors, Inc.*, 2009 WL 4823808 at *2 (Bankr. N.D. Iowa Dec. 8, 2009).

31. The Application includes an "Activity Code" for Intra-office communications. The data reflects that $114,031.50 was billed under this activity code. Some of the entries reflect conferences and communication with the "MWE Team". It is unclear who is on the "MWE team" and how many team members are billing. There are also multiple entries where two and three partners confer with each other, and partners confer with multiple associates. By way of example of the intra-office conferences, and by no ways the entirety of the objectionable entries:

- On August 15, 2023, where five (5) attorneys conferenced regarding "strategy and motion to appoint an examiner", including three (3) partners and two (2) associates.

- On August 29, 2023 two partners (N. Bull and D. Simon) and three associates (Haake, B. Paulson, D.C. Wolf), held multiple conferences, communications and internal correspondence regarding discovery issues for total charges of $8,193. On August 30 and 31, the same team charged $4,781 and $6,685 also for internal conferences and communications regarding discovery.

- On August 29, 2023 two McDermott partners, F. Pearlman **(.6)** and D. Simon **(1.3** ) prepared for and attended a board meeting.

32. McDermott should be required to determine who appropriately billed for each conference in light of the caselaw and then "no charge" for the rest of the MWE team as duplicative.

*Issues Regarding Benefit to the Estate:*

33. On August 14, 2023, Computershare Trust Company, N.A. as Trustee, Preston Hollow Community Capital, Inc. as Bondholder Representative (Preston Hollow) filed a Motion to Appoint Examiner in the case, citing leadership and financial failures that resulted in the bankruptcy filing. *See* Doc. 96.

34. The Motion to Appoint Examiner has been set for hearing on several occasions (*see* Docs. 99, 154, 162, 163, 181, 187, 234, 248, 293, 299, 341, 343) but has never been heard. Notably, no objection has been filed in opposition to the Motion.

35. In total, $92,712 was billed to the estate related to the Motion to Appoint an Examiner, of which $86,433 was for research, drafting, review, and conferences related to a potential objection to the Motion to Appoint Examiner. No objection has been filed and the issue is not resolved to date. The UST is not objecting to the $6,279.00 billed for depositions and responding to discovery requests.

36. McDermott should be given the opportunity to justify how this work benefitted the estate. If they are unable to show benefit to the estate, the UST requests a reduction of their fees for any portion of the $86,433 billed to the estate that did not provide a benefit.

37. Additionally, certain claims of defamation between Preston Hollow and the Debtors have been discussed generally as some of the issues leading into bankruptcy. The issue itself, however, is not reflected on the docket and no clear action has been taken. Despite this, the current McDermott Application reflects $30,972.50 in charges related to defamation, researching defamation, and discussing defamation. Without further information on the source of the claim, it is impossible to determine if this is an appropriate use of estate funds and the UST objects to the allowance of the $30,972.50 billed.

38. Finally, the Application reflects that that only 8.2 hour of travel were billed at the non-working rate of 50% of the time spent traveling, instead of billing at the attorney's 50% hourly rate for travel which is the standard practice in Iowa. McDermott should explain their billing practices to the court for working while on travel status.

*Fee/Employment Applications:*

39. McDermott charged 40.3 hours for a total of $50,814.50 for preparing Retention Applications. It does not appear that 40.3 hours is reasonable for the preparation of the retention applications. The content of the retention forms themselves appear to be boilerplate with details about the applicants and their rates then added. The UST objects to this entire amount, absent a showing of what should reasonably be charged for mostly boiler-plate forms and routine objections.

*Vague Entries:*

40. The application contains vague entries which do not allow for the reasonableness analysis. For example, there are multiple entries for F. Perlman for "Attention to" various matters. It is unclear what service is being provided by counsel in these entries. There are also various entries regarding "strategy" again making it unclear the services being provided. There are numerous entries by J. Haack regarding "conferencing" that do not shed light on the necessity of these conferences.

41. "Courts may reject vague, incomplete, or imprecise time entries because they "preclude any meaningful review…of the fee application for "excessive, redundant, or otherwise unnecessary" hours that make it impossible to attribute a particular attorneys' specific time to a distinct issue or claims." *Frerichs v. Harford Life & Acc. Ins. Co.*, 2012 LEXIS 119214 at *5. (Dist. Minn, Aug. 28, 2012).

*Other Issues:*

42. The UST notes that on August 8, R. Trickey billed for a half hour of work incorrectly, resulting in an overbilling amount of $290. J. Haake charged for .7 hours to appear at first day

hearings. He did not appear in person, but may have appeared telephonically, however his name is not listed in the appearance list for those appearing by telephone, so it is unclear whether his time was correctly charged to the estate and why a 5th attorney was warranted if he did appear.

43. The Application for employment sets out the hourly rates of partners, F. Pearlman as $1,850.00 and D. Simon as $1,450.00 associate E. Kiel as $1,105.00. The blended hourly rate being charged by the McDermott Firm is $1,273.49. The rates charged far exceed the local standards as evidenced by the hourly rate of $295.00 for local counsel, Roy Leaf, a shareholder in the Nyemaster Firm.

44. The UST did not object to the hourly rates at the outset of the case. The hourly rates charged by McDermott raises the issue of reasonableness for time charges when they are being paid at a rate that reportedly reflects their experience and expertise. That expertise should translate into matters being handled efficiently and effectively, not requiring frequent intra-office conferencing and the review of the same pleadings and each other's work product by multiple professionals for every matter in the case.

## CONCLUSION

45. The applicant bears the burden of proving both the reasonableness and necessity of fees requested in the fee application. If a professional fails to meet this burden of proof under 11 U.S.C. §330(a), the bankruptcy court may award less than the amount of compensation that is requested.

46. The McDermott Fee Application totals $922,897.50 for fees for the first three weeks this case was on file. The amount shocks the conscience. The case was initially presented as a vehicle to effect a sale where the Stalking Horse was chosen, APA was redlined, and the sale was all but complete. Naturally, issues arose and the case became more complex, but this was not the way

the case was initially presented. The UST submits that the Fee Application is excessive for the reasons stated in this objection.

47. The UST reserves all rights to amend and supplement or modify each portion of this objection.

48. Finally, as of the filing of this Motion, the UST is informed that the Debtors still owe the U.S. Trustee Quarterly fees for the 3rd quarter of 2023. Payment, which the UST submits came due on October 31, 2023, must be remitted in the full amount prior to any other fees being paid in this case. The fees accumulate to $46,076.00.

WHEREFORE, the Acting United States Trustee requests that the Court reduce the First Fee Application by 30% absent further explanation requested and required above.

Dated:     November 6, 2023

**Mary R. Jensen**
Acting United States Trustee
Region 12

By:/s/ Janet G. Reasoner
**Janet G. Reasoner**
111 7th Ave SE, Box 17
Cedar Rapids, Iowa 52404
Ph: (319) 364-2211
Janet.G.Reasoner@usdoj.gov

## CERTIFICATE OF SERVICE

    I certify that a copy of the foregoing document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing dated November 6, 2023

By:/s/ Jennifer L. Cline
**Jennifer L. Cline**
Paralegal Specialist
United States Trustee's Office