UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, | ) | |
| IOWA CITY, IOWA, *et al.,* | ) | Case No. 23-00623C |
| | ) | |
| Debtors. | ) | Jointly Administered |

## OBJECTION OF THE ACTING UNITED STATES TRUSTEE TO THE DEBTORS' SECOND MONTHLY FEE APPLICATION OF MCDERMOTT WILL & EMERY, LLP

### JURISDICTION, VENUE, AND STATUTORY PREDICATE

1. The Court has jurisdiction over this Objection and the Sale Motion pursuant to 28 U.S.C. §§157 and 1334. Venue is proper pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicate for the relief sought herein is 11 U.S.C. §§330 and 331, as well as Fed. R. Bankr. P. 2016. The United States Trustee has standing to raise, appear and be heard on this Objection pursuant to 11 U.S.C. §307; 28 U.S.C. § 581 *et seq.*

### PROCEDURAL BACKGROUND

2. On August 7, 2023, Mercy Iowa City ACO, LLC, Mercy Hospital, Iowa City, Iowa, and Mercy Services Iowa City, Inc., (hereinafter "Mercy" or "Debtors") filed three individual chapter 11 bankruptcy petitions that are being Jointly Administered under case number 23-00623.

3. The Debtors continue to operate as debtors-in-possession under §§1107 and 1108 of the Bankruptcy Code.

4. McDermott Will & Emery, LLP (McDermott) filed its Application to Employ on August 23, 2023. On September 14, 2023, the Court entered an Order allowing retention of McDermott effective August 7, 2023.

5. On September 14, 2023, the Interim Compensation Order was entered by the Court. Doc. 224. It provided that a Retained Professional may file and serve Monthly Fee Applications and required a 20% holdback of all fees awarded.

6. McDermott reported that it was paid pre-petition $3,141.170.00 by the Debtors from February 28, 2023, through August 4, 2023. *See* Doc. 189 page 14. In addition, McDermott also received a prepetition retainer of $761,951.00.

7. McDermott filed their *First Monthly Fee Application of McDermott Will & Emery, LLP, Counsel to the Debtors and Debtors-In-Possession, For Allowance of Compensation and Reimbursement of Expenses* on October 9, 2023. The First Fee Application sought payment of $738,318 (80% of $922,897.50 in fees billed) and expenses of $4,741.38 for fees and expenses incurred from between August 7, 2023 through August 31, 2023. *See* Doc. 348.

8. The UST filed its Objection to the First Fee Application on November 6, 2023 and sought a reduction of the total award by 30%. *See* Doc. 467. A hearing on the Application and Objection has been set for November 28, 2023. Because the Second Application was filed only four days after the UST filed its Objection to the First Application, many of the issues and objections will be the same. As stated in the UST's Objection to the First Application, resolution of these matters should proceed expeditiously so all attorneys billing in this matter may conform their practices to the expectations of this Court.

9. The Debtors' *Second Monthly Fee Application of McDermott Will & Emery LLP, Counsel to the Debtors and Debtors-In-Possession, For Allowance of Compensation and Reimbursement of Expenses* was filed on November 10, 2023, seeking payment of $649,102.80 (80% of $811,378.50 in fees billed) and expenses of $3,346.20. Footnote 1 of the Application reports that

McDermott has voluntarily written off $20,991.45, including $18,262.50 in fees and $2,728.95 in expenses. The "no charge" entries are not set out in the Application.

10. The fees in the Second Monthly Application were incurred between September 1, 2023, through September 30, 2023. Payment for fees and expense is sought pursuant to 11 U.S.C. §§ 330 and 331.

## INTRODUCTION

11. As stated, the UST has filed an Objection to McDermott's First Fee Application, but the issues raised have not yet been decided. Many of the same issues persist in the Second Application. Describing itself as having extensive bankruptcy and restructuring experience, as well as experience in virtually all other aspects of law that may arise in these cases, McDermott continues to seek payment of fees multiple times greater than any other party in this case. The Second Application period saw a number of issues raised that may have been fatal to the case, but the Debtors have been able to maintain their status and are well on their way to a sale of substantially all assets and transition to the University of Iowa. However, noting that "every dollar expended on legal fees results in a dollar less that is available for distribution to creditors or use by debtor," the UST continues to look closely at all fee applications filed in these jointly administered cases. *In re Pettibone Corp.*, 74 B.R. 293, 299-300 (Bankr. N.D. Ill. 1987) (internal citations omitted).

## ARGUMENT

12. All requests for compensation should be carefully examined by the Court to determine whether the services were reasonable and necessary to the administration of the estate and to determine whether the applicants exercised reasonable billing judgment.

13. 11 U.S.C. § 330 requires that compensation be for actual and necessary services and makes the exercise of "billing judgment" a mandatory requirement in bankruptcy fees matters.

The U.S. Supreme Court in *Hensley v. Eckerhart* noted that attorneys are obligated to make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary. 461 U.S. 424, 103 S. Ct. 1933, 76 L.Ed.2d 40 (1983). If such requests are found in a fee application, they are disallowed by the court as unnecessary. Good billing judgment is reflected in part where a case is staffed in an efficient manner that is cost-effective to the client's interest. *Matter of Fansteel, Inc.*, No. 16-01823, 2017 Bankr. LEXIS 1265, at *5 (Bankr. S.D. Iowa May 9, 2017).

14. The Court may award compensation that is less than the amount requested in the Application. The bankruptcy court has broad power and discretion to award or deny attorney fees under § 330(a).

15. In this jurisdiction the lodestar method is used to calculate fee allowances, which considers the number of hours reasonably expended multiplied by a reasonable hourly rate to reach the appropriate calculation of fees. The Bankruptcy Code requires courts to consider a number of factors to determine the reasonable rates and hours, including: the time spent, the rates charged, the necessity of the services for administration of the case, the reasonableness of the amount of time spent in light of the complexity, importance and nature of the problem, issue or task addressed, and the reasonableness of the requested compensation compared to the customary compensation charged by comparably skilled practitioners in non-bankruptcy cases. *See In re Agriprocessors*, 2009 Bankr. LEXIS 3916 at *3-4 (Bankr. N.D. Iowa 2009); *citing In re Peterson*, 251 B.R. 359, 364 (B.A.P. 8th Cir. 2000).

16. The applicant bears the burden of demonstrating "the value of his or her services in relation to a particular case." *In re Pothoven*, 84 B.R. 579, 584 (Bankr. S.D. Iowa 1988). This burden is not to be taken lightly, especially given that "every dollar expended on legal fees

results in a dollar less that is available for distribution to creditors or use by debtor." *In re Pettibone Corp.*, 74 B.R. 293, 299- 300 (Bankr. N.D. Ill. 1987) (internal citations omitted).

*Note on the Hourly Rates of McDermott*

17. The Application for Employment sets out the hourly rates of partners, F. Pearlman as $1,850.00 and D. Simon as $1,450.00 associate E. Kiel as $1,105.00. The blended hourly rate is often used to analyze the reasonableness of the hourly rate in a given case. In this case, the blended hourly rate for the McDermott Firm in the First Application was $1,273.49. The figure for the blended hourly rate in the Second Application was not provided. The rates charged far exceed the local standards as evidenced by the hourly rate of $295.00 for local counsel, Roy Leaf, a shareholder in the Nyemaster Firm. This rate is also substantially higher than the blended rate being used for all attorneys working on matters for the Committee of Unsecured Creditors, which has been reduced to $675. Of the professionals seeking compensation from the estate, the McDermott firm charges the highest hourly rate.

18. The UST did not object to the hourly rates at the outset of the case. Hourly rates set at the outset of the case should represent not only the appropriate rate customary to the area where the firm is located (in this case, Chicago), but also to the expertise and efficiency a particular firm brings. The UST understood the McDermott firm would be charging a substantially higher rater than what was normal and customary to Iowa, but also has an expectation that that higher rate translates to commensurate work product.

19. The hourly rates charged by McDermott raises the issue of reasonableness for time charges when they are being paid at a rate that reportedly reflects their experience and expertise. That expertise should translate into matters being handled efficiently and effectively, not

requiring frequent intra-office conferencing and the review and revisions of the same pleadings and each other's work product by multiple professionals for many of the matters in the case.

20. By way of example, on September 22, 2023 J. Knapp billed 1.1 hours for reviewing case law on "fiduciary duties/corporate governance issues relating to potential acquisition of certain funds" – J. Knapp bills $1,450 an hour. At this hourly rate, no research can be compensable. Firms should be setting their rates to be commensurate with the work they produce, and at a rate nearly five times rates generally accepted in Iowa, firms should not need to research issues arising in the case.

*A Lack of Billing Judgment Should Result in a Reduction of Fees Awarded*

21. As this court has noted in *VeroBlue Farms USA, Inc.*, a "factor to be considered is 'whether billing judgment was exercised to avoid duplicate or unnecessary services. Billing judgment is reflected in staffing a file in a manner that efficiently provides the most cost-effective representation necessary to a client's interest without redundant, duplicative, and unnecessary services." *VeroBlue Farms USA, Inc. v. Cassels Brock & Blackwell LLP (In re VeroBlue Farms USA, Inc.)*, 2023 Bankr. LEXIS 1071, at *17 (Bankr. N.D. Iowa April 19, 2023) (internal citations omitted).

22. Similar to the concerns raised by the UST in the First Application, a careful review of the Second Application reflects that there was once again a significant amount of conferencing, reviewing, and revising each other's work throughout the McDermott firm. The Application is replete with conferences where multiple partners and associates were involved. An accurate exercise of good billing judgment would result in a reduction of the actual amount charged to the Debtor as such overbilling is not warranted. *See Matter of Fansteel, Inc.*, Bankr. LEXIS 1265 at *5.

23. During the first day hearings on August 8, 2023, this Court noted that it would be reviewing the fees charged in the case. The Court specifically observed the number of attorneys appearing on behalf of the Debtor at the hearing and cautioned that he would be reviewing the fees billed in the case considering the number of professionals present at a largely uncontested hearing.  Despite this caution, the Second Application is once again replete with duplication of effort and overstaffing with multiple attorneys reviewing, revising, and conferencing on multiple issues.

24. By way of example, on September 6, 2023 the UST conducted the 341 meeting of creditors. Partner D. Simon billed (1.5) hours to attend the telephonic §341 and associate, J. Haack billed (1.0) hours to attend the §341 meeting. It is unclear why it was necessary for two McDermott attorneys to attend the meeting of creditors.

25. Further, on September 15, 2023 the court held a telephonic hearing regarding Debtor's Motion to Continue the final hearing on Cash Collateral and Examiner Motions.  Doc 235.  Two partners and one associate appeared at the hearing (F. Pearlman, D. Simon, and E. Keil) along with local counsel.  The McDermott attorneys all billed to prepare for and attend the hearing. D. Simon billed (1.3) F. Pearlman billed (.4), and E. Kiel billed (.6).  McDermott's total charges calculated at the attorney's various rates, was $3,288 for this hearing. This excludes any amounts incurred by local counsel.

26. The UST has noted only two examples above of the pattern the McDermott firm is engaged in when it comes to the representation of the Debtor. While the UST appreciates this case has become much more complex than was originally anticipated and a number of areas of law have been implicated, this does not allow the McDermott firm the unfettered right for every

attorney to meet with a number of their colleagues on every matter and bill accordingly. Because of the general lack of billing judgment, the UST requests a reduction in any fees awarded.

*Overstaffing*

27. As noted in the UST's Objection to the First Fee Application, McDermott's Retention Application (Doc. 148) lists names and rates of the six "McDermott professionals currently performing, or expected to perform, material work in the Chapter 11 cases."

28. McDermott's Second Monthly Fee Application reflects that it had twenty-three (23) individuals that worked on the case. This included ten (10) partners, nine (9) associates, two (2) technology managers and two (2) technology data analysts billing the estate for services for a total of 614.6 hours in the month of September. The application netted two (2) additional partners to the billing statement and one (1) additional associate from those professionals that were listed on the First Monthly Fee application.

29. The UST previously noted that there was only one paralegal who billed the estate and could provide cost savings to the estate for some work being done by an associate at a higher cost. In the current fee Application, remarkably, there were no billings submitted by a paralegal.

30. The UST has again identified billing entries that reflect work completed by an attorney that would have been better suited to a paralegal who would have billed at a substantially lower rate. These items include preparing drafts of routine documents, such as appearances, filing documents with the court, and preparing documents for uploading to Epiq. For example, on September 11, 2023 E. Keil billed (.3) hours at $1,105 per hour to prepare a Notice of Filing Revised Proposed Bidding procedures Order. Doc. 204. On September 14, 2023 she billed (.5) to revise sale and cure notices. On September 20,2023 she billed (.1) regarding addresses for cure notice and (.1) to correspond with the Eqip team regarding those addresses. This work was better

suited to either a paralegal, or in the case of updating addresses, to other non-attorney support staff.

31. This Court has held that "secretarial work performed by lawyers" is not compensable. *In re Agriprocessors, Inc.*, 2009 Bankr. LEXIS 3916, 2009 WL 4823808, at * 2 (Bankr. IA. 2009). The UST requests a reduction in the Application for overstaffing by having associates perform non-attorney tasks.

*Intra-Office Conferences Leading to Duplication of Efforts*

32. While not controlling law in the Northern District, most Iowa attorneys follow the advice of *In re Pothoven* which asks attorneys to use their best billing judgment as required by the Code. *In re Pothoven*, 84 B.R. 579, 584-85 (Bankr. S.D. Iowa 1988). *Pothoven* also notes that "the bankruptcy estate should not bear the cost of compensating each attorney present at an intra-office conference. . ." *Pothoven*, 84 B.R. 579 at 585.

33. The UST has noticed the same pattern as was raised in the objection to the First Fee Application: each time an item is filed or updated on the docket or within the attorney's own calendaring system, intra-office conferences are conducted with each attorney billing for the update. Intra-office conferences are indeed helpful and often necessary when working with a team the size of McDermott, but this does not mean every one of the team members may bill and allow the firm to be compensated for their full rate for their attendance at every conference. *See In re Agriprocessors, Inc.*, 2009 Bankr. LEXIS 3916 at *8; *see also In re VeroBlue Farms USA, Inc.* 2023 Bankr. LEXIS 1071, at *16-17. Notably in this fee application, the time entries do not usually disclose clearly every team member who is meeting on each conference. For example, the Application is replete with time entries which state "status conference with University,

Debtor, et al." making it impossible to know which attorneys were attending and billing for the conference.

34. This excessive use of intra-office conferences does not exhibit best billing judgment and should not be compensated. The attorneys continue to bill for the same conferences with each other, reviewing each other's drafts, editing and revising drafts, reviewing edits, reviewing the same documents received from other parties, attending the same hearings, and generally performing duplicative work.

35. The Application submitted by McDermott lacks transparency. There are multiple entries where two partners confer with each other, and with various associates. However, due to differences in the way each attorney codes their billing activity and describe their work it is difficult to compare entries to determine the extent of overstaffing and duplication of effort.

36. Examples of the intra-office conferences, include, but are not limited to the following objectionable entries:

- September 1, 2023: Two partners (F. Pearlman and D. Simon) charged for the same conferences. F. Pearlman conferenced with counsel for the University (.4) hours for $740 while D. Simon charged (.5) hours for $750. They both billed to conference with the Creditors Committee, and with the "client, TK and H2C" re: sale issues. F. Pearlman billed $1,850 for (1.0) hours and coded it as "sales update and next steps" whereas D. Simon charged $1,450 for (1.0) hours for the same conference and coded it as "sale issues." Associate (E. Keil) billed 1.2 hours for the same conference, though she uses the billing detail "conference with M. Toney**, et al** re: sales update." (emphasis added). *"et al" is not defined.*
- September 7, 2023: Two partners (F. Pearlman and D. Simon) billed for time associated with the "Bayman Deposition. F. Pearlman billed (1.5 hours) to attend the deposition while D. Simon billed (5.2) hours to prepare for and defend the R. Bayman deposition. It is unclear why two partners were required for this deposition.
- September 6, 2023: Partners (F. Pearlman and D. Simon) charged for a conference with the Restructuring committee. F. Pearlman charged (1.0) while D. Simon billed (.5). It is unclear why there is a difference in the billing hours for the conference.
- September 18, 2023: Partners, F. Pearlman (1.0) and D. Simon (1.1) prepared for and attended a Mercy hospital Board meeting.
- September 21, 2023: Three partners, (N. Bull, D. Simon, F. Pearlman) conferenced about Foundation Issues and Adversary Complaint. N. Bull's billing statement

- reported "Conference with M. Tony, D. Simon, **et al**." D. Simon's billing entries on this date included "conference with **litigation team** re: adversary complaint. (emphasis added) *"Litigation team" nor "et al" are defined terms and makes it difficult to verify who from McDermott participated and billed to participate in the same conference.*
- September 21, 2023:  D. Simon and charged (1.8) hours for "numerous strategy conferences with M. Tony and F. Perlman re litigation strategy" related to the Foundation adversary. F. Pearlman billed (1.8 )hours but listed it as  "analysis of foundation issues and potential settlement strategies." These entries do not provide transparency that multiple partners are billing for the same meeting.
- September 23, 2023: Two partners (F. Pearlman and D. Simon) appear to have worked on the same issue, but described it differently. F.Pearlman billed (2.3) hours to "work on resolution of foundation issues with UCC and Preston Hollow." D. Simon billed (1.0) hours to "conference re: various litigation and foundation issues and draft communications re: same." He does not disclose who he conferenced or communicated with regarding these issues.
- September 24, 2023: Two partners (F. Pearlman and D. Simon) charged for the same meeting with the Restructuring committee.  F. Pearlman billed (1.7) hours while D. Simon billed (1.8) hours.
- On September 26, 2023: Partners (F. Pearlman and D. Simon) prepared for and attended a joint board meeting. F. Pearlman billed (1.9 and 1.5) hour and D. Simon billed (1.8) and (1.7) for follow-up meetings.
- September 27, 2023: Two partners (F. Pearlman and D. Simon) both conferenced with the Committee and the Bondholders and worked on foundation issues. F. Pearlman billed (2.7) hours and D. Simon billed (4.0) hours.

37. McDermott should be required to determine who appropriately billed for each conference considering the applicable case law and then "no charge" for the rest of the MWE team as duplicative. "Fees are not allowed for simply reviewing the work product of another or for duplicative billing by attorneys involved in intra-office conferences." *In re Agriprocessors, Inc.*, 2009 WL 4823808 at *2 (Bankr. N.D. Iowa Dec. 8, 2009). If multiple partners were indeed needed at each intra-office conference, the case law states the Applicant bears the burden of proving the specific expertise the additional participant provided. *See Pothoven*, 84 B.R. at 585 ("The bankruptcy estate should not bear the cost of compensating each attorney present at an intra-office conference unless counsel can show that the estate benefitted from each attorney's special area of expertise.").

38. Absent this additional analysis and explanation, the UST requests a reduction of the total fee award.

*Issues Regarding Benefit to the Estate*

39. McDermott's Second Application includes numerous charges for drafting, reviewing, and revising supplemental declarations to their Declarations related to their own retention. The UST filed an Objection to McDermott's retention application on September 6, 2023. Doc. 189. The Objection raised important issues including a lack of disinterestedness due to actual conflicts of interest and issues regarding the $762,000 "advanced retainer" which was not being held in a Trust Account as required by Iowa law.  The Objection questioned threshold issues every attorney practicing in bankruptcy should be familiar with; proving they are disinterested and appropriately handling client money according to the laws of the bankruptcy forum. The Objection did not raise new or novel issues that are unfamiliar to bankruptcy practice.

40.  Some examples of the multiple charges associated with reviewing and revising supplement declarations include the following:

- On September 5, 2023, E. Kiel charged a total of (1.1) hours to revise MWE supplemental declaration (.6) and (.5) to research the same.  It is unclear why McDermott would have to research retention applications considering their experience with Chapter 11 cases.
- On September 6, 2023, associate E. Keil billed (4.9) hours to analyze and summarize UST retention objections, conference with associate J. Haack regarding the objection (.5) and research (1.6).  J. Haack also charged (.5) hours for that conference.  Partner D. Simon billed (.7) to review the UST retention objections, and communicate with client, F. Perlman et al. regarding the UST objection.  Associate R. Trickey, billed (3.9) hours to research issues re: 363 and bankruptcy professional fee applications and (.2) to correspond with E. Keil re: same.
- September 7, 2023: Associate E. Keil billed (1.3) hours to revise supplemental Perlman declaration. Associate J. Haack billed (2.7) hours at an hourly rate of $1,190 to research conflict of laws and Iowa law regarding the retainer despite have local Iowa counsel that could have provided a quick answer to his questions.

- September 9 and 10, 2023: Associate E. Keil billed a total of 11.2 hours to draft an Omnibus response to retention objection, which included a response to the UST's objections.
- September 11, 2023:  Associate J. Haack billed (1.1) hours to prepare for and participate in a conference re: retention objections and to conference with E. Keil. Partner K. Kapp billed (.4) to review the UST's objection to the retention application. Partner F. Pearlman billed a total of  (2.1) hours related to the UST's objection regarding retention issues, including to conference with the UST  to revise her supplemental declaration and for continued analysis of retention issues. Associate, E. Keil billed (3.8) hours to revise the retention application response, (.5) to revise the UST objection chart and (1.0) to conference with the UST and then (.5) to confer with R. Leaf about that conference; (.4) to revise retention orders and (.9) to draft the supplemental declaration re: MWE retention.
- September 12, 2023: Associate E. Keil spent (6) hours to revise retention reply and summary chart, even though the meeting with the UST was the day before and the chart was used as the basis for discussion. E. Keil also billed (.2) to discuss the chart with local counsel and then another (.9) to draft and second supplemental Perlman Declaration.

41. McDermott properly prepared two supplemental Disclosure Statements to address objections to their Application for Retention by the UST and other parties. However, the amount of fees billed to the estate is unreasonable and should not be approved in their entirety to cure relatively routine objections.

42. In McDermott's Retention Application, they disclosed multiple actual conflicts, including their prior representation of both Preston Hollow and the University of Iowa. The disclosure of actual representations of two other primary parties in this case drew an Objection by the UST. Conflicts searches are required to be performed prior to representing a client. In this Second Application, it is unclear substantial charges associated with addressing those concerns were necessary.

43.  Additionally, many charges in the Second Application appear to be related to McDermott's challenge to the UST's objection to their "advance retainer" being paid to their firm's general account and not being held in a Trust Account as required by Iowa law.

McDermott's records reflect that they billed 75.10 hours and $98,450.50 in fees related to "Fee/Employment Applications."

44. Eventually, through the additional disclosures of the conflicts arising in this case and by placing the retainer in an Iowa Trust Account, these issues were resolved. However, the UST objects to McDermott's excessive and duplicative charges related this resolution as the entirety of the charges do not represent a benefit to the bankruptcy estate. The UST does not dispute the necessity of McDermott representing the Debtors, rather the litigious nature that eventually led to the consensual resolution of routine employment issues. The issue should not have required $98,450.50 to be billed to the estate to be resolved.

45. The Second Application also includes additional charges of $10,168.50 for "Fee/Employment Applications." It does not appear that spending an additional 11.3 hours is reasonable for the preparation of the retention applications.

46. To the extent any of these charges are to support McDermott's fee application, they are not compensable under *Baker v. Botts*. 576 U.S. 121 (2015). Many of the entries do not provide enough detail in what "Fee/Employment Application" was being worked on, and as such the UST cannot ascertain what exactly is compensable and what must be excluded under *Baker v. Botts. Id.*

47. McDermott was also charged with the retention of Toney Korf, but H2C had its own counsel working on its retention. Because of the vague entries, it is difficult to ascertain when McDermott was working on a retention of themselves or another firm.

*Vague Entries*

48. The application contains vague entries which do not allow for the reasonableness analysis. For example, there are multiple entries by various attorneys to "Analyze foundation

complaint" and "analysis of foundation issues" and "analyze retention issues." It is unclear what service is being provided by counsel in these entries. There are also various entries regarding conferences re: "various strategy issues" again making it unclear the services being provided.

49. A new pattern in the Second Application is to include entries such as "meet with McDermott team" or "meet with ____ et. al" which does not allow the reader to ascertain who exactly was present at each meeting and the appropriateness of the billing for such meetings.

50. "Courts may reject vague, incomplete, or imprecise time entries because they "preclude any meaningful review…of the fee application for "excessive, redundant, or otherwise unnecessary" hours that make it impossible to attribute a particular attorneys' specific time to a distinct issue or claims." *Frerichs v. Harford Life & Acc. Ins. Co.*, 2012 LEXIS 119214 at *5. (Dist. Minn, Aug. 28, 2012).

51. Finally, the Application reflects that that only 5.2 hour of travel were billed at the non-working rate of 50%. McDermott should explain their billing practices to the court for working while on travel status.

## **CONCLUSION**

52. The applicant bears the burden of proving both the reasonableness and necessity of fees requested in the fee application. If a professional fails to meet this burden of proof under 11 U.S.C. §330(a), the bankruptcy court may award less than the amount of compensation that is requested.

53. The McDermott Second Fee Application totals $811,378.50 for fees for the monthly of September, 2023. The UST submits that the Fee Application is excessive for the reasons stated in this objection. Additionally, while a number of charges were voluntarily written off, a review of those charges is appropriate in light of the circumstances of the case.

54. The UST reserves all rights to amend and supplement or modify each portion of this objection.

WHEREFORE, the Acting United States Trustee requests that the Court reduce the Second Fee Application by 20% absent further explanation requested and required above and Order McDermott to provide the billing entries for the voluntarily written off charges.

Dated:   November 24, 2023

**Mary R. Jensen**
Acting United States Trustee
Region 12

By:/s/ Janet G. Reasoner
**Janet G. Reasoner**
111 7th Ave SE, Box 17
Cedar Rapids, Iowa 52404
Ph: (319) 364-2211
Janet.G.Reasoner@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served electronically on parties who receive electronic notice through CM/ECF as listed on CM/ECF's notice of electronic filing dated November 24, 2023.

By: /s/ Jennifer L. Cline
**Jennifer L. Cline**
Paralegal Specialist
United States Trustee's Office