UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: | Chapter 11 |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | Case No. 23-00623 (TJC) |
| Debtors. | (Jointly Administered) |

**MOTION OF ALTERA DIGITAL HEALTH INC. TO
COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT**

Altera Digital Health Inc. ("Altera"), by and through its undersigned counsel, hereby files this motion (this "Motion") to compel Mercy Hospital, Iowa City, Iowa, *et al.* (the "Debtors") to assume or reject that certain *Master Client Agreement* executed on March 9, 2021 by and among Altera, as successor to Allscripts Healthcare, LLC ("Allscripts"), and the Debtors (as amended, the "Agreement"). In support of this Motion, Altera submits the Declaration of Elliott Bryant and respectfully states as follows:

**PRELIMINARY STATEMENT[1]**

1. The Debtors seek to permit the Buyer to use the Software licensed under the Agreement with Altera, without assuming or rejecting the Agreement. The Debtors have stated they intend to force Altera to provide services to the Buyer for a transition period – for more than one year – and once the transition is completed, they will terminate the Agreement. There is no basis under the Agreement or in law for the Debtors to do so.

2. But by using the Software and evading assumption or rejection of the Agreement, the Debtors are unfairly forcing Altera to continue performing under the Agreement without giving Altera any of the benefits and protections of the Bankruptcy Code – *i.e.*, allowance for Altera to

---

[1] All capitalized terms used, but not defined in this Preliminary Statement are defined further below.

immediately cease performance and cease incurring significant out-of-pocket expenses in the event of rejection or payment of the cure amount and adequate assurance of future performance in the event of assumption. By intentionally keeping Altera in limbo, Altera is being prejudiced because it is incurring out of pocket expenses for employees who work full-time at the hospital and other expenses.

3.      Accordingly, Altera seeks to compel the Debtors to assume or reject the Agreement as the Bankruptcy Code mandates. Once the sale of the hospital closes in January, the Debtors will no longer be operating and will no longer have any need for the Software. At this point, the Debtors must make the choice required by the Bankruptcy Code – either assume the Agreement, pay the cure amounts and assign the Agreement to the Buyer or reject the Agreement.

## JURISDICTION AND VENUE

4.      The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408-09. The bases for the relief requests are sections 105(a), 365, 503, and 507 of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A.      The Agreement between Altera and the Debtors.**

5.      The Debtors use Altera's proprietary electronic medical record software (the "Software"). The Software is integral to the Debtors' operations. The Software is used to keep and track medical records, including scheduling patient visits, tracking medical histories, lab results, and physicians' notes, as well as billing and collecting, among other things. The Debtors have stated that they could not operate without the Software and that "the Hospital would grind to a halt, patients' lives would be at risk, and the Hospital would likely immediately close." **Ex. D**.

2

6.      The Software is licensed pursuant to the Agreement (**Ex. A**), which was executed on March 9, 2021 by Allscripts (Altera's predecessor-in-interest) and the Debtors. The Debtors were, *inter alia*, granted a nonexclusive, non-transferable right and license to use the Software. *Id.*, § 3.1. The Agreement incorporates the separate "Client Orders" that were signed by the Parties. *Id.*, § 1. Concurrent with the Agreement's execution, the parties also executed that certain *Initial Client Order* (**Ex. B**) (the "Client Order").

7.      Schedule 1, Paragraph A.1 of the Client Order provides that "[t]he initial term of this Client Order begins on the Order Date and ends 120 months after the Order Date." Pursuant to Paragraph 2 of the Client Order, the Order Date was March 9, 2021, the date that the parties signed the Client Order. Thus, the Client Order – and therefore the Agreement's – term runs through March 9, 2031.

**B.      Altera and the Debtors execute the Amendment to the Agreement.**

8.      As of June 30, 2023, the Debtors owed Altera an amount not less than $9,848,792.88 in unpaid accounts receivables for invoices issued in connection with the Agreement.

9.      Even though the Debtors were significantly indebted to Altera, Altera worked in good faith with the Debtors to permit the Debtors to continue to use the Software. Accordingly, on August 1, 2023, Altera and the Debtors executed that certain amendment to the Agreement (**Ex. C**) (the "Amendment"). The Amendment recited that "Altera recognizes the significant financial challenges facing [the Debtors]" and Altera reduced the amount to be paid for 9 months to less than half the amount due under the Agreement. The Debtor has continued to use the Software through the Petition Date. As a result, Altera is owed almost $4 million since the Petition Date.

**C.    Bankruptcy procedural background.**

10.    On August 7, 2023 (the "Petition Date"), the Debtors commenced the Chapter 11 Cases. On November 7, 2023, the Court entered an order approving the sale of substantially all of the Debtors' assets to State of Iowa's University of Iowa (the "Buyer"). *See* Dkt. No. 476 (the "Sale Order"). As part of that sale approval process, the Debtors served notice that the Agreement might be assumed. Dkt. No. 265. Altera objected to the cure amount as insufficient. Dkt. No. 376. The Sale Order preserved Altera's objection and a hearing is scheduled for January 22, 2024.

11.    The closing is expected to occur in January 2024. The Debtors, however, have advised Altera that they will not assume or reject the Agreement and instead have attempted to "terminate" the Agreement, while demanding that Altera provide the Buyer with transition services and allow the Buyer to use the Software for 12 months.

**D.    The Debtors' improper attempt to terminate – but not reject – the Agreement.**

12.    On December 8, 2023, the Debtors sent Altera a letter, purportedly terminating the Agreement by giving written notice of "the Debtors' non-renewal of the [Agreement] effective March 9, 2024." **Ex. D**. The Debtors also purported to give notice of their election to extend the Agreement's post-termination "support term" through and including March 9, 2025. *Id.*, p. 2. The Debtors stated the Buyer needs the support term to facilitate a transition to a different electronic medical record provider following the sale. The Debtors asserted that the need for transition services is of the utmost importance because: "Put simply, without transition services provided by Altera to the Buyer, the daily operations of the Hospital would grind to a halt, patients' lives would be at risk, and the Hospital would likely immediately close." *Id.*, p. 2.

13.    On December 14, 2023, Altera sent a response to the Debtors' letter, explaining that the Debtors are not permitted to terminate the Agreement prior to the Agreement's expiration

4

on March 9, 2031 and that the Debtors are not entitled to a "support term" because they cannot terminate the Agreement before 2031.  **Ex. E**.

14. The Debtors assert that they can terminate the Agreement as of March 9, 2024 – *i.e.*, the end of the third year of the Agreement under Paragraph 2 of the Agreement.  While Paragraph 2 permits the Agreement to be terminated if no term is agreed upon, the parties *did* agree upon a term.  Specifically, Paragraph 2 states that the Agreement's term is set forth in the Client Order.  The Client Order, in turn, states (Schedule 1, Paragraph A.1) that the term runs for 10 years, through March 9, 2031.  Thus, the Agreement may not be terminated sooner than March 9, 2031.

15. The Debtors seem to assert that the Agreement does not have a 10-year term ending on March 9, 2031.  Instead, they assert that the term is one year, renewable annually and choose not to renew effective as of March 9, 2024.  The Agreement is clear that it is for a period of 10 years, ending on March 9, 2031, and the Debtors cannot terminate earlier.

16. The Debtors' mistake apparently stems from a misreading of the Agreement.  Paragraph 2 provides that "If no term is set forth in a Client Order, the Term shall be a one (1) year initial term that automatically renews for additional one (1) year terms (each a renewal term), unless either Party provides the other written notice of non-renewal at least ninety (90) days prior to the expiration of the then-current initial or renewal Term."  The problem for the Debtors is that the Initial Client Order <u>does</u> set forth a term and that term is 10 years, expiring on March 9, 2031.  Accordingly, the Debtors are not permitted to "not renew."[2]

---

[2] In fact, the Agreement permits termination only upon a material breach.  Paragraph 14.1 of the Agreement provides that "[e]ither Party may terminate this Agreement by providing a written termination notice to the other Party if the other Party materially breaches the Agreement and does not, within sixty (60) days after receipt of a corresponding breach notice specifying in reasonable detail the nature of such breach, cure such breach in all material respect."  Thus, a condition precedent to termination is a material breach by either party and notice to start a sixty-day cure period.  Despite that the Debtors allege they have causes of action against Altera, the

5

17. By attempting to manufacture a "termination" and the election of a one-year transition period, the Debtors are attempting to effectuate a *de facto* assignment and delayed rejection, while evading their obligations under Section 365 of the Bankruptcy Code, to Altera's significant prejudice. Altera brings this Motion to compel the Debtors to assume or reject the Agreement.

### RELIEF REQUESTED

18. Altera respectfully requests entry of an Order, in the form annexed hereto, (i) compelling the Debtors to immediately assume or reject the Agreement under Section 365(d)(2) and Bankruptcy Rule 6006, (ii) in the event that the Debtors decide to reject the Agreement, requiring immediate payment of an administrative claim to Altera in the amount of $3,932,754.64 through December 15, 2023 under Section 503(b)(3); and (iii) granting such other, further, and different relief as the Court deems appropriate.

### BASIS OF RELIEF REQUESTED

**I.    The Debtors should be compelled to assume or reject the Agreement.**

    **A.    Legal standards for granting a motion to compel assumption or rejection.**

19. Section 365(d)(2) of the Bankruptcy Code provides that a debtor may assume or reject an executory contract at any time before plan confirmation, "but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease." Under Bankruptcy Rule 6006(b), "[a] proceeding by a party to an executory contract . . . to require the . . . debtor in possession . . . to determine whether to assume or reject the contract or lease is governed by Rule 9014."

---

Debtors have not sent notice of material breach. Instead, the Debtors improperly attempt to terminate based on a purported (non-existent) right of "non-renewal."

20. Although the Bankruptcy Code provides Chapter 11 debtors with a "breathing space" to determine whether a particular executory contract should be assumed or rejected, such breathing space "is not without limits." *In re Enron Corp.*, 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002). Accordingly, "[t]he settled rule" is that "the debtor has a *reasonable time* within which to decide whether to assume or reject an executory contract." *Id.* at 702 (emphasis added); *In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012); *In re Shalom Hospitality, Inc.*, No. 02-00276, 2002 Bankr. LEXIS 541, at *7 (Bankr. N.D. Iowa May 9, 2002) (ordering debtor to elect to assume or reject contract, observing "Debtor has had a reasonable time within which to formulate business decisions").

21. "The determination of what is a reasonable time is within the bankruptcy court's discretion 'in light of the circumstances of each case.'" *In re Enron Corp.*, 279 B.R. at 702 (quoting *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 106 (2d Cir. 1982)); *accord In re Hawker Beechcraft, Inc.*, 483 B.R. at 429. In *Shalom Hospitality*, this Court recognized that certain factors used to address whether to shorten or extend time to assume or reject executory contracts may "have relevance" for considering whether to compel assumption or rejection. 2002 Bankr. LEXIS 541, at *5-6. Other courts have found that a different set of twelve factors may be relevant. *In re Hawker Beechcraft, Inc.*, 483 B.R. 424 (citing *In re Adelphia Communs. Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003)).

22. *Hawker Beechcraft* is instructive and nearly on all fours with this case. There, three months into the case, a counterparty to an executory contract moved to compel the debtors to assume or reject an intellectual property agreement. By the time the court decided the motion, the court had already approved the disclosure statement and solicitation of votes for a plan. In connection with the upcoming plan confirmation hearing, the debtors already committed to

7

deciding which executory contracts they intended to assume, however, the moving counterparty sought assumption or rejection before plan confirmation.

23. The Court summed up its analysis of whether to compel assumption or rejection: "First, [whether] the Debtors had sufficient time to decide whether they need the Agreement" and "Second, . . . [consideration of] the relative balance of hurt and the compensability of any injury that [the non-debtor contract counterparty] may suffer." 483 B.R. at 424.

24. On the first point, the court found that the debtors had enough time to make a decision to assume or reject because "[t]he Agreement may be the single most important agreement relating to the Debtors' single most important product" and, therefore, the decision to assume or reject "should have been among their first and most pressing orders of business." 483 B.R. at 432.

25. On the second point, the court found that the balancing of harms was "neutral." However, the court found that the debtors' prejudice arguments were "not particularly compelling" in light of the facts and posture of the case. *Id.* at 433. The debtor argued that granting the motion would affect the debtors' "marketing process" and would open "the floodgates" of litigation. *Id.* The court easily rejected both arguments. First, the marketing process was already over because the debtor was on track for plan confirmation. Second, "any possibility of a flood has ebbed because the Debtors must identify the executory contracts they intend to assume" before the confirmation hearing. *Id.* Thus, the court granted the motion and ordered the debtors to assume or reject the contract. This Court should reach the same conclusion here.

**B.   The Debtors should be compelled to decide to assume or reject the Agreement.**

  **i.   *The Debtors have had enough time to decide whether to assume or reject the Agreement.***

26. The Debtors have already had a "reasonable time" to make a decision to assume or reject the Agreement. This case is over five months old and *Hawker Beechcraft* granted the motion

8

seeking the same exact relief that was filed only three months into the case. Moreover, like the contract in *Hawker Beechcraft*, the Agreement "may be the single most important agreement" and "should have been among their first and most pressing orders of business." 483 B.R. at 432. The Debtors even admit this. The Debtors state that, without the ability to utilize the Software, "the daily operations of the Hospital would grind to a halt, patients' lives would be at risk, and the Hospital would likely immediately close." *Id.*, p. 2.

27. Since assumption or rejection of the contract is literally a matter of life and death <u>and</u> mission critical to the hospital's basic operation, a decision concerning assumption or rejection should have been the "first and most pressing orders of business." 483 B.R. at 432. Indeed, the assumption or rejection of an agreement that could literally put someone's life in danger should be decided immediately. Instead of prioritizing that decision, however, the Debtors are simply trying to use the Software and allow the Buyer to use the Software, while ignoring the Bankruptcy Code's requirements and protections under Section 365 of the Bankruptcy Code – *i.e.*, payment of the cure amount (in the event of assumption) or permitting Altera to cease performance (in the event of rejection).

    **ii.**  *The balancing of harms weighs in favor of compelling the Debtors to make a decision.*

28. Altera will be significantly prejudiced if the Debtors are permitted to continue using the Software and if the Buyer is allowed to use the Software without having to assume or reject the Agreement.

29. <u>First</u>, absent granting the Motion, the Debtors will be permitted to improperly assign the Agreement, without assumption, without paying the cure amounts and thereafter reject. <u>Second</u>, until the Debtors assume or reject the Agreement, Altera will be obligated to continue performing under the Agreement and incur out-of-pocket expenses. <u>Third</u>, Altera presently is only

being compensated at less than half of the payment required under the Agreement.  <u>Fourth</u>, the Software and benefits from the Agreement will be conferred on an absolute stranger to the Agreement with whom Altera did not contract: the Buyer.  Paragraph 3.3 provides: "[the Debtors] shall not authorize or permit any third parties, other than Authorized Users, to access or use any Software."  Thus, the Agreement prohibits exactly what the Debtors are attempting to do: let a third party use the Software without Altera's consent.[3]  The Debtor is attempting to bypass these protections.

30.     In contrast to the prejudice to Altera, the Debtors will not be prejudiced by being compelled to assume or reject the Agreement because once the sale has closed, the Debtors will no longer be operating.  Like *Hawker Beechcraft*, "any possibility of a flood has ebbed" because the Debtors already identified the executory contracts they intended to assume.  483 B.R. at 433. The Court has already granted the Debtors' sale motion.  *See* Dkt. No. 265; *see also* Dkt. No. 476 (sale order).  The closing is expected to occur by the end of January.

## II.    If the Debtors elect to reject the Agreement, the Debtors should be required to make immediate payment of Altera's administrative expense claim.

31.     Section 503(b)(1)(A)(i) provides an administrative expense for the "the actual, necessary costs and expenses of preserving the estate . . . for services rendered after the commencement of the case."  Altera voluntarily agreed to defer payment of more than half of the amounts due under the Agreement through March 31, 2024.  Since the filing date, $3,932,754.64 has accrued through December 15, 2023.  The unpaid amounts continue to accrue in the approximate amount of $207,000 per week.  The amounts which accrue after the filing date are

---

[3] Altera would not object to the Debtors' assumption and assignment of the Agreement to the Buyer.  Altera does object, however, to the Debtors' attempt to allow the Buyer to use the Software without assumption and assignment of the Agreement.

10

entitled to administrative expense claim priority. In the event the Debtors elect to reject the Agreement, Altera respectfully requests immediate payment of an administrative claim in the amount of $3,932,754.64 through December 15, 2023, plus all additional amounts due through the rejection date.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, Altera respectfully requests that this Court grant the Motion and grant Altera such other and further relief as the Court may deem just and proper.

Dated: December 20, 2023

Respectfully submitted,

PAPPAJOHN, SHRIVER, EIDE &
NIELSEN P.C.

 /s/ Larry S. Eide
Larry S. Eide (AT0002317)
103 E. State Street, Suite 800
Mason City, IA 50401
Tel: (641) 423-4264
Fax: (641) 423-3145
eide@pappajohnlaw.com

-and-

LOEB & LOEB LLP
Schuyler G. Carroll (admitted *pro hac vice*)
345 Park Avenue
New York, NY 10154
Tel: (212) 407-4000
Fax: (212) 202-5431
scarroll@loeb.com

*Counsel to Altera Digital Health Inc.*

237966656