EXHIBIT A

EXECUTION COPY

# OPERATING AGREEMENT

## OF

## CORRIDOR RADIOLOGY, LLC
## AN IOWA LIMITED LIABILITY COMPANY

**October 1, 2012**

# TABLE OF CONTENTS

Page

ARTICLE I        DEFINITIONS ..................................................................................... 2

    1.1    Generally .............................................................................................. 2

    1.2    Certain Definitions ............................................................................... 2

ARTICLE II       FORMATION OF COMPANY ............................................................. 2

    2.1    Organization ......................................................................................... 2

    2.2    Name .................................................................................................... 3

    2.3    Principal Place of Business ................................................................... 3

    2.4    Registered Office and Registered Agent ............................................... 3

    2.5    Term ..................................................................................................... 3

ARTICLE III      BUSINESS OF THE COMPANY ........................................................ 3

    3.1    Purposes ............................................................................................... 3

    3.2    Policies ................................................................................................. 4

    3.3    Limitation on Authority ........................................................................ 4

    3.4    No State Law Partnership ...................................................................... 4

ARTICLE IV      MEMBERS ......................................................................................... 4

    4.1    Names, Addresses and Contributions .................................................... 4

    4.2    Membership Classes ............................................................................. 4

    4.3    New Members ....................................................................................... 5

    4.4    Limitation of Liability .......................................................................... 5

    4.5    Priority and Return of Capital ............................................................... 5

    4.6    List of Members .................................................................................... 5

    4.7    Membership Meetings and Voting ......................................................... 5

    4.8    General Powers Reserved to All Members ............................................. 7

    4.9    Powers Reserved to the Class H Member .............................................. 8

    4.10   Members' Duties and Liability; Transactions with Affiliates ............... 9

    4.11   Class P Member Option to Purchase ................................................... 10

ARTICLE V       MANAGEMENT OF COMPANY ..................................................... 10

    5.1    Board of Managers; General Powers ................................................... 10

    5.2    Number, Tenure and Qualifications ..................................................... 11

71015614.18                                   -i-

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| 5.3 | Limitation on Power To Bind the Company | | 11 |
| 5.4 | Quorum; Voting Requirements | | 11 |
| 5.5 | Meetings | | 14 |
| 5.6 | Action by Managers without a Meeting | | 15 |
| 5.7 | Deadlock | | 15 |
| 5.8 | Committees | | 15 |
| 5.9 | Managers' and Officers' Duties and Liability; Transactions with Related Parties | | 15 |
| 5.10 | Indemnification | | 16 |
| ARTICLE VI | OFFICERS AND ADMINISTRATIVE SERVICES | | 18 |
| 6.1 | Officers | | 18 |
| 6.2 | Election and Term of Office | | 18 |
| 6.3 | Removal | | 18 |
| 6.4 | Other Officers and Agents | | 19 |
| 6.5 | Direction By the Board of Managers | | 19 |
| 6.6 | Absence or Disability of Officers | | 19 |
| 6.7 | Compensation and Reimbursement | | 19 |
| ARTICLE VII | CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS | | 19 |
| 7.1 | Members' Initial Capital Contributions | | 19 |
| 7.2 | Additional Capital Contributions | | 19 |
| 7.3 | Capital Accounts | | 20 |
| ARTICLE VIII | ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS | | 21 |
| 8.1 | Allocations of Profits and Losses from Operations | | 21 |
| 8.2 | Special Allocations to Capital Accounts | | 21 |
| 8.3 | Distributions | | 23 |
| 8.4 | Limitation upon Distributions | | 24 |
| 8.5 | Interest on and Return of Capital Contributions | | 25 |
| 8.6 | Loans to Company | | 25 |
| 8.7 | Accounting Period | | 25 |

**TABLE OF CONTENTS**
(continued)

Page

| | | | |
|---|---|---|---|
| 8.8 | Records, Audits and Reports | | 25 |
| 8.9 | Returns and Other Elections | | 26 |
| 8.10 | Tax Matters Partner | | 26 |
| 8.11 | Allocations and Distributions to Economic Interest Holders | | 26 |
| ARTICLE IX | TRANSFERABILITY | | 26 |
| 9.1 | Prohibition on Transfers of Membership Interests | | 26 |
| 9.2 | Transfer to an Affiliate | | 27 |
| 9.3 | Terms of Transfer | | 27 |
| 9.4 | Substitute Member | | 27 |
| 9.5 | Conditions for Transfer | | 27 |
| 9.6 | Transfer Costs | | 28 |
| 9.7 | Prohibited Transfers Null and Void | | 28 |
| 9.8 | Applicability to All Membership Interests | | 28 |
| 9.9 | Sales to Third Parties | | 28 |
| ARTICLE X | MEMBER DISQUALIFICATION AND WITHDRAWAL | | 29 |
| 10.1 | Withdrawal Events | | 29 |
| 10.2 | Determination of Disqualification | | 29 |
| 10.3 | Obligations of Withdrawing Member Prior to Withdrawal | | 30 |
| 10.4 | Payment to Member for Percentage Interest Upon Disqualification or Withdrawal | | 30 |
| 10.5 | Closure of Books Upon Withdrawal | | 32 |
| 10.6 | Appraiser Process and Qualifications | | 32 |
| ARTICLE XI | DEADLOCK RESOLUTION | | 33 |
| 11.1 | Right to Purchase Assets | | 33 |
| 11.2 | Dispute Resolution for Deadlock | | 33 |
| ARTICLE XII | DISSOLUTION AND TERMINATION | | 34 |
| 12.1 | Dissolution of the Company | | 34 |
| 12.2 | Winding Up, Liquidation and Distribution of Assets | | 34 |
| 12.3 | Effect of Filing of Articles of Dissolution | | 36 |
| 12.4 | Return of Contribution Nonrecourse to Other Members | | 36 |

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| ARTICLE XIII | CONFIDENTIALITY AND RESTRICTIVE COVENANT | 36 |
| 13.1 | Confidentiality | 36 |
| 13.2 | Noncompetition | 37 |
| 13.3 | Confidentiality and Noncompetition Agreement by Physicians | 38 |
| ARTICLE XIV | MISCELLANEOUS PROVISIONS | 38 |
| 14.1 | Notices | 38 |
| 14.2 | Headings | 39 |
| 14.3 | Invalidity | 39 |
| 14.4 | Further Action | 39 |
| 14.5 | Variation of Pronouns | 39 |
| 14.6 | Governing Law | 39 |
| 14.7 | Compliance with Laws | 39 |
| 14.8 | Counterparts | 40 |
| 14.9 | Entire Agreement | 40 |
| 14.10 | Representation/Interpretation | 40 |
| 14.11 | Amendments | 40 |
| 14.12 | Arbitration | 40 |
| 14.13 | Change in Law; Reformation | 41 |
| 14.14 | Waiver of Action for Partition | 41 |
| 14.15 | Waivers | 42 |
| 14.16 | Rights and Remedies Cumulative | 42 |
| 14.17 | Successors and Assigns | 42 |
| 14.18 | Creditors | 42 |

**THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE. THE SALE, ASSIGNMENT, TRANSFER, EXCHANGE, MORTGAGE, PLEDGE OR OTHER DISPOSITION OF ANY MEMBERSHIP INTEREST IS RESTRICTED IN ACCORDANCE WITH THE PROVISIONS OF THIS OPERATING AGREEMENT AND THE COMPANY WILL NOTE ANY STOP TRANSFER INSTRUCTIONS IN ITS RECORDS, AND THE EFFECTIVENESS OF ANY SUCH SALE OR OTHER DISPOSITION MAY BE CONDITIONED UPON, AMONG OTHER THINGS, RECEIPT BY THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY AND ITS COUNSEL THAT SUCH SALE OR OTHER DISPOSITION CAN BE MADE WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND OTHER APPLICABLE FEDERAL OR STATE STATUTES. BY ACQUIRING THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT, EACH MEMBER REPRESENTS THAT HE, SHE OR IT WILL NOT SELL OR OTHERWISE DISPOSE OF ITS MEMBERSHIP INTERESTS WITHOUT REGISTRATION OR OTHER COMPLIANCE WITH THE AFORESAID STATUTES AND RULES AND REGULATIONS THEREUNDER AND THE TERMS AND PROVISIONS OF THIS OPERATING AGREEMENT.**

**OPERATING AGREEMENT OF**
**CORRIDOR RADIOLOGY, LLC**
**AN IOWA LIMITED LIABILITY COMPANY**

THIS OPERATING AGREEMENT is made and entered into effective as of October 1, 2012 (the "Effective Date"), by and between Mercy Hospital, Iowa, City, Iowa, an Iowa non-profit corporation ("Hospital"), and RMS Holdings, P.C., an Iowa professional corporation ("RMSH").

**RECITALS**

A.      Hospitalis the owner and operator of a general acute care hospital located at 500 East Market Street, Iowa City, Iowa 52245 and provides diagnostic imaging services, including MRI and CT services (the "Hospital Radiology Business").

B.      RMSH has been in the business of providing imaging services, including x-ray, mammography, ultrasound, bone densitometry scanning, MRI, and CTat a freestanding diagnostic imaging center located at 2769 Heartland Drive, Suite 105, Coralville, Iowa 52241 (the "Radiology Center")

C.      Hospital and RMSH desire to work together to provide the community with needed radiology services in a timely and quality fashion; RMSH acknowledges the obligations of Hospital, as a tax-exempt organization, to further its charitable purposes in providing this service to the community and agrees that in working together Hospital can and will take such actions as may be necessary to promote, protect and preserve its tax-exempt status.

D.      Accordingly, Hospital and RMSH caused Corridor Radiology, LLC, an Iowa limited liability company (the "Company"), to be organized on June 5, 2012, by filing Articles of Organization with the Iowa Secretary of State on such date.

E.      Pursuant to that certain Contribution Agreement dated as of October 1, 2012, by and among RMSH, Radiologic Medical Services, P.C. ("RMS"), RMS Asset Management, LLC ("RMSA") (RMSH, RMS and RMSA are together referred to as the "RMS Parties") and the Company (the "RMS Contribution Agreement"), the RMS Parties transferred and assigned to the Company tangible and intangible assets used in connection with the operation of the Radiology Center and the business related thereto, including the all furniture fixtures and equipment purchased by the RMS Parties for the build out of the Facility (as defined in Section 3.1.1(i)).

F.      Pursuant to that certain Contribution Agreement dated as of October 1, 2012, by and between Hospital and the Company (the "Hospital Contribution Agreement"), Hospital transferred to the Company the intangible assets used in connection with a portion of its existing MRI/CT business.

G.      The members of the Company desire to adopt this Operating Agreement and to define the relationships among the Company and its members and to provide for management of the Company.

## TERMS AND CONDITIONS

**NOW, THEREFORE**, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1     Generally**.  Pursuant to Treasury Regulation § 301.7701-3, the Company shall be treated as a partnership for Federal income tax purposes, and the tax treatment of the Company shall be governed by Subchapter K of the Code.  Certain definitions contained in this Agreement refer to sections of the Code or Treasury Regulations involving partnerships, and some of the definitions contained herein substitute the words "Member" for "Partner," "Company" for "Partnership," and "Membership Interest" for "Partnership Interest."  However, the intention is to utilize the concepts and requirements of the Code and Treasury Regulations involving partnerships, and the definitions contained herein should be read consistently with each provision of the Code and Treasury Regulations.

**1.2     Certain Definitions**.  A capitalized term used in this Agreement and not otherwise defined herein shall have the meaning assigned to the capitalized term set forth on Exhibit 1.2.

## ARTICLE II
## FORMATION OF COMPANY

**2.1     Organization**.  The Company has been organized as an Iowa limited liability company by executing and delivering Articles of Organization to the Iowa Secretary of State in accordance with and pursuant to the Act.  The affairs of the Company and the conduct of its

business shall be governed by the terms, and be subject to the conditions, set forth in this Agreement, as amended from time to time.

**2.2   Name**. The name of the Company shall be "Corridor Radiology, LLC." The Company may do business under that name and under any other name or names as selected from time to time by the Board of Managers.

**2.3   Principal Place of Business**. The principal place of business of the Company within the State of Iowa shall be 2769 Heartland Drive, Suite 105, Coralville, IA 52241, unless and until the Board of Managers determines otherwise. The Company may locate its places of business (including, without limitation, its principal place of business) and registered office at any other place or places as the Board of Managers may deem advisable.

**2.4   Registered Office and Registered Agent**. The Company's registered office, and the name of its initial registered agent, shall be as set forth in the Articles of Organization. The registered office and registered agent may be changed by filing the name and address of the new registered agent with the Iowa Secretary of State pursuant to the Act.

**2.5   Term**. The term of the Company shall be perpetual from the effective date of the filing of the Articles of Organization with the Iowa Secretary of State, unless the Company is earlier dissolved in accordance with either the provisions of this Agreement or the Act.

**ARTICLE III**
**BUSINESS OF THE COMPANY**

**3.1   Purposes**.

3.1.1   The purposes of the Company are as follows:

(i)   to own and operate an outpatient imaging center in Coralville, Iowa that provides imaging services including MRI, CT, x-ray, mammography, ultrasound, bone densitometry scanning and possibly other modalities (the "Facility");

(ii)   to purchase, sell, exchange, lease, assign, transfer, encumber or otherwise deal in or with real property, personal property, equipment, supplies and other items in relation to the purposes stated herein, including to borrow for the acquisition of and/or to pledge and/or encumber such property;

(iii)   to do any and all things permitted by law incident to the foregoing and to engage in any other business or activities that are related to or incident to the foregoing; and

(iv)   in general to engage in the transaction of any or all lawful businesses for which Iowa limited liability companies may be organized under the laws of the State of Iowa.

Notwithstanding any provision in this Agreement to the contrary, the Company shall operate in a manner that furthers the federal tax-exempt status under Code Section 501(c)(3) of

the Class H Member, does not jeopardize the tax-exempt status of bonds relating to the Class H Member, and does not jeopardize the Medicare provider status of the Class H Member. The Company shall be operated in a manner that (i) promotes, protects and preserves the tax-exempt and the Medicare provider status of the Class H Member, and (ii) furthers the charitable purposes of the Class H Member by promoting health for a broad cross-section of the community. The duty to operate the Company in a manner that furthers such charitable purposes shall prevail over Member Duties and any duty the Board of Managers may have to operate the Company for the financial benefit of the Members. Each of the Members agrees that it shall not cause the Company to take any action or fail to take any action that would adversely affect the tax-exempt status of the Class H Member or any Affiliate of the Class H Member within the meaning of Section 501(c)(3) of the Code or the Medicare provider status of the Class H Member. No Member or Manager shall be deemed to be in breach of his/her/its fiduciary duties to the Company for operating the Company in compliance with this Section 3.1.

3.2    **Policies**. The Company will maintain corporate compliance, charity care, conflict of interest and quality assurance policies that are substantially similar to the Class H Member's corporate compliance, conflict of interest, charity care and quality assurance policies in place from time to time as they relate to outpatient diagnostic services.

3.3    **Limitation on Authority**. Except as otherwise provided in this Agreement, no Member shall have authority to act as the general agent of the other Member or shall be required to offer to other Member or the Company any business opportunity.

3.4    **No State Law Partnership**. No provisions of this Agreement shall be deemed or construed to create or constitute a partnership or joint venture, or any Member or Manager a partner or joint venturer for any purposes other than federal and state tax purposes.

### ARTICLE IV
### MEMBERS

4.1    **Names, Addresses and Contributions.** The Company shall have two Members. The name, address, Percentage Interest and Capital Contributions of the Class H Member is as set forth on Exhibit 4.1-A hereto, as amended from time to time by the Board of Managers to reflect the Class H Member and its Membership Interest, as described in Section 4.2 below. The name, address, Percentage Interest and Capital Contributions of the Class P Member is as set forth on Exhibit 4.1-B hereto, as amended from time to time by the Board of Managers to reflect the Class P Member and its Membership Interest, as described in Section 4.2 below. The Class H Member and the Class P Member acknowledge that they have been actively involved in the development of the Company and its business, and have had access to and reviewed all material facts in connection with the development and formation of the Company.

4.2    **Membership Classes**. The Company shall have two (2) Classes of Membership Interests, namely, the Class H Membership Interest, represented by the Percentage Interest owned by the Class H Member (the "Class H Membership Interest"), and the Class P Membership Interest, represented by Percentage Interest owned by the Class P Member (the "Class P Membership Interest"). The Class H Percentage Interest and the Class P Percentage Interest may only be held by an Entity or Entities. In no event shall the Class P Member(s) hold a Majority In Interest in the Company.

**4.3     New Members**.  The Company may admit a Person as a new Member only as provided in this Section 4.3.  The Company may admit a Person who meets the qualifications set forth in Section 4.2 as a Member of the Company only upon (i) approval of such admission by all of the Members; (ii) payment of an initial Capital Contribution in an amount determined by, the Board of Managers, which amount shall be equal to the value of the Company, as determined from time to time by the Board of Managers, multiplied by the Percentage Interest purchased by such new Member; (iii) approval as required under this Agreement of such amendments to this Agreement as necessary to admit such new member to the Company; and (iv) execution by such Person of an agreement to be bound by this Agreement.  To accomplish the issuance of an appropriate membership interest to a new Member, the Board of Managers may re-classify any portion of the Class H Membership Interest and/or the Class P Membership Interest as necessary to affect such an issuance; provided, however, in no event shall the Class P Member, individually or in combination with such new Member(s), hold a Majority In Interest in the Company.  No new Members shall be entitled to any retroactive allocation of Profits and Losses incurred by the Company.  The Board of Managers may, at its option, at the time a new Member is admitted, close the Company books (as though the Company's tax year has ended) or make pro rata distributions and allocations of Profits and Losses to a new Member for that portion of the Company's tax year in which a Member was admitted, in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

**4.4     Limitation of Liability**.  Each Member's liability shall be limited as set forth in this Agreement, the Act and other applicable law.  A Member will not be personally liable for any debts or losses of the Company beyond its respective Capital Contribution.  A Member who receives a distribution or the return in whole or in part of its Capital Contribution is liable to the Company only to the extent provided by non-waivable provisions of the Act.

**4.5     Priority and Return of Capital**.  Except as may be expressly provided in this Agreement, no Member or owner of an Economic Interest shall have priority over any other Member or owner, either as to the return of Capital Contributions or as to Profits, Losses or distributions; provided, however, that this Section 4.5 shall not apply to loans which a Member has made to the Company if approved as required hereunder.

**4.6     List of Members**.  Upon the written request of any Member, the custodian of the Company's records shall provide a list showing the names, addresses, Capital Accounts, Classes and Percentage Interests of all Members.

**4.7     Membership Meetings and Voting**.

      4.7.1     There shall be no regularly scheduled or annual meeting of all of the Members.  The Board of Managers may call meetings of all of the Members.  In addition, the Board of Managers shall call a meeting of the Members at the request of any Member or Members holding, in the aggregate, at least twenty percent (20%) of the Membership Interests of the Company.

      4.7.2     Each Member shall designate up to two (2) individuals (and, in the event of two (2) individuals, designate one (1) as the Primary Member Representative) who each shall serve as a Member representative at any meetings of the Members (a "Member Representative").  In the event of any disagreement among a Member's Representatives, only the vote of the Primary Member Representative shall be counted.

4.7.3      The Board of Managers may designate any place within the State of Iowa as the place of meeting for any meeting of the Members.  If no such designation is made, the place of meeting shall be the principal place of business of the Company in the State of Iowa.

4.7.4      Notice of any membership meeting shall be given at least three (3) Business Days previous thereto by written notice to each Member at its address as set forth in Exhibit 4.1-A and/or Exhibit 4.1-B attached hereto, as applicable.  Such notice shall state the purpose or purposes of the special meeting.  If mailed, such notice shall be deemed to be delivered three (3) Business Days after deposited in the United States mail so addressed, with postage thereon prepaid.  If notice is given by personal delivery or by overnight courier, such notice shall be deemed to be delivered when delivered to the Member at the address(es) as set forth in Exhibit 4.1-A and/or Exhibit 4.1-B attached hereto, as applicable.  If notice is given by facsimile, such notice shall be deemed effective when a transmission report is generated by the sender's facsimile machine indicating all pages of the notice were transmitted successfully to the facsimile number of the applicable Member, as reflected in the Company's records, and the original documents are mailed consistent with the method for mailing notices provided in this Section 4.7.4.  In each case, a courtesy copy of such formal notice shall be provided by email to the Member Representative at the email address reflected in the Company's records.  The attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

4.7.5      Each Member may participate in a meeting of Members or of its Class by conference call or similar communications equipment that enables all participating Member Representatives to hear each other.  Such participation shall constitute presence in person at such meeting.

4.7.6      At all meetings of Members, a Member entitled to vote on a matter may vote its interest through a proxy executed in writing by the Member Representatives.  Each proxy shall be filed with the Company before or at the time of the meeting.  No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

4.7.7      At any meeting of all of the Members, a quorum for the transaction of business shall consist of at least one (1) Member Representative of the Class H Member and at least one (1) Member Representative of the Class P Member; provided, however, that if a quorum is not achieved at a meeting of the Members due to the failure of a particular Class to present at least one (1) Member Representative at the meeting and, after appropriate notice, a quorum is not achieved at a second meeting due to the failure of the same Class to present at least one (1) Member Representative, then the Members shall be deemed to be Deadlocked with respect to the issues to be raised at such meeting that a quorum cannot be obtained.

4.7.8      Unless otherwise specifically stated in this Agreement (including without limitation the powers reserved under Section 4.8), the affirmative vote of fifty-one

percent (51%) of the Membership Interest represented at a Members' meeting at which a quorum is present shall constitute the decision of the Members; provided, however, that the percentage Membership Interest of a Member or Members not permitted to vote on a matter pursuant to this Agreement shall not be counted in determining the quorum or decision of the Members.  A Member shall be permitted to vote with respect to any matter in which it has a financial interest, except as follows:

       (i)     as otherwise required by non-waivable provisions of applicable law;

       (ii)    as otherwise expressly provided in this Agreement; and

       (iii)   regarding a material issue on a contract between the Company and any one (1) or more individuals or entities in itsMember Group (e.g., termination for cause, renewal, compensation, indemnity, performance standards, etc.).

       4.7.9   Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by Members representing the Percentage Interest required to approve the applicable action and delivered to the Board of Managers for inclusion in the minutes or for filing with the Company records.  Action taken under this Section 4.7.9 is effective when all Members representing the Percentage Interest required to approve the applicable action have signed the consent, unless the consent specifies a different effective date.

       4.7.10  If the Members are Deadlocked on an issue, and the Deadlock remains unresolved after a period of thirty (30) days (or such shorter period designated by either Member due to time constraints relevant to the specific Deadlock) then the dispute resolution process pursuant to Section 11.2 shall be invoked.

   **4.8**    **General Powers Reserved to All Members**.  Each of the matters listed below shall be submitted to the Members for approval and shall be subject to Member vote and shall require the unanimous and affirmative vote of all of the Members:

       4.8.1   amendments to this Agreement or the Articles of Organization;

       4.8.2   the filing of a voluntary petition in bankruptcy, receivership or taking any other similar action;

       4.8.3   the issuance of Membership Interests or the admission of any new Member or Substitute Member and the terms for such admission or issuance;

       4.8.4   the sale, transfer or other disposition of all or substantially all of the assets of the Company other than in the ordinary course of business, whether in one transaction or multiple related transactions;

       4.8.5   any transaction prior to January 1, 2018, in a transaction that is taxable for Federal income tax purposes and that involves the sale, transfer or other disposition of

any portion of the Company's goodwill or going concern value that was obtained by the Company from RMS, RMSA or RMSH;

4.8.6    any merger or consolidation involving the Company;

4.8.7    the dissolution of the Company;

4.8.8    any calls for Additional Capital Contributions pursuant to Section 7.2;

4.8.9    approval of the annual capital and operating budgets of the Company;

4.8.10   any material change in the nature of the business of the Company;

4.8.11   any borrowing by the Company in excess of One Hundred Thousand Dollars ($100,000), unless such borrowing is approved in the annual operating or capital budget or such borrowing is pursuant to a line of credit approved by Member vote;

4.8.12   approval of an acquisition or lease of capital equipment or lease of real property in excess of One Hundred Thousand Dollars ($100,000), unless pursuant to an approved operating or capital budget;

4.8.13   approval of any secured or unsecured loan by a Member to the Company;

4.8.14   approval of a Transfer pursuant to Article IX;

4.8.15   change in size of the Board of Managers in accordance with Section 5.2 hereof; and

4.8.16   any other act or matter for which the vote of the Members is expressly required by the terms of this Agreement or the Act.

Except as provided in this Section 4.8, Section 4.9 or Section 11.2 or as otherwise required under this Agreement, all matters related to the management of the Company shall be determined by the Board of Managers.

**4.9    Powers Reserved to the Class H Member**.

4.9.1    Notwithstanding anything in this Agreement to the contrary, the Class H Member shall, without the consent or approval of the Class P Member or the Board of Managers, have the exclusive right, by written notice to the Company and the Class P Member, to take any action in the name of, and on behalf of, the Company in order to promote, protect or preserve its tax-exempt status and Medicare provider status and to avoid the incurrence of unrelated business taxable income ("Tax-Exempt Issue"), including, but not limited to, the approval or disapproval of any matter or decision which the Class H Member reasonably finds promotes, conflicts with or jeopardizes such tax-exempt status or jeopardizes such Medicare provider status and/or avoids the incurrence of unrelated business taxable income

EXHIBIT A

4.9.2    If, in the reasonable judgment of the Class H Member, as determined by the Board of Directors of the Class H Member (the "Class H Member's Board") after consultation with tax-exempt counsel, there exists a Tax-Exempt Issue, then the Class H Member will notify the Class P Member of such Tax-Exempt Issue and the Members will work together in good faith for a period of time not to exceed ninety (90) days to discuss appropriate action to address the Tax-Exempt Issue. If the Members are unable to agree to the action within ninety (90) days following notice by the Class H Member of the Tax-Exempt Issue the Class H Member's Board believes is necessary to address the Tax-Exempt Issue, the matter will be submitted to arbitration in accordance with the American Health Lawyers Association ("AHLA")Alternative Dispute Resolution Service Rules of Procedure for Arbitration.  The arbitrator in reaching his or her decision shall specifically consider and address Section 3.1 of this Agreement.  The arbitrator shall make written findings of fact and conclusions of law.  The Members agree that the arbitrator's findings of fact shall be final and binding upon the Members and their successors.  The Members agree that one (1) arbitrator shall be selected pursuant to the rules and procedures of the AHLA.  The Members agree that the Federal Arbitration Act and the federal substantive law promulgated relative thereto shall be the applicable governing law regarding the application, implementation, interpretation and enforcement of the rights to arbitration as set forth in this Section 4.9.2.

**4.10    Members' Duties and Liability; Transactions with Affiliates**.

4.10.1    Each Member shall owe the Company only the duties of loyalty and care and the obligation of good faith and fair dealing as required in non-waivable provisions of the Act, to be interpreted in accordance with the disclosure and voting procedures set forth in this Section 4.10 ("Member Duties").  No Member shall be required to participate in the Company as its sole and exclusive function.  Each Member may have other business interests and may engage in other activities in addition to those relating to the Company, except as expressly prohibited pursuant to this Agreement, including all schedules and exhibits, or any other agreement entered into by such Member; neither the Company, nor any Member shall have any right, by virtue of this Agreement or membership in the Company, to share or participate in the other Member's other business interests and activities, or to the income or proceeds derived there from.  Each Member understands that the conduct of the business of the Company may involve business dealings and undertakings with Members; shareholders, partners or owners of Members; Affiliates of Members; and/or entities with which the Member has a financial interest (individually or collectively, "Member Group").  An act or transaction involving the Company and one or more Persons included within the Member Group which could otherwise be a violation of the Member Duties shall not be a violation if: (i) such Member notifies the Board of Managers or other Member, as applicable, of the potential violation; (ii) the terms of the applicable act or transaction are substantively fair to the Company; and (iii) a majority of the disinterested Managers or a majority of the disinterested Members, as applicable, approve such act or transaction after full disclosure of all material facts as requested by the approving Managers or Members.  All such acts and transactions shall be on commercially reasonable terms, and when so conducted and determined in accordance with this Section 4.10, shall be deemed to satisfy the Member's Duties.

9

4.10.2   No Member in any way guarantees the return of any Member's Capital Contributions or a profit for the Members from the operations of the Company.  Except as otherwise required under non-waivable provisions of the Act, no Member shall be personally liable to the Company or to any other Member for any loss or damage sustained by the Company, or any other Member, unless the loss or damage shall have been the result of grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

**4.11   Class P Member Option to Purchase**.  Upon termination without cause or failure of the Company to renew for any reason, and on substantially similar terms, the Professional Services Agreement (as defined in Section 5.4.5(iv)) and/or the MMSA (as defined in Section 5.4.5(vi)), the Class P Member shall have the option for a period of one hundred and eighty (180) days  to purchase all (but no less than all) of the Membership Interest of the Class H Member (the "**Option Percentage Interest**") for a fair market value purchase price (the "**Class P Member Option**").  Following such one hundred and eighty (180) day period, the Class P Member Option shall expire.  If the Class P Member intends to exercise the Class P Member Option, the Class P Member shall send written notice thereof (an "**Option Notice**") to the Class H Member specifying the proposed purchase price to be paid for the Option Percentage Interest. In response to the Option Notice, the Class H Member may either (a) accept the proposed purchase price or (b) within ninety (90) daysrequest a fair market review of the proposed purchase price for the Option Percentage Interest determined in accordance with the process described Section 10.6 (in which case the fair market value of the Option Percentage Interest shall be established as provided in such section).  On the closing date, all documents conveying the Option Percentage Interest to the Class P Member shall be delivered against payment (in full) in cash of the purchase price thereof.

## ARTICLE V
## MANAGEMENT OF COMPANY

**5.1   Board of Managers; General Powers**.  The business and affairs of the Company shall be directed and managed by its Board of Managers.  The Board of Managers shall, subject to the authority of the Members as expressly set forth in this Agreement or required by non-waivable provisions of the Act, have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the business of the Company, including determining, making, approving or authorizing all determinations, decisions, approvals, and actions affecting the Company and its business and affairs.  The Board of Managers may, by written agreement, delegate certain of the day-to-day management activities to a third-party, provided that (i) the Board retains ultimate authority over the Company and (ii) such third party's activities are subject to the rights reserved to the Class H Member under Section 4.9.

In carrying out its management of the Company, the Board shall have a duty to govern the Company for charitable purposes following the community benefit standard as promulgated and interpretedby the Internal Revenue Service, including, without limitation, causing the Company to provide treatment of patients receiving medical benefits or assistance under any federal health care program in a nondiscriminatory manner, and providing charity care pursuant to a charity care policy adopted and maintained by the Board.  The Board shall cause the

Company to review and monitor on a regular basis the Company's provision of charity care and the Company's participation in other programs, activities and services that provide benefits to the community. The Board shall also assure that the Company's charity care policy is (1) consistent with the charity care policy of the Class H Member as it applies to its outpatient facilities, as the same may be amended from time to time, and (2) prominently displayed in the Company's facilities and disclosed to patients of the Company.

**5.2** **Number, Tenure and Qualifications**. The Board of Managers shall consist of an equal number of managers to be appointed by each of the Class H Member and the Class P Member. The initial Board of Managers shall consist of four (4) managers (the "Managers") to be appointed as follows: two (2) Managers to be appointed by the Class H Member (the "Class H Managers") and two (2) Managers to be appointed by the Class P Member (the "Class P Managers"). The initial Class H Managers and the initial Class P Managers are set forth on Exhibit 5.2 attached hereto. The size of the Board of Managers may be increased or decreased from time to time by approval of the Members but shall always have an equal number of representatives of each the Class H Member and the Class P Member. The Board of Managers shall amend Exhibit 5.2 from time to time to set forth the names of the then current Managers.

5.2.1    Each Class H Manager and Class P Manager shall hold office until such time as his/her successor is duly appointed and qualified or until his or her earlier death, resignation or removal.

5.2.2    A Manager appointed by a Member may be removed, with or without cause, and the vacancy may be filled, by such Member at any time.

5.2.3    Any Manager may resign at any time by providing written notice to the Board of Managers stating the effective date of such resignation and the vacancy shall be filled by the Member who appointed the Manager.

**5.3** **Limitation on Power To Bind the Company**. Unless authorized to do so by this Agreement or by the Board of Managers pursuant to the terms of this Article V, no Member, Manager, Officer, employee or other agent of the Company shall have any authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. Any Member, Manager, Officer, employee or other agent who takes any action or binds the Company in violation of this Section 5.3 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to the loss or expense.

**5.4** **Quorum; Voting Requirements**. At any meeting of the Board of Managers, a quorum for the transaction of business at such meeting shall consist of no fewer than a majority of the Managers; provided, however, that (a) at least one (1) Class H Manager and one (1) Class P Manager is present at the meeting, and (b) if a quorum is not achieved at a meeting of the Board of Managers due to the failure of a particular Class to have a Manager present at the meeting and, after appropriate notice, a quorum is not achieved at a second meeting due to the failure of the same Class to have at least one (1) Manager present, then the Board of Managers shall be deemed Deadlocked with respect to the issues to be raised at such meeting of the Board of Managers that a quorum cannot be obtained. If less than a quorum of the Board of Managers is present at a meeting, the Managers present shall adjourn the meeting to a different time.

5.4.1    Managers may participate in any meeting of the Board of Managers through the use of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Participation in a meeting by such means shall be deemed equivalent to attendance in person at the meeting.

5.4.2    Except as otherwise expressly provided in this Agreement, all determinations, decisions, approvals, and actions affecting the Company or its business and affairs shall be determined, made or approved by the affirmative vote of a majority of the Managers present at a meeting at which a quorum is present which includes the affirmative vote of at least one (1) Class H Manager and one (1) Class P Manager; provided, however, that the Manager or Managers not permitted to vote on a matter pursuant to this Agreement shall not be counted in determining the quorum or decision of the Board of Managers.

5.4.3    Determinations, decisions, approvals and actions required of the Board of Managers shall include, without limitation, the following (subject to any requirement of Member approval under this Agreement):

(i)    any calls for Additional Capital Contributions pursuant to Section 7.2;

(ii)    approval of any material expansion of services provided at the Facility;

(iii)    approval of leases of equipment in excess of $50,000 or leases of space;

(iv)    approval of  annual operating and capital budgets and any strategic plans;

(v)    approval of the incurrence of debt obligations by the Company in excess of Twenty-Five Thousand Dollars ($25,000);

(vi)    approval of any unbudgeted capital expenditures (individually or in the aggregate) in excess of One Hundred Thousand Dollars ($100,000);

(vii)    approval of unbudgeted operating expenditures or commitments in excess of Fifty Thousand Dollars ($50,000);

(viii)    approval of the terms of material contracts, including any management or similar agreement for operation of the Facility and all contracts with Affiliates of the Members, subject to appropriate conflict of interest provisions;

(ix)    approval of the hiring and termination of the Executive Director and medical director for the Facility;

(x)     decisions relating to the Lease Agreement dated June 26, 2009, between UDM, LLC, as landlord (the "Landlord") and RMS, as tenant, assigned to the Company pursuant to that certain Landlord Consent to Assignment of Lease, by and among, the Landlord, RMS and the Company, effective as of October 1, 2012;

(xi)    approval of any modifications of amendments to the Available Cash Flow Distribution Policy; and

(xii)   any other matter requiring approval of the Board of Managers pursuant to this Agreement.

5.4.4    A Manager shall be permitted to vote with respect to any matter in which he or she, or any one (1) or more individuals or entities in his or her Management Group, has a financial interest except as follows:

(i)     As otherwise required by non-waivable provisions of applicable law;

(ii)    As otherwise expressly provided in this Agreement;

(iii)   Regarding a material issue on a contract between the Company and such Manager or any one (1) or more individuals or entities in his or her Management Group, (e.g., amendment, termination for cause, compensation, indemnity, performance standards, etc.);and

(iv)    A determination that an Event of Disqualification has occurred with respect to a Member.

5.4.5    Notwithstanding any other provision of this Section 5.4, the Class P Managers shall recuse themselves from voting on the following matters (with a quorum for the transaction of such business to consist of no fewer than all of the Class H Managers and approval of a matter shall be made by the affirmative vote of all of the Class H Managers):

(i)     decisions relating to the Professional Services Agreement dated October 1, 2012, between the Company and RMS (the "Professional Services Agreement"), including, without limitation, any amendments or renewals thereto or termination thereof in accordance with the terms of the Professional Services Agreement or enforcement of the Company's rights thereunder;

(ii)    decisions relating to the Management and Medical Director Services Agreement datedOctober 1, 2012, between the Company and RMS (the "MMSA"), including, without limitation, any amendments or renewals thereto or termination thereof in accordance with the terms of the MMSA or enforcement of the Company's rights thereunder;

(iii)   decisions relating to the Billing Services Agreement dated October 1, 2012 between the Company and RMS (the "Billing Agreement"), including,

without limitation, any amendments or renewals thereto or termination thereof in accordance with the terms of the Billing Agreement or enforcement of the Company's rights thereunder; and

(iv)   enforcement by the Company of a Physician Confidentiality and Noncompetition Agreement between the Company and a RMSH Physician described in Section 13.3.

In connection with any of the foregoing matters, the Class P Managers shall be given notice of a meeting to discuss the matters identified in this Section 5.4.5 and shall be allowed to participate in the discussion of any such matters.

5.4.6    At all meetings of the Managers, a Manager entitled to vote on a matter may vote its interest through a proxy executed in writing by Manager. Each proxy shall be filed with the Company before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

**5.5    Meetings**. Meetings of the Board of Managers shall be held on the dates and at the times and places determined by the Board of Managers from time to time. The Managers may provide, by resolution, the time and place, either within or outside of the State of Iowa for the holding of additional regular meetings without other notice than such resolution.

5.5.1    Special meetings of the Board of Managers may be called by or at the request of any two (2) or more Managers.

5.5.2    The Board of Managers may designate any place, either within or outside the State of Iowa, as the place of meeting for any meeting of the Board of Managers. If no such designation is made, the place of meeting shall be the principal place of business of the Company in the State of Iowa.

5.5.3    Each Manager may participate in a meeting of the Board of Managers by conference call or similar communications equipment that enables all participating persons to hear each other. Such participation shall constitute presence in person at such meeting. In addition, any Manager shall be permitted to invite any other person to attend a meeting of the Board of Managers for purposes of discussing or conducting business matters.

5.5.4    Notice of any meeting of the Board of Managers shall be given at least three (3) Business Days previous thereto by written notice to each Manager at his or her business address or by personal delivery to such Manager. Such notice shall state the purpose or purposes of the meeting. If mailed, such notice shall be deemed to be delivered three (3) Business Days after deposited in the United States mail so addressed, with postage thereon prepaid. If notice is given by personal delivery or by overnight courier, such notice shall be deemed to be delivered when delivered to the Manager or to the business address of the applicable Manager, as reflected in the Company's records. If notice is given by facsimile, such notice shall be deemed effective when a transmission report is generated by the sender's facsimile machine indicating all pages of the notice were transmitted successfully to the facsimile number of the applicable Manager, as

reflected in the Company's records, and the original documents are mailed consistent with the method for mailing notices provided in this Section 5.5.4. In each case, a courtesy copy of such formal notice shall be provided by email to each Manager at the email address reflected in the Company's records. The attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened.

**5.6      Action by Managers without a Meeting**. Action required or permitted to be taken at a meeting of the Board of Managers may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by the number of Managers required to approve the applicable action, delivered to the Company for inclusion in the minutes or for filing with the Company records. Action taken under this Section 5.6 is effective when the required number of Managers have signed the consent, unless the consent specifies a different effective date.

**5.7      Deadlock**. If the Board of Managers is Deadlocked on an issue (including, but not limited to, a Deadlock caused by lack of a quorum of the Board of Managers), and the Deadlock remains unresolved after a period of thirty (30) days (or such shorter period designated by either Class of Managers due to time constraints relevant to the specific Deadlock), then the dispute resolution process pursuant to Section 11.2 shall be invoked.

**5.8      Committees.**

5.8.1      The Board of Managers may create one or more committees to assist, or exercise appropriate authority of, the Board of Managers. Except as otherwise provided in the resolution of the Board of Managers creating such committee, no committee shall have authority to bind the Company. All committees shall be subject to supervision and direction by the Board of Managers.

5.8.2      All provisions of Sections 5.4 through 5.7 regarding procedure shall apply to meetings of committees except as otherwise provided by the Board of Managers. Except as otherwise provided in this Agreement or by the Board of Managers, all determinations, decisions, approvals and actions of a committee shall be made by affirmative vote of a majority of the members of the applicable committee then in office.

**5.9      Managers' and Officers' Duties and Liability; Transactions with Related Parties**.

5.9.1      Each Manager and each Officer shall owe the Company only the duties of loyalty and care and the obligation of good faith and fair dealing as required in non-waivable provisions of the Act, to be interpreted in accordance with the disclosure and voting procedures set forth in this Section 5.9 ("Management Duties"). No Manager or Officer shall be required to participate in the Company as his or her sole and exclusive function. Each Manager or Officer may have other business interests and may engage in other activities in addition to those relating to the Company, except as expressly prohibited pursuant to this Agreement, including all schedules and exhibits, or any other agreement entered into by such Manager or Officer; neither the Company, nor any Manager or Officer shall have any right, by virtue of this Agreement or his or her

management position in the Company, to share or participate in the other Manager's or Officer's other business interests and activities, or to the income or proceeds derived therefrom. Each Manager and Officer understands that the conduct of the business of the Company may involve business dealings and undertakings with Managers, Officers and/or entities with whom such Manager or Officer has a financial interest (individually or collectively, "Management Group"). An act or transaction involving the Company and any one or more Managers, Officers and/or Persons included within the Management Group which could otherwise be in violation of the Management Duties shall not be a violation if: (i) such Manager or Officer notifies the Board of the potential violation; (ii) the terms of the applicable act or transaction are substantively fair to the Company; and (iii) a majority of the disinterested Managers or a majority of the disinterested Members, as applicable, approve such act or transaction after full disclosure of all material facts as requested by the approving Managers or Members. All such acts or transactions shall be on commercially reasonable terms, and when so conducted and determined in accordance with this Section 5.9, shall be deemed to satisfy the Management Duties.

5.9.2    No Manager or Officer in any way guarantees the return of any Member's Capital Contributions or a profit for the Members from the operations of the Company. Except as otherwise required under non-waivable provisions of the Act, no Manager or Officer shall be personally liable to the Company, to any other Member, or to any other Manager for any loss or damage sustained by the Company, or any other Member or Manager, unless the loss or damage shall have been the result of grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

**5.10    Indemnification**.

5.10.1    Actions By Third Parties.  The Company shall indemnify each Manager and each of its Officers, and may indemnify any other Person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company), by reason of the fact that the Person is or was a Manager, committee member, Officer, employee, or agent of the Company, or who is or was serving at the request of the Companyas a director, manager, employee, or agent of another Company, corporation, partnership, joint venture, trust, or, other enterprise, against expenses (including, without limitation, attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the Person in connection with the action, suit or proceeding, if the Person acted in good faith and in a manner the Person reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe the Person's conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the Person did not act in good faith and in a manner that the Person reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or proceeding, that the Person had reasonable cause to believe that the Person's conduct was unlawful.

5.10.2    Actions By the Company.  The Company shall indemnify each Manager and each of the Company's Officers, and may indemnify any other Person who was or is

a party, or is threatened to be, made a party, to any threatened, pending, or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that the Person is or was a Manager, committee member, Officer, employee, or agent of the Company, or is or was serving at the request of the Company as a director, manager, employee, or agent of another company, corporation, partnership, joint venture, trust, or other enterprise, against expenses (including, without limitation, attorney's fees) actually and reasonably incurred by the Person in connection with the defense or settlement of the action or suit, if the Person acted in good faith and in a manner the Person reasonably believed to be in, or not opposed to, the best interests of the Company, provided that no indemnification shall be made in respect of any claim, issue, or matter as to which the Person shall have been adjudged to be liable for gross negligence or misconduct in the performance of the Person's duty to the Company, unless, and only to the extent that, the court in which the action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, the Person is fairly and reasonably entitled to indemnity for those expenses as the court shall deem proper.

5.10.3    Costs of Defense.  To the extent that a Manager, Officer, or any other Person entitled to indemnification pursuant to Section 5.10.1 or Section 5.10.2 has been successful, on the merits or otherwise, in the defense of any action, suit or proceeding referred to in Section 5.10.1 or Section 5.10.2, or in defense of any claim, issue or matter therein, the Person shall be indemnified against expenses (including, without limitation, attorney's fees) actually and reasonably incurred by the Person in connection therewith.

5.10.4    Specific Authority.  Any indemnification under Section 5.10.1 or Section 5.10.2 (unless ordered by a court) shall be made by the Company only as authorized in the specific case, upon a determination that indemnification of the Manager, Officer, or other Person entitled in indemnification pursuant Section 5.10.1 or Section 5.10.2 is proper in the circumstances because the Person has met the applicable standard of conduct set forth in Section 5.10.1 or Section 5.10.2.  The determination shall be made (i) by a majority of the Managers who are not parties to the action, suit, or proceeding, or (ii) if such a majority is not obtainable, or if a majority of Managers who are not parties to the action, suit or proceeding so directs, by independent legal counsel in a written opinion, or (iii) bya Majority in Interest of the Members, or (iv) by a court of competent jurisdiction.

5.10.5    Expenses in Pending Actions.  Expenses incurred in defending a civil or criminal action, suit or proceeding may be paid by the Company in advance of the final disposition of the action, suit, or proceeding, as authorized by the Board of Managers, Members or court in the specific case, upon receipt of an undertaking by or on behalf of the Manager, Officer, or other Person to repay that amount, unless it shall ultimately be determined that the Person is entitled to be indemnified by the Company as authorized in this Section 5.10.

5.10.6    Indemnification Not Exclusive Remedy.  The indemnification provided by this Section 5.10 shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any agreement, vote of Members, or otherwise, both as to action in the Person's official capacity and as to action in another

EXHIBIT A

capacity while holding office, and shall continue as to a Person who has ceased to be a Manager, Officer, or other Person entitled in indemnification pursuant to Section 5.10.1 or Section 5.10.2, and shall inure to the benefit of the heirs, executors, and administrators of the Person.

5.10.7   Insurance.  Unless otherwise determined by the Board of Managers, the Company shall purchase and maintain insurance on behalf of any Person who is or was a Manager, Officer, or other Person who may be entitled to indemnification pursuant to Section 5.10.1 or Section 5.10.2 or who is or was serving at the request of the Company as a manager, director, employee, or agent of another limited liability company, corporation, partnership, joint venture, or other enterprise, against any liability asserted against the Person and incurred by the Person in any capacity, or arising out of the Person's status as such, whether or not the Company would have the power to indemnify the Person against the liability under the provisions of this Section 5.10.

5.10.8   Definitions.  For purposes of this Section 5.10, references to the "other enterprises" shall include, without limitation, employee benefit plans; references to "fines" shall include, without limitation, any excise taxes assessed on a Person with respect to an employee benefit plan; and references to "serving at the request of the Company" shall include, without limitation, any service as a Manager, employee, or agent of the Company that imposes duties on, or involves services by the Manager, employee, or agent with respect to an employee benefit plan, its participants, or beneficiaries.  A Person who acted in good faith and in a manner the Person reasonably believed to be in the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Company" as referred to in this Section 5.10.

## ARTICLE VI
## OFFICERS AND ADMINISTRATIVE SERVICES

**6.1**   **Officers**.  The officers of the Company (the "Officers") shall be a Chairperson and a Vice-Chairperson and such other officers as may be elected or appointed by the Board of Managers from time to time.  The offices of Chairperson and Vice-Chairperson shall not be held by the same person and shall also be held by a member of the Board of Managers as specified in Section 6.2.

**6.2**   **Election and Term of Office**.  The Officers shall be elected by the affirmative vote of the majority of the Board of Managers.  The Officers shall serve for a term of one (1) year, except that, with respect to all Officers, (i) an Officer elected to fill a vacancy for a partial term shall serve the remaining term of his or her predecessor; and (ii) each Officer shall hold office until his or her successor shall have been duly elected and shall have qualified or until his or her death or until he or she shall resign or shall have been removed in the manner hereinafter provided.  Vacancies may be filled or new offices created and filled by the Board of Managers. Election of an Officer shall not of itself create contract rights.

**6.3**   **Removal**.  Any Officer may be removed by the Board of Managers with or without cause whenever in their judgment the best interest of the Company would be served thereby, but such removal shall be without prejudice to the contract rights (if any) of the Officer

so removed.  Any Officer may also be removed from his or her office by the Class H Member if required pursuant to an action taken under Section 4.9.

6.4 **Other Officers and Agents**.  Officers, assistant Officers, and agents, if any, other than those whose duties are provided for in this Agreement, shall have such authority and perform such duties as may from time to time be prescribed by resolution of the Board of Managers.

6.5 **Direction By the Board of Managers**.  All Officers shall be subject to direction by the Board of Managers, subject to the provisions of this Agreement.

6.6 **Absence or Disability of Officers**.  In the case of the absence or disability of any Officer of the Company and of any Person hereby authorized to act in such Officer's place during such officer's absence or disability, the Board of Managers may by resolution delegate the powers and duties of such Officer to any other Officer or to any Manager, or to any other Person whom it may select.

6.7 **Compensation and Reimbursement**.  The Officers shall not be entitled to any compensation except for reimbursement for reasonable expenses incurred in connection with his or her service as an Officer, subject to such policies and procedures as adopted from time to time by the Board of Managers.

**ARTICLE VII**
**CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS**

7.1 **Members' Initial Capital Contributions**.  In order to provide the Company with necessary working capital, each Member shall be required to make an initial capital contribution in an amount commensurate with its ownership interest in the Company (the "Initial Capital Contribution").  The Class H Member shall make an Initial Capital Contribution, and in consideration therefore the Class H Member shall receive the Percentage Interest as set forth on Exhibit 4.1-A.  The Class P Member shall make an Initial Capital Contribution, and in consideration therefore the Class P Member shall receive the Percentage Interest as set forth on Exhibit 4.1-B.

7.2 **Additional Capital Contributions**.

7.2.1 No Member shall be required to make additional capital contributions to the Company unless such contributions are approved pursuant to and in accordance with this Section 7.2 and Section 4.8.  Each Member may contribute to the Company at such times as are approved by all of the Members pursuant to Section 4.8 its proportionate share of any additional capital contributions ("Additional Capital Contributions").  For purposes of this Section 7.2.1, a Member's proportionate share of an Additional Capital Contribution at any time shall be based on the Percentage Interest of such Member at the time such Additional Capital Contribution is approved by all of the Members.

7.2.2 Additional Capital Contributions shall result in the parties receiving additional equity in such amounts as approved by all of the Members.  The manner, time of payment, Percentage Interest and Capital Contribution shall be as set forth in a resolution approved by all of the Members. An Additional Capital Contribution made by

a Member shall be reflected in the Member's Capital Account, and <u>Exhibit 4.1-A</u> or <u>Exhibit 4.1-B</u>, as applicable, shall be revised to reflect the Percentage Interest held by such Member.

**7.3    Capital Accounts**.

7.3.1    A separate Capital Account shall be maintained for each Member.

7.3.2    Each Member's Capital Account shall be increased by (i) the amount of money contributed by such Member to the Company, including any Additional Capital Contributions; (ii) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752); and (iii) allocations of Profits to such Member.

7.3.3    Each Member's Capital Account shall be decreased by (i) the amount of money distributed to such Member by the Company; (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752); and (iii) allocations to such Member of Losses; (iv) allocations to such Member of expenditures described in Code Section 705(a)(2)(B).

7.3.4    In the event of a permitted sale or exchange of a Membership Interest or an Economic Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest or Economic Interest in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

7.3.5    The manner in which Capital Accounts are to be maintained pursuant to this Section 7.3 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Board of Managers determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 7.3.5 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 7.3, the method in which Capital Accounts are maintained shall be so modified; <u>provided,</u> <u>however,</u> that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in this Agreement.

7.3.6    The book value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of the following times:  (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) shall be made only if the Board of Managers reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members.

7.3.7    No Member shall have any liability to restore all or any portion of a deficit balance in such Member's Capital Account.

7.3.8    All Capital Contributions shall be in the form of cash or immediately available funds, unless the Board of Managers approves the Company's acceptance of Capital Contributions in a form other than cash.

7.3.9    In the event that Company property is reflected on the books of the Company at a book value that differs from the adjusted tax basis of such property, the Capital Accounts of the Members shall be adjusted according to each Member's allocable share of depreciation, depletion, amortization and gain or loss as computed for book value purposes with respect to such property in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g).

## ARTICLE VIII
## ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS

**8.1    Allocations of Profits and Losses from Operations**.  After giving effect to the special allocations set forth in Section 8.2, the Profits and Losses of the Company for each Fiscal Period shall be allocated to the Members based upon the Percentage Interests of the respective Members immediately prior to such allocation.

**8.2    Special Allocations to Capital Accounts**.  Notwithstanding Section 8.1 hereof:

8.2.1    No allocations of Loss shall be charged to the Capital Account of any Member if such allocation would cause such Member to have a Deficit Capital Account. The amount of the Loss which would have caused a Member to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to their respective Capital Contributions, or, if no such Members exist, then to the Members in accordance with Section 8.1.

8.2.2    In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member, then items of Company income and gain (consisting of a pro rata portion of each item of income, including, without limitation, gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible.  It is the intent that this Section 8.2.2 be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

8.2.3    In the event any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Treasury Regulations (which is also treated as an obligation to

restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations), the Capital Account of such Member shall be specially credited with items of Membership income (including, without limitation, gross income) and gain in the amount of such excess as quickly as possible.

8.2.4    Notwithstanding any other provision of this Section 8.2, if there is a net decrease in the Company's minimum gain as defined in Treasury Regulation Section 1.704-2(d) during a taxable year of the Company, then the Capital Account of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in the Company's minimum gain. This Section 8.2.4 is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in minimum gain, and the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may in their discretion (and shall, if requested to do so by a Member) seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Treasury Regulation Section 1.704-2(f)(4).

8.2.5    Losses that are attributable to any nonrecourse debt of the Company and are characterized as partner (Member) nonrecourse deductions under Section 1.704-2(i) of the Treasury Regulations shall be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

8.2.6    Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in accordance with their respective Percentage Interests.

8.2.7    In accordance with Code Section 704(c)(1)(A) and Treasury Regulations Sections 1.704-1(b)(2) or 1.704-3, if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, then income, gain, loss and deductions with respect to the property shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution using the "traditional method" without curative allocations method set forth under Treasury Regulations under Code Section 704, unless the Board of Managers designates a different method to be used. The Board of Managers shall have the sole authority to designate a different method to be used.

8.2.8    In connection with a Capital Contribution of money or other property (other than a *de minimis* amount) by a new or existing Member as consideration for a Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a *de minimis* amount) by the Company or a distribution of money or other property (other than a *de minimis* amount) by the Company to a retiring Member (as consideration for a Membership Interest), the Capital Accounts of the Members shall be adjusted to reflect a revaluation of property of

the Company (including, without limitation, intangible assets) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f). If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under Code Section 704(c).

8.2.9    Any credit or charge to the Capital Accounts of the Members pursuant to Sections 8.2.1, 8.2.2, 8.2.3, and/or 8.2.4, hereof shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 8.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Section 8.1 shall, to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Article VIII if the special allocations required by Section 8.2.1, 8.2.2, 8.2.3, and/or 8.2.4 had not occurred.

8.2.10    After all allocations for a taxable year are made, Capital Accounts shall be adjusted by the Company to the extent necessary to comply with applicable laws, regulations and administrative pronouncements.    The allocation provisions of this Agreement are intended to produce final Capital Account balances that are at levels ("Target Final Balances") which permit liquidating distributions that are made in accordance with such final Capital Account balances to be equal to the distributions that would occur under Section 8.3.3 hereof if all of the assets of the Company were sold and liquidating proceeds were distributed pursuant to such Section 8.3.3. To the extent that the allocation provisions of this Agreement would not produce the Target Final Balances, the Members agree to take such actions as are necessary to amend such allocation provisions to produce such Target Final Balances. Notwithstanding the other provisions of this Agreement, allocations of income, gain, loss and deduction (including items of gross income, gain, loss and deduction) shall be made prospectively as necessary to produce such Target Final Balances (and, to the extent such prospective allocations would not effect such result, the prior tax returns of the Company shall be amended to reallocate items of gross income, gain, loss and deductions to produce such Target Final Balances).

## 8.3    Distributions.

8.3.1    Except as otherwise expressly provided in this Agreement or as required by non-waivable provisions of the Act, a Member has no right to demand and receive any distribution in a form other than cash.

8.3.2    Except as provided in Section 8.4, the Company shall distribute Available Cash Flow in accordance with the Available Cash Flow Distribution Policy. A copy of the initial Available Cash Flow Distribution Policy is attached hereto as Exhibit 8.3.2 and may be amended or modified from time to time as approved by the Board of Managers. Notwithstanding the foregoing, if any Member is allocated Profits (the

"Income Allocation"), then, to the extent the Board of Managers determines that cash is available to the Company, such Member shall be entitled to receive a distribution in an amount equal to the Income Allocation multiplied by the combined maximum individual federal and state income tax rates as if such Member were an individual (reduced to reflect the maximum individual federal tax benefit from the deduction of state income taxes) ("Minimum Distribution"). The Minimum Distribution shall be payable before any other distributions under this Section 8.3.2. Any Minimum Distribution received by a Member shall be credited against or reduce the amount of distributions that such Member shall be entitled to receive under this Section 8.3.2.

8.3.3    All distributions (other than pursuant to Section 12.2) shall be made to the Members *pro rata* in proportion to their respective Percentage Interests on the record date of such distribution. All amounts withheld pursuant to the Code or any provisions of state or local tax law with respect to any payment or distribution to the Members from the Company shall be treated as amounts distributed to the relevant Member or Members pursuant to this Section 8.3.

**8.4    Limitation upon Distributions.**

8.4.1    Notwithstanding any terms of this Agreement, no distributions or return of contributions shall be made and paid if, after the distribution or return of distribution is made, either:

(i)    the Company would be insolvent; or

(ii)    the net assets of the Company would be less than zero.

8.4.2    A determination regarding a distribution or return of contribution may be made under Section 8.4.1 in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the Person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

8.4.3    The net cash proceeds resulting from any financing or the refinancing of any loan secured by property of the Company or from any voluntary or involuntary conversion of the Company's property (other than the sale, exchange or other disposition of all or substantially all of the Company's property) or from casualty insurance proceeds or condemnation awards shall be applied to any reasonably necessary restoration or repair of such property or replacement of such property by purchase or lease, to the repayment of any loan secured by such property, and to reasonable reserves for working capital. The balance of such net cash proceeds shall be treated as provided in Section 8.3.

8.4.4    Notwithstanding any other provision of this Agreement to the contrary, all amounts received by the Company as a refund of taxes paid as a result of the tax-exempt status of the Class H Member or an Affiliate of the Class H Member or another tax-exempt entity that is a Member (or direct or indirect owner of a Member), shall be paid to such Class H Member or such Affiliate of the Class H Member, Member or owner within ten (10) days of the receipt of the refund. Any distribution under this Section shall not reduce the distributions to the Class H Member under any other Section of this

Agreement. Any taxable income resulting pursuant to this Section shall be allocated one hundred percent (100%) to the Class H Member. Any expense attributable to accounting for and preparation and filing of the refund request for tax paid by the Company shall be economically borne by and allocated to the Class H Member. The allocations and distributions set forth in this Section are intended to maintain Capital Accounts in proportion to the Percentage Interests held by the Members and shall be interpreted consistently with such intent. For those situations where there is a reduction of taxes paid as a result of the tax-exempt status of a direct or indirect Member or direct or indirect owner of a Member (instead of a tax refund), distributions and allocations of income and expense directly related to such tax reduction will be made in a manner consistent with this Section.

**8.5    Interest on and Return of Capital Contributions**. No Member shall be entitled to interest on its Capital Contribution or to return of its Capital Contribution.

**8.6    Loans to Company**. Subject to any requirement of Member approval under this Agreement, nothing in this Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

**8.7    Accounting Period**. The accounting period (the fiscal year) of the Company shall be from January 1 to December 31 (the "Fiscal Period").

**8.8    Records, Audits and Reports**.

8.8.1    At the expense of the Company, the Board of Managers or other Person appointed by the Board of Managers as the custodian of records shall maintain, in accordance with GAAP, records and accounts of the operations and expenditures of the Company. Except as otherwise determined by the Board of Managers, such records shall be kept at the principal place of business of the Company. Each Member shall have access to all reports, accounting information, and other business records of the Company appropriate to allow such Member to undertake financial audit and review services as required or requested by its internal and external auditors and/or financial policies.

8.8.2    Upon reasonable written request, each Member or its duly authorized representative, shall have the right, at a time during ordinary business hours, as reasonably determined by the Board of Managers, to inspect and copy, at the requesting Member's expense, the documents required to be provided under the Act and such other documents which the Board of Managers, in its discretion, deem appropriate. Such access shall be subject to such reasonable standards as established from time to time by the Board of Managers. Each Member shall reimburse the Company for all reasonable costs and expenses incurred by the Company in connection with such Member's (or his, her or its duly authorized representative's) inspection and copying of books and records.

8.8.3    The Company, at its expense, shall engage an independent accounting firm to conduct (i) a financial statements review of the Company, including those processes and procedures as determined by the Board of Managers, on an annual basis, and (ii) an audit of the Company every three (3) years. In addition, each Member, upon reasonable notice to the Company, shall have the right to initiate financial audits or reviews upon a reasonable showing to the Company that such financial audit or review is

necessary for such Member to meet its overall financial audit or review obligations, and if such audit or review results in a material adjustment to the financial statements of the Company, such Member shall be entitled to the reasonable costs and fees incurred in undertaking such financial audit or review. If an audit or review under this Section 8.8.3 does not result in a material adjustment to the financial statements of the Company, the Member initiating the audit or review shall reimburse the Company for the reasonable costs and fees incurred by the Company in cooperating with such financial audit or review.

**8.9     Returns and Other Elections**.   The Board of Managers shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business.  Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's Fiscal Period upon the Members' written request.  Except as otherwise provided for in this Agreement, all elections permitted to be made by the Company under federal or state laws shall be made by the Board of Managers in its sole discretion.

**8.10     Tax Matters Partner**.   The Class H Member is designated the "Tax Matters Partner" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the expense of the Company) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.  The Tax Matters Partner may be changed by the Board of Managers.  The Tax Matters Partner shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223.  The Tax Matters Partner shall inform each other Member of all significant matters that may come to its attention in its capacity as Tax Matters Partner by giving notice thereof within ten (10) days after becoming aware thereof and, within such time, shall forward to each other Member copies of all significant written communications it may receive in such capacity.  The Tax Matters Partner shall not have the right to extend the statute of limitations period and/or settle with the Internal Revenue Service without the approval of the Board of Managers.

**8.11     Allocations and Distributions to Economic Interest Holders**.   To the extent, if any, that an Economic Interest is owned by a Person who is not a Member, all allocations and distributions to which the Member who Transferred such Economic Interest would otherwise be entitled if not for the applicable Transfer shall be made to the Person owning the applicable Economic Interests previously owned by such Member.

### ARTICLE IX
### TRANSFERABILITY

**9.1     Prohibition on Transfers of Membership Interests**.   Except upon the express written approval by the Members pursuant to Section 4.8 or pursuant to the terms of Section 4.11, Section 9.2 or Article X, (i) no Member shall Transfer or purport to Transfer all or any portion of its Membership Interest (including, without limitation, an Economic Interest) and (ii) neither any Membership Interest nor any portion of any Membership Interest (including, without

limitation, an Economic Interest) shall be subject to Transfer, including, without limitation, as a result of bankruptcy, receivership, attachment, foreclosure or execution.

**9.2     Transfer to an Affiliate**.  Notwithstanding anything in this Agreement to the contrary, the Class H Member may at any time upon written notice to the Board of Managers, and without satisfying any of the requirements of this Article IX, Transfer all or a portion of its Membership Interest to: (i) any wholly-owned subsidiary or its parent; or (ii) any Affiliate where the Class H Member has control over the appointment of a majority of its board.

**9.3     Terms of Transfer**.  Notwithstanding any other provision of this Agreement, any transferee of a Membership Interest shall be bound by the provisions of this Agreement.  A transferee who is not a Member at the time of a Transfer shall be entitled only to the allocations of Profits and Losses and to distributions of Company assets attributable to the Membership Interest or portion thereof Transferred to him, her or it from and after the effective date of the Transfer; it being understood that such transferee shall not be entitled to the other rights of a Member until such time (if any) as such Person shall become a Substitute Member.  The effective date of a permitted Transfer shall be the last day of the month during which the Managers receive notice of any Transfer made pursuant to and in accordance with the provisions of this Article IX.  Notwithstanding the foregoing, the Company and the Board of Managers shall incur no liability for allocations and distributions made in good-faith to the transferring Member until the written instrument of Transfer has been received by the Board of Managers and recorded on the Company's books and the effective date of the permitted Transfer has passed.

**9.4     Substitute Member**.  The Transfer of a Membership Interest shall not cause the transferee to become a Member unless and until (a) such transferee executes such documents and instruments as the Board of Managers may reasonably request or as may be necessary or appropriate to confirm such transferee as a Member and such transferee's agreement to assume and be bound by all of the terms and provisions of this Agreement, and (b) the Members shall have approved such Transfer.  Any transferee so admitted shall be a "<u>Substitute Member</u>" hereunder.  A Substitute Member shall succeed to the Capital Account, Capital Contribution, rights, powers, restrictions, liabilities and obligations of the transferring Member.

**9.5     Conditions for Transfer**.  No Transfer under the provisions of this Article IX shall be permitted unless, in the opinion of counsel for the Company, such Transfer will not:

> 9.5.1     require registration under Section 5 of the Securities Act of 1933, as amended, or any applicable state securities laws;

> 9.5.2     to the best of such counsel's knowledge, violate any law or governmental rule or regulation of any federal, state or local government or governmental agency applicable to such Transfer;

> 9.5.3     cause the Company not to be deemed a limited liability company under the Act;

> 9.5.4     cause any Member to be subject to unlimited liability under the laws of the State of Iowa or of any other jurisdiction in which the Company is qualified to do business; or

9.5.5    affect the tax status of the Company as a partnership for federal or state income tax purposes.

The transferring Member shall give the Board of Managers notice that it wishes to make a Transfer together with sufficient information to allow Company's counsel to render its opinion that the proposed Transfer will not result in the consequences referred to in this Section 9.5.

**9.6    Transfer Costs**.  The transferor and transferee of a Membership Interest shall be jointly and severally obligated to reimburse the Company for all reasonable expenses (including reasonable attorneys' fees incurred by the Company) with respect to any Transfer of such Membership Interest.

**9.7    Prohibited Transfers Null and Void**.

9.7.1    Any Transfer or purported Transfer in violation of this Agreement shall be null and void.

9.7.2    If, for any reason, any Transfer or purported Transfer in violation of this Agreement is <u>not</u> null and void, the transferee shall have no right to participate in the affairs or business of the Company or to become a Member, but instead shall have only an Economic Interest to which the Transferring Member otherwise would be entitled. The Economic Interest of such a transferee shall be subject to all rights that the Company or any Member could assert with respect to the Economic Interest of the Transferring Member.

**9.8    Applicability to All Membership Interests**.  All Membership Interests and all portions thereof (including, without limitation, Economic Interests) shall be subject to the provisions of this Agreement.

**9.9    Sales to Third Parties**.  Subject to the prohibitions and requirements set forth in Section 9.1, Section 9.4 and elsewhere in this Agreement, if any Member (the "<u>Selling Member</u>") desires to sell all or any portion of its Membership Interest (the "<u>Offered Interest</u>"), the Selling Member must have received a *bona fide* offer in writing to purchase the Offered Interest (the "<u>Offer</u>") from a third party (the "<u>Buying Party</u>"), and the Selling Member shall promptly give the other Member (the "<u>Remaining Member</u>") written notice of such Offer, together with a copy of the Offer (the "<u>Offer Notice</u>").  The Remaining Member shall have the right, but not the obligation, for a period of sixty (60) days after receipt of the Offer Notice (the "<u>Option Period</u>") to purchase the entire Offered Interest in accordance with the terms and conditions of the Offer.  If the Remaining Member does not elect, within the Option Period, to exercise its option to purchase the Offered Interest, the Selling Member shall have the right to accept the Offer, but only in accordance with the provisions of the Offer and only if the transaction is consummated within one hundred twenty (120) days after the Remaining Member receives the Offer Notice from the Selling Member of the Offer.  In the event that such transaction is not consummated within one hundred twenty (120) days after the Remaining Member's Offer Notice, then the Selling Member must again comply with the provisions of this Section 9.9.

## ARTICLE X
## MEMBER DISQUALIFICATION AND WITHDRAWAL

**10.1    Withdrawal Events**.

10.1.1    The Membership Interest of any Member shall terminate, and such Member shall be dissociated from the Company (a "<u>Withdrawal Event</u>" or a "<u>Withdrawal</u>") if the Board reasonably and in good faith determines that an Event of Disqualification has occurred with respect to the Member.  The Member with respect to whom a Withdrawal Event occurs shall sometimes be referred to as a "<u>Withdrawing Member</u>."

10.1.2    For purposes of this Agreement, an "<u>Event of Disqualification</u>" shall mean, with respect to any Member, any of the following:

(i)    such Member (a) files a voluntary petition in bankruptcy or becomes the subject of an order for relief under the federal bankruptcy laws or (b) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Member all or any substantial part of its properties;

(ii)    the occurrence of any event making it unlawful to carry on the Company's business with such Member;

(iii)    the dissolution of the Member or the revocation of its charter and the continuation thereof beyond the last date such event may be corrected;

(iv)    such Member undergoes a Change of Control;

(v)    such Member's expulsion by judicial determination pursuant to the Act;

(vi)    any Transfer or purported Transfer of such Member's Economic Interest or Membership Interest other than as permitted by Article IX;

(vii)    any other material breach of this Agreement by such Member which is not cured within thirty (30) days after written notice by the Board of Managers to such Member;

(viii)    such Member is excluded or suspended from participation in any federally funded health care program, including Medicare and Medicaid; and

(ix)    such Member becoming subject to any judgment, indictment, settlement, civil monetary penalty, exclusion or conviction regarding false claims, fraud and abuse, fee-splitting or illegal kickbacks or referrals, which arise from the provision of medical services.

**10.2    Determination of Disqualification**.

10.2.1    Disqualification of a Member shall be determined by the Board at a special meeting of the Board.  Disqualification of a Member upon the occurrence of any

Event of Disqualification must be preceded by at least fifteen (15) days' notice to the Member of an intent to disqualify (which notice of intent may be given during any other cure period), together with citation to the provisions deemed applicable, and a statement of the grounds for disqualification.  Such notice shall state the effective date of the disqualification (which shall be deemed the "Withdrawal Date" for such Member).

10.2.2    Upon an Event of Disqualification of the Class P Member, the Company shall have the right to terminate any agreements entered into between the Company and the Class P Member; provided, however, that in such instance the Class H Member shall have sole decision-making authority on behalf of the Company regarding the termination of such agreements.If the Class P Member disputes the Company's determination that an Event of Disqualification of the Class P Member has occurred, then the Class P Member, within fifteen (15) business days of the receipt of Company's written notice of termination, may submit the question of whether an Event of Disqualification has occurred to arbitration in accordance with the arbitration procedures specified in Section 14.12 hereof and the agreements entered into between the Company and the Class P Member shall not be terminated by the Company unless and until the arbitrator(s) determine that an Event of Disqualification of the Class P Member has occurred. Notwithstanding the arbitration provisions of Section 14.12 hereof, the non-prevailing party in arbitration under this Section 10.2.2 shall bear the entire costs of the arbitration proceedings as well as attorney fees and other third party costs incurred by the prevailing party in connection therewith.

10.2.3    If the Class H Member disputes the Company's determination that an Event of Disqualification of the Class H Member has occurred, then the Class H Member, within fifteen (15) business days of the receipt of Company's written notice of termination, may submit the question of whether an Event of Disqualification has occurred to arbitration in accordance with the arbitration procedures specified in Section 14.12 hereof and the agreements entered into between the Company and the Class H Member shall not be terminated by the Company unless and until the arbitrator(s) determine that an Event of Disqualification of the Class H Member has occurred. Notwithstanding the arbitration provisions of Section 14.12 hereof, the non-prevailing party in arbitration under this Section 10.2.3 shall bear the entire costs of the arbitration proceedings as well as attorney fees and other third party costs incurred by the prevailing party in connection therewith.

**10.3    Obligations of Withdrawing Member Prior to Withdrawal**.  Withdrawal shall under no circumstances relieve the withdrawn Member from its obligations to fulfill its contractual obligations to the Company.

**10.4    Payment to Member for Percentage Interest Upon Disqualification or Withdrawal.**

10.4.1    Except as set forth herein below, if a Member is disqualified as a Member, the Membership Interest of any such Member shall be transferred to the Company and such Withdrawing Member shall be entitled to receive, within sixty (60) days following the Withdrawal Date with respect to such Member, a payment equal to the fair market value of the Member's Membership Interest (determined in accordance with

the process set forth in Section 10.6) (the "<u>Redemption Price</u>").   Notwithstanding anything in this Section 10.4 to the contrary, if any material adverse change shall have occurred with respect to the Company between the end of the preceding quarter and the applicable Withdrawal Date, as applicable, as a result of which the Capital Account was materially decreased, the Board may elect to calculate the cash payment due to a Withdrawing Member as of the Withdrawal Date.

10.4.2   In addition, the following limitations on the amount paid in connection with the disqualification or withdrawal of a Member shall apply:

(i)   The closing for a redemption or purchase pursuant to this Section shall occur on a date determined by mutual agreement of the Board of Managers and the Withdrawing Member, <u>provided</u>, <u>however</u>, that in the event the Board of Managers and Withdrawing Member are unable to agree, the closing date shall be ninety (90) days after the Withdrawal Date.   At the closing, the other purchasers (as applicable) and the Withdrawing Member or his or her representative shall execute such documents and instruments of conveyance as may be reasonably necessary or reasonably appropriate to confirm the redemption of the Withdrawing Member's interest, the withdrawal of the Withdrawing Member as a Member as of the Withdrawal Date and the obligations of the Members to make the payments set forth in this Article X; provided, however, the Company shall not require the Withdrawing Member to enter into any document or instrument of conveyance that requires such Member to (a) indemnify the Company, or (b) make any representations or warranties to the Company (except for representations and warranties relating to free and clear title and that the Withdrawing Member is in good standing, has the requisite authority to execute the document or instrument of conveyance and that any such document or instrument of conveyance is enforceable against the Withdrawing Member).

(ii)   The Redemption Price shall be payable in cash on the ninetieth (90th) day after the Withdrawal Date.

(iii)   Company shall be entitled to offset against the Redemption Price (and interest thereon) any amounts owed by the Withdrawing Member to the Company, including, without limitation, any amounts owed under this Agreement.

(iv)   The Company shall not (a) holdback any portion of the Redemption Price (except as provided in Section 10.4.2(iii)); or (b) require that the any portion of the Redemption Price be placed into escrow.

(v)   If at any time the Company becomes obligated to redeem a Membership Interest under this Agreement, then (i) under no circumstances shall the Company be required to redeem such Membership Interest to the extent that such redemption would be in violation of applicable law, and (ii) the Board of Managers shall take all appropriate measures in good-faith and to use their best efforts to accomplish such purchase in a manner not in violation of any applicable law.

10.4.3   Notwithstanding anything to the contrary, a Withdrawing Member subject to an expulsion vote shall abstain from all votes of Members or Board of Managers relating to its Withdrawal.

**10.5   Closure of Books Upon Withdrawal**.   Upon or after a Withdrawal Event, the Board of Managers may order an accounting by the Company's independent accountants of the accounts from the date of the last previous accounting until the applicable Withdrawal Date to adjust the Members' Capital Accounts in accordance with Article VII.

**10.6   Appraiser Process and Qualifications**.

10.6.1   In the event that a purchase or sale of assets of the assets of the Company is triggered pursuant to Section 4.11 or the purchase or sale of a Membership Interest is triggered pursuant to this Article X, the remaining Member shall engage an appraiser (the "Initial Appraiser") who meets the qualifications set forth below.  The Initial Appraiser shall complete his/her determination and shall provide such determination in writing to the Members within thirty (30) days following the provision of notice demanding purchase or sale of the Membership Interest.  If, within fifteen (15) days following receipt of the Initial Appraiser's written determination, the selling Member is not reasonably satisfied with the appraisal of the Initial Appraiser, the selling Member may engage an appraiser who meets the qualifications set forth below (the "Second Appraiser").  The Second Appraiser shall complete his/her determination and shall provide such determination in writing to the Members within thirty (30) days following the delivery of the Initial Appraiser's determination.  If the determinations of the Initial Appraiser and the Second Appraiser are within ten percent (10%) of each other, then the parties agree that the appraisal value shall be an average of the two appraiser's determinations.  If, on the other hand, there is more than a ten percent (10%) variance between the determinations of the two appraisers, then the two appraisers shall choose a third appraiser (the cost of whom shall be borne one-half by the selling Member and one-half by the other Member) who meets the qualifications set forth below.  The third appraiser shall provide his/her determination within thirty (30) days of engagement, and the parties agree that the appraisal value shall be an average of the determinations of the three appraisers.

10.6.2   Each appraiser shall be a certified public accountant or other financial professional who is independent of either Member, and who is qualified and experienced in the field of conducting valuations of and rendering opinions regarding the fair market value of ownership interests in health care joint ventures.   In making his or her determinations pursuant to this Section 10.6, each appraiser shall (a) act in good faith and in accordance with the applicable standards in the industry and (b) take into account, in addition to historical data, reasonable assumptions regarding future operations and cash flows of the Company.  If the Redemption Price as calculated above is a negative number, the Redemption Price shall be One Dollar ($1.00).  Each appraiser's written determination shall be accompanied by a written explanation of the data, assumptions and valuation methods relied upon by the appraiser in preparing such determinations.

EXHIBIT A

## ARTICLE XI
## DEADLOCK RESOLUTION

**11.1  Right to Purchase Assets**.  If a Deadlock occurs on a matter that requires unanimous approval of the Members (except a Tax-Exempt Matter that shall be resolved in accordance with Section 4.9.2) and such issue is not resolved in accordance with the dispute resolution process set forth in Section 11.2, then the Company shall be dissolved and its affairs wound up in accordance with Article XII; provided, however, either Member shall have the right to purchase the assets of the Company.  Within one hundred twenty (120) days following the date this Section 11.1 is triggered, each Member shall provide the other Member with a written offer, if any, to purchase the assets of the Company with a purchase price equal to or greater than (a) the fair market value of the assets of the Company, multiplied by (b) 1.20.  The Member with the higher offer ("Higher Offer") shall have forty-five (45) days to notify the other Member that it intends to purchase the assets of the Company in accordance with the terms of the Higher Offer.  If the Member with the Higher Offer does not so notify the other Member, such other Member shall purchase the assets of the Company in accordance with the terms of its lower offer.

**11.2  Dispute Resolution for Deadlock**.

11.2.1  The dispute resolution process described in this Section 11.2 may be invoked by any Member or Manager in the event of any Deadlock (including any Deadlock caused by lack of a quorum or arising out of a vote of the Board of Managers or vote of the Members).  This dispute resolution process shall be the only process applicable to seeking to resolve such a Deadlock and Section 14.12 shall not apply.  In addition, the dispute resolution process described in this Section 11.2 shall not apply with respect to the resolution of any Tax-Exempt Issue (which issue shall be resolved in accordance with the process set forth in Section 4.9.2).

11.2.2  If the dispute resolution process is invoked, representatives of the Members concerned will meet informally within seven (7) days after receipt of notice invoking the dispute resolution process to discuss the areas of disagreement and to negotiate in good faith regarding possible solutions.

11.2.3  If these informal discussions do not result in a resolution of the dispute, the Members will name a neutral mediator.  If the parties are unable to agree on a mediator within fourteen (14) days after receipt of notice invoking the dispute resolution process, the mediator will be selected in accordance with the alternative dispute resolution process established by the AHLA.  The mediator will have no authority to impose a resolution, but will work with the disputants to reach a mutually acceptable solution.  All parties involved in the dispute will give the mediator their full cooperation and will participate in good faith in all sessions convened by the mediator.

11.2.4  If the mediation process described in Section 11.2.3 above has not resolved the Deadlock on a material issue of the Board of Managers or the Members within thirty (30) days after receipt of notice invoking the dispute resolution process (the "Deadlock Resolution Period"), then the Company shall be dissolved and its affairs wound up in accordance with Article XII (provided, however, if the Deadlock is a result

of the failure of the Members to approve a matter that requires unanimous approval of the Members, Section 11.1 shall apply to such dissolution).

## ARTICLE XII
## DISSOLUTION AND TERMINATION

**12.1    Dissolution of the Company**.  The Company shall be dissolved and its affairs wound up upon the first of the following to occur:

12.1.1    a unanimous determination by the Members that the Company shall be dissolved;

12.1.2    the Members are unable to resolve a Deadlock in accordance with Section 11.2; or

12.1.3    At such earlier time as may be provided for by applicable law.

When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefore and all of the remaining property and assets of the Company have been distributed, articles of dissolution as required by the Act, shall be executed in duplicate by the Board of Managers and filed with the Iowa Secretary of State. When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefore and all of the remaining property and assets of Company have been distributed, articles of dissolution as required by the Act shall be executed in duplicate by the Board of Managers and filed with the Iowa Secretary of State.

**12.2    Winding Up, Liquidation and Distribution of Assets**.

12.2.1    Upon termination, the Company shall be liquidated in an orderly manner in accordance with this Section 12.2 and the Act.  The liquidation shall be conducted by the Board of Managers or its designee.  The Board of Managers or its designee when acting to conduct such liquidation shall be called the "Liquidating Trustee."  An accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.  The Board of Managers shall immediately proceed to wind up the affairs of the Company.

12.2.2    If the Company is dissolved and its affairs are to be wound up, the Liquidating Trustee shall, subject to the rights of the Members under Section 11.1:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Liquidating Trustee may determine to distribute any assets to the Members in kind);

(ii)    Allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' Capital Accounts in accordance with Article VII hereof;

(iii)    Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such reserves shall be deemed to be an expense of the Company); and

(iv)    distribute the remaining assets in the following order:

(1)    if any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal in accordance with Section 10.6 or by agreement of the applicable Members.  Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members shall be adjusted pursuant to the provisions of this Agreement to reflect such deemed sale; and

(2)    the positive balance (if any) of each Member's applicable Capital Account (as determined after taking into account all Capital Account adjustments for the taxable year during which the liquidation occurs) shall be distributed to the applicable Members, either in cash or in kind, as determined by the Board of Managers, with any assets distributed in-kind being valued for this purpose at their fair market value as determined pursuant to Section 12.2.2(iv)(1).   Notwithstanding the foregoing, if the funds and assets available for distribution pursuant to this Section 12.2.2(iv)(2) are less than the aggregate positive balances of the Capital Accounts, such remaining assets shall be distributed pro rata in proportion to the respective positive balances of the Members' Capital Accounts.  If the funds and assets available for distribution pursuant to this Section 12.2.2(iv)(2) exceed the aggregate positive balances of the Members' applicable Capital Accounts, then such excess (after the distribution to the Members of the positive balances of such Capital Accounts) shall be distributed to the Members *pro rata* in proportion to their respective Percentage Interests in the Company.   Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations;

(v)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1 (b) (2) (ii) (g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a

debt owed by such Member to the Company or any other Person for any purpose whatsoever.

(vi)   Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated, unless otherwise determined by the Liquidating Trustee, and any assets of the Company not otherwise distributed shall be distributed as assets of the Company.

(vii)   The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated against the amount otherwise distributable to such Member.

(viii)   The Liquidating Trustees shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of any assets thereof.

**12.3    Effect of Filing of Articles of Dissolution**.   Upon the filing of articles of dissolution with the Iowa Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act.   The Members shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

**12.4    Return of Contribution Nonrecourse to Other Members**.   Except as provided by non-waivable provisions of the Act or other applicable law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution with respect to the Company.   If the property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

**ARTICLE XIII**
**CONFIDENTIALITY AND RESTRICTIVE COVENANT**

**13.1    Confidentiality**.

13.1.1   Each Member recognizes and acknowledges that (i) the Members may have access to some Company Proprietary Information, and (ii) the unauthorized use or disclosure of Company Proprietary Information would cause substantial and irreparable harm to the Company.

13.1.2   Each Member agrees that so long as it is a Member of the Company and for a period of two (2) years thereafter, it shall not, directly or indirectly, disclose or use any Company Proprietary Information except as reasonably necessary in order to perform its duties to the Company.

13.1.3   Notwithstanding the foregoing, this Article XIII shall not prohibit a Member from the use or disclosure of information or material to the extent (if any) (i) reasonably necessary to comply with generally accepted ethical or professional standards

or as required by law or order of a court or governmental agency or authority, (ii) reasonably necessary to maintain and prepare financial and tax records and filings so long as Company Proprietary Information is disclosed only to accounting, tax and legal professionals who are instructed to maintain the confidentiality of the applicable information or documents, or (iii) obtained or developed by a Member from a source other than the Company, provided that such source was not bound by a duty of confidentiality to the Company with respect to such information.   Any Member (and each employee, representative or other agent of such Member) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure (in each case, within the meaning of Treasury Regulation Service 1.6011-4) of the Transaction and all materials of any kind (including opinions or other tax analyses) that are provided to such Member relating to such tax treatment and tax structure; provided that, with respect to any document or similar item that contains information concerning the tax treatment or tax structure of the Transaction as well as other information, this authorization shall only apply to such portions of the document or similar item that relate to the tax treatment or tax structure of the Transaction.

13.1.4   If a Member becomes compelled by law, or required pursuant to generally accepted ethical or professional standards, to use or disclose any Company Proprietary Information or becomes aware of the initiation of proceedings or any intention to compel the use or disclosure of Company Proprietary Information, he or she shall provide the Board of Managers of the Company with prompt notice so that the Board of Managers may seek a protective order or other remedy as it deems appropriate.

**13.2    Noncompetition**.

13.2.1   During the Restricted Period (as defined below), the Class P Member and its Affiliates shall not directly or indirectly, and shall cause each RMSH Physician (as defined in Section 13.3) to not directly or indirectly (i) compete with the Company or theClass H Member within Johnson County, Iowa or (ii) provide professional services, management services or similar services to a competing imaging center or hospital within Johnson County, Iowa (excluding services to a physician or physician group for the benefit of the patients of such physician or physician group), other than one owned and operated by the Class H Member or an Affiliate of the Class H Member.  For purposes of this Section 13.2.1, the "Restricted Period" shall mean during the time that RMSH, RMS or any of their Affiliates is a Member of the Company. For any individual RMSH Physician, the "Restricted Period" shall mean the lesser of (y) during the time that RMSH, RMS or any of their Affiliates is a Member of the Company or (z) during the time that such RMSH Physician holds an ownership interest in the Class P Member or RMS and for two (2) years thereafter.

13.2.2   During the Restricted Period, the Class H Member shall not compete with the Company within Johnson County, Iowa; provided, however, that maintenance or enhancement of any imaging services provided on the Hospital's campus shall not be a violation of this restriction.  For purposes of this Section 13.2.2, the term "Restricted Period" shall mean during the time the Hospital or an Affiliate of Hospital is a Member of the Company and the term "campus" shall mean a location of the Hospital where inpatient services are performed.

13.2.3    Notwithstanding the restrictions set forth in Sections 13.2.1 and 13.2.2, either Membermay open a facility that provides the same services provided by the Company in Johnson County, Iowa, provided that such Member first offers the other Member an opportunity in writing to participate in the project on terms substantially similar as the Company.  If the non-offering Member declines to participate in such opportunity then the offering Member shall be entitled to pursue such opportunity on its own without violation of the non-compete provisions.

13.2.4    Each Member shall cause each of its Affiliates to take such actions as the Company may reasonably request to ensure the enforceability of the provisions of this Section 13.2 applies to such Affiliates.

13.2.5    In the event of a breach of this Section 13.2, the Company, in addition to other remedies available at law or in equity, shall be entitled, as a matter of right, to injunctive relief in any court of competent jurisdiction plus reasonable attorneys' fees for the securing of such relief.

13.2.6    The parties agree that the foregoing restrictive covenant set forth in this Section 13.2 is necessary to protect the Company, and that such restrictions are reasonable in scope and duration.  In furtherance of, and not in limitation of, the foregoing, it is expressly agreed that should the duration or geographical extent of, or activities covered by, this Section 13.2 be in excess of that which is determined to be valid or enforceable under applicable law, such provision shall be construed to cover only that duration, extent or activities which may validly or enforceably be covered, it being the intention of the parties that the provisions hereof shall be construed in a manner which renders them valid and enforceable to the maximum extent (not exceeding their express terms) permissible under applicable law.

**13.3    Confidentiality and Noncompetition Agreement by Physicians**.    The confidentiality restrictions set forth in Section 13.1 and the noncompete restrictions set forth in Section 13.2 shall apply to each of the physician owners of the Class P Member and/or RMS (the "RMSH Physicians") and each RMSH Physician shall be required to enter into an agreement with the Company and the Class P Member shall cause all of RMSH Physicians to execute and deliver to the Company a Physician Confidentiality and Noncompetition Agreement substantially in the form of Exhibit 13.3 hereof (a "Physician Confidentiality and Noncompetition Agreement"), as amended from time to time by the Board of Managers, or such other form as deemed appropriate from time to time by the Board of Managers from time to time.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

**14.1    Notices**.    Except as otherwise provided in this Agreement, any and all notices given in connection with this Agreement shall be deemed adequately given only if in writing and personally delivered, sent registered or certified mail with postage prepaid and return receipt requested, or sent by Federal Express or other nationally recognized overnight courier.  A written notice shall be deemed to have been given to the recipient party on the earliest of:

14.1.1    the date it shall be delivered personally to the designated Member or the Company (as applicable) or delivered to the required address;

14.1.2    the date delivery shall have been refused at the address required by this Agreement; or

14.1.3    with respect to notices sent by mail but not delivered, the date as of which the postal service shall have indicated that such notice to be undeliverable at the address required by this Agreement.

Each party may change his or her address to any other location in the United States upon written notice in accordance with this paragraph.  Until changed as provided in this Agreement, all notices shall be addressed as follows:

TO COMPANY:

Corridor Radiology, LLC
2769 Heartland Drive, Suite 105
Coralville, IA 52241
Facsimile: 319-545-7314
Attn:  Chairperson and Vice-Chairperson

TO EACH MEMBER AT:

THE ADDRESS SET FORTH ON EXHIBITS 4.1(a) AND 4.1(b) HERETO, AS AMENDED FROM TIME TO TIME.

**14.2    Headings**.  The headings and other captions in this Agreement are for convenience and reference only and shall not be used in interpreting, construing or enforcing any of the provisions of this Agreement.

**14.3    Invalidity**.

14.3.1    If any term, restriction, covenant or promise contained in this Agreement is invalid or unenforceable, then the parties agree to be bound by such term, restriction, covenant or promise as modified to the extent (and only to the extent) necessary to make it valid and enforceable.

14.3.2    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

**14.4    Further Action**.  Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

**14.5    Variation of Pronouns**.  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the Person or Persons may require.

**14.6    Governing Law**.  The laws of the State of Iowa shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members.

**14.7    Compliance with Laws**.  The Company and each Member agree to comply with and abide by all laws, regulations and rules applicable to the Business of the Company.  The

Company and each Member agree to cooperate with each other in carrying out activities pursuant to their respective corporate compliance and financial audit programs.

**14.8    Counterparts**.  This Agreement may be executed in counterparts each of which shall be deemed an original and all of which together shall be considered one and the same Agreement.  The parties agree that a facsimile may be used as an original.  Signatures provided by facsimile or in portable document format (a/k/a pdf) or other electronic format shall be as binding as original signatures.

**14.9    Entire Agreement**.  This Agreement and the exhibits hereto shall be deemed to express, embody and supersede all previous understandings, agreements and commitments, whether written or oral, between the parties hereto with respect to the Membership and to fully and finally set forth the entire agreement between the parties hereto.

**14.10   Representation/Interpretation**.  The parties acknowledge that this Agreement has been jointly prepared by the Members and their respective legal counsel and will not be strictly construed against any Member.

**14.11   Amendments**.  Except as permitted pursuant to Section 4.9.1, this Agreement shall be amended only if approved by (a) all the Members in accordance with Section 4.8, and (b) the Board of Managers in accordance with Section 5.4.  The Company shall deliver a copy of any amendment to this Agreement to each Member.

**14.12   Arbitration**.  Any controversy or dispute or alleged breach arising out of or relating to this Agreement (other than a Deadlock of the Board of Managers or Members which shall be governed <u>solely</u> by Section 11.2 or a Tax-Exempt Issue which shall be governed <u>solely</u> by Section 4.9.2) ("<u>Controversy</u>"), shall be resolved pursuant to the following resolution process:

14.12.1  <u>Administrative Resolution Process</u>.  The Members shall, in good faith, attempt to resolve any Controversy as follows: (i) the Member seeking to resolve the Controversy shall prepare a written position statement and deliver a copy thereof to the other Member; and (ii) no later than ten (10) days after delivery of such position statement, appropriate representatives of the Members shall meet and seek, in good-faith, to resolve the Controversy (collectively, the "<u>Administrative Resolution Process</u>").

14.12.2  <u>Arbitration</u>.  If the Members are unable to resolve the Controversy through the Administrative Resolution Process, then either Member may submit a demand for arbitration, and upon demand, any such Controversy shall be settled in accordance with the AHLA Alternative Dispute Resolution Service Rules of Procedure for Arbitration, and judgment upon the award rendered by the arbitrator may be entered in any court of competent jurisdiction.  The arbitrator shall make written findings of fact and conclusions of law.  The Members agree that the arbitrator's findings of fact shall be final and binding upon the Members and that the arbitrator's award shall be final, binding and enforceable upon the Members and their successors except that the Members shall have the right to appeal to a court of competent jurisdiction any conclusion of law made by such arbitrator.  The Members agree that (i) one (1) arbitrator shall be selected pursuant to the rules and procedures of the AHLA, (ii) the arbitrator will not have the authority to award punitive damages, and (iii) the arbitrator will have the authority to award attorneys' fees.  The Members agree that the Federal Arbitration Act and the

federal substantive law promulgated relative thereto shall be the applicable governing law regarding the application, implementation, interpretation and enforcement of the rights to arbitration as set forth in this Section 14.12. Any Member shall have the right to pursue injunctive or other equitable remedies to enforce the terms of this Section 14.12. The obligations of this Section 14.12 shall survive the expiration or termination of this Agreement for any reason.

14.12.3 <u>Equitable Remedies.</u>   Notwithstanding any provision of this Section 14.12 to the contrary, either Member may freely pursue any equitable remedy for any Controversy under this Agreement in any court of competent jurisdiction.

**14.13   Change in Law; Reformation**.   Subject to Section 14.3 hereof, in the event that any federal or state legislation or regulations are enacted, promulgated, modified or interpreted or a decision of a court or a governmental agency is rendered, or formal guidance is issued from a regulatory agency, that (i) prohibits, restricts or in any way materially alters the agreements made by the parties to this Agreement (or may prohibit, restrict or in any way materially alter such agreements), (ii) subjects Company or either Member to a significant fine or penalty in connection with its performance of obligations hereunder, (iii) subjects Company or either Member to a loss of Medicare or Medicaid certification because of the existence of this Agreement or the applicable party's performance of its obligations hereunder, (iv) has a materially adverse effect on the ability of Company or either Member to perform its obligations hereunder, or (v) indicates that allocations of the Company's income to the Class H Member are likely to be treated as unrelated business taxable income ((i) – (v) each, a "Reformation Event"), then, within thirty (30) days following notice from one party to the other party, both Members shall negotiate in good-faith an amendment to this Agreement or a substitute agreement which will remedy the Reformation Event while carrying out the original intention of the parties to the extent possible, and, if the parties reach an agreement on the terms and conditions of such amendment, then each party shall execute such amendment.   The determination that a Reformation Event has occurred shall be made by (x) with respect to events described in (i) – (iv) of this Section 14.13, legal counsel for one Member with the concurrence of the legal counsel for the other Member, or if legal counsel for each of the Members cannot concur, by a nationally recognized law firm with expertise in health care law jointly selected by both Members; and (y) with respect to the event described in (v) of this Section 14.13, legal counsel for the Class H Member. In the event that both Members cannot reach agreement as to the terms and provisions of the amendment or substitute agreement within sixty (60) days following the notice provided in this Section 14.13 or such earlier date as necessary to avoid substantial penalties or fines (or treatment of allocations of Company's income to the Class H Member as unrelated business taxable income), provided such earlier date is mutually agreeable to both Members, which agreement shall not be unreasonably withheld, then either Member may exercise those rights provided in Article 11 with respect to a Deadlock. No party shall claim or assert illegality as a defense to the enforcement of this Agreement or any provision hereof; instead, any such purported illegality shall be resolved pursuant to the terms of this Section 14.13.

**14.14   Waiver of Action for Partition**.   Each Member and Economic Interest holder irrevocably waives during the term of the Company any right that it may have to maintain any action for the partition with respect to the property of the Company.

**14.15   Waivers**.  The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

**14.16   Rights and Remedies Cumulative**.  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy.  Said rights and remedies are given in addition to any other legal rights the parties may have.

**14.17   Successors and Assigns**.  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective successors and assigns.

**14.18   Creditors**.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company or any Member.

**[Signature Page to Operating Agreement]**

**IN WITNESS WHEREOF**, the Members have executed this Agreement as of the day and year first above written.

**CLASS H MEMBER:**

**MERCY HOSPITAL, IOWA CITY, IOWA**

By: _Ronald R. Reed_
Name: _Ronald R. Reed_
Title: _President and CEO_

**CLASS P MEMBER:**

**RMS HOLDINGS, P.C.**

By: _Scott M. Trebla_
Name: _Scott M. Trebla_
Title: _President_

71015614.17                    1

## EXHIBIT 1.2

## DEFINITIONS

**"Act"** shall mean the Iowa Limited Liability Company Act, § 490.A.100, etseq., as amended from time to time, and any successor statute.

**"Additional Capital Contributions"** shall have the meaning set forth in Section 7.2.1.

**"Administrative Resolution Process"** shall have the meaning set forth in Section 14.12.1.

**"Affiliate"** of a Person (each Person for purposes of this definition referred to as the "Controlling Party") shall mean (i) any not-for-profit corporation, for-profit corporation, association, business trust, limited liability company, joint venture, partnership or similar entity organized under the laws of any state, of which the Controlling Party possesses, directly or indirectly, more than fifty percent (50%) of the equity interest, membership interest (with respect to a not-for-profit corporation) or voting rights with respect thereto, provided that the ability to acquire voting rights will not be treated as possession of such rights until the rights are acquired; or (ii) any not-for-profit corporation, for-profit corporation, association, business trust, limited liability company, joint venture, partnership or similar entity organized under the laws of any state, the articles of incorporation, articles of association, bylaws or similar organizational documents of which expressly permit the Controlling Party to (A) appoint the officers, directors or employees of the Controlling Party or other individuals to more than fifty percent (50%) of the entity's governing body, or (B) remove more than fifty percent (50%) of the members of such governing body. For purposes of this definition, a "Controlling Party" will be deemed to have the power specified in clauses (i) or (ii) of the preceding sentence if such Controlling Party can exercise such powers directly or through one or more intermediary Persons.

**"Agreement"** shall mean this Operating Agreement as originally executed and as amended hereinafter from time to time.

**"AHLA"** shall have the meaning set forth in Section 4.9.2.

**"Articles of Organization"** shall mean the Articles of Organization of the Company as filed with the Secretary of State of Iowa and amended from time to time.

**"Available Cash Flow"** shall mean all cash, revenues and funds received by the Company, less such Reserves as the Board of Managers deems reasonably necessary to the proper operation of the Company's business.

**"Board of Managers"** shall mean the Board of Managers of the Company, as elected pursuant to Section 5.2.

**"Billing Agreement"** shall have the meaning set forth in Section 5.4.5(iii).

**"Business Day"** shall mean a day other than a Saturday, Sunday or legal holiday under federal law.

EXHIBIT A

**"Buying Party"** shall have the meaning set forth in Section 9.9.

**"Capital Account"** as of any given date shall mean the Capital Contribution to the Company by a Member, as adjusted pursuant to Article VII.

**"Capital Contribution"** shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

**"Change of Control"** with respect to a Person shall mean (i) the dissolution of such Person; (ii) the merger or consolidation of such Person with any third Person, unless upon completion of the merger or consolidation the Persons who were owners of such merging Person immediately prior to such merger or consolidation will have more than fifty percent (50%) of the voting control (including, without limitation, the right to appoint or elect more than fifty percent (50%) of the governing body) of the surviving corporation or entity of such merger or consolidation; or (iii) the sale or transfer of fifty percent (50%) or more ownership interests or the assets of such Person to one or more third Persons, whether by one or more transfers within any twelve (12) month period (whether by change in sponsorship or membership, by contractual arrangement(s) or any other means) that results in a transfer of fifty percent (50%) or more over the appointment of the governing body of the Person or a transfer of fifty percent (50%) or more of the assets away from the control of the governing body of the Person.

**"Class"** shall mean the Class H Membership Interest or Class P Membership Interest, as applicable.

**"Class H Managers"** shall have the meaning set forth in Section 5.2.

**"Class H Member"** shall mean the owner of the Class H Membership Interest.

**"Class H Member's Board"** shall have the meaning set forth in Section 4.9.2

**"Class H Membership Interest"** shall have the meaning set forth in Section 4.2.

**"Class P Managers"** shall have the meaning set forth in Section 5.2.

**"Class P Member"** shall mean the owner of the Class P Membership Interest.

**"Class P Member Option"** shall have the meaning set forth in Section 4.11.

**"Class P Member Physician"** shall mean, with respect to the Class P Member, any physician who is an employee, member, shareholder, partner or other owner of the Class P Member.

**"Class P Membership Interest"** shall have the meaning set forth in Section 4.2.

**"Code"** shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue laws.

**"Company"** shall mean Corridor Radiology, LLC, an Iowa limited liability company.

**"Company Proprietary Information"** shall mean all trade secrets and other proprietary or confidential information of the Company or arising out of the business of the Company, including, without limitation, the following information and documents (except to the extent generally available, through no fault of a Member or its Affiliates (and, with respect to the Class P Member, RMS and the RMSH Physicians),  to the general public or the Company's competitors): (i) Company financial statements and forecasts, (ii)  Companycontract proposals, bidding information and negotiating strategies, (iii) Company rate and fee structures, (iv) Company policies and procedures, (v) Company management systems and procedures, (vi) Company business plans and projections, (vii) the terms of this Agreement, as amended from time to time, or any other contract or agreement of the Company, (viii) inventions and discoveries, (ix) all information the confidentiality of which the Company is required (whether by law, contract or otherwise) to maintain, and (x) other Company information that is (a) sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use and (b) the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.  A Person asserting that information is available to the general public or the Company's competitors shall bear the burden of proof with respect to such issue.

**"Controversy"** shall have the meaning set forth in Section 14.12.

**"Deadlock"** shall mean a situation of impasse at the Board of Managers or Members' level, as applicable, which impairs the ability of the Company to make a decision regarding a material issue or to resolve a material dispute.

**"Deadlock Resolution Period"** shall have the meaning set forth in Section 11.2.4.

**"Deficit Capital Account"** shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a)     credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

(b)     debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provisions of Treasury Regulation Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

**"Economic Interest"** shall mean a Member's share of Profits, Losses and distributions of the Companypursuant to this Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company.

**"Effective Date"** shall have the meaning set forth in the opening paragraph of this Operating Agreement.

**"Entity"** shall mean any legally recognized entity, including, without limitation, any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

**"Event of Disqualification"** shall have the meaning set forth in Section 10.1.2.

**"Facility"** shall have the meaning set forth in Section 3.1.1.

**"Fiscal Period"** shall have the meaning set forth in Section 8.7.

**"GAAP"** shall mean Generally Accepted Accounting Principles.

**"Higher Offer"** shall have the meaning set forth in Section 11.1.

**"Hospital"** shall have the meaning set forth in the opening paragraph of this Operating Agreement.

**"Hospital Contribution Agreement"** shall have the meaning set forth in Recital F.

**"Hospital Radiology Business"** shall have the meaning set forth in Recital A.

**"Income Allocation"** shall have the meaning set forth in Section 8.3.2.

**"Initial Appraiser"** shall have the meaning set forth in Section 10.6.1.

**"Initial Capital Contribution"** shall have the meaning set forth in Section 7.1.

**"Interest Rate"** shall mean the lesser of (i) the prime interest rate as published as of the applicable date in **The Wall Street Journal** or (ii) the maximum rate allowed under applicable law.

**"Landlord"** shall have the meaning set forth in Section 5.4.3(x).

**"Liquidating Trustee"** shall have the meaning set forth in Section 12.2.1.

**"Majority In Interest"** shall mean the holder(s) of ownership interests which in the aggregate exceed fifty percent (50%) of all ownership interests then outstanding; provided, however, that with respect to issues on which only the Members of a particular Class are entitled to vote, "Majority In Interest" shall mean the holder(s) of ownership interests of a particular Class which in the aggregate exceed fifty percent (50%) of all ownership interests of that Class then outstanding and held by the Members of such Class eligible to vote.

**"Management Duties"** shall have the meaning set forth in Section 5.9.

**"Management Group"** shall have the meaning set forth in Section 5.9.

**"Manager(s)"** shall mean any one or more of the persons constituting the Board of Managers, from time to time, as appointed pursuant to Section 5.2.

**"Member"** shall mean each of the parties who is a Member as of the date hereof and each party who may hereafter become a Member, but not after the time they cease to be a Member.

**"Member Duties"** shall have the meaning set forth in Section 4.10.1.

**"Member Group"** shall have the meaning set forth in Section 4.10.1.

**"Member Representative"** shall have the meaning set forth in Section 4.7.2.

**"Membership Interest"** shall mean a Member's entire interest in the Company, including, without limitation, such Member's Economic Interest.

**"Minimum Distribution"** shall have the meaning set forth in Section 8.3.2.

**"MMSA"** shall have the meaning set forth in Section 5.4.5(ii).

**"Offer"** shall have the meaning set forth in Section 9.9.

**"Offer Notice"** shall have the meaning set forth in Section  9.9.

**"Offered Interest"** shall have the meaning set forth in Section 9.9.

**"Officer(s)"** shall have the meaning set forth in Section 6.1.

**"Option Notice"** shall have the meaning set forth in Section 4.11.

**"Option Percentage Interest"** shall have the meaning set forth in Section 4.11.

**"Option Period"** shall have the meaning set forth in Section 9.9.

**"Percentage Interest"** shall mean, for any Member, the Percentage Interest held by such Member as set forth on Exhibit 4.1-A or Exhibit 4.1-B attached hereto, as amended from time to time pursuant to Section 4.1.

**"Person"** shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

**"Physician"** shall mean a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, a doctor of podiatric medicine, a doctor of optometry, or a chiropractor.

**"Physician Confidentiality and Noncompetition Agreement"** shall have the meaning set forth in Section 13.3.

**"Professional Services Agreement"** shall have the meaning set forth in Section 5.4.5(i).

**"Profits" and "Losses"** shall mean, for each fiscal year or other period, an amount equal to taxable income or loss for such year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    any tax-exempt income of the Partnership described in Code Section 705(a)(1)(B) which is not otherwise taken into account in determining Profits or Losses shall be included as if it were taxable income or loss;

(b)    any expenditures of Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(c)    if the value at which any asset is carried on the books of Company is adjusted under Treasury Regulations Section 1.704-1(b)(2)(iv)(g), the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset;

(d)    gain or loss resulting from any disposition of an asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the value at which such asset is carried on the books of Company;

(e)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation, amortization or cost recovery computed by reference to Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3); and

(f)    any item that is specifically allocated pursuant to Section 8.2 shall not be taken into account.

**"Radiology Center"** shall have the meaning set forth in Recital B.

**"Redemption Price"** shall have the meaning set forth in Section 10.4.1.

**"Reformation Event"** shall have the meaning set forth in Section 14.13.

**"Remaining Member"** shall have the meaning set forth in Section 9.9.

**"Reserves"** shall mean the funds set aside or amounts allocated to reserves which shall be maintained in amounts reasonably and in good faith deemed sufficient by the Board of Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

**"Restricted Period"** shall have the meaning set forth in Section 13.2.1 or Section 13.2.2, as applicable.

**"RMS"** shall mean Radiologic Medical Services, P.C.

**"RMS Contribution Agreement"** shall have the meaning set forth in Recital E.

**"RMS Parties"** shall have the meaning set forth in Recital E.

**"RMSH"** shall have the meaning set forth in the opening paragraph of this Operating Agreement.

**"RMSH Physicians"** shall have the meaning set forth in Section 13.3.

**"Second Appraiser"** shall have the meaning set forth in Section 10.6.1.

**"Selling Member"** shall have the meaning set forth in Section 9.9.

**"Substitute Member"** shall have the meaning set forth in Section 9.4.

**"Target Final Balances"** shall have the meaning set forth in Section 8.2.10.

**"Tax Exempt Issue"** shall have the meaning set forth in Section 4.9.1.

**"Tax Matters Partner"** shall have the meaning set forth in Section 8.10.

**"Transaction"** shall mean all of the factual elements relevant to the expected tax treatment of any investment, entity, plan or arrangement contemplated pursuant to this Agreement, and includes any series of steps carried out as part of a plan.

**"Transfer"**, when used as a verb, shall mean to grant, convey, sell, impair, dispose of or assign, with or without consideration, voluntarily or involuntarily, any legal or equitable interest in a Membership Interest. **"Transfer"**, when used as a noun, shall mean any transfer of title or beneficial interest, whether by operation of law or otherwise, and whether or not for value, including, without limitation, any conveyance, sale, gift, exchange, pledge, hypothecation, creation of a security interest, transfer in trust or option to purchase, sell or transfer.

**"Treasury Regulations"** shall include proposed, temporary and final regulations promulgated under the Code.

**"Withdrawal"** shall have the meaning set forth in Section 10.1.1.

**"Withdrawal Date"** shall have the meaning set forth in Section 10.2.

**"Withdrawal Event"** shall have the meaning set forth in Section 10.1.1.

**"Withdrawing Member"** shall have the meaning set forth in Section 10.1.1.

## EXHIBIT 4.1-A

### CLASS H MEMBER

| NAME AND ADDRESS | PERCENTAGE INTEREST | INITIAL CAPITAL CONTRIBUTION |
|---|---|---|
| **Mercy Hospital, Iowa City, Iowa**<br>500 East Market Street<br>Iowa City, Iowa  52245<br>Facsimile: 319-339-3788<br>Attention: President and CEO | 51% | $2,915,562.00* |

*Initial Capital Contribution has been made in accordance with the terms of that certain Contribution Agreement between the Class H Member and the Company dated as of October 1, 2012.

## EXHIBIT 4.1-B

### CLASS P MEMBER

| NAME AND ADDRESS | PERCENTAGE INTEREST | INITIAL CAPITAL CONTRIBUTION |
|---|---|---|
| **RMS Holdings, P.C.**<br>2769 Heartland Drive, Suite 307<br>Coralville, Iowa 52241<br>Facsimile: 319-545-7314<br>Attention: President | 49% | $2,801,226.00* |

\*Initial Capital Contribution has been made in accordance with the terms of that certain Contribution Agreement by and among the RMS Parties and the Company dated as of October 1, 2012.

## EXHIBIT 5.2

### MANAGERS

**Class H Managers**

1.  Michael G. Heinrich
2.  Timothy J. Ahlers

**Class P Managers**

1.  Scott M. Truhlar M.D.
2.  Shane A. Kraske, M.D.

**EXHIBIT 8.3.2**

Adopted:  October 1, 2012

## AVAILABLE CASH FLOW DISTRIBUTION POLICY

Except as otherwise provided in Article 8 of the Operating Agreement of Corridor Radiology, LLC, an Iowa Limited Liability Company (the "Company"), dated October 1, 2012, as amended from time to time (the "Operating Agreement"), within thirty (30) days of the end of each quarter during a Fiscal Period (as defined in the Operating Agreement), the Company shall distribute all Available Cash Flow (as defined below) generated during the prior quarter; provided, however, that any such distributions shall be made only to the extent of Available Cash Flow as of the date of such distribution and shall not be made if and to the extent such distribution would be unlawful under the Act.

For purposes of this policy, "Available Cash Flow" shall mean all cash, revenues and funds received by the Company, less such Reserves as the Board of Managers deems reasonably necessary to the proper operation of the Company's business."Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts reasonably and in good faith deemed sufficient by the Board of Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business for a period of thirty (30) calendar days or such other period as determined by the Board of Managers.

This Policy may be amended from time to time by the Board of Managers.

**CLASS H MANAGERS:**                    **CLASS P MANAGERS:**

By: _____                    By: _____
Name: _____                    Name: _____
Title: _____                    Title: _____


By: _____                    By: _____
Name: _____                    Name: _____
Title: _____                    Title: _____

## EXHIBIT 13.3

## PHYSICIAN CONFIDENTIALITY AND NONCOMPETITION AGREEMENT

THIS PHYSICIAN CONFIDENTIALITY AND NONCOMPETITION AGREEMENT ("Agreement"), is entered into and effective this 1st day of October, 2012 (the "Effective Date"), by and between Corridor Radiology, LLC, an Iowa limited liability company (the "Company"), and _____ ("Physician").

WHEREAS, Mercy Hospital, Iowa City, Iowa ("Hospital"), and RMS Holdings, P.C. ("RMSH") are members of the Company; and

WHEREAS, as a condition (but not the only condition) for the issuance to RMSH of a membership interest in the Company (the "Membership Interest"), the Company requires Physician to execute and deliver this Agreement.

NOW THEREFORE, as a condition for the issuance of the Membership Interest to RMSH, and the admission of RMSH as a member of the Company, the parties agree as follows:

1.    **Definitions**.    Any terms used herein that are not defined shall have the meaning set forth in the Operating Agreement (as defined below).  The following terms shall have the following meanings in this Agreement:

**"Company Proprietary Information"** shall mean all trade secrets and other proprietary or confidential information of the Company or arising out of the business of the Company, including, without limitation, the following information and documents (except to the extent generally available, through no fault of RMSH, Radiologic Medical Services, P.C. ("RMS"), any of their Affiliates or any  RMSH Physician (including, but not limited to, the undersigned Physician) to the general public or the Company's competitors): (i) Company financial statements, cost reports and forecasts, (ii)  Companycontract proposals, bidding information and negotiating strategies, (iii) Company rate and fee structures, (iv) Company policies and procedures, (v) Company management systems and procedures, (vi) Company business plans and projections, (vii) lists of, or other nonpublic information regarding, actual or potential Company patients, vendors, referral sources, payors, or contracting parties, (viii) the terms of the Operating Agreement of the Company, as amended from time to time, or any other contract or agreement of the Company, including this Agreement, (ix) inventions and discoveries, (x) all information the confidentiality of which the Company is required (whether by law, contract or otherwise) to maintain, and (xi) other Company information that is (a) sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use and (b) the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.  A Person asserting that information is available to the general public or the Company's competitors shall bear the burden of proof with respect to such issue.

**"Operating Agreement"** shall mean that Operating Agreement by and between the Hospital and RMSH dated October 1, 2012.

## 2.    **Confidentiality Obligations.**

(a)    The parties recognize and acknowledge that (i) Company Proprietary Information is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use, and (ii) the unauthorized use or disclosure of Company Proprietary Information would cause substantial and irreparable harm to the Company.

(b)    Physician agrees that so long as he or she is an owner of RMSH, RMS or any of their Affiliates and such entity is a member of the Company, and for a period of two (2) years thereafter, he or shall not, directly or indirectly, disclose or use any Company Proprietary Information except as reasonably necessary in order to perform his or her duties to the Company.

(c)    Notwithstanding the foregoing, this Section 2 shall not prohibit Physician from the use or disclosure of information or material to the extent (if any) (i) reasonably necessary to comply with generally accepted ethical or professional standards or as required by law or order of a court or governmental agency or authority, (ii) reasonably necessary to maintain and prepare financial and tax records and filings so long as Company Proprietary Information is disclosed only to accounting, tax and legal professionals who are instructed to maintain the confidentiality of the applicable information or documents, or (iii) obtained or developed by Physician from a source other than the Company, provided that such source was not bound by a duty of confidentiality to the Company with respect to such information.

(d)    If Physician becomes compelled by law, or required pursuant to generally accepted ethical or professional standards, to use or disclose any Company Proprietary Information or becomes aware of the initiation of proceedings or any intention to compel the use or disclosure of Company Proprietary Information, he or she shall provide the Board of Managers of the Company with prompt notice so that the Board of Managers may seek a protective order or other remedy as it deems appropriate.

## 3.    **Noncompetition.**

(a)    Physician hereby recognize and acknowledge that he or she would cause substantial and irreparable harm to the Company by breaching the terms set forth below in this Section 3.

(b)    During the Restricted Period (as defined below), Physician shall not directly or indirectly (i) compete with the Company or the Hospitalwithin Johnson County, Iowa or (ii) provide professional services, management services or similar services to a competing imaging center or hospital within Johnson County, Iowa (excluding services to a physician or physician group for the benefit of the patients of such physician or physician group), other than one owned and operated by the Hospital or an Affiliate of the Hospital.  For purposes of this Section 3, the "Restricted Period" shall mean the lesser of (y) during the time that RMSH, RMS or any of their Affiliates is a Member of the Company or (z) during the time that Physician holds an ownership interest in RMSH or RMS and for two (2) years thereafter.

4.     **Reasonable Restrictions**.

(a)     Physician acknowledges and recognizes that the terms of this Agreement are reasonable and enforceable and that his or her education, training and experience are such that the restrictions set forth in this Agreement will not jeopardize or significantly interfere with his or her ability to secure gainful employment within his or her profession or specialty.

(b)     If any term, restriction, covenant or promise contained in this Agreement is invalid or unenforceable, then the parties agree to be bound by such term, restriction, covenant or promise as modified to the extent (and only to the extent) necessary to make  it valid and enforceable.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

5.     **Remedies**.

(a)     Physician hereby acknowledges and agrees that any breach of the terms of this Agreement would cause irreparable harm to the Company for which no adequate remedy at law would exist.  The Parties therefore agree that, in addition to any other remedies available to the Company (including, without limitation, liquidated, actual and punitive damages), the Company may enforce this Agreement by injunction, whether temporary or permanent, in any court of competent jurisdiction, with or without notice, and without bond or other security.  Any one Party to this Agreement may file an action against Physician to enforce its rights under this Agreement.  Physician hereby waives any rights to object to such injunction on the basis that the Company has not given bond or other security or to require the Company to give bond or other security.

(b)     Should the Company institute any action or proceeding to enforce the terms of this Agreement, the Company shall be entitled to (and Physician shall pay) the Company's costs, expenses and fees (including, without limitation, reasonable attorneys' fees) reasonably incurred in such action or proceeding.

6.     **Governing Law**.  This Agreement shall be subject to and governed by the laws of the State of Iowa, irrespective of whether either party is or may become a resident of a different state.

7.     **Headings**.  The headings of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

8.     **Counterparts**.  This Agreement may be executed in counterparts each of which shall be deemed an original and all of which together shall be considered one and the same Agreement.  The parties agree that a facsimile may be used as an original.  Signatures provided by facsimile or in portable document format (a/k/a pdf) or other electronic format shall be as binding as original signatures.

[Signature Page Follows]

**[Signature Page to Physician Confidentiality and Noncompetition Agreement]**

      IN WITNESS WHEREOF, the undersigned Party has executed this Agreement as of the date set forth below.

**CORRIDOR RADIOLOGY, LLC**


By:_____
Name: _____
Title:_____


**PHYSICIAN**


_____
Name: _____