IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | Chapter 11 |
| **MERCY HOSPITAL, IOWA CITY, IOWA,** *et al.,* | Case No. 23-00623 |
| Debtors. | Jointly Administered |

**PATIENT CARE OMBUDSMAN'S THIRD INTERIM REPORT**

Pursuant to 11 U.S.C. § 333 of the United States Bankruptcy Code (the "**Code**") and this court's August 10, 2023, *Order Approving Appointment of Susan N. Goodman as Patient Care Ombudsman* [Docket No. 59] (the "**Appointment Order**"), Susan N. Goodman was appointed to serve as the Patient Care Ombudsman ("**PCO**") in the above-referenced jointly administered cases inclusive of an acute-care community hospital and its associated medical clinics.

PCO was directed to monitor the quality of patient care provided by the Debtors and immediately report to the court any findings suggesting patient care was declining or significantly compromised. Otherwise, PCO was directed to provide reports to the court at least every sixty (60) days. Accordingly, PCO engaged in an initial site visit and filed *Patient Care Ombudsman's First Interim Report* on September 12, 2023, at Docket No. 211. PCO conducted a second round of site visits and filed *Patient Care Ombudsman's Second Interim Report* on November 12, 2023, at Docket No. 504. In anticipation of the pending sale effective date, PCO conducted an abbreviated, third site visit and comes now to file this third report updating the court on the most recent site visit and continued remote monitoring.

**SUMMARY OF FINDINGS**

In the interim period, PCO received one report of the electronic health record ("**EHR**") going down such that the hospital moved to paper charting processes consistent with their down time procedures. Patient impacts relative to procedure rescheduling and diversion of patients to University of Iowa Health Center (the "**University**" or "**UIHC**")

1

emergency department were reported, with patient harm denied. The service interruption was not bankruptcy related.

Over the interim reporting period, PCO received reports of various staffing strain points[1], yet not at a level to trigger immediate reporting under 11 U.S.C. § 333(b). Further, on the dates of PCO's site visits, nurse-to-patient inpatient staffing ratios were reported by staff as being "good," while also reporting some challenging shifts consistent with those reported earlier to PCO.

At the time of PCO's visit, staff were in the process of receiving official position and compensation information for University employment beginning January 31, 2024. Similarly, medical providers were receiving contracts for review and signature. For some, the reported benchmarking of their role at UIHC was at a level that was inconsistent with their Mercy status. Further, Mercy employed a special weekend staffing option to stabilize weekend coverage in some service lines. The continuation of this staffing model under UIHC, or something similar, was uncertain and a frequent reported concern.

At a macro level, while PCO consistently heard comments that supported the University transaction as the best outcome from those available to the Debtor, yet the ultimate settling out of the transition seemed to suggest some level of staff and/or clinician departures could occur. A handful of staff resignations were reported to PCO as she met with various leadership and team members across the organization during her site visit. The situation remained fluid at the time of PCO's site visit, with leadership now reporting, at the time of report filing, that the offer acceptance rate was at 90%.

Mercy's CMO reported active engagement with UIHC leadership on the topic of clinician coverage and reported receiving assurances from UIHC that clinician gaps would be back-filled as needed to support ongoing specialty coverage for the emergency department

---

[1] Factors reported as affecting staffing included, without limitation, continued strong inpatient census numbers, agency/contracted staff engagements ending without extensions, and reduction in staffing filled by team members who worked both at the University and at the Debtor in anticipation of this practice no longer being allowed after the sale effective date.

2

("**ED**").  While PCO met briefly with the Chief Human Resources Officer (the "**CHRO**"), she was busy with individual staff follow-up meetings relative to the University offer letters. PCO will remain in contact with the CHRO as the transition process progresses.

PCO spoke with a vendor employee who supports the health information management ("**HIM**" or "**Medical Records**") hospital team.  HIM leadership was not in on the date of PCO's site visit.  Nonetheless, it sounded as though the group had some capacity should the various clinician dynamics result in an influx of medical record disclosure requests for care continuity.  No anticipated HIM concerns were appreciated.

Importantly, one day in advance of PCO's report filing, the Debtor reported concern that the EHR vendor may not be willing to perform the record migration necessary to bridge electronic record access to the buyer while their information technology ("**IT**") team works to integrate the Debtor hospital and clinics to the UIHC EHR.  If this assertion is accurate, patient hospital and clinic information would not be available to patients or clinicians. Obviously, any abrupt discontinuation of patient record access, data that is heavily relied upon for safe care delivery, would create a material, immediate care concern as contemplated under § 333(b).  Further, it would seem to run afoul of the prohibition against information blocking as defined at 45 C.F.R. §171.103(a)(2) and as enforced by the Office of Inspector General.

## NEXT STEPS

Certainly, transition logistics seem to be yet another hurdle for the Mercy team in a series of challenges up to this point.  Because the University would be the institution most impacted by any Debtor capacity challenges that could ensue if clinician and/or staff departures are significant.  The data should soon be available for all parties to quantify additional coverage needs to minimize staffing gaps heading into the sale effective date.

Despite the many logistics associated with staff and clinician transitions, PCO's largest current concern is that of continued patient record access.  While PCO has regularly

encountered the issue of whether old paper records would be included in a sale transaction, this is the first time she has encountered reports of transition uncertainty relative to an EHR.

DATED: January 12, 2024.    By: */s/ Susan N. Goodman, RN JD*
PIVOT HEALTH LAW, LLC
P.O. Box 69734 | Oro Valley, AZ 85737
Ph: 520.744.7061 (message)
sgoodman@pivothealthaz.com
*Patient Care Ombudsman*

## CERTIFICATE OF SERVICE

The undersigned certifies that, under penalty of perjury, that on this January 12, 2024, the foregoing document was electronically filed with the Clerk of the Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

By: */s/ Susan N. Goodman, RN JD*

4