UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF IOWA

IN RE:

MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*,

Debtors.

Chapter 11

Case No. 23-00623 (TJC)

(Jointly Administered)

**ALTERA DIGITAL HEALTH INC.'S (A) REPLY IN FURTHER SUPPORT
OF MOTION OF TO COMPEL ASSUMPTION OR REJECTION OF
EXECUTORY CONTRACT; (B) OPPOSITION TO DEBTORS'
MOTION FOR ENTRY OF AN ORDER (I) COMPELLING CONTRACTUAL
PERFORMANCE UNDER ALTERA AGREEMENT, (II) ENFORCING
THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF;
AND (C) BRIEF**

PAPPAJOHN, SHRIVER, EIDE & NIELSEN P.C.
Larry S. Eide (AT0002317)
103 E. State Street, Suite 800
Mason City, IA 50401
Tel: (641) 423-4264
Fax: (641) 423-3145
eide@pappajohnlaw.com

-and-

LOEB & LOEB LLP
Schuyler G. Carroll (admitted *pro hac vice*)
Noah Weingarten (admitted *pro hac vice*)
345 Park Avenue
New York, NY 10154
Tel: (212) 407-4000
Fax: (212) 202-5431
scarroll@loeb.com
nweingarten@loeb.com

*Counsel to Altera Digital Health Inc.*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

COUNTERSTATEMENT OF FACTS ....................................................................3

ARGUMENT ...........................................................................................................18

I.     The Debtors have not – and cannot – terminate the Agreement............................18

       A.    The plain language of the Agreement does not permit the
             Debtors to terminate the Agreement prior to March 9, 2031....................18

       B.    The Debtors have not and cannot satisfy a single condition
             precedent to termination. ...........................................................18

             i.     Condition #1: Altera did not breach the Agreement.....................19

                    1.     The Debtors fail to satisfy their burden of
                           demonstrating a breach or that any alleged
                           breach caused any damages. ...............................................19

                    2.     The Debtors waived any breach by failing to
                           send a breach notice until years after the fact. ...................22

             ii.    Conditions #2 and 3: The Debtors' January 9 letter
                    failed to constitute a breach notice because the letter
                    does not comply with the Agreement's notice
                    requirements...................................................................24

             iii.   Condition #4: The 60-day window for Altera to cure any
                    alleged breach has not yet expired and will not until
                    March 9, 2024. ................................................................25

             iv.    Condition #5: Any alleged breach was cured long ago. ................25

II.    The Debtors are not entitled to transition services..................................25

       A.    The Debtors do not satisfy either condition precedent to
             receiving transition services........................................................25

             i.     Condition #1: The Agreement cannot be terminated
                    because there was no breach by Altera. .......................................26

             ii.    Condition #2: The Debtors have not paid all amounts
                    due to Altera....................................................................26

1.      Even if the Debtors were to prevail on a breach claim, any liability would be capped under the Agreement – at an amount much less than what Altera is owed. ..................................................................26

B.      Even if the Debtors were entitled to transition services – the Buyer is not; the Debtors would need to assume and assign the Agreement for the Buyer to benefit from transition services. ...................29

C.      Compelling Altera to provide transition services is directly contrary to the Agreement's express terms.................................................29

D.      The Agreement expressly requires the Debtors to assume and assign the Agreement if the Debtors want to permit a third party to use the software. ....................................................30

III.      The Debtors have had more than sufficient time to decide whether to assume such an important contract. ........................................................31

A.      The Debtors fail to respond to Altera's argument that an agreement as important as the Agreement should have been among the first order of business. .............................................31

B.      The Debtors' boilerplate excuses are not credible.....................................32

C.      Altera will suffer concrete prejudice if the Debtors are not compelled to assume or reject the Agreement. ...........................................32

IV.      The Court should deny sanctions; Altera has not violated the stay; the Debtors rely on the incorrect legal standard, which the Eighth Circuit has made clear only applies to individual debtors, not to a corporate debtor. ......................................................33

V.      The Debtors must prevail on every single argument and rebut every defense made by Altera in order to terminate the Agreement. .............................35

VI.      The Debtors' Motion must be denied because there is a complete failure of factual allegations and a complete failure of admissible evidence. ...................................................36

A.      The Debtors' sole piece of "evidence" – the revenue chart – is inadmissible, and the Debtors offer only testimony from Mr. Toney who has no personal knowledge. ...................................................37

i.      The Debtors provide no admissible evidence of breach or of their damages.........................................................37

ii.    The Debtors do not intend to offer any witness with
personal knowledge of the alleged breaches.................................39

B.    The Debtors' Motion should be denied because Altera will be
prejudiced without the ability to obtain discovery to defend
itself against the Debtors' eleventh hour claims. .......................................40

VII.    The Debtors' Motion, which necessarily seeks declaratory and
equitable relief, is required to be brought as an adversary proceeding..................40

CONCLUSION......................................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Safety v. Roman Catholic Archbishop*,
94 F.3d 1 (1st Cir. 1996) .......................................................................................................37

*Chi. Steel Rule & Die Fabricators Co. v. Adt Sec. Sys. Inc.*,
327 Ill. App. 3d 642 (2002) ..................................................................................................26

*Halloran & Yauch, Inc. v. Roughneck Concrete Drilling & Sawing Co.*,
2013 IL App (1st) 131059-U (2013)...............................................................................27, 30

*Horn v. Airway Servs., Inc.*,
No. 18-CV-3053 CJW-MAR,
2020 U.S. Dist. LEXIS 14044 (N.D. Iowa Jan. 27, 2020) ....................................................39

*In re Hawker Beechcraft, Inc.*,
483 B.R. 424 (Bankr. S.D.N.Y. 2012).......................................................................16, 31, 32

*Johnson v. Amerbank, LLC (In re Miles)*,
652 B.R. 512 (Bankr. N.D. Ill. 2023) ......................................................................19, 35, 36

*Marlen v. Hurst Investigation Servs.*,
2022 IL App (5th) 200424-U (2022) ...............................................................................22, 23

*Tectonic, LLC v. Tandem Admin. Mgmt. Grp.*,
2020 IL App (1st) 191663-U (2020)......................................................................................27

*Theatre Holding Corp. v. Mauro*,
681 F.2d 102 (2d Cir. 1982).................................................................................................31

*United States ex rel. Maris Equip. Co. v. Morganti, Inc.*,
163 F. Supp. 2d 174 (E.D.N.Y 2001) ....................................................................................38

*United States v. Kim*,
595 F.2d 755 (D.C. Cir. 1979) ...............................................................................................38

*United States v. Miller*,
771 F.2d 1219 (9th Cir. 1985) ...............................................................................................38

*United States v. Modena*,
302 F.3d 626 (6th Cir. 2002) .................................................................................................38

*Wells v. Minor*,
219 Ill. App. 3d 32 (1991) .....................................................................................................22

*Whalen v. K Mart Corp.*,
   166 Ill. App. 3d 339 (1988) ............................................................................................22, 23

**Statutes**

11 U.S.C. § 362.............................................................................................................................33

**Other Authorities**

6 Weinstein's Federal Evidence § 1006.06....................................................................................37

Fed. R. Bankr. P. 7001 ..................................................................................................................40

Fed. R. Evid. 1006 ....................................................................................................................37, 38

Altera Digital Health Inc. ("Altera"), by and through its undersigned counsel, hereby files this (A) reply in further support of its motion [Docket No. 589] ("Altera's Motion") and in response to the Debtors' objection to Altera's Motion [Docket No. 633] (the "Objection" or "Obj."); and (B) opposition to the *Debtors' Motion for Entry of an Order (I) Compelling Contractual Performance Under Altera Agreement, (II) Enforcing the Automatic Stay, and (III) Granting Related Relief* [Docket No. 635] (the "Debtors' Motion").

## PRELIMINARY STATEMENT[1]

1.      The Court should see the Debtors' Motion for what it really is: a desperate – and last minute – attempt to pressure Altera into doing what the clear and unambiguous terms of the Agreement do not require: ***Force Altera to provide transition services to the Buyer <u>and</u> thereby avoid the consequences of assumption or rejection of the Agreement***.  There is no basis under the Bankruptcy Code to support the Debtors' Motion.

2.      Altera initially brought its motion because the Debtors indicated that they were going to provide the Buyer the core of Altera's business – a very valuable and proprietary piece of software – without assuming and assigning the Agreement as the Bankruptcy Code requires.  In response, the Debtors filed the Debtors' Motion, which is an attempt to get judicial approval to misappropriate Altera's software, and impose a term of indentured servitude on Altera to comply with the Debtors' wishes – *i.e.*, providing transition support services to the Buyer.  This Court should see through the Debtors' breach claims and other complaints and see that the Debtors want to use Altera's software, but do not want to pay market value for it or live with the consequences of assumption or rejection.

---

[1] Terms used in this Preliminary Statement are defined further below.

3.      The key issues the Debtors' Motion raises are: (i) whether Altera breached the Agreement, (ii) whether the Agreement may be terminated as a result, (iii) whether the Debtors may elect for transition services after termination and if they do, can they assign that one obligation of Altera to provide transition services to the Buyer without the Debtors assuming the contract and assigning it to the Buyer, and (iv) whether the Debtors can prove that they suffered damages that were solely Altera's fault that exceed all amounts due to Altera, such that the Debtors are not required to pay anything to Altera.  The resounding answer must be that Altera did not breach the Agreement, therefore the Agreement could not be terminated, and thus Altera is not required to provide transition services.  But even if the Debtors' statements were true, without the assumption and assignment of the Agreement, the Debtors cannot require Altera to provide transition services to the Buyer.

4.      In order to prevail on the threshold breach claim, the Debtors must prove every single one of the numerous disputed factual and legal issues.  But it is clear that the Debtors cannot do so.  Even a cursory glance at the Debtors' Motion shows this.  The breach allegations contain *zero* specific facts of how Altera allegedly breached the Agreement or even what terms Altera allegedly violated.  Moreover, the Debtors' Motion cites absolutely *zero* evidence showing a breach.  This is not a case where the parties dispute the meaning of evidence submitted – the Debtors did not submit any evidence whatsoever.  This is just one of the many glaring and fundamental defects that are fatal to the Debtors' Motion.

5.      Assuming that the Debtors are somehow able to prove an uncured breach and thus an entitlement to transition services, the Agreement specifically requires the Debtors to first pay Altera all amounts due and owing, which is something that the Debtors clearly have no intention of doing.  Moreover, there is nothing in the Agreement that would entitle, a third party like the

Buyer to use those services. Additionally, if the Buyer were permitted to use those services, under what terms would they be using them? They have no agreement with Altera and once the Agreement is terminated it cannot be assigned. The Debtors cannot misappropriate Altera's software and give it away to the Buyer without assuming and assigning the Agreement. Thus, ultimately, this Court does not even need to decide the issue of breach because the Debtors must assume and assign the Agreement – even if they are able to prevail over the myriad of obstacles to obtaining transition services.

<b><u>COUNTERSTATEMENT OF FACTS</u></b>

**A.      The Agreement between Altera and the Debtors.**

6.      Altera and the Debtors are parties to that certain *Master Client Agreement* executed on March 9, 2021 (as amended, the "<u>Agreement</u>"). **Ex. A**. Under the Agreement, Altera granted the Debtors a license to use the Clinical and Financial Manager Software (terms defined below), in connection with the operation of the Debtors' hospital and clinics. These are two very different software platforms that are used for different tasks – clinical and financial – which connect or speak to each other.

7.      The Agreement incorporates the separate "Client Orders" that were signed by the Parties. *Id.*, ¶ 1. Concurrent with the Agreement's execution, the parties also executed that certain *Initial Client Order* (**Ex. B**) (the "<u>Client Order</u>"), which provided more specific terms to the implementation and deployment of Altera's software.

> **i.      *The Agreement's term lasts until March 9, 2031.***

8.      The Agreement was signed on March 9, 2021. The Agreement provides for a term of 10 years, through March 9, 2031. In this regard, Paragraph 2 of the Agreement (**Ex. A**) states that "[t]he term of this Agreement . . . ends on the end-date of the last defined Term for Services or Software. . . .The Terms for services and licenses of Software are set forth in the applicable

3

Client Order(s)."  Paragraph A1 of Schedule 1 to the Client Order (**Ex. B**), in turn, states that "[t]he

initial term of this Client Order begins on the Order Date [March 9, 2021] and ends 120 months

after the Order Date."  As a result, the Agreement's term runs through March 9, 2031.

      **ii.**    ***Termination requires the Debtors to satisfy several conditions precedent.***

     9.    The Agreement may not be terminated sooner absent material breach and not until

several other conditions precedent are satisfied.  Paragraph 2 of the Agreement states that the

Agreement will continue through the end of the full term unless the Agreement is terminated earlier

under Paragraph 14 of the Agreement.  Paragraph 14.1, in turn, specifies several conditions

precedent to termination.  Specifically, it states that either party may terminate the Agreement by

"providing a written termination notice to the other Party if the other Party materially breaches the

Agreement and does not, within sixty (60) days after receipt of a corresponding breach notice

specifying in reasonable detail the nature of such breach, cure such breach in all material respects."

     10.    This provision requires the Debtors to satisfy several conditions precedent before

termination may be effective.  Among other things, this provision requires that:

    (i)    a breach occurs that is:

        (a) material,

        (b) active,

        (c) uncured, and

        (d) not waived,

    (ii)    the Debtors must give written notice of such breach,

    (iii)    such notice must:

        (a) specify the details of such breach in reasonable detail ***and***

        (b) be given at a time when the breach is still active and uncured,

    (iv)    Altera must be given sixty days to cure the alleged breach, and

4

(v)      Altera must fail to cure the alleged breach within 60 days.

11.      This provision thus makes clear that the Agreement cannot be terminated before the end of the 60-day cure window.  Likewise, the Agreement cannot be terminated if the alleged breach has been cured.

### iii.   *To elect to receive transition services, the Debtors must satisfy a separate and additional set of conditions precedent.*

12.      Paragraph 14.3 of the Agreement permits the Debtors to "elect to extend the support term for the then-licensed Software (and associated non-perpetual license term) for up to one (1) year following that original termination date."  However, Paragraph 14.3 expressly provides that the Debtors are only entitled to transition services "[i]f the Agreement is to terminate for any reason other than Client breach, and Client has paid all amounts owed hereunder."  As a result, the Debtors are not entitled to obtain transition services unless all amounts owed to Altera have been paid.

13.      Even if the Debtors were somehow entitled to transition services, only the Debtors – but not any third party – would be permitted to request and benefit from transition services.  The Agreement does not permit the Debtors to confer those services on the Buyer  (defined below).  The only way that the Buyer could benefit from services under the Agreement would be if the Debtors *assumed and assigned* their rights under the Agreement.  Absent this however, the Debtors' ability to obtain transition services does not permit the Buyer to use the software.

## B.    **The Debtors agreed to assume the risk of going live all at once instead of Altera's normal execution of a staggered approach.**

### i.    *The Debtors' problems before engaging with Altera.*

14.      The Debtors experienced substantial problems long before the Debtors entered into the Agreement.  Among these problems was the medical records and financial software the Debtors were using.  The Debtors operated the Horizon electronic medical software ("EMR") and

accompanying software that was created by McKesson.  However, McKesson decided to sunset this product in 2015 and ceased maintenance of it in early 2018.  As a result, the Debtors were using an obsolete system that was not supported and maintained by the vendor for at least four years.  Consequently, the Debtors suffered several cybersecurity incidents.  Also McKesson did not meet the certification requirements after 2017 so the Horizon EMR was no longer certified.  Thus, the Debtors were unable to comply with certain reporting requirements imposed by the Centers for Medicare & Medicaid Services ("CMS").  Failure to comply can result in CMS adjusting reimbursement amounts to non-compliant providers that can amount to millions of dollars.

15.     CMS guidelines permit hospitals 5 hardship exceptions to these reporting requirements.  By the time the Altera EMR went live, the Debtors had already used all 5 exceptions and were at risk of incurring a significant diminution in reimbursement amounts.

16.     The Debtors also experienced numerous management changes, as well as turnover at senior staff levels.  The Debtors have asserted that causes of action exist against one of the former management teams – Mercy One.  The interim CEO who came from Mercy One had never implemented a hospital EMR system and did not understand the amount of work required by the hospital staff to get the system up and running.  He thought all EMRs should just be turnkey and not require input by staff.  This slowed progress and made it difficult for Altera to complete its tasks.

    **ii.     _Altera's software and the process of implementation of new software for a hospital._**

17.     The Debtors use two distinct types of software from Altera.  The Debtors incorrectly refer to both of these as electronic medical records ("EMR") in the Debtors' Motion.  These are two very important, but different, pieces of software.  The first is software that is used

in hospital or clinic to record information about the patient, the patient's problems and disease states, and the patient's treatment (the "Clinical Software").  It records and sends provider orders, allows the provider to prescribe medications, and provides clinical alerts among other things.  The second type of the software strictly manages the Debtors' the billing to patients and payors (the "Financial Manager Software").  The Clinical Software records all aspects of patient care, including all drug and treatment orders.  The Financial Manager Software pulls the patient demographic and treatment information from the Clinical Software to generate bills, seek reimbursement, and keep track of the financials of patient care generally.

18.    Implementation of a new EMR system – the backbone of any hospital – is no small task.  The Debtors are not the only ones who experienced issues during and after implementation. https://www.techtarget.com/searchhealthit/video/Epics-EHR-Challenges-and-lessons-learned-at-Mass-General.  Indeed, Massachusetts General Hospital, one of the world's premier hospitals, hired Epic (the largest and most expensive EMR vendor and the vendor that is used by the Buyer), to implement its EMR, but its implementation took three years, and the cost was double the original budget – over $1.2 Billion.

19.    Research indicates that "More than 50% of EMR systems either fail or fail to be properly utilized."  *See* https://www.sciencedirect.com/science/article/pii/S1877050917329563. In this peer-reviewed, academic research paper, the authors describe the numerous obstacles facing a hospital during implementation.  In another research paper, the authors report that more than 60%     of     implementations     result     in     substantial     financial     challenges. https://empeek.com/insights/all-you-need-to-know-before-implementing-an-ehr-system/     This report also reviews data from a study conducted by HealthAffairs.org – a peer-reviewed journal

which is "the leading journal of health policy thought and research." The researchers state that a typical implementation takes 16 to 24 months.

20.    It ordinarily takes Altera approximately 12 months to successfully implement any clinical software (regardless of the software provider) into a hospital the size of Mercy. Indeed, that is the exact amount of time that the Buyer advised the Debtors it needs to transition services from Altera's software to the Buyer's. Debtors' Motion, ¶ 25. While Altera's software is functional immediately in a generic sense, the software must be configured to meet each hospital's clinical requirements. Every hospital has its own workflows, processes, and medical procedures it requires. Every hospital has its own permission levels for providers and staff. Every hospital has its own measures that it reports to CMS. Every clinical software requires configuration of the system to accommodate and adapt to each hospital's unique needs and procedures. Thus, in any implementation, the software provider and the hospital must work together collaboratively and cooperatively to achieve the end result. *See* https://protect-us.mimecast.com/s/U_GbCNk5YyiZmz2gcmc_y0?domain=softwarefinder.com. It typically takes approximately 12 months for Altera and its hospital clients to collaborate and work through these matters to get to the point where the Clinical Software is seamlessly integrated into the hospital's work flow.

21.    Because the Financial Manager Software pulls the information from the Clinical Software, Altera generally recommends to its hospital clients to implement the Clinical and Financial Manager Software in a phased approach. In particular, Altera recommends that hospitals first implement the Clinical Software and make sure that it is operational and integrated. Once the Clinical Software has been successfully deployed, then the Financial Manager Software can be deployed. Doing so avoids many problems, allows for a smoother transition, and avoids

substantial complaints from doctors, nurses, billing professionals, and other staff who use the Clinical and Financial Manager Software.

### iii. *The Debtors assumed the risks of a simultaneous deployment of the Clinical and Financial Manager Software.*

22.     The Debtors' Chief Executive Officer, the Debtors' Chief Financial Officer, the Vice President of Revenue Cycle, and Chartis Healthcare Consulting, the Debtors' consultant, were the Debtors' primary decision makers throughout the implementation process.

23.     Initially, Altera recommended that the Debtors proceed with a two-stage deployment of the software for a smooth transition and to enable testing.  Altera explained the risks of doing otherwise to the Debtors.  However, the Debtors wanted the single phase approach because of the cybersecurity and non-reporting issues described above.

24.     Paul Black, the former Chief Executive Officer of Allscripts Healthcare LLC ("Allscripts") (Altera's predecessor-in-interest under the Agreement), ultimately agreed to the single phase implementation but made sure that Allscripts' most experienced and best staff were assigned to the Debtors' project.  Often times staff were pulled off of other jobs to assist with the Debtors' implementation.

25.     Even though Allscripts ultimately agreed to a single phase approach, Altera needed to make sure the Debtors were closely involved in the process, because the implementation could not happen without substantial input from the Debtors.  Accordingly, Altera did everything it could to support the Debtors, repeatedly going above and beyond what is required by the Agreement.

26.     Eventually, the parties executed that certain *Client Order for Managed Services* dated as of June 30, 2021.  **Ex. C**.  Under this agreement, Altera provided the Debtors with a significantly increased scope of services, including providing substantial staff on sight, who were devoted solely to working for the Debtors, as well as various additional personnel working off-site

providing technical advice and support to staff, maintaining servers, storage, and providing a help-portal and helpdesk support.

27.     Much of this staff remains on site through present day and Altera help support the infrastructure technology function that the Debtors operate.  As a result, Altera is obliged to pay the salary and benefits of these employees – even when the Debtors refuse to pay Altera (or pay at a huge discount).

28.     It should be recognized that the Debtors expressly agreed to take responsibility for their decisions.  Specifically, Paragraph 8.1.5 of the Agreement states: "***Before any Software is used in a live production environment, it is Client's responsibility to make independent decisions about system settings and configurations based upon Client's needs, and reach its own independent determination that the Software as implemented is appropriate for live production use***." (Emphasis added).  Thus, the Debtors agreed that it was solely their responsibility to independently determine how and when to implement the software.

### iv.     *The Debtors also overruled Altera's recommendation to do further testing.*

29.     Prior to the deployment of Altera's software, Altera discussed with the Debtors the need to do further testing prior to the "go live" of the Clinical and Financial Manager Software.  Altera explained the risks that without further testing, there could be post-deployment issues that could cause substantial problems, but that could easily be resolved pre-implementation in testing (*i.e.*, a non-live environment).  This testing was especially important here because the Clinical and Financial Manager Software were being deployed simultaneously.  Yet again, the Debtors rejected Altera's recommendation and decided to forgo the additional testing that Altera recommended.  In both instances (resisting the two-stage implementation and not conducting sufficient testing), the Debtors knew of and accepted the risks that Altera specifically identified for them (among other reasons, because Altera informed the Debtors).

     v.     ***The Debtors failed to satisfy their own obligations, which led to numerous unnecessary problems.***

30.     Software is only as effective as the information input and the ability of the user. Altera's software is no different. In this regard, the Agreement required the Debtors to provide substantial support for the implementation. Among other things, the Debtors were required to provide staff who were knowledgeable about the existing systems and about the requirements of various payors. This was important so that each payor could be properly set up in the Financial Manager Software and so that each invoice would contain all the required information. In addition, in order for Mercy to be paid by the payors, the Debtors' staff (doctors, nurses, and others) needed to correctly input billing codes and patient info, including dates of birth, addresses, patient number, social security numbers, and the treating doctor's National Provider Identifier number ("NPI"). If this information was not inputted or inputted incorrectly, bills could not be sent because the payor would not pay. Mercy's staff failed to meet these requirements. Altera could not input the information for Mercy.

31.     It is also important to understand that each individual payor (Medicare, Medicaid, and each different health insurance carrier) is required to be set up with different information in the Financial Manager Software. For example, each payor has a different payor number. Unless that number is properly input, the payor will not pay. Even Mass General and Epic experienced problems with this seemingly simple task. https://www.techtarget.com/searchhealthit/video/Epics-EHR-Challenges-and-lessons-learned-at-Mass-General.

32.     There are numerous other requirements for billing and coding. Each payor has different requirements. If any of those requirements are not followed, the payor will not pay. Each payor's billing requirements are set out in contracts or other documents between the Debtors and

the payor.  Altera did not have access to these.  For this reason, the Debtors were required – and agreed – to input all of the information required by the payors into the Financial Manager Software.

33.     The Debtors wholly failed to satisfy their obligations.  Among other things, the Debtors experienced substantial employee turnover, including losing the Vice President of Revenue Cycle Management shortly after the go live and having staff who were assigned to the fix the billing issues failing to report to work.  These failures on the part of the Debtors directly led to increases in accounts receivable.  These problems had nothing to do with Altera or its software.  To the contrary, these problems would have occurred regardless of what software was being used and irrespective of who implemented that software.

34.     After the Debtors decided to go live in March 2022, Altera worked tirelessly to fix the many issues that resulted from the Debtors' decisions.  The failure and absence of the Debtors' personnel led Altera again to try to help the Debtors.  Altera assigned a significant number of additional personnel and resources to support the implementation, even though Altera did not charge the Debtors for this additional personnel.  Altera came out of pocket approximately $4 to 5 million for the additional personnel.

35.     During this time, senior executives from Altera personally traveled to the hospital to assist with the project.  Altera executives repeatedly flagged invoices with missing information, and told the Debtors what information was missing and advised the Debtors that without the missing information, payments would not be paid.

36.     Today, all issues have been corrected and the Debtors continue to use Altera's software and rely on the managed services that Altera provides.  The Debtors admit that since at

least March 2023, the issues have been resolved.  The sole piece of "evidence"[2] submitted by the Debtors demonstrates this.  While the Debtors assert that their accounts receivable increased starting in March 2022, the chart on page 6 of the Debtors' Motion demonstrates that by March 2023, the Debtors revenues *increased* above the pre-go live level.

37.     Despite the Debtors' complaints now, the Debtors never sent a notice of default and never sent a notice of termination – until 10 days ago – two years after they allege the breach occurred.

**C.     Altera and the Debtors execute the Amendment to the Agreement.**

38.     In 2022, the Debtors stopped paying Altera.  Despite the Debtors' complaints that Altera acted recklessly and willfully, Altera did not stop providing services to the Debtors and Altera did not block the Debtors' access to the software.  Instead, Altera worked with the Debtors and provided the Debtors financial flexibility.  As a result, by the Petition Date (defined below), the Debtors owed Altera at least $9,624,793.15 for invoices issued in connection with the Agreement.  *See* **Ex. D** (proof of claim).  Even though the Debtors were significantly indebted to Altera, Altera worked in good faith with the Debtors to permit the Debtors to continue to use the software and to provide employees and services to the Debtors.

39.     But Altera did even more.  On August 1, 2023, the parties agreed to reduce the amount Altera would be paid on a current basis and Altera agreed to forbear from seeking to collect the outstanding balance (or the continuing unpaid amounts) for 9 months.  The parties executed that certain amendment to the Agreement (**Ex. E**) (the "Amendment").  The Amendment recited that "Altera recognizes the significant financial challenges facing [the Debtors]" and Altera

---

[2] In fact, this is not "evidence" at all, but merely a chart created by the Debtors, without any backup.  As will be discussed below, this chart is not admissible and cannot be used to support the Debtors' Motion.

13

reduced the amount to be paid for 9 months to less than half the amount due under the Agreement.

The Debtors continue to use the software and rely on the support and employees of Altera while

paying less than half of the amounts due since the Petition Date – despite that the Debtors would

be required to pay Altera in full, absent the Amendment and agreement by Altera.

**D.     The Debtors' improper attempt to terminate – but not reject – the Agreement to obtain transition services for the Buyer.**

40.     On August 7, 2023 (the "<u>Petition Date</u>"), the Debtors commenced the Chapter 11

cases.  On November 7, 2023, the Court entered an order approving the sale of substantially all of

the Debtors' assets to the University of Iowa (the "<u>Buyer</u>").  *See* Dkt. No. 476 (the "<u>Sale Order</u>").

41.     Thereafter, the Debtors attempted to manufacture a "termination" to "elect" for a

one-year post-termination transition period that could be used to facilitate a transition to the Buyer,

so that the Debtors could avoid assuming or rejecting the Agreement.

42.     The Debtors initially attempted to "non-renew" the Agreement.  The Debtors

asserted that the Agreement was annual and that the Debtors could "not renew" the Agreement so

that its term would end on March 9, 2024.  Altera pointed out that the Debtors had completely

ignored several provisions of the Agreement, including that the term is for 10 years, expiring on

March 9, 2031.  The Debtors apparently recognized their error because they reversed course and

argued – for the first very time on January 9, only 10 days ago – that Altera's alleged breach

permits the Debtors to terminate the Agreement.  Altera responded that the Debtors had no basis

for terminating the Agreement.  The Debtors' Motion was then filed, even though it provides no

support for their allegations of breach.

**i.     *The Debtors' improper attempt to terminate the Agreement without asserting a breach by Altera.***

43.     On December 8, 2023, the Debtors sent Altera a letter, purportedly terminating the

Agreement by giving written notice of "the Debtors' non-renewal of the [Agreement] effective

14

March 9, 2024." **Ex. F**, p. 2.  The Debtors also purported to give notice of their "election" for

post-termination transition services through and including March 9, 2025.  *Id*.  The Debtors

purported to terminate not based on a material breach (as required by Paragraph 14.1 of the

Agreement), but "[b]ecause the Debtors intend to wind-down and liquidate their remaining assets

following the Closing Date."  *Id.*

ii.     ***The Debtors' purported "election" ignores the Agreement's plain language,
which provides that the Agreement's term continues through March 9, 2031, is
not for annual, renewable terms, and cannot be "non-renewed."***

44.     On December 14, 2023, Altera sent a response to the Debtors' letter (**Ex. G**).  Altera

explained that the Debtors' assertions were directly contrary to the clear and unambiguous

language of the Agreement.  The letter explained that: (i) the Agreement does not have an annual,

renewable term, (ii) the Debtors were not permitted to "non-renew" the Agreement, (iii) the

Agreement continued through its expiration on March 9, 2031, and (iv) the Debtors had ignored

the terms of the Agreement and Client Order, which mandated that the Agreement's term continues

through March 9, 2031.  Altera also explained that the Debtors were not entitled to transition

services because they had no right to terminate the Agreement.

45.     Specifically, Paragraph A1 of Schedule 1 to the Client Order (**Ex. B**), made

applicable by Paragraph 2 of the Agreement, states that "The initial term of this Client Order begins

on the Order Date [March 9, 2021] and ends 120 months after the Order Date" –

*i.e.*, March 9, 2031.

46.     The Debtors could not "non-renew" the Agreement because this is only permitted

"[i]f no term is set forth in a Client Order."  Agreement, ¶ 2.  If no term is specified, the Agreement

would automatically renew for one year terms, unless either party provided written notice of non-

renewal.  *Id.*  But the Client Order *does* set forth a term – a 10-year term – ending on March 9,

2031.

47.     The term of the Agreement continues through its March 9, 2031 expiration date because Paragraph 2 only permitted the Agreement to be terminated earlier under Paragraph 14 "if the other Party materially breaches the Agreement."  As discussed below, Altera did not breach, much less *materially* breach the Agreement.  Thus, the Debtors could not terminate the Agreement early.

### iii.     *Altera files the motion to compel the Debtors to assume or reject the Agreement.*

48.     On December 20, 2023, Altera filed its motion to compel the Debtors to assume or reject the Agreement.  Docket No. 589.  Altera explained that the Debtors had enough time to decide whether to assume or reject the Agreement.  In particular, Altera stated: "like the contract in [*In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 431 (Bankr. S.D.N.Y. 2012)], the Agreement "may be the single most important agreement" and "should have been among their first and most pressing orders of business."  *Id.* ¶ 26.  Similarly, here, the Debtors have repeatedly said Altera is critical to the operation of the hospital and the hospital cannot operate without Altera.

### iv.     *The Debtors reverse course and attempt to manufacture a material breach of the Agreement as a basis for termination to receive transition services.*

49.     After reviewing Altera's letter, the Debtors went silent for nearly a month.  On January 9, 2024, three days before the Debtors filed the Debtors' Motion, the Debtors replied to Altera's letter (**Ex. H**) asserting – *for the very first time* – and a mere 3 days before filing the Debtors' Motion, that the Debtors were terminating the Agreement due to Altera's alleged "material and incurable breaches under the Altera Agreement."  *Id.*, p. 1.  The Debtors were declaring a breach to attempt to satisfy the first of two conditions precedent for obtaining transition services under Paragraph 14.3 of the Agreement.

50.     The Debtors also asserted that they did not need to pay anything to Altera to satisfy Paragraph 14.3's second condition precedent to receiving transition services because the Debtors

purportedly have claims against Altera that set off and cancel out any amounts owing to Altera. In support of that assertion, the Debtors rely on the same chart that was included in the Debtors' Motion.  The Debtors, however, provided no attribution or backup source materials for that chart. Indeed, the only source attribution for the chart is "Management Records" (even this attribution is missing in the version included in the Debtors' Motion).

> **v.    *The Debtors cannot terminate the Agreement, Altera did not breach the Agreement, and the Debtors' letter was ineffective as a cure notice.***

51.     On January 14, 2024, Altera responded to the Debtors' letter (**Ex. I**) and indicated that nearly every statement in the Debtors' letter was incorrect and that the Debtors' positions were contradicted by the plain and unambiguous terms of the Agreement.

52.     Altera explained that Altera did not breach the Agreement and, in any event, any alleged breach was cured.  Altera explained that the chart actually showed that monthly cash collections exceeded the monthly cash collections prior to the implementation of Altera's software so that the chart itself demonstrates that any alleged breach has been cured and no longer exists.

53.     Altera also explained that the letter failed to satisfy Paragraph 14.1's requirement that a breach notice "specify[] in reasonable detail the nature of such breach."  The Debtors' letter failed to comply with this "reasonable detail" requirement because the letter did not provide any information as to what the alleged breaches are.  Rather, the letter contained the vague assertion that "[Altera] has been on notice of its failures under the Altera Agreement for some time." **Ex. H**, p. 2.  But the Debtors never gave Altera the specific written notice with "reasonable detail" of the nature of the breach that is required.

## ARGUMENT

### I.      The Debtors have not – and cannot – terminate the Agreement.

54.      The Debtors assert that they purportedly terminated the Agreement, and therefore, there is no agreement to assume or reject.  Obj., ¶¶ 7-8.  That is false.  The Debtors have attempted to terminate the Agreement, but their attempt to do so is invalid for numerous reasons.

### A.      The plain language of the Agreement does not permit the Debtors to terminate the Agreement prior to March 9, 2031.

55.      In Altera's Motion (¶¶ 14-17), Altera explained why the Debtors cannot terminate the Agreement prior to March 9, 2031 – the end of the Agreement's 10-year term.  The Debtors have not even attempted to respond to this deficiency.  Instead, the Debtors assume that they can terminate the Agreement (which they cannot do).  The Court need only review the plain and unambiguous language of the Agreement, which states that the Agreement's term is 10 years, beginning on March 9, 2021 and continuing through March 9, 2031.  *See supra* ¶ 8.

### B.      The Debtors have not and cannot satisfy a single condition precedent to termination.

56.      Paragraph 14.1 of the Agreement states that "[e]ither Party may terminate this Agreement by providing a written termination notice to the other Party if the other Party materially breaches the Agreement and does not, within sixty (60) days after receipt of a corresponding breach notice specifying in reasonable detail the nature of such breach, cure such breach in all material respects."

57.      Thus, Paragraph 14.1 provides as a condition precedent to termination of the agreement that:

      (i)      a breach occurred,

      (ii)     the Debtors must give written notice of such breach,

      (iii)    such notice must:

(a) specify the details of such breach in reasonable detail ***and***

(b) be given at a time when the breach is still active and uncured,

 (iv) Altera must be given sixty days to cure the alleged breach, and

 (v) Altera must fail to cure the alleged breach within 60 days.

58. The Debtors must satisfy every one of these conditions precedent before they can terminate the Agreement.  The Debtors, however, cannot satisfy even a single one.

  **i.** ***Condition #1: Altera did not breach the Agreement.***

   **1.** **The Debtors fail to satisfy their burden of demonstrating a breach or that any alleged breach caused any damages.**

59. As a threshold matter, Paragraph 15.3 of the Agreement states that "[the] Agreement shall be governed by and interpreted according to the laws of the States of Illinois." The Debtors fail to cite a single case from Illinois or the Seventh Circuit.  Accordingly, all of the Debtors' authority is irrelevant as they cite the law from the wrong jurisdiction.

60. The law is clear that the Debtors bear the burden of demonstrating "each element" of their contract claim, including a breach by Altera and resulting damages.  *Johnson v. Amerbank, LLC (In re Miles)*, 652 B.R. 512, 524 (Bankr. N.D. Ill. 2023).  That means that the Debtors must prove, *inter alia*, (i) neither the Clinical or the Financial Manager Software worked; (ii) the software caused actual revenue loss (not just delays in collection – because the Debtors only assert that their "accounts receivable ballooned" – the Debtors do not even assert that these receivables were not collected); (iii) the Debtors also need to disprove each of Altera's defenses; and (iv) demonstrate that the damages were not the result of the Debtors' own actions or a circumstance not attributable to Altera.  The Debtors' breach claim must fail for numerous related and additional reasons.

61. <u>First</u>, the Debtors fail to offer any evidence whatsoever to *prove* beyond self-serving and conclusory allegations that Altera breached the Agreement or that the software did not work or that Altera did not install or implement it correctly. In an apparent recognition that there are no facts to support their claims, the Debtors do not even submit a declaration that could have included any self-serving statements that the Debtors wanted to make.

62. <u>Second</u>, the Debtors likely submit no evidence because the problems were the Debtors' own fault. The Debtors decided not to do a two-step phased integration as Altera recommended. The Debtors also decided to "go live" with the software over Altera's recommendation to the contrary that more testing was needed. The Debtors knew about and accepted the risks. Additionally, the Debtors' personnel failed to show up and satisfy their obligations. *Supra* ¶ 33.

63. <u>Third</u>, the Debtors bore the risk of their choice to implement the software when they did and without further testing. Paragraph 8.1.5 of the Agreement states: "***Before any Software is used in a live production environment, it is Client's responsibility to make independent decisions about system settings and configurations based upon Client's needs, and reach its own independent determination that the Software as implemented is appropriate for live production use***." (Emphasis added). Thus, the Agreement made clear that the Debtors were required to test the Software **before** going live to ensure there would not be problems. The Debtors chose not to do this. The Debtors chose to ignore their obligations under the Agreement. Now the Debtors want to blame Altera for the choices and the failure that the Debtors made. The Agreement is clear, however, that the Debtors are solely responsible for their actions and solely responsible to ensure the software was ready for use before going live.

64.     <u>Fourth</u>, the Debtors have not demonstrated that they suffered damages.  The only assertion made by the Debtors is that accounts receivable ballooned.  That does not mean the Debtors suffered damages.  To the contrary, it only shows a delay in collection.  The only submission by the Debtors is a chart which shows that revenues were reduced for a period of time (beginning in April 2022), but that revenues began to increase and by March 2023 revenues were higher than the period before April 2022.  The Debtors cut off the chart once the revenues reach historic highs.  A review of the full chart may demonstrate that all the accounts receivable were collected and thus, the only possible damages could be a delay in payment.  The Debtors' chart shows only that revenues were temporarily reduced.  It does not show that revenues were lost.  Altera does not know the total amount collected, but it could be that revenues were simply delayed temporarily and not lost.  One thing is clear: the Debtors have not satisfied their burden to show that revenues were lost.

65.     In the Debtors' Motion (¶ 14), the Debtors state: "As depicted in the chart [on page  6], the Debtors' accounts receivable ballooned by more than 40% during this period ***despite lower year-over-year net patient revenues***."  (Emphasis added).  This makes clear that the Debtors had "lower" revenues to begin with.  Also, the statement could easily mean that the Debtors did not lose, but rather, that it took longer to receive payment.

66.     The chart suspiciously cuts off in April, just at the point the trend shows higher amounts of revenue than pre-implementation.  It is entirely possible that the next 10 months of data – through present – show that any alleged breach was cured and that revenues remain high.  That would demonstrate: (i) that the software did not cause a loss of revenue, and (ii) there was merely a delay in collection.

67.     <u>Finally</u>, the Debtors' business was faltering long before the implementation of Altera's software.  Indeed, as far back as 2020, years before the Agreement was executed, the Debtors had to lay off employees because of financial issues.  **Ex. J**.  Likewise, around this time, the Debtors also decided to close their inpatient care unit because of their financial problems. **Ex. K**.  These problems existed long before Altera entered the picture.  Thus, the Debtors must demonstrate that their own financial issues had nothing to do with any damage they allege that Altera might have caused.

68.     The Debtors bear the burden of proof of showing a breach, including damages, but they have failed to satisfy this burden.

## 2.     The Debtors waived any breach by failing to send a breach notice until years after the fact.

69.     The law in Illinois is clear "[a] party to a contract may not lull another into false assurance that strict compliance with a contract duty will not be required and then sue for noncompliance."  *Whalen v. K Mart Corp.*, 166 Ill. App. 3d 339, 343 (1988); *Wells v. Minor*, 219 Ill. App. 3d 32, 45 (1991) (finding party "waived any complaint he had" by failing to declare a breach); *accord Marlen v. Hurst Investigation Servs.*, 2022 IL App (5th) 200424-U (2022).

70.     *Whalen* is instructive.  There, a general contractor and landowners sued two sub-contractors for contribution based on several contractual requirements that the sub-contractors had to procure insurance for the general contractor and landowners.  166 Ill. App. 3d at 341.  The sub-contractors argued that the general contractor and landowners waived the contractual insurance requirement.  *Id.*  The trial court agreed and dismissed the claims against them.  *Id.*  The intermediate appellate court affirmed, finding that the general contractor and landowners waived the alleged breach by failing to promptly send notice.  *Id.*

71.     The appellate court found that "Parties to a contract have the power to waive provisions placed in the contract for their benefit and such a waiver may be established by conduct indicating that strict compliance with the contractual provisions will not be required." *Id.* at 343. "An implied waiver of a legal right may arise when conduct of the person against whom waiver is asserted is inconsistent with any other intention than to waive it." There, the general contractor and landowners waived the breach because they never demanded proof of insurance. *Id.*

72.     Here, the Debtors similarly waived any alleged breach by their inaction, just like the parties in *Whalen*. Specifically, following the implementation of the software and the alleged increase in accounts receivable, the Debtors ***never*** sent a notice of a breach to Altera, much less a breach notice as prescribed under the Agreement. The Debtors admit they knew of the facts giving rise to the alleged breach soon after Altera's software was deployed. In the first day declaration [Docket No. 27], the Debtors admit that "***immediately***" after the March 2022 implementation, there were allegedly "significant operational problems" and "the flawed system caused a precipitous loss of revenue in late 2022 and early 2023 due to delayed patient bill submissions, resulting in a substantial backlog of accounts receivable payments that could not be collected promptly." *Id.* (emphasis added).

73.     The Agreement afforded the Debtors the opportunity to send a breach notice and demand cure. But they chose not to do that. Instead, the Debtors continued to use the software without asserting a breach. The Debtors' multi-year long failure to do anything constituted a waiver of any alleged breach because the Debtors' conduct was "inconsistent with any other intention than to waive it." *Whalen*, 166 Ill. App. 3d at 343.

74.     In reality, the Debtors chose not to send a breach notice because they were (and are) well aware that any alleged breach was cured long ago – and that there was no breach in the

first place.  The Debtors' Motion itself is further evidence that there is no breach – why would the Debtors seek to compel continued performance if the Software did not work?  In addition, why would the Buyer require the use of the Software for at least a year if the Software did not work?  The answer is that the Software does work.

              **ii.**     ***Conditions #2 and 3: The Debtors' January 9 letter failed to constitute a breach notice because the letter does not comply with the Agreement's notice requirements.***

75.  The Debtors' January 9 breach notice failed to satisfy Paragraph 14.1's requirement that a breach notice must "specify[] in reasonable detail the nature of such breach."  The January 9 letter provides no detail whatsoever.  Rather than comply with the Agreement's "reasonable detail" requirement, the letter only states "[Altera] has been on notice of its failures under the Altera Agreement for some time, and the Debtors estimate that Altera's actions have caused tens of millions of dollars of damages to the Debtors and their estates."  **Ex. H**.

76.  These vague and conclusory statements fail to satisfy the specific, plain, and unambiguous terms of Paragraph 14.1, which require the Debtors to provide "reasonable detail" of the alleged breach in writing.  In fact, the Debtors never previously gave any "reasonable detail" about Altera's alleged breach.  Nor does the Debtors' Motion give "reasonable detail" about any alleged breach.

77.  The purpose of the "reasonable detail" requirement is so that the alleged breaching party be given an opportunity to cure and be advised of the specific issues so that those issues may be fixed.  The failure to give Altera reasonable (or any) detail deprived Altera of the exact purpose of the notice requirement: the opportunity to cure.  Altera is entitled to an opportunity to cure any breach and the Debtors' defective notice deprives Altera of that opportunity.  Thus, the notice cannot possibly be effective because it violates the specific, plain, and unambiguous requirements of the Agreement, as well as the purpose of the requirements.

> ### iii.   *Condition #4: The 60-day window for Altera to cure any alleged breach has not yet expired and will not until March 9, 2024.*

78.    Paragraph 14.1 states that the Debtors may only terminate the Agreement if Altera breached the Agreement and "does not, within sixty (60) days after receipt of a corresponding breach notice . . . cure such breach in all material respects."  Here, even if the Debtors' January 9 letter satisfied the requirements to constitute a "breach notice" – which it did not – Altera would still have 60 days, through March 9, 2024, to cure any such breach.  That date has not yet passed. Therefore, this condition to termination is not satisfied.

> ### iv.   *Condition #5: Any alleged breach was cured long ago.*

79.    The Debtors' Motion asserts that the rollout of the Financial Manager Software and the ensuing loss of revenue occurred in "late 2022 and early 2023."  Debtors' Motion, ¶ 14.  As described above, the Debtors' chart demonstrates that this issue was cured at least a year ago and that revenues then *increased* to all-time highs.

80.    Not only did Altera cure any alleged breach, but with the help of Altera's software, the Debtors reached new all-time highs in revenues.  Indeed, the Debtors' own chart demonstrates this.  Revenues in March 2023 were over $2 million higher than they were in March 2022, the month immediately preceding the alleged breach.  Thus, based on the Debtors' own filings alone, it is clear that any breach was cured by no later than March 2023.

## II.    The Debtors are not entitled to transition services.

### A.    The Debtors do not satisfy either condition precedent to receiving transition services.

81.    Paragraph 14.3 of the Agreement contemplates that Altera provide certain transition services, but only if two conditions precedent are satisfied: "[1] the Agreement is to terminate for any reason other than Client breach [*i.e.*, a breach by Altera], and [2] Client has paid all amounts owed hereunder."  Neither condition has been satisfied.

**i.     *Condition #1: The Agreement cannot be terminated because there was no breach by Altera.***

82.    The Debtors fail to satisfy the first condition to receiving transition services because the Agreement cannot be terminated.  Under Paragraph 14.1, the only way that the Debtors could terminate the Agreement is if "the other Party materially breaches the Agreement."  As discussed above (*supra* Section I.B.i), Altera did not breach the Agreement and, in any event, the Debtors waived any such breach.  Therefore, there is no basis for terminating the Agreement. Consequently, the Debtors cannot satisfy the first condition precedent that is required before they are entitled to receive transition services.

**ii.     *Condition #2: The Debtors have not paid all amounts due to Altera.***

83.    Under Paragraph 14.3 of the Agreement, the second condition to receiving transition services is that the Debtors have paid Altera "all amounts owed hereunder."  This amount equals approximately $63.4 million, which includes; (i) $9,848,792.88 in pre-petition arrearages; (ii) $2,017,684.41 in the amount owed post-petition through December 15, 2023; (iii) $1,600,114.41 (estimated) through the end of January 2024; and (iv) $50,000,000 for all amounts due under the remaining term of the Agreement.  *See* Docket No. 631; *see also* Client Order, ¶ 3.

84.    The Debtors argue that no amounts are due to Altera because of Altera's alleged breaches and the damages suffered by the Debtors, which cancel out any amounts owed to Altera. This argument fails for numerous reasons, including that the Debtors' damages are capped.

**1.     Even if the Debtors were to prevail on a breach claim, any liability would be capped under the Agreement – at an amount much less than what Altera is owed.**

85.    Contractual limitation of liability provisions, including limitations against gross negligence, are enforced under Illinois law.  *See Chi. Steel Rule & Die Fabricators Co. v. Adt Sec.*

*Sys. Inc.*, 327 Ill. App. 3d 642, 655 (2002) (affirming dismissal of claims under limitation of liability provision finding "[f]reedom of contract allows commercial parties to use their business judgment to exculpate claims for liability"); *Tectonic, LLC v. Tandem Admin. Mgmt. Grp.*, 2020 IL App (1st) 191663-U, ¶ 15 (2020) ("Tectonic does not dispute that it is seeking indirect or consequential damages, which are expressly prohibited under this [exculpatory] clause. Thus, the exculpatory clause applies and . . . bar[s] Tectonic's breach of contract claim."); *accord Halloran & Yauch, Inc. v. Roughneck Concrete Drilling & Sawing Co.*, 2013 IL App (1st) 131059-U (2013).

86.    Here, Paragraph 13.1 of the Agreement limits Altera's potential liability to the Debtors in several ways. First, the Agreement excludes "special, incidental, consequential, exemplary, punitive, or other indirect damages of any character, including, but not limited to, ***loss of revenue*** or profits." (Emphasis added).

87.    Specifically, the Agreement excludes liability for damages, including loss of revenue as follows:

> NOTWITHSTANDING ANYTHING ELSE, SUBJECT ONLY TO SECTION 13.2, ***TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER PARTY SHALL BE LIABLE WITH RESPECT TO ANY SOFTWARE, SERVICES, EQUIPMENT AND/OR ANY OTHER SUBJECT MATTER OF THIS AGREEMENT UNDER ANY THEORY OF CONTRACT, NEGLIGENCE, STRICT LIABILITY, OR OTHER LEGAL OR EQUITABLE THEORY FOR***: . . . ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, PUNITIVE, OR OTHER INDIRECT DAMAGES OF ANY CHARACTER, INCLUDING, BUT NOT LIMITED TO, ***<u>LOSS OF REVENUE OR PROFITS</u>***, . . .

(Emphasis added).

88.    Since the only damages asserted by the Debtors are loss of revenue, all of the alleged damages are barred by this provision.

89.     Second, even if the alleged damages were not wholly excluded, the Agreement further limits any damages that can be recovered to the greater of $2 million dollars or the fees paid to Altera for the software, in the prior 24 months.

90.     The language of the Agreement provides that any liability is limited to the greater of:

> *(A) $2 MILLION DOLLARS OR (B) THE FEES PAID HEREUNDER FOR THE SOFTWARE, SERVICES AND/OR EQUIPMENT THAT IS/ARE THE SUBJECT OF ANY CLAIMS DURING THE TWENTY-FOUR (24) MONTH PERIOD BEFORE THE FIRST EVENT, ACTION, OR OMISSION GIVING RISE TO THE CLAIM.*

(Emphasis added).

91.     This is not a boilerplate provision, and it is not a copy-and-paste from a template. This is a highly-specific provision that the parties bargained for and should be enforced as they agreed.

92.     Assuming that the Debtors were entitled to damages (which they are not), any damages that were not entirely excluded (*i.e.*, for lost revenues) would be capped at the greater of $2 million and the amount paid in the prior 24 months.  Agreement, ¶ 13.1.  The Debtors have not submitted any information, let alone evidence, to demonstrate the amount paid.  Thus, the $2 million limit must apply.  Even if the Debtors could submit evidence of the amount of payments made, there is no question that this amount is substantially less than just the $9.8 million owed to Altera as of June 30, 2023.  Thus, the Debtors still owe substantial amounts to Altera – over and above any amounts the Debtors could assert as damages – amounts that the Debtors are required to pay before they would have transition rights (assuming they can prove a termination first, which they cannot).

28

**B.    Even if the Debtors were entitled to transition services – the Buyer is not; the Debtors would need to assume and assign the Agreement for the Buyer to benefit from transition services.**

93.    Even if the Debtors cured all their defaults under the Agreement and properly terminated the Agreement, only the Debtors – but not any third party – would be permitted to request transition services.   Transition services simply permit the Debtors to benefit from the Agreement post-termination.   It does not confer a right that the Debtors otherwise do not have – to permit an unauthorized stranger to use Altera's software.   The *only way* that the Buyer could benefit from the services under the Agreement would be if the Debtors *assumed and assigned* their rights under the Agreement.   Absent this, however, the Debtors' ability to obtain transition services does not permit the Buyer to use the software.   The Buyer is not a party to the Agreement, and the Debtors have chosen not to assume and assign the Agreement to the Buyer.   Thus, the Buyer has no rights whatsoever under the Agreement.

**C.    Compelling Altera to provide transition services is directly contrary to the Agreement's express terms.**

94.    The Debtors argue that the Court should compel Altera to provide transition services to "best effectuate the purpose for which a contract is made."   Debtors' Motion, ¶ 32 (quoting *Lange v. Lange*, 520 N.W.2d 113, 118 (Iowa 1994)).   Compelling Altera to provide transition services, however, could not be further from the "purpose" of the contract – or the actual terms that the parties agreed upon.   Indeed, the "purpose" asserted by the Debtors is directly contrary to the specific, plain and unambiguous terms of the Agreement.

95.    Paragraph 3.1 of the Agreement granted the Debtors a "limited, nonexclusive, non-transferable right and license to use, and permit Authorized Users to use, . . . the executable version(s) of the generally-available . . . proprietary software and/or content."   The Agreement defined "Authorized Users" very carefully to mean and include "Client authorized persons and

entities who support or facilitate Client's business of providing medical care, including (a) Client's employees and authorized agents, and (b) Client's nurses, physicians, and technicians." *Id.* The term also includes third party consultants and other independent contractors who "are performing services for Client." *Id.*

96.     Thus, the Agreement makes clear that the only persons who are authorized to use Altera's software are those employed on ***the Debtors' behalf –*** and no one else – *i.e.*, the Buyer. This Agreement ensures that only the Debtors and individuals working on their behalf may use the software and the Debtors may not turn it over to a third party.  Yet that is exactly what the Debtors are trying to do by handing the software over to the Buyer – a party with whom Altera did not contract – and forcing Altera to provide transition services to the Buyer.

**D.     The Agreement expressly requires the Debtors to assume and assign the Agreement if the Debtors want to permit a third party to use the software.**

97.     While the Agreement expressly prevents the Debtors from simply handing over the software to a stranger, the Agreement ***did*** contemplate a mechanism for the Debtors to transfer the software: assignment of the Agreement to the Buyer.  Paragraph 16.7 states that "either Party may assign this Agreement to a successor to all or substantially all of the business or assets of the assigning Party."  But, the Debtors have chosen not to assign the Agreement.  The Debtors can very well effectuate the smooth transition they desire by complying with the Agreement's terms via assumption and assignment.  By simply handing over the software without assumption and assignment, the Debtors are doing the complete opposite of the Agreement's specific terms.

### III.    The Debtors have had more than sufficient time to decide whether to assume such an important contract.

#### A.    The Debtors fail to respond to Altera's argument that an agreement as important as the Agreement should have been among the first order of business.

98.    In Altera's Motion (¶ 26), Altera argued that in light of the importance of the Agreement to the hospital's operations, deciding whether to assume or reject it "should have been among their first and most pressing orders of business." *In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 431 (Bankr. S.D.N.Y. 2012). Indeed, other courts have recognized that the importance of an asset is essential to determining whether a debtor has had enough time to make a decision to assume or reject a contract. *See, e.g.*, *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 106 (2d Cir. 1982) ("the lease is [the debtor]'s primary asset. [The debtor]'s decision to assume or reject the lease would be central to any plan of reorganization in this Chapter 11 proceeding").

99.    In the Objection, the Debtors cite *Hawker* for support (Obj., ¶ 11), but they blatantly fail to address *Hawker's* instruction that deciding whether to assume or reject an important contract – such as the Agreement – should have been the first order of business. To the contrary, the Debtors double down on the importance on the Agreement to hospital's operations, demonstrating that they should have made a decision concerning the Agreement long ago.

100.    In the Debtors' Motion, the Debtors argue that Altera's software "is the backbone of the Hospital's operations," "is vital to the day-to-day operations of the Hospital," and "the Debtors could not continue to operate" without Altera assistance. Debtors' Motion, ¶ 2. In their Objection, the Debtors further state that the failure to obtain transition services from Altera would have "potentially dire consequences to the wellbeing of patients served by the Debtors." Obj., ¶ 14.

101. In light of the foregoing, the decision to assume or reject the Agreement "should have been among their first and most pressing orders of business." *In re Hawker Beechcraft, Inc.*, 483 B.R. at 431. It is simply not credible that the Debtors have not had enough time to decide whether to assume or reject the Agreement. The reality is that the Debtors are seeking to avoid assumption or rejection and to avoid paying Altera's cure claim, in an attempt to force Altera to do what it is not required to do – provide transition services to the Buyer.

### B. The Debtors' boilerplate excuses are not credible.

102. The Debtors argue that they should not be forced to assume or reject such a critically important asset because of the boilerplate excuse that they must focus their time and resources on addressing plan issues. Obj., ¶ 13. The Debtors have not filed a plan or disclosure statement. The Debtors have, however, filed a motion to compel performance of the Agreement. The reality is the Debtors are simply seeking to avoid assumption or rejection.

103. Moreover, it is unclear why the Debtors' sophisticated counsel cannot consider assumption and assignment of the Agreement while it focuses on other issues. The Debtors' counsel has sufficient personnel to do so. In its objection to the Debtors' counsel's fee application [Docket No. 608], the U.S. Trustee argues that the Debtors' counsel has "significant[ly] overstaff[ed]" this Chapter 11 case and there is large duplication of efforts. *Id.*, ¶ 17. The Debtors' counsel has sufficient bandwidth and personnel to handle this matter.

### C. Altera will suffer concrete prejudice if the Debtors are not compelled to assume or reject the Agreement.

104. Every day that Altera continues to perform under the Agreement is another day that Altera continues to incur additional out of pocket costs that is unlikely to be paid. In particular, Altera hires personnel who work onsite and exclusively for the Debtors, as well as personnel who work specifically for the Debtors to maintain 24/7 support. Altera also hires personnel to maintain

the Debtors' technological infrastructure because the Debtors had an insufficient structure in place.

Altera is only being paid a small portion of the amount due under the Agreement.  As a result,

Altera is incurring substantial losses each day that it is required to continue performing under the

Agreement.  The problem for Altera is that unless and until the Debtors assume or reject the

Agreement, Altera will continue to accrue these charges.

**IV.    The Court should deny sanctions; Altera has not violated the stay; the Debtors rely on the incorrect legal standard, which the Eighth Circuit has made clear only applies to individual debtors, not to a corporate debtor.**

105.    Altera has not violated the automatic stay.  Altera is continuing to fully perform

under the Agreement, despite the fact that Altera is being paid less than half of the amount required

under the Agreement.  Moreover, Altera has never stopped performing under the Agreement.

Altera continues to provide 24/7 support to the Debtors, the Debtors continue to use the software,

and they continue to benefit from Altera's experts working on the Debtors' behalf.  The sale to the

Buyer has not even closed and Altera has done absolutely nothing to alter the *status quo*.  Thus,

Altera never did anything remotely close to violating the automatic stay.

106.    The Debtors' only argument is that Altera's demand for a release in exchange for

transition services violates the automatic stay.  That is incorrect.  The Debtors intentionally

misconstrue Altera's position to manufacture a stay violation.  Altera's position has always been

clear: the Debtors may (a) assume and assign the Agreement and be content with the rights

provided for under the Agreement – which does not include the Buyer obtaining transition services

over Altera's objection, or (b) the Debtors, the Buyer, and Altera can agree on the terms of a new

contract with the Buyer.  One of the terms Altera has required for a new contract is a release from

litigation.  Altera has no obligation to enter into a new contract with the Buyer.  Altera is free to

request any consideration it wants in exchange for entering into a new contract.  The Debtors are

not required to agree – nor will the Debtors be prejudiced if they do not agree – the Debtors can

assume the Agreement and continue to have full use of the Software.  The Debtors also can assign the Agreement to the Buyer, so that the Buyer may have full use of the Software.  It is only the Debtors' choice – not to assume and assign the Agreement – that may cause prejudice to the Debtors.

107.    Even if the Debtors' assertions were correct, they still do not constitute a violation of the automatic stay.  The Debtors do not cite any authority for their allegations.  To the contrary, even if true, their allegations of Altera's "demand" amounts to nothing more than a statement by Altera.  No statement could possibly affect property of the estate.

108.    Even if there was a stay violation, the law is clear that only individual debtors may obtain damages or sanctions.  The Debtors misstate the law and ignore controlling Eighth Circuit precedent.  The Debtors argue that the Court "must" award "actual damages, including costs and attorneys' fees, and, in appropriate circumstances [punitive damages]."  Debtors' Motion, ¶ 42. This statement applies **only** to an individual debtor case.  While the Debtors cite 11 U.S.C. § 362, they fail to tell this Court that they are referring to 11 U.S.C. § 362(k), which, by its own terms, only applies to an individual debtor case.  The Eighth Circuit in *Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys.)*, 108 F.3d 881, 884 (8th Cir. 1997) specifically held that section 362(h) (now section 362(k)) does not apply to corporate debtors.  *Id.* ("The bankruptcy court ruled that § 362[k] only applies to 'individual' debtors, not to corporate entities such as Just Brakes.  We agree."); *Mahaska State Bank v. Weiler (In re Weiler)*, Adv. No. 01-20105, 2003 Bankr. LEXIS 2336, at *25 (Bankr. S.D. Iowa May 27, 2003) ("The Eighth Circuit has held that the plain meaning of the word 'individual' precludes the use of § 362([k]) by corporations.").

109.    In *Sosne*, the Eight Circuit affirmed the bankruptcy court's finding that a creditor violated the automatic stay, but reversed the award of stay violation damages, finding that they

were "an improper remedy" against a corporate debtor.  108 F.3d at 883.  There, a creditor had an outstanding judgment against a debtor.  In between back-to-back bankruptcy filings, the creditor and debtor engaged in state court litigation that resulted in the foreclosure sale of certain of the debtor's assets.  Prior to the sale, the debtor filed its second bankruptcy case, the state court permitted the sale to proceed, and the creditor applied to the state court and was granted a "pay-out" of the net sale proceeds without first seeking stay relief.  The Eighth Circuit easily concluded that the creditor violated the automatic stay.  The Eighth Circuit also agreed with the bankruptcy court's ruling that 11 U.S.C. § 362(k) did not apply to individual debtors.  The Eighth Circuit noted that other courts read the term "individuals" in section 362(k) broadly, but it "reject[ed] earlier, contrary circuit decisions that did not give adequate weight to the statute's plain meaning." *Id.* at 884-85.

## V. The Debtors must prevail on every single argument and rebut every defense made by Altera in order to terminate the Agreement.

110.    "To prevail at trial on a breach of contract claim under Illinois law, a plaintiff must demonstrate: '(1) the existence of a valid and enforceable contract; (2) substantial performance by [the plaintiff]; (3) a breach by defendants; and (4) resultant damages.'" *Johnson*, 652 B.R. at 524 (citation omitted).  The law is clear that "[t]he plaintiff has the burden of establishing ***each element*** by a preponderance of the evidence." *Id.* (emphasis added).  In *Johnson*, the court found that the Chapter 7 trustee "failed to meet the burden of proof on her claims for breach of oral contract against Defendants as to the essential elements of the claim" and also failed to prove the elements for breach of a written contract.  *Id.* at 524, 526.  As to breach of the written agreement, the court found that the trustee "simply failed to cite any supporting evidence from the record." *Id.* at 525.  In particular, "[a] plaintiff is required to prove, not only that damages were suffered, but also a

way to measure or compute the amount of such damages.  No such evidence or argument was presented."  *Id.* at 526.

111.     Applied here, the Debtors bear the burden of proving their termination claim, which, in turn, requires them to prove each element of a breach of contract.  A failure of proof on any element means that their claim fails and the Debtors' Motion must be denied.  Stated differently, if Altera prevails on even a single point herein, the Debtors *cannot* terminate the Agreement.  The Debtors will not be able to establish any of their arguments.  Therefore, they would *not* be entitled to transition services.

**VI.     The Debtors' Motion must be denied because there is a complete failure of factual allegations and a complete failure of admissible evidence.**

112.     The Debtors fail to provide any details or facts concerning an alleged breach beyond broad, conclusory allegations concerning the implementation of the software.  Similarly, the Debtors fail to submit any evidence to support their factual allegations.  This is not a situation where a party submitted evidence and their adversary is asserting that the evidence is insufficient.  In this case, the Debtors have not submitted anything other than a summary revenue chart.  While the Debtors allege that Altera's breach was "willful" they fail to provide any factual basis for that conclusory allegation.  In particular, the Debtors do not say what in particular Altera failed to do, nor do they even cite to a provision of the Agreement that Altera allegedly breached.  Simply pointing at reduced revenues – which is likely the result of many circumstances besides Altera's fault – cannot possibly prove anything more than that revenues were reduced – and certainly does not prove that Altera breached or that Altera caused damages to the Debtors.  Moreover, the Debtors fail to submit any evidence to substantiate their claims.

**A.**   **The Debtors' sole piece of "evidence" – the revenue chart – is inadmissible, and the Debtors offer only testimony from Mr. Toney who has no personal knowledge.**

**i.**   ***The Debtors provide no admissible evidence of breach or of their damages.***

113.   Beyond vague and unsubstantiated statements that Altera allegedly breached the Agreement, the Debtors' only attempt at evidence is the revenue chart found at page 6 of the Debtors' Motion.  This chart has no source or attribution.  Thus, the chart is inadmissible under Federal Rule of Evidence ("FRE") 1006, which excludes charts such as this one where a party has failed to provide any underlying support for the chart.

114.   Pursuant to FRE 1006, the Debtors "may use a summary [or] chart . . . to prove the content of voluminous writings, . . . that cannot be conveniently examined in court."  However, the Debtors "must make the originals or duplicates available for examination or copying, or both, by [Altera] at a reasonable time and place." *Id.*  FRE 1006 also requires that the chart's underlying information (*i.e.*, the voluminous writings from which the chart was prepared) be admissible for the chart itself to be admissible.  6 Weinstein's Federal Evidence § 1006.06[3] ("Charts, summaries and calculations are only admissible when based on original or duplicate materials that are themselves admissible evidence.").

115.   "The right to examine the underlying records is absolute."  6 Weinstein's Federal Evidence § 1006.06[1]. "Under Rule 1006, the judge does not have discretion to waive the requirement that originals or duplicates of voluminous writings, recordings, or photographs be made available for examination or copying, or both, at a reasonable time or place."  6 Weinstein's Federal Evidence § 1006.06[2].  The obligation to "make available" the underlying records is self-executing and records must be turned over without a discovery request.  *See, e.g.*, *Air Safety v. Roman Catholic Archbishop*, 94 F.3d 1, 8 (1st Cir. 1996) ("Rule 1006 operates independently of

the discovery rules . . . and the failure to request or obtain the documents during discovery does not negate 'a party's absolute right to subsequent production of material under Rule 1006, should that material become incorporated in a chart, summary, or calculation.'") (citation omitted); *United States v. Modena*, 302 F.3d 626, 633 (6th Cir. 2002) (party must produce source data for summary evidence "without regard to whether [defendant] made a request for these records").

116.    Courts regularly exclude summary evidence – such as the Debtors' chart – under FRE 1006, when the underlying data purporting to be summarized has not been produced.  *See, e.g.*, *United States ex rel. Maris Equip. Co. v. Morganti, Inc.*, 163 F. Supp. 2d 174, 202 (E.D.N.Y 2001) (court correctly decided "not to allow the cost report summary in evidence"); *United States v. Miller*, 771 F.2d 1219, 1238 (9th Cir. 1985) ("[T]he lists were not admissible as summaries under Rule 1006 because the government failed to provide appellants with a copy of the underlying documents prior to the introduction of the summary."); *United States v. Kim*, 595 F.2d 755, 764 (D.C. Cir. 1979) ("When the underlying documents are not subject to examination by the opposing parties, the summary should not be admitted into evidence.").

117.    Here, the Debtors have failed to make the underlying information for the chart available to Altera.  The chart does not state what records it purports to summarize.  Thus, the Court cannot determine what documents were used to create the chart.  This means that Altera has no way to test the truth or accuracy of the chart.

118.    Because the Debtors have not identified the underlying source of records, the Debtors cannot demonstrate that the underling records are, themselves, admissible.  Consequently, the revenue chart must be excluded under FRE 1006.

> ii.    ***The Debtors do not intend to offer any witness with personal knowledge of the alleged breaches.***

119.    The Debtors intend to rely on the sole testimony of Mark Toney, the Debtors' Chief Restructuring Officer, in support of the Debtors' Motion.  But Mr. Toney has no personal knowledge of the implementation or deployment of the Altera software.  He was not there at the time.  In fact, almost none of the people involved in the implementation (the only possible witnesses with personal knowledge) are still employed by either the Debtors or Altera.

120.    Under FRE 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness ***has personal knowledge of the matter***."  (Emphasis added).  *See Horn v. Airway Servs., Inc.*, No. 18-CV-3053 CJW-MAR, 2020 U.S. Dist. LEXIS 14044, at *42 (N.D. Iowa Jan. 27, 2020) (barring witness from testifying as to certain matter because "[witness] does not have personal knowledge and thus cannot testify about the [matter]").

121.    According to the Debtors, the alleged breaches occurred in 2022.  *See* Debtors' Motion, ¶ 15.  According to Mr. Toney's first day declaration [Docket No. 27], he and his firm were engaged later in January 2023.  *See id.*, ¶ 14.  Mr. Toney has no first-hand knowledge of the events giving rise to the alleged breaches, including: (1) the implementation of the software; (2) the Debtors' decisions to overrule Altera's suggestions to (a) phase the software in a two-stage schedule; or (b) the Debtors' decision to deploy the software without sufficient testing; (3) the Debtors' failure to provide the support that was required under the Agreement; (4) the alleged lost revenues; or (5) whether the revenues were simply delayed.  Anything that Mr. Toney would testify to would be hearsay, not subject to admission via any exception.  The Debtors have no other witness and thus, their motion must be denied for failure of evidence.

**B.      The Debtors' Motion should be denied because Altera will be prejudiced without the ability to obtain discovery to defend itself against the Debtors' eleventh hour claims.**

122.     The Debtors' Motion must be denied absent a full factual record, in which the Debtors have actually proven each of their allegations, by admissible evidence – not self-serving allegations that are devoid of any evidentiary backup.  The Debtors decided to claim a breach that could terminate the Agreement – for the very first time – in the Debtors' Motion and their letter sent just three days before the Debtors' Motion was filed.  Yet the Debtors knew full well about this dispute and the need for resolution when it sent their initial letter in December and certainly when Altera filed Altera's Motion in December.  The Debtors' delay in making this assertion was intentional, knowing, and tactical to prejudice Altera's ability to obtain the discovery and present third party witnesses that Altera needs to defend itself.

123.     But Altera *is* entitled to have the opportunity to dispute and disprove the Debtors' false allegations, after taking discovery.  Unfortunately, almost all of the employees of the Debtors and Altera who had any personal knowledge no longer work for either party.  Thus, Altera needs to take discovery from third parties that are not before the Court.  Altera is seeking to obtain this discovery, but it takes time.  In addition, Altera is entitled to take the deposition of a representative of the Debtors.  That will also take more time to obtain applicable documents and deposition.

**VII.   The Debtors' Motion, which necessarily seeks declaratory and equitable relief, is required to be brought as an adversary proceeding.**

124.     Rule 7001(7) of the Federal Rules of Bankruptcy Procedure requires that a proceeding to obtain equitable relief be brought as an adversary proceeding.  Rule 7001(9) requires an adversary proceeding "to obtain a declaratory judgment relating to any of the foregoing."

125.     While Bankruptcy Courts often make exceptions and permit motions to proceed as a substitute for an adversary proceeding using the rules governing contested matters, this case

presents the exact situation that the requirement of an adversary proceeding was designed for – the

Debtors are seeking a multi-level factual and legal determination – on 10 days' notice.

126.    Among other things, for the Debtors' Motion to be granted the Debtors must prove

via submission of admissible evidence that (a) a breach exists and has not been cured, (b) the

Debtors sent a proper cure and termination notice, (c) the time within which to cure has expired,

(d) Altera has not cured the alleged breach, (e) the Debtors suffered tens of millions of dollars in

damages, (f) Altera was the sole cause of the damages, (g) none of the contractually agreed upon

damages limitations apply, and (h) the amount of damages the Debtors are entitled to exceeds the

amounts due to Altera.

127.    Nearly all of the individuals involved in the software implementation have moved

on and no longer continue working for the Debtors or Altera.  Altera is entitled to discovery to

defend itself against these allegations, including the opportunity to obtain the testimony of these

witnesses, who are now third parties and not under the control of Altera or the Debtors.  Altera is

entitled to the additional procedural safeguards that an adversary proceeding would provide,

including dispositive motions.  An adversary proceeding setting is the only way to ensure these

protections, and thus the Debtors should be required to commence an adversary proceeding to seek

the relief that they seek.

## **CONCLUSION**

WHEREFORE, for the reasons set forth herein, Altera respectfully requests that this Court grant Altera's Motion, overrule the Objection, deny the Debtors' Motion, and grant Altera such other and further relief as the Court may deem just and proper.

Dated: January 19, 2024

PAPPAJOHN, SHRIVER, EIDE & NIELSEN P.C.

 /s/ Larry S. Eide
Larry S. Eide (AT0002317)
103 E. State Street, Suite 800
Mason City, IA 50401
Tel: (641) 423-4264
Fax: (641) 423-3145
eide@pappajohnlaw.com

-and-

LOEB & LOEB LLP
Schuyler G. Carroll (admitted *pro hac vice*)
Noah Weingarten (admitted *pro hac vice*)
345 Park Avenue
New York, NY 10154
Tel: (212) 407-4000
Fax: (212) 202-5431
scarroll@loeb.com
nweingarten@loeb.com

*Counsel to Altera Digital Health Inc.*

238192783