> **THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED BY THE COURT FOR SOLICITATION PURPOSES**
>
> **This proposed Combined Disclosure Statement and Plan is being submitted for approval only and is not a solicitation of acceptance or rejection of the same. Acceptances or rejections may not be solicited until the Court has approved the disclosures contained herein.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | ) | Case No. 23-00623 (TJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## DEBTORS' COMBINED DISCLOSURE STATEMENT AND
## JOINT CHAPTER 11 PLAN OF LIQUIDATION

**NYEMASTER GOODE, P.C.**
Roy Leaf, AT0014486
625 First Street SE, Suite 400
Cedar Rapids, IA 52401
Telephone:    (319) 286-7002
Facsimile:    (319) 286-7050
Email:    rleaf@nyemaster.com

- and -

Kristina M. Stanger, AT0000255
Matthew A. McGuire, AT0011932
Dana Hempy, AT0014934
700 Walnut, Suite 1600
Des Moines, IA 50309
Telephone:    (515) 283-3100
Facsimile:    (515) 283-8045
Email:    kmstanger@nyemaster.com
    mmcguire@nyemaster.com
    dhempy@nyemaster.com

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (admitted *pro hac vice*)
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:    fperlman@mwe.com
    dsimon@mwe.com
    ekeil@mwe.com

- and -

Jack G. Haake (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:    jhaake@mwe.com

*Counsel for Debtors and Debtors-in-Possession*

Dated: February 23, 2024

# **TABLE OF CONTENTS**

Article I. INTRODUCTION ................................................................................................................3
    A.    Overview ................................................................................................................3
    B.    Summary of Treatment of Claims and Interests ........................................................3

Article II. DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION, COMPUTATION
OF TIME, AND GOVERNING LAW ............................................................................................. 10
    A.    Definitions ........................................................................................................... 10
    B.    Rules of Interpretation and Construction ............................................................. 30
    C.    Computation of Time ........................................................................................... 31
    D.    Governing Law .................................................................................................... 31

Article III. BACKGROUND AND DISCLOSURES ...................................................................... 31
    A.    General Background ............................................................................................ 31
    B.    Circumstances Giving Rise to the Chapter 11 Cases ............................................ 38
    C.    The Chapter 11 Cases ......................................................................................... 42
    D.    Releases and Exculpation .................................................................................... 58

Article IV. TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS ................................... 58
    A.    Administrative Expense Claims ........................................................................... 58
    B.    Priority Tax Claims ............................................................................................. 59
    C.    Priority Non-Tax Claims ..................................................................................... 59
    D.    Professional Fee Claims ...................................................................................... 60
    E.    Substantial Contribution Compensation and Expenses Bar Date ......................... 60

Article V. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........................ 61
    A.    Classification of Claims and Interests.................................................................. 61
    B.    Treatment of Claims and Interests ....................................................................... 62
    C.    Special Provision Governing Unimpaired Claims ............................................... 66
    D.    Nonconsensual Confirmation............................................................................... 66
    E.    Allowed Claims .................................................................................................. 66

Article VI. CONFIRMATION AND VOTING PROCEDURES ...................................................... 66
    A.    Confirmation Procedure ...................................................................................... 66
    B.    Statutory Requirements for Confirmation ........................................................... 67
    C.    Acceptance or Rejection of the Plan .................................................................... 71
    D.    Voting Procedures ............................................................................................... 72

Article VII. CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ...................... 74
    A.    General Bankruptcy Law and Plan Considerations .............................................. 74
    B.    Risks Associated with Forward Looking Statements ........................................... 76
    C.    Alternatives to Confirmation and Consummation of the Plan .............................. 76

Article VIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES .......................................... 77
    A.    Overview............................................................................................................. 77
    B.    Tax Consequences to U.S. Holders of Certain Allowed Claims ........................... 79
    C.    Tax Consequences to Non-U.S. Holders of Certain Allowed Claims .................... 80
    D.    Matters Related to the Disputed Claims Reserve.................................................. 82
    E.    Tax Consequences in Relation to the Liquidation Trust........................................ 82

    F.        Information Reporting and Back-Up Withholding ........................................................... 84

Article IX. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................ 85
    A.       Substantive Consolidation ............................................................................................. 85
    B.       Corporate Transactions .................................................................................................. 86
    C.       Sources of Consideration for Plan Distributions ............................................................ 86
    D.       The Liquidation Trust .................................................................................................... 86
    E.       Corporate Action ........................................................................................................... 87
    F.       Books and Records ........................................................................................................ 89
    G.      Committee Dissolution ................................................................................................... 89
    H.      Altera Agreement .......................................................................................................... 90
    I.        Transfer of JV Interests ................................................................................................. 90
    J.       Accounts and Reserves .................................................................................................. 90
    K.      Exemption from Certain Transfer Taxes ........................................................................ 92
    L.       No Revesting of Assets in the Debtors ........................................................................... 92
    M.     Applicability of Bankruptcy Code Sections 1145 and 1125(e) ....................................... 92
    N.      Preservation of Causes of Action ................................................................................... 93
    O.      The Foundation ............................................................................................................. 93
    P.       The Pension Plan ........................................................................................................... 93
    Q.      Administration and Wind-Down of Workers' Compensation Self-Insured Trust ........... 94

Article X. PROVISIONS REGARDING THE LIQUIDATION TRUST ............................................... 94
    A.       Establishment and Administration of the Liquidation Trust ........................................... 94
    B.       Liquidation Trust Assets ................................................................................................ 94
    C.       Other Funds to be Transferred to the Liquidation Trust ................................................. 95
    D.       Liquidation Trust Distributions and Expenses ............................................................... 95
    E.       Appointment of the Liquidation Trustee ........................................................................ 95
    F.       Liquidation Trust Beneficiaries ..................................................................................... 96
    G.      Liquidation Trust Interests ............................................................................................. 96
    H.      Certain Powers and Duties of the Liquidation Trust and Liquidation Trustee ................. 96

Article XI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................................... 98
    A.       Distributions on Allowed Claims ................................................................................... 98
    B.       Disbursing Agent ........................................................................................................... 99
    C.       Delivery of Distributions and Undeliverable or Unclaimed Distributions ...................... 99
    D.       Timing of Distributions ................................................................................................ 101
    E.       Means of Cash Payment ............................................................................................... 101
    F.       Interest on Claims ........................................................................................................ 101
    G.      No Creditor to Receive More than Payment in Full ...................................................... 101
    H.      Withholding and Reporting Requirements .................................................................... 101
    I.        Setoffs ......................................................................................................................... 102
    J.       Procedure for Treating and Resolving Disputed, Contingent, and/or Unliquidated
            Claims ......................................................................................................................... 102

Article XII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............. 104
    A.       Rejection of Executory Contracts and Unexpired Leases .............................................. 104
    B.       Rejection Bar Date ....................................................................................................... 105
    C.       Indemnification and Reimbursement ............................................................................ 105

Article XIII. CONDITIONS PRECEDENT TO CONFIRMATION AND  CONSUMMATION OF THE PLAN ........................................................................................................................... 106
    A.    Conditions Precedent to Confirmation ................................................................ 106
    B.    Conditions Precedent to Effective Date ............................................................. 106
    C.    Establishing the Effective Date .......................................................................... 107
    D.    Waiver of Conditions ......................................................................................... 107
    E.    Consequences of Non-Occurrence of Effective Date ........................................ 107

Article XIV. EFFECTS OF CONFIRMATION ................................................................. 107
    A.    Compromise and Settlement of Claims and Controversies ............................... 107
    B.    Binding Effect .................................................................................................... 108
    C.    Discharge of the Debtors ................................................................................... 108
    D.    Releases ............................................................................................................. 108
    E.    Exculpation and Limitation of Liability ............................................................ 109
    F.    Injunction .......................................................................................................... 110

Article XV. RETENTION OF JURISDICTION ................................................................ 111
    A.    Retention of Jurisdiction .................................................................................... 111
    B.    Retention of Non-Exclusive Jurisdiction by the Court ...................................... 113
    C.    Alternative Jurisdiction ...................................................................................... 113
    D.    Failure of Court to Exercise Jurisdiction .......................................................... 113

Article XVI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..................... 114
    A.    Modifications and Amendments ......................................................................... 114
    B.    Effect of Confirmation on Modifications ........................................................... 114
    C.    Revocation or Withdrawal of the Plan ............................................................... 114

Article XVII. MISCELLANEOUS PROVISIONS ............................................................. 114
    A.    Terminations of Injunctions or Stays ................................................................. 114
    B.    Severability of Provisions .................................................................................. 115
    C.    Payment of Statutory Fees ................................................................................. 115
    D.    Service of Documents ........................................................................................ 115
    E.    2002 Service List .............................................................................................. 116
    F.    Filing of Additional Documents ........................................................................ 116
    G.    Plan Supplement(s) ............................................................................................ 116
    H.    Votes Solicited in Good Faith ............................................................................ 116
    I.    Closing of Chapter 11 Cases .............................................................................. 117
    J.    No Admissions ................................................................................................... 117
    K.    Inconsistency ..................................................................................................... 117
    L.    Request for Expedited Determination of Taxes ................................................. 117
    M.    Reservation of Rights ......................................................................................... 117

## DISCLAIMERS

THIS COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS CERTAIN SUMMARIES OF CERTAIN STATUTORY PROVISIONS AND CERTAIN DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN THAT MAY BE ATTACHED AND ARE INCORPORATED BY REFERENCE AND DESCRIBES CERTAIN EVENTS IN THE CHAPTER 11 CASES.  ALTHOUGH THE DEBTORS BELIEVE THAT THIS INFORMATION IS FAIR AND ACCURATE, THIS INFORMATION IS QUALIFIED IN ITS ENTIRETY TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.  THE TERMS OF THE DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE COMBINED DISCLOSURE STATEMENT AND PLAN. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE COMBINED DISCLOSURE STATEMENT AND PLAN, THE DOCUMENTS RELATED THERETO, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED HEREIN OR ATTACHED HERETO IS MADE BY THE DEBTORS ONLY AS OF THE DATE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS ANOTHER TIME IS SPECIFIED.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF.  THERE CAN BE NO ASSURANCES THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.  THE DEBTORS DISCLAIM ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  THE DELIVERY OF THE COMBINED DISCLOSURE STATEMENT AND PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS.  EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND IN THE RELATED EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES OR ANY OTHER JURISDICTION.

THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE SECTIONS 1123 AND 1125 AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES

EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.   NO OTHER GOVERNMENTAL OR OTHER REGULATORY AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.   CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS AND INVOLVE MATERIAL RISKS AND UNCERTAINTIES THAT ARE SUBJECT TO CHANGE BASED ON A NUMBER OF FACTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES AND THE DEBTORS' FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN ARE BASED UPON THE ANALYSES PERFORMED BY THE DEBTORS AND ITS ADVISORS.   ALTHOUGH THE DEBTORS AND THEIR ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE DEBTORS AND THEIR ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.   THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

IF YOU ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.   PRIOR TO DECIDING WHETHER OR HOW TO VOTE ON THIS PLAN, EACH HOLDER OF A CLAIM THAT IS ENTITLED TO VOTE SHOULD CAREFULLY REVIEW ALL OF THE INFORMATION IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

**THE DEBTORS AND THE BONDHOLDER REPRESENTATIVES SUPPORT CONFIRMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN AND RECOMMEND ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## ARTICLE I.
## INTRODUCTION

A.    **Overview**[1]

The Debtors hereby propose the Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation (the disclosure statement portion hereof, the "Disclosure Statement" and the chapter 11 plan portion hereof, the "Plan", as may be subsequently modified, amended, or supplemented from time to time),[2] pursuant to Bankruptcy Code sections 1125 and 1129.  The Debtors are the proponents of the Plan within the meaning of Bankruptcy Code section 1129.

The Debtors submit the Disclosure Statement pursuant to Bankruptcy Code section 1125 to Holders of Claims against and Interests in the Debtors in connection with (i) solicitation of acceptances of the Plan; and (ii) the hearing to consider approval of the Disclosure Statement.  The Disclosure Statement contains, among other things, a discussion of the Debtors' history, business operations, events leading to the filing of the Chapter 11 Cases, significant events that have occurred during the Chapter 11 Cases, certain risk factors, and a discussion of certain other related matters.  The Disclosure Statement also discusses the Confirmation process and the procedures for voting, which procedures must be followed by the Holders of Claims entitled to vote under the Plan in order for their votes to be counted.

The Plan constitutes a liquidating joint chapter 11 plan for the Debtors.  Except as otherwise provided by Order of the Court, Distributions will occur on the Effective Date or as soon thereafter as is practicable.  The Plan provides that, upon the Effective Date, the Liquidation Trust Assets will be transferred to the Liquidation Trust and the Debtors will be dissolved under applicable law as soon as practicable.  The Liquidation Trust Assets will be administered and distributed as soon as practicable pursuant to the terms of the Plan and the Liquidation Trust Agreement.

Subject to the restrictions on modifications set forth in Bankruptcy Code section 1127 of and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XVI hereof, the Debtors expressly reserve the right to alter, amend, or modify the Plan, one or more times, before its substantial consummation.

B.    **Summary of Treatment of Claims and Interests**

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE COMBINED DISCLOSURE STATEMENT AND PLAN IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

---

[1]    Capitalized terms used but not defined in this introduction shall have the same meanings set forth in Article II.A hereof.

[2]    Copies of all Filings in the Chapter 11 Cases (as defined herein) can be obtained and viewed free of charge at the following web address:  https://dm.epiq11.com/case/mercyhospital.

The classification and treatment of Claims against the Debtors pursuant to the Plan is as set forth below and as further detailed in Article V hereof:[3]

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Approximate Recovery |
|---|---|---|---|---|---|
| 1-A | Bondholder Claims – Series 2018 Bonds | On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder of an Allowed Bondholder Claim – Series 2018 Bonds shall receive, on account of, in exchange for, and in full satisfaction of such Allowed Bondholder Claim, a Pro Rata Distribution of the Bondholder Claim Waterfall Amount; *provided, however*, that, notwithstanding anything to the contrary above, aggregate recovery amounts attributable to the Holders of Allowed General Unsecured Claims (Class 3) and Holders of Allowed Pension Claims (Class 5) shall not be less than ten percent (10)% of the aggregate recovery amounts attributable to the Holders of Allowed Bondholder Claims | Impaired | Entitled to Vote | Agreed Amount: $62,000,000 (includes Class 1-A and Class 1-B) Projected Recovery: 77% - 97% |

---

[3]  The information set forth herein is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process. Actual recoveries may widely vary within these ranges and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distributions received by Holders of Allowed Claims.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimate as of the date hereof only.  The Debtors' reconciliation of Claims remains ongoing, which may impact the estimated amounts and projected recoveries reflected above.  In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Approximate Recovery |
|---|---|---|---|---|---|
| | | (Classes 1-A and 1-B), with distributions made by the Liquidation Trust post-Effective Date being modified accordingly. | | | |
| 1-B | Bondholder Claims – Series 2011 Bonds | On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder of an Allowed Bondholder Claim – Series 2011 Bonds shall receive, on account of, in exchange for, and in full satisfaction of such Allowed Bondholder Claim, a Pro Rata Distribution of the Bondholder Claim Waterfall Amount; *provided, however*, that, notwithstanding anything to the contrary above, aggregate recovery amounts attributable to the Holders of Allowed General Unsecured Claims (Class 3) and Holders of Allowed Pension Claims (Class 5) shall not be less than ten percent (10%) of the aggregate recovery amounts attributable to the Holders of Allowed Bondholder Claims (Classes 1-A and 1-B), with distributions made by the Liquidation Trust post-Effective Date being modified accordingly. | Impaired | Entitled to Vote | <u>Agreed Amount</u>: $62,000,000 (includes Class 1-A and Class 1-B)<br><br><u>Projected Recovery</u>: 77% - 97% |
| 2 | Other Secured Claims | On, or as soon as reasonably practicable after, the Effective Date, to the extent not otherwise paid pursuant to another Court order, each Holder of an Allowed Other | Unimpaired | Deemed to Accept | <u>Estimated Amount</u>: $598,867<br><br><u>Projected Recovery</u>: 100% |

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Approximate Recovery |
|---|---|---|---|---|---|
| | | Secured Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Other Secured Claim, (i) cash equal to the unpaid portion of the Allowed Other Secured Claim, (ii) such other treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment as to which such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to in writing. | | | |
| 3 | General Unsecured Claims | On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder of an Allowed General Unsecured Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed General Unsecured Claim, a Pro Rata Distribution of the General Unsecured Claims Waterfall Amount; *provided* that aggregate recovery amounts attributable to the | Impaired | Entitled to Vote | Estimated Amount: $38,368,054[4] Projected Recovery: 8% - 10% |

[4]   The estimated amount of General Unsecured Claims does not include Claim No. 10359 filed by HRSA on February 2, 2024 for $14,149,139.  The Debtors do not believe that payment of such claim will be necessary, subject to ongoing reporting related to their use of provider relief funds.

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Approximate Recovery |
|---|---|---|---|---|---|
| | | Holders of Allowed General Unsecured Claims (Class 3) and Holders of Allowed Pension Claims (Class 5) shall not be less than ten percent (10)% of the aggregate recovery amounts attributable to the Holders of Allowed Bondholder Claims (Classes 1-A and 1-B), with distributions made by the Liquidation Trust post-Effective Date being modified accordingly. | | | |
| 4 | Bondholder Deficiency Claims | In the event that the Master Trustee receives less than $62 million on account of the Bondholder Claims pursuant to the treatment set forth in Classes 1-A and 1-B, the Holders of the Bonds shall receive an Allowed Bondholder Deficiency Claim, allocated between Classes 1-A and 1-B based upon the outstanding principal amount due on Series 2018 and Series 2011 Bonds, respectively, for the difference between $62 million and the amount actually received. Except to the extent such Holders and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder of an Allowed Bondholder Deficiency Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Bondholder | Impaired | Entitled to Vote | Estimated Amount: TBD<br><br>Projected Recovery: TBD |

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Approximate Recovery |
|---|---|---|---|---|---|
| | | Deficiency Claim, the same treatment as an Allowed General Unsecured Claim hereunder; *provided, however*, that in the event the Master Trustee receives payment in full on account of the Bondholder Claim, each Holder of a Bondholder Deficiency Claim shall be deemed to waive and release any Bondholder Deficiency Claim that otherwise may exist in excess of $62 million and shall contribute the distributions it otherwise would be entitled to receive as a Holder of an Allowed General Unsecured Claim to the Holders of Class 3 General Unsecured Claims and Class 5 Pension Claims, each of whom shall receive their respective Pro Rata Distribution of all such amounts. | | | |
| 5 | Pension Claims | On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder of an Allowed Pension Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge such Allowed Pension Claim, a Pro Rata Distribution of (i) the Pension Trust Administrative Cost Amount, *plus* (ii) 100% of the net proceeds of the | Impaired | Entitled to Vote | <u>Estimated Amount</u>: $21,500,000<br><br><u>Projected Recovery</u>: 8% - 10% |

| Class | Claim / Interest | Treatment | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims / Approximate Recovery |
|-------|------------------|-----------|--------|---------------|------------------------------------------------------------------|
| | | Pension Causes of Action, *plus* (iii) the Pension GUC Claim; *provided* that aggregate recovery amounts attributable to the Holders of Allowed General Unsecured Claims (Class 3) and the Holders of Allowed Pension Claims (Class 5) shall not be less than ten percent (10)% of the aggregate recovery amounts attributable to the Holders of Allowed Bondholder Claims (Classes 1-A and 1-B), with distributions made by the Liquidation Trust post-Effective Date being modified accordingly. | | | |
| 6 | Intercompany Claims | On the Effective Date, each Allowed Intercompany Claim shall be cancelled, extinguished, and discharged, as mutually agreed upon by each Holder of such Intercompany Claim and the Debtors or the Liquidation Trust, as applicable. | Impaired | Deemed to Reject | Projected Recovery: 0% |

As reflected above, the projected recovery under the Plan is 77% - 97% on account of Class 1-A (Bondholder Claims – Series 2018) and Class 1-B (Bondholder Claims – Series 2011), 8% - 10% on account of Class 3 (General Unsecured Claims), and 8% - 10% on account of Class 5 (Pension Claims). In the event the Plan is not confirmed and the Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, the settlements provided for herein will be void and no such recovery will be available.

Therefore, in the Debtors' view, the Plan offers Holders of Allowed Bondholder Claims, Allowed General Unsecured Claims, Allowed Bondholder Deficiency Claims, and Allowed Pension Claims the best opportunity to maximize value for recovery purposes and is therefore in the best interests of all creditors. Accordingly, the Debtors urge the Holders of Bondholder Claims, General Unsecured Claims, Bondholder Deficiency Claims, and Pension Claims to vote to accept the Plan.

## ARTICLE II.
### DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    **Definitions**

For purposes of the Combined Disclosure Statement and Plan, except as expressly provided herein or unless the context otherwise requires, all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in this Article II.

1.1    "**9019 Motion**" means the *Debtors' (I) Motion for Entry of Order Approving Settlement By and Among the Debtors, the Bondholder Representatives, the Committee, and Mercy Foundation; and (II) Application of Mercy, as Sole Member of Mercy Foundation, for Section 540A.106 Ruling* [Docket No. 346].

1.2    "**Acceleration Notice**" shall have the meaning set forth in Article III.C.5 hereof.

1.3    "**Accounts Receivable**" means the Debtors' accounts receivable that have yet to be collected and converted to Cash as of the Effective Date.

1.4    "**Administrative and Priority Claims Estimate**" means, as of the Effective Date, the estimated amount, exclusive of Professional Fee Claims, of all unpaid Claims that will be Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims.

1.5    "**Administrative Expense Claim**" means a Claim against the Debtors or their Estates for costs or expenses of administration of the Estate pursuant to Bankruptcy Code sections 364(c)(1), 503(b), 503(c), 507(b), or 1114(e)(2), including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the business of the Debtors; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses awarded or allowed under Bankruptcy Code sections 330(a) or 331, including Professional Fee Claims; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. sections 1911-1930.

1.6    "**Administrative Expense Claim Bar Date**" means the deadline for Filing Proofs of Claim for payment of Administrative Expense Claims (other than a Professional Fee Claim or any Statutory Fees), which shall be (a) March 15, 2024 for Administrative Expense Claims that (i) arose between the Petition Date and February 1, 2024 and (ii) were required to be filed by March 15, 2024 pursuant to the Administrative Expense Claim Bar Date Order; or (b) 30 days after the Effective Date that arose after February 1, 2024, unless otherwise ordered by the Court; *provided that* Professional Fee Claims shall be subject to the Professional Fee Claim Bar Date.

1.7    "**Administrative Expense Claim Bar Date Order**" means the Court order dated February 12, 2024 [Docket No. 740] setting the Administrative Expense Claim Bar Date for Administrative Expense Claims that arose between the Petition Date and February 1, 2024.

**1.8** **"Administrative Expense Claim Objection Deadline"** means the date that is no later than 30 days after the later of (a) the Effective Date and (b) any filing of any Administrative Expense Claim (other than a Professional Fee Claim) or filing of any request for payment of Administrative Expense Claim, unless such objection deadline is extended by Order of the Court.

**1.9** **"Adversary Complaint"** shall have the meaning set forth in Article III.C.5 hereof.

**1.10** **"Adversary Proceeding"** shall have the meaning set forth in Article III.C.5 hereof.

**1.11** **"Affiliate"** shall have the meaning set forth in Bankruptcy Code section 101(2). With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person was a Debtor in the Chapter 11 Cases.

**1.12** **"Allowed"** means, when used in reference to a Claim or Interest within a particular Class, an Allowed Claim or Interest in the specified Class or of a specified type.

**1.13** **"Allowed Claim"** means a Claim or any portion thereof (a) that has been allowed by a Final Order of the Court, (b) that has been Scheduled as a liquidated, non-contingent, and undisputed Claim in an amount greater than zero in the Schedules, and the Schedules have not been amended with respect to such Claim on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Court, (c) that is the subject of a timely Filed Proof of Claim and either (i) no objection to its allowance has been Filed on or before the Claims Objection Deadline or the expiration of such other applicable period fixed by the Court or (ii) any objection to its allowance has been settled, waived through payment or withdrawn, or has been denied by a Final Order, or (d) that is expressly allowed in a liquidated amount (x) in the Plan or (y) after the Effective Date, by the Liquidation Trustee in writing; *provided, however*, that with respect to an Administrative Expense Claim, "Allowed Claim" means an Administrative Expense Claim as to which a timely written request for payment has been made in accordance with applicable bar dates for such requests set by the Court (if such written request is required) in each case as to which (a) the Debtors or the Liquidation Trustee, as applicable, or any other party-in-interest (x) has not Filed an objection on or before the Administrative Expense Claims Objection Deadline or the expiration of such other applicable period fixed by the Court or (y) has interposed a timely objection and such objection has been settled, waived through payment or withdrawn, or has been denied by Final Order, or (b) after the Effective Date, the Liquidation Trustee has expressly allowed in a liquidated amount in writing.  For purposes of computing Distributions under the Plan, a Claim that has been deemed "Allowed" shall not include interest, fees, costs, or charges on such Claim from and after the Petition Date, except as provided in Bankruptcy Code section 506(b) or as otherwise expressly set forth in the Plan.

**1.14** **"Altera"** means Altera Digital Health Inc.

**1.15** **"Assets"** means all of the assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estates pursuant to Bankruptcy Code section 541, Cash, Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and the proceeds of all of the foregoing.

**1.16** "**Avoidance Actions**" means any and all Claims and Causes of Action of the Debtors arising under chapter 5 of the Bankruptcy Code, including, without limitation, sections 544, 545, 547, 548, 549, and 550 thereof, or their state law analogs.

**1.17** "**Ballot**" means the appliable form or forms of ballot(s) distributed to each Holder of an Impaired Claim entitled to vote on the Plan on which the Holder indicates either acceptance or rejection of the Plan.

**1.18** "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.19** "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, and the Local Rules, as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.20** "**Bar Date**" means October 16, 2023.

**1.21** "**Bidding Procedures Motion**" means the *Debtors' Motion for Entry of Order (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Provide Stalking Horse Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving the Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 58], filed by the Debtors on August 9, 2023.

**1.22** "**Bidding Procedures Order**" means the *Order (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Provide Stalking Horse Bid Protections, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving the Assumption and Assignment Procedures and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 222], entered on the Docket by the Court on September 14, 2023.

**1.23** "**Bond Documents**" shall have the meaning set forth in Article III.A.4 hereof.

**1.24** "**Bondholder Bid**" shall have the meaning set forth in Article III.C.5 hereof.

**1.25** "**Bondholder Claim**" means an Allowed Secured Claim held by the Master Trustee for the benefit of the Bondholders against the Debtors on account of the Series 2011 Bonds and the Series 2018 Bonds, respectively, in the aggregate amount of $62,000,000, inclusive of all prepetition and postpetition principal, interest, attorneys' fees (exclusive of amounts provided for under the Cash Collateral Orders) and other charges.

**1.26** "**Bondholder Claim Cash Amount**" means $26,200,000 from the proceeds of the Sale, payable to the Master Trustee on the Effective Date or such earlier date approved by the Court; *provided, however*, that the Bondholder Claim Cash Amount, along with the Pension Trust Administrative Cost Amount, Liquidation Trust Expense Fund, and the General Unsecured Claims Initial Cash Amount may be reduced *pro rata* to the extent additional Cash is required to fund, or reserve for, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims.

**1.27** "**Bondholder Claim Waterfall Amount**" means, collectively, (a) the Bondholder Claim Cash Amount (payable on the Effective Date or such earlier date approved by the Court), *plus* (b) the Bondholder Post-Distribution Cash (payable within five business days of the Effective Date, following all other Effective Date Distributions, and payable every other week thereafter, other than the GUC Post-Distribution Cash Amount), *plus* (c) the JV Sale Proceeds (payable on the Effective Date to the extent any JV Interests are sold prior to the Effective Date and payable upon the closing of each such sale to the extent any JV Interests have not been sold prior to the Effective Date), *plus* (d) seventy-five percent (75%) of the Contingent Payments (payable by the Liquidation Trustee until the Bondholder Claim is paid in full), *plus* (e) twenty-five percent (25%) of the Litigation Claims Recovery Amount, other than net proceeds derived from the Pension Causes of Action (payable by the Liquidation Trustee until the Bondholder Claim is paid in full).

**1.28** "**Bondholder Deficiency Claim**" means the unsecured, non-priority portion of the Claims held by the Master Trustee on account of the Series 2011 Bonds and Series 2018 Bonds, as determined in accordance with Bankruptcy Code section 506(a).

**1.29** "**Bondholder Post-Distribution Cash**" means, after funding all Effective Date Distributions, all remaining Cash, including without limitation, proceeds of Accounts Receivable (net of costs to collect the same), the Unrestricted Foundation Funds, and unencumbered Cash, whether received pre or post-Effective Date, up to the Initial Bondholder Post-Distribution Cash Amount, which shall initially be distributed within five Business Days after the Effective Date and thereafter be distributed every other week to the Master Trustee until it receives the Initial Bondholder Post-Distribution Cash Amount; *provided further* that after the GUC Post-Distribution Cash Amount is distributed, all other remaining Cash, including without limitation, proceeds of Accounts Receivable (net of costs to collect the same), the Unrestricted Foundation Funds, and unencumbered Cash, whether received pre or post-Effective Date, shall be distributed every other week to the Master Trustee for the benefit of the Holders of Bondholder Claims.

**1.30** "**Bondholder Representatives**" means, together, Preston Hollow Community Capital, Inc., as Bondholder Representative under the Series 2018 Trust Indenture, and Computershare Trust Company, N.A., in its capacities as Series Trustee, Master Trustee, and Mortgagee under the Bond Documents.

**1.31** "**Bondholders**" means all holders of the Series 2011 Bonds and Series 2018 Bonds as of the Petition Date.

**1.32** "**Bonds**" shall have the meaning set forth in Article III.A.4 hereof.

**1.33** "**Books and Records**" means any and all books and records of the Debtors, including any and all documents and any and all computer generated or computer-maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in the possession of third parties, wherever located.

**1.34** "**Business Day**" means any day other than a Saturday, Sunday, or any legal holiday (as that term is defined in Bankruptcy Rule 9006(a)).

**1.35** "**Carve-Out**" shall have the meaning set forth in the [Final] Cash Collateral Order.

**1.36** "**Cash**" means legal tender of the United States of America and equivalents thereof.

**1.37** "**Cash Collateral Budget**" means the budget depicting cash revenue, receipts, expenses, and disbursements in connection with the Debtors' use of cash collateral, which must be approved in accordance with the terms of the [Final] Cash Collateral Order.

**1.38** "**Cash Collateral Motion**" means the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection; (II) Scheduling a Final Hearing on the Use of Cash Collateral; and (III) Granting Related Relief* [Docket No. 26], Filed by the Debtors on the Petition Date.

**1.39** "**Cash Collateral Orders**" means the Interim Cash Collateral Orders and the [Final] Cash Collateral Order.

**1.40** "**Causes of Action**" means any and all claims, actions, proceedings, causes of action, Avoidance Actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and Claims, whether known or unknown, reduced to judgment or not reduced to judgment, liquidated or unliquidated, contingent or non-contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, through and including the Effective Date, that the Debtors and/or the Estates may hold against any Person or Entity.

**1.41** "**Chapter 11 Cases**" means the chapter 11 cases commenced by the Debtors and jointly administered under case number 23-00623 (TJC) in the Court.

**1.42** "**Claim**" means a claim against the Debtors, whether or not asserted, as such term is defined in Bankruptcy Code section 101(5).

**1.43** "**Claims and Noticing Agent**" means Epiq Corporate Restructuring, LLC or any successor thereto.

**1.44** "**Claims Objection Deadline**" means the last day for filing objections to Claims (other than Disallowed Claims for which no objection or request for estimation is required or Administrative Expense Claims for which the deadline is the Administrative Expense Claims Objection Deadline), which day shall be 180 days after the Effective Date, or such other date as

may be ordered by the Court.  For the avoidance of doubt, the Claims Objection Deadline may be extended one or more times by the Court upon a motion Filed by the Liquidation Trustee and/or Liquidation Trust, as applicable.

1.45 **"Class"** means each category or group of Holders of Claims or Interests that has been designated as a class in Article V hereof.

1.46 **"Clerk"** means the clerk of the Court.

1.47 **"Collateral"** means any property or interest in property of the Debtors' Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

1.48 **"Combined Disclosure Statement and Plan"** means this combined disclosure statement and chapter 11 plan of liquidation, including, without limitation, the Disclosure Statement, the Plan, the Plan Supplement(s), all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time in accordance with the terms hereof.

1.49 **"Confirmation"** means the entry of the Confirmation Order, subject to all conditions specified in Article XIII.A having been satisfied or waived pursuant to Article XIII.D.

1.50 **"Confirmation Date"** means the date of entry of the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

1.51 **"Confirmation Hearing"** means the hearing(s) held by the Court as more fully set forth in Local Rule 3020-1 to consider confirmation of the Plan pursuant to Bankruptcy Code section 1129, as such hearing may be adjourned or continued from time to time.

1.52 **"Confirmation Hearing Notice"** shall have the meaning set forth in Article VI.D hereof.

1.53 **"Confirmation Order"** means the order of the Court confirming the Plan pursuant to Bankruptcy Code section 1129.

1.54 **"Consummation"** means the occurrence of the Effective Date.

1.55 **"Contingent"** means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

1.56 **"Contingent Payments"** means any net proceeds of other contingent assets held by the Debtors, other than Causes of Action, including, without limitation, any payments relating to or deriving from (a) Employee Retention Credits under the Coronavirus Aid, Relief, and Economic Security Act or (b) public assistance grants or other payments made by the Federal Emergency Management Agency.

**1.57** "**Corporate Transactions**" shall have the meaning set forth in Article IX.B hereof.

**1.58** "**Court**" means the United States Bankruptcy Court for the Northern District of Iowa, having jurisdiction over the Chapter 11 Cases, or such other court as may have jurisdiction over the Chapter 11 Cases.

**1.59** "**Creditor**" means any Person or Entity that is the Holder of a Claim against the Debtors.

**1.60** "**CRO**" means Mark E. Toney, in his capacity as Chief Restructuring Officer of the Debtors.

**1.61** "**Cure Notice**" means the *Notice of Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Costs* [Docket No. 265].

**1.62** "**Debtors**" means (a) Mercy Hospital, Iowa City, Iowa, (b) Mercy Services Iowa City, Inc., and (c) Mercy Iowa City ACO, LLC, in their capacity as debtors and debtors-in-possession in the Chapter 11 Cases.

**1.63** "**Default Notice**" shall have the meaning set forth in Article III.B.3 hereof.

**1.64** "**Disallowed**" means, when used in reference to a Claim or Interest within a particular Class, a Disallowed Claim or Interest in the specified Class or of a specified type.

**1.65** "**Disallowed Claim**" means a Claim or any portion thereof that (a) has been disallowed by a Final Order, (b) is Scheduled at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been Filed by the Bar Date or deemed timely Filed with the Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, (c) is not Scheduled, and as to which (i) no Proof of Claim has been Filed by the Bar Date or deemed timely Filed with the Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, and (ii) no request for payment of an Administrative Expense Claim has been Filed by the Administrative Expense Claim Bar Date or deemed timely Filed with the Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, or (d) after the Effective Date, has been disallowed in a written agreement by and between the Liquidation Trustee and the Holder of such Claim.

**1.66** "**Disbursing Agent**" means (a) on or prior to the Effective Date, the Debtors, and (b) after the Effective Date, the Liquidation Trustee; *provided, however*, that the Debtors or the Liquidation Trustee may, in its discretion, retain a third party to act as Disbursing Agent.

**1.67** "**Disputed Claim**" means a Claim or any portion thereof, that is neither an Allowed Claim nor a Disallowed Claim, that (a) has not been Scheduled by the Debtors or has been Scheduled as unknown, contingent, unliquidated, disputed, or at zero, whether or not such Claim is the subject of a proof of Claim; (b) is the subject of a proof of Claim that differs in nature, amount or priority from the Schedules (except to the extent that the Liquidation Trustee elects, in its discretion, to treat the Claim asserted in such proof of Claim as an Allowed Claim); or (c) is the subject of an objection interposed by the Claims Objection Deadline or such other time period fixed by the Court, which has not been withdrawn or overruled by a Final Order; *provided,*

*however*, that a Claim shall not be a Disputed Claim to the extent it becomes an Allowed Claim or Disallowed Claim.

**1.68** **"Disputed Claim Amount"** means (a) if a liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (i) the liquidated amount set forth in the Proof of Claim relating to a Disputed Claim; (ii) an amount agreed to by the Debtors or the Liquidation Trustee, as applicable, and the Holder of such Disputed Claim; or (iii) if a request for estimation is Filed by any party, the amount at which such Claim is estimated by the Court; (b) if no liquidated amount is set forth in the Proof of Claim relating to a Disputed Claim, (i) an amount agreed to by the Debtors or the Liquidation Trustee, as applicable, and the Holder of such Disputed Claim or (ii) the amount estimated by the Court with respect to such Disputed Claim; or (c) if the Claim is a Disallowed Claim, zero.

**1.69** **"Disputed Claims Reserve"** means the reserve established and maintained by the Liquidation Trust pursuant to and in accordance with the terms of the Liquidation Trust Agreement for the payment of Disputed Claims that become Allowed Claims after the Effective Date. The Disputed Claims Reserve need not be maintained by the Liquidation Trust in a segregated account.

**1.70** **"Distribution"** means any distribution to be made by the Disbursing Agent in accordance with the Plan of, as the case may be: (a) Cash or (b) any other consideration or residual value distributed to Holders of Allowed Claims under the terms and provisions of the Plan.

**1.71** **"Distribution Date"** means any date on which a Distribution is made to Holders of Allowed Claims under the Plan, or as otherwise agreed. The first Distributions shall occur on or as soon as practicable after the Effective Date or as otherwise determined by the Liquidation Trustee. To the extent subsequent Distributions are necessary, such subsequent Distributions shall occur as soon after the first Distribution Date as the Liquidation Trustee shall determine in accordance with the Liquidation Trust Agreement.

**1.72** **"Distribution Record Date"** means the record date for the purpose of determining Holders of Allowed Claims entitled to receive Distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order or any subsequent Court order.

**1.73** **"Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

**1.74** **"Effective Date"** means the first Business Day on which all conditions to the Consummation of the Plan set forth in Article XIII.B have been satisfied or waived in accordance with Article XIII.D.

**1.75** **"EMR"** shall have the meaning set forth in Article III.B.2 hereof.

**1.76** **"Entity"** means an entity as defined in Bankruptcy Code section 101(15).

**1.77** **"Epiq"** means Epiq Corporate Restructuring, LLC.

**1.78** **"Estates"** means the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to Bankruptcy Code section 541.

**1.79** "**Examiner Motion**" means the *Motion of Master Trustee and Bondholder Representative for Entry of an Order Appointing an Examiner* [Docket No. 96], filed by the Bondholder Representatives on August 14, 2023.

**1.80** "**Exculpated Parties**" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the UCC and each member thereof (solely in its capacity as such); (c) the Pension Committee and each member thereof (solely in its capacity as such); (d) any retained Professional of the Debtors, the UCC, or the Pension Committee; and (f) the Debtors' directors and officers who served in their capacity during the pendency of the Chapter 11 Cases, including the CRO.

**1.81** "**Exclusivity Motion**" shall have the meaning set forth in Article III.C.12 hereof.

**1.82** "**Executory Contract**" means a contract to which any of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.83** "**Exhibit**" means an exhibit attached to the Combined Disclosure Statement and Plan.

**1.84** "**Face Amount**" means (a) when used in referenced to a Disputed Claim or Disallowed Claim, the Disputed Claim amount; and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

**1.85** "**FFE**" shall have the meaning set forth in Article III.A.4 hereof.

**1.86** "**File**", "**Filed**", or "**Filing**" means, file, filed, or filing with the Court or its authorized designee in the Chapter 11 Cases.

**1.87** "**Final Cash Collateral Order**" means any Final Order in connection with the Debtors' use of cash collateral.

**1.88** "**First Interim Cash Collateral Order**" means the *Interim Order Granting Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection; (II) Scheduling a Final Hearing on the Use of Cash Collateral; and (III) Granting Related Relief* [Docket No. 38], entered on the Docket by the Court on August 8, 2023.

**1.89** "**Final Fee Applications**" shall have the meaning set forth in Article IV.D hereof.

**1.90** "**Final Order**" means an Order of the Court (a) as to which the time to appeal, petition for certiorari, or move for reargument, rehearing, or new trial has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument, rehearing, or new trial shall then be pending; (b) as to which any right to appeal, petition for certiorari, reargue, rehear, or retry shall have been waived in writing; or (c) in the event that an appeal, writ of certiorari, reargument, rehearing, or new trial has been sought, as to which (i) such order of the Court shall have been affirmed by the highest court to which such order is appealed; (ii) certiorari has been denied as to such order; or (iii) reargument or rehearing or new trial from such order shall have been denied,

and the time to take any further appeal, petition for certiorari, or move for reargument, rehearing, or new trial shall have expired without such actions having been taken.

**1.91** "**Fiscal Year 2023**" shall have the meaning set forth in Article III.A.3 hereof.

**1.92** "**Foundation**" means Mercy Hospital Foundation.

**1.93** "**Foundation AOI**" shall have the meaning set forth in Article III.A.2 hereof.

**1.94** "**Foundation Bylaws**" shall have the meaning set forth in Article III.A.2 hereof.

**1.95** "**Foundation Governing Documents**" shall have the meaning set forth in Article III.A.2 hereof.

**1.96** "**General Unsecured Claim**" means any Claim against the Debtors that (a) is unpaid as of the Effective Date and (b) arose or is deemed by the Bankruptcy Code or Court, as the case may be, to have arisen before the Petition Date and that is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Bondholder Claim, Other Secured Claim, Bondholder Deficiency Claim, Pension Claim, or Intercompany Claim.

**1.97** "**General Unsecured Claims Initial Cash Amount**" means $1,200,000 to be distributed to the Liquidation Trust on the Effective Date and to be used solely for recoveries to Holders of General Unsecured Claims, including the Pension GUC Claim and any Bondholder Deficiency Claim; *provided, however,* that the General Unsecured Claims Initial Cash Amount, along with the Liquidation Trust Expense Fund, Pension Trust Administrative Cost Amount, and the Bondholder Claim Cash Amount may be reduced *pro rata* to the extent additional Cash is required to fund, or reserve for, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims.

**1.98** "**General Unsecured Claims Waterfall Amount**" means, collectively, (i) the General Unsecured Claims Initial Cash Amount (payable on the Effective Date), *plus* (ii) the Real Property Sale Proceeds (payable by the Liquidation Trustee upon the later of the Effective Date or the closing of the applicable sale), *plus* (iii) seventy-five percent (75%) of the Litigation Claims Recovery Amount, other than the proceeds of the Pension Causes of Action, *plus* (iv) twenty-five percent (25%) of the Contingent Payments, *plus* (v) the GUC Post-Distribution Cash Amount.

**1.99** "**GHA**" shall have the meaning set forth in Article III.C.5 hereof.

**1.100** "**Governmental Bar Date**" means February 5, 2024.

**1.101** "**Governmental Unit**" shall have the meaning set forth in Bankruptcy Code section 101(27).

**1.102** "**GUC Post-Distribution Cash Amount**" means, after funding all Effective Date Distributions and funding the Initial Bondholder Post-Distribution Cash Amount, all remaining Cash, including without limitation, proceeds of Accounts Receivable (net of costs to collect the same), the Unrestricted Foundation Funds, and unencumbered Cash, whether received pre or post-Effective Date, up to $750,000, payable to Holders of General Unsecured Claims.

**1.103** "**H2C**" shall have the meaning set forth in Article III.B.3 hereof.

**1.104** "**Holder**" means a Person or Entity who is the beneficial holder of any Claim or Interest.

**1.105** "**Impaired**" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of Bankruptcy Code section 1124.

**1.106** "**Impaired Class**" means a Class of Claims or Interests that is Impaired.

**1.107** "**Initial Bondholder Post-Distribution Cash Amount**" means, after funding all Effective Date Distributions, all remaining Cash, including without limitation, proceeds of Accounts Receivable (net of costs to collect the same), the Unrestricted Foundation Funds, and unencumbered Cash, whether received pre- or post-Effective Date, up to $20,000,000, payable to the Master Trustee for the benefit of the Bondholder Claims.

**1.108** "**Insurance Policies**" means any and all insurance policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provisions of insurance entered into by or issued to or for the benefit of, at any time, the Debtors or their predecessors (including, for the avoidance of doubt, any such policies, agreements, or other documents that have been paid in full).

**1.109** "**Intercompany Claim**" means any Claim held by a Debtor against another Debtor, including, without limitation, (a) any account reflecting intercompany book entries with respect to another Debtor; (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor; and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor.

**1.110** "**Interest**" means the legal interests, equitable interests, contractual interests, Interests, or ownership interests, or other rights of any Person or Entity in the Debtors, including all partnership interests, limited liability company or membership interests, rights, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest in the Debtors, subscription rights and liquidation preferences, and commitments of any character whatsoever relating to any such equity or ownership interests or obligating the Debtors to issue, transfer, or sell any interests whether or not certificated, transferable, voting, or denominated security.

**1.111** "**Interim Cash Collateral Orders**" means the First Interim Cash Collateral Order and the Second Interim Cash Collateral Order.

**1.112** "**Internal Revenue Code**" shall have the meaning set forth in Article VIII.A hereof.

**1.113** "**Issuer**" shall have the meaning set forth in Article III.A.4 hereof.

**1.114** "**Judicial Action**" shall have the meaning set forth in Article III.C.5 hereof.

**1.115** "**JV Interests**" means the Debtors' interests in the following joint ventures that were not purchased assets in the Sale: (a) Iowa City Ambulatory Surgical Center, L.L.C.; (b) Melrose Meadows LLC; (c) Central Iowa Rehabilitation Hospital, LLC; (d) Eastern Iowa Rehabilitation Hospital, LLC; and (e) Progressive Rehabilitation Associates LLC.

**1.116** "**JV Sale Proceeds**" means the net sale proceeds or other dividends relating to or arising under the Debtors' JV Interests.

**1.117** "**Liabilities**" means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

**1.118** "**Lien**" shall have the meaning set forth in Bankruptcy Code section 101(37).

**1.119** "**Liquidating Debtors**" means the Debtors on or after the Effective Date.

**1.120** "**Liquidation Trust**" means the trust established on the Effective Date that, among other things, shall effectuate the wind down of the Liquidating Debtors and make Distributions in accordance with the terms hereof and the Liquidation Trust Agreement. With respect to any action required or permitted to be taken by the Liquidation Trust, the term includes the Liquidation Trustee or any other Person or Entity authorized to take such action in accordance with the Liquidation Trust Agreement.

**1.121** "**Liquidation Trust Account**" means the bank account created pursuant to Article IX.I.1 hereof.

**1.122** "**Liquidation Trust Agreement**" means the agreement establishing the Liquidation Trust in conformity with the provisions of the Plan approved in the Confirmation Order, and entered into by the Debtors, on behalf of the Liquidation Trust Beneficiaries, and the Liquidation Trustee on the Effective Date pursuant to the terms of the Plan. A copy of the Liquidation Trust Agreement shall be Filed with the Plan Supplement.

**1.123** "**Liquidation Trust Assets**" means, collectively, after making all of the Effective Date payments as set forth herein, (a) the Debtors' Cash; (b) the Debtors' Accounts Receivable; (c) the Liquidation Trust Claims and proceeds from the prosecution of the same (including, but not limited to, the Litigation Claims Recovery Amount); (d) the Sale Proceeds; (e) proceeds from the sale of the Debtors' ancillary assets (including, without limitation, the JV Interests); (f) the Unencumbered Assets and any proceeds from the sale of the same (including, but not limited to, the Real Property Sale Proceeds); and (g) all other remaining assets of the Debtors existing as of the Effective Date; *provided, however,* that, except as otherwise provided herein, the Liquidation Trust Assets shall not include Cash required to fund, or reserve, the Administrative Expense Claims Reserve and the Professional Fee Reserve.

**1.124** "**Liquidation Trust Beneficiaries**" means Holders of Bondholder Claims, General Unsecured Claims, Bondholder Deficiency Claims, and Pension Claims entitled to receive

Distributions pursuant to the terms of the Plan, whether or not such Claims are Allowed as of the Effective Date.

**1.125** "**Liquidation Trust Claims**" means all Causes of Action.

**1.126** "**Liquidation Trust Expenses**" means all reasonable and documented fees, expenses and costs incurred by the Liquidation Trust (including, but not limited to, payment of Statutory Fees, compensation of the Liquidation Trustee, and the reasonable fees and expenses of professionals or other persons retained by the Liquidation Trustee) in connection with carrying out the duties and responsibilities set forth in the Liquidation Trust Agreement and the Plan.

**1.127** "**Liquidation Trust Expense Fund**" means $750,000 to be paid to the Liquidation Trust on the Effective Date as initial funding for the liquidation and wind-down of remaining estate assets, investigation and prosecution of Claims and Causes of Action (other than investigation and prosecution of the Pension Causes of Action, which shall be financed by the Pension Trust Administrative Cost Amount), and the distribution of Liquidation Trust Assets; *provided, however,* that the Liquidation Trust Expense Fund shall not be used to collect Accounts Receivable; *provided further* that the Liquidation Trust Expense Fund, along with the Pension Trust Administrative Cost Amount, the Bondholder Claim Cash Amount, and the General Unsecured Claims Initial Cash Amount, may be reduced *pro rata* to the extent additional Cash is required to fund, or reserve for, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims.

**1.128** "**Liquidation Trust Interests**" means the uncertificated beneficial interests in the Liquidation Trust representing the right of Holders of Allowed Bondholder Claims, General Unsecured Claims, Bondholder Deficiency Claims, and Pension Claims to receive Distributions from the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement.

**1.129** "**Liquidation Trust Proceeds**" means the Cash proceeds generated by the Liquidation Trust after the Effective Date of the Plan.

**1.130** "**Liquidation Trustee**" means the person appointed to administer the Liquidation Trust with such rights, duties, and obligations as set forth herein and in the Liquidation Trust Agreement. The identity of the Liquidation Trustee shall be determined jointly by the Debtors and the Bondholder Representatives, with the reasonable consent of the UCC and the Pension Committee (which such consent shall not be unreasonably withheld), and shall be disclosed in the Plan Supplement.

**1.131** "**Liquidation Analysis**" means the hypothetical chapter 7 liquidation analysis attached hereto as **Exhibit A**.

**1.132** "**Litigation Claims**" means any Causes of Action or Avoidance Actions that are asserted in actions resolved by final judgment or settlement by the Liquidation Trustee; *provided, however*, that Litigation Claims shall not include any Claims or Causes of Action against Released Parties (which, for the avoidance of doubt, shall include any of the Debtors' directors and officers that served in such role at any time between the Petition Date and the Effective Date).

**1.133** "<u>**Litigation Claims Recovery Amount**</u>" means any recoveries on account of the Litigation Claims obtained by the Liquidation Trustee.

**1.134** "<u>**Local Rules**</u>" means the Local Rules of the United States Bankruptcy Court for the Northern District of Iowa.

**1.135** "<u>**Master Trustee**</u>" shall have the meaning set forth in Article III.A.4 hereof.

**1.136** "<u>**Master Trust Indenture**</u>" shall have the meaning set forth in Article III.A.4 hereof.

**1.137** "<u>**Mercy Hospital**</u>" means Mercy Hospital, Iowa City, Iowa.

**1.138** "<u>**Mercy Office Building II**</u>" means that certain office building and parking lot connected to Mercy Hospital that was not sold by the Debtors as part of the Sale to the University with the address commonly known as 601E Bloomington Street, Iowa City, Iowa.

**1.139** "<u>**MercyOne**</u>" means MercyOne as well as any such other entities or parties related to or affiliated with MercyOne that provided services to the Debtors prior to the Petition Date or were a party to a prepetition contract or agreement with the Debtors.

**1.140** "<u>**Mercy Services**</u>" means Mercy Services Iowa City, Inc.

**1.141** "<u>**Mortgage**</u>" shall have the meaning set forth in Article III.A.4 hereof.

**1.142** "<u>**Non-U.S. Holder**</u>" shall have the meaning set forth in Article VIII.A hereof.

**1.143** "<u>**Notice Parties**</u>" shall have the meaning set forth in Article VI.A hereof.

**1.144** "<u>**Objection(s)**</u>" means any objection, application, motion, complaint, or other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim).

**1.145** "<u>**Official Bankruptcy Forms**</u>" means the Official Bankruptcy Forms, prescribed by the Judicial Conference of the United States, the observance and use of which is required pursuant to Bankruptcy Rule 9009, as such forms may be amended, revised, or supplemented from time to time.

**1.146** "<u>**OID**</u>" shall have the meaning set forth in Article VIII.B hereof.

**1.147** "<u>**Order**</u>" means an order or judgment of the Court as entered on the Docket.

**1.148** "<u>**Other Secured Claim**</u>" means an Allowed Secured Claim arising prior to the Petition Date against any of the Debtors, other than the Bondholder Claim.

**1.149** "<u>**Owned Real Property**</u>" shall have the meaning set forth in Article III.A.4 hereof.

**1.150** **"PCO"** means Susan N. Goodman, the Debtors' patient care ombudsman, appointed by the U.S. Trustee as of August 9, 2023 [Docket No. 57].

**1.151** **"Pension Beneficiaries"** means any person entitled to distributions from the Pension Fund.

**1.152** **"Pension Causes of Action"** means any Causes of Action relating solely to allegations of underfunding the Pension Trust; *provided, however*, that such Causes of Action shall not include any Causes of Action against the Debtors' directors and officers that served in such role at any time between the Petition Date and the Effective Date.

**1.153** **"Pension Claim"** means any Claim of the Pension Beneficiaries against the Debtors that is unpaid as of the Effective Date.

**1.154** **"Pension Committee"** means the Official Committee of Pensioners appointed by the U.S. Trustee as of November 4, 2023 [Docket No. 458].

**1.155** **"Pension Fund Assets"** means the assets remaining in the Pension Plan, which are held for the benefit of the Pension Beneficiaries.

**1.156** **"Pension GUC Claim"** means the Claim of the Pension Beneficiaries in an amount equal to the underfunded portion of the Pension Plan as of the Effective Date and such other amounts incurred in connection with the termination of the Pension Plan to the extent applicable, which Claim, if Allowed, shall receive the treatment afforded to Holders of General Unsecured Claims in Class 4.

**1.157** **"Pension Plan"** means that certain single employer defined benefit pension plan qualified under section 401(a) of the Internal Revenue Code titled "Mercy Hospital, Iowa City, Iowa Employees' Pension Plan".

**1.158** **"Pension Plan Administrator"** means that certain individual or entity to be identified by the Pension Committee, with the reasonable consent of the Debtors (which such consent shall not be unreasonably withheld), by the Plan Supplement Filing Date. The identity of the Pension Plan Administrator, if any, shall be disclosed in the Plan Supplement.

**1.159** **"Pension Trust"** shall have the meaning set forth in Article III.A.4 hereof.

**1.160** **"Pension Trust Administrative Cost Amount"** means $250,000 to be paid on the Effective Date to the Pension Trust from amounts available to the Debtors pursuant to Article IX.O hereof for the continued administration of the Pension Plan and/or prosecution and investigation of the Pension Causes of Action; *provided*, *however*, that, the Pension Trust Administrative Cost Amount, along with the Bondholder Claim Cash Amount, the Liquidation Trust Expense Fund, and the General Unsecured Claims Initial Cash Amount, may be reduced *pro rata* to the extent additional Cash is required to fund, or reserve for, Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims.

**1.161** **"Person"** shall have the meaning set forth in Bankruptcy Code section 101(41).

**1.162** "**Petition Date**" means August 7, 2023.

**1.163** "**Plan Documents**" means any of the documents, other than this Combined Disclosure Statement and Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement.

**1.164** "**Plan Supplement**" means the documents, schedules, and any exhibits Filed prior to the Confirmation Hearing, as amended, supplemented or modified from time to time, including, but not limited to, (a) the form of the Liquidation Trust Agreement; (b) the identity of the Liquidation Trustee; and (c) the identity of the Pension Plan Administrator.

**1.165** "**Plan Supplement Filing Date**" means the date on which the Plan Supplement was filed with the Court, which date is at least seven days prior to the Voting Deadline.

**1.166** "**Plan Support Agreement**" means that certain *Plan Support Agreement* by and among the Debtors and the Bondholder Representatives, dated February 23, 2024.

**1.167** "**Prepetition Collateral**" shall have the meaning set forth in Article III.A.4 hereof.

**1.168** "**Prepetition Liens**" shall have the meaning set forth in Article III.A.4 hereof.

**1.169** "**Prepetition Obligations**" shall have the meaning set forth in Article III.A.4 hereof.

**1.170** "**Priority Claims**" means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

**1.171** "**Priority Non-Tax Claim**" means a Claim that is accorded priority in right of payment under Bankruptcy Code section 507, other than a Priority Tax Claim or an Administrative Expense Claim.

**1.172** "**Priority Tax Claim**" means a Claim that is entitled to priority under Bankruptcy Code section 507(a)(8).

**1.173** "**Professional**" means any professional Person employed in the Chapter 11 Cases pursuant to Bankruptcy Code sections 327, 328, 363, or 1103 pursuant to an Order of the Court and to be compensated for services rendered pursuant to Bankruptcy Code sections 327, 328, 329, 330, or 331.

**1.174** "**Professional Fee Claim**" means a Claim of a Professional pursuant to Bankruptcy Code sections 327, 328, 330, 331, or 503(b) for compensation or reimbursement of costs and expenses relating to services performed after the Petition Date and prior to and including the Effective Date.

**1.175** "**Professional Fee Claim Bar Date**" means the deadline for Filing all applications for Professional Fee Claims, which shall be 45 days after the Effective Date.

**1.176** "**Professional Fee Claim Objection Deadline**" shall have the meaning set forth in Article IV.D hereof.

**1.177** "**Professional Fee Estimate**" means (a) with respect to any Professional, a good-faith estimate of such Professional's anticipated accrued, unpaid Professional Fee Claims as of the Effective Date to be provided by each Professional in writing to the Debtors prior to the commencement of the Confirmation Hearing, or in the absence of such a writing, to be prepared by the Debtors, and (b) collectively, the sum of all individual Professional Fee Estimates.

**1.178** "**Professional Fee Reserve**" means the reserve of Cash funded by the Debtors and maintained by the Liquidation Trust for the benefit of Holders of Allowed Professional Fee Claims in an amount equal to the Professional Fee Estimate.  The Professional Fee Reserve need not be maintained by the Liquidation Trust in a segregated account.

**1.179** "**Proof of Claim**" means the proof of claim that must be Filed before the Bar Date, the Governmental Bar Date, or the Administrative Expense Claim Bar Date, as applicable, which term shall include a request for payment of an Administrative Expense Claim.

**1.180** "**Pro Rata**" means, at any time, the proportion that the Face Amount of a Claim in a particular Class bears to the aggregate Face Amount of all Claims (including Disputed Claims, but excluding Disallowed Claims) in such Class, unless the Plan provides otherwise.

**1.181** "**Real Property Interests**" means the Debtors' real property interests in (a) Mercy Office Building II and (b) the adjacent parking lots.

**1.182** "**Real Property Sale Proceeds**" means the proceeds from any sale of the Debtors' Real Property Interests.

**1.183** "**Receivership Action**" shall have the meaning set forth in Article III.B.3 hereof.

**1.184** "**Reinstated**" means the treatment provided for in Bankruptcy Code section 1124.

**1.185** "**Rejection Bar Date**" means the deadline to File a Proof of Claim for damages relating to the rejection of an Executory Contract or Unexpired Lease, which is the later of (a) 30 days after the effective date of rejection of any unexpired lease or executory contract of the Debtors as provided by an order of the Court or pursuant to a notice under procedures approved by the Court, (b) any date set by another order of the Court, or (c) the Bar Date or the Governmental Bar Date, whichever is applicable.

**1.186** "**Released Parties**" means, collectively, the following Entities, each in their capacity as such: (a) the Debtors; (b) the UCC and each of its members (only in their capacity as such); (c) the Pension Committee and each of its members (only in their capacity as such); (d) the Bondholder Representatives; (e) the Foundation; (f) the Sisters of Mercy; and (g) with respect to any such Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, equity holders, affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, affiliates, partners, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors; *provided,*

*however*, that Released Parties shall not include former officers and directors of the Debtors but shall include any of the Debtors' directors and officers that served in such role at any time between the Petition Date and the Effective Date; *provided further* that Released Parties shall not include MercyOne.

1.187   "**Releasing Parties**" means the following Entities, each in their respective capacities as such: (a) each Holder of a Claim that (i) votes to accept the Plan or (ii) either (1) abstains from voting or (2) votes to reject the Plan and, in the case of either (1) or (2), does not opt out of the voluntary release by checking the opt-out box on the applicable Ballot, and returning it in accordance with the instructions set forth thereon, indicating that they are electing to opt out of granting the releases provided in the Plan; (b) each Holder of a Claim that is deemed to accept the Plan or is otherwise Unimpaired under the Plan and who does not opt out of the voluntary release by checking the opt out box on the applicable non-voting status notice form, and returning it in accordance with the instructions set forth thereon, indicating that they are not willing to grant the releases provided in the Plan; and (c) each Holder of a Claim that is deemed to reject the Plan or is otherwise Impaired under the Plan and who does not opt out of the voluntary release by checking the opt-out box on the applicable non-voting status notice form, and returning it in accordance with the instructions set forth thereon, indicating that they are not willing to grant the releases provided in the Plan.

1.188   "**Response Letter**" shall have the meaning set forth in Article III.B.3 hereof.

1.189   "**Review**" shall have the meaning set forth in Article III.C.5 hereof.

1.190   "**Sale**" means the Debtors' sale of substantially all assets to the University.

1.191   "**Sale Order**" means the *Order (I) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (II) Authorizing the Assumption and Assignment of Contracts and Leases, and (III) Granting Related Relief* [Docket No. 476], entered on the Docket by the Court on November 7, 2023.

1.192   "**Sale Proceeds**" means the proceeds of the Sale.

1.193   "**Scheduled**" means, with respect to any Claim, the status and amount, if any, of that Claim as set forth in the Schedules.

1.194   "**Schedules**" means the schedules of assets and liabilities and the statement of financial affairs Filed by the Debtors on August 21, 2023 and August 22, 2023 [Docket Nos. 135, 136, 137] and the amended schedules Filed by the Debtors on December 28, 2023 [Docket No. 606], as such schedules and statements have been or may be supplemented or amended from time to time in accordance with Bankruptcy Rule 1009 or any orders of the Court.

1.195   "**Second Interim Cash Collateral Order**" means the *Second Interim Order Granting Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection; (II) Scheduling a Final Hearing on the Use of Cash Collateral; and (III) Granting Related Relief* [Docket No. 475], entered on the Docket by the Court on November 7, 2023.

**1.196** "**Secured Claim**" means a Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Court, or that is subject to a valid right of setoff pursuant to Bankruptcy Code section 553, to the extent of the value of the Holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a) or as Allowed pursuant to the Plan as an Other Secured Claim.

**1.197** "**Series 2011 Bonds**" shall have the meaning set forth in Article III.A.4 hereof.

**1.198** "**Series 2011 Loan Agreement**" shall have the meaning set forth in Article III.A.4 hereof.

**1.199** "**Series 2011 Note**" shall have the meaning set forth in Article III.A.4 hereof.

**1.200** "**Series 2011 Obligations**" shall have the meaning set forth in Article III.A.4 hereof.

**1.201** "**Series 2011 Trust Indenture**" shall have the meaning set forth in Article III.A.4 hereof.

**1.202** "**Series 2018 Bonds**" shall have the meaning set forth in Article III.A.4 hereof.

**1.203** "**Series 2018 Loan Agreement**" shall have the meaning set forth in Article III.A.4 hereof.

**1.204** "**Series 2018 Note**" shall have the meaning set forth in Article III.A.4 hereof.

**1.205** "**Series 2018 Obligations**" shall have the meaning set forth in Article III.A.4 hereof.

**1.206** "**Series 2018 Trust Indenture**" shall have the meaning set forth in Article III.A.4 hereof.

**1.207** "**Series Trustee**" shall mean Computer Share Trust Company, N.A. in its capacity as Trustee under each of the Series 2011 Trust Indenture and the Series 2018 Trust Indenture.

**1.208** "**Settlement Effective Date**" shall have the meaning set forth in Article III.C.5 hereof.

**1.209** "**Sisters of Mercy**" means Sisters of Mercy of the Americas.

**1.210** "**Solicitation Procedures Motion**" means the *Debtors' Motion for Entry of Order (I) Approving Disclosure Statement; (II) Scheduling Hearing on Confirmation of Plan; (III) Establishing Deadlines and Procedures for (A) Filing Objections to Confirmation of Plan, (B) Claims Objections, and (C) Temporary Allowance of Claims for Voting Purposes; (IV) Determining Treatment of Certain Unliquidated, Contingent, or Disputed Claims for Notice, Voting, and Distribution Purposes; (V) Setting Record Date; (VI) Approving (A) Solicitation*

*Packages and Procedures for Distribution, (B) Form of Notice of Hearing on Confirmation and Related Matters, and (C) Forms of Ballots; (VII) Establishing Voting Deadline and Procedures for Tabulation of Votes; and (VIII) Granting Related Relief* [Docket No. [__]], filed by the Debtors on [__], 2024.

**1.211** "**Solicitation Procedures Order**" means the *Order (I) Approving Disclosure Statement; (II) Scheduling Hearing on Confirmation of Plan; (III) Establishing Deadlines and Procedures for (A) Filing Objections to Confirmation of Plan, (B) Claims Objections, and (C) Temporary Allowance of Claims for Voting Purposes; (IV) Determining Treatment of Certain Unliquidated, Contingent, or Disputed Claims for Notice, Voting, and Distribution Purposes; (V) Setting Record Date; (VI) Approving (A) Solicitation Packages and Procedures for Distribution, (B) Form of Notice of Hearing on Confirmation and Related Matters, and (C) Forms of Ballots; (VII) Establishing Voting Deadline and Procedures for Tabulation of Votes; and (VIII) Granting Related Relief* [Docket No. [___]], entered on the Docket by the Court on March [_], 2024.

**1.212** "**Stalking Horse APA**" shall have the meaning set forth in Article III.B.3 hereof.

**1.213** "**Stalking Horse Bid**" shall have the meaning set forth in Article III.C.5 hereof.

**1.214** "**Statutory Fees**" means any fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code to the extent applicable.

**1.215** "**Substantial Contribution Claim**" means a Claim under Bankruptcy Code subsections 503(b)(3), (b)(4), or (b)(5) for compensation or reimbursement of expenses incurred in making a substantial contribution in the Chapter 11 Cases.

**1.216** "**Supplemental Cure Notice**" means the *Notice of Assumption and Assignment of Executory Contracts or Unexpired Leases and Cure Costs* [Docket No. 610].

**1.217** "**ToneyKorf Partners**" shall have the meaning set forth in Article III.B.3 hereof.

**1.218** "**Treasury Regulations**" shall have the meaning set forth in Article VIII.A hereof.

**1.219** "**UCC**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee as of August 15, 2023 [Docket No. 107].

**1.220** "**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

**1.221** "**Unclaimed Distribution Deadline**" means 90 days from the date the Liquidation Trustee makes a Distribution of Cash or other property under the Plan to a Holder of an Allowed Claim.

**1.222** "**Unencumbered Assets**" means the Debtors' assets, including but not limited to any real property, that are not otherwise subject to liens or other encumbrances.

**1.223** "<u>Unexpired Lease(s)</u>" means an unexpired lease to which a Debtor is party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.224** "<u>Unimpaired</u>" means, when used in reference to a Claim or a Class, a Claim or a Class that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.225** "<u>University</u>" means the State of Iowa's University of Iowa.

**1.226** "<u>Unrestricted Foundation Funds</u>" means all funds of the Foundation that have been turned over to the Debtors' Estates, including funds determined by GHA or by order of the Court (including pursuant to the Confirmation Order) to be "unrestricted," totaling approximately $15,838,642.

**1.227** "<u>Unrestricted Receivables</u>" shall have the meaning set forth in Article III.A.4 hereof.

**1.228** "<u>U.S. Holder</u>" shall have the meaning set forth in Article VIII.A hereof.

**1.229** "<u>U.S. Trustee</u>" means the Office of the United States Trustee for Region 12.

**1.230** "<u>Voting Classes</u>" means Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims).

**1.231** "<u>Voting Deadline</u>" means April [29], 2024 at 4:00 p.m. (prevailing Central time), the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted, as set forth by the Solicitation Procedures Order.

**1.232** "<u>Workers' Compensation SIR</u>" shall have the meaning set forth in Article IX.Q hereof.

## B.    Rules of Interpretation and Construction

For purposes of this Combined Disclosure Statement and Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Combined Disclosure Statement and Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Combined Disclosure Statement and Plan in its entirety rather than to a particular portion of the

Combined Disclosure Statement and Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Combined Disclosure Statement and Plan; (9) unless otherwise specified herein, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (10) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Court's CM/ECF system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (12) any effectuating provisions may be interpreted by the Liquidating Debtors in such a manner that is consistent with the overall purpose and intent of the Combined Disclosure Statement and Plan all without further notice to or action, order, or approval of the Court or any other Entity; (13) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (14) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (15) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

## C.    Computation of Time

In computing any period of time prescribed or allowed by the Combined Disclosure Statement and Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) and except as otherwise provided herein or therein, the laws of (i) the State of Iowa shall govern the construction and implementation of the Combined Disclosure Statement and Plan and any agreements, documents and instruments executed in connection with the Combined Disclosure Statement and Plan and (ii) the state of incorporation of the Debtors shall govern corporate governance matters with respect to the Debtors, in either case without giving effect to the principles of conflicts of law thereof.

## ARTICLE III.
## BACKGROUND AND DISCLOSURES

## A.    General Background

### 1.    Corporate History

Mercy Hospital is a Catholic-based Iowa nonprofit corporation and a tax-exempt organization described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended) that operates an acute care community hospital and clinics located in Iowa City, Iowa and surrounding communities.  Mercy Hospital was established in 1873 by the Sisters of Mercy to

provide a facility where medical students could gain clinical experience and the Sisters of Mercy could pursue their mission of caring for the poor and sick.

The Sisters of Mercy and the University medical school faculty worked together at Mercy Hospital until 1898 when the State Board of Regents appropriated money to build a new hospital for the medical school.  When the University's own hospital was created, the Sisters of Mercy were free to operate Mercy Hospital as a community institution.  Mercy Hospital continued to serve the community and provide for the healthcare needs of Iowa City and the surrounding communities.  Mercy Hospital continued to serve Iowa City since its founding as an important part of the Johnson County community.

### 2.     Corporate Structure

#### i.     Debtors

The Debtors' corporate structure consists of the following:



#### ii.     The Foundation

Prior to the consummation of the Sale, Mercy Hospital benefitted from the Foundation, which is a 501(c)(3) tax-exempt foundation that supports Mercy Hospital's mission.  The Foundation is governed by the *Amended and Restated Bylaws of Mercy Hospital Foundation* dated February 27, 2023 (the "Foundation Bylaws") and the *Third Amended and Restated Articles of Incorporation of Mercy Hospital Foundation* (the "Foundation AOI" and, together with the Foundation Bylaws, the "Foundation Governing Documents") as well as a board of directors, which in turn administers the Foundation in the ordinary course in accordance with the Governing Documents.

The Foundation Bylaws state that the specific purpose of the Foundation is "to support and encourage social, human and health care services by providing financial and facility assistance to and in all other relevant ways aiding and supporting the missions of Mercy Hospital, the Sisters of Mercy, the West Midwest Community, Inc., or its successor, and other organizations exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code of 1954, as amended (or

the corresponding provision of an future United States Internal Revenue law), which are or may become affiliated with Mercy Hospital, Iowa." The Foundation Governing Documents further provide that the Hospital is sole "member" of the Foundation and in such capacity has significant oversight and consent rights over the Foundation.

Since its inception in 1969, the Foundation has solicited and received gifts from community donors, sometimes subject to certain restrictions, to support Mercy Hospital. As of June 2023, the unaudited total amount of funds held by the Foundation was approximately $18,000,000. The funds can be broken down into unrestricted, temporarily restricted, and permanently restricted assets. Pursuant to the terms of the settlement set forth in the 9019 Motion (discussed herein) and subsequently approved by the Court on November 7, 2023, the Foundation agreed to contribute certain Funds to Mercy Hospital to help offset its operational needs in facilitating the care, diagnosis, and treatment of its patients.

### iii.     The Pension Plan

The Pension Plan is a defined benefit plan qualified under section 401(a) of the Internal Revenue Code, designed to provide retirement income to employees of Mercy Hospital and certain participating affiliated employers that have adopted the Pension Plan based on years of service and average compensation earned while employed by Mercy Hospital. The Pension Plan is a "church plan" under section 414(e) of the Internal Revenue Code. Church plans, like the Pension Plan, are not covered by the Employee Retirement Income Security Act of 1974 ("ERISA") and therefore, benefits under the Plan are not guaranteed or insured by the Pension Benefit Guaranty Corporation ("PBGC") in the event of termination.

The Pension Plan was established by Mercy Hospital effective January 1, 1968 and is funded by The Mercy Hospital Employees' Pension Trust (the "Pension Trust"), with Principal Trust Company as trustee. The Pension Administrative Committee, whose members are appointed by the Board of Mercy Hospital, is the administrator of the Pension Plan. To the extent that a committee is not constituted, the Board of Mercy Hospital is the default administrator of the Pension Plan. The human resources team of Mercy Hospital previously worked with third-party vendors to administer the Pension Plan.

The Pension Plan was frozen after December 31, 2016 and benefits were frozen for certain groups as of December 31, 2008 and April 4, 2010, meaning that no employee has been accruing further benefits with respect to compensation or service after 2016.

The Pension Plan actuary evaluates the Pension Plan each plan year to ensure that minimum funding obligations will be met. As of June 30, 2023, the Pension Plan's actuaries estimated that the Pension Plan had approximately $117.5 million in assets and approximately $141.1 million in long-term liabilities, meaning that the Pension Plan was approximately 83% funded. The Pension Plan's funded status fluctuates and depends on various factors and related assumptions such as future market performance of assets, bond and interest rates, the lifespan of retirees, and participant mortality rates.

Mercy Hospital reserves the right to change or discontinue the Pension Plan at any time. In the event of termination of the Pension Plan, its participants, joint annuitants, beneficiaries, and

spouses have the right to benefits accrued to the date of such termination and such benefits shall become fully vested and nonforfeitable in such persons. The Pension Plan provides, in the event of its termination, that assets are distributed in the following order to the extent sufficient assets remains in the Pension Plan: (i) to provide pensions to retired participants who retired prior to termination of the Pension Plan; (ii) to provide benefits to participants who have reached normal retirement age (*i.e.*, 65 years of age) but have not yet commenced a pension; and (iii) to provide benefits to those who have not yet reached normal retirement age.

In lieu of terminating the Pension Plan, Mercy Hospital could use assets to purchase annuities from an insurance company for all participants currently receiving benefits to continue monthly benefit payments, as well as future pensioners. However, annuitization with an insurer typically requires funding at more than 100% of Pension Plan liabilities to account for insurance premiums and fluctuations in bond and interest rates. Alternatively, Mercy Hospital could seek an alternative sponsor to administer and manage the Pension Plan. The Debtors remain in active discussions with the Pension Committee regarding a successor administrator to ensure continuing administration of the Pension Plan.

### 3.     Business Operations

Prior to the closing of the Sale, the Debtors provided a broad range of healthcare services, including cardiovascular care, bariatric care, high-definition robotic surgery, behavioral and mental health services, pain management, urological services, obstetrics and gynecological services, and many other forms of specialized care. The Debtors operated in healthcare and clinical facilities in Iowa City and the surrounding area that they owned or leased. These facilities provided much-needed services to the communities that they served and included an acute care hospital, an emergency department, family health centers, obstetrics and gynecology, cancer care, behavioral health care, home health care, a walk-in clinic, and various other primary and specialty care clinics. In the period from July 1, 2022 and June 30, 2023 ("Fiscal Year 2023"), the Debtors generated total revenues of approximately $176 million (unaudited).

The Debtors owned or operated 18 primary and specialty clinics through their for-profit subsidiary, Mercy Services. Total clinic visits for Mercy Services were over 140,000 in Fiscal Year 2023. The off-campus clinic sites are located in various towns and communities in the surrounding geographic region, primarily south and east of Iowa City.

Prior to the closing of the Sale, Mercy Hospital, accredited by The Joint Commission, was the low-cost, high-quality leader serving Iowa City and Southeast Iowa. Newsweek previously recognized Mercy Hospital as one of the World's Best Hospitals in 2022 and 2023. In 2021, Watson Health recognized Mercy Hospital in its 100 Top Hospitals and 50 Top Cardiovascular awards. Mercy Hospital was nationally recognized for its commitment to providing high-quality stroke care and received the American Heart Association's Get With The Guidelines – Stroke GOLD PLUS award in 2023. Mercy Hospital's Wound and Vein Center received the 2022 Center of Distinction award from Healogics, the nation's largest provider of advanced wound care services.

As of the Petition Date, the Debtors' workforce comprised approximately 1,100 employees, including nurses, certified nursing assistants, licensed practical nurses, caregivers,

janitorial workers, receptionists, corporate-level personnel, and other staff. Further, the Debtors employ over 90 physicians. With these employed providers, the medical staff of the Debtors, prior to closing of the Sale, comprised approximately 365 individuals, including voluntary community doctors and other contracted providers.

As healthcare providers, the Debtors were heavily regulated and accredited by various state and federal agencies. In particular, nearly every aspect of the Debtors' operations, including the services provided to patients as well as billing and collections, was subject to rules and regulations promulgated by the United States Department of Health and Human Services' – Centers for Medicare & Medicaid Services and the Iowa Department of Health and Human Services.

### 4.   Prepetition Capital Structure

#### i.   Secured Debt Obligations

The following chart sets forth Mercy Hospital's funded secured debt obligations as of July 31, 2023. The other Debtors are not obligated under this secured debt.

| Debt Obligation | Secured Status | Prepetition Principal Amount Owed |
|---|---|---|
| Series 2011 Bonds | Secured | $24,270,000 |
| Series 2018 Bonds | Secured | $37,875,000 |
| Total | N/A | $62,145,000 |

#### (a)   Series 2011 Bonds

Pursuant to a Trust Indenture dated as of November 1, 2011 (as amended and supplemented from time to time, the "Series 2011 Trust Indenture") by and between the City of Hills, Iowa (the "Issuer" and Wells Fargo Bank, National Association, as Trustee and Master Trustee (in such capacity, the "Master Trustee"),[5] the Issuer issued $44,615,000 in the aggregate principal amount of its Health Facilities Revenue Bonds, Series 2011 (Mercy Hospital Project) (the "Series 2011 Bonds").

The Issuer loaned the proceeds of the Series 2011 Bonds to Mercy pursuant to that certain Loan Agreement, dated as of November 1, 2011 (as amended or supplemented from time to time, the "Series 2011 Loan Agreement") between the Issuer and Mercy Hospital. The proceeds of the 2011 Bonds were used, among other things, to (i) refund the outstanding principal amount of the Issuer's Revenue Refunding Bonds, Series 1998 (Mercy Hospital, Iowa City, Iowa), (b) finance a portion of the costs of the construction, renovation, expansion, equipping, and furnishing of Mercy Hospital's existing hospital facilities located at 500 East Market Street, Iowa City, Iowa, and (c) pay certain costs of issuance of the Series 2011 Bonds.

To evidence Mercy Hospital's obligations under the Series 2011 Loan Agreement, Mercy Hospital executed and delivered to the Master Trustee that certain Direct Note Obligation, Series 2011, dated as of November 1, 2011 (as amended, modified, or supplemented prior to the Petition Date, the "Series 2011 Note"). As security for the Series 2011 Bonds, the Issuer assigned to the

---

[5]   As of the date hereof, the successor Master Trustee is Computershare Trust Company, N.A.

Master Trustee (a) substantially all of the Issuer's interest in the Series 2011 Loan Agreement and (b) the Issuer's interest in the Series 2011 Note.

As of the Petition Date, the aggregate principal amount outstanding under the Series 2011 Loan Agreement was approximately $24,270,000, plus accrued interest and other fees due and owing under the Series 2011 Loan Agreement (the "Series 2011 Obligations").

**(b)      Series 2018 Bonds**

Pursuant to a Trust Indenture dated as of May 1, 2018 (as amended and supplemented, the "Series 2018 Trust Indenture") by and between the Issuer and the Master Trustee, the Issuer issued $41,760,000 in the aggregate principal amount of its Health Facilities Revenue Bonds, Series 2018 (Mercy Hospital Project) (the "Series 2018 Bonds" and together with the Series 2011 Bonds, the "Bonds").

The Issuer loaned the proceeds of the Series 2018 Bonds to Mercy Hospital pursuant to that certain Loan Agreement dated as of May 1, 2018 (as amended or supplemented from time to time, the "Series 2018 Loan Agreement") between the Issuer and Mercy Hospital. The proceeds of the Series 2018 Bonds were used to, among other things, (a) finance a portion of the costs of the construction, renovation, expansion, equipping and furnishing of Mercy Hospital's existing hospital facilities, including the purchase of routine capital equipment, hardware, and software, all located on the Mercy Hospital's campus, (b) refinance other existing indebtedness, and (c) fund any necessary debt service reserve and/or capitalized interest funds and pay for costs of issuance of the Series 2018 Bonds.

To evidence Mercy Hospital's obligations under the Series 2018 Loan Agreement, Mercy Hospital executed and delivered to the Indenture Trustee that certain Direct Note Obligation, Series 2018, dated as of May 10, 2018 (as amended, modified, or supplemented prior to the Petition Date, the "Series 2018 Note").

As of the Petition Date, the aggregate principal amount outstanding under the Series 2018 Loan Agreement is approximately $37,875,000, plus accrued interest and other fees due and owing under the 2018 Loan Agreement (the "Series 2018 Obligations," and, together with the Series 2011 Obligations, the "Prepetition Obligations"). On August 3, 2023, the Master Trustee noticed its intent to set off the aggregate amount of $3,701,603 from monies on deposit in reserve accounts controlled by the Master Trustee to principal and interest. The aggregate principal value of the Series 2018 Bonds, to the extent such amounts were appropriately setoff prior to the Petition Date, is approximately $34,219,899.

**(c)      The Master Trust Indenture**

Mercy Hospital issued the Series 2011 Note and the Series 2018 Note, respectively, to the Master Trustee as trustee for the Bondholders of the Series 2011 Bonds and the Series 2018 Bonds, respectively pursuant to that certain Master Trust Indenture, dated as of June 1, 1998, (as amended or supplemented from time to time, the "Master Trust Indenture" and, together with the 2011 Trust Indenture and the 2018 Trust Indenture and all other documents relating to the foregoing, the "Bond Documents").

The Series 2011 Obligations and the Series 2018 Obligations are *pari passu* in right of payment.  To the Debtors' knowledge, Preston Hollow is the beneficial holder of all of the Series 2018 Bonds, but none of the Series 2011 Bonds.  Pursuant to the Bond Documents, because Preston Hollow owns more than 50% of the aggregate bonds issued under the Master Trust Indenture, Preston Hollow has the ability to direct the Master Trustee for certain actions taken under the Master Trust Indenture (in respect of both the Series 2011 Bonds and the Series 2018 Bonds).

### (d)    Prepetition Liens and Collateral

As of the Petition Date, the Master Trustee asserts a security interest in, and a lien upon (the "Prepetition Liens") the following as collateral for the Prepetition Obligations, on a *pari passu* basis between the Series 2011 Bonds and the Series 2018 Bonds:

- Pursuant to the Master Trust Indenture, the Master Trustee has a security interest in all of Mercy Hospital's[6] property, including "All accounts and assignable general intangibles now owned or hereafter acquired by any Member of the Obligated Group regardless of how generated, and all proceeds therefrom, whether cash or non-cash, all as defined in Article 9 of the Uniform Commercial Code" (the "Unrestricted Receivables"), subject to certain exclusions. Master Trust Indenture at Division I.

- To further secure the Prepetition Obligations, Mercy Hospital also granted to the Master Trustee a mortgage and security interest in the Mercy Hospital facility (the "Owned Real Property") and related fixtures, furniture and equipment (the "FFE" and, together with the Unrestricted Receivables and the Owned Real Property, the "Prepetition Collateral") pursuant to that certain Mortgage and Security Agreement and Fixture Financing Statement, dated as of May 1, 2018 (the "Mortgage").

During the Chapter 11 Cases, the Debtors are authorized to use Cash Collateral, pursuant to the Second Interim Cash Collateral Order.

### ii.    Unsecured Debt Obligations

### (a)    Pension Liabilities

The Debtors have obligations with respect to the Pension Plan on behalf of certain employees.   Because the Pension Plan was frozen to new entrants and all benefit accruals after December 31, 2016, there are no new benefit accruals. As of June 30, 2023, the Pension Plan actuary reported that the aggregate fair value of the assets held in the Pension Trust was approximately $117.5 million in assets and approximately $141.1 million in long-term liabilities.

---

[6]    The Master Trustee's security interest only encompasses the "Obligated Group" which is defined to include only Mercy Hospital, and does not include the assets of the other Debtors.

#### (b)      Other Unsecured Liabilities

In addition to the debt obligations described above, the Debtors have significant (and in some cases, contingent) unsecured obligations, including asserted or estimated amounts owing to trade vendors, suppliers and others.

## B.      Circumstances Giving Rise to the Chapter 11 Cases

### 1.      COVID-19 Pandemic

Like many other hospital and health care operators, the COVID-19 pandemic severely impacted the Debtors' operations, liquidity, and cash flows.  The effects of the pandemic, and the after-effect of sharp inflationary pressures, caused an increase in operating expenses, driven primarily by an increasing need for and use of staffing agencies to address an increased shortage of local clinical staffing.  At the same time, Mercy Hospital's patient volume decreased, driven primarily by a decline in more profitable clinical encounters, such as elective surgeries.

As the clinical workforce faced challenges through the pandemic, many providers and nursing personnel moved toward working for agencies, seeking better pay and transitioning away from set schedules and employer-paid benefits.  The industry-wide shift has increased costs for clinical staff in hospitals across the country, leaving those organizations, including Mercy Hospital, with significantly higher costs to staff inpatient and outpatient units.

At the same time, following the onset of the COVID-19 pandemic, Mercy Hospital was hit with an increasing number of canceled and deferred elective surgery cases, decreased primary care and outpatient visits, and decreased emergency room visits.  This resulted in a decrease in revenue, as evidenced by a decrease in inpatient days of 19% from fiscal year 2019 to Fiscal Year 2023.  During this period, inpatient admissions decreased by 26% and inpatient surgeries declined 51%.  This decrease in patient volume was largely attributable to individuals choosing to avoid clinical settings to minimize the risk of COVID-19 exposure, a concern that continues to influence patient behavior today.

### 2.      Failed Implementation of Electronic Medical Record Upgrade

The Debtors utilized an electronic medical record ("EMR") system to keep and track medical records, including scheduling patient visits, tracking medical histories, lab results, and physicians' notes, among other things.  In March 2021, the Debtors entered into an agreement with Allscripts Healthcare Solutions, Inc. in connection with their EMR system.

The EMR implementation, which went live in March 2022, immediately created significant operational problems.  These included difficulties in coding, billing and collecting for patient encounters, an inability to submit regulatory reports on time, and misconfigured workflows.  Consequently, the Debtors experienced a precipitous loss of revenue in late 2022 and early 2023 due to delayed patient bill submissions, resulting in a substantial backlog of accounts receivable payments that could not be collected promptly.  The Debtors' accounts receivable ballooned by more than 40% during this period despite lower year-over-year net patient revenues.  As a result, the Debtors' financial liquidity was severely affected during the latter half of 2022 and the first quarter of 2023.

### 3.      Sale Efforts and Restructuring Negotiations

#### i.      Initial Sale Efforts

In June 2021, the Debtors retained H2C Securities, Inc. ("H2C") as their investment banker to assist in the search for a long-term strategic partner.  Following H2C's retention, H2C collaborated with existing management to explore a range of potential transactions, including a merger, affiliation, partnership or other similar type of arrangement.  In doing so, the Debtors with the assistance of H2C ran a process that would best enable a partnership with another healthcare provider and would maintain the Debtors' role as an essential healthcare provider to the community.

In particular, H2C prioritized potential candidates that would have the resources to maintain and continue the Debtors' operations and to manage its balance sheet liabilities.  H2C initially identified a number of potential candidates that met the criteria above and would potentially be interested in partnering with a non-profit community hospital in Iowa City.  In addition, on June 30, 2021, the Debtors announced to the organization and the market that the Debtors were seeking a long-term partner.  During this time, three parties submitted initial indications of interest.  One of these parties was the University.

H2C subsequently conducted management presentations (and prepared related materials) and otherwise engaged with each of the three entities that submitted indications of interest.  In addition, the Debtors formed a strategic planning committee consisting of certain board members and physicians to assess any potential transaction.  After due diligence and considerable negotiations with each of the entities, the Debtors were unable to reach an agreement with any of the parties at that time.

#### ii.      University's First Offer

In late 2022, the Debtors re-engaged with the University regarding a potential strategic acquisition of the Debtors.  The Debtors spent significant resources in the winter months of late 2022 and early 2023, with the University conducting extensive due diligence on the Debtors.   In early February 2023, the University submitted a draft stalking horse asset purchase agreement that contemplated a potential bankruptcy filing and asset sale.

Upon receiving the transaction documents from the University, the Debtors, through its then management team and financial advisors, met in person with Preston Hollow in February 2023 to inform it of the offer from the University.  Preston Hollow took the position that the Debtors should not engage with the University under the terms of the proposal because the proceeds would be insufficient to pay the Bondholders' debt in full.  Recognizing the inherent risks in moving forward with a transaction that is not supported by the Bondholder Representatives, and in light of the desire of the Debtors to establish a productive working relationship with Preston Hollow, as bondholder representative for the Series 2018 Bonds, the Debtors broke off discussions with the University.

###### iii.      Debtors' Prepetition Discussions with the Bondholder Representatives

Beginning in February 2023, following the Debtors and the University parting ways, the Debtors and Preston Hollow engaged in collaborative and productive discussions regarding operational improvements to improve cash flow. Preston Hollow executed a confidentiality agreement with the Debtors and began receiving significant diligence and financial reporting from the Debtors. The discussions regarding cash flow and performance improvement plans were led, at that time, by the Debtors' senior management team in place by MercyOne. In addition, ToneyKorf Partners, LLC ("ToneyKorf Partners"), who had been engaged in early January 2023 to provide certain financial advisory services to the Company, advised on the development of cash management forecasts and processes and coordinated certain workstreams with the Bondholder Representatives' financial advisor, Kaufman Hall.

As part of this process, the Bondholder Representative and its financial advisor expressed the view that the Debtors would be better served by terminating the existing management agreement with MercyOne and replacing it with an experienced senior management team. Acting with the input of the Bondholder Representative, the Boards interviewed both ToneyKorf Partners and Berkeley Research Group ("BRG"), ultimately deciding to retain ToneyKorf Partners effective April 3, 2023, to provide interim management services to Mercy Hospital. Immediately following ToneyKorf Partners' engagement, Mark E. Toney assumed the role of CRO, and Dr. Thomas Clancy, the former Chief Nursing Officer and current Chairman of the Boards, came out of retirement to assume the role of Chief Executive Officer. In addition, select ToneyKorf Partners team members assumed the Debtors' senior management to help stabilize operations and improve financial performance. The new management team engaged in near-daily discussions with Preston Hollow regarding key financial initiatives, operational stabilization actions and improvements, strategic partner discussions, and other critical developments.

The new management team—under the CRO's leadership, and under the direction and supervision of the Boards—became instrumental in engaging in two key sets of physician groups and practices and a significant number of independent physicians during a time when the market is competitive and tight. The new management team also held four sets of physician and employee town hall meetings, meetings with elected officials, community leaders and other key stakeholders to communicate the organization's financial status, outline actions for improvement, and create and execute a plan to stabilize the failed EMR system.

In the months following ToneyKorf Partners assuming the senior leadership of the organization, and in conjunction with Dr. Clancy's new role as CEO, Mercy Hospital experienced significant improvement in the overall financial picture, including:

- increasing collections from patient accounts receivable by $6.4 million from Q1 2023 to Q2 2023, representing a 14% improvement;

- reversing the operating cash flow deficit of $3.8 million in Q1 2023 to generating a surplus of $1.7 million in Q2 2023, an improvement of $5.5 million;

- reducing the average number of days to collect accounts receivable from 119 days on March 31, 2023, to 82.5 days on July 31, 2023 (representing more than 30% improvement);

- reducing gross accounts receivable by $75 million as well as reducing receivables greater than 180 days old by over $15 million (from $82 million to $66 million);

- outperforming its budgeted cash flow by over $10 million in the 28-week period from the beginning of January through July 14, 2023; and

- applications for new hires increased significantly, and the organization successfully recruited 65 new employees to fill temp-filled and traveler positions in just the last two months. Over time the reduction of traveler nurses alone have helped reduce labor costs by approximately $100,000 per week as of July 2023.

Although these significant financial achievements helped alleviate certain near-term financial pressures, it was clear that the organization still required a long-term solution. To that end, the new management team again pursued new strategic partners. For instance, in the Spring of 2023, the Debtors and Preston Hollow began lengthy discussions with a potential strategic partner. The three parties jointly engaged Kaufman Hall (financial advisor to the Bondholders) to help assess and evaluate a strategic transaction for the Debtors. Although those discussions did not result in a viable transaction, the negotiations and discussions indicated the Bondholders' interest in continuing to collaborate and support the Debtors' ongoing pursuit of a strategic partner.

In the months leading up to the Chapter 11 Cases, the Debtors' new senior management team, alongside Debtors' counsel, spoke openly with Preston Hollow regarding potential paths forward, including in-court and out-of-court restructuring options. On July 18, 2023, the Bondholder Representatives sent a *Notice of Events of Default and Loan Default Events; Demand for Further Assurances* (the "Default Notice"). The Default Notice asserted that Mercy Hospital was in default, identifying three different alleged defaults under the relevant bonds. On July 21, 2023, Mercy responded with a lengthy letter (the "Response Letter"), disputing each of these alleged defaults. On July 24, 2023, the Bondholder Representatives sent a notice of acceleration (the "Acceleration Notice") to the Debtors, which did not address the Response Letter. The Debtors responded the following day, highlighting the significant operational risks that the Bondholder Representatives' actions were placing on the organization.

On July 24, 2023, the Bondholder Representatives initiated an action in the Iowa District Court for Johnson County, *Computershare Trust Company, N.A., as Master Trustee and Series 2018 Trustee, and Preston Hollow Community Capital, Inc., as Bondholder Representative v. Mercy Hospital Iowa City*, Case No. LACV084546 (the "Receivership Action") and seeking an expedited hearing. The next day, on July 25, 2023, the Debtors filed a motion to dismiss, highlighting among other things that (i) the Bondholder Parties' Default Notice was incorrect and the Acceleration Notice was ineffective; (ii) an experienced fiduciary from ToneyKorf Partners was already in place; and (iii) the action was procedurally improper. As a result of the commencement of these Chapter 11 Cases, the Receivership Action was stayed pursuant to Bankruptcy Code section 362(a).

### iv.      Re-Engagement with the University

Following the commencement of the Receivership Action, the Debtors re-initiated negotiations with the University on a potential path forward and eventually partnered together in a joint effort to protect the value for all stakeholders, and to avoid a scenario in which an important Iowa institution would be forced to shutter its doors.

After careful consideration, and an analysis of all viable alternatives, and following this intense period of negotiations with the University, the Debtors determined that filing the Chapter 11 Cases to effectuate a sale of substantially all of the Debtors' assets presented the best option for the Debtors. The Debtors negotiated and finalized a binding letter of intent with the University on August 6, 2023. On August 8, 2023, the Debtors and the University executed a fully binding stalking horse asset purchase agreement (the "Stalking Horse APA").

## C.    The Chapter 11 Cases

The following is a brief description of certain material events that have occurred during the Chapter 11 Cases to date. The pleadings and Orders referenced herein can be viewed free of charge at https://dm.epiq11.com/case/mercyhospital.

### 1.      First-Day Relief

On the Petition Date, the Debtors Filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their assets and affairs as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108. On the Petition Date, the Debtors also Filed pleadings seeking certain "first day" relief, including the following:

- *Debtors' Motion for Entry of Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 2], by which the Debtors sought joint administration of the Chapter 11 Cases. On August 8, 2023, the Court entered an Order granting joint administration of the Chapter 11 Cases. *See* Docket No. 37.

- *Debtors' Motion for Entry of Order (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (C) Redact Employee Home Address Information from Certain Bankruptcy Documents; and (II) Granting Related Relief* [Docket No. 7], by which the Debtors sought authority to file a consolidated creditor matrix and top-30 list and redact employee home address information. On August 9, 2023, the Court entered an Order granting the requested relief. *See* Docket No. 48.

- *Debtors' Motion for Entry of Order (I)(A) Establishing Certain Notice and Case Management Procedures and (B) Limiting Certain Notice Requirements in the Chapter 11 Cases; (II) Implementing Patient Confidentiality Procedures; (III) Approving the Form and Manner of Notice of the Commencement of the Chapter*

*11 Cases; and (IV) Granting Related Relief* [Docket No. 8], by which the Debtors sought authority to establish certain noticing, case management, and patient confidentiality procedures. On August 9, 2023, the Court entered an Order granting the requested relief. *See* Docket No. 49.

- *Debtors' Application for Entry of Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent, Effective as of the Petition Date* [Docket No. 9], by which the Debtors sought authorization to retain and employ Epiq as its claims, noticing, solicitation, and administrative agent in the Chapter 11 Cases. On August 7, 2023, the U.S. Trustee filed an objection to the requested relief. See Docket No. 33. On August 9, 2023, the Court overruled the U.S. Trustee's objection and entered an Order approving the Debtors' retention of Epiq. *See* Docket No. 91. On August 15, 2023, the Court entered an amended Order approving the Debtors' retention of Epiq. *See* Docket No. 104.

- *Debtors' Motion to (I) Schedule Expedited Hearing on First-Day Motions and (II) Approve the Form and Manner of Limited Notice Thereof* [Docket No. 10], by which the Debtors sought an expedited first-day hearing. On August 7, 2023, the Court entered an Order scheduling an expedited first-day hearing. *See* Docket No. 21.

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Wages, Compensation, and Employee Benefits, (II) Continue Certain Employee Benefit Programs in the Ordinary Course, and (III) Granting Related Relief* [Docket No. 13], by which the Debtors sought authority to, among other things, pay prepetition wages and benefits to their employees. On August 9, 2023, the Court entered an Order authorizing the requested relief on an interim basis. See Docket No. 50. On September 14, 2023, the Court entered an Order authorizing the requested relief on a final basis. *See* Docket No. 217.

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms and Honor Certain Prepetition Obligations Related to the Use Thereof, (C) Maintain Purchasing Card Program and Honor Prepetition Obligations Related Thereto, and (D) Continue to Perform Intercompany Transactions; (II) Extending the Time for the Debtors to Comply with 11 U.S.C. § 345(b) Deposit and Investment Requirements; and (III) Granting Related Relief* [Docket No. 14], by which the Debtors sought authority to, among other things, continue to operate their existing cash management system. On August 9, 2023, the Court entered an Order authorizing the requested relief on an interim basis. *See* Docket No. 51.

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing Debtors to (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder; (II) Renew, Revise, Extend, Supplement, Change, or Enter Into New Insurance Policies; and (III) Granting Related Relief* [Docket No. 15], by which

the Debtors sought authority to, among other things, maintain existing insurance policies and pay obligations related thereto. On August 9, 2023, the Court entered an Order authorizing the requested relief on an interim basis. *See* Docket No. 52. On September 14, 2023, the Court entered an Order authorizing the requested relief on a final basis. *See* Docket No. 218.

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain, Administer, and Modify Their Refund Programs and Practices, and (II) Honor Obligations Related Thereto* [Docket No. 16], by which the Debtors sought authority to continue their refund programs and practices. On August 9, 2023, the Court entered an Order authorizing the requested relief on an interim basis. *See* Docket No. 53. On September 14, 2023, the Court entered an Order authorizing the requested relief on a final basis. *See* Docket No. 219.

- *Debtors' Motion for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services; and (IV) Granting Related Relief* [Docket No. 17], by which the Debtors sought authority to, among other things, establish procedures for resolving issues with utility providers. On August 9, 2023, the Court entered an Order authorizing the requested relief on an interim basis. *See* Docket No. 54. On September 14, 2023, the Court entered an Order authorizing the requested relief on a final basis. *See* Docket No. 220.

- *Debtors' Motion for Entry of Interim and Final Orders Authorizing (I) Payment of Prepetition Taxes and Fees and (II) Necessary Taxes and Fees in the Ordinary Course* [Docket No. 23], by which the Debtors sought authority to pay prepetition taxes. On August 9, 2023, the Court entered an Order authorizing the requested relief on an interim basis. *See* Docket No. 55. On September 14, 2023, the Court entered an Order authorizing the requested relief on a final basis. *See* Docket No. 221.

In support of the foregoing, the Debtors Filed the *Declaration of Mark E. Toney in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 27].

**2.      Cash Collateral**

On the Petition Date, the Debtors Filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Granting Adequate Protection, (II) Scheduling a Final Hearing on the Use of Cash Collateral, and (III) Granting Related Relief* [Docket No. 26], seeking Court authorizing to use Cash Collateral during the Chapter 11 Cases.

On August 8, 2023, the Court entered the First Interim Cash Collateral Order, authorizing the Debtors' use of cash collateral on an interim basis in accordance with the Cash Collateral Budget attached thereto. On November 7, 2023, the Court entered the Second Interim Cash Collateral Order, authorizing the Debtors' use of cash collateral on an interim basis in accordance with the Cash Collateral Budget attached thereto.

### 3. Retention of Debtors' Professionals

#### i. Epiq Corporate Restructuring, LLC

On the Petition Date, the Debtors Filed the *Debtors' Application for Entry of Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent, Effective as of the Petition Date* [Docket No. 9], by which the Debtors sought authorization to retain and employ Epiq as its claims, noticing, solicitation, and administrative agent in the Chapter 11 Cases. On August 7, 2023, the U.S. Trustee filed an objection to the requested relief. *See* Docket No. 33. On August 9, 2023, the Court overruled the U.S. Trustee's objection and entered an Order approving the Debtors' retention of Epiq. *See* Docket No. 91. On August 15, 2023, the Court entered an amended Order approving the Debtors' retention of Epiq. *See* Docket No. 104.

On February 22, 2024, the Debtors Filed the *Debtor's Application for Entry of Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Administrative Advisor Effective as of the Petition Date* [Docket No. 759]. On [__], 2024, the Court entered an Order approving the Debtors' retention of Epiq as their administrative advisor for solicitation purposes. *See* Docket No. [__].

#### ii. Nyemaster Goode, P.C.

On August 23, 2023, the Debtors Filed the *Application of Debtors for Entry of Order Authorizing the Retention and Employment of Nyemaster Goode, P.C. as Counsel for the Debtors and Debtors-in-Possession Effective as of the Petition Date* [Docket No. 145]. On September 6, 2023, the U.S. Trustee filed an objection to such retention. *See* Docket No. 192. On September 14, 2023, the Court overruled the U.S. Trustee's objection and entered an Order authorizing the Debtors' employment of Nyemaster Goode, P.C. as its counsel. *See* Docket No. 225.

#### iii. McDermott Will & Emery LLP

On August 23, 2023, the Debtors Filed the *Debtors' Application for Entry of Order Authorizing the Retention and Employment of McDermott Will & Emery LLP as Counsel for the Debtors and Debtors-in-Possession Effective as of the Petition Date* [Docket No. 148]. On September 6, 2023, the U.S. Trustee filed an objection to such retention. *See* Docket No. 189. On September 8, 2023, the Bondholders filed an objection to such retention. *See* Docket No. 203. On September 14, 2023, the Court overruled the foregoing objections and entered an Order approving the Debtors' employment of McDermott Will & Emery LLP as its counsel. *See* Docket No. 226.

#### iv. ToneyKorf Partners, LLC

On August 23, 2023, the Debtors Filed the *Debtors' Application for Entry of Order, Pursuant to Section 363 of the Bankruptcy Code, Authorizing Debtors to Retain ToneyKorf Partners, LLC as Interim Management of the Debtors, Effective as of the Petition Date, and Granting Related Relief* [Docket No. 149]. On September 6, 2023, the U.S. Trustee filed an objection to such retention. *See* Docket No. 191. On September 8, 2023, the Bondholders and the UCC filed objections to such retention. *See* Docket Nos. 197, 201. On September 20, 2023, the Court overruled the foregoing objections and entered an Order approving the Debtors' retention

of ToneyKorf Partners, LLC and designation of Mr. Toney as the Debtors' CRO.  *See* Docket No. 259.

###### v.  H2C Securities, Inc.

On August 23, 2023, the Debtors Filed the *Debtors' Application for Entry of Order (I) Authorizing the Employment and Retention of H2C Securities Inc. as Investment Banker to the Debtors and Debtors-in-Possession, Nunc Pro Tunc to the Petition Date, (II) Approving the Terms of the H2C Engagement Letter, (III) Waiving Certain Time-Keeping Requirements, and (IV) Granting Related Relief* [Docket No. 150].  On September 6, 2023, the U.S. Trustee filed an objection to such retention.  *See* Docket No. 190.  On September 8, 2023, the Bondholders filed an objection to such retention.  *See* Docket No. 200.  On September 18, 2023, the Court overruled the foregoing objections and entered an Order approving the Debtors' retention of H2C as their investment banker.  *See* Docket No. 247.

On December 29, 2023, the Debtors Filed the *Debtors' Application for Entry of Order (I) Expanding the Scope of Employment and Retention of H2C Securities, Inc. as Investment Banker to the Debtors and Debtors-in-Possession, (II) Approving the Terms of the Amendment to the H2C Engagement Letter, and (III) Granting Related Relief* [Docket No. 613], which sought to expand the scope of H2C's retention to include services related to marketing the JV Interests.  On January 23, 2024, the Court entered an Order approving the Debtors' amended retention of H2C.  *See* Docket No. 686.

##### 4.  Appointment of PCO and Official Committees

###### i.  Patient Care Ombudsman ("PCO")

On August 9, 2023, the U.S. Trustee appointed Susan N. Goodman as the Debtors' PCO.  *See* Docket No. 57.  On August 10, 2023, the Court entered an Order approving the PCO's appointment.  *See* Docket No. 59.  Throughout the Chapter 11 Cases, the PCO has filed reports pursuant to Bankruptcy Rule 2015.1.  *See* Docket Nos. 185, 425, 612.

###### ii.  UCC

On August 15, 2023, the U.S. Trustee appointed the UCC pursuant to Bankruptcy Code section 1102(a).  *See* Docket No. 107.  On September 14, 2023, the UCC filed the *Application to Retain and Employ Cutler Law Firm, P.C., as Co-Counsel for the Official Committee of Unsecured Creditors, Effective as of August 21, 2023* [Docket No. 227]; the *Application to Retain and Employ Sills Cummis & Gross P.C. as Co-Counsel for the Official Committee of Unsecured Creditors, Effective as of August 18, 2023* [Docket No. 228]; and the *Application for an Order Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor to the Official Committee of Unsecured Creditors Effective as of August 21, 2023* [Docket No. 229].  On October 12, 2023, the Court entered Orders approving the UCC's requested professional retentions.  *See* Docket Nos. 354, 355, 356.

### iii.    Pension Committee

On October 18, 2023, an ad hoc committee of pensioners filed the *Motion to Establish Official Committee of Pensioners Under 11 U.S.C. § 1102(a)(2)* [Docket No. 385]. On October 25, 2023, the UCC filed an objection to the requested relief. *See* Docket No. 415. On October 27, 2023, the ad hoc committee of pensioners filed a reply in support of their request for an official committee. *See* Docket No. 419. On November 3, 2023, the Court entered an Order requesting that the U.S. Trustee appoint an official committee of pensioners. *See* Docket No. 451. On November 4, 2023, the U.S. Trustee appointed the Pension Committee. *See* Docket No. 458.

On November 8, 2023, the Pension Committee filed the *Application to Employ Day Rettig Martin, P.C. as Counsel for the Official Committee of Pensioners, Effective as of November 4, 2023* [Docket No. 479]. On November 13, 2023, the Court entered an Order approving the requested retention. *See* Docket No. 506. On January 15, 2024, the Pension Committee filed the *Application to Employ HBM Management Associates, LLC as Financial Advisor for the Official Committee of Pensioners* [Docket No. 642]. On January 18, 2024, the Court entered an Order approving the requested retention. *See* Docket No. 665.

### 5.    Sale Process

### i.    Bidding Procedures

On August 9, 2023, the Debtors Filed the Bidding Procedures Motion. *See* Docket No. 58. On August 24, 2023, the U.S. Trustee Filed an objection to the Bidding Procedures Motion. *See* Docket No. 155. Other contract counterparties filed various objections and/or reservations of rights to the Bidding Procedures Motion. *See* Docket Nos. 195, 202. On September 14, 2023, the Court entered the Bidding Procedures Order. *See* Docket No. 222.

### ii.    Cure Notice & Objections

On September 20, 2023, the Debtors Filed the Cure Notice, which set forth proposed cure amounts. *See* Docket No. 265. Various parties in interest Filed objections to the Cure Notice. *See* Docket Nos. 310, 313, 316, 318, 319, 327, 331, 433, 450. Certain other parties in interest submitted informal objections to the Cure Notice to Debtors' counsel. As set forth in the Sale Order, any parties who Filed objections to the Cure Notice or submitted informal objections to the Cure Notice had until January 12, 2024 to file (to the extent not resolved by agreement with the Debtors) a formal objection to the Cure Notice. *See* Sale Order, ¶ 21.

On December 29, 2023, the Debtors Filed the Supplemental Cure Notice, which set forth proposed cure amounts for additional potential assumed contracts. *See* Docket No. 610. On January 11, 2024, the Debtors Filed an amended version of the Cure Notice, reflecting resolutions of certain formal and informal objections to the proposed cure amounts. *See* Docket No. 625.

### iii.    Initial Bids

The Bidding Procedures Motion named the University as the Debtors' Stalking Horse Bidder, with an initial proposed purchase price of $20 million (the "<u>Stalking Horse Bid</u>"), plus

certain assumed liabilities as set forth therein, and set forth proposed procedures for the Debtors' proposed bidding and auction process.

Pursuant to the timelines outlined in the Bidding Procedures Order, the Debtors received one other bid prior to the Bid Deadline, which was submitted by the Bondholder Representatives. The Bondholder Representatives' initial bid contemplated a purchase price consisting of (a) $27,000,000 to be satisfied in the form of a credit bid and (b) cash consideration in the amount of $800,000 to satisfy the Break-Up Fee payable to the University (together, the "Bondholder Bid").

### iv.      Auction Process

Pursuant to the Bidding Procedures Order, the Debtors commenced an in-person auction at the offices of Debtors' counsel in Chicago, Illinois on October 4, 2023, which was subsequently continued to October 10, 2023 via Zoom and reopened on October 27, 2023 via Zoom.  In addition, each of these auction sessions were attended by representatives of the Debtors, the UCC, the Bondholder Representatives as a bidding party, and the University as a bidding party.

### (a)      October 4, 2023 Auction

A critical discussion point at the commencement of the auction on October 4, 2023 was the timing of any proposed closing date.  Because the University had begun numerous workstreams relating to transition and potential closing issues, the University had the ability to close the transaction as soon as November 30, 2023.  In contrast, if the Bondholder Representatives were to be selected as the winning bidder, it was likely that their transaction would not be in a position to close until, at a minimum, several months thereafter.  This was critical because, on average, the Debtors' operational burn is approximately $1 million per week, and because the Debtors' liquidity would run out prior to the end of November 2023.  Therefore, in order to properly assess and compare the bids between the University and the Bondholder Representatives, it was crucial to get both parties to agree to fund any operating losses between November 30, 2023 and any potential closing.

To this end, as part of the Debtors' initial auction on October 4, 2023, the University modified the Stalking Horse Bid to reflect that "[i]f the University fails to close the transaction on or before November 30, 2023, despite the fact that all closing conditions have been satisfied, the University will absorb and assume the actual operating losses of the Debtors until such time as the University closes, including any shutdown costs, if applicable." Oct. 4 Auction Tr. at 12:7–14.[7] Based upon this modification to the University's bid, the Debtors and the UCC pushed the Bondholder Representatives during the October 4, 2023 auction to include a similar funding mechanism in the Bondholder Bid.  Later that day, the Bondholder Representatives modified their bid "to include a commitment on the part of the [Bondholder Representatives] to cover the operating expenses for the hospital beginning on December 1 to the extent that the [Bondholder Representatives] are designated and selected as the winning bidder . . ." Oct. 4 Auction Tr. at 10:5–11.

---

[7]   Copies of the auction transcripts are available free of charge on the Debtors' bankruptcy website (https://dm.epiq11.com/case/mercyhospital), specifically as exhibits to Docket No. 464.

On the evening of October 4, 2023, the Debtors continued the auction in order to, among other things, (i) address potential modifications in the bids relating to certain parcels of real property, (ii) further assess the role of the proposed operating partner in the Bondholder Bid, which was to be the hospital managing entity and the entity which would apply for healthcare licensure; and (iii) continue negotiations among the bidding parties.  At the end of the auction on October 4, 2023, the University's bid remained at $20 million plus additional assumed liabilities, with a commitment to fund operating losses after November 30, whereas the Bondholder Representatives' bid was, in addition to payment of the Break-Up Fee, a credit bid of $27 million plus additional assumed liabilities, plus a commitment to fund up to $750,000 in operating losses between November 15 and November 30, and an uncapped commitment to fund operating losses after November 30 until closing.

**(b)    October 10, 2023 Auction**

At the resumed auction on October 10, 2023, after several rounds of bidding, the University submitted a modified topping bid of $28 million in cash (after having modified their bid to remove certain unencumbered real property), plus the operating loss commitment for funding operating losses after November 30 until closing, as well as an agreement to invest an additional $25 million over a five-year period at Mercy Hospital.

Similarly, at the resumed auction on October 10, 2023, the Bondholder Representatives modified the Bondholder Bid to include (i) $27.8 million in credit bid; (ii) agreement to fund up to $1.2 million for operating losses incurred between November 15 – November 30, 2023 in exchange for clinics that are not part of the Bondholder Representatives' collateral; (iii) payment of the $800,000 Break-Up Fee to the University; and (iv) agreement to fund uncapped operating losses incurred after November 30 until closing.  As was the case with the initial Bondholder Bid, the Bondholder Representatives committed to engage an interim manager designee to assume operational control over Mercy Hospital as of November 15, 2023.

At the conclusion of the auction on October 10, 2023, the Debtors determined, in consultation with the UCC, that the final bid from the Bondholder Representatives was the highest or otherwise best bid, subject to documentation reasonably acceptable to the parties.  In addition, the Debtors designated the University's final bid as the Back-Up Bidder, pursuant to the requirements of the Bidding Procedures.  The University disagreed with this designation and reserved rights with respect to this issue.  As described further below, the Debtors relied on the Bondholder Representatives' operating loss commitment in selecting the bid from the Bondholder Representatives', as the Debtors intended for it to allow the Debtors' estate to be net neutral between the two bids given the differences between the parties' proposed closing dates.

On October 10, 2023, the Debtors filed the *Notice of Auction Results* [Docket No. 352], which disclosed that the Debtors selected the final bid from the Bondholder Representatives as the highest and best bid.

**(c)    Definitive Documentation and Material Disagreement**

Immediately following the conclusion of the auction, the Debtors engaged in numerous discussions and negotiations with the Bondholder Representatives and their proposed operating

partner regarding (i) an amended asset purchase agreement, (ii) an interim management agreement providing for the Bondholder Representatives' proposed operating partner to take over interim management of the Debtors as of November 15, 2023, and (iii) a funding agreement to provide for funding of operating losses consistent with the Bondholder Representatives' bid.  During these negotiations, the Bondholder Representatives took the position—to the surprise of the Debtors and the UCC—that the funding commitments for operating losses incurred after November 30 would be subject to first using all of the Debtors' cash on hand and funds available from the Foundation, an amount that could approach, or potentially exceed, $10 million.

Both the University's and Bondholder Representatives' bids to cover operating losses were made on the record prior to the filing of the 9019 Motion, which was filed on October 9, 2023. Although, the Bondholder Representatives were party to the settlement discussions with the Foundation that had been ongoing prior to that time.  Because the 9019 Motion had not been filed when both bidders added the operating loss commitment to their respective bids on October 4, 2023, it was clear that the settlement set forth therein and the proposed use of the Foundation funds was not a factor in the University's modified bid to absorb and assume the Debtors' operating losses following November 30, 2023.

The operating loss commitment was a crucial term that the Debtors (in consultation with the UCC) weighed in evaluating the bid submitted by the Bondholder Representatives.  In the absence of an operating loss commitment—that is, a commitment to backstop the Debtors' operating losses without requiring the Debtors to obtain liquidity from assets beyond its operations—the Debtors and the UCC firmly believed that the last bid submitted by the Bondholder Representatives (based on the Bondholder Representatives' mistaken interpretation) was materially lower than the last bid by the University, which would mean that the Debtors would be forced to deplete all of the remaining cash and Foundation funds before the closing of the sale transaction, which was not required by the University as part of its bid.  As a result of this critical issue, the Debtors were unable to reach final agreement on the funding agreement.

During this period, the Debtors re-engaged in discussions and negotiations with the University to determine whether the University was willing and able to recommit to the transaction in light of the fact that the Debtors believed—based upon the developments occurring after October 10, 2023—that the University's bid was the only viable transaction available to the Debtors.

### (d)      Auction Reopening

In light of this material disagreement, and because the hearing on the Debtors' proposed sale had been continued and no sale order had been entered, the Debtors determined, after consultation with the UCC, that (a) the last bid from the Bondholder Representatives (previously designated as the Winning Bid) was not higher or otherwise better than the last bid submitted by the University, and, therefore (b) it was appropriate and consistent with the Bidding Procedures Order and the Debtors' fiduciary duties to reopen the auction.

On the record at the October 27, 2023 auction, the University stated, "[c]onsistent with its commitment to maintaining sustainable access to care and healthcare workforce, and in light of the current impasse among the parties to this bankruptcy court proceeding, the State University of

Iowa is willing to intercede to preserve the legacy of Mercy Iowa City." Oct. 27 Auction Tr. at 14:22-15:3. To that end, the University confirmed that the University's bid "would not include any Foundation money whatsoever," nor would it deplete the Debtors' cash on hand. *Id.* at 13:4-5, 13:9-10. Based on those clarifications, the Debtors determined that "the last bid submitted by the Bondholder Representatives [was] no longer the highest or otherwise best bid." *Id.* at 13:15-18. Instead, the Debtors determined that (a) the last bid submitted by the University on the record on October 10, 2023 was the highest or otherwise best bid, and the last bid submitted by the Bondholder Representatives was "no longer the successful bid or the winning bid." *See id.* at 13:19-25, 14:1-2.

The University subsequently restated its bid on the record at the October 27, 2023 auction, which consisted of (a) $28 million plus (b) an amount equal to the Debtors' actual operating losses exclusive of professional fees and all other costs and expenses relating to the bankruptcy that are not already otherwise covered by the Debtors' cash and other investments for the period commencing on December 1, 2023, and continuing until such time as the transaction closes plus (c) a commitment to invest at least $25 million within five years of the transaction closing on information technology and physical plant infrastructure at Mercy Hospital. *See id.* at 15:16-24; 16:4-12. Upon request by the Debtors, the University also confirmed on the record that "[t]o the extent that actual operating disbursements are greater than actual operating receipts, then the University agrees to fund the difference post-December 1st without regard to the Debtors' Foundation funds or the Debtors' cash on hand as of . . . December 1st." *Id.* at 17:8-14; 17:21-24.

With these clarifications and statements made on the record, the Debtors determined, in consultation with the UCC, that the University's bid was the "highest or otherwise best bid" at the conclusion of the October 27, 2023 auction. *See id.* at 18:1-3. In addition, the Debtors determined that any bid that required the use of the Debtors' remaining cash and the Foundation's cash prior to closing was not a viable transaction under the circumstances, and under the broad discretion granted in the Bidding Procedures Order, the Debtors rejected the bid from the Bondholder Representatives as not being financially viable, and the Bondholder Representatives confirmed that they were unwilling to move forward with their bid without use of all remaining cash on hand and Foundation funds. *See id.* at 20-22.

On October 27, 2023, the Debtors Filed the *Amended Notice of Auction Results* [Docket No. 420] and publicly announced that the University was the winning bidder. On November 7, 2023, the Court entered the Sale Order, approving the Debtors' Sale to the University. *See* Docket No. 476.

On January 31, 2024, the Debtors successfully closed the Sale to the University, transferring substantially all of the Debtors' assets to the University. *See* Docket No. 699.

### 6.      Sale of JV Interests

Mercy Hospital and/or Mercy Services act as joint venture partners in various other healthcare ventures that operate separately and apart from the Debtors, as shown below:

| Name of Non-Debtor Joint Venture | Ownership Percentage |
|---|---|
| Corridor Radiology, LLC | Mercy Hospital owns 51% |
| Eastern Iowa Rehabilitation Hospital, LLC | Mercy Hospital owns 51% |
| Iowa City Ambulatory Surgery Center, L.L.C. [8] | Mercy Hospital owns 40% |
| Melrose Retirement Community, LLC | Mercy Services owns 50% |
| Progressive Rehabilitation Associates, L.L.C. | Mercy Services owns 25% |

As part of the Debtors' initial marketing process from 2021 to the fall of 2023 discussed above, H2C highlighted the Debtors' JV Interests. Following a thorough marketing process, the University only acquired the Debtors' JV Interest in Corridor Radiology, LLC. With respect to the remaining four JV Interests, H2C has actively engaged each JV Interest co-owner to negotiate a mutually agreeable solution that fairly compensates the Debtors.

In January 2024, the Debtors and Progressive Rehabilitation Associates LLC agreed to terms of a proposed sale transaction. On February 1, 2024, the Debtors Filed the *Debtors' Motion for Entry of Order (I) Approving the Sale of the Debtors' Interest in a Joint Venture Free and Clear of Liens, Claims, Interests, and Encumbrances and (II) Granting Related Relief* [Docket No. 703], seeking approval of the terms of that proposed sale transaction. On February 21, 2024, the Debtors Filed the underlying purchase agreement related to the proposed sale transaction. *See* Docket No. 756. On February [___], 2024, the Court entered an order, granting the requested relief. *See* Docket No. [___].

H2C's discussions with Melrose Meadows LLC, Iowa City Ambulatory Surgical Center, L.L.C. and Central Iowa Rehabilitation Hospital, LLC remain ongoing as the parties seek agreement on the financial and non-financial terms of each transaction.

### 7.      Claims Process and Bar Dates

#### i.      Section 341(a) Meeting of Creditors

On September 6, 2023, the U.S. Trustee presided over a meeting of creditors in the Chapter 11 Cases pursuant to Bankruptcy Code section 341(a).

#### ii.      Schedules and Statements

On August 21, 2023, the Debtors Filed their Schedules with the Court. *See* Docket Nos. 135, 136. On August 22, 2023, the Debtors Filed a revised version of Schedule A/B with the Court. *See* Docket No. 137. On December 28, 2023 the Debtors Filed an amended version of their Schedules with the Court. *See* Docket No. 606.

#### iii.      Bar Dates

On August 14, 2023, through Docket No. 92, the Court established the following deadlines for filing the following categories of Proofs of Claim:

---

[8]    Mercy Hospital's ownership will decrease from 40% to 37.5% on March 1, 2024.

| Category | Deadline |
|---|---|
| Bar Date (General) | October 16, 2023 |
| Governmental Bar Date | February 5, 2024 |

On January 30, 2024, the Debtors Filed the *Motion for Entry of Order (I) Establishing Administrative Claims Bar Date, (II) Approving Form, Manner, and Sufficiency of Notice Thereof, and (III) Approving Proof of Administrative Claim Form* [Docket No. 694], seeking approval of March 15, 2024 as the deadline to File Proofs of Claim for Administrative Expense Claims arising between and including the Petition Date and February 1, 2024.  On February 12, 2024, the Court entered an order, granting the requested relief.  *See* Docket No. 740.

### 8.      Examiner Motion

On August 14, 2023, the Bondholders Filed the Examiner Motion.  *See* Docket No. 96.  As part of the settlement contemplated under the 9019 Motion (as discussed herein), the Examiner Motion was resolved.

### 9.      Foundation Adversary Complaint

On September 20, 2023, the Foundation filed a Declaratory Judgment Adversary Complaint (the "Adversary Complaint") against the Debtors, the UCC, and the Bondholder Representatives, commencing Adversary Case No. 23-09043 (the "Adversary Proceeding").  *See* Adv. Docket No. 1.  The Adversary Complaint sought a declaration from this Court as to the rights, powers, and duties of the Foundation, vis-à-vis the contentions of the Debtor, Committee, and Bondholder Representatives.  *See id.*  On September 27, 2023, pursuant to the terms of the settlement enumerated in the 9019 Motion (as discussed below), the Foundation voluntarily dismissed the Adversary Complaint.  *See* Adv. Docket No. 4.

### 10.      9019 Motion

On October 9, 2023, the Debtors Filed the 9019 Motion, seeking approval of the settlement by and among the Debtors, the UCC, the Bondholder Representatives, and the Foundation.  *See* Docket No. 346.  Among other things, the settlement included the following terms:

- **Settlement Order; Settlement Effective Date:**  The parties shall cooperate in good faith and use commercially reasonable efforts to seek approval of the settlement by an order of the Court as promptly as possible.  The settlement shall take effect upon the date the order is entered by the Court approving the relief requested in the 9019 Motion (the "Settlement Effective Date").  Notwithstanding the foregoing, upon execution of the settlement term sheet by all parties, the Foundation shall not use the Unrestricted Funds (as defined in the 9019 Motion) for any purpose other than in accordance with the settlement term sheet pending Court approval.

- **Contribution:** The Foundation shall contribute the Unrestricted Funds (as defined in the 9019 Motion) by the Foundation to Mercy Hospital (without any right of repayment) as follows:

- o On or about September 26, 2023, the Foundation contributed Unrestricted Funds in the amount of $1,000,000 to the Debtors to help offset the operating losses of Mercy Hospital.

- o On or about September 28, 2023, the Foundation contributed Unrestricted Funds in the amount of $1,200,000 to the Debtors to help offset the operating expenses of Mercy Hospital.

- o If the Winning Bidder following an Auction (each as defined in the Bid Procedures Order) does not intend—taking into account such Winning Bidder's answer to Bid Requirement No. 8 contained in section V(B)(8) of the Bidding Procedures—to continue to operate Mercy Hospital as an acute care hospital such that the continuity of provision of healthcare by Mercy Hospital is not preserved, the Foundation's obligation to contribute any additional Unrestricted Funds for operating expenses shall immediately cease.

- o If the Winning Bidder following an Auction (each as defined in the Bid Procedures Order) intends—taking into account such Winning Bidder's answer to Bid Requirement No. 8 contained in section V(B)(8) of the Bidding Procedures—to continue to operate Mercy Hospital as an acute care hospital such that the continuity of provision of healthcare by Mercy Hospital is preserved, then, following the Review (as defined below) and (if necessary) the Judicial Proceeding (as defined below), within two business days of the entry of the Proposed Order, the Foundation shall be obligated to transfer to the Debtors all remaining Unrestricted Funds that have not already been transferred as set forth above, which funds shall be used, in the first instance, to help offset the Operating Expenses of the Hospital; *provided, however*, that the Foundation shall be entitled to retain up to $250,000.00 of Unrestricted Funds to fund wind-down expenses, legal fees, and other costs of the Foundation; *provided, further*, upon the entry of the Proposed Order, the Foundation shall no longer be obligated to reimburse Mercy Hospital for the use of its employees.

- o The Foundation agrees to cooperate in good faith with the Debtors, the UCC, and the Bondholder Representatives to determine the amount and to monitor the use of its Funds consistent with the Settlement.

- **AOI Amendment:** The Foundation, through the Foundation board, agrees to effectuate Mercy Hospital's request pursuant to Article III(1)(d) of the Foundation AOI to make any requested changes to the foregoing or corresponding bylaws in order to effectuate, implement, or enforce the terms of the settlement.  The Debtors and the Foundation consented to the jurisdiction of the Court to approve such revisions in the proposed order with respect to the 9019 Motion.

- **Review; Judicial Proceeding:** William H. Henrich from Getzler Henrich & Associates, LLC ("GHA") shall be retained to review or otherwise render an opinion regarding the Funds in an attempt to determine whether the remaining funds constitute Unrestricted

Funds (the "Review").  Such review shall be completed as expeditiously as possible from the filing of the 9019 Motion, after which any additional funds determined to be without restriction as to transfer to the Debtors pursuant to the settlement term sheet shall be deemed Unrestricted Funds and distributed pursuant to the settlement.

- o   The party retaining GHA shall be entitled to be reimbursed for the costs of the Review pursuant to the terms of an order entered by the Court approving the Debtors' use of Cash Collateral on a final basis, or such other Court order (which may include the Settlement Order).  The Debtors and the Foundation will be entitled to receive updates from GHA upon reasonable request to GHA and shall be entitled to the finding of the Review from GHA promptly upon completion.

- o   In the event that the Review determines that there are less than $8,000,000 in Unrestricted Funds, the Debtors and the Foundation consent to the jurisdiction of this Court and shall cooperate in good faith to obtain a finding in the settlement order, pursuant to Iowa Code Section 540A, that any restrictions on the Green Funds (as defined in the 9019 Motion) may be lifted (the "Judicial Action").  The Judicial Action, in the Debtors' discretion, shall be brought either as part of the Motion or filed as a separate application to the Court contemporaneously therewith.  Upon entry of the settlement order, approving the settlement and determining that any such restrictions are lifted, the relevant amounts shall be deemed Unrestricted Funds and distributed pursuant to the terms of the settlement.

- **Releases:**  Following implementation of the terms of the Settlement and the distribution of the full amount of Unrestricted Funds from the Foundation, in accordance with the settlement term sheet, the Debtors, the Bondholders, and the UCC, for good and valuable consideration, the sufficiency of which is acknowledged, shall release the Foundation and each of its past and present members of the Foundation board, as well as the Foundation's officers, agents, and attorneys, solely in their capacities as such, from any and all claims, causes of action, obligations, rights, suits, damages, remedies, and liabilities, whether known or unknown, contingent or not contingent, and including any derivative or equitable claims.

- **Resolutions:**  Upon the execution of the Settlement Term Sheet or the Settlement Effective Date, as applicable, the following contested issues were resolved:

- o   *Subpoenas*: Upon execution of the Settlement Term Sheet, the Bondholder Representatives shall withdraw any and all subpoenas issued to the Foundation and shall not seek further discovery from the Foundation without the consent of the Foundation or an order from the Court authorizing such discovery.

- o   *Adversary Proceeding*: On or about September 27, 2023, the Foundation dismissed the Adversary Complaint.

- o   *Examiner Motion*: Upon the Settlement Effective Date, the Examiner Motion shall be deemed withdrawn.

o *Cash Collateral Objections*: Upon the Settlement Effective Date, the objections to the Debtors' use of Cash Collateral filed by the UCC and the Bondholder Representatives shall be deemed withdrawn to the extent they relate to the Foundation and use of the Unrestricted Funds.

On October 13, 2023, the Foundation filed its *Joinder* to the 9019 Motion [Docket No. 379]. On November 7, 2023, the Court entered the order approving the relief requested in the 9019 Motion. *See* Docket No. 477.

On November 30, 2023, GHA completed the Review, which found, among other things, that over $15.8 million of the total $18.3 million of remaining Foundation Funds were unrestricted, as reflected in the below summary chart:

| Donor | Unrestricted | Temporarily restricted invested | Temporarily restricted | Available earnings from permanent endowments | Permanently restricted endowments | Total |
|---|---|---|---|---|---|---|
| Net Assets | 10,003,007 | 4,945,162 | 145,943 | 479,094 | 2,749,954 | 18,323,161 |
| Potential adjustments to Categories : | | | | | | |
| Mercy | 1,750,294 | (1,750,294) | | | | 0 |
| Mercy Scholarship | 95,185 | (95,185) | | | | 0 |
| Ambrisco, W&C | 137,580 | (137,580) | | | | 0 |
| Cross, J | 41,366 | (41,366) | | | | 0 |
| Dodds, C | 558,495 | (558,495) | | | | 0 |
| Mercy Hospice | 1,660,344 | (1,660,344) | | | | 0 |
| Mercy Mental Health | 475,243 | (475,243) | | | | 0 |
| Steinway | 29,143 | (29,143) | | | | 0 |
| Cardiac Rehab | 1,000 | | (1,000) | | | 0 |
| Cardiology | 800 | | (800) | | | 0 |
| ECU | 4,450 | | (4,450) | | | 0 |
| Education | 50 | | (50) | | | 0 |
| Home Health Care | 200 | | (200) | | | 0 |
| Infusion Center | 1,000 | | (1,000) | | | 0 |
| Lab | 90 | | (90) | | | 0 |
| Pastoral Care | 6,212 | | (6,212) | | | 0 |
| Radiology | 60 | | (60) | | | 0 |
| Surgical Services | 300 | | (300) | | | 0 |
| Stratton, E&J | 0 | | 0 | | | 0 |
| Wound Center | 745 | | (745) | | | 0 |
| Gift Annuity | 10,443 | | (10,443) | | | 0 |
| Anderson, G | 49,513 | | | (15,317) | (34,196) | 0 |
| Becker, R&S | 22,650 | | | (2,650) | (20,000) | 0 |
| Bozek, TT | 15,279 | | | (3,309) | (11,970) | 0 |
| Cory, W | 61,074 | | | (11,817) | (49,257) | 0 |
| Green, C&H | 3,307 | | | (377) | (2,930) | 0 |
| Guild Scholarship | 55,087 | | | (9,218) | (45,869) | 0 |
| Hospice | 214,808 | | | (139,073) | (75,735) | 0 |
| Jindrich, G | 323,957 | | | (103,472) | (220,484) | 0 |
| Josephus, M | 43,034 | | | (2,488) | (40,546) | 0 |
| Mental Health | 126,019 | | | (55,527) | (70,492) | 0 |
| Morrison, B | 27,260 | | | (2,680) | (24,580) | 0 |
| Reed, R | 59,301 | | | (10,943) | (48,359) | 0 |
| Reed, RR | 22,952 | | | (2,952) | (20,000) | 0 |
| Watts, I | 38,391 | | | (9,754) | (28,636) | 0 |
| Potential adjustments to Categorizations : | 5,835,634 | (4,747,650) | (25,351) | (369,578) | (693,056) | 0 |
| Proposed Reclassified Net Assets | 15,838,642 | 197,512 | 120,592 | 109,516 | 2,056,899 | 18,323,161 |

**11.    365(d)(4) Extension Motion**

On November 28, 2023, the Debtors Filed the *Debtors' Motion for Entry of an Order Extending the Debtors' Time to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to 11 U.S.C. § 365(d)(4)* [Docket No. 534]. On November 29, 2023, the Court entered an Order granting the requested extension. *See* Docket No. 544.

### 12.    Combined Disclosure Statement and Plan

On December 5, 2023, the Debtors Filed the *Debtors' Motion for Entry of Order Extending Exclusive Periods to File Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 554] (the "Exclusivity Motion"), seeking a 90-day extension of their exclusive periods to file and solicit a chapter 11 plan. On December 6, 2023, the Bondholder Representatives filed an objection to the relief sought in the Exclusivity Motion. *See* Docket No. 559. On January 19, 2024, the Debtors filed a motion to continue the hearing on the Exclusivity Motion to February 12, 2024. *See* Docket No. 669. On January 23, 2024, the Court entered an order granting the Debtors' motion to continue. *See* Docket No. 685.

During the February 12, 2024 hearing, the Debtors and the Bondholder Representatives asked the Court to continue the hearing on the Exclusivity Motion to February 22, 2024 to allow for a consensual resolution of the Exclusivity Motion and the objection thereto. On February 12, 2024, the Court granted the extension. *See* Docket No. 738. On February 20, 2024, the Debtors filed a notice of continuation of hearing on the Exclusivity Motion to March 27, 2024. *See* Docket No. 751.

On February 23, 2024, the Debtors Filed the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. [__]]. On [__], 2024, the Debtors Filed the Solicitation Procedures Motion. On March 27, 2024, the Court held a hearing with respect to the Solicitation Procedures Motion. On March [__], 2024, the Court entered the Solicitation Procedures Order, approving the Disclosure Statement on a final basis and authorizing the Debtors to solicit acceptances of the Plan.

### 13.    Altera Dispute

On December 20, 2023, Altera filed its *Motion of Altera Digital Health Inc. to Compel Assumption or Rejection of Executory Contract* [Docket No. 589], through which Altera sought to compel the Debtors to assume or reject the agreement between Altera and the Debtors. On January 12, 2024, the Debtors filed an objection Altera's motion [Docket No. 633], as well as their *Motion for Entry of an Order (I) Compelling Contractual Performance Under Altera Agreement, (II) Enforcing the Automatic Stay, and (III) Granting Related Relief* [Docket No. 635]. On January 19, 2024, the Bondholder Representatives filed joinders to both the Debtors' objection to Altera's motion and the Debtors' motion to compel. *See* Docket Nos. 670, 671.

On January 22, 2024, the Debtors and Altera reached a global settlement of the issues raised in the foregoing pleadings, as reflected in the *Stipulated and Agreed Order Regarding Settlement Between the Debtors and Altera Digital Health Inc.*, entered by the Court on January 23, 2024. *See* Docket No. 684.

### 14.    The Plan Support Agreement

On February 23, 2024, the Debtors and the Bondholder Representatives entered into the Plan Support Agreement, setting forth various obligations and rights on behalf of all such parties. Among other things, the Plan Support Agreement provides that the Bondholder Representatives have agreed to support and vote in favor of the Plan in exchange for the Claim treatment enumerated herein.

**D.      Releases and Exculpation**

The Plan proposes to release the Released Parties and to exculpate the Exculpated Parties as set forth in Article XIV.D and Article XIV.E hereof.  The Debtors believe that these provisions are an integral part of the Plan.  In addition to the release of the Released Parties and the exculpation of the Exculpated Parties, there is an injunction against bringing Claims and Causes of Action from which the Released Parties were released or the Exculpated Parties were exculpated.

The Debtors believe that the releases and exculpation provisions contained in Article XIV.D and Article XIV.E are narrowly tailored and appropriate given the facts and circumstances of the Chapter 11 Cases and that Holders of Claims in Voting Classes should vote to accept the Plan.

<h3 style="text-align:center">ARTICLE IV.<br>TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS</h3>

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, Priority Tax Claims, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article V hereof.

**A.      Administrative Expense Claims**

Unless a Holder agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim (other than a Professional) shall receive Cash in an amount equal to the Face Amount of such Allowed Administrative Expense Claim either (i) in the ordinary course of business by the Debtors pursuant to the Cash Collateral Budget or (ii) on the later of (x) the Effective Date and (y) the date on which such Claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter) by the Liquidation Trustee out of the Debtors' Cash on hand, including, without limitation, unrestricted Cash, Unrestricted Foundation Funds, and proceeds of Accounts Receivable collected pre-Effective Date; *provided* that, in the Debtors' or the Liquidation Trustee's reasonable discretion, as applicable, to the extent additional Cash is required to fund, or reserve for, Administrative Expense Claims, the Bondholder Claims Cash Amount, the Unsecured Claims Cash Amount, the Pension Trust Administrative Cost Amount, and the Liquidation Trust Expense Fund shall be reduced on a Pro Rata basis.

Objections to Administrative Expense Claims must be Filed and served on the Liquidation Trustee and/or Liquidation Trust and the requesting party by the Administrative Expense Claim Objection Deadline.  Allowed Professional Fee Claims shall be paid from the Professional Fee Reserve pursuant to Article IX.I.2 hereof.

Requests for payment of Administrative Expense Claims (other than Professional Fee Claims and the Claims of Governmental Units arising under Bankruptcy Code section 503(b)(1)(B), (C) or (D)) must be either (i) submitted to Epiq on or before the Administrative Expense Claims Bar Date pursuant to the Administrative Claims Bar Date Order for Administrative Expense Claims that arose and/or occurred between the Petition Date and February 1, 2024; or (ii) Filed on the Docket and served on the Liquidation Trust no later than the Administrative Expense Claim Bar Date for Administrative Expense Claims that arose and/or

occurred between February 2, 2024 and the Effective Date.  Unless otherwise Ordered by the Court, Holders of Administrative Expense Claims (other than the Holders of Professional Fee Claims and the Claims of Governmental Units arising under Bankruptcy Code section 503(b)(1)(B), (C) or (D)) that do not comply with the provisions set forth herein for the allowance and payment thereof on or before the Administrative Expense Claim Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtors or their Estates.

Unless the Liquidation Trust or any other party-in-interest objects to an Administrative Expense Claim by the Administrative Expense Claims Objection Deadline, such Administrative Expense Claim shall be deemed Allowed in the amount requested.  In the event that the Liquidation Trust or any other party-in-interest objects to an Administrative Expense Claim, the Court shall determine the Allowed amount of such Administrative Expense Claim.

## B.   Priority Tax Claims

Unless a Holder agrees to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive treatment consistent with the provisions of Bankruptcy Code section 1129(a)(9)(C).  Such payment shall be made either (i) in the ordinary course of business by the Debtors pursuant to the Cash Collateral Budget or (ii) on the later of the Effective Date and the date on which such Claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter) by the Liquidation Trust out of the Debtors' Cash on hand, including, without limitation, unrestricted Cash, Unrestricted Foundation Funds, and proceeds of Accounts Receivable collected pre-Effective Date; *provided* that, in the Debtors' or the Liquidation Trustee's reasonable discretion, as applicable, to the extent additional Cash is required to fund, or reserve for, Priority Tax Claims, the Bondholder Claims Cash Amount, the Unsecured Claims Cash Amount, the Pension Trust Administrative Cost Amount, and the Liquidation Trust Expense Fund shall be reduced on a Pro Rata basis.

Notwithstanding anything to the contrary stated in the Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors or their respective property.

## C.   Priority Non-Tax Claims

Unless a Holder agrees to less favorable treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to the Face Amount of such Allowed Priority Non-Tax Claim either (i) in the ordinary course of business by the Debtors pursuant to the Cash Collateral Budget or (ii) on the later of (x) the Effective Date and (y) the date on which such Claim becomes an Allowed Claim (or as soon as reasonably practicable thereafter) by the Liquidation Trustee out of the Debtors' Cash on hand, including, without limitation, unrestricted Cash, Unrestricted Foundation Funds, and proceeds of Accounts Receivable collected pre-Effective Date; *provided* that, in the Debtors' or the Liquidation Trustee's reasonable discretion, as applicable, to the extent additional Cash is required to fund, or reserve for, Priority Non-Tax Claims, the Bondholder Claims Cash Amount, the Unsecured Claims Cash Amount, the Pension

Trust Administrative Cost Amount, and the Liquidation Trust Expense Fund shall be reduced on a Pro Rata basis.

**D.     Professional Fee Claims**

**1.     Final Fee Applications and Payment of Professional Fee Claims**

All final requests for payment of Professional Fee Claims (the "Final Fee Applications") may be made any time after the Confirmation Date but shall be Filed no later than the Professional Fee Claim Bar Date.  Objections, if any, to Final Fee Applications of such Professionals must be Filed and served on the Liquidation Trust, the requesting Professional, and the U.S. Trustee no later than 21 days from the date on which each such Final Fee Application is Filed (the "Professional Fee Claim Objection Deadline").  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court, the Allowed amounts of such Professional Fee Claims shall be determined by the Court.

**2.     Post-Effective Date Fees and Expenses**

The Professionals employed by the Debtors, the UCC, and the Pension Committee shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, including the preparation, filing, and prosecution of Final Fee Applications; *provided that* that the Professionals employed by the UCC and the Pension Committee shall only be entitled to such fees and expenses related to Final Fee Applications.  Any time or expenses incurred in the preparation, filing, and prosecution of Final Fee Applications shall be disclosed by each Professional in its Final Fee Application and shall be subject to approval of the Court.

Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331 in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the Liquidation Trust Agreement, the Liquidation Trustee may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to, or action, Order, or approval of, the Court.

**E.     Substantial Contribution Compensation and Expenses Bar Date**

Any Person or Entity that wishes to make a Substantial Contribution Claim based on facts or circumstances arising after the Petition Date must File an application with the Clerk of the Court, on or before the Administrative Expense Claim Bar Date, and serve such application on the Liquidation Trust and the U.S. Trustee and as otherwise required by the Court and the Bankruptcy Code, or be forever barred from seeking such compensation or expense reimbursement. Objections, if any, to the Substantial Contribution Claim must be Filed no later than the Administrative Expense Claims Objection Deadline, unless otherwise extended by Order of the Court.

60

## ARTICLE V.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    Classification of Claims and Interests

The Plan is premised upon the substantive consolidation of the Debtors, as set forth in more detail below, for the purposes of voting, determining which Claims and Interests have accepted the Plan, confirmation of the Plan, and the resultant treatment of Claims and Interests and Distributions under the terms of the Plan. Accordingly, the Plan shall serve as a motion for entry of a Court order approving the substantive consolidation of the Debtors.

Pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), all Claims against and Interests in the Debtors (except for the Claims addressed in Article IV hereof) are classified for the purposes of voting and Distribution pursuant to this Plan, as set forth herein. A Claim or an Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class. A Claim is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date. Except as otherwise specifically provided for herein, the Confirmation Order, or any other Order of the Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

Bankruptcy Code section 1129(a)(10) shall be satisfied for the purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; *provided*, *however*, that in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the deadline established by the Court indicating acceptance or rejection of this Plan, such Class will be deemed to have accepted this Plan. The Debtors may seek Confirmation of this Plan pursuant to Bankruptcy Code section 1129(b) with respect to any rejecting Class of Claims or Interests.

All Claims and Interests (other than Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims) are placed in the Classes set forth below. The following chart provides a summary of treatment of each Class of Claims and Interests (other than Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims) and an estimate of the recoveries of each Class.[9] The treatment provided

---

[9]    These amounts represent estimated Allowed Claims and do not represent amounts actually asserted by Creditors in Proofs of Claim or otherwise. The Debtors have not completed its analysis of Claims in the Chapter 11 Cases and Objections to such Claims have not been fully litigated. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. Rather, the actual amount of the Allowed Claims may be higher or lower than estimated.

in this chart is for informational and illustrative purposes only and is qualified in its entirety by Article V hereof.[10]

| Class | Claim / Interest | Status | Voting Rights | Estimated Dollar Amount of Allowed Claims | Projected Recovery |
|---|---|---|---|---|---|
| 1-A | Bondholder Claims – Series 2018 Bonds | Impaired | Entitled to Vote | $62,000,000 | 77% - 97% |
| 1-B | Bondholder Claims – Series 2011 Bonds | Impaired | Entitled to Vote | | |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept | $598,867 | 100% |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote | $38,368,054 | 8% - 10% |
| 4 | Bondholder Deficiency Claims | Impaired | Entitled to Vote | TBD | TBD |
| 5 | Pension Claims | Impaired | Entitled to Vote | $21,500,000 | 8% - 10% |
| 6 | Intercompany Claims | Impaired | Deemed to Reject | TBD | 0% |

**B.    Treatment of Claims and Interests**

    **1.    Class 1-A: Bondholder Claims – Series 2018 Bonds**

        (a)    <u>Classification</u>: Class 1-A consists of all Bondholder Claims related to the Series 2018 Bonds.

        (b)    <u>Treatment</u>:  On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder

---

[10]   The information reflected below is also subject to material change based on certain contingencies, including those related to the Claims reconciliation process.  Actual recoveries may widely vary within these ranges, and any changes to any of the assumptions underlying these amounts could result in material adjustments to recovery estimates provided herein and/or the actual distributions received by Holders of Allowed Claims.  The projected recoveries are based on information available to the Debtors as of the date hereof and reflect the Debtors' estimates as of the date hereof only.  In addition to the cautionary notes contained elsewhere in the Combined Disclosure Statement and Plan, it is underscored that the Debtors make no representation as to the accuracy of these recovery estimates. The Debtors expressly disclaim any obligation to update any estimates or assumptions after the date hereof on any basis (including new or different information received and/or errors discovered).

of an Allowed Bondholder Claim – Series 2018 Bonds shall receive, on account of, in exchange for, and in full satisfaction of such Allowed Bondholder Claim – Series 2018 Bonds, a Pro Rata Distribution of the Bondholder Claim Waterfall Amount; *provided, however*, that, notwithstanding anything to the contrary above, aggregate recovery amounts attributable to the Holders of Allowed General Unsecured Claims (Class 3) and Holders of Allowed Pension Claims (Class 5) shall not be less than ten percent (10)% of the aggregate recovery amounts attributable to the Holders of Allowed Bondholder Claims (Classes 1-A and 1-B), with distributions made by the Liquidation Trust post-Effective Date being modified accordingly.

(c) <u>Voting</u>. Class 1-A is Impaired, and, therefore, Holders of the Bondholder Claims in Class 1-A are entitled to vote to accept or reject the Plan.

**2. Class 1-B: Bondholder Claims – Series 2011 Bonds**

(a) <u>Classification</u>: Class 1-B consists of all Bondholder Claims related to the Series 2011 Bonds.

(b) <u>Treatment</u>: On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder of an Allowed Bondholder Claim – Series 2011 Bonds shall receive, on account of, in exchange for, and in full satisfaction of such Allowed Bondholder Claim – Series 2011 Bonds, a Pro Rata Distribution of the Bondholder Claim Waterfall Amount; *provided, however*, that, notwithstanding anything to the contrary above, aggregate recovery amounts attributable to the Holders of Allowed General Unsecured Claims (Class 3) and Holders of Allowed Pension Claims (Class 5) shall not be less than ten percent (10)% of the aggregate recovery amounts attributable to the Holders of Allowed Bondholder Claims (Classes 1-A and 1-B), with distributions made by the Liquidation Trust post-Effective Date being modified accordingly.

(c) <u>Voting</u>. Class 1-B is Impaired, and, therefore, Holders of the Bondholder Claims in Class 1-B are entitled to vote to accept or reject the Plan.

**3. Class 2: Other Secured Claims**

(a) <u>Classification</u>: Class 2 consists of all Other Secured Claims.

(b) <u>Treatment</u>: On, or as soon as reasonably practicable after, the Effective Date, to the extent not otherwise paid pursuant to another Court order, each Holder of an Allowed Other Secured Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Other Secured Claim, (i) cash equal to the unpaid portion of the Allowed Other Secured Claim, (ii) such other

treatment that will render such Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other treatment as to which such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to in writing.

(c)    <u>Voting</u>:  Class 2 is Unimpaired and Holders of Claims in Class 2 shall be conclusively deemed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

**4.**    **Class 3: General Unsecured Claims**

(a)    <u>Classification</u>:  Class 3 consists of all General Unsecured Claims.

(b)    <u>Treatment</u>:  On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder of an Allowed General Unsecured Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed General Unsecured Claim, a Pro Rata Distribution of the General Unsecured Claims Waterfall Amount; *provided* that aggregate recovery amounts attributable to the Holders of Allowed General Unsecured Claims (Class 3) and Holders of Allowed Pension Claims (Class 5) shall not be less than ten percent (10)% of the aggregate recovery amounts attributable to the Holders of Allowed Bondholder Claims (Classes 1-A and 1-B), with distributions made by the Liquidation Trust post-Effective Date being modified accordingly.

(c)    <u>Voting</u>:  Class 3 is Impaired and therefore, Holders of General Unsecured Claims in Class 3 are entitled to vote to accept or reject the Plan.

**5.**    **Class 4: Bondholder Deficiency Claims**

(a)    <u>Classification</u>:  Class 4 consists of all Bondholder Deficiency Claims.

(b)    <u>Treatment</u>:  In the event that the Master Trustee receives less than $62 million on account of the Bondholder Claim pursuant to the treatment set forth in Classes 1-A and 1-B, the Holders of the Bonds shall receive an Allowed Bondholder Deficiency Claim, allocated between Classes 1-A and 1-B based upon the outstanding principal amount due on the Series 2018 Bonds and the Series 2011 Bonds, respectively, for the difference between $62 million and the amount actually received.  Except to the extent such Holders and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder of an Allowed Bondholder Deficiency Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge of such Allowed Bondholder Deficiency Claim, the same treatment as an Allowed General Unsecured Claim hereunder; *provided, however*, that in

the event the Master Trustee receives payment in full on account of the Bondholder Claim, each Holder of a Bondholder Deficiency Claim shall be deemed to waive and release any Bondholder Deficiency Claim that otherwise may exist in excess of $62 million and shall contribute the distributions it otherwise would be entitled to receive as a Holder of an Allowed General Unsecured Claim to the Holders of Class 3 General Unsecured Claims and Class 5 Pension Claims, each of whom shall receive their respective Pro Rata Distribution of all such amounts.

(c)  <u>Voting</u>:  Class 4 is Impaired and therefore, Holders of Bondholder Deficiency Claims in Class 4 are entitled to vote to accept or reject the Plan.

**6.  Class 5: Pension Claims**

(a)  <u>Classification</u>:  Class 5 consists of all Pension Claims.

(b)  <u>Treatment</u>:  On, or as soon as reasonably practicable after, the Effective Date, except to the extent such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, each Holder of an Allowed Pension Claim shall receive, on account of, in exchange for, and in full and final satisfaction, compromise, settlement, release, and discharge such Allowed Pension Claim, a Pro Rata Distribution of (i) the Pension Trust Administrative Cost Amount, *plus* (ii) 100% of the net proceeds of the Pension Causes of Action, *plus* (iii) the Pension GUC Claim; *provided* that aggregate recovery amounts attributable to the Holders of Allowed General Unsecured Claims (Class 3) and the Holders of Allowed Pension Claims (Class 5) shall not be less than ten percent (10)% of the aggregate recovery amounts attributable to the Holders of Allowed Bondholder Claims (Classes 1-A and 1-B), with distributions made by the Liquidation Trust post-Effective Date being modified accordingly.

(c)  <u>Voting</u>: Class 5 is Impaired and therefore, Holders of Pension Claims in Class 5 are entitled to vote to accept or reject the Plan.

**7.  Class 6: Intercompany Claims**

(a)  <u>Classification</u>:  Class 6 consists of all Intercompany Claims.

(b)  <u>Treatment</u>:  On the Effective Date, each Allowed Intercompany Claim shall be cancelled, extinguished, and discharged, as mutually agreed upon by each Holder of such Intercompany Claim and the Debtors or the Liquidation Trust, as applicable.

(c)  <u>Voting</u>: Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).  Therefore, Holders of Intercompany Claims in Class 6 are not entitled to vote to accept or reject the Plan.

C.      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, the Confirmation Order, any other Order of the Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the rights and defenses, both legal and equitable, of the Debtors and/or the Liquidation Trust with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

D.      **Nonconsensual Confirmation**

With respect to Impaired Classes that are deemed to reject the Plan, the Debtors intend to request that the Court confirm the Plan pursuant to Bankruptcy Code section 1129(b) notwithstanding the deemed rejection of the Plan by such Classes.  If any other Impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in Bankruptcy Code section 1126, the Debtors reserve the right to amend the Plan or to undertake to have the Court confirm the Plan under Bankruptcy Code section 1129(b) with respect to such Class as well, or both.

E.      **Allowed Claims**

Notwithstanding any provision herein to the contrary, the Disbursing Agent shall only make Distributions to Holders of Allowed Claims.  No Holder of a Disputed Claim shall receive any Distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim.  The Debtors and/or the Liquidation Trustee may, in their discretion, withhold Distributions otherwise due hereunder to any Holder until the Claims Objection Deadline, to enable a timely objection thereto to be Filed.  Any Holder of a Claim that becomes an Allowed Claim after the Effective Date shall receive its Distribution in accordance with the terms and provisions of the Plan and/or the Liquidation Trust Agreement, as applicable.

## ARTICLE VI.
## CONFIRMATION AND VOTING PROCEDURES

A.      **Confirmation Procedure**

1.      **Confirmation Hearing**

On March [__], 2024, the Court entered the Solicitation Procedures Order, approving the Disclosure Statement on a final basis and authorizing the Debtors to solicit acceptances of the Plan. The Confirmation Hearing has been scheduled for **May [6], 2024 at [10:30 a.m.] (prevailing Central Time)** to consider confirmation of the Plan pursuant to Bankruptcy Code section 1129. Pursuant to Local Rule 3020-1, if there are no objections to the Plan, or any objections can be satisfied through negotiation and modification of the Plan, and the Plan can be confirmed under Bankruptcy Code section 1129(a), the Court may enter the Confirmation Order at the Confirmation Hearing.  If there are objections to the Plan that cannot be satisfied through negotiation or mediation of the Plan, the Confirmation Hearing will be preliminary and the parties shall be prepared to discuss outstanding issues and scheduling a date for a final Confirmation Hearing.  The Confirmation Hearing may be continued from time to time without further notice other than the

announcement by the Debtors in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing or as indicated in any notice Filed with the Court.

The Confirmation Hearing will be held in person before the Honorable Thad J. Collins at the United States Bankruptcy Court for the Northern District of Iowa, 6th Floor Courtroom, 111 Seventh Avenue SE, Cedar Rapids, Iowa 52401. Parties or counsel unable to appear in person may appear via telephone by calling:

**Dial-in Number: 888-684-8852**
**Access Code: 7148063**
**Security Code: 0623**

> 2.      **Procedure for Objections**

Any objection to confirmation of the Plan must (a) be made in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (c) state the name and address of the objecting party and the nature and amount of any claim or interest asserted by such party against the Debtors, their Estates, or their property; (d) state with particularity the legal and factual bases and nature of any objection to confirmation of the Plan; (e) be Filed with the Court, and served upon the following parties (collectively, the "Notice Parties"): (i) Mercy Hospital, Iowa City, Iowa, 500 E. Market Street, Iowa City, IA 52245 (Attn: Mark E. Toney (noticing@mercyic.org)); (ii) counsel to the Debtors, (A) McDermott Will & Emery LLP, (x) 444 West Lake Street, Suite 4000, Chicago, IL 60606 (Attn: Felicia Gerber Perlman (fperlman@mwe.com), Daniel M. Simon (dsimon@mwe.com), and Emily C. Keil (ekeil@mwe.com) and (y) 2501 North Harwood Street, Suite 1900, Dallas, TX 75201 (Attn: Jack G. Haake (jhaake@mwe.com)) and (B) Nyemaster Goode, P.C., 625 First Street SE, Suite 400, Cedar Rapids, IA 52401-2030 (Attn: Roy R. Leaf (rleaf@nyemaster.com)); (iii) counsel for the Master Trustee and Trustee and Bondholder Representative, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111 (Attn: William Kannel (wkannel@mintz.com), Nathan F. Coco (nfcoco@mintz.com), and Megan Preusker (mpreusker@mintz.com)) and Whitfield & Eddy, P.C., 699 Walnut Street, Suite 2000, Des Moines, IA 50309 (Attn: Peter J. Chalik (chalik@whitfieldlaw.com)); (iv) counsel for the UCC, (A) Cutler Law Firm, P.C., 1307 50th Street, West Des Moines, IA 50266, Attn: Robert C. Gainer (rgainer@cutlerfirm.com), and (B) Sills Cummis & Gross P.C., The Legal Center, One Riverfront Plaza, Newark, NJ 07102, Attn: Andrew H. Sherman (asherman@sillscummis.com) and Boris Mankovetskiy (bmankovetskiy@sillscummis.com); and (v) Office of the United States Trustee for the Northern District of Iowa, 111 Seventh Avenue SE, Suite 2800, Cedar Rapids, IA, 52401, Attn: Janet G.L. Reasoner (Janet.G.Reasoner@usdoj.gov), so as to be received on or before **April [29], 2024 at 4:00 p.m. (prevailing Central time)**. **Unless an objection is timely Filed and served, it may not be considered by the Court at the Confirmation Hearing.**

**B.      Statutory Requirements for Confirmation**

> 1.      **General Requirements**

The Court will confirm the Plan only if it meets all the applicable requirements of Bankruptcy Code section 1129, as discussed herein. Among other requirements, the Plan (a) must

be accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to such Class; and (b) must be feasible.  The Court must also find that (a) the Plan has classified Claims and Interests in a permissible manner; (b) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.

### 2.      Classification of Claims and Interests

Bankruptcy Code section 1123 provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with Bankruptcy Code section 1123, Article V of the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to Bankruptcy Code section 1123(a)(1), need not be and have not been classified).  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors are also required, under Bankruptcy Code section 1122, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.  In accordance with Bankruptcy Code section 1122, the Plan creates separate Classes to deal respectively with secured Claims, unsecured Claims, and Interests. The Debtors believe that the Plan's classifications place substantially similar Claims or Interests in the same Class and thus, meet the requirements of Bankruptcy Code section 1122.[11]

The Bankruptcy Code also requires that a plan provide the same treatment for each Claim or Interest of a particular Class unless a Holder agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with such standard. If the Court finds otherwise, however, it could deny confirmation of the Plan if the Holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

### 3.      Confirmation Pursuant to Bankruptcy Code Sections 1129(a)(10) and 1129(b)

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b).  Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not

---

[11]   It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Court may find that a different classification is required for the Plan to be confirmed. If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

Because Class 6 (Intercompany Claims) is deemed to reject the Plan, the Debtors shall (a) seek Confirmation of the Plan from the Court by employing the "cramdown" procedures set forth in Bankruptcy Code section 1129(b) and/or (b) modify the Plan in accordance with Article XVI.A hereof. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Exhibit or schedule, including to amend or modify the Plan or such Exhibits or schedules to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

The Debtors believe that the requirements of Bankruptcy Code section 1129(b) are satisfied. The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists; courts typically examine the facts and circumstances of each particular case to determine whether unfair discrimination exists. At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without sufficient justifications for doing so. The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, except where there is sufficient justification for different treatment. Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

- <u>Secured Creditors</u>. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value at least equal to the amount of its allowed secured claim as of the effective date, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

- <u>Unsecured Creditors</u>. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value as of the effective date equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan on account of such junior claim or interest.

- <u>Interests</u>. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any Interest that is junior to such non-accepting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

### 4.   Best Interests of Creditors Test and Liquidation Analysis

#### i.   Best Interests of Creditors Test

Even if a plan is accepted by the Holders of each Class of Claims and Interests, the "best interests" test, as set forth in Bankruptcy Code section 1129(a)(7), requires that each Holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from the debtor's assets if the Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

To make these findings, the Court must (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Cases were converted to a chapter 7 case and the Assets of the Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

The Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that would be incurred as a result of the ineffectiveness associated with replacing existing management and professionals in a chapter 7 case. Accordingly, the Debtors believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available to them in a chapter 7 liquidation. Accordingly, the Debtors believe that the "best interests" test promulgated by Bankruptcy Code section 1129 is satisfied.

#### ii.   Liquidation Analysis

The Debtors believe that liquidation under chapter 11 is more beneficial to the Holders of Claims than a liquidation under chapter 7 because the Plan allows the Liquidation Trust Assets to be promptly administered by the Liquidation Trustee to the Liquidation Trust Beneficiaries in accordance with the Plan.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of counsel and other professionals retained by the chapter 7 trustee, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants that are allowed in the chapter 7 case), litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases. Moreover, a chapter 7 trustee would be entitled to statutory fees relating to the Distribution of the Debtors' already monetized Assets. Accordingly, a portion of the cash currently available for Distribution to Liquidation Trust Beneficiaries, including unsecured creditors, would instead be paid to a chapter 7 trustee.

The Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit A**, that summarizes the Debtors' best estimate of recoveries by Holders of Claims and Interests if the Chapter 11 Cases were converted to a case under chapter 7 of the Bankruptcy Code. As set forth in the Liquidation Analysis, if the Chapter 11 Cases were to be converted to a chapter 7 case, the Sale Proceeds would remain unchanged, but the Debtors would incur the additional costs of a chapter 7 trustee, as well as the costs of counsel and other professionals retained by the chapter 7 trustee. These costs would reduce potential distribution to Allowed Impaired Claims on a dollar-for-dollar basis. Conversion also would likely delay the liquidation process and the ultimate distribution, if any, to unsecured creditors. Accordingly, the Debtors believe that Holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Cases were converted to chapter 7 cases.

### 5. Feasibility

Bankruptcy Code section 1129(a)(11) requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). Because the Plan proposes a liquidation of all of the Debtors' Assets, for purposes of this test, the Debtors have analyzed the ability of the Liquidation Trustee to meet its obligations under the Plan. Based on the Debtors' analysis, the Liquidation Trustee will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtors believe that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

## C. Acceptance or Rejection of the Plan

### 1. Presumed Acceptances by Vacant Classes

Any Class or sub-Class of Claims that is not occupied as of the date of the Combined Hearing by at least one Allowed Claim, or at least one Claim temporarily Allowed under Bankruptcy Rule 3018, shall not be included for purposes of (a) voting on the acceptance or rejection of the Plan and (b) determining acceptance or rejection of the Plan by such Class under Bankruptcy Code section 1129(a)(8).

### 2. Presumed Acceptances to Reject Plan

Pursuant to Bankruptcy Code section 1126(f), only the Holders of Claims in Classes Impaired by the Plan and receiving a payment or Distribution under the Plan may vote on the Plan. Class 2 (Other Secured Claims) is Unimpaired by the Plan. Therefore, under Bankruptcy Code

section 1126(f), such Holders of Claims are conclusively presumed to accept the Plan and the votes of Holders of such Claims shall not be solicited.

### 3.  Class Deemed to Reject Plan

Pursuant to Bankruptcy Code section 1124, a Class of Claims or Interests may be Impaired if the Plan alters the legal, equitable or contractual rights of the Holders of such Claims or Interests treated in such Class.  Holders of Intercompany Claims in Class 6 are not entitled to receive or retain any property under the Plan.  Under Bankruptcy Code section 1126(g), such Holders are deemed to reject the Plan, and the votes of such Holders of Intercompany Claims shall not be solicited.

### 4.  Impaired Classes of Claims Entitled to Vote

Because Claims in Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims) are Impaired under the Plan and Holders of such Claims may receive or retain property under the Plan, Holders of Claims in such Classes are entitled to vote and shall be solicited with respect to the Plan.  **ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 1-A (BONDHOLDER CLAIMS – SERIES 2018 BONDS), CLASS 1-B (BONDHOLDER CLAIMS – SERIES 2011 BONDS), CLASS 3 (GENERAL UNSECURED CLAIMS), CLASS 4 (BONDHOLDER DEFICIENCY CLAIMS), AND CLASS 5 (PENSION CLAIMS).**

In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and at least two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan.  At least one Impaired Class of Creditors, excluding the votes of Insiders, must actually vote to accept the Plan.

## D.  Voting Procedures

### 1.  Eligibility to Vote on the Plan

Unless otherwise ordered by the Court, only Holders of Allowed Claims in Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims) may vote on the Plan.  Further, subject to the tabulation procedures that were approved by the Solicitation Procedures Order, in order to vote on the Plan, you must hold an Allowed Claim in Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims), or be the Holder of a Claim in such Class that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).  **IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY SUBMIT YOUR BALLOT.  PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

### 2.      Solicitation Packages and Notice

All Holders of Allowed Claims in Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims) will receive (a) notice of the Confirmation Hearing (the "Confirmation Hearing Notice") setting forth: (i) the deadline to vote on the Plan, (ii) the deadline to object to confirmation of the Plan, (iii) procedures for filing objections and responses to confirmation of the Plan, and (iv) the time, date, and place of the Confirmation Hearing; and (b) a form of ballot.  All other Creditors and parties-in-interest not entitled to vote on the Plan will receive (a) the Confirmation Hearing Notice and (b) a notice of non-voting status.

**IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY (A) EMAILING MERCYINFO@EPIQGLOBAL.COM AND REFERENCING "MERCY HOSPITAL" IN THE SUBJECT LINE, (B) CALLING (888) 318-5044 (TOLL-FREE) OR (503) 451-6294 (INTERNATIONAL OR CANADA), OR (C) WRITING TO THE FOLLOWING ADDRESS: MERCY HOSPITAL, IOWA CITY, IOWA, BALLOT PROCESSING CENTER, C/O EPIQ CORPORATE RESTRUCTURING, LLC, P.O. BOX 4422, BEAVERTON, OR 97076-4422.**

**THE CLAIMS AND NOTICING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.  IF YOU BELIEVE YOU REQUIRE LEGAL ADVICE, YOU SHOULD CONSULT WITH AN ATTORNEY.**

### 3.      Voting Deadlines

In order for your Ballot to count, you must either (a) complete an electronic ballot at http://dm.epiq11.com/mercyhospital or (b) complete, date, sign, and deliver by first class mail, overnight courier, messenger, or hand delivery to the following address: Mercy Hospital, Iowa City, Iowa, Ballot Processing Center, c/o Epiq Corporate Restructuring, LLC, P.O. Box 4422, Beaverton, OR 97076-4422.  **BALLOTS SENT BY FACSIMILE TRANSMISSION OR E-MAIL ARE NOT ALLOWED AND WILL NOT BE COUNTED.**

Ballots must be submitted electronically, or the Claims and Noticing Agent must physically receive original ballots by mail or overnight delivery, on or before **April [29], 2024 at 4:00 p.m. (prevailing Central time)**.  Subject to the tabulation procedures approved by the Solicitation Procedures Order, you may not change your vote once a ballot is submitted electronically or once the Claims and Noticing Agent receives your original paper ballot.

Subject to the tabulation procedures approved by the Solicitation Procedures Order, any ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Plan.

## ARTICLE VII.
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION

### A.      General Bankruptcy Law and Plan Considerations

#### 1.      The Plan May Not be Accepted

The Debtors can make no assurances that the requisite acceptances to the Plan will be received, and the Debtors may need to obtain acceptances to an alternative plan of liquidation for the Debtors, or otherwise, may be forced to liquidate under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to Holders of Allowed Claims as those proposed in the Plan.

#### 2.      The Plan May Not be Confirmed

Even if the Debtors receive the requisite acceptances, there is no assurance that the Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Court determined that the Plan and the balloting procedures and results were appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation had not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what distributions Holders of Allowed Claims ultimately would receive with respect to their Claims in a subsequent plan of liquidation.

#### 3.      Distributions to Holders of Allowed Claims Under the Plan May be Inconsistent with Projections

Projected Distributions are based upon good faith estimates of the total amount of Claims and Interests ultimately Allowed and the Liquidation Trust Assets available for Distribution. There can be no assurance that the estimated Claim amounts set forth in herein are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors, including, but not limited to, the resolution of objections Filed to certain Claims.  Both the actual amount of Allowed Claims in a particular Class and the Liquidation Trust Assets available for Distribution may differ from the Debtors' estimates due to, among other things, the successful prosecution and liquidation of the Litigation Claims.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for Distribution to such Class are lower than

the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

### 4. The Disposition of the Litigation Claims May Impact Unsecured Creditor Recoveries

Depending on any defenses or counterclaims set forth by the counterparties involved with any Litigation Claims and the resolution of any appeal(s), the anticipated proceeds associated with the Litigation Claims and available to unsecured creditors may be impacted.

### 5. Objections to Classifications of Claims

The Debtors believe that all Claims and Interests have been appropriately classified in the Plan. To the extent that the Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires resolicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member. The Debtors believe that under the Bankruptcy Rules, it would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with the requirement of equal treatment. To the extent that the Court finds that the Plan does not satisfy such requirement, the Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### 6. Failure to Consummate the Plan

Article XIII of the Plan provides for certain conditions that must be satisfied (or waived) prior to confirmation and for certain other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date hereof, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will go effective.

### 7.  Releases, Exculpation, and Injunction Provisions May Not be Approved

Article XIV of the Plan contains certain releases, exculpations, and injunction language. Parties are urged to read these provisions carefully to understand how Confirmation and Consummation of the Plan will affect any Claim, Interest, right, or action with regard to the Debtors and certain third parties.

**THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.**

There can be no assurance that the releases, exculpation, and injunction provisions, as provided in Article XIV.D, Article XIV.E, and Article XIV.F hereof, will be granted. Failure of the Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

### B.  Risks Associated with Forward Looking Statements

The financial information contained in this Combined Disclosure Statement and Plan has not been audited. In preparing this Combined Disclosure Statement and Plan, the Debtors relied on financial data derived from their Books and Records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Combined Disclosure Statement and Plan, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

### C.  Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, the Plan is not confirmed, the theoretical alternatives include (i) formulation of an alternative plan or plans of liquidation under chapter 11, or (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Each of these possibilities is discussed in turn below.

### 1.  Alternative Plan(s) of Liquidation

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of liquidation. With respect to an alternative liquidation plan, the Debtors have explored various other alternatives in connection with the development and formulation of the Plan. The Debtors believe that the Plan enables the Liquidation Trust Beneficiaries to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated.

      **2.**      **Liquidation under Chapter 7**

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to a liquidation case under chapter 7 of the Bankruptcy Code. In a case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to promptly liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the Liquidation Trust Beneficiaries. The Debtors believe that in a liquidation under chapter 7 of the Bankruptcy Code, before creditors received any distributions, additional administrative expenses would likely be required in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, which could cause a substantial diminution in the value of the estate. The assets available for distribution to the Liquidation Trust Beneficiaries would be reduced by such additional expenses. Further, it is unclear whether a chapter 7 trustee could appropriately maximize the value of the Litigation Claims. Therefore, the Debtors believe that the Plan enables the Liquidation Trust Beneficiaries to realize the greatest possible value under the circumstances, and that, as compared to a chapter 7 liquidation, provides the best opportunity for unsecured creditor recoveries.

**ARTICLE VIII.**
**CERTAIN FEDERAL INCOME TAX CONSEQUENCES**

**A.**      **Overview**

The following discussion is a summary of certain material U.S. federal income tax consequences of the Plan to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations promulgated and proposed thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the Internal Revenue Service with respect to any of the issues discussed below. The discussion below is not binding upon the Internal Revenue Service or the courts. No assurance can be given that the Internal Revenue Service would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, or non-income tax consequences of the Plan (including such consequences with respect to the Debtor), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtors within the meaning of the Internal Revenue Code, U.S. Holders whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, retirement plans, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, controlled foreign

77

corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the Internal Revenue Code). This summary also assumes that the Claims against the Debtors will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Internal Revenue Code (and thus are not subject to withholding under the Foreign Investment in Real Property Tax Act). This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to accept or deemed to reject the Plan. Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the Internal Revenue Code) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes, or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other passthrough entity for U.S. federal income tax purposes). In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership. If you are a partner (or other beneficial owner) of a partnership (or other entity treated as a partnership or other pass-through entity) that is, or will be, a Holder of a Claim, then you should consult your own tax advisors.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO YOU. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Tax Consequences to U.S. Holders of Certain Allowed Claims**

**1.      Gain or Loss Recognition**

A U.S. Holder of Allowed Claims that receives Cash will be treated as receiving payment in a taxable exchange under section 1001 of the Internal Revenue Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest or original issue discount ("OID"), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) sum of the Cash received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the Internal Revenue Code.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

**2.      Accrued Interest**

A portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest on such Claims or OID. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the payment does not fully satisfy all principal and interest on Allowed Claims, the extent to which payment will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed General Unsecured Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan may be binding for U.S. federal income tax purposes, but certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal. Thus, the Internal Revenue Service could take the position that the payment received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

**3.      Market Discount**

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered

to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claim (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

## C.   Tax Consequences to Non-U.S. Holders of Certain Allowed Claims

The following discussion includes only certain U.S. federal income tax consequences of the payments to Non-U.S. Holders for Claims. The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the payments to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the payment of a Claim and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

### 1.   Gain or Loss Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the exchange occurs or who otherwise meets the so-called "substantial presence test" under Section 7701(b)(3) of the Internal Revenue Code, or (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's gains allocable to U.S. sources exceed losses allocable to U.S. sources during the taxable year of the exchange.

If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. To claim an exemption from withholding tax, such Non-U.S.

Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.      Accrued Interest

The United States generally imposes a 30% U.S. federal withholding tax on payments of interest to Non-U.S. Holders. Subject to the discussion below of an interest effectively connected with the conduct of a trade or business within the United State, a Non-U.S. Holder will not be subject to the 30% U.S. federal withholding tax with respect to payments of interest on the notes, provided that:

(a)      it does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote;

(b)      it is not a "controlled foreign corporation" with respect to which we are, directly or indirectly, a "related person"; and

(c)      it provides its name and address, and certify, under penalties of perjury, that it is not a U.S. person (on a properly executed IRS Form W-8BEN or W- 8BEN-E (or other applicable form)), or it holds its notes through certain foreign intermediaries and the foreign intermediaries satisfy the certification requirements of applicable Treasury Regulations.

If you cannot satisfy the requirements described above, you will be subject to the 30% U.S. federal withholding tax with respect to payments of interest on the notes, unless you provide us (or other applicable withholding agent) with a properly executed IRS Form W-8BEN or W- 8BEN-E or other applicable form claiming an exemption from or reduction in withholding under the benefit of an applicable U.S. income tax treaty.

If such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

### 3.      FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of interest on certain

types of obligations.  FATCA withholding may apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.  U.S. Holders that hold Claims through foreign financial institutions and Non-U.S. Holders are encouraged to consult their tax advisors regarding the possible implications of these rules on their Claim.

**D.    Matters Related to the Disputed Claims Reserve**

The Debtors intend to create a reserve for Disputed Claims.  It is possible the Debtors will treat the reserve for Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections).  In general, property that is subject to disputed ownership fund treatment is subject to taxation within the fund (either at C-corporation or trust rates, depending on the nature of the assets held by the fund).  Under disputed ownership fund treatment, a separate federal income tax return would be filed with the IRS for the reserve for Disputed Claims with respect to any income attributable to the account, and any taxes imposed on the reserve for Disputed Claims or its assets shall be paid out of the assets of the reserve.

Although not free from doubt, U.S. Holders should not recognize any gain or loss when amounts are set aside in the reserve for Disputed Claims but should recognize gain or loss in an amount equal to: (i) the amount of Cash actually distributed to such U.S. Holder from the reserve, less (ii) the U.S. Holder's adjusted tax basis of its Claim when and to the extent Cash is actually distributed to such U.S. Holder.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  It is possible that the recognition of any loss realized by a U.S. Holder may be deferred until the reserve for Disputed Claims has made all payments to Holders of Disputed Claims.  U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such Holders in respect of their Claims due to the receipt of cash in a taxable year subsequent to the taxable year in which the reserve is established.  The discussion herein assumes that the installment method does not apply.

The timing of the inclusion of income may be subject to alteration for accrual method U.S. Holders that prepare "applicable financial statements" (as defined in Section 451 of the Internal Revenue Code), which may require the inclusion of income no later than the time such amounts are reflected on such financial statement.

**E.    Tax Consequences in Relation to the Liquidation Trust**

As of the Effective Date, the Liquidation Trust will be established for the benefit of the Holders of certain Allowed Claims.  The tax consequences of the Plan in relation to the Liquidation Trust and the Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Liquidation Trust (other than taxable income allocable to the Liquidation Trust's claims reserves) among Holders of Claims will be determined by

reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Liquidation Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

For federal income tax purposes, it is intended that the Liquidation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of sections 671 through 679 of the Internal Revenue Code. The Internal Revenue Service, in Revenue Procedure 94–45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an Internal Revenue Service ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties to the Liquidation Trust (including, without limitation, the Debtors, the Liquidation Trustee, and the holders of beneficial interests in the Liquidation Trust) will be required to treat the transfer of the Liquidation Trust Assets to the Liquidation Trust as (1) a transfer of the Liquidation Trust Assets (subject to any obligations relating to those assets) directly to the holders of Allowed Claims receiving interests in the Liquidation Trust (other than to the extent any of the Liquidation Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such holders to the Liquidation Trust of the Liquidation Trust Assets in exchange for interests in the Liquidation Trust. Accordingly, except in the event of contrary definitive guidance, holders of Allowed Claims receiving interests in the Liquidation Trust (*i.e.*, the beneficiaries of the Liquidation Trust) would be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Liquidation Trust Assets transferred to the Liquidation Trust (other than such Liquidation Trust Assets as are allocable to Disputed Claims).

While the following discussion assumes that the Liquidation Trust will be treated as a liquidating trust for federal income tax purposes, no ruling has been requested from the Internal Revenue Service concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the Internal Revenue Service would not take a contrary position to the classification of the Liquidation Trust as a grantor trust. If the Internal Revenue Service were to successfully challenge such classification, the federal income tax consequences to the Liquidation Trust and the Beneficiaries thereof could materially vary from those discussed herein.

The Liquidation Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the Liquidation Trust.  All Liquidation Trust Assets held by the Liquidation Trust on the Effective Date shall be deemed for federal income tax purposes to have been distributed by the Debtors on a Pro Rata basis to Holders of Allowed Bondholder Claims, Allowed General Unsecured Claims, Allowed Bondholder Deficiency Claims, and Allowed Pension Claims, as applicable, and then contributed by such Holders to the Liquidation Trust in exchange for the Liquidation Trust Interests.  Thus, such Holders (and any subsequent holders of interests in the Liquidation Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidation Trust for all federal income tax purposes.  Accordingly, each Holder of Liquidation Trust Interests will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust.

The Liquidation Trustee shall be responsible for filing all federal, state, and local tax returns for the Liquidation Trust and for the Debtors.  The Liquidation Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Liquidation Trust shall be subject to any such withholding and reporting requirements.  The Liquidation Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, Liquidation Trust Beneficiaries complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Liquidation Trust Beneficiary.  Notwithstanding any other provision of the Plan, (a) each Liquidation Trust Beneficiary that is to receive a Distribution from the Liquidation Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Liquidation Trust Beneficiary under the Plan unless and until such Liquidation Trust Beneficiary has made arrangements satisfactory to the Liquidation Trustee to allow it to comply with its tax withholding and reporting requirements.  Any property to be distributed by the Liquidation Trust or the Liquidation Trustee, as applicable, shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution to be held by the Liquidation Trust or the Liquidation Trustee, as applicable, until such time as the Liquidation Trust or the Liquidation Trustee, as applicable, is satisfied with the Liquidation Trust Beneficiary's arrangements for any withholding tax obligations.

## F.     Information Reporting and Back-Up Withholding

Information reporting requirements may apply to payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that

may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

The Debtors, or the applicable agent, will withhold all amounts required by law to be withheld from payments of interest and comply with all applicable information reporting requirements.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## ARTICLE IX.
## MEANS FOR IMPLEMENTATION OF THE PLAN

In addition to the provisions set forth elsewhere in the Combined Disclosure Statement and Plan, the following shall constitute the means for implementation of the Plan:

**A.      Substantive Consolidation**

**1.      Consolidation of the Chapter 11 Estates**

On the Effective Date, (i) all Intercompany Claims among the Debtors shall be eliminated, (ii) any obligation of a Debtor and any guarantee thereof by any other Debtor shall be deemed to be one obligation, and any such guarantee shall be eliminated, (iii) each Claim filed or to be filed against more than one Debtor shall be deemed filed only against one consolidated Debtor and shall be deemed a single Claim against and a single obligation of the Debtors, and (vi) any joint or several liability of the Debtors shall be deemed one obligation of the Debtors.  On the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment performance made by one Debtor as to the obligations of another Debtor shall be released and of no further force and effect.

The substantive consolidation effected pursuant to this Article IX.A of the Plan and the Confirmation Order (i) shall not affect the rights of any holder of an Other Secured Claim with respect to the collateral securing such Claim and (ii) shall not, and shall not be deemed to, prejudice the Causes of Action which shall survive entry of the Confirmation Order (subject to the releases set forth in Article XIV.D of the Plan) as if there had been no substantive consolidation.

In the event the Court authorizes the Debtors to substantively consolidate less than all of the Estates: (a) the Plan shall be treated as a separate plan of liquidation for each Debtor not substantively consolidated and (b) the Debtors shall not be required to resolicit votes with respect to the Plan.

### 2.   Substantive Consolidation Order

The Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases. If no objection to substantive consolidation is timely filed and served by any holder of an Impaired Claim on or before the deadline to object to the confirmation of the Plan, or such other date as may be fixed by the Court and the Debtors meet their burden of introducing evidence to establish that substantive consolidation is merited under the standards of applicable bankruptcy law, the Confirmation Order, which shall be deemed to substantively consolidate the Debtors, may be entered by the Court. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Court, which hearing shall coincide with the Confirmation Hearing.

## B.   Corporate Transactions

On the Effective Date, the Debtors or the Liquidation Trustee shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, one or more mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, purchases, or other corporate transactions (collectively, the "Corporate Transactions"). The actions to implement the Corporate Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

## C.   Sources of Consideration for Plan Distributions

The Debtors' Cash on hand and the Liquidation Trust Assets shall be used to fund the distributions to Holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims provided pursuant to the Plan and subject to the terms provided herein.

## D.   The Liquidation Trust

As further described in Article X hereof, on the Effective Date, the Debtors and the Liquidation Trustee shall sign the Liquidation Trust Agreement and take all other steps necessary to establish the Liquidation Trust. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors will transfer to the Liquidation Trust all of their rights, title, and

interests in the Liquidation Trust Assets.  The Liquidation Trustee shall accept all Liquidation Trust Assets on behalf of the Liquidation Trust Beneficiaries, and be authorized to obtain, collect, seek the turnover of, liquidate, and collect all of the Liquidation Trust Assets not in its possession or control.  The Liquidation Trust will then be created and effective without any further action by the Court or any Person or Entity as of the Effective Date.

## E.      Corporate Action

### 1.      Continued Corporate Existence

From and after entry of the Confirmation Order, the Debtors shall continue to exist for the limited purposes of disposing of the assets of the Debtors' Estate, to the extent necessary, and complying with and fulfilling its obligations under the Liquidation Trust Agreement and the Plan until its dissolution as provided herein.  The organizational documents of each of the Debtors and the Foundation shall be amended and restated as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and shall include, among other things, pursuant to Bankruptcy Code section 1123(a)(6), a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Bankruptcy Code section 1123(a)(6).

On and after the Effective Date, the Debtors (a) shall be deemed to have withdrawn its business operations from any state in which it was previously conducting, or is registered or licensed to conduct, its business operations, and shall not be required to File any document, pay any sum or take any other action in order to effectuate such withdrawal; and (b) shall not be liable in any manner to any taxing or other authority for franchise, business, license or similar taxes accruing on or after the Effective Date.

### 2.      Dissolution of the Debtors

As soon as practicable after the Liquidation Trust exhausts the assets of the Debtors' Estate by making the final Distribution under the Plan and the Liquidation Trust Agreement and has complied with and fulfilled its obligations under the Plan, the Liquidation Trustee shall, (a) File a certification stating that the Assets of the Debtors' Estate have been exhausted and final Distributions have been made under the Plan; and (b) File the necessary paperwork to effectuate the dissolution of the Liquidating Debtors in accordance with the laws of Iowa.  Upon the Filing of the certificate described in section (a) of the preceding sentence, the Liquidating Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Liquidating Debtors or payments to be made in connection therewith and without the need for filing a notice or motion with the Court.

The Liquidation Trust shall be authorized to pay and shall be responsible for any and all costs and expenses in connection with (a) the winding-up of the affairs of the Liquidating Debtors, including the costs and expense of preparing and filing any final tax return(s), and (b) the dissolution of the Debtors pursuant to the applicable laws of the state of Iowa, including the costs and expenses of preparing and filing necessary certificates, paperwork or documentation.  For the avoidance of doubt, the Confirmation Order shall be deemed the appropriate and sufficient authorization, under and for purposes of the applicable laws of the state of Iowa, for the Liquidation Trust and Liquidation Trustee, as applicable, to dissolve the Liquidating Debtors and make,

execute, acknowledge and file a certificate of dissolution of the Debtors with the Secretary of State of the State of Iowa.

### 3. Cancellation of Old Securities and Agreements

Except as otherwise provided in the Combined Disclosure Statement and Plan, and in any contract, instrument, or other agreement or document created in connection with the Combined Disclosure Statement and Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article XI hereof, any promissory notes, share certificates, whether for preferred or common stock (including treasury stock), other instruments evidencing any Claims or Interests, including the Bond Documents, other than a Claim that is being Reinstated and rendered Unimpaired, and all options, warrants, calls, rights, puts, awards, commitments or any other agreements of any character to acquire such Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order or rule, and the obligations of the Debtors under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be discharged. The holders of or parties to such canceled notes, share certificates and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates and other agreements and instruments or the cancellation thereof, except the rights provided pursuant to the Plan.

The Master Trustee and Series Trustee under each of the Master Trust Indenture, Series 2011 Trust Indenture, and the Series 2018 Trust Indenture shall be automatically and fully discharged from all duties and obligations thereunder, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote, or other approval or authorization by any Person or Entity; *provided*, that, notwithstanding anything set forth in the Combined Disclosure Statement and Plan or in the Plan Supplement or any related agreement, instrument, or document, any credit document or loan agreement that governs the rights of the Holder of a Claim, including the Master Indenture, Series 2011 Trust Indenture, and Series 2018 Trust Indenture, shall continue in effect for the limited purposes of allowing and preserving the rights of the Master Trustee, trustees, and holders of the Bonds, as applicable, to: (a) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Combined Disclosure Statement and Plan; (b) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Master Trustee may have under the Combined Disclosure Statement and Plan, the applicable credit agreements, collateral agreements, or pledge agreements against any Person or Entity; (c) enforce any obligation (if any) owed to such respective Person or Entity under the Combined Disclosure Statement and Plan; (d) appear and raise issues in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court; (e) receive distributions pursuant to the Combined Disclosure Statement and Plan; (f) make distributions on account of the Bondholder Claims and Bondholder Deficiency Claims; and (g) perform any functions that are necessary to effectuate the foregoing; *provided, further*, however, that (i) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Combined Disclosure Statement and Plan, or result in any expense or liability to the Debtors or the Liquidation Trustee, as applicable, except as expressly provided for in the Combined Disclosure Statement and Plan; and (ii) except as otherwise provided in the Combined Disclosure

Statement and Plan, the terms and provisions of the Combined Disclosure Statement and Plan shall not modify any existing bond indenture, credit document or loan agreement that would in any way be inconsistent with Distributions under the Combined Disclosure Statement and Plan.  The Master Trustee and trustees under the Series 2011 Bond Indenture and the Series 2018 Bond Indenture shall be discharged and shall have no further obligation or liability except as provided in the Combined Plan and Disclosure Statement, and after performance by the Master Trustee and series Bond trustees, and their representatives and professionals of any obligations and duties required under or related to the Combined Disclosure Statement and Plan, the Master Trustee and series Bond trustees shall be relieved of and released from any obligations and duties arising hereunder or thereunder.

### 4.     No Further Action

On the Effective Date, all matters and actions provided for under the Combined Disclosure Statement and Plan that would otherwise require approval of the directors and officers, or members, managers, or shareholders of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors and officers, members, managers, or shareholders of the Debtors.

### 5.     Effectuating Documents

The Debtors, the Liquidating Debtors, and the Liquidation Trustee acting pursuant to the terms and conditions of the Liquidation Trust Agreement, as applicable, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### F.     Books and Records

On or before the Effective Date, the Debtors shall transfer their Books and Records to the Liquidation Trust.  As soon as practicable after the Liquidation Trust exhausts the assets of the Debtors' Estate by making the final Distribution under the Plan and the Liquidation Trust Agreement and has complied with and fulfilled its obligations under the Plan, the Liquidation Trustee shall be free, in its discretion, to abandon, destroy, or otherwise dispose of the books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other or further Court Order.

### G.     Committee Dissolution

The UCC and the Pension Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in Bankruptcy Code section 1103 and shall perform such other duties as it may have been assigned by the Court prior to the Effective Date.  Upon the occurrence of the Effective Date, the UCC and the Pension Committee shall dissolve automatically, whereupon their members, professionals, and agents shall be discharged and released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of its Professionals or attending to any other issues related to applications for payment

of fees and reimbursement of expenses of its Professionals, (iii) any motions or motions for other actions seeking enforcement of implementation of the provisions of the Plan, and (iv) prosecuting or participating in any appeal of the Confirmation Order or any request for reconsideration thereof.

## H.    Altera Agreement

On October 16, 2023, Altera asserted a General Unsecured Claim against the Debtors totaling approximately $9,625,739.15.   Effective as of the entry of the Confirmation Order, pursuant to the *Stipulated and Agreed Order Regarding Settlement Between the Debtors and Altera Digital Health Inc.* [Docket No. 684], Altera shall have an Allowed General Unsecured Claim in the amount of $6,000,000.

## I.    Transfer of JV Interests

To the extent that the JV Interests are not sold or otherwise monetized by the Debtors prior to the Effective Date, the JV Interests shall transfer to the Liquidation Trust, subject to all existing liens, claims, and encumbrances, which liens, claims, and encumbrances shall be released concurrently with, and conditioned upon, the applicable Distributions made pursuant to this Plan.   The Liquidation Trustee shall effectively assume the role of the Debtors in connection with the remaining JV Interests, including, without limitation, occupying the Debtors' board seat(s), if applicable, with respect to those JV Interests.   Following the Effective Date, the Liquidation Trustee shall act diligently and in good faith to liquidate any remaining JV Interests.

## J.    Accounts and Reserves

### 1.    Liquidation Trust Account

On or prior to the Effective Date, the Liquidation Trust Account will be established and maintained in one or more federally insured domestic banks in the name of the Liquidation Trust. Cash deposited in the Liquidation Trust Account will be invested, held and used solely as provided in the Liquidation Trust Agreement.   The Liquidation Trustee is authorized to establish additional Liquidation Trust Accounts after the Effective Date, consistent with the terms of the Liquidation Trust Agreement.

After the funding of the Liquidation Trust Account on the Effective Date, the Liquidation Trust Account will be funded, as applicable, by Cash proceeds obtained through prosecution or settlement of the Liquidation Trust Claims or by the disposition of the Liquidation Trust Assets.

Upon obtaining an order of the Court authorizing final Distribution and/or closure of the Debtors' Chapter 11 Cases, any funds remaining in the Liquidation Trust Account shall be distributed in accordance with the Plan and the applicable Liquidation Trust Agreement, and the Liquidation Trust Account may be closed.

### 2.    Professional Fee Reserve

As soon as practicable after Confirmation and not later than the Effective Date, the Debtors shall transfer to the Liquidation Trust Cash in the Amount of the Professional Fee Estimate, which Cash shall be used by the Liquidation Trustee to fund the Professional Fee Reserve.   The

Professional Fee Reserve shall be maintained in trust for the Professionals and shall be used to pay the Allowed Professional Fee Claims; *provided* that, in the Debtors' or the Liquidation Trustee's reasonable discretion, as applicable, to the extent additional Cash is required to fund, or reserve for, Professional Fee Claims, the Bondholder Claims Cash Amount, the Unsecured Claims Cash Amount, the Pension Administrative Cost Amount, and the Liquidation Trust Expense Fund shall be reduced on a Pro Rata basis. Such funds shall not be considered property of the Debtors' Estates or Liquidation Trust Assets. The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve within two business days after such Professional Fee Claims are Allowed. Once payments on account of such Allowed Professional Fee Claims have been made in full, any such excess Cash remaining in the Professional Fee Reserve shall be considered Liquidation Trust Assets available for Distribution by the Liquidation Trustee in accordance with the terms of the Plan. For the avoidance of doubt, (a) to the extent that the Professional Fee Reserve is not sufficient to satisfy in full all Allowed Professional Fee Claims, such Allowed Professional Fee Claims shall nevertheless be paid in full in Cash from other available Cash prior to making any Distributions to the Holders of Allowed Claims and (b) any fees and expenses incurred by Professionals in connection with preparing Final Fee Applications shall be paid from the Professional Fee Reserve or, if exhausted, from other available Cash prior to making any Distributions to the Holders of Allowed Claims.

The Liquidation Trustee shall segregate and shall not commingle the Cash held in the Professional Fee Reserve and shall pay each Professional Fee Claim of a Professional employed by the Debtors, the UCC, or the Pension Committee on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim, upon entry of a Final Order allowing such Claim. After all Professional Fee Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Liquidation Trust, any remaining Cash in the Professional Fee Reserve shall become a Liquidation Trust Asset. Only Professionals employed in the Chapter 11 Cases by the Debtors, the UCC, or the Pension Committee shall be entitled to payment from the Professional Fee Reserve.

The Professionals employed by the Debtors, the UCC, or the Pension Committee, as applicable, shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, including the preparation, filing and prosecution of Final Fee Applications, from the Professional Fee Reserve; *provided that* that the Professionals employed by the UCC or Pension Committee shall only be entitled to such fees and expenses related to Final Fee Applications. Any time or expenses incurred in the preparation, filing and prosecution of Final Fee Applications shall be disclosed by each Professional in its Final Fee Application and shall be subject to approval of the Court. The Liquidation Trustee shall be authorized and directed to act or refrain from acting on the representations of the Professionals with respect to any payments made from the Professional Fee Reserve which are consistent with the Debtors' Books and Records and shall not be held liable for acting or refraining to act pursuant to any such representations.

    **3.**      **Administrative Expense Claims Reserve**

On or before the Effective Date, the Debtors shall transfer to the Liquidation Trust Cash in the Amount of the Administrative and Priority Claims Estimate, which Cash shall be used by the Liquidation Trustee to fund the Administrative Expense Claims Reserve. The Cash so transferred

shall not be used for any purpose other than to pay Allowed Administrative Expense Claims (except Professional Fee Claims, which shall be paid from the Professional Fee Reserve) and Allowed Priority Claims.

The Liquidation Trustee shall segregate and shall not commingle the Cash held in the Administrative Expense Claims Reserve and shall pay each Administrative Expense Claim (except Professional Fee Claims, which shall be paid from the Professional Fee Reserve) and Priority Claim on or as soon as reasonably practicable after the date such Claim becomes an Allowed Claim. After all Administrative Expense Claims (except Professional Fee Claims) and Priority Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Liquidation Trust, any remaining Cash in the Administrative Expense Claims Reserve shall become a Liquidation Trust Asset and be treated and distributed as Bondholder Post-Distribution Cash or to fund the GUC Post-Distribution Cash Amount, as applicable.

### 4.     Other Reserves

The Liquidation Trust shall establish and administer any other necessary reserves that may be required under the Plan or Liquidation Trust Agreement, including the Disputed Claims Reserve.

## K.     Exemption from Certain Transfer Taxes

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant hereto shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, personal property tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning any contract, lease or sublease; (3) any transaction authorized by this Plan; (4) any sale of an Asset by the Liquidation Trustee in furtherance of the Plan, including but not limited to any sale of personal or real property and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Plan.

## L.     No Revesting of Assets in the Debtors

The property of the Debtors' Estates shall not be vested in the Debtors on or following the Effective Date, but shall be vested in the Liquidation Trust to be administered by the Liquidation Trustee and continue to be subject to the jurisdiction of the Court following confirmation of the Plan until such property is distributed to Holders of Allowed Claims in accordance with the provisions of the Plan, the Liquidation Trust Agreement, and the Confirmation Order.

## M.     Applicability of Bankruptcy Code Sections 1145 and 1125(e)

Under Bankruptcy Code section 1145, the issuance of any securities under the Plan (if applicable) shall be exempt from registration under the Securities Act of 1933, as amended, and

all applicable state and local laws requiring registration of securities.  If the Liquidation Trustee determines, with the advice of counsel, that the Liquidation Trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, in connection with the distribution of any securities, then the Liquidation Trustee shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the SEC.

## N.     Preservation of Causes of Action

In accordance with Bankruptcy Code section 1123(b), the Liquidation Trust shall retain and may enforce all rights to commence and pursue, as appropriate, the Liquidation Trust Claims, which include all Causes of Action not otherwise released under the Plan, and the Liquidation Trust's rights to commence, prosecute, or settle such Liquidation Trust Claims shall be preserved notwithstanding the occurrence of the Effective Date or the dissolution of the Liquidating Debtors. The Liquidation Trust may pursue such Liquidation Trust Claims, as appropriate, in accordance with the best interests of the Liquidation Trust Beneficiaries.  No Person or Entity may rely on the absence of a specific reference in the Combined Disclosure Statement and Plan to any Liquidation Trust Claims against them as any indication that the Liquidation Trust shall not pursue any and all available Liquidation Trust Claims against them.  Unless any Liquidation Trust Claims are expressly waived, relinquished, exculpated, released, compromised, or settled in the Combined Disclosure Statement and Plan or other Court Order, the Liquidation Trust expressly reserves all such Liquidation Trust Claims for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppels (judicial, equitable, or otherwise), or laches, shall apply to such Liquidation Trust Claims as a consequence of the Confirmation or Consummation.

## O.     The Foundation

Pursuant to its governing bylaws, the Foundation shall be dissolved as of the Effective Date.  The Confirmation Order shall provide that any restrictions on the use of remaining funds held by the Foundation shall be modified and lifted pursuant to section 540A.106 of the Iowa Code.  Such funds shall be Unrestricted Foundation Funds hereunder and used to fund distributions as set forth under the Plan.

## P.     The Pension Plan

The Pension Committee shall have until the Plan Supplement Filing Date to identify the Pension Plan Administrator, with the reasonable consent of the Debtors (which such consent shall not be unreasonably withheld), to assist with the ongoing administration of the Pension Plan post-Effective Date for the benefit of Holders of Allowed Pension Claims.  The identity of the Pension Plan Administrator, if any, shall be disclosed in the Plan Supplement.  If identified by the Plan Supplement Filing Date, the Confirmation Order shall provide, among other things, that the Pension Plan shall be administered by the Pension Plan Administrator, with no liability relating thereto resulting from the Debtors' underfunding of the Pension Plan.

If the Pension Committee fails to identify a Pension Plan Administrator by the Plan Supplement Filing Date, then the Debtors shall work in good faith with the Pension Committee

between the Plan Supplement Filing Date and the Effective Date to commence termination of the Pension Plan.

**Q.      Administration and Wind-Down of Workers' Compensation Self-Insured Trust**

In January 2018, the Debtors established and funded a self-insured account with Hill's Bank & Trust Company as security under Iowa Code Section 87.11 for the purposes of self-insuring their workers' compensation obligation under Iowa law.  As of 2023, based upon the State of Iowa's annual review, the State determined that the Debtors' Workers' Compensation Self-Insured Trust (the "Workers' Compensation SIR") is fully funded to support the open workers' compensation claims.  On or before the Effective Date, the Debtors will discontinue its self-insured status.  Pursuant to the *Workers' Compensation Trust Fund Agreement*, Iowa Code Chapter 87, and any applicable Court order, the assets for the Workers' Compensation SIR shall continue to be held in trust for the purposes of continuing to pay compensation and benefits until all workers' compensation claims are settled, discharged, or fully administered.  Unless otherwise Ordered or agreed upon with the State of Iowa, the Workers' Compensation SIR shall be terminated pursuant to the *Workers' Compensation Trust Agreement* and Iowa law, and any remaining trust assets shall be vested in the Liquidation Trust to be administered according to the Plan, the Liquidation Trust Agreement, and the Confirmation Order.

## ARTICLE X.
## PROVISIONS REGARDING THE LIQUIDATION TRUST

**A.      Establishment and Administration of the Liquidation Trust**

On the Effective Date, the Debtors and the Liquidation Trustee shall sign the Liquidation Trust Agreement and, in its capacity, the Liquidation Trustee shall accept all Liquidation Trust Assets on behalf of the Liquidation Trust Beneficiaries, and be authorized to obtain, collect, seek the turnover of, liquidate, and collect all of the Liquidation Trust Assets not in its possession or control.  The Liquidation Trust will then be created and effective without any further action by the Court or any Person or Entity as of the Effective Date.

The Liquidation Trust shall be established for the primary purposes of liquidating the Liquidation Trust Assets and making Distributions in accordance with the Plan and the Liquidation Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

Upon execution of the Liquidation Trust Agreement, the Liquidation Trustee shall be authorized to take all steps necessary to complete the formation of the Liquidation Trust.  The Liquidation Trust shall be administered by the Liquidation Trustee in accordance with the Liquidation Trust Agreement.

**B.      Liquidation Trust Assets**

On the Effective Date, and periodically thereafter if additional Liquidation Trust Assets become available, the Debtors or Liquidating Debtors, as applicable, shall transfer and assign to the Liquidation Trust all of its right, title, and interest in and to all of the Liquidation Trust Assets

and in accordance with Bankruptcy Code section 1141, all such assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, and other interests, subject only to the interests of the Liquidation Trust Beneficiaries in the Liquidation Trust Assets and the Liquidation Trust Expenses, as set forth in the Plan and the Liquidation Trust Agreement.  Thereupon, neither the Debtors nor the Liquidating Debtors shall have any interest in or with respect to the Liquidation Trust Assets.

## C.   Other Funds to be Transferred to the Liquidation Trust

Pursuant to Article IX.I.2 hereof, as soon as practicable after Confirmation and not later than the Effective Date, the Debtors shall transfer Cash in the amount of the Professional Fee Estimate to the extent not covered by the Carve-Out, which Cash shall be used by the Liquidation Trustee to fund the Professional Fee Reserve.

Pursuant to Article IX.I.3 hereof, on or before the Effective Date, the Debtors shall transfer Cash in the amount of the Administrative and Priority Claims Estimate, which Cash shall be used by the Liquidation Trustee to fund the Administrative Expense Claims Reserve.

## D.   Liquidation Trust Distributions and Expenses

Distributions from the Liquidation Trust shall be made from the Liquidation Trust Assets in accordance with the Plan and the Liquidation Trust Agreement.  Such Distributions shall be made after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the Liquidation Trust, including but not limited to all costs, expenses, and obligations incurred by the Liquidation Trustee (or professionals who may be employed by the Liquidation Trustee in administering the Liquidation Trust) in carrying out their responsibilities to the Liquidation Trust under the Liquidation Trust Agreement, or in any manner connected, incidental, or related thereto.  For the avoidance of doubt, the Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets; *provided, however*, that, on the Effective Date, the Liquidation Trust shall receive the Liquidating Trust Expense Amount to facilitate the costs of winding down the Debtors, collecting post-Effective Date Accounts Receivable, and making Distributions of the Liquidating Trust Assets.

## E.   Appointment of the Liquidation Trustee

The identity of the Liquidation Trustee shall be disclosed in the Plan Supplement, and shall be selected jointly by the Debtors, the Bondholder Representatives, the UCC, and the Pension Committee.  The appointment of the Liquidation Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.  The Liquidation Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and Liquidation Trust Agreement.

The Liquidation Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court.  On the Effective Date, all Liquidation Trust Beneficiaries of the Liquidation Trust shall be deemed to have ratified and become bound by the terms and conditions of the Liquidation Trust Agreement.  In the event that the Liquidation Trustee resigns or is removed, terminated, or otherwise unable to serve as Liquidation Trustee, then successors shall be appointed as set forth in the Liquidation Trust

Agreement. Any successor Liquidation Trustee appointed shall be bound by and comply with the terms of the Plan, the Confirmation Order, and the Liquidation Trust Agreement.

Following the Effective Date, the Liquidation Trustee shall also be, and shall enjoy the powers of, the Debtors' authorized representative for all purposes, including, without limitation, Bankruptcy Code section 1123. No further proof of such power shall be necessary or required.

## F.   Liquidation Trust Beneficiaries

Holders of Bondholder Claims, General Unsecured Claims, Bondholder Deficiency Claims, and Pension Claims entitled to receive Distributions pursuant to the terms of the Plan, whether or not such Claims are Allowed as of the Effective Date, shall be the Liquidation Trust Beneficiaries and shall be bound by the Liquidation Trust Agreement. The interests of the Liquidation Trust Beneficiaries in the Liquidation Trust shall be uncertificated and transferable in accordance with the terms set forth in the Plan and the Liquidation Trust Agreement.

## G.   Liquidation Trust Interests

On the Effective Date, each Holder of an Allowed Bondholder Claim, General Unsecured Claim, Bondholder Deficiency Claim, and Pension Claim shall, by operation of the Plan, receive its Pro Rata share of the Liquidation Trust Interests, as set forth in Article V above. Liquidation Trust Interests shall be reserved for Holders of Disputed General Unsecured Claims, Bondholder Deficiency Claims, and Pension Claims and issued by the Liquidation Trust to, and held by the Liquidation Trustee in, the Disputed Claims Reserve pending allowance or disallowance of such Claims. No other entity shall have any interest, legal, beneficial or otherwise, in the Liquidation Trust Assets upon the assignment and transfer of such assets to the Liquidation Trust.

The Liquidation Trust Interests shall be uncertificated and shall be nontransferable except upon death of the Holder or by operation of law. Holders of Liquidation Trust Interests, in such capacity, shall have no voting rights with respect to such interests.

As set forth in the Liquidation Trust Agreement, Distributions from the Liquidation Trust on account of Liquidation Trust Interests shall be made from the Liquidation Trust Assets and Liquidation Trust Proceeds after paying, reserving against or satisfying, among other things, the operating and administrative expenses of the Liquidation Trust, including but not limited to all costs, expenses and obligations incurred by the Liquidation Trustee (or professionals who may be employed by the Liquidation Trustee in administering the Liquidation Trust) in carrying out their responsibilities under the Liquidation Trust Agreement, or in any manner connected, incidental or related thereto

## H.   Certain Powers and Duties of the Liquidation Trust and Liquidation Trustee

### 1.   Powers and Duties of the Liquidation Trust

The Liquidation Trustee shall be deemed the Estates' representative in accordance with Bankruptcy Code section 1123 and shall have all the rights and powers set forth in the Liquidation Trust Agreement, including, without limitation, the powers of a trustee under Bankruptcy Code sections 704 and 1106 and Bankruptcy Rule 2004, in addition to any powers granted by law or

conferred to it by any other provision of the Plan, including without limitation any set forth herein; *provided, however*, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidation Trustee to act as specifically authorized by any other provision of the Plan, the Liquidation Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidation Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Liquidation Trustee or provided herein, to conserve and protect the Liquidation Trust and the Liquidation Trust Assets, or to confer on the Liquidation Trust Beneficiaries the benefits intended to be conferred upon them by the Plan.

The powers, rights, and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement and shall include the authority, power, and responsibility, among other things, to (a) receive, manage, invest, supervise, and protect Liquidation Trust Assets; (b) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the Liquidation Trust Agreement; (c) pay taxes or other obligations incurred by the Liquidation Trust and issue to employees or other Persons, and/or file with the appropriate Governmental Units, applicable tax and wage returns and forms; (d) investigate, prosecute, settle, abandon, or compromise any Liquidation Trust Claims; (e) resolve issues involving Claims and Interests in accordance with the Plan, including the power to object to Claims against the Debtors, and to subordinate and recharacterize Claims by objection, motion, or adversary proceeding against the Debtors without any further notice to or action, order or approval by the Court; (f) prosecuting and liquidating the Litigation Claims; (g) resolving all Disputed Claims and any Claim Objections pending as of the Effective Date; (h) prosecuting any Objections to Claims and Disputed Claims that the Liquidation Trustee deems appropriate and, without Court approval, settle, compromise, withdraw, or resolve in any manner such objections; (i) make Distributions from the Liquidation Trust to Holders of Allowed Claims as provided for in the Plan and the Liquidation Trust Agreement; (j) establish and administer any necessary reserves that may be required, including the Disputed Claims Reserve, the Administrative Expense Claims Reserve and the Professional Fee Reserve; (k) employ and compensate counsel or other advisors to assist in the performance of its duties, which counsel may include any counsel who has represented either the Debtors, the UCC, or the Pension Committee during the pendency of the Chapter 11 Cases, *provided, however*, that any such compensation shall be made only out of the Liquidation Trust Assets and Liquidation Trust Proceeds; (l) file all federal, state and local tax returns if necessary; (m) undertake all administrative functions of the Chapter 11 Cases, including the payment of U.S. Trustee Fees incurred post-Effective Date with respect to distributions from the Liquidation Trust and the ultimate closing of the Chapter 11 Cases and dissolution of the Debtors; and (n) take such other action as may be vested in or assumed by the Liquidation Trustee consistent with the Plan, the Liquidation Trust Agreement, and any applicable Orders of the Court, or as may be necessary and proper to carry out the provisions of the Plan.  The Liquidation Trust Agreement may establish certain powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidation Trust as a liquidating trust for United States federal income tax purposes.

The Liquidation Trustee has full authority to take any steps necessary to administer the Liquidation Trust Agreement, including without limitation, the duty and obligation to liquidate Liquidation Trust Assets, to make Distributions therefrom in accordance with the provisions of the

Plan and to pursue, settle or abandon any Liquidation Trust Claims, all in accordance with the Liquidation Trust Agreement.

### 2. Books and Records

On the Effective Date, the Liquidation Trust shall: (a) take possession of all books, records, and files of the Debtors and the Estates that relate to the operation and business of the Liquidation Trust; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidation Trustee determines, in accordance with the Liquidation Trust Agreement, that retention of same is no longer necessary or beneficial.

### 3. Investments of Cash

The Liquidation Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by Bankruptcy Code section 345 or in other prudent investments, *provided, however*, that such investments are permitted to be made by a Liquidation Trust within the meaning of Treasury Regulation Section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### 4. Term of the Liquidation Trust

The Liquidation Trust will terminate on the earlier of the: (a) final liquidation, administration, and Distribution of the Liquidation Trust Assets in accordance with the terms of the Plan and the Liquidation Trust Agreement, and its full performance of all other duties and functions as set forth in the Plan or the Liquidation Trust Agreement; and (b) the fifth anniversary of the Effective Date. Notwithstanding the foregoing, multiple fixed term extensions can be obtained so long as Court approval is obtained within six months before the expiration of the term of the Liquidation Trust and each extended term provided that any further extension would not adversely affect the status of the Liquidation Trust as a "liquidating trust" within the meaning of section 301.7701-4(d) of the Treasury Regulations for federal income tax purposes.  After (a) the final Distributions pursuant to the Plan, (b) the filing by or on behalf of the Liquidation Trust of a certification of dissolution with the Court, and (c) any other action deemed appropriate by the Liquidation Trustee, the Liquidation Trust shall be deemed dissolved for all purposes without the necessity for any other or further actions.

**ARTICLE XI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

### A. Distributions on Allowed Claims

Distributions to be made on account of Claims that are Allowed Claims as of the Effective Date or become Allowed Claims thereafter shall be made by the Disbursing Agent pursuant to the terms and conditions of the Plan and the Liquidation Trust Agreement.  Notwithstanding any other provision of the Plan to the contrary, no Distribution shall be made on account of any Allowed Claim or portion thereof that (1) has been satisfied after the Petition Date; (2) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of Claim has not been timely Filed; or (3) is evidenced by a Proof of Claim that has been amended by a subsequently Filed Proof of Claim.

**B.      Disbursing Agent**

The Disbursing Agent shall make all Distributions required under the Plan, subject to the terms and provisions of the Plan and the Liquidation Trust Agreement.  If the Disbursing Agent is an independent third party designated to serve in such capacity, such Disbursing Agent shall receive, without further Court approval, reasonable compensation from the Liquidation Trust for distribution services rendered pursuant to the Plan and reimbursement of reasonable out-of-pocket expenses.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties.  The Disbursing Agent shall be authorized and directed to rely upon the Debtors' Books and Records and the Liquidation Trust's representatives and professionals in determining Allowed Claims entitled to Distributions under the Plan in accordance with the terms and conditions of the Plan.

**C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1.      Delivery of Distributions in General**

Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtors have been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, after sufficient evidence of such addresses as may be requested by the Disbursing Agent is provided, (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address, (d) at the addresses set forth in the other records of the Debtors or the Disbursing Agent at the time of the Distribution, or (e) in the case of the Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the addresses contained in the official records of such agent or servicer.

Notwithstanding the foregoing, any distributions made pursuant to this Combined Disclosure Statement and Plan on account of Bondholder claims represented in Classes 1-A and 1-B shall be transmitted to the Master Trustee and allocated and distributed to the Holders of the Bonds in accordance with, and subject to the terms and conditions of, the Master Trust Indenture and the other applicable Bond Documents.  For the avoidance of doubt, and notwithstanding any provisions of this Combined Disclosure Statement and Plan to the contrary, the provisions of the Master Trust Indenture, the Series 2018 Indenture, the Series 2011 Indenture, and the other applicable Bond Documents governing the allocation, distribution, and payment mechanisms in respect of the Bonds and related obligations shall remain operative and in effect for purposes of (a) effecting distribution to the Holders of Bonds and (b) exercising the Master Trustee's charging liens against any such distributions

In making Distributions under the Plan, the Disbursing Agent may rely upon the accuracy of the claims register maintained by the Claims and Noticing Agent in the Chapter 11 Cases, as modified by any Final Order of the Court disallowing Claims in whole or in part.

### 2. Undeliverable Distributions

If a Distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address and such Holder provides sufficient evidence of such address as may be requested by the Disbursing Agent, at which time all missed Distributions shall be made to such Holder without interest, subject to the time limitations set forth below. Undeliverable Distributions shall remain in the possession of the Liquidation Trustee until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution. Nothing contained in the Combined Disclosure Statement and Plan or the Liquidation Trust Agreement shall require the Debtors, the Liquidation Trust, the Liquidation Trustee, or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 3. Unclaimed Distributions

Any Cash or other property to be distributed under the Plan shall revert to the Liquidation Trustee and/or the Liquidation Trust, as applicable, if it is not claimed by the Entity on or before the Unclaimed Distribution Deadline. If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, the Distribution made to such Entity shall be deemed to be reduced to zero.

In the case of undeliverable or unclaimed Distributions on account of Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims, any Cash otherwise reserved for undeliverable or unclaimed Distributions shall revert to the Administrative Expense Claims Reserve. In the case of undeliverable or unclaimed Distributions on account of Liquidation Trust Interests, any Cash otherwise reserved for undeliverable or unclaimed Distributions shall revert to the Liquidation Trust, and all title to and all beneficial interests in the Liquidation Trust Assets represented by any such undeliverable Distributions shall revert to and/or remain in the Liquidation Trust and shall be distributed in accordance with the Liquidation Trust Agreement and the Plan. The reversion of such Cash to the Administrative Expense Claims Reserve or the Liquidation Trust, as applicable, shall be free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be treated in accordance with the terms of the Plan and the Liquidation Trust Agreement.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or Unclaimed Distribution within 90 days after the date such Distribution was returned undeliverable shall be deemed to have forfeited its Claim for such undeliverable or Unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or Unclaimed Distribution against the Debtors and their Estate, the Liquidation Trustee, the Liquidation Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its or their property.

If there is any residual unclaimed property at the time of dissolution of the Liquidation Trust, such residual unclaimed property shall be available for a subsequent Distribution on a Pro Rata basis to other Liquidation Trust Beneficiaries or donated to a charitable organization at the sole discretion of the Liquidation Trust or the Liquidation Trustee, as applicable.

D.     **Timing of Distributions**

Unless otherwise provided herein, on each Distribution Date, each Liquidation Trust Beneficiary shall receive such Distributions in accordance with Article XI hereof.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  The Liquidation Trustee shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Effective Date.

E.     **Means of Cash Payment**

Cash payments made pursuant to the Plan shall be in U.S. dollars and shall be made at the option and in the sole discretion of the Disbursing Agent by (i) checks drawn on or (ii) wire transfers from a domestic bank selected by the Disbursing Agent.  In the case of foreign creditors, Cash payments may be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular jurisdiction; *provided* that the Disbursing Agent receives a signed receipt or otherwise verifiable record of any such Cash payment.

F.     **Interest on Claims**

Unless otherwise specifically provided for in the Interim Cash Collateral Orders, the Plan, or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as otherwise specifically provided for in the Plan, or the Confirmation Order, or required by applicable law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

G.     **No Creditor to Receive More than Payment in Full**

Notwithstanding any other provision hereof, no Liquidation Trust Beneficiary shall receive more than full payment of its applicable Allowed Claim, including any interest, costs or fees that may be payable with respect thereto under or pursuant to the Plan.

H.     **Withholding and Reporting Requirements**

In accordance with Bankruptcy Code section 346 and in connection with the Plan and all Distributions hereunder, the Disbursing Agent shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority.  The Disbursing Agent shall be authorized to take any and all actions necessary and appropriate to comply with such requirements.

All Distributions hereunder shall be subject to withholding and reporting requirements.  As a condition of making any Distribution under the Plan, each Person and Entity holding an Allowed Claim is required to provide any information necessary in writing, including returning W-9 statements, to effect the necessary information reporting and withholding of applicable taxes with respect to Distributions to be made under the Plan as the Disbursing Agent may request.  The

101

Disbursing Agent shall be entitled in its sole discretion to withhold any Distributions to a Holder of an Allowed Claim who fails to provide tax identification or social security information within the timeframe requested in writing by the Disbursing Agent to such Holder of an Allowed Claim, which timeframe shall not be less than 30 days. **The Distribution to any Holder of an Allowed Claim that fails to timely respond to the Disbursing Agent shall be treated as an undeliverable or unclaimed Distribution pursuant to Article XI.C hereof.**

Notwithstanding any other provision of the Plan, each Person and Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such Distribution.

**I.      Setoffs**

Subject to the terms and conditions of the Liquidation Trust Agreement, the Debtors and/or the Liquidation Trust may, but shall not be required to, set off against any Claim and the payments or other Distributions to be made under the Plan on account of the Claim, claims of any nature whatsoever that the Debtors may have against the Holder thereof, provided that any such right of setoff that is exercised shall be allocated, first, to the principal amount of the related Claim, and thereafter to any interest portion thereof, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors and/or the Liquidation Trust of any such claim that the Debtors may have against such Holder.

**J.      Procedure for Treating and Resolving Disputed, Contingent, and/or Unliquidated Claims**

**1.      Objection Deadline; Prosecution of Objections**

Except as set forth in the Plan with respect to Professional Fee Claims and Administrative Expense Claims, all objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline, as the same may be extended by the Court from time to time upon motion and notice by the Liquidation Trustee. If an Objection has not been Filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (i) was Scheduled by the Debtors but (ii) was not Scheduled as contingent, unliquidated and/or disputed, by the Claims Objection Deadline, as the same may be extended by order of the Court, the Claim to which the Proof of Claim or Scheduled Claim relates shall be treated as an Allowed Claim if such Claim has not been Allowed earlier. Notice of any motion for an Order extending the Claims Objection Deadline shall be required to be given only to those Persons or Entities that have requested notice in the Chapter 11 Cases in accordance with Bankruptcy Rule 2002.

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Liquidation Trustee shall have the authority to: (a) File, withdraw or litigate to judgment Objections to and requests for estimation of Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Court; and (c) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court; *provided, however*, that the objection to and settlement of Professional Fee Claims shall not be subject to this Article XI.J, but rather shall be governed by Article IV.D hereof. In the event that any

Objection Filed by the Debtors remains pending as of the Effective Date, the Liquidation Trustee shall be deemed substituted for the Debtors, as applicable, as the objecting party.

The Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any Objection to such Claim or during the appeal relating to such Objection. In the event that the Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the Liquidation Trustee may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

The Liquidation Trust shall be entitled to assert all of the Debtors' rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization and/or equitable subordination and counter-claims with respect to Claims.

### 2.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan or the Liquidation Trust Agreement, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

To the extent that a Claim is not a Disputed Claim but is held by a Holder that is or may be liable to the Debtors or the Liquidation Trust on account of a Cause of Action, no payments or Distributions shall be made with respect to all or any portion of such Claim unless and until such Claim and liability have been settled or withdrawn or have been determined by Final Order of the Court, administrative tribunal, or such other court having jurisdiction over the matter.

### 3.      Disputed Claims Reserve

On the Distribution Date, the Liquidation Trust shall withhold on a Pro Rata basis from property that would otherwise be distributed to Holders of Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, such amounts or property as may be necessary to equal one hundred percent (100%) of Distributions to which Holders of such Disputed Claims would be entitled under the Plan if such Disputed Claims were allowed in their Disputed Claim Amount. The Liquidation Trust may request, if necessary, estimation for any Disputed Claim that is contingent or unliquidated, or for which the Liquidation Trust determines to reserve less than the face amount. If the Liquidation Trust elects not to request such an estimation from the Court with respect to a Disputed Claim that is contingent or unliquidated, the Liquidation Trust shall withhold the applicable Disputed Claims Reserve based upon the good faith estimate of the amount of such Claim by the Liquidation Trust. If practicable, the Liquidation Trust shall invest any Cash that is withheld as the Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment, in accordance with the Liquidation Trust Agreement. Nothing in the Plan or the Liquidation Trust Agreement shall be deemed to entitle the Holder of a Disputed Claim to postpetition interest on such Claim, however.

4.      **Distributions After Allowance**

Payments and Distributions to Holders of Disputed Claims that ultimately become Allowed Claims shall be made in accordance with provisions of the Liquidation Trust Agreement that govern Distributions to Holders of Allowed Claims.

5.      **De Minimis Interim Distributions**

The Liquidation Trust shall not be required to make any interim distributions to Holders of Allowed Claims aggregating less than $50.00; *provided, however*, that Holders of Allowed Claims shall be entitled to final distributions regardless of their amount.  Cash that otherwise would be payable under the Plan to Holders of Liquidation Trust Interests but for this Article XI.J.5 shall remain Liquidation Trust Assets to be used in accordance with the Liquidation Trust Agreement. Cash that otherwise would be payable under the Plan to Holders of Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims but for this Article XI.J.5 shall remain in the Administrative Expense Claims Reserve.

6.      **Fractional Dollars**

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not be required to make Distributions or payments of fractions of dollars.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

7.      **Allocation of Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

8.      **Distribution Record Date**

The Disbursing Agent shall have no obligation to recognize the transfer of or sale of any participation in any Allowed Claim that occurs after the close of business on the Distribution Record Date.  Instead, the Disbursing Agent shall be entitled to recognize and deal for all purposes under the Plan with only those record Holders stated on the official Claims register or the Debtors' Books and Records, as applicable, as of the close of business on the Distribution Record Date.

## ARTICLE XII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      **Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases to which any Debtor is a party shall be deemed automatically rejected by

the Debtors as of the Effective Date, unless such contract or lease (1) previously has been assumed or rejected by the applicable Debtor; (2) expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume or reject pending before the Court as of the Confirmation Date; (4) is identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be assumed; or (5) is an Insurance Policy; *provided*, *however*, that nothing contained in the Plan shall constitute an admission by a Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or its successors and assigns has any liability thereunder; *provided further*, that the Debtors reserve their rights, at any time before the Confirmation Date, to assume any Executory Contract or Unexpired Lease that was not already rejected prior to the Confirmation Date.  The Confirmation Order shall constitute an order approving such rejection as of the Effective Date.

**B.     Rejection Bar Date**

If the rejection of an Executory Contract or Unexpired Lease pursuant to Article XII.A above gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors or their Estates, the Liquidation Trust, or their respective successors or assigns unless a Proof of Claim is Filed with the Claims and Noticing Agent and served on counsel for the Liquidation Trust by the Rejection Bar Date. Any Proofs of Claim not Filed and served by the Rejection Bar Date will be forever barred from assertion against the Debtors and their Estates.  Unless otherwise Ordered by the Court, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as Class 3 (General Unsecured Claims) under the Plan.

**C.     Indemnification and Reimbursement**

Any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify, reimburse, or limit the liability of any Person pursuant to the Debtors' operating agreements, bylaws, policy of providing employee indemnification, applicable state law or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtors shall survive confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement or limitation of liability accrued or is owed in connection with an occurrence before or after the Petition Date; *provided, however*, that all related monetary obligations shall be limited solely to available insurance coverage and neither the Liquidation Trust, the Liquidation Trustee, nor any of the Liquidation Trust's assets shall be liable for any such obligations.  This provision for indemnification obligations shall not apply to or cover any Claims, suits or actions against a Person that result in a final order determining that such Covered Person is liable for fraud, willful misconduct, gross negligence, bad faith, self-dealing or breach of the duty of loyalty.

## ARTICLE XIII.
## CONDITIONS PRECEDENT TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

**A.      Conditions Precedent to Confirmation**

The following are conditions precedent to confirmation of the Plan, each of which must be satisfied:

1.      The Combined Disclosure Statement and Plan, Plan Supplement(s), the Confirmation Order, and any other related Definitive Documents shall be in form and substance reasonably acceptable to the Debtors and the Bondholder Representatives.

2.      The Sale Order shall not have been stayed, modified, or vacated on appeal.

3.      The Confirmation Order shall have been entered by the Court.

**B.      Conditions Precedent to Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived:

1.      All conditions precedent to Confirmation of the Plan shall have either been satisfied or waived.

2.      The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

3.      The Solicitation Procedures Order and the Confirmation Order shall not have been stayed, vacated, or reversed and shall have become a Final Order.

4.      The Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless the Bondholder Representatives have provided written consent to such material amendment, alteration, or modification.

5.      The Professional Fee Reserve and the Administrative Expense Claims Reserve shall have been funded in Cash in full.

6.      The Liquidation Trust Agreement shall have been executed and the Liquidation Trustee shall have been appointed.

7.      The Liquidation Trust shall have been established and the Liquidation Trust Assets shall have been transferred to and vested in the Liquidation Trust free and clear of all Claims and Liens, except as specifically provided in the Plan and the Liquidation Trust Agreement.

8.      All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable.

## C.      Establishing the Effective Date

The calendar date to serve as the Effective Date shall be a Business Day of, on, or promptly following the satisfaction or waiver of all conditions to the Effective Date, which date will be selected by the Debtors.  On or within two Business Days of the Effective Date, the Debtors shall File and serve a notice of occurrence of the Effective Date.  Such notice shall contain, among other things, the Administrative Expense Claim Bar Date, the Professional Fee Claims Bar Date, and the Rejection Bar Date with respect to Executory Contracts or Unexpired Leases rejected pursuant to the Plan.

## D.      Waiver of Conditions

Each of the conditions to Confirmation and the occurrence of the Effective Date set forth in Article XIII hereof may be waived in whole or in part by the Debtors and the Bondholder Representatives without any other notice to other parties-in-interest or the Court.  The failure to satisfy or waive any condition to Confirmation or the occurrence of the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of any party to exercise any of its foregoing rights shall not be deemed a waiver of any of its other rights, and each such right shall be deemed an ongoing right that may be asserted thereby at any time.

## E.      Consequences of Non-Occurrence of Effective Date

If the Effective Date does not occur within 90 days following the Confirmation Date, or by such later date after notice and hearing, as is proposed by the Debtors, then upon motion by the Debtors and upon notice to such parties-in-interest as the Court may direct, (i) the Plan shall be null and void in all respects; (ii) any settlement of Claims shall be null and void without further order of the Court; and (iii) the time within which the Debtors may assume and assign or reject all Executory Contracts shall be extended for a period of 30 days after such motion is granted.

## ARTICLE XIV.
## EFFECTS OF CONFIRMATION

## A.      Compromise and Settlement of Claims and Controversies

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019 and in consideration for the classification, Distributions, releases, and other benefits provided pursuant to the Combined Disclosure Statement and Plan, on the Effective Date, the provisions of the Combined Disclosure Statement and Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Combined Disclosure Statement and Plan or relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Claim or Interest, or any Distribution to be made on account of such Claim or Interest.  The entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by

Document       Page 112 of 124

the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable and reasonable.

The Debtors expressly reserve the right (with Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle any and all Claims against it and claims that it may have against other Persons and Entities at any time up to and including the Effective Date. After the Effective Date, such right shall pass to the Liquidation Trust and shall be governed by the terms of the Plan and the Liquidation Trust Agreement.

## B.    Binding Effect

The Combined Disclosure Statement and Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, whether or not such Holders shall receive or retain any property or interest in property under the Combined Disclosure Statement and Plan, and their respective successors and assigns, including, but not limited to, the Liquidation Trust and all other parties-in-interest in the Chapter 11 Cases.

## C.    Discharge of the Debtors

Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation shall not discharge Claims against the Debtors; *provided, however*, no Holder of a Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, the Debtors, the Liquidation Trust, or its respective successors, assigns, and/or property, except as expressly provided in the Plan.

## D.    Releases

### 1.    Debtor Releases

**Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their Estates, and the Debtors' current and former Affiliates, successor, and assigns, including any successor to the Debtors or any Estate representative appointed or selected pursuant to Bankruptcy Code section 1123(b)(3), including the Liquidation Trustee, shall be deemed to forever release, waive, and discharge each of the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' operations, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Series 2011 Bonds, the Series 2018 Bonds, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the Plan Support Agreement, or the Combined Disclosure Statement and Plan, and the administration, formulation, preparation, dissemination, solicitation, negotiation, consummation, and**

implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date.

2.    **Third-Party Releases**

**Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, and discharge the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' operations, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Series 2011 Bonds, the Series 2018 Bonds, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, the Plan Support Agreement, or the Combined Disclosure Statement and Plan, and the administration, formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date.**

E.    **Exculpation and Limitation of Liability**

**Except as otherwise specifically provided herein, the Exculpated Parties shall not have or incur, and are hereby released and exculpated from, any liability, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured and whether asserted or assertable directly or derivatively in law or equity, to any Holder of a Claim or an Interest, or any other party-in-interest, or any of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders or Affiliates, or any of their respective successors or assigns, for any act or omission in**

109

connection with, relating to or arising out of, the Chapter 11 Cases, the Sale, the formulation, negotiation, or implementation of the Combined Disclosure Statement and Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct  (in each case as determined by a Final Order entered by a court of competent jurisdiction), and such parties in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Combined Disclosure Statement and Plan.

Notwithstanding any other provision of the Combined Disclosure Statement and Plan, no Holder of a Claim or an Interest, no other party-in-interest, none of their respective members, directors, officers, employees, advisors, attorneys, professionals, agents, partners, stockholders or Affiliates, and none of their respective successors or assigns, shall have any right of action against the Exculpated Parties for any act or omission in connection with, relating to or arising out of, the Chapter 11 Cases, the Sale, the formulation, negotiation, or implementation of the Combined Disclosure Statement and Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct (in each case as determined by a Final Order entered by a court of competent jurisdiction).  For the avoidance of doubt, nothing contained in this paragraph shall exculpate acts or omissions prior to the Petition Date or post-Effective Date.

F.    Injunction

Effective as of the Effective Date, all Persons and Entities that hold, have held, or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, or liability of any nature whatsoever, that is released pursuant to this Combined Disclosure Statement and Plan, shall be permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions (other than actions to enforce any rights or obligations under the Combined Disclosure Statement and Plan): (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum against or affecting the Liquidating Debtors, the Liquidation Trust, or any of its or their respective property; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order against the Liquidating Debtors, the Liquidation Trust, or any of its or their respective property; (iii) creating, perfecting, or in any way enforcing in any manner, directly or indirectly, any encumbrance or lien of any kind against the Liquidating Debtors, the Liquidation Trust, or any of its or their respective property; (iv) asserting any right of setoff, directly or indirectly, against any obligation due to the Liquidating Debtors, the Liquidation Trust, or any of its or their respective property, except with respect to any right of setoff asserted prior to the entry of the Confirmation Order, whether asserted in a Proof of Claim or otherwise, or as otherwise contemplated,

impaired, or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Combined Disclosure Statement and Plan; and (vi) prosecuting or otherwise asserting (A) any Claim or Interest, including any right, claim, or Cause of Action released pursuant to the Plan, (B) any form of objection to any Claim that is Allowed by the Plan and Confirmation Order, or (C) Avoidance Actions against any Holder of a Claim that is Allowed or any Avoidance Action released by the Plan.  Additionally, unless otherwise explicitly stated in the Combined Disclosure Statement and Plan, in furtherance of the releases granted by the Plan or Confirmation Order, the injunction contemplated by this paragraph shall prohibit the assertion against the Liquidation Trust and the Liquidation Trustee of all Claims or Interests, if any, related to the Debtors.

Confirmation of the Plan shall further have the effect of permanently enjoining all Persons and Entities from obtaining (i) any documents or other materials from current counsel for the Debtors that are in the possession of such counsel as a result of or arising in any way out of its representation of the Debtors, *provided, however*, that the Liquidation Trustee shall be entitled to obtain any such documents or other materials, (ii) any documents or other materials from current counsel for the UCC or Pension Committee, as applicable, that are in the possession of such counsel as a result of or arising in any way out of its representation of the UCC or Pension Committee, as applicable, or (iii) Books and Records, *provided, however*, that the Liquidation Trustee shall be entitled to obtain any such Books and Records.

## ARTICLE XV.
## RETENTION OF JURISDICTION

**A.    Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, following the Effective Date, the Court shall retain such jurisdiction over the Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of the Combined Disclosure Statement and Plan are carried out.  The Court shall have exclusive jurisdiction of all matters arising out of the Chapter 11 Cases and the Combined Disclosure Statement and Plan pursuant to, and for the purposes of, Bankruptcy Code sections 105(a) and 1142 and for, among other things, the following purposes:

1.    To the extent not otherwise determined by the Combined Disclosure Statement and Plan, to determine (a) the allowance, classification, or priority of Claims upon objection by any party-in-interest entitled to File an objection, or (b) the validity, extent, priority, and nonavoidability of consensual and nonconsensual Liens and other encumbrances against assets of the Estates, the Liquidating Debtors, or the Liquidation Trust;

2.    To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Combined Disclosure Statement and Plan or its execution or implementation by any Person or Entity, to construe and to take any other action to enforce and execute the Combined Disclosure Statement and Plan, the Confirmation Order, or any other order of the Court, to issue such orders as may be necessary for the implementation,

execution, performance, and Consummation of the Combined Disclosure Statement and Plan and all matters referred to herein, and to determine all matters that may be pending before the Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person or Entity;

3.      To protect the assets or property of the Estate, the Liquidating Debtors, or the Liquidation Trust, including Causes of Action, from claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any assets of the Estates, the Liquidating Debtors, or the Liquidation Trust;

4.      To determine any and all applications for allowance of Professional Fee Claims;

5.      To determine any Priority Tax Claims, Priority Non-Tax Claims, or Administrative Expense Claims entitled to priority under Bankruptcy Code section 507(a);

6.      To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

7.      To resolve any dispute arising under or related to the implementation, execution, Consummation, or interpretation of the Combined Disclosure Statement and Plan and the making of Distributions hereunder;

8.      To modify the Combined Disclosure Statement and Plan under Bankruptcy Code section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Combined Disclosure Statement and Plan or the Confirmation Order so as to carry out their intent and purposes;

9.      To issue such orders in aid of Consummation of the Combined Disclosure Statement and Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person or Entity, to the full extent authorized by the Bankruptcy Code;

10.     To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

11.     To determine any and all motions related to the rejection, assumption, or assignment of Executory Contracts or Unexpired Leases or determine any issues arising from the deemed rejection of Executory Contracts and Unexpired Leases set forth in Article XII.A hereof;

12.     Except as otherwise provided herein, to determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases;

13.     To enter a final decree closing the Chapter 11 Cases;

14.     To hear and determine any tax disputes concerning the Debtors and to determine and declare any tax effects under this Plan; *provided, however*, that nothing herein shall be construed to confer jurisdiction upon the Court to make determinations as to federal tax liabilities and federal tax treatment, except as provided under 11 U.S.C. § 505;

15.     To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases has been closed);

16.     To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, the Governmental Bar Date, the Rejection Bar Date, the Administrative Expense Claim Bar Date, the Professional Fee Claim Bar Date, and/or the Confirmation Hearing for the purpose of determining whether a Claim, or Interest is released, satisfied and/or enjoined hereunder or for any other purpose;

17.     To ensure that Distributions to Liquidation Trust Beneficiaries are accomplished pursuant to the provisions of the Plan;

18.     To determine any other matters that may arise in connection with or related to the Combined Disclosure Statement and Plan, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Combined Disclosure Statement and Plan; and

19.     To hear any other matter not inconsistent with the Bankruptcy Code.

**B.      Retention of Non-Exclusive Jurisdiction by the Court**

Notwithstanding anything else in the Combined Disclosure Statement and Plan, the Court shall retain non-exclusive jurisdiction over all Liquidation Trust Claims prosecuted by the Liquidation Trust.

**C.      Alternative Jurisdiction**

In the event that the Court is without jurisdiction to resolve any matter, then the District Court or such other administrative tribunal or court of competent jurisdiction shall hear and determine such matter.  If the District Court does not have jurisdiction, then the matter may be brought before any court having jurisdiction with regard thereto.

**D.      Failure of Court to Exercise Jurisdiction**

If the Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article XV.A hereof, the provisions of Article XV.A hereof shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE XVI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**A.     Modifications and Amendments**

Alterations, amendments, or modifications of the Combined Disclosure Statement and Plan may be proposed in writing by the Debtors, at any time before the Confirmation Date; *provided that* the Combined Disclosure Statement and Plan, as altered, amended or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123, and the Debtors shall have complied with Bankruptcy Code section 1125.  Additionally, after the Confirmation Date and prior to substantial consummation of the Plan, the Debtors may, under Bankruptcy Code section 1127(b), institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Combined Disclosure Statement and Plan or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Combined Disclosure Statement and Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Combined Disclosure Statement and Plan; *provided, however,* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Court.

**B.     Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**C.     Revocation or Withdrawal of the Plan**

The Debtors reserves the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation of the Plan does not occur, then (1) the Plan shall be null and void in all respects, (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (3) nothing contained in the Plan, and no acts taken in preparation for Consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person or Entity, (ii) prejudice in any manner the rights of such Debtor or any other Person or Entity, or (iii) constitute an admission of any sort by the Debtors or any other Person or Entity.

## ARTICLE XVII.
## MISCELLANEOUS PROVISIONS

**A.     Terminations of Injunctions or Stays**

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 or otherwise, and extant on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## B.     Severability of Provisions

If, prior to Confirmation, any term or provision of the Combined Disclosure Statement and Plan is held by the Court to be invalid, void, or unenforceable, then the Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Combined Disclosure Statement and Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Combined Disclosure Statement and Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## C.     Payment of Statutory Fees

All fees payable through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid on or as soon as practicable after the Effective Date.   The Debtors, prior to the Effective Date, and the Liquidation Trust, from and after the Effective Date, shall pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 until the Chapter 11 Cases are closed or converted and/or the entry of a final decree.   Quarterly fees shall continue to accrue for the Debtors and be timely paid until the Chapter 11 Cases are closed, dismissed or converted.   In addition, the Liquidation Trust shall File post-confirmation quarterly reports or any pre-confirmation monthly operating reports not Filed as of the Confirmation Hearing in conformance with the U.S. Trustee Guidelines.   The U.S. Trustee shall not be required to File a request for payment of its quarterly fees, which shall be deemed an Administrative Expense Claim against the Debtors and their Estates.

## D.     Service of Documents

All notices, requests and demands to or upon the Debtors, the Liquidation Trust and/or the Liquidation Trustee, as applicable, to be effective shall be in writing and, unless otherwise expressly provided herein, shall be (a) in writing; (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission; (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed; and (d) addressed as follows:

| Entity | Contact Information |
|---|---|
| Debtors and Liquidating Debtors | [__]<br><br>with a copy to:<br><br>Nyemaster Goode, P.C.<br>625 First Street SE, Suite 400<br>Cedar Rapids, IA 52401-2030 |

| Entity | Contact Information |
|---|---|
|  | Attn: Roy Leaf (rleaf@nyemaster.com)<br><br>McDermott Will & Emery LLP<br>444 West Lake Street, Suite 4000<br>Chicago, IL 60606<br>Attn: Felicia Gerber Perlman (fperlman@mwe.com) and<br>Daniel M. Simon (dsimon@mwe.com) |
| Liquidation Trustee | [_] |

**E.    2002 Service List**

After the Effective Date, any Entities or Persons that want to continue to receive notice in these Chapter 11 Cases must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002 no later than thirty days after the Effective Date; *provided, however*, that the U.S. Trustee shall be excused from this requirement and shall remain on the Bankruptcy Rule 2002 service list. To the extent a renewed request is not timely Filed with the Court, the Liquidation Trustee is authorized to limit notice and not include such Entities or Persons on any post-Effective Date Bankruptcy Rule 2002 service list.

**F.    Filing of Additional Documents**

On or before substantial consummation of the Plan, the Debtors shall File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**G.    Plan Supplement(s)**

Exhibits to the Combined Disclosure Statement and Plan not attached hereto shall be Filed in one or more Plan Supplements by the Plan Supplement Filing Date. Any Plan Supplement (and amendments thereto) Filed by the Debtors shall be deemed an integral part of the Combined Disclosure Statement and Plan and shall be incorporated by reference as if fully set forth herein. Substantially contemporaneously with their Filing, the Plan Supplements may be viewed at the Debtor' case website (http://dm.epiq11.com/MercyHospital) or the Court's website (https://www.ianb.uscourts.gov/). Unless otherwise ordered by the Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Combined Disclosure Statement and Plan that does not constitute the Plan Supplement, the Plan Supplement shall control. The documents considered in the Plan Supplement are an integral part of the Combined Disclosure Statement and Plan and shall be deemed approved by the Court pursuant to the Confirmation Order.

**H.    Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be

116

deemed to have participated in good faith and in compliance with the Bankruptcy Code and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**I.      Closing of Chapter 11 Cases**

The Liquidation Trustee shall, promptly after the full administration of the Chapter 11 Cases, file with the Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

**J.      No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in the Combined Disclosure Statement and Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

**K.      Inconsistency**

In the event of any inconsistency among the Combined Disclosure Statement and Plan and any other instrument or document created or executed pursuant to the Combined Disclosure Statement and Plan, the provisions of the Combined Disclosure Statement and Plan shall govern.

**L.      Request for Expedited Determination of Taxes**

The Debtors, the Liquidation Trust, and the Liquidation Trustee, as applicable, shall have the right to request an expedited determination under Bankruptcy Code section 505(b) with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**M.      Reservation of Rights**

Except as expressly set forth herein, the Combined Disclosure Statement and Plan shall have no force or effect unless the Court shall enter the Confirmation Order. None of the Filing of the Combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Combined Disclosure Statement and Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors, Holders of Claims or Interests before the Effective Date.

Dated: February 23, 2024

MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*
Debtors and Debtors-in-Possession

By:   /s/ DRAFT_____
      Mark E. Toney
      Chief Restructuring Officer

NYEMASTER GOODE, P.C.

By:   /s/ *Roy Leaf*_____
      Roy Leaf, AT0014486
      625 First Street SE, Suite 400
      Cedar Rapids, IA 52401-2030
      Telephone:   (319) 286-7002
      Facsimile:   (319) 286-7050
      Email:       rleaf@nyemaster.com

      - and -

      Kristina M. Stanger, AT0000255
      Matthew A. McGuire, AT0011932
      Dana Hempy, AT0014934
      700 Walnut, Suite 1600
      Des Moines, IA 50309
      Telephone:   (515) 283-3100
      Facsimile:   (515) 283-8045
      Email:       mmcguire@nyemaster.com
                   kmstanger@nyemaster.com
                   dhempy@nyemaster.com

      - and -

MCDERMOTT WILL & EMERY LLP

      Felicia Gerber Perlman (admitted *pro hac vice*)
      Daniel M. Simon (admitted *pro hac vice*)
      Emily C. Keil (admitted *pro hac vice*)
      444 West Lake Street, Suite 4000
      Chicago, IL 60606
      Telephone:   (312) 372-2000
      Facsimile:   (312) 984-7700
      Email:       fperlman@mwe.com
                   dsimon@mwe.com
                   ekeil@mwe.com

- and -

Jack G. Haake (admitted *pro hac vice*)
2501 North Harwood Street, Suite 1900
Dallas, TX 75201
Telephone:      (214) 295-8000
Facsimile:      (972) 232-3098
Email:          jhaake@mwe.com

*Counsel for Debtors and Debtors-in-Possession*

## EXHIBIT A

**Liquidation Analysis**

[to come]