**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**

| | |
|---|---|
| In re:<br><br>MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 23-00623 (TJC)<br><br>Jointly Administered<br><br>**Related to Docket No. 799** |

**DEBTORS' RESPONSE AND LIMITED OBJECTION WITH RESPECT TO MOTION OF IOWA CITY AMBULATORY SURGICAL CENTER, LLC FOR ENTRY OF AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY TO ISSUE A NOTICE OF INTENT TO OBTAIN A PURCHASE PRICE DETERMINATION**

Mercy Hospital, Iowa City, Iowa ("Mercy") and certain of its affiliates as debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, hereby submit this response and limited objection (the "Response") with respect to the *Motion of Iowa City Ambulatory Surgical Center, LLC for Entry of an Order Granting Relief from the Automatic Stay to Issue a Notice of Intent to Obtain a Purchase Price Determination* [Docket No. 799] (the "Motion")[1] filed by Iowa City Ambulatory Surgical Center, LLC ("ICASC"). In support of this Response, the Debtors respectfully state as follows:

**RESPONSE**

1. As this Court is well aware, following the sale of Mercy Hospital to the University of Iowa, the Debtors are in the process of winding down their remaining assets and seeking confirmation of a chapter 11 plan of liquidation to provide recoveries to their creditors. To that end, the Debtors anticipate seeking approval of a disclosure statement on or around March 27, 2024, with an anticipated confirmation hearing in early May. Part and parcel of the Debtors' plan process, the Debtors are engaging with their key stakeholders on liquidating the Debtors'

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

remaining assets, which include the Debtors' joint venture assets, the most valuable of which is the Debtors' interest in ICASC (the "Mercy Interest").

2. The Debtors currently own 37.5% of ICASC. In fiscal year 2022, ICASC generated approximately $19.3 million in revenue, and $6.85 million in operating EBITDA. In fiscal year 2023, ICASC generated approximately $19.4 million in revenue and $6.80 million in operating EBITDA. In addition, the ASC owns valuable real property, with a recent appraisal value of approximately $7.5 million alone.

3. JCSI, however, has taken the unsupportable position that the Mercy Interest is worth a fraction of its actual fair market value. This position was based upon a valuation conducted by PYA, P.C. ("PYA"), outside the ambit of the Operating Agreement, with overly pessimistic and self-serving assumptions regarding ICASC's go-forward projections. The Debtors believe there is significantly more value associated with ICASC assuming reasonable assumptions. The Debtors have even engaged JCSI in a settlement construct that provides for a purchase of Mercy's Interest at a reasonable fair market value, but those efforts have been entirely rebuffed by JCSI, who has refused to even provide a counteroffer.

4. At bottom, the Debtors acknowledge that the Operating Agreement provides an option (the "Option") to acquire the Mercy Interest[2] and contemplates valuation procedures that may be utilized in determining the appropriate purchase price with respect thereto.[3] Indeed, the Debtors fully support a fair and consensual valuation and sale of the Mercy Interest that adheres to the process contemplated by the Operating Agreement.

---

[2] *See* Operating Agreement, § 5.6. As set forth in the Operating Agreement, ICASC has a right to obtain a Purchase Price Determination of the Mercy Interest upon the earlier of (a) acknowledgment from the board of managers of ICASC of the existence of a Permissive Redemption Event or (b) notice by Mercy to ICASC of the occurrence of a Permissive Redemption Event.

[3] *See id.*, § 3.2.

5. As a result, the Debtors do not oppose ICASC's requested relief from the automatic stay for the limited purpose of issuing a Price Determination Notice with respect to the Mercy Interest and initiating the valuation process contemplated by section 3.2(b)-(e) of the Operating Agreement.[4]

6. In particular, once the Price Determination Notice is provided, section 3.2(b) of the Operating Agreement provides that JCSI and Mercy shall have thirty days to agree upon the selection of an independent appraiser. Mercy is hopeful that it and JCSI can reach agreement as to such appraiser, as well as with respect to any assumptions and market determinations underlying an appraisal. Mercy believes that it is in the best interest of all of its stakeholders to avoid, if at all possible, the time consuming and costly valuation procedures contemplated by section 3.2 of the Operating Agreement in the absence of an agreement as to the independent appraiser.

7. To the extent that ICASC, however, (a) does not intend to (i) comply with the terms of the Operating Agreement and (ii) initiate a process in compliance with sections 3.2 and 5.6 of the Operating Agreement or (b) intends to argue that the informal process conducted by it in November 2023, somehow contemplates a proper valuation process in compliance with the Operating Agreement, the Debtors object to the relief requested by the Motion for the reasons set forth herein.

8. *First*, again, the Debtors agree to modify the automatic stay **solely** to allow ICASC to issue a Price Determination Notice in compliance with the Operating Agreement in the hopes of kickstarting a consensual valuation and sale process of the Mercy Interest to the benefit of the Debtors' estate and creditors. The automatic stay should otherwise remain in place with respect to ICASC and the Mercy Interest.

---

[4] *See* Motion, ¶ 20.

3

9. The issuance of a Price Determination Notice initiates a process pursuant to section 5.6 of the Operating Agreement which could potentially culminate in ICASC's acquisition of the Mercy Interest. Because the Mercy Interest, and the underlying Operating Agreement itself, constitute property of the Debtors' estates pursuant to section 541(a) of the Bankruptcy Code, the proper valuation and disposition of the Mercy Interest rests firmly in this Court's purview. As such, the Debtors' stakeholders should be heard and this Court should have the final say with respect to any acquisition of the Mercy Interest. Thus, if ICASC subsequently seeks to exercise the Option following completion of the contemplated valuation process or take any other action with respect to the Mercy Interest, ICASC must return to this Court and seek further relief from the automatic stay.

10. ***Second***, if the automatic stay is modified as contemplated above, it is **critical** that ICASC comply with the valuation process set forth in section 3.2 of the Operating Agreement. Strict compliance by ICASC with the procedures set forth in section 3.2 of the Operating Agreement is critical to establish and maintain a fair, unbiased process that will benefit all parties involved, including the Debtors and their estates.

11. Unfortunately, ICASC's informal attempt to value the Mercy Interest in November 2023 was deficient in a variety of ways.[5] For example, ICASC must provide any Price Determination Notice to Mercy and its representatives **in writing** rather than conveying the same orally.[6] Nor were the Debtors privy to any valuation methodologies, management presentations, or any other discussions between JCSI and PYA in connection with the prior valuation, which

---

[5] *See* Motion, ¶ 14.

[6] On or about November 29, 2023, counsel to JCSI provided **oral** rather than **written** notice of ICASC's intention to obtain a Purchase Price Determination, in clear violation of the Operating Agreement. *See* Operating Agreement, § 12.1 ("All notices, demands, requests and other communications desired or required to be given hereunder . . . shall be **in writing** . . .") (emphasis added).

again, was not in compliance with the terms of the Operating Agreement.[7] In addition, no enforceable Permissive Redemption Event had occurred at the time of such oral notice that would justify the issuance of any such notice in the first place.[8]

12. Mercy was also not afforded thirty days to consensually select with JCSI an independent appraiser that was acceptable to both parties as required by section 3.2(b) of the Operating Agreement. Although paragraph 14 of the Motion seems to suggest otherwise, Mercy never agreed to the selection of PYA or to a divergence from the procedures contained in section 3.2 of the Operating Agreement. Moreover, Mercy does not consent to PYA serving as the independent appraiser for such purposes going forward pursuant to section 3.2(b) of the Operating Agreement.

13. Moreover, as noted above, the resulting valuation reflected in the PYA Report contained significant flaws.[9] Among other things, the PYA Report (a) used excessively pessimistic and non-market assumptions regarding ICASC as a going concern and (b) excluded both (i) a valid indication of interest from a third-party for ICASC interests and (ii) the intrinsic value of the underlying real estate and related improvements.

14. As a result, the PYA Report drastically undervalued the Mercy Interest to the detriment of the Debtors and their estates, and simply cannot serve as the basis for any purchase

---

[7] To the extent that ICASC attempts to argue that its actions in November 2023 somehow complied with the procedures set forth in sections 3.2 and 5.6 of the Operating Agreement, the Debtors reserve the right to argue that such actions by ICASC constitute a violation of the automatic stay and to seek appropriate sanctions with respect thereto.

[8] See Operating Agreement, § 1.1(yy) (definition of Permissive Redemption Event). To the extent that ICASC seeks to argue that Mercy's chapter 11 filing constituted a Permissive Redemption Event, Mercy reserves the right to argue that (i) such clause constitutes an unenforceable *ipso facto* clause pursuant to section 365(e)(1) of the Bankruptcy Code and (ii) even if such clause is enforceable, ICASC failed to issue proper written notice no later than thirty days after the initiation of Mercy's bankruptcy proceedings as required by section 5.6 of the Operating Agreement.

[9] As acknowledged in paragraph 15 of the Motion, the Debtors have communicated such deficiencies to ICASC. See Motion, at ¶ 15.

offer with respect to the same. Accordingly, the Debtors submit that such deficiencies, including, but not limited to, those detailed in Mercy's letter to JCSI's counsel dated February 27, 2024, must be rectified in any future valuation to ensure that the Mercy Interest is accurately and fairly valued.

15. In short, if ICASC is going to initiate a process compliant with sections 3.2 and 5.6 of the Operating Agreement, it must start such process anew. Indeed, any such process must disregard the PYA Report and any new appraisal must rectify the mistakes contained in the PYA Report.[10] Moreover, it must allow the Debtors to provide input on the process, the valuation methodology, and any other assumptions underlying any appraisal reports solicited pursuant to the Operating Agreement.

16. *Finally*, to the extent that ICASC and the Debtors are unable to reach consensus on any valuation and proposed sale of the Mercy Interest, the Debtors reserve the right to return to this Court for appropriate relief, which may include either a valuation determined by the Court, or approval of other sale procedures to allow the Debtors to engage in a fulsome marketing process to accurately determine the value of the Mercy Interest and to assume and assign the Operating Agreement to a qualified purchaser as part of any approved sale.[11] This process, to the extent necessary, would allow the Debtors to continue to further maximize the value of their remaining

---

[10] As ICASC now comes before this Court seeking relief from the automatic stay to issue a Price Determination Notice, it cannot at the same time seek to rely on actions taken by ICASC prior to receiving such relief. In particular, any attempt by ICASC to rely on the PYA Report (a report compiled prior to the filing of the Motion) or somehow seek to use the PYA Report in any new valuation process going forward in accordance with the Operating Agreement would constitute a violation of the automatic stay and the Debtors reserve all rights and remedies with respect thereto.

[11] While reserving all rights with respect thereto, the Debtors submit that assumption and assignment of the Operating Agreement is permissible under section 365(a) of the Bankruptcy Code and, importantly, is not prohibited by Iowa state law. Indeed, unlike other state laws that restrict the assignability of limited liability company agreements, the Iowa LLC Code **does not** prohibit assignment of the Operating Agreement. *See* Iowa Code, § 489.502(1) ("[F]or a transfer, in whole or in part, all of the following applies to a transferable interest: (a) [i]t is permissible . . ."). Accordingly, because the Operating Agreement constitutes an executory contract that does not involve unique, personal services, the Debtors retain the right to assume and assign the Operating Agreement in their discretion during these Chapter 11 Cases to the extent necessary pursuant to section 365 of the Bankruptcy Code. *See* 11 U.S.C. § 365(a).

assets for the benefit of their estates and creditors, which remains the Debtors' primary objective in these Chapter 11 Cases.

## **RESERVATION OF RIGHTS**

17.     The Debtors hereby reserve any and all rights with respect to, among other things and without limitation, (a) the Motion, the relief sought therein, this Response, and any subsequent amendment or modification thereto; (b) the Mercy Interest and any valuation, appraisal, or sale with respect to the same; (c) any and all arguments with respect to the Debtors' ability to assume and assign the Operating Agreement pursuant to section 365(a) of the Bankruptcy Code; and (d) any and all arguments with respect to the Operating Agreement and the enforceability of its terms. Nothing contained herein shall constitute the Debtors' approval, consent, or agreement with respect to, among other things and without limitation, any proposed valuation or offer to purchase the Mercy Interest and the Debtors reserve all rights with respect to the same.

*[Remainder of Page Intentionally Left Blank]*

| | |
|---|---|
| Dated: March 22, 2024<br>Cedar Rapids, Iowa | **MCDERMOTT WILL & EMERY LLP**<br><br>*/s/ Jack G. Haake*<br>Jack G. Haake (admitted *pro hac vice*)<br>2501 North Harwood Street, Suite 1900<br>Dallas, TX 75201<br>Telephone: (214) 295-8000<br>Facsimile: (972) 232-3098<br>Email: jhaake@mwe.com<br><br>- and -<br><br>Felicia Gerber Perlman (admitted *pro hac vice*)<br>Daniel M. Simon (admitted *pro hac vice*)<br>Emily C. Keil (admitted *pro hac vice*)<br>444 West Lake Street, Suite 4000<br>Chicago, IL 60606<br>Telephone: (312) 372-2000<br>Facsimile: (312) 984-7700<br>Email: fperlman@mwe.com<br>dsimon@mwe.com<br>ekeil@mwe.com<br><br>*Counsel for Debtors and Debtors-in-Possession* |

## **CERTIFICATE OF SERVICE**

The undersigned certifies, under penalty of perjury, that on this March 22, 2024, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of the Chapter 11 Cases.

*/s/ Jack G. Haake*