**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | ) | Case No. 23-00623 (TJC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Doc. Nos. 760 and 796** |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO
DEBTORS' MOTION TO APPROVE THE DISCLOSURE STATEMENT COMPONENT
OF THE DEBTORS' COMBINED DISCLOSURE STATEMENT AND JOINT PLAN OF
LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the

above-captioned chapter 11 cases of Mercy Hospital, Iowa City, Iowa (the "Mercy Hospital")

and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") files this

objection (the "Objection") to the *Debtors' Motion for Entry of Order (I) Approving Disclosure*

*Statement; (II) Scheduling Hearing on Confirmation of Plan; (III) Establishing Deadlines and*

*Procedures for (A) Filing Objections to Confirmation of Plan, (B) Claim Objections, and (C)*

*Temporary Allowance of Claims for Voting Purposes; (IV) Determining Treatment of Certain*

*Unliquidated, Contingent, or Disputed Claims for Notice, Voting, and Distribution Purposes; (V)*

*Setting Record Date; (VI) Approving (A) Solicitation Packages and Procedures for Distribution,*

*(B) Form of Notice of Hearing on Confirmation and Related Matters, and (C) Forms of Ballots;*

*(VII) Establishing Voting Deadline and Procedures for Tabulation of Votes; and (VIII) Granting*

*Related Relief* [Doc. No. 796] (the "Motion"),[1] and respectfully states as follows:

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Plan (defined below), as applicable.

## PRELIMINARY STATEMENT[2]

1.      The Plan is fatally flawed and patently unconfirmable on its face for the reasons set forth below. It would therefore be a colossal waste of time and estate resources for the Court to approve the Disclosure Statement and permit the Debtors to solicit acceptances of and pursue a hopeless attempt at confirmation of the Plan. While the Plan may have been filed for expedience and to appease certain interests, it cannot be confirmed as filed.

2.      The Plan improperly treats the Master Trustee Claim as an Allowed Secured Claim in the amount of $62 million without any basis. The value of the Master Trustee's collateral is well below that amount, and the Master Trustee is not entitled to any post-petition interest, fees or expenses because the Master Trustee Claim is under-secured. Based on an analysis conducted by the Committee's financial advisors and set forth herein, excluding the disputed collateral that is subject to the Committee Challenge, the Master Trustee's collateral is reasonably valued at approximately $55.5 million.

3.      Further, the Master Trustee Claim was filed for approximately $59.5 million, should be reduced by all adequate protection payments made to the Master Trustee under the Cash Collateral Orders during the course of these cases, and is subject to further reduction in the millions of dollars based on the surcharge and other claims included in the Committee Challenge. Moreover, regardless of the extent to which it is secured, the amount of the Master Trustee Claim has not been determined by the Court and there is no basis for the Plan to treat it as an allowed claim, particularly in light of the Committee Challenge. The Plan's improper treatment of the Master Trustee Claim demonstrates that the Plan was not filed in good faith and is patently unconfirmable on that basis as well.

---

[2] Capitalized terms used in this Preliminary Statement but not defined in the Plan are defined below in this Objection.

4.      The Plan also contains improper "Debtor Releases" in favor of, among other

parties, (a) the Bondholder Representatives, and (b) the Debtors' directors and officers who

served in such capacities post-petition. The Plan may not, through the Debtor Releases,

eviscerate the Committee's challenge rights under the Second Interim Cash Collateral Order, and

any and all claims against the Debtors' current and former directors and officers, especially those

based on prepetition acts or omissions, must be preserved for the benefit of the Debtors' estates

and creditors.

5.      The Plan is also patently unconfirmable because it (a) improperly provides for

substantive consolidation of the Debtors' estates in the absence of any factual or legal basis for

such consolidation, and (b) discriminates unfairly in its disparate treatment of Pension Claims

and General Unsecured Claims by providing the Pension Claims with an additional $250,000 of

recoveries as described below.

6.      Even if the Plan were not patently unconfirmable, the Disclosure Statement still

cannot be approved because it lacks adequate information necessary for creditors to make an

informed decision whether to accept or reject the Plan.

7.      The Disclosure Statement fails to provide any explanation for why the Master

Trustee Claim is treated as an Allowed Secured Claim in the amount of $62 million. The

Disclosure Statement does not explain (a) how this amount was arrived at when the Master

Trustee Claim was filed in the amount of approximately $59.5 million, (b) that the Committee

believes the Master Trustee Claim is under-secured and not entitled to any post-petition interest,

fees or expenses, (c) how the Plan purports to allow the Master Trustee Claim when, at the time

the Plan was filed, it remained subject to challenge by the Committee (and is now subject to the

Committee Challenge), or (d) why the Debtors excluded all amounts already paid to the Master

Trustee as adequate protection when determining the purported allowed amount of the Master Trustee Claim.

8.      The Disclosure Statement also does not adequate information regarding the Debtor Releases. The Disclosure Statement fails to describe what potential claims the Debtors' estates may have against the Released Parties, the value of those claims, what consideration, if any, the Debtors are receiving for such releases, or why such releases are necessary or appropriate. The Disclosure Statement further fails to explain that allowance of the Bondholder Claim and release of any estate claims against the Bondholder Representatives would eviscerate all of the claims asserted by the Committee in the Committee Challenge without any recovery.

9.      The Disclosure Statement does not provide any basis or justification for why the Plan provides for substantive consolidation of the Debtors' estates and fails to describe the implications of such consolidation on recoveries for creditors of each of the Debtors. The Disclosure Statement also fails to explain the legal standard for approval of substantive consolidation and how it purports to be met in these Chapter 11 Cases. Thus, creditors are unable to determine whether substantive consolidation is appropriate or how it would affect their potential recoveries under the Plan.

10.     The Disclosure Statement also fails to provide any explanation for the Plan's disparate treatment of Pension Claims and General Unsecured Claims, although they are each general unsecured claims that are equal in priority under the Bankruptcy Code. Finally, the Disclosure Statement lacks sufficient details regarding the terms of the Plan Support Agreement and its negotiation. Creditors are entitled to better understand the nature and origin of the Plan Support Agreement before voting on the Plan

11.     For the foregoing reasons and those that follow, the Committee submits that the
Motion should be denied.

## RELEVANT BACKGROUND

4.      On August 7, 2023 (the "Petition Date"), the Debtors each filed voluntary
petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy
Code") in the United States Bankruptcy Court for the Northern District of Iowa (this "Court"),
thereby commencing these chapter 11 cases (the "Chapter 11 Cases").

5.      The Debtors continue in possession of their property and are operating as debtors
in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or
examiner has been appointed in the Chapter 11 Cases.

6.      On August 15, 2023, the United States Trustee appointed the Committee [Doc.
No. 107].

7.      On November 11, 2023, the United States Trustee appointed the Pension
Committee [Doc. No. 458].

**A.      The Combined Disclosure Statement and Plan**

8.      On February 23, 2024, the Debtors filed the *Debtors' Combined Disclosure
Statement and Joint Plan of Liquidation* [Doc. No. 760] (the "Plan", and the disclosures
contained therein, the "Disclosure Statement").

9.      The Plan creates a class (consisting of two subclasses, 1-A and 1-B) of
Bondholder Claims held by the Master Trustee for the benefit of the Bondholders against the
Debtors on account of the Series 2011 Bonds and the Series 2018 Bonds, respectively, and treats
such Bondholder Claims as an Allowed Secured Claim in the aggregate amount of $62,000,000,
inclusive of all prepetition and postpetition principal, interest, attorneys' fees (exclusive of

amounts provided for under the Cash Collateral Orders) and other charges. *See* Plan Art. II.A.1.25 and V.B.1.-2.

10.     The Plan also creates a class of Bondholder Deficiency Claims (Class 4), notwithstanding that the Plan purports to treat the Bondholder Claims as an Allowed Secured Claim in the aggregate amount of $62,000,000 and the Bondholders are owed less than that amount. *See* Plan Art. II.A.1.28 and V.B.1.5.

11.     The Plan creates two classes of general unsecured claims: General Unsecured Claims (Class 3) and Pension Claims (Class 4). However, the treatment of these two classes differs. In particular for purposes of this Objection, the Plan provides the Pension Claims with an additional $250,000 (the Pension Trust Administrative Cost Amount) of recoveries to be paid to the Pension Trust "for the continued administration of the Pension Plan and/or prosecution and investigation of the Pension Causes of Action."  *See* Plan Art. II.A.1.160 and V.B.6.

12.     Article XIV.D.1. of the Plan provides for certain broad "Debtor Releases" of all potential claims and causes of action held by the Debtors against the Released Parties, including, among other parties, (a) the Bondholder Representatives, and (b) the Debtors' directors and officers who served in such capacities post-petition.[3]

---

[3] Article XIV.D.1. of the Plan, titled "Debtor Releases", provides:

> Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors, their Estates, and the Debtors' current and former Affiliates, successor, and assigns, including any successor to the Debtors or any Estate representative appointed or selected pursuant to Bankruptcy Code section 1123(b)(3), including the Liquidation Trustee, shall be deemed to forever release, waive, and discharge each of the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' operations, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party, the Series 2011 Bonds, the Series 2018 Bonds, the assertion or enforcement of rights and remedies against the Debtors, the Debtors'

13.     The Plan provides for substantive consolidation of the Debtors' estates for, among other things, voting and distribution purposes under the Plan. *See* Plan Art. V.A. and IX.A.

**B.     The Plan Support Agreement**

14.     Also on February 23, 2024, the Debtors, on the one hand, and Preston Hollow Community Capital, Inc., as Bondholder Representative for the Series 2018 Bonds, Preston Hollow Capital, LLC as the majority holder of the Series 2018 Bonds, and Computershare Trust Company, N.A., as Master Trustee (collectively, the "Bondholder Plan Support Parties"), on the other hand, entered into that certain Plan Support Agreement (as the same may be amended, the "Plan Support Agreement"). Pursuant to the Plan Support Agreement, the Bondholder Plan Support Parties have agreed to, among other things, support and vote in favor of the Plan in exchange for certain treatment of the Bondholder Claim under the Plan and other rights and commitments by the Debtors specified in the Plan Support Agreement.

---

in- or out-of-court restructuring efforts, any Avoidance Actions, the Plan Support Agreement, or the Combined Disclosure Statement and Plan, and the administration, formulation, preparation, dissemination, solicitation, negotiation, consummation, and implementation of any of the foregoing or any contract, instrument, release, or other agreement, understanding, accord, course of dealing, or document created or entered into in connection with or evidencing any of the foregoing, whether or not accrued, arising or having occurred, liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, mixed, or otherwise, that may be based in whole or part on any act, omission, transaction, agreement, understanding, course of dealing, event or other occurrence or omission taking place on or prior to the Effective Date.

Article II.A.1.186 of the Plan defines "Released Parties" as:

"Released Parties" means, collectively, the following Entities, each in their capacity as such: (a) the Debtors; (b) the UCC and each of its members (only in their capacity as such); (c) the Pension Committee and each of its members (only in their capacity as such); (d) the Bondholder Representatives; (e) the Foundation; (f) the Sisters of Mercy; and (g) with respect to any such Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, equity holders, affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, affiliates, partners, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors; *provided, however*, that Released Parties shall not include former officers and directors of the Debtors but shall include any of the Debtors' directors and officers that served in such role at any time between the Petition Date and the Effective Date; *provided further* that Released Parties shall not include MercyOne.

15.     The Debtors did not seek this Court's approval of the Plan Support Agreement

prior to entering into it or disclose the existence of the Plan Support Agreement to the Committee

or this Court until filing the Plan.

**C.     The Committee Challenge**

16.     On October 2, 2023, the Master Trustee filed a proof of claim (Claim No. 10132)

(the "Master Trustee Claim") in the amount of $59,526,655.69 for amounts allegedly owed by

Mercy Hospital with respect to the Bonds and related obligations.  The Master Trustee Claim

asserts that it is a fully secured claim.

17.     On November 7, 2023, the Court entered the *Second Interim Order Granting*

*Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral*

*and Granting Adequate Protection, and (II) Granting Related Relief* [Docket No. 475] (the

"Second Interim Cash Collateral Order").

18.     Pursuant to paragraph 12 of the Second Interim Cash Collateral Order, the

Committee (and other Interested Parties, as defined in the Second Interim Cash Collateral

Order), were granted standing and authority to commence a Challenge[4] in the form of an

adversary proceeding or contested matter to the Master Trustee's liens and claims and to assert

any claims or causes of action against the Maser Trustee and/or holders of the Bonds. *See*

Second Interim Cash Collateral Order at ¶ 12.  The Challenge Deadline (as defined in the Second

Interim Cash Collateral Order) was extended for the Committee by several stipulations between

the Committee and the Debtors, Master Trustee and Bondholder Representative. *See* Doc. Nos.

578, 649 and 751.

---

[4] A "Challenge" is defined in paragraph 12 of the Second Interim Cash Collateral Order to include any challenge to
the Debtors' Stipulations (as defined in the Second Interim Cash Collateral Order) and the assertion of "any claim or
cause of action against the Trustee and/or holders of the Bonds."

19.     On March 25, 2024, the Committee filed with this Court a complaint commencing an adversary proceeding in which the Committee asserted various Challenges to the Bondholder Representatives' security interests and claims. *See Official Committee of Unsecured Creditors of Mercy Hospital, Iowa City, Iowa, et al. v. Computershare Trust Company, N.A., as Master Trustee and Trustee, Preston Hollow Community Capital, Inc., as Bondholder Representative, Preston Hollow Capital, LLC, and PHCC LLC d/b/a Preston Hollow Community Capital*, Adv. Proc. No. 24-09009 (Bankr. N.D. Iowa 2024) [Doc. No. 1] (the "Committee Challenge").

20.     In the Committee Challenge, the Committee seeks, among other things, (i) a determination that, as of the Petition Date, the Master Trustee did not have a valid, perfected and/or enforceable security interest in, or lien against, various encumbered assets of the Debtors, (ii) a determination that the Bondholder Representative and its affiliate defendants (collectively, "Preston Hollow") breached a confidentiality agreement between Mercy Hospital and PHCC LLC d/b/a Preston Hollow Community Capital, causing damage to Mercy Hospital's reputation and business and significant and negative destruction of value that harmed all of the Debtors' stakeholders, (iii) equitable subordination of the Master Trustee Claim pursuant to section 510(c) of the Bankruptcy Code as a result of Preston Hollow's engaging in inequitable conduct, resulting in injury and damages to the Debtors and conferring an unfair advantage on Preston Hollow, (iv) to surcharge the Master Trustee's collateral (or proceeds thereof) for the reasonable, necessary costs and expenses of preserving and disposing of that collateral pursuant to section 506(c) of the Bankruptcy Code, (v) to limit the Master Trustee's liens on any proceeds of its prepetition collateral under the "equities of the case" exception in section 552(b)(1) of the Bankruptcy Code, (vi) setoff against the Master Trustee Claim on account of Preston Hollow's prepetition breach of the confidentiality agreement, and (vii) a determination that that the Master

Trustee Claim is not a fully secured claim under section 506(a) of the Bankruptcy Code because

the alleged amount of the Master Trustee Claim exceeds the value of the Master Trustee's

collateral.

## **OBJECTION**

## I.    **THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE THE PLAN IT DESCRIBES IS PATENTLY UNCONFIRMABLE**

21.    The Disclosure Statement should not be approved because it describes a Plan that

is patently unconfirmable on its face. A bankruptcy court may deny approval of a disclosure

statement where solicitation of the plan would be futile because the plan is patently

unconfirmable. *In re Am. Cap. Equip., LLC,* 688 F.3d 145, 154 (3d Cir. 2012); *see also In re*

*Quigley, Co., Inc.*, 377 B.R. 110, 115-16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently

unconfirmable on its face, the application to approve the disclosure statement must be denied, as

solicitation of the vote would be futile."); *In re Beyond.com Corp.,* 289 B.R. 138, 140 (Bankr.

N.D. Cal. 2003) (collecting cases); *In re Silberkraus,* 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000)

(same); *In re 266 Washington Assocs.,* 141 B.R. 275, 288 (Bankr. E.D.N.Y.), *aff'd* 147 B.R. 827

(E.D.N.Y. 1992) (same).

22.    Where a plan cannot be confirmed on its face, a bankruptcy court has "an

obligation not to subject the estate to the expense of soliciting votes and seeking confirmation."

*In re Dakota Rail, Inc.*, 104 B.R. 138, 143 (Bankr. D. Minn. 1989) (emphasis in original)."Not

only would allowing a nonconfirmable plan to accompany a disclosure statement, and be

summarized therein, constitute inadequate information, it would be misleading and it would be a

needless expense to the estate." *In re Pecht,* 57 B.R. 137, 139 (Bankr. E.D. Va. 1986).  In such

circumstances, it is "incumbent upon the [c]ourt to decline approval of the disclosure statement

and prevent diminution of the estate." *Id.*

23.    Here, it would be a waste of estate resources for the Court to approve the Disclosure Statement and permit solicitation of the Plan because the Plan is patently unconfirmable.

**A.    The Plan Improperly Treats the Master Trustee Claim as an Allowed Secured Claim in an Inflated Amount**

24.    Pursuant to the proposed Plan, the Master Trustee Claim (defined as the "Bondholder Claim") is improperly treated as an Allowed Secured Claim in the amount of $62 million, "inclusive of all prepetition and postpetition principal, interest, attorneys' fees (exclusive of amounts provided for under the Cash Collateral Orders) and other charges." Plan § 1.25.

25.    This proposed treatment of the Master Trustee Claim under the Plan is improper and without basis as the value of the Master Trustee's collateral is well below $62 million and the Master Trustee is not entitled to any post-petition interest, fees or expenses. *See* 11 U.S.C. 506(b); *United Savings Assoc. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 372-73 ("Since this provision permits postpetition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest.") (citation omitted); *In re Bradley*, 94 B.R. 563, 567 (Bankr. N.D. Iowa 1988) (same).

26.    Based on an analysis conducted by the Committee's financial advisors (FTI Consulting) and set forth in the table below, excluding the disputed collateral that is subject to the Committee Challenge, the Master Trustee's collateral is reasonably valued at approximately $55.5 million.[5]

---

[5] As set forth in the Committee Challenge, the Master Trustee does not have a prepetition security interest in, without limitation, the following assets of the Debtors and the proceeds thereof: (a) any and all assets of (i) Mercy Services, including, but not limited to, Mercy Service's 25% ownership interest in Progressive Rehabilitation Associates, LLC, 50% ownership interest in Melrose Retirement Community LLC, and 100% ownership interest in Captis Mercy Hospital, and (ii) Mercy Iowa City ACO, LLC; (b) any and all of Mercy Hospital's deposit or other accounts and funds deposited therein, including, without limitation, the accounts identified in Mercy Hospital's

**Collateral Analysis**

| $ in USD | Allocation | |
|---|---|---:|
| Unencumbered Value | | |
| Hospital Cash as of Petition Date | $ | 2,285,301 |
| Clinic Cash as of Petition Date | | 1,065,096 |
| Accounts Receivable - Clinic (as of Petition Date) | | 4,612,766 |
| Less: Cost to Collect A/R | | (461,277) |
| MOB | | 2,820,000 |
| Melrose Meadows | | 1,500,000 |
| Progressive Rehab Associates | | 250,000 |
| Other Assets | | 5,100,000 |
| | | 17,171,887 |
| | | |
| Collateral Value | | |
| Accounts Receivable - Hospital (as of Petition Date) | | 23,714,184 |
| Hospital Sale Proceeds | | 26,800,000 |
| ICASC | | 5,000,000 |
| Total Value | | 55,514,184 |

27.     As the Master Trustee Claim is undersecured, the Master Trustee is not entitled to payment of any post-petition interest, fees or expenses with respect to the Master Trustee Claim (which was filed in the amount of approximately $59.5 million; not $62 million).  Further, all adequate protection payments made by the Debtors to the Master Trustee under the Cash Collateral Orders for professional fees and expenses during the course of the Chapter 11 Cases should be recharacterized as payments of principal, reducing the amount of the Master Trustee Claim.

---

Schedules of Assets filed with the Court [Case No. 23-00623; Doc. No. 135]; (c) any and all of Mercy Hospital's investment accounts and any cash, securities or other investment property held  therein, including, without limitation, the investment account identified in Mercy Hospital's Schedule A/B: Assets – Real and Personal Property filed with the Court [Case No. 23-00623; Doc. No. 135]; (d) Mercy Hospital's 100% ownership interests in each of Mercy Hospital Foundation, Mercy Services, Captis Mercy Hospital,  Mercy Hospital Guild, and Mercy Outreach Iowa City, Inc., and Mercy Hospital's ownership interest in Mercy of Iowa City Regional PHO; (e) any and all of the Debtors' commercial tort claims; (f) any and all of the Debtors' claims and causes of action arising under chapter 5 of the Bankruptcy Code or under section 544 of the Bankruptcy Code and applicable state law governing avoidable or preferential transfers; or (g) any and all federal or state government grants, subsidies, entitlements, assistance and/or relief funds, including, without limitation, funds or tax credits awarded to, or received by the Debtors arising under or relating to (i) Federal Emergency Management Agency and other grants for COVID-19 business interruptions or (ii) the CARES Act, including all employee retention credits thereunder.

28.     The Plan is also internally inconsistent in its treatment of the Bondholder Claim as an Allowed Secured Claim in the amount of $62 million, while also providing the Master Trustee with a Bondholder Deficiency Claim on account of the unsecured portion of its claim. The Master Trustee Claim cannot be both fully secured and entitled to post-petition interest, fees and expenses and under-secured at the same time. It cannot have both an Allowed Secured Claim in the amount of $62 million and deficiency claim treated as a general unsecured claim.

29.     In addition, regardless of the extent to which it is secured, the amount of the Master Trustee Claim has not been determined or allowed by the Court, and there is therefore no basis for the Plan to treat it as an allowed claim, particularly in light of the Committee Challenge. As noted above, the Committee Challenge, among other things, objects to the scope, validity, perfection and/or enforceability of the Master Trustee's security interests, seeks to surcharge the Master Trustee's collateral (or the proceeds thereof) under section 506(c) of the Bankruptcy Code for the cost of preserving and disposing of that collateral by use of the Debtors' unencumbered assets, including funds provided by Mercy Hospital Foundation, asserts affirmative claims against Preston Hollow that may serve as a set off against the Master Trustee Claim, seeks equitable subordination of the Master Trustee Claim, and seeks to limit the Master Trustee's liens on any proceeds of its prepetition collateral under the "equities of the case" exception in section 552(b)(1) of the Bankruptcy Code.

30.     Of particular significance, but not addressed in the Plan at all, is the potential size of the Committee's surcharge claim against the Master Trustee's collateral (or the proceeds thereof) under section 506(c) of the Bankruptcy Code, which will further reduce the amount of the Master Trustee Claim that may be allowed. As set forth in the table below, the Committee believes the surcharge claim is worth over $3 million at a minimum, even without consideration

of all of the Debtors' additional professional fees incurred during the Chapter 11 Cases through the sale of substantially all of the Debtors' assets, a portion of which may also form the basis for a surcharge under section 506(c).

**Minimum Section 506(c) Surcharge**

| Asset Sale Success Fee/AR Collection Cost | | |
|---|---|---|
| H2C Success Fee - Hospital Sale | 100% | (600,000) |
| H2C Success Fee - ICASC Sale [2] | 100% | (100,000) |
| AR Collection Costs [3] | 100% | (2,371,418) |
| | | (3,071,418) |

[2] H2C success fee assumes 2% of ICASC purchase price.
[3] AR collection costs estimated to be 10% of AR.

31.    In sum, the Plan is patently unconfirmable in its current form because its treatment of the Master Trustee Claim an Allowed Secured Claim in the amount of $62 million is entirely improper and has no basis in fact or law.

**B.    The Plan was Not Proposed in Good Faith**

32.    Section 1129(a)(3) of the Bankruptcy Code provides that a plan may be confirmed only if "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). A finding of good faith is primarily a factual determination. *In re Peabody Energy Corp.*, 582 B.R. 771, 783 (E.D. Mo. 2017), aff'd, 933 F.3d 918 (8th Cir. 2019) (citing *In re Keeley & Grabanski Land P'ship*, 832 F.3d 853, 858–59 (8th Cir. 2016)).  "Good faith" is not defined in the Bankruptcy Code, but in general, "a plan is considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." *Peabody Energy Corp.*, 582 B.R. at 783 (citing *Hanson v. First Bank of S.D., N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987)). The standards of good faith include serving Bankruptcy Code objectives such as discouraging debtor misconduct and achieving

-14-

fundamental fairness and justice. *Peabody Energy Corp.*, 582 B.R. at 783  (citing *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013)).

33.     The proposed treatment of the Master Trustee Claim as an Allowed Secured Claim in the amount of $62 million demonstrates that the Plan is not proposed in good faith because the Plan would unfairly and unjustly eviscerate the Committee's challenge rights vis a vis the Master Trustee Claim under the Second Interim Cash Collateral Order. The Second Interim Cash Collateral Order conferred "standing on the Committee, but not on any other Interested Party to commence, prosecute and/or settle a Challenge."  Inexplicably, and despite the vesting of such standing in the Committee, the Debtors, through the Plan, are effectively attempting to settle claims against the Master Trustee and objections to the Master Trustee Claim that they waived and granted standing for the Committee to pursue.

34.     The Committee has not waived its challenge rights under the Second Interim Cash Collateral Order and, as noted above, has commenced the Committee Challenge asserting a challenge to the scope, validity, perfection and/or enforceability of the Master Trustee's security interests and a variety of other claims that are likely to substantially reduce the allowed amount of the Master Trustee Claim and determine the extent to which it is secured.

35.     The claims asserted by the Committee may reduce the Master Trustee's recovery in these cases –potentially by tens of millions of dollars– and serve as an offset against the amount of the Master Trustee Claim that may ultimately be allowed. The proposed Plan cannot be confirmed because it purports to strip the challenge rights exclusively granted to the Committee by the Second Interim Cash Collateral Order, and the Plan cannot meet the good faith requirement of section 1129(a)(3) as the Debtors are attempting to settle and release valuable claims that they have divested themselves of standing to pursue, prosecute and settle.

### C.     The Plan Contains Improper Debtor Releases

36.     The Plan also cannot be confirmed as proposed because there is no basis for the
proposed "Debtor Releases" in Article XIV.D.1. of the Plan in favor of the Released Parties,
including (a) the Bondholder Representatives, and (b) the Debtors' directors and officers who
served in such capacities post-petition. The Plan may not, through the Debtor Releases,
eviscerate the Committee's challenge rights under the Second Interim Cash Collateral Order vis-
à-vis the Master Trustee.  In addition, any and all claims against the Debtors' current and former
directors and officers, especially those based on prepetition acts or omissions, must be preserved
for the benefit of the Debtors' estates and creditors and available to be investigated and pursued
by the Liquidation Trustee if appropriate.

37.     A release by a debtor of estate claims against non-debtors should only be
approved after a fact specific review, weighing the equities of each case. *See In re Washington
Mut., Inc.*, 442 B.R. 314, 345-46 (Bankr. D. Del. 2011) (setting forth five factors that must be
weighed before a debtor may release estate claims) (citing *In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)). In conducting this analysis, courts generally consider
the following five factors:

i.     whether there is an identity of interest between the debtor and the third party,
usually an indemnity relationship, such that a suit against the non-debtor is, in
essence, a suit against the debtor or will deplete assets of the estate;

ii.     whether the non-debtor has contributed substantial assets to the reorganization;

iii.     whether the injunction is essential to the reorganization;

iv.     whether a substantial majority of the creditors agree the such injunction,
specifically, the impacted class, or classes, has "overwhelmingly" voted to accept
the proposed plan treatment; and

v.     whether the plan provides a mechanism for the payment of all, or substantially all,
of the claims of the class or classes affected by the injunction.

*In re Washington Mut.*, 442 B.R. at 346; *Master Mortg. Inv. Fund*, 168 B.R. at 934-35; *see also*

*In re Riverbend Leasing LLC*, 458 B.R. 520, 527 (Bankr. S.D. Iowa 2011) (citing same factors in

the context of non-debtor releases) and *Matter of Fansteel Foundry Corp.*, 2018 WL 5472928, at

*11-12 (Bankr. S.D. Iowa Oct. 26, 2018) (same).

38.     Here, there is no basis or justification for the Plan's proposed releases of the

Bondholder Representatives or the Debtors' directors and officers who served in such capacities

post-petition and the Disclosure Statement does not even attempt to offer any basis or

justification for them. Accordingly, the proposed Debtor Releases in favor of these parties cannot

be approved.

### D.     There is No Basis for Substantive Consolidation of the Debtors' Estates

39.     The Plan is also patently unconfirmable because it improperly provides for

substantive consolidation of the Debtors' estates for, among other things, voting and distribution

purposes under the Plan in the absence of any factual or legal basis for such consolidation.

40.     Substantive consolidation is an equitable remedy grounded in the broad powers of

section 105(a) of the Bankruptcy Code, which allows the court to "issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. *In*

*re Archdiocese of Saint Paul & Minneapolis*, 888 F.3d 944, 951 (8th Cir. 2018). It combines the

assets and liabilities of multiple debtors to satisfy creditors from a combined pool of assets. *Id.*

Because substantive consolidation unfairly disadvantages some creditors' recovery, there is

broad consensus that substantive consolidation is an "extraordinary remedy" that is to be invoked

"sparingly." *Id.* (quoting  *In re Owens Corning*, 419 F.3d 195, 199 and 209 (3d Cir. 2005).

Although various circuit courts of appeals differ as to the precise test to determine the

appropriateness of the substantive consolidation remedy, there is general agreement the

determination must be made on a "case-by-case basis" after a "searching review of the record" as

the bar for granting the remedy is set high. *Id.* (quoting *F.D.I.C. v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992).

41.     Factors that courts in the Eighth Circuit consider when deciding whether substantive consolidation is appropriate include: (1) the necessity of consolidation due to the interrelationship among the debtors; (2) whether the benefits of consolidation outweigh the harm to creditors; and (3) prejudice resulting from not consolidating the debtors. *In re Giller*, 962 F.2d 796, 799 (8th Cir. 1992); *In re Petters Co., Inc.*, 506 B.R. 784, 797 (Bankr. D. Minn. 2013).

42.     Here, there is simply no factual or legal basis for substantive consolidation of the Debtors' estates and the Disclosure Statement does not purport to provide any such basis. Substantive consolidation of the Debtors estates is particularly improper to the extent it would permit the Bondholder Claim or Pension Claims to receive any recovery from the assets of Mercy Services (or Mercy Iowa City ACO, LLC) because those claims are against Mercy Hospital only.  Substantive consolidation is an equitable remedy and is not something the Debtors can include in a plan of liquidation merely for administrative convenience or to gain the support of the Bondholder Representatives.

**E.      The Plan Discriminates Unfairly In Its Disparate Treatment of Pension Claims and General Unsecured Claims**

43.     The Committee does not support the Plan (as currently proposed) and will recommend that general unsecured creditors vote against the Plan if a consensus cannot be reached on a revised plan acceptable to the Committee. Section 1129(b)(1) of the Bankruptcy Code provides that a plan may be confirmed where the plan has not been accepted by all impaired classes of claims only if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class. 11 U.S.C. § 1129(b)(1).

-18-

44.    Courts in the Eighth Circuit utilize a four-part test when determining whether a plan discriminates unfairly:

a.    whether the discrimination has a reasonable basis;

b.    whether the debtor can carry out the plan without discrimination;

c.    whether the discrimination proposed is in good faith; and

d.    whether the degree of discrimination is directly related to the basis or rationale for the discrimination, *i.e.*, does the basis for discrimination demand that this degree of differential treatment be imposed.

*In re Union Fin. Servs. Grp.*, Inc., 303 B.R. 390, 421 (Bankr. E.D. Mo. 2003) (citing *In re Apex Oil*, 118 B.R. 683, 711 (Bankr. E.D. Mo. 1990) and *In re Internet Navigator Inc.,* 289 B.R. 128 (Bankr. N.D. Iowa 2003)).

45.    Application of these factors here demonstrates that the Plan discriminates unfairly in its disparate treatment of the Pension Claims and General Unsecured Claims by providing the Pension Claims with an additional $250,000 (the Pension Trust Administrative Cost Amount) of recoveries paid to the Pension Trust, purportedly for continued administration of the Pension Plan and/or prosecution and investigation of the Pension Causes of Action. This discrimination violates section 1129(b)(1) of the Bankruptcy Code by unfairly providing more favorable treatment to one class of unsecured claims versus another in circumstances where (a) such discrimination has no reasonable factual or legal basis, (b) there is no evidence to support a finding that the Plan cannot be effectuated without the discrimination, (c) the discrimination appears to have been designed solely to obtain acceptance of the Plan by purported holders of Pension Claims,[6] and (d) the degree of discrimination is not related to any legitimate basis or rationale.

---

[6] The Pension Plan did not file a proof of claim by the prepetition claims bar date of October 16, 2023.

## II.   THE DISCLOSURE STATEMENT SHOULD NOT BE APPROVED BECAUSE IT FAILS TO PROVIDE ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125(b) OF THE BANKRUPTCY CODE

46.     For the reasons set forth above, the Plan is patently unconfirmable. However, to the extent this Court is inclined to defer consideration of these issues to a plan confirmation hearing, the Disclosure Statement still should not be approved as filed and used to solicit votes because it lacks adequate information necessary for creditors to make an informed decision whether to accept or reject the Plan.

47.     Section 1125 of the Bankruptcy Code requires approval of a written disclosure statement before a party may solicit acceptances of a chapter 11 plan. *See* 11 U.S.C. § 1125(b). To approve a disclosure statement, a court must find that the disclosure statement contains "adequate information," which is defined as "information of a kind, and in sufficient detail, . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . ." 11 U.S.C. § 1125(a)(1).

48.     The primary purpose of a disclosure statement is "to give the creditors the information they need to decide whether to accept the plan." *In re Monnier Bros.,* 755 F.2d 1336, 1342 (8th Cir. 1985); *see also In re Puff,* No. 10-01877, 2011 WL 2604759, at *5 (Bankr. N.D. Iowa June 30, 2011) ("In analyzing disclosure statements, courts should not lose sight of the fact that . . . [t]he purpose of the disclosure statement is not to assure acceptance or rejection of a plan, but to provide enough information to interested persons so they may make an informed choice between two alternatives.") (internal citations omitted); *Century Glove, Inc. v. First Am. Bank of N.Y.,* 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.").

49.     Bankruptcy courts have broad discretion in determining whether a disclosure statement contains adequate information based on the unique facts and circumstances of each

case. *See Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414, 417 (3d Cir. 1988)

("From the legislative history of § 1125 we discern that adequate information will be determined

by the facts and circumstances of each case."); *Lisanti v. Lubetkin (In re Lisanti Foods, Inc.),*

329 B.R. 491, 507 (D.N.J. 2005), *aff'd,* 241 Fed. App'x. 1 (3d Cir. Aug. 2, 2007) ("Section 1125

affords the Court substantial discretion in considering the adequacy of a disclosure statement.").

50.     For the reasons that follow, the Disclosure Statement does not contain adequate

information necessary for claimants to make an informed decision whether to accept or reject the

Plan and therefore should not be approved.

**A.     The Disclosure Statement Fails to Explain the Basis for the Plan's Treatment
of the Master Trustee Claim**

51.     The Disclosure Statement fails to provide any explanation or basis for why the

Master Trustee Claim is treated as an Allowed Secured Claim under the Plan in the amount of

$62 million, exclusive of all amounts paid to the Master Trustee under the Cash Collateral

Orders during the Chapter 11 Cases.  The Disclosure Statement does not explain (a) how the $62

million amount was arrived at when the Master Trustee Claim was filed in the amount of

approximately $59.5 million, (b) that the Committee believes the Master Trustee Claim is under-

secured and not entitled to any post-petition interest, fees or expenses, (c) how or why the Plan

purports to allow the Master Trustee Claim in any amount when, at the time the Plan was filed, it

remained subject to challenge by the Committee under the terms of the Second Interim Cash

Collateral Order (and is now subject to the pending Committee Challenge), or (d) why the

Debtors excluded all amounts already paid to the Master Trustee as adequate protection under

the Cash Collateral Orders during the Chapter 11 Cases when determining the amount of the

Master Trustee Claim.

52. The Disclosure Statement also fails to describe the potential surcharge claims against the Master Trustee under section 506(c) of the Bankruptcy Code, which the Committee believes are worth millions of dollars to the Debtors' estates and creditors and is in the process of pursuing. The surcharge claims will reduce the amount of any distribution that the Master Trustee would otherwise be entitled to receive on account of its secured claim once the allowed amount of that secured claim is determined.

**B.      The Disclosure Statement Fails to Provide Any Explanation of Why the Plan Contains Releases by the Debtors of the Bondholder Representatives and the Debtors' Directors and Officers**

53. The Disclosure Statement does not explain on what basis the Plan includes releases by the Debtors of any potential claims and causes of action held by the Debtors' estates against the Bondholder Representatives, the potential value of those claims and causes of action, and what consideration, if any, the Bondholder Representatives are providing for the proposed releases. The Disclosure Statement further fails to explain that allowance of the Bondholder Claim and release of any estate claims against the Bondholder Representatives would eviscerate all of the claims asserted by the Committee in the Committee Challenge, with no recovery for the Debtors' estates and unsecured creditors. The Disclosure Statement is woefully inadequate in its failure to address this.

54. The Disclosure Statement likewise fails to explain why the Debtors propose to grant releases under the Plan to each of the Debtors' directors and officers that served in such role at any time between the Petition Date and the Effective Date, what potential claims the Debtors' estates may have against these individuals, the value of those claims, what consideration these individuals are providing in return for the releases, or why the releases are necessary. This is basic information without which the Disclosure Statement cannot be approved.

**C.    The Disclosure Statement Does Not Provide Any Basis for the Proposed Substantive Consolidation**

55.    The Disclosure Statement does not provide any basis or justification for why the Plan provides for substantive consolidation of the Debtors' estates, and the Disclosure Statement does not describe the implications of such substantive consolidation on recoveries for creditors with claims against Mercy Hospital versus claims against Mercy Services. The Disclosure Statement fails to provide any information regarding the legal standard for approval of substantive consolidation by the Court and how it is met in these Chapter 11 Cases. Thus, creditors are unable to determine whether substantive consolidation is appropriate or the effect it would have on their potential recoveries under the Plan.

**D.    The Disclosure Statement Fails to Provide Any Explanation for the Plan's Disparate Treatment of Pension Claims and General Unsecured Claims**

The Disclosure Statement likewise fails to explain why the Plan discriminates in its treatment of Pension Claims and General Unsecured Claims by providing the Pension Claims with an additional $250,000 (the Pension Trust Administrative Cost Amount) of recoveries paid to the Pension Trust, purportedly for continued administration of the Pension Plan and/or prosecution and investigation of the Pension Causes of Action. The Disclosure Statement does not provide any factual or legal basis for this disparate treatment of two classes of general unsecured claims that are equal in priority of distribution under the Bankruptcy Code. The Disclosure Statement further fails to explain why the Plan cannot be effectuated without this discrimination.

**E.    The Disclosure Statement Does Not Provide Sufficient Information Concerning the Plan Support Agreement**

56.     The Disclosure Statement does not provide sufficient details regarding the terms of the Plan Support Agreement, its negotiation, and whether it can be terminated by the Debtors or the Bondholder Plan Support Parties, and on what grounds. The Disclosure Statement further fails to explain whether the Debtors believe they had authority to enter into the Plan Support Agreement without approval of this Court or whether the Debtors intend to seek this Court's approval of the Plan Support Agreement. Creditors are entitled to understand the nature of the agreement the Debtors reached with the Bondholder Plan Support Parties before voting on the Plan.

## **RESERVATION OF RIGHTS**

57.     The Committee expressly reserves and preserves all rights, claims, arguments and objections with respect to the Motion, to supplement, modify or amend this Objection, and to raise additional objections in writing or orally at any hearing with respect to the Motion.

**WHEREFORE**, for the foregoing reasons, the Committee respectfully requests that the Court (a) deny the Motion and (b) grant the Committee such other and further relief as this Court deems just and proper.

Dated:  March 25, 2024                    Respectfully submitted,

*/s/ Andrew H. Sherman*
Andrew H. Sherman, NJS Bar No. 042731991
(admitted *pro hac vice*)
Boris I. Mankovetskiy, NJS Bar No. 012862001
(admitted *pro hac vice*)
SILLS CUMMIS & GROSS, P.C.
One Riverfront Plaza
Newark, New Jersey 07102
Telephone:  973-643-7000
Facsimile:  973-643-6500
E-mail:  asherman@sillscummis.com
          bmankovetskiy@sillscummis.com

-and-

*/s/ Robert C. Gainer*
Robert C. Gainer IS9998471
CUTLER LAW FIRM, P.C.
1307 50th Street
West Des Moines, Iowa 50266
Telephone:     515-223-6600
Facsimile:     515-223-6787
E-mail:  rgainer@cutlerfirm.com

*Attorneys for the Official Committee*
*of Unsecured Creditors*

## Certificate of Service

The undersigned certifies, under penalty of perjury, that on this March 25, 2024, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case, caused to mail by United States mail, postage prepaid, to the following:

Counsel for Debtors:

Roy Leaf
Nyemaster Goode, P.C.
625 First Street SE, Suite 400
Cedar Rapids, IA 52401-2030

Felicia Gerber Perlman & Daniel M. Simon
McDermott Will & Emery, LLP
444 West Lake Street, Suite 4000
Chicago, Illinois 60606

Jack G. Haake
McDermott Will & Emery, LLP
2501 North Harwood Street, Suite 1900
Dallas, TX 75201

United States Trustee:

Office of the United States Trustee
111 Seventh Avenue SE, Suite 280
Cedar Rapids, IA 52401

/s/ *Robert C. Gainer*