**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, | ) | Case No. 23-00623 (TJC) |
| IOWA, *et al.* | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**OBJECTION OF MERCYONE**
**TO CONFIRMATION OF THE DEBTORS' COMBINED**
**DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF LIQUIDATION**

Mercy Health Network, Inc., d/b/a "MercyOne" ("<u>MercyOne</u>"), by its undersigned counsel, respectfully submits this objection (the "<u>Objection</u>") the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 929] (the "<u>Plan</u>").

**<u>PRELIMINARY STATEMENT</u>**

1.     The Plan is unconfirmable because it grants releases to 25 classes of parties who are contributing no consideration to the implementation of the Plan or the Debtors' estates. These classes include, among others, current and former employees, agents, representatives, advisors, consultants, and professionals for the six entities that are being released.[1] It is impossible to know specifically who is even included in this overbroad group; the category of "employees" alone likely numbers in the hundreds, if not thousands, of unidentified parties. Debtors offer no justification for the release of the Remote Non-Debtor Parties, and the Plan's only statement is that "on information and belief," it believes Bondholder Representatives would not contribute

---

[1] MercyOne will refer to this cluster of released groups and entities as the "Remote Non-Debtor Parties" to distinguish them from the Debtors, the UCC and its members, the Pension Committee and its members, the Bondholder Representatives, the Foundation and the Sisters of Mercy, for which it does not object to the Plan's releases, injunctions and exculpations (collectively "<u>Releases</u>").

consideration unless this cavalcade is also released. This is self-evidently ridiculous. While Debtors acknowledge authority that requires a plan proponent to establish that there are "rare" or "unusual" circumstances necessitating such relief, including a 30-year-old case, *In re Master Mortg. Inv. Fund, Inc*., 168 B.R. 930 (Bankr. W.D. Mo. 1994), they make no attempt to satisfy its five-part test. They plainly cannot do so, and courts in this Circuit and throughout the country have denied plan confirmation because of such releases, finding they fail both Section 1129(a)(1)'s[2] requirement that a plan comply with the Bankruptcy Code. Debtors' Plan is even more problematic because it does not require actual consent to the Releases, but instead infers consent from the failure to timely return a ballot with a properly checked "opt out" box. While authority is split, more recent and better-reasoned authority notes that this violates due process and fails to comport with both contract principles and class action standards upon which valid releases are based. For these reasons, this Court should deny confirmation of the Plan.

## BACKGROUND

A.   **The Plan Releases the Remote Non-Debtor Parties**

2.   Under Article II(A)(1.189) of the Plan, "Released Parties" include, not merely (a) the Debtors; (b) the UCC and each of its members (only in their capacity as such); (c) the Pension Committee and each of its members (only in their capacity as such); (d) the Bondholder Representatives; (e) the Foundation; and (f) the Sisters of Mercy themselves, but also includes, by operation of Subsection (g), 25 other categories of parties for each of these six entities (amounting to 150 categories of additionally released parties). These are:

> such Entity's current and former directors, managers, officers, equity holders, affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, affiliates, partners, principals, members, management companies, employees, agents,

---

[2] Citations to 11 U.S.C §1129 will use the word "Section" instead of "11 U.S.C. §".

> financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors.

(Plan, pp.28-29). As these entities have many "employees," many thousands of additional persons and entities are likely being released.

     3.     Accepting the Plan requires accepting these Releases and forfeiting any potential claim or cause of action. Article II(A)(1.190) of the Plan defines the "Releasing Parties" to include not just those who accept the Plan, but those who reject the plan either affirmatively, by being "Deemed Rejecting" due to full impairment, or by failing to vote, while also failing to affirmatively opt-out of the Releases. In subsection "a" it extends the Release to "each Holder of a Claim that (i) votes to accept the Plan or (ii) either (1) abstains from voting or (2) votes to reject the Plan and, in the case of either (1) or (2), does not opt out of the voluntary release by checking the opt-out box on the applicable Ballot, and returning it in accordance with the instructions set forth thereon, indicating that they are electing to opt out of granting the releases provided in the Plan." In subsection "b" the Plan also extends the Releases to "each Holder of a Claim that is deemed to accept the Plan or is otherwise Unimpaired under the Plan and who does not opt out of the voluntary release by checking the opt out box on the applicable non-voting status notice form, and returning it in accordance with the instructions set forth thereon, indicating that they are not willing to grant the releases provided in the Plan." And in Subsection "c", it extends the Releases to "each Holder of a Claim that is deemed to reject the Plan or is otherwise Impaired under the Plan and who does not opt out of the voluntary release by checking the opt-out box on the applicable non-voting status notice form, and returning it in accordance with the instructions set forth thereon, indicating that they are not willing to grant the releases provided in the Plan." (Plan, p.29).

4.      In other words, those who do not vote or who do not both affirmatively and properly opt out of the Third Party Release, release their claims, including against the Remote Non-Debtor Parties.

5.      Article 3(B)(10) of the Plan includes a specific release for the Foundation, pursuant to its settlement with the Debtors, the UCC, and the Bondholder Representatives (Plan, p.59). This Release expressly extends not just to the Foundation itself, but also to "each of its past and present members of the Foundation board, as well as the Foundation's officers, agents, and attorneys." That Subsection refers to monetary consideration that the *Foundation* itself contributed to the reorganization but identifies no consideration that any of its officers, agents, or attorneys provided. Irrespective, by operation of Article 3(D), as detailed below, the Plan's Releases extend even beyond officers, agents or attorneys associated with the Foundation, but to every one of its employees, professionals, advisors, and others who are within the definition of "Released Parties." (Plan, pp.28-29).

6.      The Plan also proposes an injunction against bringing Claims[3] and Causes of Action from which the Plan's "Released Parties" were released or the "Exculpated Parties" were exculpated. (Plan,  Art.3(D)).

7.      The "Third Party Release" being granted to each of the Remote Non-Debtor Parties is indisputably broad. It includes anything about the Debtors, their operations, business dealings with the debtors, courses of dealing with the Debtors, and implementation of any contracts or releases relating to same (so a release regarding releases), among other things. (Plan, Art. XIV(D)(2)). Specifically, it releases, waives, and discharges these parties:

---

[3] "Claim" is defined in Article II(A)(1.43) as means a claim against the Debtors, whether or not asserted, as such term is defined in Bankruptcy Code section 101(5). (p.17).

> **from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, liability, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, for any act or omission in connection with, relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' operations, the Chapter 11 Cases, the Sale, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party…**

(*Id.*) (emphasis original).

8. Debtors note in the Plan that MercyOne objected to the Releases in response to their Disclosure Statement as being improper and they anticipated that MercyOne would similarly object to confirmation for this reason. (Plan, Art. III(D), p.67). Debtors, however, did not withdraw or modify the Releases in any way in response to MercyOne's earlier objection. Thus, all defects remain intact.

9. In Art.VII(A)(8) of the Plan, Debtors acknowledged the possibility that the Releases might fail and that this might cause the Plan to not be confirmed, stating:

> There can be no assurance that the releases, exculpation, and injunction provisions, as provided in Article XIV.D, Article XIV.E, and Article XIV.F hereof, will be granted. Failure of the Court to grant such relief may result in a plan of liquidation that differs from the Plan or the Plan not being confirmed.

(Plan, Art. VII(A)(8). Nonetheless, Debtors careened ahead anyway, refusing to modify the Releases in any way, even as to the Remote Non-Debtor Parties.

10. As of today, Debtors have not filed any brief in support of confirmation in general or the Releases in particular. Still, they have not provided any evidence in support of the Releases or any witnesses on which they will rely to provide such evidence.

5

## ARGUMENT

11.     The Releases together release, exculpate, and enjoin claims against 25 categories of parties, encompassing likely thousands of individuals and entities, and amount to what appears to be the broadest and most sweeping release of claims in any modern plan. This approach fails the five-part test articulated in *Master Mortgage*, which Debtors admit Courts in the Eighth Circuit rely on to evaluate such provisions. (Plan, Art. III(D)(2)). At least four of those tests fail here (and possibly all).  As to the first three factors, Debtors (a) cannot show how the Remote Non-Debtor Parties, individually or in aggregate share an identity with the Debtor; (b) cannot identify any consideration that any party which belongs to any of these 25 categories of Remote Non-Debtor Parties is providing to the Debtors' estate or anything else even one of these Remote Non-Debtor Parties is doing to further the purposes of the Plan; (c) cannot provide any legitimate reason why such broad and free-ranging Releases are necessary for the consummation of the Plan. In place of facts and evidence, Debtors posit "on information and belief" that the Bondholder Representatives would insist on a release of hundreds if not thousands of other parties or they will walk away from the Plan. (Plan, Art. III(D)(2)). Such allegations do not constitute "evidence" sufficient to satisfy *Master Mortgage*'s factors. *See, e.g., Evans v. Contract Callers, Inc.,* 2012 WL 234653, at *3n.2 (E.D. Mo. Jan 25, 2012)(statements in affidavits "on information and belief" "do not constitute admissible evidence")[4]; *ZO Skin Health, Inc. v. HBA & MFL, Inc.*, 2022 WL 20679647, at *8n.1 (D. Neb. Aug. 8, 2022)(statement made "on information and belief" could not rebut evidence). Moreover, since the Bondholder Representatives themselves are being released and exculpated-- both very valuable forms of relief for them—the unsupported assertion almost certainly defies belief.  As to the fourth *Master Mortgage* factor, Debtors cannot show the Releases only apply to

---

[4] Here, of course, this assertion is not even made by a witness but merely asserted in Debtors' Plan.

those who consent to the Plan. To the contrary, the Releases apply to those who fail to timely return a properly checked "Opt-Out" square on their ballot. If they do not, even if they voted to reject the plan or do not vote at all or even if they did not read the ballot because they did not understand the Plan had Releases or that these would extend far beyond the Debtors, they would release claims against a multitude of parties connected at most remotely to the Debtors, if at all. As to the fifth *Master Mortgage* factor, MercyOne, Debtors have yet to supply proof that the Plan would pay MercyOne's claim. Certainly, Debtors cannot be said to have satisfied this. *See In Re Wool Growers Cent. Storage Co.,* 371 B.R. 768, 778 (N.D. Tex. 2007) (applying *Master Mortgage* factors and finding failure to satisfy Factor 5 alone precluded confirmation, even where the other four were satisfied).

12.      Here, the Releases also fail because they are vague, ambiguous, and speculative in scope. Certain of the 25 categories of Remote Non-Debtor Parties being released are abstract and open-ended, making it difficult to discern who would actually be released.   Creditors like MercyOne are simply left to guess who might be an "agent," "representative," "consultant," "advisor" or "professional" of any kind for each of the Debtors, UCC, Bondholders, Pension Committee, or Foundation, for example.  Plaintiffs define none of these terms and make no attempt to limit their natural reach. An "agent," for example, could be a real estate broker, who would have no connection whatsoever with this case. *See, e.g., In re Colony Beach & Tennis Club*, 508 B.R. 468, 486 (M.D. Fla. 2014) (ambiguous terms rendered plan unconfirmable especially in light of broad non-debtor releases); *In re Patriot Place, Ltd.*, 486 B.R. 773, 821-22 (W.D. Tex. 2013) (non-debtor releases and exculpations in plan were improper and contained vague, overbroad and undefined terms). Likewise, even if it were clear as to what Debtors mean by an "investment

vehicle" of the Pension Committee or any other Released Party—and it is not—Debtors cannot explain why such a "vehicle" would merit a full release.

13.     That the universe of parties possibly eligible for a release is staggeringly overbroad is further demonstrated by the fact that the only parties identified who are expressly ineligible for a release are Debtors' pre-petition officers and directors and MercyOne itself. (Plan, Art.II(A), §1.189).

14.     Importantly, however, nowhere in the Plan or in any filing of which MercyOne is aware do Debtors identify any consideration that any Remote Non-Debtor Party is providing for the Debtors' estate or its creditors or to achieve the purposes of the Plan. Nor are these releases dependent on or tied to anything the released Remote Non-Debtor Party has done or will do in connection with the Plan or even Debtors' bankruptcy. They are simply given blanket, third-party releases en masse. The Releases cause the Plan to fail the requirements of Section 1129(a)(1) and therefore render the plan unconfirmable.

15.     Finally, because the Releases apply to anyone who does not affirmatively opt-out, they pose the risk of negating hundreds of claims that unwitting claimants might otherwise have against a Non-Debtor Released Party, even if that claimant voted to reject the Plan or neglected to return its ballot. This violates due process, and principles of contract and class action law which courts consider in these circumstances.

16.     Substantial   precedent   makes   clear   that   these   Releases   render   the   Plan unconfirmable.

**B.      The Plan's Overbroad and Indefensible Releases of the Remote Non-Debtor Parties Cause it to Fail Section 1129(a)(1)'s Requirements**

17.     Section 1129 governs confirmation of Chapter 11 plans and a court may not confirm a plan unless each of its requirements is met. *See, e.g., In re Reuter*, 427 B.R. 727, 769 (Bankr.

W.D. Mo. 2010); *In re Gilbertson Restaurants, LLC*, 2005 WL 783063, *4 (Bankr. N.D. Iowa

2005). As proponents of the plan, Debtors have the burden of showing the confirmability of the

plan by a preponderance of the evidence. *See, e.g., In re Civic Partners Sioux City, LLC*, 2013 WL

5534743, *15 (N.D. Iowa Oct. 7, 2013)(Collins, J.); *Gilbertson Restaurants*, 2005 WL 783063,

*4; *In re Internet Navigator, Inc.*, 289 B.R. 128, 131 (N.D. Iowa 2003); *In re Hoffinger Industries,

Inc.*, 321 B.R. 498 (E.D. Ark. 2005)(plan proponent bears burden of proving by preponderance of

evidence, that plan satisfies statutory confirmation requirements). The random, unjustifiable

release of a multitude of claims against the thousands of individuals and entities who comprise the

Non-Debtor Released Parties here means Debtors cannot satisfy their burden.

18.    Pursuant to Section 1129(a)(1), court may only confirm a plan if it "complies with

the applicable provisions of this title." *Riverbend Leasing*, 458 B.R. at 525-56 (quoting 11 U.S.C.

§1129(a)(1)). Here, however, the Releases in the Plan, standing alone, make the Plan

unconfirmable.

19.    There has long been a circuit split as to whether non-consensual releases of third

parties through a plan are permitted at all. Indeed, three Circuits—the Fifth, Ninth, and Tenth—

prohibit them outright. *See American Hardwoods, Inc. v. Deutsche Credit Corp.*, 885 F.2d 621; *In

re Western Real Estate*, 922 F.2d 592, 601 (10th Cir. 1990); *In re Pacific Lumber Co.*, 584 F.3d

229 (5th Cir. 2009)(non-debtor releases in Chapter 11 plan which released current owners of

reorganized debtors from liability had to be stricken where fresh start provided to debtors was not

intended to absolve the released parties from any negligent conduct that occurred during the course

of the bankruptcy); *Feld v. Zale Corp (In re Zale Corp.)*, 62 F.3d 746, 751 (5th Cir.

1995)("Accordingly, because the permanent injunction as entered improperly discharged a

potential debt of CIGNA, a nondebtor, the bankruptcy court exceeded its powers under §105.").

20.     The Eighth Circuit has yet to expressly rule on this issue.

21.     Even courts that permit such releases note that they pose some "knotty problems." *In re Specialty Equip. Co*., 3 F.3d 1043, 1047 (7ᵗʰ Cir. 1993).[5] *See also In re Metromedia Fiber Network, Inc*., 416 F.3d 136 (2d Cir. 2005)("[A] non-debtor release is a device that lends itself to abuse. By it, a non-debtor can shield itself from liability to third parties. In form, it is a release; in effect it may operate as a bankruptcy discharge without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity."); *Fansteel*, 2018 WL 5472928, at *10 (holding that third-party releases must be carefully reviewed "to ensure that the purpose does not lead to an abuse of the bankruptcy process or extend protections that would otherwise not be afforded."); *In re Armstrong Energy Inc.*, 613 B.R. 529, 535 (B.A.P. 8ᵗʰ Cir. 2020) (noting that "the bankruptcy court correctly recognized that court should treat third-party releases with caution.").

22.     As noted above, Debtors admit that, in the absence of Eighth Circuit authority, courts in this Circuit have adopted the standards set forth in *Master Mortgage* to assess whether a Plan provision releasing third parties is enforceable or precludes confirmation. The *Master Mortgage* Court stressed how rare the circumstance would be when such a release was justifiable:

> The Court cautions the Gentle Reader that a permanent injunction is a rare thing, indeed, and only upon a showing of exceptional circumstances in which the factors outlined above are present will this Court even entertain the possibility of a permanent injunction.

*Id*. at 937.

---

[5] In *Specialty Equipment*, the Court did not elaborate on these knotty problems because parties had consented to the release provisions. As detailed below, here, by contrast, the Releases apply even where parties do not affirmatively consent, including where they fail to return a ballot with an "opt out" box checked within the time for voting on the Plan. The Plan does not treat a vote against the Plan itself by a party as sufficient to preclude the Releases.

23.     There, the Court identified five key factors to be considered in making this

assessment. These are:

> (1) There is an identity of interest between the debtor and the third
> party, usually an indemnity relationship, such that a suit against the
> non-debtor is, in essence, a suit against the debtor or will deplete
> assets of the estate.
>
> (2) The non-debtor has contributed substantial assets to the
> reorganization.
>
> (3) The injunction is essential to reorganization. Without it (sic),
> there is little likelihood of success.
>
> (4) A substantial majority of the creditors agree to such injunction,
> specifically, the impacted class or classes has "overwhelmingly"
> voted to accept the proposed plan treatment.
>
> (5) The plan provides a mechanism for the payment of all, or
> substantially all, of the claims of the class or classes affected by the
> injunction.[6]

*Id.* at 935. *See also In re Riverbend Leasing LLC*, 458 B.R. 520, 527 (Bankr. S.D. Iowa 2011)

(citing same factors in the context of third-party releases);[7] *Matter of Fansteel Foundry Corp.*,

No. 16-01825-als11, 2018 WL 5472928, at *10-11 (Bankr. S.D. Iowa Oct. 26, 2018) (same).[8]

24.     To list these factors is to see that they fail here.

25.     In *Master Mortgage*, the Court found that the factors supported a release. It found

an identity of interest between the debtor and the released parties because a settlement between the

debtor and Skopbank (a released party) created a right of indemnity against the parties. Thus, an

---

[6] The Court noted that these factors were not exclusive or conjunctive.

[7] Debtors, in their Revised Disclosure Statement, state that when these five factors are met releases in the Eighth Circuit are approved. (p.65). Notably, *Riverbend Leasing*, which they cite (*id.*) denied confirmation because debtors there failed to demonstrate the requisite unusual circumstances. 458 B.R. at 527-29.

[8] Courts outside the Eighth Circuit also have adopted standards for judging non-debtor releases derived from *Master Mortgage*. *See In re Long Ridge Road Operating Co. II, LLC*, 2014 WL 886433, at *14 (Bankr. D.N.J. Mar. 5, 2014)(Third Circuit factors are derived from *Master Mortgage*); *In re Salem Suede, Inc.*, 219 B.R. 922, 930-31 (D. Mass. 1998)(noting these are the criteria "typically employed by courts taking a permissive view on the issuance of permanent injunctions and third party releases in Chapter 11 cases.").

action against it would result in a right of contribution against Master Mortgage. *Id.* The non-debtor affiliates there likewise had a right of contribution against Master Mortgage because of pre-petition contracts, further demonstrating satisfaction of the identity criterion. *Id.*

26.     The *Master Mortgage* Court also found that Skopbank contributed substantial assets to the reorganization. Through the settlement of its claims, it assigned participation interest and released collateral interest in notes and mortgages, which enabled a distribution to be made to plan classes where this otherwise was not feasible. *Id*. at 938.

27.     That Court further found that the release was "necessary," finding that "[t]here is little debate among the creditors that without the Skopbank settlement, Master Mortgage could not have reorganized," emphasizing it was the single largest creditor and that the assets it contributed formed the foundation of the plan. *Id*. The Court also found that the non-debtor affiliates released over $3 million of claims against Skopbank, without which it would not have been willing to settle.

28.     The *Master Mortgage* Court found factor four satisfied because creditors overwhelmingly voted for the plan. *Id*.

29.     Finally, the *Master Mortgage* Court found factor five satisfied because at least three classes were to ultimately receive payment of their claims, and because even impaired classes, were only impaired by the releases, yet voted for the plan. *Id*.

30.     Other courts in this Circuit have emphasized the presence of similar factors in upholding a non-debtor release. Thus, in *Fansteel*, 2018 WL 5472928, at **11-12, the Court emphasized that the plan tailored the release to debtor's rights in a specific asset that could only be described as a contingent claim for breach of contract and did not extend to other causes of action and was restricted in its applications to claims involving fraud, willful misconduct or gross negligence. The Court held that the released party, TCTM was providing "the only funding

available to propose a viable plan," thereby realizing recovery for creditors who otherwise would receive no distribution and that without the release the plan could not move forward. *Id.*

31.     Again, in *In re U.S. Fidelis, Inc*., 481 B.R. 503 (Bankr. E.D. Mo. 2012), the third-party release enabled a substantial distribution to consumers that would evaporate without this and result in years of litigation which would be costly to the estate and no consumer creditor who would actually be restrained by the release objected to it.

32.     By contrast here, Debtors have submitted <u>no proof</u> to support that the Releases fall within the "rare exception" recognized by *Master Mortgage* or that they meet any of its criteria. Nor have they identified any proof they might present at the Confirmation Hearing to remedy this. As noted above, their conclusory assertions and speculations "on information and belief" carry no weight. This alone causes these releases to fail. Moreover, as a matter of law, the Releases fail at least four *Master Mortgage* factors.

## C.     Debtors' Conclusory Assertions Cannot Support The Releases

33.     Debtors merely list out the Master Mortgage factors and then never bother addressing why each is satisfied. Instead, they repeatedly note their "belief" that the Releases are necessary. *See, e.g,* Plan, Art.3(D)(2), pp.66-67 ("Debtors believe that the Debtors' Release and Third Party Release are essential to Debtor's restructuring efforts, in part because they are critical to maintaining Bondholder Representatives' support for the Plan" only to then acknowledge that their fear that Bondholder Representatives would not otherwise support the plan is solely based "on information and belief") & ("the Debtors believe that the releases and exculpation provisions contained in Article XIV.D and Article XIV.E, including the Debtor Release and the Third-Party Release, are narrowly tailored and appropriate given the facts and circumstances of the Chapter 11 Cases and that Holders of Claims in Voting Classes should vote to accept the Plan."). Debtors then

punt setting forth any actual facts to support their beliefs until pleadings they say they will file in support of confirmation. (*Id.*). To date, no such pleadings have been filed.

34.     Thus, in *In re Dow Corning*, 280 F.3d 648 (6th Cir. 2002), the Sixth Circuit reversed a Bankruptcy Court's finding upholding third party releases where the record lacked supporting proof. As the Court explained:

> The bankruptcy court's findings of fact with regards to the 'unusual circumstances' test were no more than conclusory statements that restated elements of the test in the form of factual conclusions. The bankruptcy court provided no explanation or discussion of the evidence underlying these findings. Moreover, the findings did not discuss the facts as they related specifically to the various released parties, but merely made sweeping statements as to all released parties collectively. Such factual determinations are not sufficiently specific and explained to support a finding of "unusual circumstances."

*Id.* at 658.

**D.      There is No Identity of Interest Between Debtors and the Vast Number of Released Parties**

35.     Debtors do not identify any facts related to any of these parties that show that their interests are identical to Debtors.

36.     Indeed, Debtors do not even identify the vast majority of "released parties." One can only speculate who can take shelter under the broad, open-ended categories of released parties under the guise of being, *inter alia*, "agents," "representatives," "advisors," "consultants," "professionals" and the like of the Debtors, UCC, Bondholders' Representatives, Pension Committee, and Foundation.

37.     Under similar circumstances, other Bankruptcy Courts in this Circuit have denied confirmation. Thus, in *Riverbend Leasing*, the bankruptcy court rejected the debtor's assertion that unusual circumstances supported an injunction precluding claims against guarantors and other insiders. While the debtor argued that there was an identity of interests between itself and these

non-debtors and presented witness testimony claimed to support this, the court found instead that the witness recited "generalizations" which "d[id] not rise to the level necessary to justify the injunctive relief requested in the plan. The bankruptcy court added that "[t]he record does not support a finding that the involvement of the Insiders is so substantial that continued collection efforts against them would adversely affect the Debtor's organization." 458 B.R. at 527.[9]

38.     So, in *In re Congoleum*, 362 B.R. 167, 192 (Bankr. D.N.J. 2007), the bankruptcy court held that release which extended to debtors' "representatives," including professionals, employees and officers, directors "lacked the 'hallmarks of permissible nonconsensual releases— fairness, necessity to the reorganization and specific factual findings to support these conclusions"; also noting that releases must be "given in exchange for fair consideration")(quoting *Continental Airlines*, 203 F.3d at 214-15).[10] The Court noted that these representatives had not contributed any assets to the reorganization and that "in fact the opposite is true: The Debtors' professionals have been amply compensated for their work in this case" and officers and directors "have been paid millions of dollars post-petition" to manage and continue Congoleum as a profitable company. *Id.* at 193. The Court also noted that it was "simply bad public policy to allow Chapter 11 to be used to insulate corporate directors or their professionals from the consequences of their actions." *Id.* at 195.

### E.     The Plan Would Release Vast Numbers Of Parties Who Are Contributing Nothing

39.     As an additional basis for rejecting a plan injunction against the pursuit of claims against third-party insiders and guarantors, the bankruptcy court in *Riverbend Leasing* held that

---

[9] Debtor attempted to justify the injunctions in *Riverbend Leasing* under 11 U.S.C. §105. The bankruptcy court's ruling there shows that Section 105 cannot justify releases that do not meet the *Master Mortgage* criteria. Likewise, Courts have rejected that Section 524(e) can support releases that do not meet similar criteria. *See, e.g., In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000).

[10] Here, the Plan would release all of debtor's representatives (and those of 5 other parties) as well as all employees and its post-petition officers and directors).

the injunction failed Section 1129(a)(1)'s requirements because "[t]he Plan does not provide that the Guarantors are personally committing financial resources to the reorganization efforts of Riverbend." 458 B.R. at 528. Here, too, the Remote Non-Debtors are contributing nothing to the reorganization efforts of Mercy Hospital. In fact, it is even worse than that. Because it is unclear who exactly falls within this large and amorphous group, it is impossible to even meet that assessment as to every released party, as is necessary. *See In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010) (striking down release in Chapter 11 plan that included debtors' officers, directors, employees, and professional, creditors committee and its professionals, secured creditors and their advisors and debtors and their affiliates where their efforts to negotiate plan did not rise to level of critical financial contribution required to make releases necessary to reorganization).

40.    Moreover, it is not even enough to merely contribute assets, the contribution must not be one the released party was obligated to make anyway. *See, e.g, In re Mahoney Hawkes, LLP*, 289 B.R. 285, 300 (D. Mass. 2002)(factor was not satisfied where released party, in contributing assets, was "only fulfilling its contractual obligation to debtor"); *In re Charles Street African Methodist Episcopal Church of Boston,* 499 B.R. 66, 99-103 (Bankr. D. Mass. 2013) (denying confirmation under *Master Mortgage* factors where third party's contribution was not to be used to pay down debt to secured creditor but for construction project which was not essential to reorganization.

F.    **The Third-Party Releases Are Not Essential To Reorganization**[11]

41.    Again, the Plan emphasizes that the Bondholders' Representatives warrant a release because they are making a substantial contribution to reorganization. (Plan, Art.III(D)). MercyOne does not dispute that. However, Debtors go on to say that the remaining laundry list of Remote

---

[11] At the time of writing this Objection, the vote tallies are unknown. Therefore, one cannot assess Factor 4.

Non-Debtor Parties in Article II(A)(1.189) must also be released because—"on information and
belief"—unless this happens, the Bondholder Representatives would not agree to provide their
promised consideration. Yet there seems absolutely no basis for such a "belief," and Debtors
identify none. The notion that the Bondholders' Representatives would abandon their support for
the Plan support unless the Pension Committee's notary (a professional) or the Foundation's
receptionist (an employee) are released, for example, seems unlikely. And even if it were somehow
true, would seem beyond the scope of what a stakeholder could rightfully request in exchange for
its support for a plan.

42.     Courts have long denied plan confirmation where third-party releases were not
essential to confirmation. In *Dow Corning*, the Sixth Circuit noted the need for particularized
findings, concluding that the plan proponents failed to present this:

> [T]he bankruptcy court did not make sufficiently particularized
> factual findings that the Settling Insurers, Corning, Incorporated, the
> Dow Chemical Company and Dow's affiliates will make significant
> contributions to the reorganization pursuant to the Plan. The
> bankruptcy court declared the contributions important without
> explaining how or why it reached this conclusion.

*Dow Corning*, 280 F.3d at 659. *See also, e.g., In re Continental Airlines*, 203 F.3d 203 (3d Cir.
2000) (reorganization plan which released and enjoined lawsuits against debtor's non-debtor
officers and directors violated the Bankruptcy Code by relieving non-debtor parties of liabilities*);
In re TCI 2 Holdings, LLC*, 428 B.R. 117 (D.N.J. 2010) (Non-debtor release in Chapter 11 plan in
favor of casino founder was not essential to reorganization).

## G.     The Releases Improperly Apply to Those Who Do Not Affirmatively Consent to the Plan

43.     Here, even if one votes against the plan, that is not enough to avoid opting out of
the Releases. It also requires that those who receive a ballot properly check a box stating
affirmatively that they wish to opt out of the release and timely return that. If they do not properly

check the box or do not timely return it, they are deemed to release the Remote Non-Debtor Parties. This causes the Releases to fail the fourth criterion of *Master Mortgage* because these Releases cannot in any realistic sense be said to be consensual.  In *Patterson v. Mahwah Bergen Retail Group, Inc.*, 636 B.R. 641 (E.D. Va. 2022), the court vacated a bankruptcy court's approval non-debtor releases in a plan, finding that the failure to opt out could not be construed as consent to these. It found that contract principles did not support finding consent by failing to opt out, because "'an offeror has no power to cause the silence of the offeree to operate as an acceptance when the offeree does not intend it to do so.'" *Id.* at 685 (quoting *Rivera-Colon v. AT &T Mobility Puerto Rico, Inc.*, 913 F.3d 200, 211 (1st Cir. 2019) (citing 1 Corbin on Contracts §3.19 (2018)). It likewise found that class action principles did not support such implied consent from failure to opt out. It compared the protections of Rule 23, including adequacy of representation, and concluded "[n]one of these protections exist in the context of a non-debtor release in a bankruptcy action," noting that no party with a typical claim represents the interest of an absent releasing party and that such absent releasing party does not have counsel to act in its stead. *Id.* It further found that such opt out mechanism raised "serious due process concerns." *Id.* at 687. Even though it noted authority approved of instances where the opportunity to return an opt out request satisfied due process, it explained this was not enough because it did not describe the released claims or the rights given up by the releasing party, stating that "[d]escribing the bankruptcy action and generally stating that the absent party would release all claims does not identify the specific claims subject to release." *Id.* at 688.  Other courts are in accord. *See also In re Emerge Energy Servx.*, 2019 WL 7634308 (D. Del. Dec. 5, 2019)("A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as a waiver of right to sue); *In*

*re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011)(plan's opt out mechanism was insufficient to support third party releases as to those who did not return a ballot; consent to release had to be manifested "by contract or the mechanism of voting in favor of a plan"); *In re Sun Edison*, 576 B.R. 453 (S.D.N.Y. 2017)(under contract principles, silence could not be taken as consent absent a duty to speak).[12]

44.    So here, again, the Plan does not even make clear who falls within the broad categories of Remote Non-Debtor Parties being released and uses instead vague terms like "agents" or "representatives." It likewise does not identify the substantive nature of the claims that are being released.

## H.    Unjustifiable Releases Mean The Plan Does Not Satisfy The "Good Faith" Requirement Of Section 1129(a)(3)

45.    While the Plan's failure to satisfy Section 1129(a)(1), standing alone, is enough to doom confirmation, the Releases cause the Plan to independently fail the requirement that a plan be proposed in good faith.

46.    In deciding whether a chapter 11 plan has been proposed in good faith, as is required for plan confirmation under 11 US.C. §1129(a)(3), a court should judge each case on its own facts after considering the totality of circumstances surrounding the plan and bankruptcy filing. *Riverbend Leasing*, 458 B.R. at 529. Good faith focuses on whether the pan "will achieve a result consistent with the standards prescribed under the Code." *Id.* (quoting *Cutliff v. Reuter (In re Reuter)*, 427 B.R. 727, 770 (Bankr. W.D. Mo. 2010)(citing *Hanson v. First Bank of South Dakota*, 828 F.2d 1310, 1315 (8th Cir. 1987)(overturned on other grounds)).

---

[12] Some courts hold otherwise. *See In re Stein Mart, Inc.*, 629 B.R. 516 (M.D. Fla. 2021).

47.     In related cases, courts have held that unjustifiable releases and injunctions cause a

plan to lack the good faith required by Section 1129. *See, e.g., In re Woolley's Parkway Center,*

*Inc.*, 147 B.R. 996 (Bankr. M.D. Fla. 1992) (denying confirmation based on finding that chapter

11 plan was not proposed in good faith where debtor's goal of getting debtor's guarantor "off the

hook on his guarantee of the primary obligation of the Debtor," and to prevent enforcement of that

guaranty wiping out obligation of guarantor had "no resemblance to any legitimate goal which was

envisioned by Congress when it created Chapter 11."); *In re Noll*, 172 B.R. 122, 124  (Bankr. M.D.

Fla. 1994)(creditor's proposed Chapter 11 plan did not satisfy good faith requirement to the extent

it provided, without any economic justification, of release of debtor's claims against creditor); *In*

*re Council of Unit Owners of 100 Harborview Drive Condominium*, 572 B.R. 131 (Bankr. Md.

2017)(third party releases which exculpated numerous "protected parties" from liability and

enjoined suits against them where no cogent reason was presented to impose such onerous and

possibly unconstitutional restrictions).

## CONCLUSION

WHEREFORE, MercyOne respectfully requests that the Court sustain its Objection to the

Releases and deny confirmation of the Plan.

Dated: May 6, 2024

/s/ David B. Goroff
Edward J. Green (Admitted *Pro Hac Vice*)
David B. Goroff (Admitted *Pro Hac Vice*)
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
egreen@foley.com
dgoroff@foley.com

/s/  Christopher J. Jessen
**BELIN McCORMICK, P.C.**
Michael R. Reck
Christopher J. Jessen
666 Walnut Street, Suite 2000
Des Moines IA 50309
Ph:  515-243-7100
Fax:  515-558-0715
mrreck@belinmccormick.com
cjessen@belinmccormick.com

Jake W. Gordon (Admitted *Pro Hac Vice* )
**FOLEY & LARDNER LLP**
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Tel: (248) 943-6484
jake.gordon@foley.com