**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | ) | Case No. 23-00623 (TJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Related to Docket Nos. 927, 1050** |
| | ) | |

## DECLARATION OF MARK E. TONEY, CHIEF RESTRUCTURING OFFICER OF MERCY HOSPITAL, IOWA CITY, IOWA, IN SUPPORT OF CONFIRMATION OF DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION

I, Mark E. Toney, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the Chief Restructuring Officer (the "CRO") of Mercy Hospital, Iowa City, Iowa ("Mercy") and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"). I have served the Debtors in my current capacity since approximately April 1, 2023 pursuant to an engagement letter approved by the *Order Authorizing Debtors to Retain ToneyKorf Partners, LLC as Interim Management of the Debtors, Effective as of the Petition Date Pursuant to Section 363 of the Bankruptcy Code, and Granting Related Relief* [Docket No. 259] (the "ToneyKorf Partners Retention Order"). Prior to that time, I worked for the Debtors in my capacity as Senior Managing Member at ToneyKorf Partners, LLC ("ToneyKorf Partners") and advised the Debtors regarding potential restructuring and contingency planning options.

2. I am a Member and Senior Managing Director with ToneyKorf, a management and advisory firm that provides expert services to healthcare organizations in various professional areas, including bankruptcy and corporate restructuring. I submit this declaration

(this "<u>Declaration</u>") in support of confirmation of the *Debtors' First Amended Disclosure Statement and Joint Chapter 11 Plan of Liquidation* (as amended, modified, or supplemented, the "Plan") and the *Debtors' (I) Memorandum of Law in Support of Confirmation of the Debtors' First Amended Disclosure Statement and Joint Chapter 11 Plan of Liquidation and (II) Omnibus Reply to Objections to Confirmation* (the "Confirmation Brief"), each filed contemporaneously herewith.[1]

3.     The statements in this Declaration are, except where specifically noted, based on (a) my personal knowledge of the Debtors' business operations; (b) my opinion based on my experience, knowledge, and information concerning the Debtors' operations; and (c) my review of the Debtors' books and records and relevant information that I have obtained from the Debtors' management and other employees, the Debtors' advisors, and employees of ToneyKorf Partners working directly with me and under my supervision, direction, or control. I am above 18 years of age and authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would competently testify to the facts set forth herein.

## THE PLAN SATISFIES THE REQUIREMENTS FOR CONFIRMATION

4.     Based on consultation with the Debtors' counsel, it is my understanding that the Plan: (a) complies with all applicable provisions of the Bankruptcy Code as required by Bankruptcy Code section 1129(a), including Bankruptcy Code sections 1122 and 1123; (b) satisfies the mandatory requirements of Bankruptcy Code section 1123(a); and (c) is consistent with Bankruptcy Code section 1123(b). I have set forth the reasons for such belief below, except

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or Confirmation Brief, as applicable.

where such compliance is apparent on the face of the Plan, the Plan Supplement, and the related

documents, or where it will be the subject of evidence introduced at the Confirmation Hearing.

**I.      The Plan Fully Complies with the Applicable Provisions of the Bankruptcy Code—
Section 1129(a)(1).**

5.      Based on consultation with the Debtors' counsel, it is my understanding that the

Plan complies with Bankruptcy Code section 1129(a)(1), which requires the Plan to comply with

Bankruptcy Code sections 1122 and 1123 in all respects.

**A.      The Plan Properly Classifies Claims as Required Under Bankruptcy Code
Section 1122.**

6.      Based on consultation with the Debtors' counsel, I understand that Article V of the

Plan provides for the following separate Classes of Claims, other than Administrative Expense

Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims.

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1-A | Bondholder Claims – Series 2018 Bonds | Impaired | Entitled to Vote |
| 1-B | Bondholder Claims – Series 2011 Bonds | Impaired | Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Bondholder Deficiency Claims | Impaired | Entitled to Vote |
| 5 | Pension Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

7.      I believe that each Class is composed of substantially similar Claims, and each

instance of separate classifications of similar Claims is based on valid business, factual, and legal

reasons. In general, I understand that the Plan's classification scheme follows the Debtors' capital

structure, properly classifying Claims into Classes based on their legal and/or factual nature or

other relevant and objective criteria and establishing that a legitimate basis exists for the classification scheme under the Plan.

8.      Based on consultation with the Debtors' counsel, I believe that valid business and factual reasons justify the separate classifications of the particular Claims into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims. It is my understanding that the classification scheme distinguishes Holders of Bondholder Claims – Series 2018 Bonds (Class 1-A), Bondholder Claims – Series 2011 Bonds (Class 1-B), and Other Secured Claims (Class 2) based on differing priority in collateral. It is also my understanding that Holders of General Unsecured Claims (Class 3), Bondholder Deficiency Claims (Class 4), Pension Claims (Class 5), and Intercompany Claims (Class 6) are classified separately due to the distinct origin of such Claims.

9.      Accordingly, I believe that the Claims assigned to each particular Class described above are substantially similar to the other Claims in each Class and the distinctions among Classes are based on valid business, factual, and legal distinctions. Further, I believe that the differences in classification are in the best interests of creditors, foster the Debtors' wind-down efforts, and do not violate the absolute priority rule. I believe, and have been advised based on information from counsel, that the Plan fully complies with and satisfies the classification requirements of Bankruptcy Code section 1122.

**B.** **The Plan Satisfies the Applicable Mandatory Plan Requirements of Bankruptcy Code Section 1123(a).**

10.     Based on consultation with the Debtors' counsel, it is my understanding that Bankruptcy Code section 1123(a) sets forth eight criteria that every chapter 11 plan must satisfy.[2] As set forth below, I believe that the Plan satisfies each of these requirements.

**i.** **Designation of Classes of Claims—Section 1123(a)(1).**

11.     As discussed above, it is my understanding that the Plan designates seven separate Classes and that each Class contains Claims that are substantially similar. Accordingly, I believe that Article V of the Plan properly designates Classes of Claims, satisfying Bankruptcy Code section 1123(a)(1).

**ii.** **Specification of Unimpaired Classes—Section 1123(a)(2).**

12.     Based on consultation with the Debtors' counsel, I understand that the Plan identifies each Class in Article V that is Unimpaired. Specifically, Article V of the Plan identifies Other Secured Claims (Class 2) as Unimpaired, satisfying Bankruptcy Code section 1123(a)(2).

**iii.** **Treatment of Impaired Classes—Section 1123(a)(3).**

13.     Based on consultation with the Debtors' counsel, I understand that the Plan identifies each Class that is Impaired. Specifically, Article V of the Plan identifies Bondholder Claims – Series 2018 Bonds (Class 1-A), Bondholder Claims – Series 2011 Bonds (Class 1-B), General Unsecured Claims (Class 3), Bondholder Deficiency Claims (Class 4), Pension Claims (Class 5), and Intercompany Claims (Class 6) as Impaired, and specifies the treatment of these Impaired Classes, satisfying Bankruptcy Code section 1123(a)(3).

---

[2]    I understand that Bankruptcy Code section 1123(a)(8) is inapplicable to the Plan because the Debtors are not "individuals" (as that term is defined in the Bankruptcy Code).

### iv. Equal Treatment of Similarly Situated Claims—Section 1123(a)(4).

14.     As described in Article V of the Plan, I understand that Holders of Allowed Claims will receive the same rights and treatment as other Holders of Allowed Claims within such Holders' respective Class, except as otherwise agreed to by a Holder of a particular Claim, satisfying Bankruptcy Code section 1123(a)(4).

### v. Adequate Means for Implementation—Section 1123(a)(5).

15.     Based on consultation with the Debtors' counsel, I understand that Bankruptcy Code section 1123(a)(5) has been satisfied because Article IX of the Plan (Means for Implementation of the Plan), as well as other provisions thereof, provides adequate means for the Plan's implementation. Among other things, I understand that Article IX of the Plan, provides for:

(a)     the sources of Cash required for payments to be made under the Plan on the Effective Date;

(b)     the execution and delivery of the Liquidation Trust Agreement and the creation of the Liquidation Trust;

(c)     the cancellation of certain existing securities and other documents evidencing or creating any indebtedness or obligation or ownership in the Debtors;

(d)     the continued existence of the Debtors as separate entities and subsequent dissolution following final Distributions by the Liquidation Trust;

(e)     the funding of the Professional Fee Reserve;

(f)     the preservation of Causes of Action;

(g)     exemption from certain transfer taxes and recording fees; and

(h)     all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

16.     Based on consultation with the Debtors' counsel, I understand that the terms governing the execution of these transactions are set forth in the applicable definitive documents

or forms of agreements included in the Plan Supplement. Additionally, I understand that various other provisions of the Plan, including, but not limited to, Article X (Provisions Regarding the Liquidating Trust), Article XI (Provisions Governing Distributions), and Article XII (Treatment of Executory Contracts and Unexpired Leases), also provide adequate means for the Plan's implementation, further satisfying Bankruptcy Code section 1123(a)(5).

**vi.    Prohibition of Issuance of Non-Voting Securities—Section 1123(a)(6).**

17.     Based on consultation with the Debtors' counsel, I understand that Article IX.E.1 of the Plan provides that the organizational documents of the Debtors will be deemed amended to include, among other things, a provision prohibiting the issuance of non-voting equity securities, satisfying Bankruptcy Code section 1123(a)(6).

**vii.    Selection of Directors and Officers—Section 1123(a)(7).**

18.     I understand that the Debtors are not reorganizing under the Plan and that the assets of the Debtors shall vest in the Liquidation Trust, which will be administered by the Liquidation Trustee. The Liquidation Trustee was selected pursuant to the Plan and the Liquidation Trust Agreement and disclosed in the Plan Supplement, consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying Bankruptcy Code section 1123(a)(7).

**C.    The Plan Complies with the Discretionary Provisions of Bankruptcy Code Section 1123(b).**

19.     Based on consultation with the Debtors' counsel, I understand that Bankruptcy Code section 1123(b) provides that, among other things, a plan may (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11. As discussed below, based on my

7

understanding of the Plan and discussions I have had with the Debtors' counsel, I believe that the

Plan's discretionary provisions, certain of which are discussed below, are the product of arm's-

length negotiations, fair and equitable, given for valuable consideration, and in the best interests

of the Debtors' estate, consistent with Bankruptcy Code section 1123(b).

> ### i.      The Plan Leaves Certain Classes of Claims Unimpaired and Impaired—Section 1123(b)(1).

20.     Based on consultation with the Debtors' counsel, I understand that, under Article

V of the Plan, Class 2 (Other Secured Claims) is Unimpaired because the Plan leaves unaltered

the legal, equitable, and contractual rights of the Holders of Claims within such Classes. I also

understand that Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder

Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder

Deficiency Claims), Class 5 (Pension Claims), and Class 6 (Intercompany Claims) are Impaired

since the Plan modifies the rights of Holders of Claims within such Classes as contemplated by

Bankruptcy Code section 1123(b)(1).

> ### ii.     The Plan Provides for the Rejection of all Executory Contracts and Unexpired Leases—Section 1123(b)(2).

21.     Based on consultation with the Debtors' counsel, I understand that Article XII.A of

the Plan provides for the rejection of all Executory Contracts and Unexpired Leases, except to the

extent set forth in the Plan and Plan Supplement, satisfying Bankruptcy Code section 1123(b)(2).

> ### iii.    The Plan Provides for the Settlement or Adjustment of Any Claim or Interest Belonging to the Debtors or Their Estates—Section 1123(b)(3).

22.     The Plan embodies a settlement of certain Claims and Causes of Action between

the Debtors and major parties-in-interest, including the Bondholder Representatives, the UCC, and

the Pension Committee. I understand that the Plan resolves a host of potential Claims and Causes

of Action, which were analyzed by the Debtors, the UCC, the Pension Committee, and their

respective advisors and which, if litigated, would not result in a better recovery for creditors than as proposed under the Plan and most certainly would result in significantly delayed recoveries to creditors, if any.

23.     Based on consultation with the Debtors' counsel, I understand that the Plan contains provisions implementing certain releases and exculpations, discharging claims and interests, and permanently enjoining certain causes of action. I believe these provisions are appropriate because, among other things, they (a) are the product of extensive good faith, arm's-length negotiations, (b) were necessary for certain key stakeholders to negotiate the settlements contemplated in the Plan and support and fund the same, (c) are supported by the Debtors and their key economic stakeholders, including the Bondholder Representatives, the UCC, and the Pension Committee, (d) are fair and equitable and in the best interests of the Debtors, their estates, and the Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Eighth Circuit law as explained to me by the Debtors' legal counsel.

### a.     The Plan Settlement is Appropriate and Should be Approved.

24.     Based on consultation with the Debtors' counsel, I understand that Bankruptcy Code section 1123(b)(3)(A) specifically provides that a chapter 11 plan may provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate. The Plan incorporates the terms of the Plan Settlement with the UCC, the Pension Committee, and the Bondholder Representatives (the "Plan Settlement"). I am familiar with the terms of the Plan Settlement because I was personally involved in the negotiation process surrounding its terms.

25.     The Plan Settlement was struck after months of good faith negotiations between and among the Debtors, the UCC, the Pension Committee, and the Bondholder Representatives, and provides for, among other things, (a) a $1,000,000 contribution by the Bondholder

Representatives for the benefit of Holders of General Unsecured Claims and Pension Claims; (b) a cap of $1,500,000 with respect to the Bondholder Deficiency Claim; (c) an allocation of 60% of recoveries on Litigation Claims to Holders of General Unsecured Claims and Pension Claims, with 40% going to Holders of Bondholder Claims; and (d) an advance distribution to the Pension Trust of $733,333.33 for the benefit of Holders of Pension Claims, subject to the terms set forth in the Plan. Each aspect of the Plan Settlement was subject to extensive negotiation, is interdependent, and, if any such aspect of the Plan Settlement is not approved or is otherwise not incorporated into the terms of the Confirmation Order, I do not believe that the UCC, the Pension Committee, and the Bondholder Representatives will support the Plan. Further, without the Plan Settlement, the current projected recoveries for unsecured creditors under the Plan would be unavailable. Indeed, if the Plan Settlement is not implemented under the Plan, I expect that the Debtors may need to convert to chapter 7, which may involve lengthy and protracted litigation by a chapter 7 trustee regarding various potential claims and causes of action sought to be resolved by the Plan Settlement, among others. Not only would such litigation likely take years and substantial costs to pursue, but for the reasons described herein, I believe that such litigation—even if successful— would result in recoveries (if collected) to unsecured creditors that, at best, would represent a small fraction of what is available to such creditors under the Plan, all without the costs, delay, and attendant risks to such recoveries.

26.     Therefore, I believe that entry into the Plan Settlement represents a reasonable and value-accretive compromise that is in the best interests of the Debtors, these estates, and the Chapter 11 Cases, and should be approved by this Court, as it allows the Debtors to avoid costly litigation risks, has the overwhelming support of the Debtors' key creditor constituencies, and remains the most effective option for the Debtors to responsibly wind down their estates.

27.     To implement the Plan Settlement, the Plan provides certain release and exculpation provisions, including the Debtor Release and a tailored (and consensual) Third-Party Release. These provisions are (a) integral components to the Plan and Plan Settlement, (b) appropriate and necessary under the facts and circumstances of these Chapter 11 Cases, and (c) being provided in exchange for substantial and valuable consideration, which would not be provided if such provisions were not approved. Based upon my discussions with the Debtors' legal counsel, I believe that such provisions are consistent with the Bankruptcy Code and comply with applicable law.

### b.       The Debtor Release is Appropriate and Should be Approved.

28.     I understand that Article XIV.D.1 of the Plan provides for certain releases by the Debtors, as of the Effective Date, of, among other things, certain Causes of Action that the Debtors, the Liquidating Debtors, and their Estates may have against the Released Parties[3] (the "Debtor Release").[4] I believe the Debtors have exercised their reasonable business judgment in proposing the Debtor Release and that the Debtor Release is reasonable and satisfies the standard that I have been advised courts in the Eighth Circuit generally apply when reviewing such releases. For the reasons discussed below in connection with the Third-Party Release, I believe that (a) there is an identity of interest between the Debtors and the Released Parties; (b) the Released Parties have

---

[3]     As revised in the Plan filed contemporaneously herewith, "Released Parties" means, collectively, the following Entities, each in their capacity as such: (a) the Debtors; (b) the UCC and each of its members (only in their capacity as such); (c) the Pension Committee and each of its members (only in their capacity as such); (d) the Bondholder Representatives; (e) the Foundation; (f) the Sisters of Mercy; and (g) with respect to any such Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, predecessors, successors, affiliates, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors; *provided, however*, that Released Parties shall not include former officers and directors of the Debtors but shall include any of the Debtors' directors and officers that served in such role at any time between the Petition Date and the Effective Date; *provided further* that Released Parties shall not include MercyOne.

[4]     *See* Plan, Art. XIV.D.1.  The description of the Debtor Release is a summary and for convenience only.  The terms of Article XIV.D.1 of the Plan shall control in all respects.

made substantial contributions in the Chapter 11 Cases; (c) the Debtor Release is essential to the Debtors' value-maximizing efforts and the success of the Plan; and (d) the Classes entitled to vote on the Plan voted overwhelmingly in favor of the Plan, which includes the Debtor Release.

29.     It is my view that the Debtor Release constitutes an essential and critical provision of the Plan and the Plan Settlement and appropriately offers protection to parties that directly or constructively participated in the Debtors' chapter 11 efforts. The Debtor Release has been a critical aspect of the Plan since its inception and, in ultimately agreeing to the Debtor Release contained in the Plan and through the Plan Settlement, the Debtors, the UCC, and the Pension Committee considered the value of the potential claims and causes of action proposed to be released against the benefits of the Plan, the Plan Settlement, and the likely recoveries to unsecured creditors. Ultimately, the Debtors made the decision to enter into the Plan Settlement, as it provides the basis for comparison between the material and guaranteed amounts provided to unsecured creditors under the Plan on the one hand, and the greatly diminished recovery prospects for unsecured creditors through expensive and uncertain litigation, on the other hand.

30.     I believe that the Debtor Release represents a sound exercise of the Debtors' business judgment and is in the best interest of the Estates because the Plan, including the Debtor Release, was negotiated by sophisticated entities that were represented by able advisors and each conditioned its support for the Plan on, among other things, the grant of the Debtor Release. The Debtor Release has, in my view, provided a material benefit to the Estates by mutually releasing potential Claims and Causes of Action against the Debtors and potential putative defendants, including the Bondholder Representatives, in exchange for substantial consideration to the benefit of the Debtors' creditors. I believe that the resulting compromise reflects a true arm's-length negotiation process and I do not believe that the Debtors and their stakeholders would have been

able to secure the substantial benefits provided by the Plan and the Plan Settlement absent the Debtor Release.

31.     Based on the foregoing, I believe that the Debtor Release represents a valid exercise of the Debtors' business judgment, is in the best interest of the Debtors and their estates, and represents a valid settlement of claims and causes of action against the Released Parties, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, and should be approved.

### c.     The Third-Party Release is Appropriate and Should be Approved.

32.     Based on consultation with the Debtors' counsel, I understand that Article XIV.D.2 provides for a customary, consensual third-party release of the Released Parties with respect to specified types of Claims or Causes of Action (the "Third-Party Release"),[5] which is integral to the Plan and given in exchange for consideration. I believe the Debtors have exercised their reasonable business judgment in proposing the Third-Party Release and that it is reasonable and satisfies the standard that I have been advised courts in the Eighth Circuit generally apply when reviewing such releases.

33.     *First*, I believe that an identity of interest exists between the Debtors and the Released Parties. I believe all of the Released Parties share the common goal with the Debtors of confirming the Plan. I believe these parties each played a role in negotiating the Plan, supported and/or voted in favor of the Plan, and facilitated the Plan through their contributions thereto. Significantly, the Released Parties and their efforts were integral to the overall success of the Debtors' sale and restructuring efforts during the Chapter 11 Cases, including, monetary support as well as time, energy, resources, and support in coordinating complex and time-consuming

---

[5]     *See* Plan, Art. XIV.D.2. The description of the Third-Party Release is a summary and for convenience only. The terms of Article XIV.D.2 of the Plan shall control in all respects.

efforts in furtherance of the Chapter 11 Cases. Furthermore, the Released Parties played a role in negotiating the Plan Settlement, facilitated the Plan through their contributions or support of the Plan, and, through the substantial concessions afforded under the Plan Settlement, are providing a path of increased recovery to unsecured creditors that would otherwise not be available.

34.    Moreover, with respect to the Debtors' current and former employees and directors and officers who served in their capacity during the pendency of the Chapter 11 Cases, I believe that there is a clear identity of interest supporting the Third-Party Release because the Debtors will assume certain indemnification provisions (the "Indemnification Provisions") pursuant to Article XII.C of the Plan. I understand that these indemnification provisions require the Debtors or the Liquidating Debtors, as applicable, to indemnify certain directors and officers for any losses or expenses incurred by an indemnified director or officer in a proceeding brought by or on behalf of the Debtors or the Liquidating Debtors, as applicable, or actions brought by third parties.

35.    *Second*, I believe that the Released Parties have provided significant value to the Debtors' Estates throughout these Chapter 11 Cases, including additional substantial contributions to the Plan. Collectively, the Released Parties have, among other things, (a) agreed to make significant concessions in their own recoveries under the Plan for the benefit of the unsecured creditors; (b) provided funding during the pendency of the Chapter 11 Cases, whether through use of cash collateral or contribution of "Unrestricted Funds", which has allowed the Debtors to fund the Chapter 11 Cases and their operations; (c) contributed important labor, expertise, and "sweat equity" beyond what is usually expected, which efforts resulted in the successful sale of substantially all of the Debtors' assets to the University; and (d) played an integral role in the formulation of the Plan and contributed to the Plan, not only by expending significant time and resources analyzing and negotiating the issues facing the Debtors, but also in giving up material

economic interests to ensure the success of the Plan. Specifically, the Bondholder Representatives, among other things, agreed to (a) contribute an additional $1,000,000 to the Unsecured Claims Waterfall Amount for the benefit of unsecured creditors, (b) ensure that recoveries available to Holders of General Unsecured Claims and Holders of Pension Claims are no less than 10% of the recoveries available to the Holders of Bondholder Claims, (c) decrease their share of any Litigation Claim recoveries to 40% with 60% benefitting unsecured creditors, and (d) support the Plan. Moreover, the Bondholder Representatives provided the Debtors with continued access to Cash Collateral during the pendency of the Chapter 11 Cases and the Foundation provided millions of dollars of Unrestricted Funds to the Debtors to pay the Debtors' ordinary course operating expenses. Further, the Released Parties, including the Foundation and the Bondholder Representatives, enabled the Debtors to secure valuable consideration provided under the Plan for the benefit of all constituents, which would not be possible absent the Third-Party Release. Finally, I believe that the Debtors' directors and officers who served in their capacity during the pendency of the Chapter 11 Cases and the Sisters of Mercy have been instrumental in negotiating, formulating, and implementing the sale and transactions contemplated by the Plan. In order to successfully guide the Company through these Chapter 11 Cases, the Debtors' directors and officers, as well as the Sisters of Mercy, dedicated significant time and attention to restructuring matters. I believe those efforts resulted in material benefits to the Debtors' Estates, as, among other things, the current directors and officers were able to protect the Debtors' business and preserve value of the same by maintaining important relationships with staff, physicians, volunteers, critical vendors, suppliers, and the community. Therefore, I believe that the Released Parties have made substantial contributions to the Chapter 11 Cases, the Plan Settlement and the Plan, in exchange for the Third-Party Release.

36.     *Third*, I believe that the Third-Party Release is essential to the success of the Plan and Plan Settlement. I understand that, without the inclusion of the Third-Party Release in the Plan, the Released Parties would not be willing to support the Plan, nor provide the very substantial consideration in the form of cash and redirection of proceeds under the Plan Settlement, as the releases being provided under the Plan are the main consideration for such cash and non-cash consideration. Therefore, for the Plan Settlement to be effectuated, I believe that the Plan must include the Third-Party Release.

37.     *Fourth*, I understand that an overwhelming majority of the creditors entitled to vote on the Plan voted in favor of the Plan, which includes the Third-Party Release. Specifically, I understand that all classes entitled to vote on the Plan—*i.e.*, Classes 1-A, 1-B, 3, 4, and 5—voted overwhelmingly to accept the Plan, which included the Third-Party Release. Accordingly, I believe that the voting results demonstrate that the Third-Party Release constitutes a valid exercise of the Debtors' business judgment.

38.     *Fifth*, I understand that the Plan provides for distributions to parties affected by the Third-Party Release. In contrast to the Debtor Release, I understand that the Third-Party Release will impact different Claims than those affected by the Debtor Release (*i.e.*, the Third-Party Release affects Claims held by all Releasing Parties, not just those of the Debtors). While it will not result in full payment of all Impaired creditors, I understand that the Plan provides for payment of meaningful recoveries to Holders of General Unsecured Claims (Class 3) and Pension Claims (Class 5), which are only possible as a result of the Plan Settlement negotiated between the Debtors, the UCC, the Pension Committee, and the Bondholder Representatives, and would not be available absent implementation of the Plan Settlement and Confirmation of the Plan. In my view,

the Third-Party Release is tailored to reflect these arm's-length, good-faith negotiations that resulted in the Plan Settlement, which is in the best interest of the Debtors and their estates.

39.    Additionally, I believe that the Third-Party Release should be approved because the release is consensual. In particular, I understand the Third-Party Release is being granted consensually by (a) Holders of Claims who vote to accept the Plan; (b) Holders of Claims who vote to reject the Plan or abstain do not opt out of the Third-Party Release; and (c) Holders of Claims who are deemed to reject the Plan and do not opt out of the Third-Party Release. With respect to the Holders of Claims who voted to accept the Plan, I believe they have consented to the Third Party Release. I understand that the existence of the Third-Party Release, the consent to such release by voting to accept the Plan, and the opt-out provision were identified, in bold and conspicuous language, in the Combined Disclosure Statement and Plan and in the Ballots. I believe that the solicitation materials and other noticing materials filed and served in connection with the Disclosure Statement provided recipients with timely, sufficient, appropriate and adequate notice of the Third-Party Release, including that all Holders of Claims that voted to accept the Plan would grant the Third-Party Release and all other Holders of Claims that abstained, voted to reject the Plan, or were not entitled to vote on the Plan would grant the Third-Party Release unless they elected on their Ballot to opt out of the Third-Party Release. Further, I understand that Holders of Claims in Classes 1-A, 1-B, 3, 4, and 5 overwhelmingly voted in favor of the Plan, which includes the Third-Party Release. Based on consultation with the Debtors' counsel, I believe that the Holders of Claims who voted to accept the Plan have affirmatively demonstrated their support of the Plan, which includes the Third-Party Release, and have consensually granted the Third-Party Release, meeting the applicable standard for approval in the Eighth Circuit. Moreover, based on consultation with the Debtors' counsel, I believe that Holders of Claims who voted to reject,

abstained, or were deemed to reject and did not opt out of the Third-Party Release have also consensually granted the Third-Party Release.

40.     Finally, I also believe that the Third-Party Release is both fair and necessary for the Debtors' value-maximizing efforts. I believe the Third-Party Release is fair, as Releasing Parties are receiving valuable consideration, including increased recoveries to unsecured creditors. Additionally, I believe the Third-Party Release is fair because of the considerable value being contributed by the Released Parties, the material distributions made to Holders of Claims under the Plan, and the need for finality following the resolution of the Chapter 11 Cases. I believe that the Third-Party Release is also necessary to the Plan, as it is a critical part of the Plan Settlement that the Debtors were able to reach with the UCC, the Pension Committee, and the Bondholder Representatives. Without the Third-Party Release, I believe that those parties would no longer support the Plan, which would derail the Debtors' efforts to maximize value at a time when the Debtors are seeking the Confirmation of a Plan that provides significant consideration to stakeholders with overwhelming support from all five of their voting Classes. In such instance, I believe the Debtors likely would either need to convert the Chapter 11 Cases to chapter 7 or renegotiate a new plan of liquidation, which, in my opinion, is unlikely to yield nearly as much value to stakeholders and which will cause significant damage to the Debtors' business by prolonging their stay in chapter 11, exhausting additional Estate resources, incurring additional professional fees, and causing significant uncertainty. Therefore, because the Third-Party Release is both fair and necessary to these efforts and the Plan Settlement, I believe that the Third-Party Release should be approved.

41.     Accordingly, I believe that the Third-Party Release is fair and necessary to these Chapter 11 Cases, and is consensual. Therefore, based on the foregoing, I believe that the Third-

Party Release represents a valid exercise of the Debtors' business judgment, is in the best interest of the Debtors and their estates, and represents a valid settlement of claims and causes of action against the Released Parties, pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, and should be approved.

> **d.     The Exculpation is Appropriate and Should be Approved.**

42.     Article XIV.E of the Plan contains an exculpation provision (the "Exculpation"),[6] which, as modified, exculpates only certain estate fiduciaries including (a) the Debtors, (b) the UCC and each member thereof (solely in its capacity as such), (c) the Pension Committee and each member thereof (solely in its capacity as such), (d) any retained Professional of the Debtors, the UCC, or the Pension Committee, and (e) the Debtors' directors and officers who served in their capacity during the pendency of the Chapter 11 Cases, including the CRO (collectively, the "Exculpated Parties"), from certain acts or omissions, except for any acts or omissions that constitute gross negligence, fraud, or willful misconduct.

43.     Based on consultation with the Debtors' counsel, I believe the Exculpated Parties are Estate fiduciaries that played a critical role in negotiating, formulating, and implementing the Disclosure Statement, the Plan, and related documents in furtherance of the Debtors' Chapter 11 Cases. I believe that the Exculpated Parties participated in good faith in formulating and negotiating the Plan as it relates to the Debtors, and should therefore be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties. Here, I believe the Debtors and their officers, managers, and professionals actively negotiated with Holders of Claims across the Debtors' capital structure and creditor constituencies in connection with the Plan

---

[6]   *See* Plan, Art. XIV.E.  The description of the Exculpation is a summary and for convenience only.  The terms of Article XIV.E of the Plan shall control in all respects.

and the Chapter 11 Cases. Such negotiations were extensive and the resulting agreements were implemented in good faith and have the support of an overwhelming majority of the Holders of Claims entitled to vote on the Plan. Further, it is my understanding that the Exculpation is also tailored to exclude acts of fraud, gross negligence, or willful misconduct, relates only to acts or omissions in connection with, or arising out of, the Debtors' chapter 11 efforts, and ultimately inures to the benefit only of those parties in their capacity as estate fiduciaries. As such, I believe the Exculpation is reasonable and appropriate, and should be approved.

### e.    The Injunction is Appropriate and Should be Approved.

44.    Based on consultation with the Debtors' counsel, I understand that Article XIV.F of the Plan implements the Plan's release and exculpation provisions, in part, by permanently enjoining all entities from, with respect to any Claims, (a) commencing or maintaining any action; (b) enforcing, attaching, collecting, or recovering any judgment; (c) creating, perfecting, or enforcing any encumbrance; (d) asserting any right of setoff, subrogation, or recoupment, unless such Holder has filed a motion requesting the right to perform such setoff; (e) acting or proceeding in any manner that does not conform to or comply with the Plan; or (f) commencing or continuing any action settled pursuant to the Plan against the Debtors, the Liquidating Trust, or the Liquidating Trustee (the "Injunction").[7] Additionally, I understand that the Injunction provides that no enjoined party may commence, continue, or otherwise pursue any claim or cause of action against any Released Party that arose from or is related to any right, claim, or Cause of Action released pursuant to the Plan. I believe that the Injunction is a key provision of the Plan because it enforces the Debtor Release, the Third-Party Release, and the Exculpation that are integral to the Plan and

---

[7]    *See* Plan, Art. XIV.F.  The description of the Injunction is a summary and for convenience only.  The terms of Article XIV.F of the Plan shall control in all respects.

is tailored to achieve its purpose. As such, to the extent that the Court finds that the Debtor Release,

Third-Party Release, and Exculpation are appropriate, I believe the Injunction is also necessary

and should be approved.

> **iv.   The Plan Does Not Provide for a Sale of Substantially All or All of the Debtors' Assets—Section 1123(b)(4).**

45.    It is my understanding that Bankruptcy Code section 1123(b)(4) is inapplicable to

the Plan because the Debtors previously sold substantially all of their assets to the University of

Iowa and the Debtors are not now engaging in a sale of all or substantially all of their assets through

the Plan through which proceeds will be distributed to Holders of Claims.

> **v.   The Plan Modifies the Rights of Certain Classes—Section 1123(b)(5).**

46.    In accordance with Bankruptcy Code section 1123(b)(5), Article V of the Plan

modifies the rights of Holders of Claims in Classes 1-A, 1-B, 3, 4, 5, and 6. The Plan leaves

unaffected the rights of Holders of Claims in Class 2 (Other Secured Claims). Thus, after

consultation with the Debtors' counsel, I believe that the Plan satisfies Bankruptcy Code section

1123(b)(5).

> **D.   Cure of Defaults—Section 1123(d).**

47.    Based on consultation with the Debtors' counsel, I believe that the Plan complies

with Bankruptcy Code section 1123(d), as the Plan provides for the satisfaction of monetary

defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan (if

any) in Cash on the Effective Date, in the ordinary course of business, or on such other terms as

the parties may otherwise agree, subject to the limitations described in Article XII of the Plan.

**II.      The Plan Satisfies the Other Confirmation Requirements Found in Bankruptcy Code Section 1129(a).**

**A.      The Debtors Complied with the Bankruptcy Code—Section 1129(a)(2).**

48.      Based on consultation with the Debtors' counsel, it is my understanding that Bankruptcy Code section 1129(a)(2) requires a plan proponent to comply with Bankruptcy Code sections 1125 and 1126. To the best of my knowledge and belief, based on discussions with the Debtors' counsel, and as evidenced by the Solicitation Procedures Order, prior orders of the Court, and the filings submitted by the Debtors, I believe that the Debtors have complied with Bankruptcy Code sections 1125 and 1126 regarding disclosure and Plan solicitation.

**i.      The Debtors Complied with Bankruptcy Code Section 1125.**

49.      Based on consultation with the Debtors' counsel, I believe that the Debtors complied with the requirements of Bankruptcy Code section 1125. By entering the Solicitation Procedures Order on April 3, 2024, the Court approved the Disclosure Statement as containing "adequate information" pursuant to Bankruptcy Code section 1125(b). As set forth in the Voting Declaration, as well as various affidavits of service filed with this Court, it is my understanding that on April 8, 2024, the Debtors, with the assistance of Epiq Corporate Restructuring, LLC (the "Solicitation Agent"), distributed solicitation packages, including (a) the Disclosure Statement and all exhibits attached thereto (including the Plan), (b) a letter in support of the Plan from the UCC, (c) the applicable ballot for Holders of Claims in Class 1-A, 1-B, 3, 4, or 5 (collectively, the "Ballots"), (d) the Solicitation Procedures Order (without exhibits), and (e) the Confirmation Hearing Notice, to Holders of Claims entitled to vote to accept or reject the Plan as of March 28, 2024 (the "Voting Record Date"). In compliance with Bankruptcy Code section 1125(b), I understand that the Debtors did not solicit acceptances of the Plan from any Holder of a Claim

prior to entry of the Solicitation Procedures Order. Moreover, I understand that no party objected to the Debtors' solicitation process and compliance with Bankruptcy Code section 1125.

50.    Based on consultation with the Debtors' counsel, I believe that the Debtors complied with the notice requirements, the tabulation procedures, and the forms of ballots set forth in the Solicitation Procedures Order. First, it is my understanding that the Debtors caused the Solicitation Agent to distribute the Solicitation Packages to Holders of Claims entitled to vote to accept or reject the Plan as of the Voting Record Date, as authorized by the Solicitation Procedures Order. Additionally, it is my understanding that the Debtors also caused the Solicitation Agent to mail the Confirmation Hearing Notice to creditors and notice parties by first-class mail and/or electronic mail. Furthermore, it is my understanding that the Debtors also caused the Solicitation Agent to distribute the Combined Disclosure Statement and Plan, a letter in support of the Plan from the Pension Committee, the applicable ballot, the Solicitation Procedures Order (without exhibits), and the Confirmation Hearing Notice (collectively, the "Provisional Solicitation Packages") were transmitted and served on all Persons receiving payments under the Pension Plan who did not file a Proof of Claim in the Chapter 11 Cases (each, a "Provisional Pension Claim Holder") pursuant to paragraphs 8 through 10 of the Solicitation Procedures Order. Moreover, it is my understanding that the Debtors caused the Confirmation Hearing Notice to be published in the *Iowa City Press Citizen* and the *Des Moines Register* on or around April 11, 2024. Finally, it is my understanding that the forms of Ballots used to solicit votes to accept or reject the Plan comply with the Bankruptcy Rules and were approved by the Court pursuant to the Solicitation Procedures Order. Based on the foregoing, I believe the Debtors complied with the notice requirements and the forms of ballots set forth in the Solicitation Procedures Order.

51. Additionally, I believe that the Debtors' solicitation period complied with the Solicitation Procedures Order and Bankruptcy Rule 3018(b). First, I understand that the Plan and Disclosure Statement were transmitted to all Holders of Claims entitled to vote on the Plan. Second, I believe that the solicitation period, which lasted from April 8, 2024 until May 6, 2024, complied with the Solicitation Procedures Order and was adequate under the particular facts and circumstances of the Chapter 11 Cases, as the Voting Classes were afforded 28 days to vote on the Plan. Thus, I believe the Debtors complied with the Solicitation Procedures Order and satisfied the requirements of Bankruptcy Rule 3018(b).

52. Moreover, I believe that the Debtors' tabulation of votes complied with the Solicitation Procedures Order and should be approved. I understand that the Solicitation Agent reviewed all Ballots received in accordance with the procedures approved in the Solicitation Procedures Order.

53. Finally, I believe that the Debtors at all times engaged in good-faith, arm's-length negotiations with key stakeholders and took appropriate action in connection with the solicitation of the Plan in compliance with Bankruptcy Code section 1125(e).

54. Therefore, I believe that the Debtors complied with and satisfied the requirements outlined in Bankruptcy Code section 1125.

**ii.   The Debtors Complied with Bankruptcy Code Section 1126.**

55. Based on consultation with the Debtors' counsel, I understand that Bankruptcy Code section 1126(a) specifies that only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such a plan. As discussed above, I understand that on April 8, 2024, the Debtors, with the assistance of the Solicitation Agent,

solicited acceptances or rejections of the Plan from the Holders of Allowed Claims in Classes 1-A, 1-B, 3, 4, 5, and 6. It is my understanding that all of the Classes of Claims entitled to vote on the Plan did so in sufficient number and by sufficient amount, as Classes 1-A, 1-B, 3, 4, and 5 voted to accept the Plan in more than two-thirds in amount and one half in number of Claims, pursuant to Bankruptcy Code section 1126(c). As such, I believe that the Debtors have satisfied the requirements of Bankruptcy Code section 1129(a)(2).

**B.      The Debtors Proposed the Plan in Good Faith—Section 1129(a)(3).**

56.      Based on consultation with the Debtors' counsel, it is my understanding that Bankruptcy Code section 1129(a)(3) requires that a chapter 11 plan be proposed in good faith and not by any means forbidden by law. I believe that the Plan was negotiated, developed, and proposed in good faith by the Debtors with the legitimate and honest purpose of winding down the Debtors' business and maximizing both the value of the Debtors' Estates and recovery to the Debtors' creditors. The Plan is the outcome of extensive, good-faith, arm's-length negotiations with, and is supported by, the UCC, the Pension Committee, and the Bondholder Representatives, among others. Moreover, I believe that the Plan fairly achieves a result consistent with the objectives and purposes of the Bankruptcy Code. The significant settlements and agreements that are embodied in the Plan and the resulting support that has been garnered to date from the UCC, the Pension Committee, and the Bondholder Representatives, among others, are a testament to the overall fairness of the Plan and an acknowledgement that the Plan has been proposed in good faith and for proper purposes. I believe it is within the Debtors' reasonable business judgment to effectuate these key settlements and agreements through which the Debtors' Estates stand to realize tangible and significant value to the benefit of the Debtors' stakeholders.

57.     Furthermore, nothing in the Plan encourages misconduct on the part of the Debtors. I do not believe that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 (15 U.S.C. § 77(e)). Finally, the Plan achieves fundamental fairness as no party is receiving more than to which it would otherwise be entitled and the Plan is built on concessions and good-faith give-and-take by the parties involved.

58.     Therefore, I believe that, throughout the negotiation of the Plan and the Chapter 11 Cases, the Debtors upheld their fiduciary duties to stakeholders, acted in good faith at all times, and protected the interests of all constituents with an even hand. Accordingly, I believe that the Plan complies with and satisfies the requirements of Bankruptcy Code section 1129(a)(3).

**C.      The Plan Provides that the Debtors' Payment of Professional Fees and Expenses is Subject to Court Approval—Section 1129(a)(4).**

59.     Based on consultation with the Debtors' counsel, it is my understanding that Bankruptcy Code section 1129(a)(4) requires that certain fees and expenses paid by the plan proponent, by a debtor, or by a person receiving distributions of property under the plan, be approved by the Court as reasonable or remain subject to approval by the Court as reasonable.

60.     I believe that the Plan satisfies Bankruptcy Code section 1129(a)(4), as the Debtors' Professional Fee Claims and corresponding payments are subject to prior Court approval. I understand that all monthly and interim compensation of Professionals prior to final allowance of such Professional Fee Claims have been or will be approved by the Court and paid in accordance with the procedures established by the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 224]. Moreover, I understand that Article IV.D.1 of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than 45 days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Fee Claims. Finally, I understand that,

per Article IX.J.2 of the Plan, as of the Effective Date, funds in the Professional Fee Reserve shall

be held in trust solely for the Allowed Professional Fee Claims and maintained by the Liquidating

Trustee. Therefore, I believe the Plan complies with the requirements of Bankruptcy Code section

1129(a)(4).

### D.     The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders—Section 1129(a)(5).

61.     Based on consultation with the Debtors' counsel, it is my understanding that

Bankruptcy Code section 1129(a)(5) requires a proponent of a plan to disclose the identity and

affiliations of the proposed officers and directors of the liquidating debtors. As discussed above,

on the Effective Date, the Liquidation Trustee shall have sole right and authority to control and

direct the activities of the Debtors and their Estates. The Debtors disclosed, as part of the Plan

Supplement, that William H. Henrich of Getzler Henrich & Associates, LLC is intended to serve

as Liquidation Trustee. Therefore, I believe that the above facts and circumstances satisfy

Bankruptcy Code section 1129(a)(5).

### E.     The Plan Does Not Require Governmental Regulatory Approval—Section 1129(a)(6).

62.     Based on consultation with the Debtors' counsel, it is my understanding that

Bankruptcy Code section 1129(a)(6) permits confirmation only if any regulatory commission that

has or will have jurisdiction over a debtor after confirmation has approved any rate change (*e.g.*,

the price of utility services) provided for in the plan. I understand that no such rate changes are

provided for in the Plan, making Bankruptcy Code section 1129(a)(6) inapplicable to the Chapter

11 Cases.

### F.      The Plan Satisfies the Best Interest Test—Section 1129(a)(7).

63.     Based on consultation with the Debtors' counsel, I understand that Bankruptcy Code section 1129(a)(7), commonly known as the "best interests test," requires that each holder of an impaired claim or interest either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  I understand that the best interest of creditors test does not apply to Holders of Claims in Class 2 (Other Secured Claims) because such Class is Unimpaired under the Plan.  Therefore, it is my understanding that, in order to satisfy the best interest of creditors test, the Debtors must demonstrate that Holders in (a) Class 1-A (Bondholder Claims – Series 2018 Bonds), (b) Class 1-B (Bondholder Claims – Series 2011 Bonds), (c) Class 3 (General Unsecured Claims), (d) Class 4 (Bondholder Deficiency Claims), and (e) Class 5 Pension Claims) have either (x) voted to accept the Plan or (y) will receive an amount under the Plan as of the Effective Date that is not less than the amount that such Holders would receive in a hypothetical chapter 7 liquidation as of such date.

64.     I have been informed that Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims) have voted overwhelmingly to accept the Plan as follows:

(a)     100% in amount and 100% in number in Class 1-A (Bondholder Claims – Series 2018 Bonds);

(b)     99.59% in amount and 98.00% in number in Class 1-B (Bondholder Claims – Series 2011 Bonds);

(c)     91.70% in amount and 88.14% in number in Class 3 (General Unsecured Claims);

      (d)      98.02% in amount and 98.02% in number in Class 4 (Bondholder Deficiency Claims); and

      (e)      99.69% in amount and 99.69% in number in Class 5 (Pension Claims).

I have been informed that Class 6 (Intercompany Claims) is deemed to have rejected the Plan.

65.      Relying on information from the Debtors' advisors and my own personal knowledge, I have reviewed the classification of Claims under the Plan and the proposed distributions to each Class of Claims. Based on my review, to the best of my knowledge, information, and belief, I believe that the Plan satisfies the "best interests test" with respect to Classes 1-A, 1-B, 3, 4, and 5 because each of the Holders of Claims in such Classes has either (a) voted to accept the Plan or (b) is expected to receive a higher recovery under the Plan than under a hypothetical chapter 7 liquidation.

66.      In order to determine whether the Plan satisfies the "best interests test," the Debtors, with the assistance of ToneyKorf Partners, prepared a liquidation analysis, which is attached to the Disclosure Statement as Exhibit A (the "Liquidation Analysis"). I personally oversaw the preparation of the Liquidation Analysis and worked closely with a team of ToneyKorf Partners staff in its development. The Liquidation Analysis was completed after due diligence by the Debtors and ToneyKorf Partners, and was based on, but not merely the product of, a variety of assumptions, which I believe are reasonable.

67.      The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical conversion to chapter 7 of the Bankruptcy Code with the estimated recoveries to holders of Allowed Claims under the Plan. The Liquidation Analysis is based on the estimated value of the Debtors' assets and liabilities as of the Liquidation Date in a forced sale by a chapter 7 trustee, and incorporate various estimates and assumptions, including the projected costs associated with the administration of the estates and wind-down of

the Debtors' operations in a hypothetical conversion to a chapter 7 liquidation. Further, the

assumptions contained within the Liquidation Analysis are subject to potentially material changes,

including with respect to economic and business conditions as well as legal rulings.

68. The projected recoveries under the Plan and the results of the Liquidation Analysis

for all Holders of Claims are as follow:

| Class | Claim/Interest | Projected Plan Recovery (Low) | Projected Plan Recovery (High) | Projected Liquidation Recovery |
|---|---|---|---|---|
| 1-A | Bondholder Claims – Series 2018 Bonds | 77% | 96% | 85% - 100% |
| 1-B | Bondholder Claims – Series 2011 Bonds | 77% | 96% | 85% - 100% |
| 2 | Other Secured Claims | 100% | 100% | 0% - 35% |
| 3 | General Unsecured Claims | 8% | 10% | 0% |
| 4 | Bondholder Deficiency Claims | TBD | TBD | 0% |
| 5 | Pension Claims | 8% | 10% | 0% |
| 6 | Intercompany Claims | N/A | N/A | N/A |

69. A comparison of the range of projected recoveries under the Liquidation Analysis

to the estimated Plan recoveries indicates that each holder of an Impaired Claim will receive or

retain under the Plan property of a value, as of the Effective Date, that is not less than the value

such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The chapter 7 liquidation recoveries for unsecured creditors are substantially lower than the

recoveries provided by the Plan. Accordingly, coupled with the overwhelming support for the Plan

from all voting classes, I believe that the Plan satisfies the "best interests test" of Bankruptcy Code

section 1129(a)(7).

**G. The Plan is Expected to Have Been Accepted by Certain Impaired Classes Entitled to Vote—Section 1129(a)(8).**

70. Based on consultation with the Debtors' counsel, it is my understanding that

Bankruptcy Code section 1129(a)(8) requires that each class of claims or interests under a plan has

either accepted the plan or is not impaired under the plan. As discussed above, Holders of Claims in Class 2 (Other Secured Claims) are Unimpaired under the Plan within the meaning of Bankruptcy Code section 1124 and are conclusively presumed to have accepted the Plan. Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims) are Impaired and entitled to vote on the Plan. I understand that Classes 1-A, 1-B, 3, 4, and 5 overwhelmingly voted to accept the Plan.

71.     Based on consultation with the Debtors' counsel, I also understand that Holders of Intercompany Claims in Class 6 are deemed to have rejected the Plan, and thus, were not entitled to vote. Accordingly, I believe that, while the Plan does not satisfy Bankruptcy Code section 1129(a)(8) of the Bankruptcy Code with respect to Class 6, the Plan is confirmable nonetheless because it satisfies the "cramdown" requirements in Bankruptcy Code sections 1129(a)(10) and 1129(b), as discussed below.

**H.     The Plan Provides for Payment in Full of All Allowed Priority Claims— Section 1129(a)(9).**

72.     Based on consultation with the Debtors' counsel, it is my understanding that Bankruptcy Code section 1129(a)(9) generally requires that holders of certain priority claims must be repaid in full in cash or receive certain other specified treatment. I believe that the Plan satisfies Bankruptcy Code section 1129(a)(9) because Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims will be paid in full under the Plan.

**I.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan— Section 1129(a)(10).**

73.     Based on consultation with the Debtors' counsel, it is my understanding that Bankruptcy Code section 1129(a)(10) provides that, to the extent there is an impaired class of

claims, at least one impaired class of claims must accept the plan "without including the acceptance of the plan by any insider." It is my understanding that Holders of Claims in Classes 1-A, 1-B, 3, 4, and 5—all of the Impaired Classes entitled to vote on the Plan—voted overwhelmingly to accept the Plan independent of any insiders' votes, thereby satisfying Bankruptcy Code section 1129(a)(10).

### J.    The Plan is Feasible—Section 1129(a)(11).

74.    Based on consultation with the Debtors' counsel, I understand that to satisfy the feasibility requirement of Bankruptcy Code section 1129(a)(11), a debtor must demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor, unless such liquidation or reorganization is proposed in the plan. As the Plan is a plan of liquidation, and such liquidation was proposed in the Plan, the feasibility requirements of Bankruptcy Code section 1129(a)(11) are satisfied.

### K.    The Plan Provides for Payment of All Fees—Section 1129(a)(12).

75.    Based on consultation with the Debtors' counsel, I understand that Article XVII.C of the Plan provides that all fees and charges under 28 U.S.C. § 1930(a), to the extent not previously paid and are due and owing, will be paid for each quarter (or any fraction thereof) until the applicable chapter 11 case of the Liquidating Debtors is converted, dismissed, or closed, whichever occurs first. Therefore, I believe that the Plan satisfies Bankruptcy Code section 1129(a)(12).

### L.    Inapplicable Provisions—Section 1129(a)(13)-(15).

76.    Based on consultation with the Debtors' counsel, it is my understanding that Bankruptcy Code section 1129(a)(13) is inapplicable because the Debtors do not provide "retiree

benefits" within the meaning of Bankruptcy Code section 1114. It is also my understanding that Bankruptcy Code section 1129(a)(14) relates to the payment of domestic support obligations. Since the Debtors are not subject to any domestic support obligations, it is my understanding that the requirements of Bankruptcy Code section 1129(a)(14) do not apply. Likewise, Bankruptcy Code section 1129(a)(15) applies only in cases in which the debtor is an "individual" as the term is defined in the Bankruptcy Code. Because the Debtors are not an "individual," it is my understanding that the requirements of Bankruptcy Code section 1129(a)(15) do not apply. Finally, I understand that Bankruptcy Code section 1129(a)(16) is inapplicable to the Plan because it applies only to corporations and trusts that are not "moneyed, business, or commercial."

### III.   The Plan Satisfies the "Cram Down" Requirements of Bankruptcy Code Section 1129(b).

77.   Based on consultation with the Debtors' counsel, it is my understanding that Bankruptcy Code section 1129(b)(1) provides that, if all applicable requirements of Bankruptcy Code section 1129(a) are met other than Bankruptcy Code section 1129(a)(8), a plan may be confirmed so long as the requirements set forth in Bankruptcy Code section 1129(b) are satisfied. To do so, the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes. For the reasons set forth below, I believe that the Plan satisfies Bankruptcy Code section 1129(b).

78.   I understand that each of the five Impaired Classes entitled to vote on the Plan—Classes 1-A, 1-B, 3, 4, and 5—overwhelmingly voted to accept the Plan. I also understand that the only non-consenting Class is Class 6 (Intercompany Claims), which was deemed to reject the Plan. It is my understanding that the Plan is nonetheless confirmable because, as discussed in greater detail below, it satisfies the "cramdown" requirements of Bankruptcy Code section 1129(b) with respect to Class 6.

**A.     The Plan Does Not Discriminate Unfairly with Respect to Impaired Classes that Have Not Voted to Accept the Plan—Section 1129(b)(1).**

79.     Based on consultation with the Debtors' counsel, it is my understanding that a plan unfairly discriminates where similarly-situated classes are treated differently without a reasonable basis for the disparate treatment. I believe that the Plan does not discriminate unfairly with respect to Class 6 (Intercompany Claims) because there is a reasonable and nondiscriminatory reason for its separate classification. It is my understanding that Holders of Claims in Class 6 consist of all Intercompany Claims. As such, I believe that any disparate treatment between Classes under the Plan is attributable to key differences between such Classes. Accordingly, I believe that the Plan does not discriminate unfairly with respect to Class 6 and the Plan may be confirmed notwithstanding its deemed rejection by Class 6.

**B.     The Plan is Fair and Equitable—Section 1129(b)(2)(B)(ii).**

80.     Based on consultation with the Debtors' counsel, my understanding is that a plan is considered "fair and equitable" pursuant to Bankruptcy Code sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) if, with respect to a class of impaired unsecured claims or interests, the plan provides that either (a) an impaired rejecting class of claims or interests be paid in full or (b) a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest. I understand this is referred to as the "absolute priority rule," which requires that if the holders of claims in a particular rejecting class receive less than full value for their claims, no holders of claims or interests in a junior class may receive any property under the plan. I believe that the Plan is fair and equitable because, under the Plan, no Holder of a Claim junior to an Impaired rejecting Class of Claims will receive any recovery under the Plan on account of such Claim.

81.     In addition, I understand that no Class is receiving more than the value of its Claims in exchange for such Claims. In particular, no Holders of Claims junior to Class 6 will receive or retain or retain any property under the Plan. Accordingly, I believe that the Plan is "fair and equitable" with respect to Class 6 and satisfies Bankruptcy Code section 1129(b).

## IV.     The Plan Complies with the Other Provisions of Bankruptcy Code Section 1129— Sections 1129(c)-(e).

82.     Based on consultation with the Debtors' counsel, I believe that the Plan satisfies the remaining provisions of Bankruptcy Code section 1129.  First, Bankruptcy Code section 1129(c), which prohibits confirmation of multiple plans, is not implicated here because the Plan is the only plan filed in the Chapter 11 Cases. Second, I understand that the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933, and no government unit or any other party has requested that the Court decline to confirm the Plan on such grounds, satisfying Bankruptcy Code section 1129(d). Finally, I understand that Bankruptcy Code section 1129(e) is inapplicable because the Chapter 11 Cases are not a "small business case." Therefore, the Plan satisfies the remaining provisions of Bankruptcy Code section 1129(c)-(e).

## V.     Modification of the Plan—Section 1127.

83.     As the Debtors continue to resolve remaining Plan objections and clarify non-material issues, certain additional modifications may be reflected in a further amended Plan filed with the Court or referenced on the record during the Confirmation Hearing. It is my understanding that the modifications to the Plan are not adverse to the creditors who were solicited to vote on the Plan. The modifications either improve or are effectively neutral with respect to creditor treatment, address specific concerns raised by particular Holders of Claims, memorialize key settlements, and/or clarify existing Plan provisions. Accordingly, I believe that all modifications to the Plan are non-material or improve creditor treatment. As a result, I have been advised by counsel that the

Debtors are not required to resolicit Plan acceptances and all Holders who previously accepted the Plan should be deemed to accept the Plan, as modified.

<u>**CONCLUSION**</u>

84.     As evidenced by the foregoing, I believe that the Plan and the compromises and agreements embodied therein have been structured to accomplish the Debtors' goal of maximizing the estates' value. I believe that the significant settlements achieved, as set forth herein, further reflect the overall fairness and reasonableness of the Plan and that the Plan has been proposed in good faith and for proper purposes. As a result, I believe that the Plan presents the best (and only) option for the Debtors, is in the best interest of creditors, and should be confirmed. I hereby reserve my right to amend the testimony set forth herein as necessary at the Confirmation Hearing.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 14, 2024

*/s/ Mark E. Toney*
Mark E. Toney
Chief Restructuring Officer
Mercy Hospital, Iowa City, Iowa