**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | ) | Case No. 23-00623 (TJC) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Related to Docket Nos. 926, 993, 1016, 1017,** |
| | ) | **1018, 1037, 1049, 1050** |

**DEBTORS' (I) MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF
THE DEBTORS' FIRST AMENDED COMBINED DISCLOSURE STATEMENT
AND JOINT CHAPTER 11 PLAN OF LIQUIDATION AND
(II) OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION**

**NYEMASTER GOODE, P.C.**
Roy Leaf, AT0014486
625 First Street SE, Suite 400
Cedar Rapids, IA 52401
Telephone: (319) 286-7002
Facsimile: (319) 286-7050
Email: rleaf@nyemaster.com

- and -

Kristina M. Stanger, AT0000255
Matthew A. McGuire, AT0011932
Dana Hempy, AT0014934
700 Walnut, Suite 1600
Des Moines, IA 50309
Telephone: (515) 283-3100
Facsimile: (515) 283-8045
Email: kmstanger@nyemaster.com
mmcguire@nyemaster.com
dhempy@nyemaster.com

*Counsel for Debtors and Debtors-in-Possession*

Dated: May 14, 2024

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (admitted *pro hac vice*)
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: fperlman@mwe.com
dsimon@mwe.com
ekeil@mwe.com

## TABLE OF CONTENTS

RELIEF REQUESTED................................................................................................ 3

PRELIMINARY STATEMENT ................................................................................ 3

BACKGROUND ....................................................................................................... 6

    I.     The Chapter 11 Cases ................................................................................ 6

    II.    Combined Disclosure Statement & Plan.................................................. 7

    III.   The Solicitation Process and Voting Results ......................................... 10

ARGUMENT ........................................................................................................... 12

    I.     The Plan Should be Confirmed Because It Complies with the Requisite Standards of the Bankruptcy Code. ........................................................................................ 12

        A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code—Section 1129(a)(1). ............................................... 12

            i.     The Plan Satisfies the Classification Requirements of Bankruptcy Code Section 1122. ...................................................... 13

            ii.    The Plan Satisfies the Applicable Mandatory Plan Requirements of Bankruptcy Code Section 1123(a). ............................................... 14

            iii.   The Plan Complies with the Discretionary Provisions of Bankruptcy Code Section 1123(b). ............................................... 17

        B.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code—Section 1129(a)(2). ............................................... 44

            i.     The Debtors Complied with Bankruptcy Code Section 1125....... 45

            ii.    The Debtors Complied with Bankruptcy Code Section 1126....... 45

        C.    The Plan is Proposed in Good Faith and Not by Any Means Forbidden by Law—Section 1129(a)(3). ................................................. 46

        D.    The Plan Provides that the Debtors' Payment of Professional Fees and Expenses is Subject to Court Approval—Section 1129(a)(4). ............................................................................................... 47

        E.    The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders—Section 1129(a)(5). ............................................................................................... 48

F.      The Plan Does Not Require Governmental Regulatory Approval—Section 1129(a)(6). ............................................................ 48

G.     The Plan is in the Best Interests of All of the Debtors' Creditors—Section 1129(a)(7)..................................................... 49

H.     The Plan is Confirmable Notwithstanding the Requirements of Bankruptcy Code Section 1129(a)(8). ................................... 50

I.       The Plan Provides for Payment in Full of All Allowed Priority Claims—Section 1129(a)(9). ......................................... 51

J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan—Section 1129(a)(10). ................................. 51

K.     The Plan is Feasible—Section 1129(a)(11). ............................. 52

L.      All Statutory Fees Have Been or Will be Paid—Section 1129(a)(12). .................................................................... 53

M.    Bankruptcy Code Sections 1129(a)(13)-(16) Do Not Apply to the Plan. ................................................................. 53

N.     The Plan Satisfies the "Cram Down" Requirements of Bankruptcy Code Section 1129(b)......................................... 54

O.     The Plan Complies with the Other Provisions of Bankruptcy Code Section 1129—Section 1129(c)-(e). ................................ 55

MODIFICATIONS TO THE PLAN .......................................................... 56

GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER ....... 57

CONCLUSION.................................................................................. 57

**RELIEF REQUESTED**

Mercy Hospital, Iowa City, Iowa and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession (collectively, the "Debtors")[1] in the above-captioned chapter 11 cases, hereby submit this memorandum of law (this "Memorandum") in support of entry of an order, filed contemporaneously herewith, granting confirmation of the *Debtors' First Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation* dated May 14, 2024 [Docket No. 1050], pursuant to section 1129 of title 11 of the United States Code (the "Bankruptcy Code"). In support of Confirmation of the Plan, the Debtors rely on (i) the *Declaration of Emily Young of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 1037] (the "Voting Declaration"); and (ii) the *Declaration of Mark E. Toney, Chief Restructuring Officer of Mercy Hospital, Iowa City, Iowa, in Support of Confirmation of Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* (the "Toney Declaration"), filed contemporaneously herewith, both of which are fully incorporated herein by reference.  In further support of Confirmation of the Plan, the Debtors respectfully state as follows:

**PRELIMINARY STATEMENT**

1.    These Chapter 11 Cases commenced over nine months ago with the goal of selling substantially all of the Debtors' assets and transferring Mercy's operations to the highest and best bidder, then subsequently maximizing value for all creditors through a chapter 11 plan of liquidation.  While the Debtors successfully consummated the sale to the State University of Iowa (the "University"), the highest and best offeror, earlier this year, the first few months following

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Combined Disclosure Statement and Plan (as defined herein).

the Petition Date can only be characterized as acrimonious at best across all creditor constituencies. Indeed, at several stages of the Chapter 11 Cases, the Debtors feared that reaching a consensual, value-maximizing chapter 11 plan was next to impossible, given the deep-seeded dissention between key parties-in-interest and their litigious proclivities.  Yet, the Debtors stand on the precipice of confirming a Plan that is supported by and consensual amongst each of the Debtors' major stakeholders, including the Bondholder Representatives, the UCC, and the Pension Committee (collectively, the "Settlement Parties") as a result of the settlements embodied in the Plan (the "Plan Settlement"), as well as a substantial majority of the unsecured creditors voting on the Plan.[2]

2.      While the Plan enjoys the support of the majority of the Debtors' stakeholders, three objections to confirmation were filed at Docket Nos. 1016, 1017, 1018 (collectively, the "Objections").[3]  The sole objectors to the Plan were originally (a) Mercy Health Network, Inc. d/b/a MercyOne ("MercyOne"), the Debtors' former management company; (b) Progressive Rehabilitation Associates, LLC ("PRA"); and (c) Nancy Russo, J. Nicholas Russo, and Brent Strabala (collectively, the "Objecting Pensioners" and, together with MercyOne and PRA, the "Objectors").  However, in the days leading up to confirmation, the Objecting Pensioners withdrew their objection [Docket No. 1049] and, as discussed herein, counsel to PRA represented to Debtors' counsel that the PRA Objection was filed solely as a protective measure with respect to the PRA

---

[2]    As set forth in the Voting Declaration, Holders of Claims in the other Voting Classes overwhelmingly voted to accept the Plan: Class 1-A (Bondholder Claims – Series 2018 Bonds) voted to accept the Plan by 100% in amount and 100% in number; Class 1-B (Bondholder Claims – Series 2011 Bonds) voted to accept the Plan by 99.59% in amount and 98.00% in number; Class 3 (General Unsecured Claims) voted to accept the Plan by 91.70% in amount and 88.14% in number; Class 4 (Bondholder Deficiency Claims) voted to accept the Plan by 98.02% in amount and 98.02% in number; and Class 5 (Pension Claims) voted to accept the Plan by 99.69% in amount and in number.  *See* Voting Decl., Ex. A.

[3]    Importantly, of the hundreds of parties-in-interest who were served with the Confirmation Hearing Notice (as defined herein), only three objections to Plan confirmation were filed.

Payment Motion (as defined herein).  Accordingly, MercyOne effectively stands alone as the sole remaining Objector, whose arguments fall woefully short of meriting denial of the otherwise entirely consensual Plan.

3.    MercyOne primarily takes aim at the Third-Party Release, arguing that it is impermissibly broad[4] and fails to satisfy the requisite standard for approval.  Quizzically, MercyOne also argues that the Plan fails to satisfy due process as a result of the opt-out mechanism contained therein with respect to granting the Third-Party Release, despite the fact that **MercyOne itself opted out of the Third-Party Release and is accordingly neither a Releasing Party under the Plan nor impacted by the Third-Party Release**.[5]  MercyOne's arguments amount to nothing more than self-promotional attacks on well-established case law, the standards of which are met under the narrow and unique facts and circumstances in these Chapter 11 Cases.

4.    At bottom, the Plan represents the Debtors' best and only option at this juncture, particularly given the Plan's consensual nature amongst all of the Debtors' key constituents.  Indeed, the voting classes—Classes 1-A, 1-B, 3, 4, and 5—voted in favor of the Plan overwhelmingly, with no Classes supporting less than 88%.  MercyOne has not proposed any alternative, let alone one that provides for the same or greater creditor recoveries as proposed in the Plan.

---

[4]    As discussed herein, the Debtors have narrowed the definition of "Released Parties" and have removed certain of the categories of parties to which MercyOne objects.  *See infra*, at 25-27.

[5]    As discussed herein, the Debtors believe that MercyOne does not have standing to object to the Third-Party Release because it is neither harmed nor impacted by the same.  Even if MercyOne had standing to lodge such an objection—which it does not—it cannot plausibly argue that the Third-Party Release renders the Plan unconfirmable, particularly when viewed from a fairness perspective.  To the contrary, denying confirmation because of the (inaccurate) views of one self-interested creditor, who opted out of the very release it objects to, is quintessentially unfair to all other case constituents.  MercyOne should not be permitted to harpoon the Plan in furtherance of its own litigation agenda, particularly when doing so risks negatively impacting all other unsecured creditors.

5.      In sum, contrary to MercyOne's assertions, and as described below, the Plan satisfies all applicable elements of Bankruptcy Code section 1129 and otherwise complies with all applicable sections of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the United States Bankruptcy Court for the Northern District of Iowa (the "Local Rules"), and non-bankruptcy law.    Accordingly, the Debtors respectfully request that the Court overrule the remaining Objections and confirm the Plan.

## **BACKGROUND**

### I.    **The Chapter 11 Cases**

6.      On August 7, 2023 (the "Petition Date"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").    The Chapter 11 Cases are being jointly administered for procedural purposes only.    The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

7.      On August 15, 2023, the Office of the United States Trustee for the Northern District of Iowa (the "U.S. Trustee") appointed the Official Committee of Unsecured Creditors (the "UCC") in the Chapter 11 Cases [Docket No. 107].    On November 4, 2023, the U.S. Trustee appointed the Official Committee of Pensioners (the "Pension Committee") in the Chapter 11 Cases [Docket No. 458].    No trustee or examiner has been appointed in the Chapter 11 Cases.

8.      Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the *Declaration of Mark E. Toney in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 27] (the "First Day Declaration").

II.      **Combined Disclosure Statement & Plan**

9.      On February 23, 2024, the Debtors filed the *Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 760] (the "Original Plan").  On March 1, 2024, the Debtors filed the *Debtors' Motion for Entry of Order (I) Approving Disclosure Statement; (II) Scheduling Hearing on Confirmation of Plan; (III) Establishing Deadlines and Procedures for (A) Filing Objections to Confirmation of Plan, (B) Claim Objections, and (C) Temporary Allowance of Claims for Voting Purposes; (IV) Determining Treatment of Certain Unliquidated, Contingent, or Disputed Claims for Notice, Voting, and Distribution Purposes; (V) Setting Record Date; (VI) Approving (A) Solicitation Packages and Procedures for Distribution, (B) Form of Notice of Hearing on Confirmation and Related Matters, and (C) Forms of Ballots; (VII) Establishing Voting Deadline and Procedures for Tabulation of Votes; and (VIII) Granting Related Relief* [Docket No. 796] (the "Solicitation Procedures Motion").

10.     Following the filing of the Original Plan, the Debtors, the UCC, the Pension Committee, and the Bondholder Representatives (collectively, the "Settlement Parties") engaged in extensive, good faith, and arm's-length negotiations regarding a potential settlement of claims, counterclaims, and causes of action held by the Debtors.  Recognizing the critical importance of reaching a resolution, the Settlement Parties continued to engage in extensive and hard-fought negotiations for several months, culminating in an in-person settlement conference in Iowa on March 18, 2024, which ultimately resulted in the Plan Settlement.

11.     On March 29, 2024, the Debtors filed the *Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 927] (the disclosures contained therein, the "Disclosure Statement" and the plan contained therein, as may be subsequently amended, modified, or supplemented, the "Plan" and collectively, as may be

amended, supplemented, or otherwise modified, the "Combined Disclosure Statement and Plan"),

which incorporated the terms of the Plan Settlement, including the following key terms:

(a)      the Bondholder Claim will consist of an Allowed Secured Claim of $62,800,000, *inclusive* of amounts paid pursuant to the Cash Collateral Orders during the Chapter 11 Cases;

(b)      the Unsecured Claims Initial Cash Amount will be increased from $1,200,000 to $2,200,000 through the contribution of an additional $1,000,000 from the Bondholder Representatives for the benefit of unsecured creditors;

(c)      the Bondholder Deficiency Claim will be capped at $1,500,000;

(d)      60% of recoveries on Litigation Claims will be allocated to the Holders of General Unsecured Claims and Pension Claims, with the remaining 40% going to the Bondholder Representatives;

(e)      the Liquidation Trust shall be monitored by the three-member Trust Oversight Committee, consisting of one member appointed by each of the Bondholder Representatives, the UCC, and the Pension Committee; and

(f)      the Pension Trust shall receive $733,333.33 on or as soon as reasonably practicable after the Effective Date as an advance distribution, subject to the terms set forth in the Plan.

Based upon the Debtors' likely ranges of potential recoveries on potential claims and causes of

action, including assessments regarding the costs and time to pursue, potential defenses, risks in

achieving success, potential collection risk, and numerous other factors, the Debtors determined

that the likelihood of achieving a greater return for its creditors by means other than the

compromises embodied in the Plan was virtually impossible.

     12.      On April 3, 2024, the Debtors filed the solicitation version of the Combined

Disclosure Statement and Plan [Docket No. 927].

     13.      On April 29, 2024, the Debtors filed the *Plan Supplement with Respect to Debtors'*

*First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket

No. 993] (the "Plan Supplement"), which (a) contained the form Liquidation Trust Agreement and

(b) disclosed (i) William H. Henrich from Getzler Henrich & Associates, LLC as the proposed Liquidation Trustee and (ii) Agilis, LLC as the proposed Pension Plan Administrator, subject to further negotiation and documentation.

14.    On May 6, 2024, the following objections to confirmation of the Plan were filed:

(a)    *Objection of MercyOne to Confirmation of the Debtors' Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 1016] (the "MercyOne Objection");

(b)    *Limited & Protection Objection to Chapter 11 Plan* [Docket No. 1017] (the "PRA Objection");[6] and

(c)    *Limited Objection of Certain Concerned Pensioners to Confirmation of the Amended Joint Chapter 11 Plan of Liquidation* [Docket No. 1018] (the "Pensioners' Objection").

15.    On May 9, 2024, the *Declaration of Emily Young, on Behalf of Epiq Corporate Restructuring, LLC, Regarding Solicitation and Tabulation of Ballots Cast on Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* [Docket No. 1037] (the "Voting Declaration").

16.    On May 14, 2024, the Objecting Pensioners withdrew the Pensioners' Objection. *See* Docket No. 1049.

17.    Contemporaneously herewith, the Debtors filed (a) the *Declaration of Mark E. Toney, Chief Restructuring Officer of Mercy Hospital, Iowa City, Iowa, in Support of Confirmation of Debtors' Joint Chapter 11 Plan of Liquidation*; (b) the *Proposed Findings of Fact, Conclusions*

---

[6]    On April 26, 2024, PRA filed the *Progressive Rehabilitation Associates' Motion for Payment of Ordinary Course Invoices* [Docket No. 990] (the "PRA Payment Motion"), seeking payment of certain invoices. As will be discussed on the record at the Confirmation Hearing, PRA's counsel has represented to Debtors' counsel that the PRA Objection was filed solely as a protective measure to ensure that the Plan does not impact the relief requested in PRA Payment Motion, which is currently set for hearing on May 31, 2024. The Debtors do not believe that the Plan affects or impairs the PRA Payment Motion or the relief sought therein, as if granted, the amount requested by PRA will be paid from the administrative expense pool. Accordingly, the PRA Objection will not otherwise be addressed or discussed herein.

*of Law, and Order Confirming Debtors' Joint Chapter 11 Plan of Liquidation*; and (c) a modified version of the Plan [Docket No. 1050], reflecting certain technical modifications (the "Modifications") in order to narrow certain issues raised by the Objections.  The Modifications are minor, immaterial, and do not impact treatment of any Class under the Plan.

### III.    The Solicitation Process and Voting Results

18.    On April 3, 2024, the Court entered the order approving the Solicitation Procedures Motion [Docket No. 926] (the "Solicitation Procedures Order"), which, among other things, (a) approved the Disclosure Statement on a final basis as containing "adequate information" to enable a hypothetical, reasonable creditor to make an informed judgment as to whether to accept or reject the Plan; (b) authorized the Debtors to use the Disclosure Statement in connection with the solicitation of votes to accept or reject the Plan; (c) established the deadline for voting on the Plan as May 6, 2024 (the "Voting Deadline"); (d) approved the solicitation procedures regarding votes to accept or reject the Plan (the "Solicitation Procedures"); and (e) approved the form and notice of the confirmation hearing notice (the "Confirmation Hearing Notice").

19.    On April 4, 2024, the Debtors filed the Confirmation Hearing Notice [Docket No. 930].  On April 8, 2024, the Debtors caused their voting and solicitation agent, Epiq Corporate Restructuring, LLC (the "Voting Agent") to serve the Confirmation Hearing Notice on all creditors in the Chapter 11 Cases.  On or about April 11, 2024, the Debtors published the Confirmation Hearing Notice in the *Iowa City Press Citizen* and the *Des Moines Register*.[7]

20.    Furthermore, on April 8, 2024, the Debtors caused the Voting Agent to distribute packages containing the Combined Disclosure Statement and Plan, a letter in support of the Plan from the UCC, the Solicitation Procedures Order (without exhibits), and the Confirmation Hearing

---

[7]    On April 18, 2024, the Debtors filed the *Debtors' Certificate of Service by Publication* of the Confirmation Hearing Notice in the *Iowa City Press Citizen* and *Des Moines Register* [Docket Nos. 970, 971].

Notice (collectively, the "Solicitation Packages") and accompanying ballots (the "Ballots") to Holders of Claims in Classes 1-A, 1-B, 3, 4, and 5 (the "Voting Classes") who were entitled to vote on the Plan as of March 28, 2024 (the "Voting Record Date").[8]  Additionally, on or about April 25, 2024, the Debtors caused the Voting Agent to distribute the Combined Disclosure Statement and Plan, a letter in support of the Plan from the Pension Committee, the applicable ballot, the Solicitation Procedures Order (without exhibits), and the Confirmation Hearing Notice (collectively, the "Provisional Solicitation Packages") to all Persons receiving payments under the Pension Plan who did not file a Proof of Claim in the Chapter 11 Cases (each, a "Provisional Pension Claim Holder") pursuant to paragraphs 8 through 10 of the Solicitation Procedures Order.[9]

21.     Following the Voting Deadline, the Debtors, through the Voting Agent, conducted an audit of all Ballots received and completed a final tabulation of votes.  These audited voting results are reflected below and in the Voting Declaration:

| Total Ballots Counted | | | | |
|---|---|---|---|---|
| **Voting Class** | **Accept** | | **Reject** | |
| | **Amount** | **Number** | **Amount** | **Number** |
| Class 1-A (Bondholder Claims – Series 2018 Bonds) | $37,875,000.00 100.00% | 2 100.00% | $0.00 0.00% | 0 100.00% |
| Class 1-B (Bondholder Claims – Series 2011 Bonds) | $13,245,000.00 99.59% | 196 98.00% | $55,000.00 0.41% | 4 2.00% |
| Class 3 (General Unsecured Claims) | $13,840,282.25 91.70% | 52 88.14% | $1,252,338.37 8.30% | 7 11.86% |
| Class 4 (Bondholder Deficiency Claims) | $198.00 98.02% | 198 98.02% | $4.00 1.98% | 4 1.98% |
| Class 5 (Pension Claims) | $326 99.69% | 326 99.69% | $1.00 0.31% | 1 0.31% |

---

[8]     On April 18, 2024, the Voting Agent filed the *Certificate of Service of Solicitation Materials* [Docket No. 967] (the "Solicitation COS").

[9]     On May 3, 2024, the Voting Agent filed the *Certificate of Supplemental Service of Solicitation Materials* [Docket No. 1013] (the "Supplemental Solicitation COS").

22.     Therefore, given the substantial and overwhelming support for the Plan and the

Debtors' satisfaction of the standards set forth by the Bankruptcy Code and governing case law in

this jurisdiction, as discussed herein, the Debtors respectfully request that the Court confirm the

Plan.

## ARGUMENT

**I.      The Plan Should be Confirmed Because It Complies with the Requisite Standards of the Bankruptcy Code.**

23.     To obtain Confirmation of the Plan, the Debtors, as plan proponent, must prove by

a preponderance of the evidence that each element of Bankruptcy Code sections 1129(a) and

1129(b) has been satisfied.[10]   The Debtors are prepared to demonstrate, and will do so through this

Confirmation Brief, the Toney Declaration, and the Voting Declaration, and, to the extent

necessary, through testimony and argument at the Confirmation Hearing, that the Plan satisfies

each element of Bankruptcy Code sections 1129(a) and 1129(b).

**A.      The Plan Complies with the Applicable Provisions of the Bankruptcy Code— Section 1129(a)(1).**

24.     Under Bankruptcy Code section 1129(a)(1), a plan must "compl[y] with the

applicable provisions of [the Bankruptcy Code]."[11]   The legislative history of Bankruptcy Code

section 1129(a)(1) explains that this provision also encompasses the requirements of Bankruptcy

Code sections 1122 and 1123, which govern the classification of claims and the content of a plan

---

[10]    *See FishDish, LLC v. Veroblue Farms USA, Inc.*, No. 19-CV-3026 (CJW), 2022 WL 1093271, at *10 (Bankr. N.D. Iowa Apr. 12, 2022) ("The plan proponent bears the burden of proof to establish by a preponderance of the evidence that its plan meets the best interests test."); *In re Internet Navigator Inc.*, 289 B.R. 128, 131 (Bankr. N.D. Iowa 2003) ("The proponent of the plan bears the burden of proof with respect to each element of sections 1129(a) and 1129(b) under a preponderance of the evidence standard.").

[11]    11 U.S.C. § 1129(a)(1).

of reorganization, respectively.[12]  As explained below, the Plan complies with the requirements of

Bankruptcy Code sections 1122, 1123, and 1129, as well as other applicable provisions.

>    **i.    The Plan Satisfies the Classification Requirements of Bankruptcy Code Section 1122.**

25.     The classification requirements of Bankruptcy Code section 1122(a) provide, in

pertinent part, that "[e]xcept as provided in subsection (b) of this section, a plan may place a claim

or an interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class."[13]  Although the Bankruptcy Code does not define "substantially

similar," these words have generally been interpreted to mean similar in legal character to other

claims against a debtor's assets or to other interests of the debtor.[14]  Courts have recognized that

plan proponents have significant flexibility in placing similar claims into different classes,

provided there is a rational basis to do so.[15]

26.     The Plan provides for the separate classification of Claims into the following seven

Classes:

     (a)    <u>Class 1-A</u>: Bondholder Claims – Series 2018 Bonds
     (b)    <u>Class 1-B</u>: Bondholder Claims – Series 2011 Bonds
     (c)    <u>Class 2</u>: Other Secured Claims
     (d)    <u>Class 3</u>: General Unsecured Claims
     (e)    <u>Class 4</u>: Bondholder Deficiency Claims
     (f)    <u>Class 5</u>: Pension Claims
     (g)    <u>Class 6</u>: Intercompany Claims

---

[12]    *See* S. Rep. No. 95-989, at 126 *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008); *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984).

[13]    11 U.S.C. § 1122(a).

[14]    *See* 7 Collier on Bankruptcy ¶ 1122.03[3] (Alan N. Resnick & Henry J. Sommers eds., 16th ed.).

[15]    *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).

27.     The foregoing classification of Claims satisfies the requirements of Bankruptcy Code section 1122 because the Plan places Claims in each Class based on relevant criteria, including legal or factual distinctions.  Specifically, the Claims assigned to each particular Class listed above are substantially similar to the other Claims in such Class.  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims.

28.     Accordingly, the Claims assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and legal distinctions.  Thus, the Debtors submit that the Plan fully complies with and satisfies the classification requirements of Bankruptcy Code section 1122.

> **ii.     The Plan Satisfies the Applicable Mandatory Plan Requirements of Bankruptcy Code Section 1123(a).**

29.     Bankruptcy Code section 1123(a) sets forth eight criteria that every chapter 11 plan must satisfy.[16]  As set forth below, the Plan satisfies each of these requirements.

> **a.     Designation of Classes of Claims and Interests—Section 1123(a)(1).**

30.     Bankruptcy Code section 1123(a)(1) requires a plan to "designate, subject to section 1122 of this title, classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests[.]"[17]  As discussed, Article

---

[16]  However, Bankruptcy Code section 1123(a)(8) is inapplicable to the Plan and not discussed herein because the Debtors are not "individuals" (as that term is defined in the Bankruptcy Code).

[17]  11 U.S.C. § 1123(a)(1).

V of the Plan designates seven separate Classes and each Class contains Claims or Interests that are substantially similar,[18] thus satisfying Bankruptcy Code section 1123(a)(1).

### b.    Specification of Unimpaired Classes—Section 1123(a)(2).

31.    Bankruptcy Code section 1123(a)(2) requires a plan to "specify any class of claims or interests that is not impaired under the plan[.]"[19]  Article V of the Plan identifies Class 2 (Other Secured Claims) as Unimpaired, thereby satisfying Bankruptcy Code section 1123(a)(2).

### c.    Treatment of Impaired Claims—Section 1123(a)(3).

32.    Bankruptcy Code section 1123(a)(3) requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan[.]"[20]  Article V of the Plan identifies each Class that is Impaired, including Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), Class 5 (Pension Claims), and Class 6 (Intercompany Claims), and specifies the treatment of these Impaired Classes, thereby satisfying Bankruptcy Code section 1123(a)(3).

### d.    Equal Treatment of Similarly Situated Claims and Interests—Section 1123(a)(4).

33.    Bankruptcy Code section 1123(a)(4) requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[21]  Here, Article

---

[18]   *See* Plan, Art. V.  In accordance with Bankruptcy Code section 1123(a)(1), Priority Tax Claims, Priority Non-Tax Claims, Administrative Expense Claims, and Professional Fee Claims have not been classified.  *See* Plan, Art. IV.

[19]   11 U.S.C. § 1123(a)(2).

[20]   11 U.S.C. § 1123(a)(3).

[21]   11 U.S.C. § 1123(a)(4).

V of the Plan provides that Holders of Allowed Claims in each Class will receive the same rights and treatment as other Holders of Allowed Claims within such Holder's respective Class, except as otherwise agreed to by a Holder of a particular Claim, thereby satisfying Bankruptcy Code section 1123(a)(4).

### e.      Adequate Means for Implementation—Section 1123(a)(5).

34.      Bankruptcy Code section 1123(a)(5) requires that the Plan provide "adequate means" for its implementation.[22]  "Adequate means" includes but is not limited to, "transfer of all or any part of the property of the estate to one or more entities," "sale of all or any part of the property of the estate," and "issuance of securities of the debtor . . . in exchange for claims or interests, or for any other appropriate purpose."[23]

35.      Article IX of the Plan (Means for Implementation of the Plan), as well as other provisions thereof, provides adequate means for the Plan's implementation.  Additionally, various other provisions of the Plan, including, but not limited to, Article X (Provisions Regarding the Liquidation Trust), Article XI (Provisions Governing Distributions), and Article XII (Treatment of Executory Contracts and Unexpired Leases), also provide adequate means for the Plan's implementation.  The Debtors, therefore, believe that the Plan satisfies Bankruptcy Code section 1123(a)(5).

---

[22]   11 U.S.C. § 1123(a)(5).

[23]   *Id.*; *see also In re Stuart Glass & Mirror, Inc.*, 71 B.R. 332, 334 (Bankr. S.D. Fla. 1987) (stating that the proper test is whether the plan provides adequate means for its execution, as required by section 1123(a)(5), not whether alternative means might or might not be available).

**f.      Prohibition of Issuance of Non-Voting Securities—Section 1123(a)(6).**

36.      Bankruptcy Code section 1123(a)(6) requires that a debtor's corporate constituent documents prohibit the issuance of non-voting equity securities.[24]   Article IX.E of the Plan provides that the organizational documents of the Debtors will be deemed amended to include, among other things, a provision prohibiting the issuance of non-voting equity securities, thereby satisfying Bankruptcy Code section 1123(a)(6).

**g.      Selection of Directors and Officers—Section 1123(a)(7).**

37.      Bankruptcy Code section 1123(a)(7) requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[25] The Debtors are not reorganizing under the Plan; rather, the assets of the Debtors shall vest in the Liquidation Trust, which will be administered by the Liquidation Trustee.  As disclosed in the Plan Supplement, William H. Henrich of Getzler Henrich & Associates, LLC was proposed as the Liquidation Trustee, which is consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying Bankruptcy Code section 1123(a)(7).

**iii.      The Plan Complies with the Discretionary Provisions of Bankruptcy Code Section 1123(b).**

**a.      Overview of the Plan's Compliance with Bankruptcy Code Section 1123(b).**

38.      Bankruptcy Code section 1123(b) sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.[26]   Among other things, Bankruptcy Code section

---

[24]      *See* 11 U.S.C. § 1123(a)(6).

[25]      11 U.S.C. § 1123(a)(7).

[26]      *See* 11 U.S.C. § 1123(b).

1123(b) provides that a plan may (a) impair or leave unimpaired any class of claims or interests;
(b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide
for the settlement or adjustment of any claim or interest belonging to the debtor or the estate; and
(d) include any other appropriate provision not inconsistent with the applicable provisions of
chapter 11.[27]

39.     The Plan is consistent with Bankruptcy Code section 1123(b).  Specifically, under
Article V of the Plan, Class 2 is Unimpaired because the Plan leaves unaltered the legal, equitable,
and contractual rights of the Holders of Claims and Interests within such Classes.  On the other
hand, Classes 1-A, 1-B, 3, 4, 5, and 6 are Impaired since the Plan modifies the rights of the Holders
of Claims within such Classes as contemplated by Bankruptcy Code section 1123(b)(1).   In
addition, Article XII.A of the Plan provides for the rejection of all Executory Contracts and
Unexpired Leases, except to the extent set forth in the Plan and Plan Supplement, satisfying
Bankruptcy Code section 1123(b)(2).  Finally, as discussed below, the release, exculpation, and
injunction provisions contained in the Plan satisfy the governing standard and are permissible
under Bankruptcy Code section 1123.

**b.      The Plan Settlement Satisfies Bankruptcy Code Section 1123
and Bankruptcy Rule 9019.**

40.     Pursuant to Bankruptcy Code section 1123(b) and Bankruptcy Rule 9019, as part
of the restructuring process, courts may approve a compromise or settlement.[28]  To be approved,
a settlement need only be "fair and equitable."  In determining whether a settlement is fair and

---

[27] *See* 11 U.S.C. § 1123(b).

[28] *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) ("The standards for approval of
a settlement under section 1123 are generally the same as those under Rule 9019.").

equitable, courts should evaluate the settlement "as a whole."[29]  In making this determination, the court "should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness."[30]  But it is not necessary for a court to conduct a "mini-trial" of the facts or the merits of the underlying disputes to be settled or "decide the numerous questions of law or fact raised by litigation."[31]  As set forth below, the Debtors respectfully submit that the Plan Settlement is fair, reasonable, and adequate, represents a valid exercise of the Debtors' business judgment, and satisfies the requisite standard for approval in the Eighth Circuit, justifying its approval.

41.    Courts in the Eighth Circuit consider the following factors (collectively, the "McQuillen Factors") in determining whether a proposed settlement is fair, reasonable, and adequate:

(a)    the probability of success in the litigation;

(b)    the difficulties, if any, to be encountered in the matter of collection;

(c)    the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

(d)    the paramount interest of the creditors and a proper deference to their reasonable views in the premises.[32]

---

[29]    *In re Wash. Mut., Inc.*, 442 B.R. 314, 329 (Bankr. D. Del. 2011) ("[E]ach part of the settlement must be evaluated to determine whether the settlement as a whole is reasonable . . . there are benefits to be recognized by a global settlement of all litigation . . . that may recommend a settlement that does not quite equal what would be a reasonable settlement of each part separately.").

[30]    *In re Capmark Fin. Grp., Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010).

[31]    *Id.*

[32]    *See In re McQuillen Place Co., LLC*, No. 19-00507 (TJC), 2021 WL 1234457, at *3 (Bankr. N.D. Iowa Mar. 30, 2021) (citing *Ritchie Cap. Mgmt., L.L.C. v. Kelley*, 785 F.3d 273, 278–79 (8th Cir. 2015)).

As set forth below, the Plan Settlement between the Debtors, the UCC, the Pension Committee, and the Bondholder Representatives (collectively, the "Settlement Parties") satisfies each of the foregoing factors, justifying its approval.

### 1)     Probability of Success in Litigation

42.     *First*, the outcome of the potential Causes of Action held by the Debtors against the Bondholder Representatives, among others, is highly uncertain because such Causes of Action are factually intensive and would require significant, time-consuming discovery and expensive, protracted litigation were they to be prosecuted.   Moreover, both the UCC and the Pension Committee, as fiduciaries to Holders of General Unsecured Claims and Pension Claims, respectively, concluded that the value and immediate benefits afforded to their constituencies through the Plan Settlement far outweighed the alternative of extended and expensive litigation with no certainty of recovery.[33]   Therefore, this factor weighs in favor of approving the Plan Settlement.

### 2)     The Likely Difficulties in Collection

43.     *Second*, even if such Causes of Action were successfully prosecuted and resulted in an enforceable judgment, the ability to collect amounts owed by any perspective defendant may prove challenging, particularly following the conclusion of these Chapter 11 Cases.   As a practical matter, any recovery to creditors would take years to achieve.   The potential claims have not yet been litigated—though the UCC filed an adversary proceeding enumerating certain Causes of Action against the Bondholder Representatives, the litigation has not progressed and the UCC has

---

[33]   *See, e.g.*, *In re McQuillen Place Co., LLC*, 2021 WL 1234457, at *3 (finding factor favored approval of settlement because "[t]here does not appear to be a likelihood that the Trustee would ultimately succeed" and "[e]ven if he could, there is no showing that the net recovery would exceed $5,000 offered to settle."); *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 774 (Bankr. D. Del. 2018) (finding factor favored approval of settlement because "lengthy and expensive litigation on a variety of fronts . . . would eat up the successful litigants' ability to recover on their claims").

agreed to withdraw the underlying complaint, subject to confirmation and consummation of the Plan. As a result, the potential claims at issue here are nowhere close to the collection stage and, even if litigation success were achieved, a judgment by any court would likely be subject to multiple layers of appellate review.

### 3) Complexity, Expense, and Delay Involved with Prosecuting the Causes of Action

44.     *Third*, litigating the potential Causes of Action against various putative defendants would require expending significant Estate resources, as such prosecution would likely involve years of contentious litigation, expensive expert analysis, and potentially lengthy appeals, all of which amount to substantial litigation costs. In general, settlements are favored in bankruptcy and this preference is particularly relevant in these Chapter 11 Cases, not only because of the limited resources available to the Debtors' Estates, but also in large part due to the expansive set of disputes that are resolved by the Plan Settlement and the complexity and highly factual nature of the issues at play. The Plan Settlement avoids the expense, inconvenience, and delay of prosecuting such Causes of Action and provides an expeditious, cost-effective resolution to the benefit of unsecured creditors. Therefore, this factor also weighs in favor of approving the Plan Settlement.[34]

### 4) Paramount Interest of Creditors

45.     *Fourth*, the Plan Settlement was negotiated with the interests of Holders of General Unsecured Claims and Pension Claims at the forefront and is in the best interests of creditors, as it offers the best recovery outcomes compared to a chapter 7 liquidation. The Debtors, the UCC, and the Pension Committee independently determined that implementing the Plan Settlement,

---

[34]   *See In re McQuillen Place Co., LLC*, 2021 WL 1234457, at *4 ("The delay alone caused by the time it would take to resolve the lawsuit favors approval of the settlement . . .").

thereby resolving significant issues without litigation, was in the best interest of the Debtors' Estates and their creditors. Therefore, this fourth and final factor also weighs in favor of approving the Plan Settlement.

46. Accordingly, the Plan Settlement satisfies the factors set forth above, Bankruptcy Code section 1123(b), and Bankruptcy Rule 9019(a) and should be approved.

### c. The Plan's Release, Exculpation, and Injunction Provisions Satisfy Bankruptcy Code Section 1123(b).

47. The Plan includes certain release, exculpation, and injunction provisions, including the Debtor Release, the Third-Party Release, the Exculpation, and the Injunction, each as defined herein. These discretionary provisions are proper because, among other things, (a) they are the product of extensive good faith, arm's-length negotiations between the Settlement Parties, (b) were a material and necessary precondition for parties to enter into the global settlement set forth in the Plan, fund substantial consideration for the benefit of unsecured creditors, and support the Plan, (c) are supported by all of the main case constituents, including the Debtors, the UCC, the Pension Committee, and the Bondholder Representatives, and (d) are consistent with applicable precedent. Further, these provisions were fully and conspicuously disclosed to all Voting Classes through the applicable Ballots and to all Non-Voting Classes through the applicable Notice of Non-Voting Status, which each excerpted the Third-Party Release, Exculpation, and Injunction as well as the definitions of "Released Parties" and "Releasing Parties" as set forth in the Plan. Accordingly, despite MercyOne's assertions to the contrary, the Plan's release, exculpation, and injunction provisions satisfy Bankruptcy Code section 1123(b) and should be approved.

> **(1)** **The Third-Party Release Complies with the Discretionary Provisions of Bankruptcy Code Section 1123(b) and Should be Approved.**

48.     Article XIV.D.2 of the Plan provides for a consensual third-party release of the Released Parties that is an essential component of the Plan and the Plan Settlement (the "Third-Party Release")[35] and was conspicuously included in bold language in the Combined Disclosure Statement and Plan, the Ballots, and Notices of Non-Voting Status, along with a checkbox through which the receiving party could "opt out" of the Third-Party Release.  For the reasons discussed below, the Debtors submit that the Third-Party Release is both narrowly tailored and consensual and should be approved.

> **A)** **MercyOne Lacks Standing to Object to the Third-Party Release.**

49.     In its Objection, MercyOne argues, among other things, that "[t]he Plan is unconfirmable because it grants releases to 25 classes of parties who are contributing no consideration to the implementation of the Plan or the Debtors' estates."[36]  While the Debtors address their satisfaction of the *Master Mortgage* factors and the appropriateness of the scope of the definition of "Released Parties" in the subsequent sections herein, it is ultimately not necessary for the Court to consider any of those aspects of the MercyOne Objection because **MercyOne opted out of the Third-Party Release**, **meaning that MercyOne is not a Releasing Party under the Plan and is not bound by the Third-Party Release**.  As such, MercyOne **lacks standing** to object to confirmation on the basis of the Third-Party Release.

---

[35]    *See* Plan, Art. XIV.D.2.  The description of the Third-Party Release is a summary and for convenience only.  The terms of Article XIV.D.2 of the Plan shall control in all respects.

[36]    MercyOne Obj., ¶ 1.

50.     Indeed, numerous courts have held in similar circumstances that a party who opts out of a release lacks standing to object.  For example, in *In re Indianapolis Downs, LLC*, the bankruptcy court held that parties who objected to the third-party release in the debtors' chapter 11 plan "lack[ed] the requisite standing to object" to such release because, among other things, the parties "voted to reject the Plan and . . . affirmatively opt[ed] out of the release provision."[37]  The bankruptcy court ultimately overruled the parties' objection to confirmation, holding that they lacked standing to object because "the third party release does not affect any of [their] direct interest, given that they are not releasing any Released Parties".[38]  Similarly, in *In re Mallinckrodt PLC*, the bankruptcy court held that the pension trust "[did] not have standing to object to the Third-Party Releases because it has opted out and is therefore not bound by them."[39]  Several other courts across multiple jurisdictions have followed suit and similarly held that parties lack standing to object to the inclusion of such releases in a chapter 11 plan if they opt out of the very release at issue.[40]

---

[37]   *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013).

[38]   *See id.*; *see also In re Orlando Investors, L.P.*, 103 B.R. 593, 596-97 (Bankr. E.D. Pa. 1989) (finding that in the context of a confirmation hearing, creditors 'have standing *only* to challenge those parts of a reorganization plan that affect their direct interests").

[39]   *In re Mallinckrodt PLC*, 639 B.R. 837, 877 (Bankr. D. Del. 2022) ("As a threshold matter, I find that the Pension Trust does not have standing to object to the Third-Party Releases because it has opted out and is therefore not bound by them.");

[40]   *See, e.g.*, *Matter of Ultra Petroleum Corp.*, No. 21-20049, 2022 WL 989389, at *5 (5th Cir. Apr. 1, 2022) (finding that despite objecting party's argument that the opt-out process and releases were improper. . . he himself managed to opt-out and thus has no standing to challenge the releases"); *In re Akorn, Inc.*, No. 20-1254 (MN), 2021 WL 4306222, *16 (D. Del. Sept. 22, 2021) (holding that because appellants did not opt into the releases, they "lacked standing to challenge those releases"); *Talarico v. Ultra Petroleum Corp.*, 2020 WL 8361996, at *3 (S.D. Tex. Dec. 29, 2020) ("[I]t is clear that [the appellant] lacks standing to bring and maintain this appeal based on the 'third-party release' provision[] of the Plan" because he "opted out of the provision."); *In re Dynegy Inc.*, No. 12 Civ. 8908 (JGK), 2013 WL 2413482, *5 (S.D.N.Y. June 4, 2013) (affirming bankruptcy court ruling that creditor "lacked standing on his own behalf to object to the [r]elease because he had timely opted out of the [r]elease and therefore a decision on whether the [r]elease was permissible would not affect his rights").

51.     Like the objecting parties in each of the cases cited above, **MercyOne opted out of the Third-Party Release and, as such, the Third-Party Release does not apply to, harm, or constrain MercyOne in any way**.  To the extent MercyOne has viable claims and causes of action against **any** of the Released Parties, it may choose to pursue them at any time at its election because neither the Plan nor the Third-Party Release impact or hinder its ability to do so.  Accordingly, MercyOne lacks standing to object to confirmation and, despite its unsuccessful attempt to stymie the Debtors' efforts to confirm the Plan—which benefits all creditors—in order to further its own self-interests and litigation strategy, MercyOne's objection to the Third-Party Release should be overruled.

### B)     The Debtors Have Narrowed the Definition of "Released Parties."

52.     In its Objection, MercyOne takes issue with, among other things, the "25 categories of parties" included in subsection (g) of the definition of "Released Parties" in the Plan.[41]  For context, the definition of "Released Parties" originally read as follows:

> **1.189   "Released Parties"** means, collectively, the following Entities, each in their capacity as such: (a) the Debtors; (b) the UCC and each of its members (only in their capacity as such); (c) the Pension Committee and each of its members (only in their capacity as such); (d) the Bondholder Representatives; (e) the Foundation; (f) the Sisters of Mercy; and (g) with respect to any such Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, equity holders, affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, affiliates, partners, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors; *provided, however,* that Released Parties shall not include former officers and directors of the Debtors but shall include any of the Debtors' directors and officers that served in such role at any time between the Petition Date and the Effective Date; *provided further* that Released Parties shall not include MercyOne.

---

[41]   *See* MercyOne Obj., ¶ 11; *see also* Pensioners' Obj., ¶ 16 (adopting the arguments raised by MercyOne in the MercyOne Objection).  As discussed in the foregoing section, the Debtors do not believe that MercyOne has standing to object to the Third-Party Release, as it elected to opt out of the same.

MercyOne complains about the fact that the Debtors "did not withdraw or modify the [Third-Party Release] in any way" in response to MercyOne's objection to the Disclosure Statement.[42] However, MercyOne never proposed **any** revisions to the Debtors regarding the Third-Party Release, nor did MercyOne meaningfully engage in settlement discussions with the Debtors, despite multiple invitations from the Debtors to do so.

53.     Nevertheless, in the spirit of compromise, the Debtors have worked in good faith with the Settlement Parties in advance of Confirmation, who have agreed to further narrow the scope of the subjection (g) of the "Released Parties" definition by removing six of the categories to which MercyOne objects, including "equity holders," "affiliated investment funds or investment vehicles," "assigns," "subsidiaries," "partners," and "representatives", as reflected below:

> **1.189  "Released Parties"** means, collectively, the following Entities, each in their capacity as such: (a) the Debtors; (b) the UCC and each of its members (only in their capacity as such); (c) the Pension Committee and each of its members (only in their capacity as such); (d) the Bondholder Representatives; (e) the Foundation; (f) the Sisters of Mercy; and (g) with respect to any such Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, equity holders, affiliated investment funds or investment vehicles, predecessors, successors, assigns, subsidiaries, affiliates, partners, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors; *provided, however*, that Released Parties shall not include former officers and directors of the Debtors but shall include any of the Debtors' directors and officers that served in such role at any time between the Petition Date and the Effective Date; *provided further* that Released Parties shall not include MercyOne.

Though the entities remaining in subsection (g) (collectively, the "Related Parties") are not specifically named, their inclusion is a critical element of the Third-Party Release to ensure that the Third-Party Release provides value to the Released Parties in exchange for their substantial contributions, discussed in greater detail below.  Without the inclusion of the Related Parties, the Releasing Parties would have an opportunity to bring actions against the Related Parties, thereby

---

[42]     *See* MercyOne Obj., ¶ 8.

undermining the effectiveness of the Plan's release provisions.  Accordingly, the Debtors believe

that the Released Parties definition is appropriate and narrowly tailored in scope.

          **C)**       **The Third-Party Release Satisfies the Relevant Standards for Approval.**

54.    As noted above, MercyOne argues, in part, that the Third-Party Release

purportedly fails to satisfy the five factors set forth in *In re Master Mortg. Inv. Fund, Inc.*, 168

B.R. 930, 935 (Bankr. W.D. Mo. 1994).[43]    Such factors are frequently used to analyze the

appropriateness of release provisions in chapter 11 plans and consist of the following:

> (a)    an identity of interest exist between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;
>
> (b)    the non-debtor has contributed substantial assets to the reorganization;
>
> (c)    the release is essential to the reorganization;
>
> (d)    a substantial majority of the creditors agree to the release, specifically, the impacted class or classes has "overwhelmingly" voted to accept the proposed plan treatment; and
>
> (e)    the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the releases.[44]

Not all of the above factors need to be satisfied for a court to approve a debtor release, nor do these

factors comprise a rigid test; rather, the court should "engage[] in a fact specific review, weighing

the equities of [the individual] case."[45]    Indeed, courts have approved releases where only one or

---

[43]    *See* MercyOne Obj., ¶ 24.

[44]    *See In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

[45]    *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303-04 (Bankr. D. Del. 2013) ("These factors are neither exclusive nor are they a list of conjunctive requirements."); *In re Wash. Mut., Inc.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that these factors are not exclusive or conjunctive requirements); *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994).

two of these factors are present.[46]  Nevertheless, and despite objections to the contrary, the Third-

Party Release satisfies the foregoing standard and is appropriate, fair, necessary, and in the best

interests of the Debtors' Estates.

> **(D)     The Third-Party Release Satisfies the
> Master Mortgage Factors.**

55.     **Identity of Interest**.  *First*, despite MercyOne's insistence to the contrary,[47] there

is an identity of interest between the Debtors and the Released Parties.   Courts in various

jurisdictions have found that there is an identity of interest between a debtor and non-debtor on

various grounds, including where the debtor and non-debtor share a common goal of confirming

the Plan and implementing a settlement of complex multi-party litigation.[48]  While many cases,

including certain of those cited by MercyOne, rely upon indemnification, contribution, or

insurance policies to demonstrate that a suit against non-Debtors is, in effect, a suit against the

Debtors, no such requirement exists and this factor has been met when, among other things,

released parties funded the plan and were instrumental in formulating the plan.[49]  The Released

---

[46]   *See, e.g.*, *In re Caribbean Petroleum Corp.*, 512 B.R. 774, 778 (Bankr. D. Del. 2014); *In re Spansion*, 426 B.R.
at 143.

[47]   *See* MercyOne Obj., ¶¶ 35-38.

[48]   *See, e.g.*, *In re Zenith Elecs.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (finding an identity of interest with debtor
where certain released parties who "were instrumental in formulating the Plan" shared the goal of "seeing that the
Plan succeed and the company reorganize"); *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (PJW), 2014 WL
2582976, at *6 (Bankr. D. Del. Jan. 30, 2014) (finding an identity of interest between the debtor and several other
parties due to, among other things, indemnification obligations and shared insurance proceeds); *In re Tribune Co.*,
464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding that debtors and releasees "share the common goal" of confirming
a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest" for purposes of
the *Master Mortgage* factors); *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1079-80 (11th Cir. 2015)
(finding identity of interest between debtor and released parties, who were debtor's key employees, where debtor
would deplete its assets in defending released parties against litigation); *In re Mercedes Homes, Inc.*, 431 B.R.
869, 879-80 (Bankr. S.D. Fla. 2009) (finding identity of interest where debtors were required to indemnify
released parties, the officers and directors, against claims or causes of action); *In re 710 Long Ridge Rd. Operating
Co., II, LLC*, No. 13-13653 (DHS), 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding identity of
interest where both debtor and non-debtor released parties shared a common goal of "confirming [a plan] and
implementing the transactions contemplated thereunder").

[49]   *In re Zenith Elecs.*, 241 B.R. at 110; *In re Tribune Co.*, 464 B.R. at 187 (finding that debtors and releasees "share
the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an

Parties, including the Debtors, the Bondholder Representatives, the UCC, the Pension Committee, the Foundation, and the Sisters of Mercy, the Debtors' current officers and directors, and the Debtors' employees, among others, played a significant and critical role in the furtherance and progression of the Chapter 11 Cases. Each of these parties and their related professionals[50] were integral to the overall success of the seamless and successful transition of the Debtors' facilities to the University, including not only by providing monetary consideration, but also through dedication of time, energy, resources, and support in coordinating complex and time-consuming transition efforts. Finally, the Debtors, the Bondholder Representatives, the UCC, and the Pension Committee, along with each of their respective professionals, were instrumental in formulating, negotiating, and prosecuting the Plan. Therefore, it is in these parties' best interests for the Plan to be confirmed, creating an identity of interest between the Released Parties and the Debtors.

56. Moreover, pursuant to Article XII.C of the Plan, the Debtors will assume certain indemnification provisions (the "Indemnification Provisions") and such Indemnification Provisions will survive the effectiveness of the Plan. These Indemnification Provisions require the Debtors or Liquidating Debtors, as applicable, to indemnify certain directors and officers for any losses or expenses incurred by an indemnified director or officer in a proceeding brought by or on behalf of the Debtors or Liquidating Debtors, as applicable, or actions brought by third

---

"identity of interest" for purposes of the *Master Mortgage* factors); *In re 710 Long Ridge Rd. Operating Co., II, LLC*, 2014 WL 886433, at *15 (finding identity of interest where both debtor and non-debtor released parties shared a common goal of "confirming [a plan] and implementing the transactions contemplated thereunder").

[50] At least one court in this Circuit has held that it was appropriate to include professionals in a third-party release, noting that "[t]he professionals included in the release have worked tirelessly over the past two years to reach a consensual exit from chapter 11." *Matter of Fansteel Foundry Corp.*, No. 16-01825 (ALS), 2018 WL 5472928, at *11 (Bankr. S.D. Iowa Oct. 26, 2018) (overruling objection to third-party release and confirming plan).

parties. Courts have found that an identity of interest exists where a suit against the released party

would deplete the assets of the debtor's estate.[51]

57.     Accordingly, given the foregoing, the Released Parties have an identity of interest

with the Debtors, satisfying the first *Master Mortgage* factor.

58.     **Substantial Contribution**. *Second*, the Released Parties have provided significant

value to the Debtors' Estates throughout the Chapter 11 Cases, including, among other things,

additional substantial contributions to the Plan. "It is within the bankruptcy court's discretion to

determine whether the nature and size of the consideration rises to the level of a 'substantial'

contribution."[52]  A bankruptcy court will consider the value of the contributions to the specific

estate when determining whether the consideration provided constitutes a substantial

contribution.[53]  Courts have found that a substantial contribution was made where a party has

affirmatively contributed value necessary to the reorganization or agreed to compromise or forego

rights in furtherance of the reorganization.[54]

---

[51]   *See In re Seaside Engineering & Surveying, Inc.*, 780 F.3d 1070, 1079-80 (11th Cir. 2015) (finding identity of
interest between debtor and released parties, who were debtor's key employees, where debtor would deplete its
assets in defending released parties against litigation); *In re Mercedes Homes, Inc.*, 431 B.R. 869, 879-80 (Bankr.
S.D. Fla. 2009) (finding identity of interest where debtors were required to indemnify released parties, the officers
and directors, against claims or causes of action).

[52]   *In re rue21, Inc.*, 575 B.R. 314, 326 (Bankr. W.D. Pa. 2017) (finding a substantial contribution where there was
valuable and material contribution to the estate though the success of the plan of reorganization was not contingent
on the release at issue).

[53]   *In re Wash. Mut. Inc.*, 442 B.R. at 347-48; *In re Indianapolis Downs, LLC*, 486 B.R. at 304 (finding substantial
contribution from senior management and holders of equity and debt instruments of the debtors where post-
petition services were performed for the debtors without compensation).

[54]   *See, e.g.*, *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 261 (Bankr. D. Del. 2017) (finding that certain
non-debtor parties' $325 million contribution in exchange for third-party releases constituted substantial
contribution in satisfaction of the *Master Mortgage* factors); *In re Am. Family Enters.*, 256 B.R. 377, 406-08
(D.N.J. 2000) (finding that a third party's contribution of more than $70 million to fund, in part, consumer fraud
victim's fund, was a substantial contribution supporting protection under channeling injunction); *Blitz U.S.A.*,
2014 WL 2582976, at *5-7 (approving third party nonconsensual release and channeling injunction for protected
parties, including, among others, (a) Walmart, which contributed more than $24 million to the personal injury
trust and waived various claims and (b) certain insurers, who contributed more than $137 million to the personal
injury trust); *In re W.R. Grace & Co.*, 446 B.R. 96, 138 (Bankr. D. Del. 2011) (finding that parties involved in

30

59.      Collectively, the Released Parties have, among other things, (a) agreed to make significant concessions in their own recoveries under the Plan for the benefit of the unsecured creditors; (b) provided funding during the pendency of the Chapter 11 Cases, whether through use of cash collateral or contribution of "Unrestricted Funds", which has allowed the Debtors to fund the Chapter 11 Cases and their operations; (c) contributed important labor, expertise, and "sweat equity" beyond what is usually expected, which efforts resulted in the successful sale of substantially all of the Debtors' assets to the University; and (d) played an integral role in the formulation of the Plan and contributed to the Plan, not only by expending significant time and resources analyzing and negotiating the issues facing the Debtors, but also in giving up material economic interests to ensure the success of the Plan.  Specifically, the Bondholder Representatives, among other things, agreed to (a) contribute an additional $1,000,000 to the Unsecured Claims Waterfall Amount for the benefit of unsecured creditors, (b) ensure that recoveries available to Holders of General Unsecured Claims and Holders of Pension Claims are no less than 10% of the recoveries available to the Holders of Bondholder Claims, (c) decrease their share of any Litigation Claim recoveries to 40% with 60% benefitting unsecured creditors, and (d) support the Plan. Moreover, the Bondholder Representatives provided the Debtors with continued access to Cash Collateral during the pendency of the Chapter 11 Cases to fund the same and the Foundation provided millions of dollars of Unrestricted Funds to the Debtors to pay ordinary course operating expenses.   Further, the Released Parties, including the Foundation and the Bondholder Representatives, enabled the Debtors to secure valuable consideration, including concessions and

---

settlement with debtor made substantial contribution where, absent the release, settling parties would not have contributed a significant sum that was necessary for the reorganization); Hr'g Tr. 73-74, *In re PNG Ventures, Inc.*, No. 09-13162 (CSS) (Bankr. D. Del. Mar. 29, 2010) (explaining that a contribution is substantial when there is a fair exchange for the release of the creditors' claims and finding that lenders, by compromising their claims and providing financing so that unsecured creditors received distributions they would not otherwise have received, made such a contribution).

redirection, provided under the Plan for the benefit of all constituents, which would not be possible

absent the Third-Party Release.  Finally, courts have held that a substantial contribution may be

made in the form of important labor or services in furtherance of the chapter 11 cases.[55]  Here, the

Debtors' directors and officers who served in their capacity during the pendency of the Chapter 11

Cases and the Sisters of Mercy have been instrumental in negotiating, formulating, and

implementing the sale and transactions contemplated by the Plan.  In order to successfully guide

the Company through these chapter 11 cases, the Debtors' directors and officers, as well as the

Sisters of Mercy, dedicated significant time and attention to restructuring matters.  In sum, the

Released Parties have made substantial contributions to the Plan and Plan Settlement, satisfying

the second *Master Mortgage* factor.

60.    **Essential to the Plan**.  *Third*, despite MercyOne's assertions to the contrary,[56] the

Third-Party Release is essential to the success of the Plan and Plan Settlement.  Courts have held

that, where the substantial contributions of constituents were contingent upon the inclusion of

releases in a chapter 11 plan, this third factor is satisfied.[57]  Without the inclusion of the Third-

---

[55]  *See, e.g., Seaside Engineering*, 780 F.3d at 1079-80 (finding that labor and services of debtors' professionals constituted substantial contribution); *Mercedes Homes, Inc.*, 431 B.R. at 881 (finding that debtors' officers' and directors' expertise and knowledge, which would be used to work for reorganized debtors, constituted a substantial contribution); *Zenith*, 241 B.R. at 111 ("Officers and Directors [made a substantial contribution] by designing and implementing the operational restructuring and negotiating the financial restructuring. . .").

[56]  *See* MercyOne Obj., ¶¶ 41-42.

[57]  *See Matter of Fansteel Foundry Corp.*, 2018 WL 5472928, at *11-12 (overruling objection to third-party release because, among other things, "[t]he plan cannot move forward if the release and exculpation are not permitted"); *Long Ridge*, 2014 WL 886433, at *15 (finding factor satisfied where "contributions by [releasees were] absolutely necessary to a successful reorganization"); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Miss. 2012) ("A release of a non-debtor is appropriate only if, without it, there would be little likelihood of the (sic) accomplishing of the goal of the chapter 11: the confirmation of a successful plan of liquidation that benefits creditors, including the unsecured creditors.  Here, there is no chance of a plan of liquidation without the releases, and if there is no confirmed plan, the Case either will be converted to a chapter 7 case or dismissed."); *In re MAC Panel Co.*, No. 98-10952C, 2000 WL 33673757, at *10 (Bankr. M.D.N.C. Feb. 24, 2000) (finding factor satisfied because injunctive relief and release, "which were prerequisites to the availability of the [releasee's] funds, [were] 'essential' to the confirmation" of debtor's plan); *In re Union Fin. Servs. Grp., Inc.*, 303 B.R. 390, 428 (Bankr. E.D. Mo. 2003) ("Where the success of the reorganization is premised in substantial part on such releases, and failure to obtain releases means the loss of a critical financial contribution to the debtor's plan that is necessary

Party Release in the Plan, the Released Parties would not be willing to support the Plan, nor provide the very substantial consideration in the form of cash and redirection of proceeds under the Plan Settlement, as the releases being provided under the Plan are the main consideration for such cash and non-cash consideration. Therefore, for the Plan Settlement to be effectuated and for creditors to receive the recoveries projected under the Plan, the Plan must include the Third-Party Release, making it essential to the Plan and satisfying the third *Master Mortgage* factor.

61.    **Overwhelming Support for Plan**. *Fourth*, all of the Voting Classes have voted **overwhelmingly** in favor of Confirmation of the Plan, which includes the Third-Party Release. Specifically, as set forth herein and in the Voting Declaration, the Voting Classes voted overwhelmingly in support of the Plan as follows:[58]

| Voting Class | Accept | |
|---|---|---|
| | Amount | Number |
| Class 1-A (Bondholder Claims – Series 2018 Bonds) | 100% | 100% |
| Class 1-B (Bondholder Claims – Series 2011 Bonds) | 99.59% | 98.00% |
| Class 3 (General Unsecured Claims | 91.70% | 88.14% |
| Class 4 (Bondholder Deficiency Claims) | 98.02% | 98.02% |
| Class 5 (Pension Claims) | 99.69% | 99.69% |

Courts have held that creditors' support for the plan "the single most important factor" to determine whether a release is appropriate.[59]  As such, the foregoing voting results are compelling evidence that the Third-Party Release is appropriate and fair, satisfying the fourth *Master Mortgage* factor.

---

to the plan's feasibility, such releases should be granted."); *W.R. Grace*, 446 B.R. at 138 (finding that substantial contributions were critical for debtor's reorganization and would not be made absent non-consensual third-party releases; therefore, releases were necessary under Continental).

[58]    *See* Voting Decl., Ex. A.

[59]    *See Master Mortgage*, 168 B.R. at 938 (stating that creditor approval of a release is "the single most important factor" to determine whether a release is appropriate); *see also* Hr'g Tr. 20:22-24, *In re Gulf Coast Health Care, LLC*, No. 21-11336 (KBO) (Bankr. D. Del. May 4, 2021) ("As courts have acknowledged, [votes cast in favor of a plan] is often the best evidence of fairness of a plan's third-party release to releasing parties."); *In re Key3Media Grp.*, 336 B.R. 87, 97-98 (Bankr. D. Del. 2005), *aff'd*, 2006 WL 2842462 (D. Del. Oct. 2, 2006) (granting a settlement of estate causes of action over a creditor's objection because, among other things, a majority of creditors approved the settlement).

62.     **Payment of Claims**.  *Fifth*, the Plan provides for distributions to parties affected by the Third-Party Release.  This factor is satisfied when a plan provides for a distribution to impaired creditors affected by releases that is greater than the distribution such creditors would receive under a chapter 7 liquidation.[60]  While claims of unsecured creditors will not be paid in full, the Plan provides for payment of meaningful recoveries to Holders of General Unsecured Creditors (Class 3) (which includes MercyOne)[61] and Pension Claims (Class 5), whose projected recoveries are only possible as a result of the Plan Settlement and would not be available absent implementation of the Plan Settlement and confirmation of the Plan.  As such, the fifth and final *Master Mortgage* factor is also satisfied.

63.     Accordingly, because the Third-Party Release satisfies Bankruptcy Code section 1123(b)(3)(A), Bankruptcy Rule 9019, and all of the *Master Mortgage* factors, the Debtors submit that MercyOne's objection to the same should be overruled and the Third-Party Release should be approved.

### (E)     The Third-Party Release is Consensual

64.     In its Objection, MercyOne argues that the Third-Party Release is effectively non-consensual, in that the Plan requires "those who receive a ballot properly check a box stating

---

[60]     *See In re Zenith*, 241 B.R. at 111; *Matter of Fansteel Foundry Corp.*, 2018 WL 5472928, at *12 (approving third-party release because, among other things, "[t]he plan provides a mechanism that realizes recovery for creditors who would receive no distribution" otherwise); *In re U.S. Fidelis, Inc.*, 481 B.R. at 520 (finding fifth *Master Mortgage* factor satisfied where there was a return to creditors); *W.R. Grace*, 446 B.R. at 138-39 (approving non-consensual third-party release provision in plan of reorganization where, absent the release and settlement, substantial expenses would be incurred by the estate and where creditors' recovery after litigation was uncertain but recovery under the plan would be certain and significant); *In re PNG Ventures, Inc.*, No. 09-13162 (CSS) (Bankr. D. Del. Mar. 29, 2010) Hr'g Tr. 73-74 (approving non-consensual third-party release where, absent such release and settlement, unsecured creditors—who otherwise would be "out of the money"—would receive a distribution under the plan).

[61]     While MercyOne complains that the Debtors "have yet to supply proof that the Plan would pay MercyOne's claim," *see* MercyOne Obj., ¶ 11, MercyOne is a creditor in Class 3 and will be entitled to the projected distributions set forth in the Plan just like its Class 3 counterparts, despite the fact that it voted to reject the Plan.

affirmatively that they wish to opt out of the release and timely return that."[62]   However, the Debtors submit that the Third-Party Release is **consensual**, given that each Releasing Party was provided with the opportunity to manifest consent to or opt-out of the Third-Party Release.  To that end, each Ballot sent to the creditors in the Voting Classes contained the full text of the Third-Party Release, along with the definitions of "Releasing Parties" and "Released Parties" and advised such creditors that (a) a vote to accept the Plan would constitute such creditor's consent to the Third-Party Release and (b) any voting creditor that wanted to vote to reject the Plan or abstain from voting could opt of the Third-Party Release by simply checking a box on the Ballot. Additionally, each Notice of Non-Voting Status, as well as the Combined Hearing Notice, apprised creditors in the Non-Voting Classes clearly and conspicuously of the existence of the Third-Party Release and set forth the mechanism by which such creditors could object to such release by returning the release opt-out form included therein to the Voting Agent.

65.    All of the foregoing mechanics clearly demonstrate that the Third-Party Release was obtained consensually from the Releasing Parties.  Though MercyOne cites a mere handful of cases on this issue, it completely ignores the majority of cases that have also approved third-party releases if (a) the solicited ballots provide claimants with the opportunity to opt out of such

---

[62]    MercyOne Obj., ¶ 43.

releases[63] and (b) non-voting claimants are provided the opportunity to opt out to such releases by objecting to plan confirmation.[64]

66.    While the case law addressing this issue is split and calls for a fact and case specific analysis that is ultimately "a matter of judgment rather than a question of law,"[65] the recent confirmation ruling in *In re Envistacom, LLC* is particularly instructive. There, the Honorable Judge Jeffrey W. Cavender overruled multiple objections to the third-party release and confirmed the plan, finding that third-party releases can constitute consensual releases when creditors are given fair notice and an opportunity to opt out of the releases.[66] Judge Cavender engaged in a

---

[63]    *See, e.g.*, Hr'g Tr. 28:5-9, *In re Envistacom, LLC*, No. 23-52696 (JWC) (Bankr. N.D. GA. Nov. 8, 2023) (overruling objections to third-party release and related opt-out mechanic and confirming plan); *In re Arsenal Intermediate Holdings, LLC*, No. 23-10097 (CTG), 2023 WL 2655592, at *8 (Bankr. D. Del. Mar. 27, 2023) ("The creditor that discards the plan and disclosure statement accordingly does run the risk that its rights against third parties – though only with respect to claims related to the debtor – may be prejudiced."); *In re Mallinckrodt PLC*, 639 B.R. at 880 (finding opt-out mechanic sufficient to demonstrate consent to third-party release); *In re Stein Mart, Inc.*, 629 B.R. 516, 523 (Bankr. M.D. Fla. 2021) (finding that the third-party releases contained in the plan were consensual because the decision to return or not return the opt-out form demonstrated "an absolute and unconditional acceptance or rejection of the offered release); *Indianapolis Downs*, 486 B.R. at 306 ("As for those impaired creditors . . . who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *In re JRV Group USA L.P.*, No. 19-11095 (Bankr. D. Del.) (CSS) (June 19, 2020) (overruling objection from the United States Trustee and approving third-party release because "people have been given reasonable notice, consistent with due process; an opportunity to object or optout, they've chosen not to do so [and] I believe that's constructive consent"); *In re AtheroGenics, Inc.*, Case No. 08-78200 (Bankr. N.D. Ga. June 9, 2009) [Docket No. 288] (approving third-party release granted by parties who did not check opt out box on ballot); *In re Levitt & Sons, LLC*, Case No. 07-19845 (Bankr. S.D. Fla. Feb. 20, 2009) (same).

[64]    *In re VER Techs. Holdco LLC*, No. 18-10834 (Bankr. D. Del. July 26, 2018) [Docket No. 647] (overruling objection from the United States Trustee where defined term "Releasing Parties" included "all Holders of Claims or Interests that are deemed to reject the plan that do not affirmatively elect to 'opt out' of being a releasing party by timely objecting to the Plan's third-party release provisions"); *In re EV Energy Partners, L.P.*, No. 18-10814 (Bankr. D. Del. May 17, 2018) [Docket No. 238] (overruling objections of the United States Trustee, Securities Exchange Commission, and others where defined term "Releasing Parties" included "each holder of a Claim or Existing Equity Interest that is deemed to reject the Plan that does not affirmatively elect to 'opt out' of being a Releasing Party by timely objecting to the Plan's third-party release provision"); Hr'g, Tr., *In re Gibson Brands*, No. 18-11025 (CSS) (Bankr. D. Del. Oct. 2, 2018) (overruling objection from the United States Trustee and holding that "to consent to something, [ ] it's sufficient to say, Here's your notice, this is what's going to happen and if you don't object, you'll have been deemed to consent").

[65]    *In re Arsenal Intermediate Holdings, LLC*, 2023 WL 2655592, at *8.

[66]    *See* Hr'g Tr. 28:5-9, *In re Envistacom, LLC*, No. 23-52696 (JWC) (Bankr. N.D. GA. Nov. 8, 2023).

fulsome analysis of the appropriateness of an opt-out mechanic in connection with third-party

releases and ultimately found that the opt-out releases were appropriate and consensual because:

(a) *first*, the opt-out mechanism used was "clear and conspicuous" in the plan, notices, and ballots;[67]

(b) *second*, the opt-out mechanism is relatively simple and easy to understand, as for impaired creditors entitled to vote, they need only check a box on a ballot and return it to the claims agent timely;[68]

(c) *third*, no party raised any objections to the forms of notices or ballots that were filed with the solicitation motion and contained the notices to creditors that their failure to take action by either objecting to confirmation or checking the opt-out box on ballots would result in the creditor being deemed to have consented to the release;[69]

(d) *fourth*, creditors were not required to grant the release in exchange for a distribution under the plan and will share equally in distributions regardless of whether they opted out of the third-party release;[70]

(e) *fifth*, the releases are limited to estate fiduciaries, parties providing substantial consideration under the plan, or affiliates of such parties;[71]

(f) *sixth*, the releases of non-estate fiduciaries are an integral part of the Plan, and the creditors affected by the opt-out releases, in other words, priority and general unsecured creditors, are receiving substantial consideration in exchange for the releases;[72] and

(g) *finally*, the plan, the global settlement, and the opt-out release are supported by the major constituents in the case, including the committee of unsecured creditors, and the plan was accepted by a large majority of voting creditors by numerosity.[73]

Following this analysis, Judge Cavender held:

---

[67] *See id.*, at 29:1-3.

[68] *See id.*, at 29:10-11.

[69] *See id.*, at 32:4-11.

[70] *See id.*, at 32:14-18.

[71] *See id.*, at 32:19-22.

[72] *See id.*, at 32:23-25; 33:1-3.

[73] *See id.*, at 34:10-14.

> [T]he Debtor's Plan and the solicitation procedures approved in connection with that Plan provide a simple and conspicuously-disclosed mechanism for creditors to opt out of the third-party releases in this case. Some creditors followed the simple procedures and opted out of the releases and will not be bound by them. For those creditors that did not, the Court finds they have consented to the third-party releases by their failure to timely opt out and will be bound by them.[74]

67.    The Third-Party Release in the Plan satisfies each of the foregoing factors. *First*, the opt-out mechanism was clear and conspicuous in the Ballots, the Notices of Non-Voting Status, and the Combined Disclosure Statement and Plan. *Second*, the opt-out mechanism made it clear to creditors that they need only check a box on the ballot and return it to the Voting Agent in order to opt out of the Third-Party Release (as MercyOne itself has done here). *Third*, no party—including MercyOne—raised any objections to the opt-out mechanism at the hearing on the adequacy of the Disclosure Statement, nor did any party object to the Ballots, Notices of Non-Voting Status, or the provisions contained therein. *Fourth*, creditors were not required to grant the release in order to recover distributions under the Plan and are set to share in distributions regardless of whether they opted out of the Third-Party Release or not. *Fifth*, as discussed above, the Third-Party Release is limited to (a) estate fiduciaries (*i.e.*, the Debtors, the UCC, the Pension Committee, the Debtors' current officers and directors, etc.), (b) the parties providing substantial consideration, whether monetary or otherwise, under the plan (*i.e.*, the Bondholder Representatives, the Foundation, the Sisters of Mercy, the Debtors' employees, and the Debtors' current officers and directors), and (c) the affiliates of the foregoing parties (*i.e.*, the Related Parties). *Sixth*, as discussed above, the Third-Party Release is an integral part of the Plan and the creditors affected by the Third-Party Release are receiving substantial consideration in exchange for the releases, consideration that would be otherwise unavailable absent the Plan Settlement.

---

[74]    *See id.*, 34:20-25; 35:1-6.

*Finally*, the Plan, the Plan Settlement, and the Third-Party Release is supported by the major constituents in the Chapter 11 Cases—namely, the UCC, the Pension Committee, and the Bondholder Representatives—and all five classes entitled to vote on the Plan voted overwhelmingly in favor of the Plan, which includes the Third-Party Release.

68.     In sum, because each party to be bound had sufficient notice and the opportunity to opt out, coupled with the foregoing facts and circumstances, the Third-Party Release is a **consensual** third-party release. Accordingly, the Debtors submit that the Third-Party Release should be approved.

> **2)     The Debtor Release Complies with the Discretionary Provisions of Bankruptcy Code Section 1123(b) and Should be Approved.**

69.     Article XIV.D.1 of the Plan provides for releases by the Debtors, as of the Effective Date, of, among other things, certain Causes of Action that the Debtors, the Liquidating Debtors, and its Estate may have against the Released Parties (the "Debtor Release").[75]  The Debtor Release only releases Claims and Causes of Action held by the Debtors and their Estates and is not a "third-party" release.  Notably, no party has objected to the Debtor Release.  Nevertheless, as set forth below, the Debtor Release meets the applicable standard because it is fair, necessary, and in the best interests of the Debtors' Estates and satisfies the five factors set forth in *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994), which have been frequently utilized to evaluate releases of third parties by chapter 11 debtors.[76]

---

[75]   *See* Plan, Art. XIV.D.1.  The description of the Debtor Release is a summary and for convenience only.  The terms of Article XIV.D.1 of the Plan shall control in all respects.

[76]   *See, e.g.*, *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *In re Wash. Mut. Inc.*, 442 B.R. at 346.

### (i)    The Debtor Release Satisfies Bankruptcy Code Section 1123(b)(3)(A) and Bankruptcy Rule 9019.

70.    Similar to the above discussion regarding the Plan Settlement, the *McQuillen* factors govern whether a compromise of a debtor's claim should be approved.[77]  The Debtors have proposed the Debtor Release based on their business judgment, which is afforded wide deference when evaluating release of their own claims.[78]  The Debtor Release reflects the important and substantial contributions, concessions, and compromises made by the Released Parties in the process of formulating and supporting the Plan and the Plan Settlement.  The Debtors believe that pursuing potential Claims or Causes of Action that are being released through the Plan Settlement would not be in the best interests of the Debtors' various constituencies, as the costs involved likely would outweigh any potential benefit from pursuing such claims.  Moreover, the Debtor Release was negotiated in good faith and at arm's-length by the Settlement Parties, including the Debtors, the UCC, the Pension Committee, and the Bondholder Representatives, and was specifically required by the Settlement Parties as a condition of the underlying settlement in exchange for the consideration they agreed to provide to the Debtors' Estates.  As such, the Debtor Release is an integral component of the Plan and the Plan Settlement and complies with the Bankruptcy Code and applicable law.

---

[77]    *In re McQuillen Place Co., LLC*, 2021 WL 1234457, at *3; *In re Martin*, 91 F.3d at 393; *accord In re Nutraquest, Inc.*, 434 F.3d at 644 (finding that the Martin factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor); *see also Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Marvel Entm't Group, Inc.*, 222 B.R. 243 (D. Del. 1998) (proposed settlement held in best interest of the estate).

[78]    *See In re Quincy Med. Ctr., Inc.*, No. 11-16394-MSH, 2011 WL 5592907, at *2 (Bankr. D. Mass. Nov. 16, 2011) ("With respect to a debtor's releases, there is no reason why a debtor in its reasonable business judgment should not be permitted, as part of its own plan, to propose to release whomever it chooses. Bankruptcy Code § 1123(b)(3) contemplates such plan provisions, which are analogous to Federal Rule of Bankruptcy Procedure 9019 compromises and settlements.").

71. In sum, in the reasonable exercise of its business judgment, the Debtors have determined that the Debtor Release is fair, reasonable, and in the best interests of their Estates, based on the significant contributions, concessions, and compromises contemplated by the Plan Settlement.

### (ii)      The Debtor Release Satisfies the *Master Mortgage* Factors.

72. In this circuit, whether a release by the debtor is fair, reasonable, in the best interests of the estate, and a valid exercise of the debtor's business judgment is evaluated by considering the non-exclusive and disjunctive *Master Mortgage* factors discussed above, which have been frequently utilized to evaluate releases of third parties by chapter 11 debtors.[79] As set forth above, the Released Parties have satisfied the *Master Mortgage* standard and, therefore, the Debtors' release of those parties is appropriate. Accordingly, the Debtors submit that the Debtor Release is appropriate and should be approved.

### (3)      The Exculpation is Appropriate and Should be Approved.

73. Article XIV.E of the Plan contains an exculpation provision (the "Exculpation"), which exculpates only the Exculpated Parties[80] from certain acts or omissions, except for any acts or omissions that constitute gross negligence, fraud, or willful misconduct. Unlike third-party releases, exculpation provisions do not affect the liability of third parties but set a standard of care

---

[79]   *See, e.g.*, *In re Zenith Elecs.*, 241 B.R. at 110; *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *In re Wash. Mut. Inc.*, 442 B.R. at 346.

[80]   Under the Plan as modified, "Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the UCC and each member thereof (solely in its capacity as such); (c) the Pension Committee and each member thereof (solely in its capacity as such); (d) any retained Professional of the Debtors, the UCC, or the Pension Committee; and (e) the Debtors' directors and officers who served in their capacity during the pendency of the Chapter 11 Cases, including the CRO. *See* Plan, § 1.84.

of gross negligence or willful misconduct in future litigation by a non-releasing party against an

exculpated party for acts arising out of the Debtors' restructuring efforts.[81]

74.     Here, the Exculpated Parties have participated in good faith in formulating,

negotiating, and supporting the Plan as it relates to the Debtors, and should be entitled to protection

from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties for their

actions over the course of the Chapter 11 Case.  The scope of the Exculpation is targeted and has

no effect on liability that is determined to have resulted from fraud, gross negligence, or willful

misconduct.  Moreover, the Exculpation and the liability standard it sets represent a conclusion of

law that flows logically from certain findings of fact that the Court must reach in confirming the

Plan.  The Exculpation is justified by the facts and circumstances of the Debtors' restructuring and

supported by applicable law.  Moreover, no party has objected to the Exculpation, further justifying

its approval.

### (4)    The Injunction is Appropriate and Should be Approved.

75.     Article XIV.F of the Plan implements the Plan's release and exculpation provisions,

in part, by permanently enjoining all entities from, with respect to any Claims or Interests,

(a) commencing or maintaining any action; (b) enforcing, attaching, collecting, or recovering any

judgment; (c) creating, perfecting, or enforcing any encumbrance; (d) asserting any right of setoff,

subrogation, or recoupment, unless such Holder has filed a motion requesting the right to perform

such setoff; (e) acting or proceeding in any manner that does not conform to or comply with the

Plan; or (f) commencing or continuing any action settled pursuant to the Plan against the Debtors,

the Liquidation Trust, or the Liquidation Trustee (the "Injunction").  Additionally, the Injunction

---

[81]   *See In re PWS Holding Corp.*, 228 F.3d 224, 230 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code").

provides that no enjoined party may commence, continue, or otherwise pursue any claim or cause

of action against any Released Party that arose from or is related to any right, claim, or Cause of

Action released pursuant to the Plan.  The Injunction is a key provision of the Plan because it

enforces the Debtor Release, the Third-Party Release, and the Exculpation that are centrally

important to the Plan, as discussed above.  As such, to the extent that the Court finds that the

Debtor Release, the Third-Party Release, and the Exculpation are appropriate, the Debtors

respectfully submits that the Injunction must also be appropriate.  Moreover, this Injunction is

narrowly tailored to achieve its purpose and accordingly should be approved.

> **d.    The Plan Does Not Provide for a Sale of Substantially All or All of the Debtors' Assets—Section 1123(b)(4).**

76.    Bankruptcy Code section 1123(b)(4) provides that a plan may provide for the "sale

of all or substantially all of the property of the estate, and the distribution of such sale among

holders of claims or interests."[82]   Because the Debtors have already sold the majority of their

assets, the Plan does not (nor could it) provide for the same.  Thus, Bankruptcy Code section

1123(b)(4) is inapplicable to the Chapter 11 Cases.

> **e.    The Plan Modifies the Rights of Certain Classes—Section 1123(b)(5).**

77.    Bankruptcy Code section 1123(b)(5) provides that a plan may "modify the rights

of holders of secured claims, other than a claim secured only by a security interest in real property

that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the

rights of holders of any class of claims."[83]   Article V of the Plan modifies the rights of Holders of

---

[82]   11 U.S.C. § 1123(b)(4).

[83]   11 U.S.C. § 1123(b)(5).

Claims and Interests in Classes 1-A, 1-B, 3, 4, 5, and 6.  The Plan leaves unaffected the rights of

Holders of Claims in Class 2.  Therefore, the Plan satisfies Bankruptcy Code section 1123(b)(5).

### f.    The Plan Complies with Bankruptcy Code Section 1123(d).

78.    Bankruptcy Code section 1123(d) provides that "if it is proposed in a plan to cure

a default the amount necessary to cure the default shall be determined in accordance with the

underlying agreement and nonbankruptcy law."[84]   The Plan provides for the satisfaction of

monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the

Plan, in the ordinary course of business, or on such other terms as the parties may otherwise agree,

subject to the limitations described in Article XII of the Plan, satisfying Bankruptcy Code section

1123(d).

### B.    The Debtors Complied with the Applicable Provisions of the Bankruptcy Code—Section 1129(a)(2).

79.    Bankruptcy Code section 1129(a)(2) requires that the "proponent of the plan

compl[y] with the applicable provisions of the [Bankruptcy Code]."[85]   The legislative history of

Bankruptcy Code section 1129(a)(2) explains that this provision refers to the disclosure and

solicitation requirements set forth in Bankruptcy Code sections 1125 and 1126.[86]   As set forth

herein, the Debtors have satisfied Bankruptcy Code section 1129(a)(2) because it complied with

Bankruptcy Code sections 1125 and 1126 regarding disclosure and solicitation of the Plan.

---

[84]   11 U.S.C. § 1123(d).

[85]   11 U.S.C. § 1129(a)(2).

[86]   *See* H.R. Rep. No. 95-595, at 412 (1977 ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Lapworth*, No. 97-34529 (DWS), 1998 WL 767456, at *3 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that section 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

### i.    The Debtors Complied with Bankruptcy Code Section 1125.

80.    On April 3, 2024, the Court entered the Solicitation Procedures Order, which approved both the Disclosure Statement as containing adequate information and the proposed Solicitation Procedures, along with the forms of Ballots, Notices of Non-Voting Status, and Confirmation Hearing Notice.[87]

81.    Bankruptcy Code section 1125(e) provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.[88]

82.    The Debtors complied with the Solicitation Procedures Order and took appropriate actions in connection with the solicitation of the Plan in compliance with Bankruptcy Code section 1125.  Therefore, the Debtors respectfully request that the Court grant the parties the protections provided under Bankruptcy Code section 1125(e).

### ii.    The Debtors Complied with Bankruptcy Code Section 1126.

83.    Bankruptcy Code section 1126 specifies the requirements for acceptance of a plan of reorganization.[89]  Specifically, under Bankruptcy Code section 1126, only holders of allowed claims and allowed interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.[90]  Bankruptcy Code section 1126 provides, in pertinent part, that: "[t]he holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan. . . ." and

---

[87]    *See* Docket No. 926.

[88]    11 U.S.C. § 1125(e).

[89]    *See generally* 11 U.S.C. § 1126.

[90]    *See* 11 U.S.C. § 1126(a); 11 U.S.C. § 1126(f).

"[n]otwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances to such class from the holders of claims or interests of such class is not required."[91]

84.    As set forth above, in accordance with Bankruptcy Code section 1125, the Debtors solicited acceptances or rejections of the Plan from the Holders of Claims in Classes 1-A, 1-B, 3, 4, and 5.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Code section 1129(a)(2).

**C.    The Plan is Proposed in Good Faith and Not by Any Means Forbidden by Law—Section 1129(a)(3).**

85.    Bankruptcy Code section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[92]  Although the term "good faith" is left undefined in the Bankruptcy Code, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirements of section 1129(a)(3) are satisfied."[93]

86.    In its Objection, MercyOne argues that "the Releases cause the Plan to independently fail the requirement that a plan be proposed in good faith."[94]  However, MercyOne offers **no** factual or legal support whatsoever to demonstrate the Debtors' purported inability to satisfy this requirement, other than referring to the mere inclusion of the Third-Party Release in

---

[91]    11 U.S.C. § 1126(f).

[92]    11 U.S.C. § 1129(a)(3).

[93]    *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir. 1995); *see also In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985); *In re Zenith Elecs. Corp.*, 241 B.R. at 107.

[94]    MercyOne Obj., ¶ 45.

the Plan.  MercyOne does not even attempt to explain why the inclusion of the Third-Party Release in the Plan is evidence of any bad faith.

87.     To the contrary, the Plan was proposed in good faith to effectuate the terms and purpose of the Bankruptcy Code and not by any means forbidden by law.  Moreover, the Plan was proposed, negotiated, and drafted in good faith by the Debtors in an effort to maximize value for creditor recoveries.  Specifically, the Plan was the product of extensive good faith, arms-length negotiations among the Debtors, the UCC, the Pension Committee, and the Bondholder Representatives, and the Plan is consistent with the interests of creditors.  The Plan, therefore, satisfies the "good faith" requirement of Bankruptcy Code section 1129(a)(3).

### D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses is Subject to Court Approval—Section 1129(a)(4).

88.     Bankruptcy Code section 1129(a)(4) requires that certain fees and expenses paid by the plan proponent or by the debtor be subject to approval by the Court as reasonable.[95]  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the court as to their reasonableness.[96]

89.     The Plan satisfies Bankruptcy Code section 1129(a)(4).  The Debtors submit that payment of Professional Fee Claims is the only category of payments that falls within the ambit of Bankruptcy Code section 1129(a)(4) in the Chapter 11 Cases, and the Debtors may not pay Professional Fee Claims absent Court approval.  Further, pursuant to Article IV.D of the Plan, all

---

[95]   *See* 11 U.S.C. § 1129(a)(4).

[96]   *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988).

such Professional Fee Claims and corresponding payments are subject to prior Court approval.[97]

Therefore, the Plan complies with the requirements of Bankruptcy Code section 1129(a)(4).

### E. The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders—Section 1129(a)(5).

90. Bankruptcy Code section 1129(a)(5) requires various disclosures regarding a debtor's officers and directors after plan confirmation.[98] Specifically, Bankruptcy Code section 1129(a)(5)(A)(i) requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors.[99]

91. As discussed above, on the Effective Date, the Liquidation Trustee shall have sole right and authority to control and direct the activities of the Debtors and their Estates.[100] The Debtors disclosed, as part of the Plan Supplement, that William H. Henrich of Getzler Henrich & Associates, LLC will serve as Liquidation Trustee, further satisfying Bankruptcy Code section 1129(a)(5).

### F. The Plan Does Not Require Governmental Regulatory Approval—Section 1129(a)(6).

92. Bankruptcy Code section 1129(a)(6) permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change (*e.g.*, the price of utility services) provided for in the plan.[101] The Plan does not provide for the change of any rates subject to the oversight of a governmental regulatory commission, meaning that Bankruptcy Code section 1129(a)(6) is inapplicable to the Chapter 11 Cases.

---

[97]   *See* Plan, Art. IV.D.1.

[98]   *See* 11 U.S.C. § 1129(a)(5).

[99]   *See* 11 U.S.C. § 1129(a)(5)(A)(i).

[100]   *See* Plan, Art. IX.D.

[101]   *See* 11 U.S.C. § 1129(a)(6).

**G.**     **The Plan is in the Best Interests of All of the Debtors' Creditors—Section 1129(a)(7).**

93.     Bankruptcy Code section 1129(a)(7), commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either (a) accepted the plan or (b) will receive or retain property having a value not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.[102]   The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes[103] and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[104]

94.     To demonstrate the Plan's compliance with the best interests test, the Debtors prepared the hypothetical liquidation analysis attached to the Combined Disclosure Statement and Plan as Exhibit A (the "Liquidation Analysis").

95.     Here, the best interests test is satisfied because the Liquidation Analysis shows that projected recoveries for Impaired Classes under the Plan are equal to or in excess of the recoveries estimated in a hypothetical chapter 7 liquidation.   In particular, the Holders of General Unsecured Claims (Class 3) and Pension Claims (Class 5) would likely receive nothing in a chapter 7 liquidation on account of their Claims, whereas under the Plan, they are receiving significant and

---

[102]   *See* 11 U.S.C. § 1129(a)(7); *In re PWS Holding Corp.*, 228 F.3d at 230; *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).

[103]   *See Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

[104]   *See In re Neff*, 60 B.R. 448, 452 (Bankr. N.D. Tex. 1985) (stating that "best interests" of creditors means "creditors must receive distributions under the Chapter 11 plan with a present value at least equal to what they would have received in a Chapter 7 liquidation of the Debtor as of the effective date of the plan"), *aff'd*, 785 F.2d 1033 (5th Cir. 1986); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'").

guaranteed recoveries.  Moreover, Holders of Intercompany Claims (Class 6) would receive the same recovery in a chapter 7 liquidation as they would under the Plan because they would not receive any recovery in either scenario.  Accordingly, because creditor recovery for unsecured creditors provided by the Plan is equal to or far exceeds the available unsecured creditor recovery in a chapter 7 liquidation, the Plan is in the best interests of creditors and complies with Bankruptcy Code section 1129(a)(7).

### H.     The Plan is Confirmable Notwithstanding the Requirements of Bankruptcy Code Section 1129(a)(8).

96.     Bankruptcy Code section 1129(a)(8) requires that each class of claims or interests under a plan must either accept a plan or be unimpaired under a plan.[105]  A class of claims accepts a plan if the holders of at least two thirds in dollar amount and more than one-half in the number of claims vote to accept the plan— counting only those claims whose holders actually vote.[106]  "A class of interests has accepted a plan if such plan has been accepted by holders of such interests . . . that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests . . . that have accepted or rejected such plan."[107]

97.     As discussed above, Class 1-A (Bondholder Claims – Series 2018 Bonds), Class 1-B (Bondholder Claims – Series 2011 Bonds), Class 3 (General Unsecured Claims), Class 4 (Bondholder Deficiency Claims), and Class 5 (Pension Claims)—all Impaired Classes entitled to vote—voted overwhelmingly to accept the Plan by more than two-thirds in amount and more than one-half in number.[108]  Additionally, the Holders of Claims in Class 2 (Other Secured Claims) are

---

[105]   *See* 11 U.S.C. § 1129(a)(8).

[106]   *See* 11 U.S.C. § 1126(c).

[107]   11 U.S.C. § 1126(d).

[108]   *See* Voting Decl., Ex. A.

Unimpaired under the Plan within the meaning of Bankruptcy Code section 1124 and are conclusively presumed to have accepted the Plan.  Even though Holders of Intercompany Claims in Class 6 are deemed to reject the Plan, meaning that the requirements of Bankruptcy Code section 1129(a)(8) have not been met, the Court may "cram down" the Plan over the rejection or deemed rejection by such Classes, subject to further protections specified in Bankruptcy Code section 1129(b), as discussed below.

I.      **The Plan Provides for Payment in Full of All Allowed Priority Claims—Section 1129(a)(9).**

98.      Bankruptcy Code section 1129(a)(9) requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[109]  The Plan satisfies Bankruptcy section 1129(a)(9) of the Bankruptcy Code because Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims will be paid in full under the Plan.

J.      **At Least One Class of Impaired, Non-Insider Claims Accepted the Plan—Section 1129(a)(10).**

99.      Bankruptcy Code section 1129(a)(10) provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider."[110]  Here, all of the Impaired Classes entitled to vote on the Plan—Classes 1-A, 1-B, 3, 4, and 5—voted to overwhelmingly accept the Plan independent of any insiders' votes, satisfying Bankruptcy Code section 1129(a)(10) of the Bankruptcy Code.

---

[109]   *See* 11 U.S.C. § 1129(a)(9).

[110]   11 U.S.C. § 1129(a)(10).

### K.      The Plan is Feasible—Section 1129(a)(11).

100.      Bankruptcy Code section 1129(a)(11) requires that the Court find that a plan is feasible as a condition precedent to confirmation.[111]   For this requirement, courts look to see whether the debtor can realistically carry out provisions of the plan and whether the plan offers reasonable prospects of success.[112]   To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[113]

101.      In the context of a liquidating plan, this "feasibility" requirement is established by demonstrating that the debtor is able to satisfy the conditions precedent to effectiveness of the plan and has sufficient funds to meet its post-confirmation date obligations to pay for the costs of administering and fully consummating the plan and closing the chapter 11 case.[114]

102.      Under the Plan, the Debtors and the Liquidation Trustee have certain payment obligations on or as soon as practicable after the Effective Date.   These chapter 11-related payment obligations include Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims.   The payment of these amounts is predicated on funding from: (a) Cash on hand as of the Effective Date; and (b) additional Cash proceeds obtained after the

---

[111]   *See* 11 U.S.C. § 1129(a)(11).

[112]   *See In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (citations omitted) ("This definition [of feasibility] has been slightly broadened and contemplates whether the debtor can realistically carry out its plan, . . . and whether the plan offers a reasonable prospect of success and is workable.").

[113]   *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *In re W.R. Grace & Co.*, 475 B.R. at 115.

[114]   *See In re NexPak Corp.*, No. 09-11244 (PJW), 2010 WL 5053973, at *6 (Bankr. D. Del. May 18, 2010) (finding plan feasible where "[t]he Plan properly provides for the means for the Plan Administrator to complete the liquidation of the estates and to make the distributions to creditors according to the Plan and the relative priorities of the parties").

Effective Date, if any, from all other sources, including the proceeds of the Plan Settlement and the monetization of the Debtors' remaining assets, including pursuing Causes of Action.

103.    As the Plan is a plan of liquidation, and such liquidation was proposed in the Plan, confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors.  Accordingly, the Plan is a feasible plan of liquidation with a reasonable likelihood of success, satisfying Bankruptcy Code section 1129(a)(11).

**L.      All Statutory Fees Have Been or Will be Paid—Section 1129(a)(12).**

104.    Bankruptcy Code section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[115]  Bankruptcy Code section 507(a)(2) provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[116]  Article XVII.C of the Plan provides that all fees and charges under 28 U.S.C. § 1930(a), to the extent not previously paid and due and owing, will be paid for each quarter (or any fraction thereof) until the applicable chapter 11 case of the Liquidating Debtors is converted, dismissed, or closed, whichever occurs first.[117]  Therefore, the Plan satisfies Bankruptcy Code section 1129(a)(12).

**M.      Bankruptcy Code Sections 1129(a)(13)-(16) Do Not Apply to the Plan.**

105.    Bankruptcy Code section 1129(a)(13) is inapplicable because the Debtors do not provide "retiree benefits" within the meaning of Bankruptcy Code section 1114.[118]  Since the Debtors are not subject to any domestic support obligations, the requirements of Bankruptcy Code

---

[115]  11 U.S.C. § 1129(a)(12).

[116]  11 U.S.C. § 507(a)(2).

[117]  *See* Plan, Art. XVII.C.

[118]  *See* 11 U.S.C. § 1129(a)(13).

section 1129(a)(14) do not apply. Because the Debtors are not "individuals," the requirements of

Bankruptcy Code section 1129(a)(15) do not apply. Finally, Bankruptcy Code section 1129(a)(16)

is inapplicable to the Plan because it applies only to corporations and trusts that are not "moneyed,

business, or commercial."[119]

### N. The Plan Satisfies the "Cram Down" Requirements of Bankruptcy Code Section 1129(b).

106. Bankruptcy Code section 1129(b)(1) provides that, if all applicable requirements

of Bankruptcy Code section 1129(a) are met other than Bankruptcy Code section 1129(a)(8), a

plan may be confirmed so long as the requirements set forth in Bankruptcy Code section 1129(b)

are satisfied.[120] To confirm a plan that has not been accepted by all impaired classes (thereby

failing to satisfy Bankruptcy Code section 1129(a)(8)), the plan proponent must show that the plan

does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting

impaired classes).[121] The only non-consenting Class is Class 6 (Intercompany Claims).

107. The Plan satisfies Bankruptcy Code section 1129(b). All five Impaired Classes

entitled to vote on the Plan—Classes 1-A, 1-B, 3, 4, and 5—overwhelmingly voted to accept the

Plan. Holders of Intercompany Claims in Class 6 were deemed to reject the Plan. However, the

Plan is nonetheless confirmable because, as discussed in greater detail below, it satisfies the "cram

down" requirements of Bankruptcy Code section 1129(b) with respect to Class 6. The Plan neither

discriminates unfairly with respect to Class 6 (because there is a reasonable and nondiscriminatory

reason for its separate classification), and the Plan is fair and equitable (because no Holder of a

---

[119] *Id.* at § 1129(a)(16).

[120] *See* 11 U.S.C. § 1129(b)(1).

[121] *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re Zenith Elecs.*, 241 B.R. at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'"); *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997).

Claim junior to an Impaired rejecting Class of Claims will receive any recovery under the Plan on account of such Claim). Accordingly, the Plan is "fair and equitable" with respect to Class 6 and satisfies Bankruptcy Code section 1129(b).

**O.   The Plan Complies with the Other Provisions of Bankruptcy Code Section 1129—Section 1129(c)-(e).**

108.   The Plan satisfies the remaining provisions of Bankruptcy Code section 1129. First, Bankruptcy Code section 1129(c), which prohibits confirmation of multiple plans, is not implicated here because the Plan is the only plan filed in these Chapter 11 Cases.[122]   Second, Bankruptcy Code section 1129(d) provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[123]   Here, the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933 and no government unit or any other party has requested that the Court decline to confirm the Plan on such grounds, satisfying Bankruptcy Code section 1129(d).   Finally, Bankruptcy Code section 1129(e) is inapplicable because the Chapter 11 Case is not a "small business case."[124]   Therefore, the Plan satisfies the remaining provisions of Bankruptcy Code section 1129(c)-(e).

109.   In sum, because all factors under Bankruptcy Code section 1129 as well as other related factors under the Bankruptcy Code are satisfied, the Debtors submit that Confirmation of the Plan is both appropriate and merited, and all outstanding Objections suggesting otherwise should be overruled, as discussed below.

---

[122]   *See* 11 U.S.C. § 1129(c).

[123]   11 U.S.C. § 1129(d).

[124]   11 U.S.C. § 1129(e).

## MODIFICATIONS TO THE PLAN

110.    Bankruptcy Code section 1127(a) provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of Bankruptcy Code sections 1122 and 1123.[125]  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications to a plan after such plan has been accepted will be deemed to have been accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.[126]

111.    Contemporaneously herewith, the Debtors filed a modified version of the Plan, which implements certain technical Modifications.  The Modifications are immaterial and non-substantive, as they do not adversely affect the treatment of any Holder of Claims.  The purpose of the Modifications was to further narrow certain issues raised in certain of the Objections.  Given the immaterial nature of the Modifications, the fact that they do not adversely affect creditors and stakeholders, the Modifications comply with Bankruptcy Code section 1127 and Bankruptcy Rule 3019.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the Modifications, and that such Modifications should be deemed accepted by all creditors that previously accepted the Plan.

---

[125]   *See* 11 U.S.C. § 1127(a).

[126]   *See* Fed. R. Bankr. P. 3019.

## GOOD CAUSE EXISTS TO WAIVE THE STAY
## OF THE CONFIRMATION ORDER

112.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[127] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays of orders authorizing the sale of property and assignments of executory contracts or unexpired leases, respectively.[128]  These rules also permit modification of the stay upon court order.

113.    Good cause exists for waiving any stay of the proposed Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the proposed Confirmation Order may become effective immediately upon its entry.  As noted above, the Chapter 11 Cases has been conducted in good faith and with a high degree of transparency and public dissemination of information.  The sooner the proposed Confirmation Order becomes effective, the sooner Holders of Allowed Claims can receive distributions and the Debtors can be dissolved.  Thus, the Debtors request a waiver of the stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may become effective immediately upon its entry.

## CONCLUSION

114.    For all the reasons set forth herein, in the Toney Declaration and the Voting Declaration, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court (a) confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order; (b) overrule any remaining objections to Confirmation of the Plan to the extent not resolved prior to or at the Combined

---

[127]  Fed. R. Bankr. P. 3020(e).

[128]  *See* Fed. R. Bankr. P. 6004(h); Fed. R. Bankr. P. 6006(d).

Hearing; (c) waive the stay of the proposed Confirmation Order; and (d) grant such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated:  Cedar Rapids, Iowa
       May 14, 2024

**NYEMASTER GOODE, P.C.**

*/s/ Roy Leaf*
Roy Leaf, AT0014486
625 First Street SE, Suite 400
Cedar Rapids, IA 52401-2030
Telephone:    (319) 286-7002
Facsimile:    (319) 286-7050
Email:      rleaf@nyemaster.com

- and -

Kristina M. Stanger, AT0000255
Matthew A. McGuire, AT0011932
Dana Hempy, AT0014934
700 Walnut, Suite 1600
Des Moines, IA 50309
Telephone:  515-283-3100
Fax:      515-283-8045
Email:      mmcguire@nyemaster.com
             kmstanger@nyemaster.com
             dhempy@nyemaster.com

- and -

**MCDERMOTT WILL & EMERY LLP**
Felicia Gerber Perlman (admitted *pro hac vice*)
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:      fperlman@mwe.com
             dsimon@mwe.com
             ekeil@mwe.com

*Counsel for Debtors and Debtors-in-Possession*

## Certificate of Service

    The undersigned certifies, under penalty of perjury, that on this May 14, 2024, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of these Chapter 11 Cases.

                     */s/ Roy Leaf*
                     Roy Leaf