# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | )    Case No. 23-00623 (TJC) |
| | ) |
| Debtors. | )    Jointly Administered |
| | ) |
| | )    **Related to Docket Nos. 1224, 1244, 1260, 1261** |
| | ) |

## MCDERMOTT WILL & EMERY'S RESPONSE (I) IN SUPPORT OF ELEVENTH MONTHLY AND FINAL FEE APPLICATION OF MCDERMOTT WILL & EMERY LLP, COUNSEL TO THE DEBTORS AND DEBTORS-IN-POSSESSION, FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES AND (II) IN OPPOSITION TO OBJECTIONS FILED THERETO

McDermott Will & Emery LLP (the "Applicant" or "McDermott"), former counsel to Mercy Hospital, Iowa City, Iowa ("Mercy") and certain of its affiliates and subsidiaries as debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), hereby submits this response (the "Response") (i) in support of the *Eleventh Monthly and Final Fee Application of McDermott Will & Emery LLP, Counsel to the Debtors and Debtors-in-Possession, for Allowance of Compensation and Reimbursement of Expenses* [Docket No. 1224] (the "MWE Fee Application") and (ii) in opposition to (a) the *Objection of the Acting United States Trustee to the Debtors' Final Fee Application of McDermott Will & Emery, LLP* [Docket No. 1244] (the "UST Objection") filed by the United States Trustee for the Northern District of Iowa (the "U.S. Trustee"); (b) the *Motion to Reduce Fees* [Docket No. 1260] (the "Fee Reduction Motion") filed by the Official Committee of Pensioners (the "Pension Committee"); and (c) the *Joinder in Motion to Reduce Fees* [Docket No.

1261] (the "Joinder") filed by the Liquidating Trust Oversight Committee (the "Oversight Committee").[1]  In support of the Response, McDermott respectfully states as follows:

## PRELIMINARY STATEMENT

*"Lawyers do not come from cookie cutters.  Some are fast studies and others require more preparation.  Some are nimble on their feet and apt to achieve better results at trial [and] [c]lients are willing to pay more, per hour . . . Markets recognize these truths; judges must too."[2]*

*"Much ink has since been spilled on differentiating so-called 'local' rates from 'national' rates.  The distinction is much ado about nothing.  The market for professional services cannot be predetermined by geography alone."[3]*

1.      Few cases better illustrate this sentiment than these Chapter 11 Cases.  Given their scope, complexities, and pace, the Debtors sought, and obtained, the assistance of a national law firm with a unique skill set, capable of navigating unexpected challenges on an expedited timeframe and achieving the best results for the Debtors' patients, estates, and creditors.  McDermott was initially selected[4] as Mercy's restructuring counsel precisely because of its significant experience and expertise in complex healthcare restructurings such as this one.[5]  McDermott's knowledge and experience in both complex chapter 11 restructurings and healthcare transactions proved invaluable to the Debtors and were critical to obtaining the results achieved in

---

[1]   As discussed herein, neither the Fee Reduction Motion nor the Joinder were timely filed by the Objection Deadline (as defined herein).

[2]   *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1149–50 (7th Cir. 1993).

[3]   *In re Nordic Aviation Capital Designated Activity Co.*, No. 21-33693-KRH, 2022 WL 10716251, at *19 (Bankr. E.D. Va. Oct. 18, 2022).

[4]   This selection was made with full knowledge of McDermott's hourly rates, which were quoted to the Board at McDermott's initial retention in 2022 and subsequently disclosed to this Court (as well as all parties-in-interest) at the retention application stage in these Chapter 11 Cases.

[5]   This combination is unique to McDermott as the only law firm in the U.S. that is ranked as a "Band 1" healthcare law firm by Chambers, a rating it has exclusively received for 20 straight years.  *See* Chambers and Partners, Healthcare in Illinois, USA Guide 2024, McDermott Will & Emery, available at https://chambers.com/department/mcdermott-will-emery-llp-healthcare-usa-5:62:12471:1:4384.

these Chapter 11 Cases, including consummating the sale of substantially all of the Debtors' assets to the State of Iowa's University of Iowa (the "University") and achieving global peace amongst all key constituents in advance of Plan confirmation.  Given the dissention and acrimony initially present in these Chapter 11 Cases, these results were not only unexpected, but widely lauded by case constituents and this Court.[6]

2.      While some have questioned the work necessary to close the sale of the hospital because this was "a case [where] there was a sale slated from day one,"[7] there were significant complexities and challenges that may not be readily apparent from a review of the docket and McDermott submits that these Chapter 11 Cases were neither simple nor straightforward.  Rather, they involved multiple complex transactions, months of contentious hard-fought negotiations on a variety of legal issues, and numerous unexpected challenges that forced McDermott, as Debtors' counsel, to take actions that were reasonably likely to benefit the Estates at the time the services were provided.  The apparent simplicity of these Chapter 11 Cases is attributable to the monumental efforts of professionals behind the scenes, including those of McDermott.  The second-guessing of the objecting parties is simply inconsistent with the facts and the law, and comes without knowledge of much of the day-to-day efforts that went into the success of these Chapter 11 Cases.

---

[6]   *See* Memorandum Opinion and Order Overruling MercyOne's Objection to Debtors' Plan Confirmation, *Mercy Hospital, Iowa City, Iowa*, Case No. 23-00623 (TJC) (Bankr. N.D. Iowa June 7, 2024) [Docket No. 1113], at 16 ("On August 8, 2023, when the Court held its 'First Day Motions' hearing in this case, the animosity between Debtors and the multiple constituent groups was palpable. The Court urged the parties to work together toward consent, with an eye to the future and a confirmation plan. The parties have done just that. The gravity of having a consensual Plan presented to the Court just a short nine months later—with MercyOne's objections being the only remaining outlier—is not lost on this Court.").

[7]   Hr'g Tr. 6:16, *In re Mercy Hospital, Iowa City, Iowa*, Case No. 23-00623 (TJC) (Bankr. N.D. Iowa Oct. 7, 2024).

3.      By way of illustration, McDermott helped the Debtors navigate a variety of potential operational and legal obstacles throughout these Chapter 11 Cases, including, among others,

(a)      engaging with the Bondholder Representatives to achieve a smooth landing into chapter 11 following an emergency filing in the face of a state court receivership action, including drafting, negotiating, and obtaining court approval of all first- and second-day motions, many of which were objected to (including **all** retention applications) by the U.S. Trustee and other key constituents;

(b)      navigating each and every aspect of the marketing, sale, and auction process of Mercy Hospital—processes that were neither simple nor routine—which involved McDermott negotiating and seeking Court approval of bid procedures, running three separate auctions, negotiating with the University and the Bondholder Representatives for weeks resulting in a substantially increased purchase price to the benefit of all creditors, drafting multiple versions of sale documents, including the asset purchase agreement, accompanying schedules, and a transition services agreement, participating in lengthy due diligence calls with the University and responding to numerous diligence requests with respect to the same, and providing restructuring, healthcare, transactional, antitrust, and employment advice to the Debtors in furtherance of their sale efforts;

(c)      representing the Debtors in hard-fought out-of-court negotiations with key constituents like the Bondholder Representatives, Altera, the Committee, and the Foundation to preserve critical assets of the Estates and settle contested matters that, if litigated, would have been significantly more expensive to the detriment of the Estates, including the Bondholder Representatives' motion to appoint an examiner, the Foundation's adversary complaint filed against the Debtors, the Committee, and the Bondholder Representatives, and Altera's motion to compel assumption or rejection of its contract;

(d)      preserving the consensual nature of the Debtors' cash collateral usage, which involved ongoing negotiations with the Bondholder Representatives and the Committee throughout the duration of the Chapter 11 Cases;

(e)      mediating global peace by and among the Bondholder Representatives, the Committee, and the Pension Committee with respect to the terms of the Debtors' chapter 11 plan, and negotiating, drafting, and soliciting the plan, as well as seeking confirmation of the same over multiple objections; and

(f)    ensuring the go-forward administration of the Mercy Pension Plan for the benefit of all pensioners.

4.    These tasks, among others, were not only reasonable and necessary for the administration of the Chapter 11 Cases but also unquestionably benefitted the Estates, either through the injection of additional cash into the Estates (*i.e.*, consummating the sale to the University at an increased purchase price, settling with the Foundation to allow for use of its unrestricted funds, and maintaining consensual use of cash collateral), or the preservation of Estate assets for the benefit of creditors (*i.e.*, settling contested matters without additional litigation, discovery, and deposition costs, facilitating Plan negotiations resulting in increased creditor recoveries, and preserving the continued administration of the Mercy Pension Plan).

5.    As evidenced by the foregoing, McDermott remained steadfast in its commitment to facilitating the Debtors' chapter 11 goals throughout these proceedings and played many critical roles in these Chapter 11 Cases, including, among others, auctioneer, litigator, mediator, and peacemaker.  McDermott, on behalf of the Debtors, chose to face contention head on, engaging in numerous challenging conversations with key stakeholders, drafting multiple correspondence and responsive pleadings to address issues raised with this Court (several of which were never filed due in large part to successful out-of-court negotiations, as encouraged by this Court), and advising the Debtors on a variety of nuanced and complex issues, including those involving bankruptcy, antitrust, pension, healthcare, regulatory, and litigation advice.  While doing so, McDermott remained cognizant of this Court's instructions at the outset of these Chapter 11 Cases and endeavored to solve issues through out-of-court negotiation wherever possible.  And, as this Court encouraged, McDermott consistently relied on the skill, local expertise, and capabilities of Nyemaster Goode, P.C. ("Nyemaster") to assist with various workstreams, including, among others, all Debtor filings, creditor negotiations, and analysis involving local Iowa law.

6.      The objecting parties (the U.S. Trustee, the Oversight Committee (led by the Bondholder Representatives), and the Pension Committee) each have different motivations in objecting to the MWE Fee Application, but what is clear is that they have been adversarial toward McDermott since day 1.  By way of example, the U.S. Trustee objected to every fee application filed by McDermott, but has refused to meaningfully engage with McDermott in any respect in connection with the MWE Fee Application, even when McDermott made offers for further voluntary six-figure reductions.  Similarly, the Bondholder Representatives refused to engage with McDermott when McDermott provided voluntary concessions, which is surprising considering McDermott's budget fell below the agreed-upon carve-out budget during the case (all while the Bondholder Representatives' counsel, Mintz, received $1.2 million from the Debtors' estates via the cash collateral orders with no court oversight).  And finally, the Pension Committee and its constituents essentially have nothing to gain from further fee reductions, as the pensioners would likely receive nothing even if their efforts were successful.

7.      McDermott respectfully submits that its efforts were essential to the overall success of the Chapter 11 Cases, particularly given the complexities of the sale and plan process along with the various contested matters that unexpectedly arose during these proceedings and the tensions by and among key case constituents that the Debtors, by and through McDermott, skillfully navigated to the best of their abilities.  Put simply, but for McDermott's efforts in these Chapter 11 Cases, the results in these Chapter 11 Cases would never have been achieved.

8.      While McDermott's rates are higher than those that are customary in this jurisdiction, these are rates McDermott charges in virtually every other chapter 11 engagement, as well as the same hourly rates charged in McDermott's non-bankruptcy matters.  As further discussed later in this response (and notwithstanding this Court's opinion in *VeroBlue*),

McDermott's hourly rates should not bound by or limited to those charged in Iowa. Rather, bankruptcy courts, when applying the reasonableness standard, either allow a professional to bill the same reasonable rate in any forum (as the U.S. Trustee Guidelines contemplate) or compare rates applied in the market in which the firm practices (*i.e.*, Chicago) rather than the market in which the case was filed (*i.e.*, Iowa). To apply any other standard would result in an unrealistic and inaccurate assumption that all lawyers are identical and accordingly must charge the same hourly rates.[8] Indeed, McDermott was selected as Mercy's restructuring counsel because of its unique skill set and to slash McDermott's rates simply because they are higher than those in this district would not only apply the incorrect legal standard but would also (a) disregard the Debtors' decision to select and compensate the counsel of their choice, (b) discourage law firms like McDermott, which are uniquely positioned to assist in complex chapter 11 cases like these, and (c) unfairly harm Iowa companies that require sophisticated out-of-state counsel.

9.    Notwithstanding these issues, as discussed in greater detail herein and to comply with *Agriprocessors*, McDermott is willing to voluntarily write off **an additional** $200,000 in fees incurred, in addition to amounts McDermott already voluntarily wrote off in fees and expenses during the Chapter 11 Cases (~$160,194), and amounts McDermott voluntarily wrote off in fees as a result of applying 2023 rates in 2024 (~$216,564). The aggregate amount of this voluntary reduction totals **$576,758**, which is **almost triple** the amounts written off by every other professional combined.

---

[8]    *See Gusman v. Unisys Corp.*, 986 F.2d 1146, 1149–50 (7th Cir. 1993) ("Lawyers do not come from cookie cutters. Some are fast studies and others require more preparation. Some are nimble on their feet and apt to achieve better results at trial. Some have deeper insight and in a few hours may find ways to prevail . . . that will elude their colleagues. Clients are willing to pay more, per hour, for these better lawyers . . . Markets recognize these truths; judges must too. Only an assumption that all lawyers are identical could support the averaging approach, under which all lawyers in a division of the Court receive the same hourly fee.").

10.     In sum, McDermott respectfully submits that the fees and expenses sought in the MWE Fee Application (subject to the voluntary write offs discussed herein) are reasonable and necessary under Bankruptcy Code section 330(a), and should be approved.

## BACKGROUND

### I.      The Chapter 11 Cases

11.     On August 7, 2023 (the "Petition Date"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").

12.     On August 15, 2023, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee") in the Chapter 11 Cases [Docket No. 107].  On November 4, 2023, the U.S. Trustee appointed the Pension Committee [Docket No. 458].

13.     This Court is familiar with the various twists and turns that occurred in these Chapter 11 Cases.  To that end, McDermott will not recite each of the various events that occurred in the ten-month period between an emergency bankruptcy filing (and what appeared to be a contested cash collateral fight at the first day hearing), to a heavily contested auction and sale process, to a battle with Mercy Hospital Foundation over its funds, to an extensive negotiation with Altera regarding its unsecured claim and contract, and ultimately concluding with a confirmation order overruling objections from MercyOne.  Rather, the Debtors incorporate by reference the extensive description of these Chapter 11 Cases contained in the *Debtors' First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation* (the "Plan"), filed at Docket No. 1050.

## II.    McDermott's Final Fee Applications and Voluntary Write-Offs

14.    On August 8, 2024, McDermott filed the MWE Fee Application.  *See* Docket No. 1224.  The MWE Fee Application seeks final allowance of fees in the amount of $5,091,287.00, and expenses in the amount of $33,264.88.

15.    In the MWE Fee Application and in each monthly fee application filed by McDermott in these Chapter 11 Cases, McDermott indicated that it voluntarily wrote off certain fees and expenses incurred.  Specifically, as a general matter, McDermott wrote off all timekeepers that billed under an hour each month, and wrote off certain time entries with respect to preparation of fee applications and other matters.  Additionally, McDermott wrote off all computer data storage charges, legal research fees, and document retrieval fees.  In total, McDermott voluntarily wrote off $160,194.32 in fees and expenses, as reflected in the summary attached hereto as **Exhibit A**.

16.    Moreover, as disclosed to the U.S. Trustee, the Committee, and the Pension Committee on December 22, 2023, McDermott chose to defer any effect of the firm's annual rate increases to its representation of the Debtors in these Chapter 11 Cases.[9]  As such, the fees sought by McDermott for the period of January 1, 2024 through and including June 24, 2024 ($2,165,641.50) were voluntarily billed at 2023 rates, resulting in a voluntarily reduction of hundreds of thousands of dollars (*i.e.*, approximately $216,564.15) purely as a result of McDermott's choice not to raise rates for the Debtors at the beginning of 2024.

17.    As an active participant in these Chapter 11 Cases, McDermott is well-aware of this Court's views on professional fees.  *See In re VeroBlue Farms, Inc.*, Case No. 18-01297, 2023 WL 3011756, at *6 (Bankr. N.D. Iowa Apr. 19, 2023); *In re Agriprocessors, Inc.*, Case No. 08-02751, 2009 WL 4823808, at *2 (Bankr. N.D. Iowa Dec. 8, 2009).  In acknowledgement of the

---

[9]    That communication indicated that the Debtors reserved the right to seek the amounts based upon 2024 rates, but McDermott chose not to do so in the MWE Fee Application.

foregoing, McDermott is willing to voluntarily write off an additional $200,000.00 in amounts that this Court may deem objectionable, including, among others, (a) 26.9 hours and $33,938.00 in fees for duplicative attendance at hearings, (b) 79.0 hours and $56,299.00 in fees incurred in connection with review of McDermott's time entries and preparation of fee applications, (c) 37.0 hours and $59,663.50 in fees incurred for non-working travel time, and (d) $50,099.50 in fees incurred in connection with the use of intra-office conferences and efforts across team members some may view as duplicative.  In total, McDermott is willing to write off the following:

| Category | Voluntary Writeoffs |
|---|---|
| Fees and Expenses Written Off During Chapter 11 Cases | $160,194.32 |
| Fees Reduced as a Result of Applying 2023 Rates through 2024 | $216,564.15 |
| *Agriprocessor* Writeoffs | $200,000.00 |
| **Total** | **$576,758.47** |

## RESPONSE

I.   **The MWE Fee Application Should be Approved.**

A.   **McDermott Has Satisfied the Requirements of Bankruptcy Code Section 330(a)(3).**

i.   **Legal Standard**

18.   Compensation for professionals employed pursuant to Bankruptcy Code section 327 is governed by Bankruptcy Code section 330, which permits "reasonable compensation for actual, necessary services rendered . . . [and] reimbursement for actual, necessary expenses."  11 U.S.C. § 330(a)(1)(A)-(B); *see also Stalnaker v. DLC, Ltd.*, 376 F.3d 819, 825 (8th Cir. 2004).  In determining the amount of reasonable compensation, the Court is directed to "consider the nature, the extent, and the value of such services, taking into account all relevant factors . . ."  11 U.S.C. § 330(a)(1)(A)-(B).  Such factors include the following:

    (a)    the time spent on such services;

    (b)    the rates charged for such services;

    (c)    whether the services were necessary to the administration of, or beneficial **at the time at which the service was rendered** toward the completion of, a case under this title;

    (d)    whether the services were performed within a reasonable amount of time **commensurate with the complexity, importance, and nature of the problem, issue, or task addressed**;

    (e)    with respect to a professional person, whether the person is board certified or otherwise has **demonstrated skill and experience in the bankruptcy field**; and

    (f)    whether the compensation is reasonable based on the **customary compensation charged by comparably skilled practitioners in cases other than cases under this title**.

*Id.* § 330(a)(3) (emphasis added); *In re Peterson*, 251 B.R. 359, 364 (B.A.P. 8th Cir. 2000). Importantly, Bankruptcy Code section 330(a)(4) provides that the Court shall not allow compensation for "(i) unnecessary duplication of services; or (ii) services that were not— (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." *Id.* § 330(a)(4)(A).

      **ii.**    **The Services Provided by McDermott Were Reasonable and Necessary to the Chapter 11 Cases.**

    19.    As discussed above, McDermott helped the Debtors address a number of challenging operational and legal issues, including, among others:

    (a)    filing the Chapter 11 Cases with limited liquidity and minimal preparations to protect Mercy Hospital from receivership and potential closure, as well as the exercise of remedies by the Bondholder Representatives;

    (b)    preparing, negotiating, and prosecuting numerous "first-day" motions, seeking emergency relief to, among other things, pay employee wages and benefits, taxes and fees, insurance premiums, and utility amounts, and to maintain the Debtors' cash management system;

(c) preparing, negotiating, and prosecuting each of the Debtors' retention applications and responding to objections filed by the U.S. Trustee, the Bondholder Representatives, and the Committee;

(d) preparing a response to the Examiner Motion and negotiating a settlement to avoid further litigation and costs attendant thereto (including the cost of an examiner, which would have been borne by the Estates);

(e) preparing, negotiating, and prosecuting the Bidding Procedures Motion and responding to objections thereto;

(f) administering the Debtors' auction process, including hosting three separate auctions, negotiating with the University and the Bondholder Representatives, and bringing the University back to the negotiating table resulting in a winning bid of over $28 million in cash, assumption of operating liabilities, and a $25 million commitment to invest in Mercy Hospital;

(g) drafting multiple versions of the governing asset purchase agreement and various schedules with respect to the same, analyzing the potential sale of Mercy Hospital for anti-trust considerations, negotiating with the University with respect to assumption of executory contracts, responding to numerous due diligence requests from the University, completing a thorough licensure, regulatory, and contract review, and consummating the sale transaction as of January 31, 2024;

(h) negotiating and drafting a transition services agreement to ensure that the administration of Mercy Hospital would continue seamlessly post-sale;

(i) negotiating with the Foundation with respect to the use of its unrestricted funds to cover operating losses, preparing and prosecuting the 9019 Motion with respect to a settlement with respect to the same and the Foundation Adversary Complaint, and prosecuting the same;

(j) negotiating a settlement with Altera with respect to its unsecured claim and motion to compel assumption or rejection of its contract;

(k) negotiated, documented, and consummated a chapter 11 plan of liquidation with increased recoveries to holders of General Unsecured Claims and Pension Claims;

(l) successfully overcoming numerous confirmation objections and achieving confirmation of the Plan; and

(m) preparing the Debtors to emerge from chapter 11, including ensuring the go-forward administration of the Mercy Pension Plan.

20.     These tasks, among others, were not only reasonable and necessary for the administration of the Chapter 11 Cases but were also undoubtedly reasonably likely to benefit the Estates at the time these services were rendered as contemplated by Bankruptcy Code section 330(a).  In fact, these actions resulted in either the injection of additional cash into the Estates (*i.e.*, consummating the sale to the University at an increased purchase price of $28 million, settling with the Foundation to allow for use of ~$18 million in unrestricted funds, and maintaining consensual use of cash collateral), or the preservation of Estate assets for the benefit of creditors (*i.e.*, settling contested matters without additional litigation, discovery, and deposition costs, facilitating Plan negotiations resulting in increased creditor recoveries, and preserving the continued administration of the Mercy Pension Plan).  Importantly, neither the U.S. Trustee nor the Pension Committee (or the Oversight Committee) have offered any arguments (much less evidence) to the contrary that the foregoing services were not reasonable or necessary to the administration of the Chapter 11 Cases.

21.     Moreover, neither the U.S. Trustee nor the Pension Committee (or the Oversight Committee) have taken issue with McDermott's expertise or skills in both the bankruptcy and healthcare industries.  McDermott was selected as the Debtors' restructuring counsel due in large part on McDermott's significant experience and expertise in complex healthcare restructurings, including large chapter 11 cases involving the sale or divestiture of hospitals.[10]  As contemplated by Bankruptcy Code section 330(a)(3), McDermott's knowledge and experience in both of these fields was unquestionably demonstrated prior to and during the Chapter 11 Cases and proved invaluable to the Debtors in navigating the complexities attendant thereto.

---

[10]     Indeed, McDermott is the only law firm in the U.S. that is ranked as a "Band 1" healthcare law firm by Chambers, a rating McDermott has exclusively received for 20 straights years.  *See* Chambers and Partners, Healthcare in Illinois, USA Guide 2024, McDermott Will & Emery, available at https://chambers.com/department/mcdermott-will-emery-llp-healthcare-usa-5:62:12471:1:4384.

22.     These amounts are significantly lower than, fees sought by debtor professionals (and approved by the respective bankruptcy courts) in other complex chapter 11 cases involving hospital sale or divestiture transactions.  *See, e.g.*, *In re Genesis Care PTY Ltd.*, Case No. 23-90614 (MI) (Bankr. S.D. Tex. 2023) (approving $26,809,735.00 in fees and $286,182.32 in expenses sought by debtors' counsel); *Envision Healthcare Corp.*, Case No. 23-90342 (CML) (Bankr. S.D. Tex. 2023) (approving $17,792,778.50 in fees and $536,583.70 in expenses sought by debtors' counsel); *Pipeline Health System, LLC*, Case No. 22-90291 (MI) (Bankr. S.D. Tex. 2022) (approving $10,784,179.50 in fees and $206,413.85 in expenses sought by debtors' counsel); *Northwest Senior Housing Corp.*, Case No. 22-30659 (MVL) (N.D. Tex. 2022) (approving $8,145,043.71 in fees and $146,248.80 in expenses sought by debtors' counsel); *In re Hospital Acquisition LLC*, Case No. 19-10998 (BLS) (D. Del. 2019) (approving $7,779,475.75 in fees and $67,520.13 in expenses); *Saint Vincent's Catholic Medical Centers of New York*, Case No. 05-14945 (ASH) (S.D.N.Y 2005) (approving $15,289,978.31 in fees and $668,986.87 in expenses). With this additional context, there can be no question that McDermott's fees are objectively reasonable compared to those in other similar healthcare restructuring cases.

**B.     Satisfaction of the *Agriprocessors* Standard**

23.     In *Agriprocessors, Inc.*, this Court set out additional guidelines to consider when evaluating attorney fee applications: (a) attorneys generally will not be compensated for preparing, submitting, or defending their fee applications, which is considered a cost of doing business; (b) compensation for secretarial work performed by lawyers, paralegals, or other staff, which is also part of the cost of doing business, will be disallowed; (c) time charged for travel should be billed at one-half the standard hourly rate; and (d) fees are not allowed for simply reviewing the work product of another or for duplicative billing by attorneys involved in intra-office conferences.  *See*

*In re Agriprocessors, Inc.*, 2009 WL 4823808, at *5.  McDermott, cognizant of this Court's view

with respect to the foregoing categories, has agreed to voluntarily write off certain fees as set forth

below; however, McDermott believes that fees billed to certain of the foregoing categories are

compensable, as set forth herein.

24.     **Fee Applications**.  With respect to the first factor, McDermott, cognizant of this

Court's views on billing for preparing fee applications, has agreed to voluntarily write off certain

of its fees, including those incurred for preparing their fee applications, for a total amount of

$56,299.00.  McDermott did not seek payment of any fees to prepare the MWE Fee Application,

nor is it seeking any fees for drafting this Response or defending its fees.  As such, McDermott

believes that the MWE Fee Application now complies with the first prong of the *Agriprocessors*

standard.

25.     **Secretarial Work**.  With respect to the second factor, McDermott does not believe

that any secretarial work was performed by its lawyers, nor does McDermott charge its clients for

"secretarial work" in the ordinary course of business.  Moreover, with the exception of one entry,

neither the U.S. Trustee nor the Pension Committee (or the Oversight Committee) have identified

with sufficient detail any "secretarial work" that is non-compensable.  Accordingly, McDermott

believes that the MWE Fee Application complies with the second prong of the *Agriprocessors*

standard.

26.     **Travel Time**.  With respect to the third factor, McDermott only billed for 50% of

the time billed to "Non-Working Travel Time."  However, cognizant of this Court's views on how

lawyers should bill travel time at half of their hourly rates, McDermott has agreed to voluntarily

write off **all** non-working travel time billed in the Chapter 11 Cases, for a total amount of

15

$59,663.50. Accordingly, McDermott believes that the MWE Fee Application now complies with the third prong of the *Agriprocessors* standard.

27.     **Intra-Office Conferences**. With respect to this final factor, McDermott recognizes this Court's views set forth in *Agriprocessors*; however, as set forth in greater detail in Section III herein, McDermott submits that a *per se* rule prohibiting intra-office conferences sets a far stricter standard than Bankruptcy Rule 330(a)(4) requires. Nevertheless, McDermott is willing to write off $50,099.50 in anticipation of this Court's views on conferences between McDermott attorneys, despite the fact that each of those collaborative conferences was necessary and reasonably likely to benefit the Debtors' estates. With the foregoing writeoffs, McDermott believes that the MWE Fee Application now complies with this final prong of the *Agriprocessors* standard.

28.     In sum, McDermott submits that the MWE Fee Application satisfies Bankruptcy Code section 330(a) as well as *Agriprocessors* and respectfully submits that (a) the compensation requested therein is reasonable, necessary, and justified and should be approved and, (b) for the reasons set forth above and in the following sections, the UST Objection, the Fee Reduction, and Joinder should be dismissed or overruled, as applicable.

## II.     The Fee Reduction Motion and the Joinder Should be Dismissed.

### A.     The Fee Reduction Motion and the Joinder are Untimely and Procedurally Improper.

29.     As an initial matter, both the Fee Reduction Motion and the Joinder extremely untimely and procedurally improper. Though titled as a "Motion to Reduce Fees" and accompanying joinder, the Fee Reduction Motion and the Joinder are nothing more than disguised objections to the MWE Fee Application. These objections were filed more than a month after the set objection deadline, with no extension sought.

30.     On August 8, 2024, Nyemaster filed a notice which set the bar date for objections to the MWE Fee Application as August 22, 2024 at 4:00 p.m. (prevailing Central Time) (the "Objection Deadline").  *See* Docket No. 1225.  On August 20, 2024, the U.S. Trustee reached out to McDermott via email to request an extension of the Objection Deadline until September 5, 2024 at 4:00 p.m. (prevailing Central Time).  In the interest of proceeding in good faith with the U.S. Trustee regarding the MWE Fee Application, McDermott agreed to extend the Objection Deadline until September 5, 2024; however, this extension was **only** granted for the U.S. Trustee. Neither the Pension Committee nor the Oversight Committee requested an extension of the Objection Deadline, nor did either entity reach out to McDermott to express any concern or issue with the MWE Fee Application, or any of its monthly fee applications previously filed in these Chapter 11 Cases for that matter.[11]

31.     Nevertheless, the Pension Committee filed the Fee Reduction Motion on September 23, 2024 and the Oversight Committee (through counsel to the Pension Committee, who also sits on the Oversight Committee) filed the Joinder on September 24, 2024, meaning that both documents were filed **over a month after the Objection Deadline**.  Even if McDermott had agreed to extend the Objection Deadline for the Pension Committee and the Oversight Committee to September 5, 2024—which it did not—the Fee Reduction Motion and the Joinder were filed **over two and a half weeks** after the extended deadline.  Accordingly, McDermott respectfully submits that the Fee Reduction Motion and the Joinder are neither timely nor procedurally proper and must be dismissed.

---

[11]   The U.S. Trustee was the only party to object to McDermott's monthly fee applications in the Chapter 11 Cases.

**B.     The Fee Reduction Motion and the Joinder Fail to Satisfy the Requisite Evidentiary Burden.**

32.     "[W]hile an applicant bears the burden of demonstrating that an application for compensation satisfies the requirements of § 330, the objecting party likewise must present evidence in support of any objections and may not rely upon generalized grievances of dissatisfaction."  *In re Abel*, No. 95-11044, 2001 WL 36160133, at \*4 (Bankr. D. Vt. May 29, 2001) ("[A] party objecting to the amount of time spent on services has the burden of proving that too much time was spent . . . [and] has a responsibility to challenge with specificity the information presented and to produce evidence controverting that produced by the applicant."); 3 Collier on Bankruptcy ¶ 330.03 (16th ed. 2023) ("A party objecting to the amount of time spent on services has the burden of proving that too much time was spent and cannot merely allege a general dissatisfaction with the results."); *In re Blackwood Assocs., L.P.*, 165 B.R. 108, 111–12 (Bankr. E.D.N.Y. 1994) (overruling fee objection because "a party opposing a fee application must carry the burden of explaining what therein is unreasonable or, at least, what would be reasonable under the circumstances" otherwise the objection "fails"—"it is not for the court to supply such evidence or the detail required to support the objectant's overly general pleading"); *In re PJ Fin. Co., LLC*, Case No. 11-10688 BLS, 2012 WL 5879728, at \*4 (Bankr. D. Del. Nov. 20, 2012) ("Although the Debtor bears the initial burden when applying for compensation and reimbursement of expenses, the opposing party 'must carry the burden of explaining what therein is unreasonable or, at least, what would be reasonable under the circumstances.'") A party objecting to final fees may not do so based on the general proposition that the fee sought is "simply too much" and must go beyond this assertion "to articulate a reason why and, if necessary, present evidence in support thereof." *Matter of Hunt's Health Care, Inc.*, 161 B.R. 971, 982 (Bankr. N.D. Ind. 1993) ("A gestalt reaction that there was too much time spent isn't good enough.  The objector must, at some point, identify

any allegedly improper, insufficient, or excessive entries and direct the court's attention to them."); *Matter of Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992) (attorneys' fees should not be reduced based on "inarticulate and unsubstantiated dissatisfaction with the lawyers' efforts to economize on their time and expenses").

33.     The Pension Committee fails to meet this burden.  Rather than presenting specific evidence challenging the services rendered by McDermott, the Pension Committee does not enumerate specific entries or specify a total amount of fees and/or expenses in the MWE Fee Application that should be reduced.  Neither the Pension Committee nor the Oversight Committee provide a recommendation to this Court regarding the appropriate reduction with respect to the MWE Fee Application, choosing instead to argue that, as a general matter, "it is appropriate for the hourly rates of McDermott Will & Emery to be reduced, and recovery denied for non-compensable work and duplicative work."  Fee Reduction Motion, at 5; Joinder at ¶ 6 ("The Oversight Committee agrees with the Pensioners [sic] assertion that the fees charged by McDermott Will and Emery were not reasonable. . .").  This falls far short of the burden clearly articulated in the case law to "challenge with specificity" and to "produce evidence."  Accordingly, McDermott submits that the Fee Reduction Motion and the Joinder are substantively deficient and must be dismissed.

**III.    The UST Objection to the MWE Fee Application Should be Overruled and the Fee Reduction Motion and Joinder Should be Dismissed.**

34.     The arguments raised in the UST Objection, the Fee Reduction Motion, and the Joinder, to the extent not otherwise addressed by McDermott's voluntary writeoffs, should be overruled for the reasons set forth below.

**A.** **McDermott is entitled to payment of its customary hourly rates without reduction.**

35.     The U.S. Trustee and the Pension Committee complain that McDermott's hourly rates are not "reasonable" under Bankruptcy Code section 330(a) because they are "exponentially higher" than those charged by attorneys in Iowa. *See* UST Obj., ¶ 14; Fee Reduction Motion, at 2 Though McDermott recognizes that its hourly rates are higher than those charged by local Iowa restructuring attorneys, the hourly rates charged in these Chapter 11 Cases are reflective of the national rates charged by McDermott in other bankruptcy and non-bankruptcy matters, and are commensurate with McDermott's expertise and skills, which were critical to these Chapter 11 Cases.

**i.** **The U.S. Trustee Guidelines prevent the U.S. Trustee from objecting to McDermott's "non-forum" hourly rates.**

36.     As an initial matter, the *Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed under United States Code by Attorneys in Larger Chapter 11 Cases* (the "U.S. Trustee Guidelines") states that "[t]he United States Trustee will not object to 'non-forum' rates of professionals when the 'non-forum' rates are based on the reasonable rates where the professionals maintain their primary office, even if the locally prevailing rates where the case is pending are lower (*i.e.*, **a professional may bill the same reasonable rate in any forum**)." U.S. Trustee Guidelines, Appx. B(*l*) (emphasis added); *In re Nordic Aviation Capital Designated Activity Co.*, 2022 WL 1076251, at *16, n.18 (citing same). By raising an issue with McDermott's hourly rates in each and every objection to McDermott's fees, the U.S. Trustee is ignoring its own U.S. Trustee Guidelines. While the U.S. Trustee is permitted to object on other grounds, lumping in an objection to non-forum rates notwithstanding the U.S. Trustee Guidelines is inappropriate.

20

> ii.  **The hourly rates charged by McDermott are both appropriate and commensurate with McDermott's expertise.**

37.    The U.S. Trustee states that "[h]ourly rates set at the outset of the case should represent not only the appropriate rate customary to the area where the firm is located (in this case, Chicago), but also to the expertise and efficiency a particular firm brings."  U.S. Trustee Obj. to MWE's Second Monthly Fee Application [Docket No. 529], at ¶ 18.  Indeed, McDermott is the only law firm in the U.S. that is ranked as a "Band 1" healthcare law firm by Chambers, a rating McDermott has exclusively received for 20 straights years.  Though it alludes to the fact that these proposed hourly rates are "unreasonable," at no point does the U.S. Trustee argue that the hourly rates charged by McDermott (a) were not indicative of rates appropriate for Chicago or other jurisdictions or (b) were not commensurate with McDermott's experience and expertise.  As discussed below, the hourly rates charged by McDermott **are** indicative of national rates and **<u>are</u>** commensurate with McDermott's experience and expertise, justifying their approval.

38.    *Market Rates*.  As discussed herein, the hourly rates utilized by McDermott in these Chapter 11 Cases were reflective of the national rates charged by McDermott across all U.S. offices, in both bankruptcy matters and non-bankruptcy matters.  McDermott's rates were approved as part of this Court's order approving its retention, which authorized the Debtors to retain and employ McDermott as their counsel in accordance with the engagement letter, the underlying retention application, and accompanying declaration, each of which disclosed the hourly billing ranges for the primary billers on this engagement.  *See* McDermott Retention Order, Docket No. 226, at ¶ 2 ("The Debtors are authorized, but not directed, to retain and employ McDermott as counsel to the Debtors in the Chapter 11 Cases effective as of the Petition Date, in accordance with the Engagement Letter, the Application, and this Order, to perform the services described in the Application . . ."); *see* McDermott Retention Application, Docket No. 148, at ¶¶

16-17 (disclosing the ranges of rates for partners, associates, and paralegals as well as billing rates for primary billers); *see id.* at Ex. B, at ¶¶ 10-11 (declaration disclosing ranges of billing rates for partners, associates, and paralegals as well as billing rates for primary billers); *see id.* at Ex. 1 to Ex. B (engagement letter disclosing the range of rates for billing partners).  By its own admission,[12] the U.S. Trustee did not object to McDermott's proposed hourly rates at the retention stage and neither did the Pension Committee.  Furthermore, as set forth above and previously disclosed to the U.S. Trustee, McDermott's hourly rates were in fact **lower** than McDermott's national rates from January 1, 2024 and onward, given that McDermott voluntarily chose not to apply firm-wide rate increases to this particular matter but instead applied 2023 rates through 2024.  Finally, McDermott's rates have been approved and viewed as reasonable in debtor representations in numerous complex chapter 11 cases across a variety of jurisdictions.  *See, e.g.*, *In re Envistacom, LLC*, Case No. 23-52696 (JWC) (Bankr. N.D. Ga. Mar. 21, 2024); *In re OSG Holdings, Inc.*, Case No. 23-90799 (CML) (Bankr. S.D. Tex. Dec. 29, 2023); *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y. Sept. 13, 2023); *In re Red River Waste Solutions, LP*, Case No. 21-42423 (ELM) (Bankr. N.D. Tex. Dec. 27, 2022); *In re Nordic Aviation Capital Designated Activity Co.*, Case No. 21-33693 (KRH) (Bankr. E.D. Va. Oct. 31, 2022); *In re Gulf Coast Health Care, LLC*, Case No. 21-11336 (KBO) (Bankr. D. Del. Oct. 26, 2022); *In re NinePoint Medical, Inc.*, Case No. 20-12618 (KBO) (Bankr. D. Del. Apr. 9, 2021); *In re Quorum Health Corp.*, Case No. 20-10766 (KBO) (Bankr. D. Del. Sept. 25, 2020).

39.    ***Expertise and Experience***.    Courts have held that "[i]n a complex case[,] compensation based on a professional's customary billing rate, though exceeding the prevailing local rate, may be justified due to the professional's experience or expertise." *In re Southern Indus.*

---

[12]  *See* U.S. Trustee Obj. to MWE's Second Monthly Fee Application [Docket No. 529], at ¶ 18 ("The U.S. Trustee did not object to the hourly rates at the outset of the case.").

*Banking Corp.*, 41 B.R. 606, 612-13 (Bankr. E.D. Tenn. 1984); *In re Wash. Manufacturing Co.*, 101 B.R. 944, 952 (Bankr. M.D. Tenn. 1989) ("[T]his Court will not limit its fee aware to the Nashville rates. The specialization of the Kronish, Lieb firm in bankruptcy reorganizations of this type, the participation in that decision by the debtors' local counsel, the urgencies of the debtors' financial condition, . . . all support the reasonableness of the debtors' selection[.]"). This is particularly true when the "needs of a particular debtor might not be available in the local community." *In re Temple Retirement Community, Inc.*, 97 B.R. at 342-43 ("The complexities of the case justified hiring a bankruptcy specialist with a national reputation, but the venue for the case was clearly Waco, Texas. Limiting the 'lodestar' to that customarily awarded in the Waco-Temple-Killeen market would have effectively deprived the debtor its choice of counsel. While it may well be that there are firms in the local market who could have handled the case, it cannot be denied that the Dallas firm the debtor chose achieved an extraordinarily favorable result for the estate with a minimum of litigation, and did so in a remarkably short period of time."); *In re Southern Indus. Banking Corp.*, 41 B.R. at 612-13 ("Clearly, in the absence of available local counsel with the personnel and resources necessary in a complex case, the prevailing local rate simply may not be reasonable compensation for a firm outside the jurisdiction whose customary billing rate exceeds the local rate. Likewise, when a firm has expertise uncommon to any local firm, reasonable compensation obviously should not be ascertained by any prevailing local rate."); *In re Wilson Foods Corp.*, 36 B.R. 317, 321 (Bankr. W.D. Okla. 1984) ("It appears contrary to this legislative intent to deny bankruptcy lawyers from other regions the normal fees charged when their expertise is needed in a complex proceeding in this venue . . . Accordingly, we find that outside counsel may charge rates normally charged clients in their respective regional areas for counsel time expended in these proceedings.").

40.     McDermott was selected by the Debtors as their restructuring counsel due, in large part, to their significant experience and expertise in both complex restructuring matters and healthcare transactional and regulatory matters, skills that were integral to the Debtors' efforts and successes in these Chapter 11 Cases.  Given the various and complex healthcare issues involved in this matter, it was imperative for the Debtors to obtain counsel that was well-versed in healthcare transactional, regulatory, and policy issues.  McDermott is the only law firm in the U.S. that is ranked as a "Band 1" healthcare law firm by Chambers, a rating it has exclusively received for 20 straight years[13] and has been named Practice Group of the Year for Healthcare by Law360 for three years in a row.[14]  As such, the hourly rates are more than commensurate with McDermott's healthcare expertise as well as its restructuring knowledge and experience, all of which were utilized to service the Debtors in these Chapter 11 Cases.[15]

41.     Taken together, McDermott submits that the hourly rates used in these Chapter 11 Cases are appropriate, given that they are consistent with the rates charged in Chicago (as well as countless other chapter 11 cases) and are commensurate with the expertise and skill demonstrated by McDermott, skills that were invaluable to the Debtors and the results achieved in the Chapter 11 Cases.

---

[13]   *See* Chambers and Partners, Healthcare in Illinois, USA Guide 2024, McDermott Will & Emery, available at https://chambers.com/department/mcdermott-will-emery-llp-healthcare-usa-5:62:12471:1:4384.

[14]   *See McDermott Named Law360 Practice Group of the Year for Health Care for Third Year in a Row*, Jan. 22, 2024, available at https://www.mwe.com/media/mcdermott-named-law360-practice-group-of-the-year-for-health-care-for-third-year-in-a-row/.

[15]   Conveniently, the U.S. Trustee takes no issue with the results obtained by McDermott during the Chapter 11 Cases, including, among others, the sale of the Mercy Hospital to the University and successful confirmation of a chapter 11 plan with enhanced unsecured creditor recoveries, choosing instead to solely focus on the appropriateness of McDermott's fees.

### iii.    The reasonableness of McDermott's rates should not be determined solely by local geography.

42.    Though McDermott acknowledges that its fees are subject to reasonableness review pursuant to this Court's order authorizing its retention, McDermott submits that section 330 reasonableness should not be used by this Court to discount its hourly rates based on the rates charged by local Iowa restructuring counsel.  Courts in most jurisdictions agree that fees should not be limited to rates charged by local attorneys and that "non-forum" market rates may be applied as necessary.  *See, e.g.*, *In re Nordic Aviation Capital Designated Activity Co.*, Case No. 21-33693-KRH, 2022 WL 10716251, at *19 (Bankr. E.D. Va. Oct. 18, 2022) ("Much ink has since been spilled on differentiating so-called 'local' rates from 'national' rates.  The distinction is much ado about nothing.  The market for professional services cannot be predetermined by geography alone."); *In re Elizabeth Serv.*, Case No. 3:20-bk-30003 (MFW), 2021 WL 1342190, at *6 (Bankr. D. Virgin Islands Apr. 7, 2021) ("Under the Bankruptcy Code, attorneys are not generally bound to accept local rates, but are entitled to their standard non-bankruptcy rates."); *In re Gurley Housing Assocs. LP*, Case No. 20-10712, 2021 WL 1422874, at *3-4 (Bankr. N.D.N.Y. Jan. 12, 2021) ("In certain situations, the practice of bankruptcy law is an appropriate exception to not bind the prevailing rate to the court's district . . . the Court declines to artificially cap the attorneys' hourly rates in this case. . ."); *In re Farley, Inc.*, 156 B.R. 203, 213-14 (Bankr. N.D. Ill. 1993) ("PBGC points out that Kaye Scholer's rates were higher than those of other experienced law firms appearing in this case, and those Chicago rates set the outside value of service here.  However, this is not a reason by itself to reduce the hourly rates."); *In re Liberal Market, Inc.*, 24 B.R. 653, 659 (Bankr. S.D. Ohio 1982) ("Legal services in cases, such as the case at bar, involving complex corporate legal problems requiring a large time commitment, have commanded particularly high compensation to attract the services of exceptionally qualified attorneys.  In light of the desire to

attract highly qualified practitioners to the field of bankruptcy, the higher fees chargeable by attorneys in related fields should be accommodated accordingly.").

43.    Indeed, courts have held that to restrict the hourly rate of a law firm to those typical in the local jurisdiction is "unduly parochial." *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 252, 260 (3d Cir. 1995) ("The idea that a firm should be restricted to the hourly rate typical in the locale of the case is unduly parochial particularly in this age of national and regional law firms working on larger more complex bankruptcy cases of more than local import.") (internal quotation marks omitted); *In re Robertson Cos.*, 123 B.R. 616, 619 (Bankr. N.D. 1990) (determining that a restriction on a Minneapolis law firm to North Dakota hourly rates was unduly parochial); *Matter of Baldwin United Corp.*, 36 B.R, 401, 402 (Bankr. S.D. Ohio 1984) ("To limit fees to the rates charged by Cincinnati bankruptcy lawyers, merely because these cases happened to be filed in Cincinnati, would be a position too capricious and parochial to withstand analysis under section 330."). Others have held that the market, not the bankruptcy court, is the appropriate determining factor when evaluating reasonableness of hourly rates. *See, e.g.*, *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150 (7th Cir. 1993) ("[T]he best measure of an attorney's time is what that attorney could earn from paying clients. For a busy attorney, this is the standard hourly rate. If he were not representing this plaintiff in this case, the lawyer could sell the same time to someone else. That other person's willingness to pay establishes the market's valuation of the attorney's services . . . Markets recognize these truths; judges must too. Only an assumption that all lawyers are identical could support the averaging approach, under which all lawyers in a division of the Court receive the same hourly fee."); *In re Jensen-Farley Pictures, Inc.*, 47 B.R. 557, 578-79 (Bankr. D. Utah 1985) ("Attorneys' hourly rates are fixed by the market in which they customarily

practice, not by the Court."). This view is similarly shared by Congress, as illustrated by a joint

explanatory statement of the floor managers on Bankruptcy Code section 330(a):

> Section 330(a) contains the standard of compensation adopted in HR 8200 as
> passed by the House rather than the contrary standard contained in the Senate
> amendment. Attorneys' fees in bankruptcy cases can be quite large and should be
> closely examined by the court. However[,] bankruptcy legal services are entitled
> to command the same competency of counsel as other cases. In that light, the policy
> of this section is to compensate attorneys and other professionals serving in a case
> under title 11 at the same rate as the attorney or other professional would be
> compensated for performing comparable services other than in a case under title 11
> . . . Notions of economy of the estate in fixing fees are outdated and have no place
> in a bankruptcy code.

124 Cong. Rec. H11091 (daily ed. Sept. 28, 1978) (remarks of Representative Edwards); 124

Cong. Rec. S17408 (daily ed. Oct. 6, 1978) (remarks of Senator DeConcini).

44.     Payment of non-local hourly rates is particularly justified when the circumstances

of the case require retention of non-local counsel. *See, e.g.*, *In re Retail Grp., Inc.*, Case No. 20-

33113 (FJS), 2022 WL 9722306, at *14 (Bankr. E.D. Va. Aug. 30, 2022) ("As previously

discussed, the rates charged by attorneys in the local community are not determinative of the

reasonableness of compensation because, particularly in national cases, it may be reasonable to

retain out-of-court market attorneys."); *In re Elizabeth Serv.*, 2021 WL 1342190, at *6 ("Under

the Bankruptcy Code, attorneys are not generally bound to accept local rates, but are entitled to

their standard non-bankruptcy rates . . . This is particularly true in this instance because there are

few bankruptcy practitioners in the Virgin Islands and, therefore, conflicts of interest may preclude

a party form obtaining local counsel who are experienced in bankruptcy matters."); *In re Natural*

*Pork Prod. II, LLP*, Case No. 12-02872-als11, 2013 WL 8351979, at *6 (Bankr. S.D. Iowa Mar.

12, 2013) ("If the circumstances of the case justify bringing in outside counsel, a firm may be paid

its normal prevailing rate, instead of being limited to the local rate in the community."); *In re*

*Waldoff's Inc.*, 132 B.R. 329, 333 (Bankr. S.D. Miss. 1991) ("[R]ates that are higher than those

customarily charged in the community where the services are rendered or where the debtor is

located may be charged and allowed when justified by the particular circumstances of the case.");

*In re Temple Retirement Community, Inc.*, 97 B.R. 333, 342-43 (Bankr. W.D. Tex. 1989) ("A firm

may be justified in recovery their own normal rate in a given case, as opposed to the local rate in

the city where the case is pending, when the circumstances of the case justify bringing in outside

counsel.").

45.     McDermott recognizes that this Court has taken the opposite view of the foregoing

jurisdictions and previously significantly discounted the hourly rates of a Chicago firm because,

in the Court's view, those rates were "quite a bit above" rates charged by local counsel.  *In re*

*VeroBlue Farms, Inc.*, 2023 WL 3011756, at *5.  While cognizant of the differences in hourly

rates in these Chapter 11 Cases, McDermott submits that such a reduction of its hourly rates is

neither necessary nor appropriate here for several reasons.

46.     *First*, Mercy, a local Iowa institution, selected McDermott and was aware of its

hourly rates at the time of McDermott's retention in the fall of 2022.  As the foregoing case law

illustrates, the Debtors' willingness, as an Iowa institution, to pay McDermott's hourly rates

establishes the market for McDermott's services.  *See Gusman*, 986 F.2d at 1150 ("That other

person's willingness to pay establishes the market's valuation of the attorney's services.").  To

limit McDermott's hourly rates to those charged in Iowa simply because the Chapter 11 Cases

were filed in Iowa (which was clearly the appropriate venue in which to file chapter 11) would

effectively deprive the Debtors of their choice of counsel.  *See In re Temple Retirement*

*Community, Inc.*, 97 B.R. at 342-43 ("The complexities of the case justified hiring a bankruptcy

specialist with a national reputation, but the venue for the case was clearly Waco, Texas.  Limiting

the 'lodestar' to that customarily awarded in the Waco-Temple-Killeen market would have effectively deprived the debtor its choice of counsel.").

47.     *Second*, the circumstances of these Chapter 11 Cases justified McDermott's involvement, despite the fact that it does not regularly practice in Iowa, meaning that it should be allowed to be paid its normal hourly rates.  *See In re Natural Pork Prod. II, LLP*, 2013 WL 8351979, at *6 ("If the circumstances of the case justify bringing in outside counsel, a firm may be paid its normal prevailing rate, instead of being limited to the local rate in the community."). Unlike *VeroBlue*, where the work could have arguably been done by local counsel, McDermott's expertise, knowledge, and experience in both complex chapter 11 restructurings and healthcare were integral to the Debtors' success in these Chapter 11 Cases and could not have been replicated by local Iowa counsel.

48.     *Finally*, McDermott submits that reducing its hourly rates, *after* such rates were approved in connection with its retention by this Court, is inappropriate.  In the event this Court deems it appropriate to do so, the Court's analysis must begin with the market in which McDermott practices (*i.e.*, Chicago), not Iowa.  *See Zolfo*, 50 F.3d at 260 ("We believe the bankruptcy court erred in taking the market rate for services in Western Pennsylvania as a starting point.  This is not the appropriate starting point for the determination of the market in which Zolfo Cooper practices . . . The bankruptcy court here should have looked first to Zolfo Cooper's customary market (New York) and then made reductions based on the other factors.").

**B.     The remaining issues raised by the U.S. Trustee and the Pension Committee should be overruled due to mischaracterizations of the MWE Fee Application or misapplication of governing standards.**

49.     The remaining issues raised by the U.S. Trustee and the Pension Committee with respect to the MWE Fee Application can be categorized in three buckets: (a) time entries that

demonstrate a purported "lack of billing judgment," specifically with respect to duplication of work, overstaffing, and use of paralegals; (b) time entries for activities that, in the U.S. Trustee's view, are not compensable, including time spent on fee/employment applications and objections, intraoffice conferences, reviewing and revising documents, research, and hearing attendance; and (c) time entries that did not provide a benefit to the Debtors' estates, including drafting certain documents and researching certain issues. Each of the foregoing buckets will be addressed in turn.

### i.    Purported Lack of Billing Judgment

#### a.    Nyemaster's role in the Chapter 11 Cases obviated the need for McDermott to use (more expensive) paralegals.

50.    The U.S. Trustee and the Pension Committee both take issue with the fact that McDermott did not utilize paralegals. *See* UST Obj., ¶ 20 ("Notably, while 10 non-attorney support staff individuals worked on this case, only 1 paralegal was employed, who expended only 1.3 hours throughout the case."); *see also* Fee Reduction Motion, at 4 ("[O]nly one paralegal did any work, and billed just 1.3 hours, amounting to just $871.00 of the 5 million [sic] billed by McDermott Will and Emery.").

51.    At the first-day hearing, the Court instructed that McDermott should endeavor to utilize Nyemaster to handle matters whenever possible in these Chapter 11 Cases. McDermott took the Court's instruction seriously and depended upon Nyemaster on numerous occasions during these Chapter 11 Cases, as evidenced by the number of hours expended by Nyemaster in these Chapter 11 Cases. For example, Roy Leaf of Nyemaster billed 1,110.5 hours, while the key restructuring lawyers of McDermott, Felicia Perlman, Daniel Simon, and Emily Keil, billed 522.3 hours, 839.4 hours, and 708.7 hours respectively. Moreover, of all of the documents filed by the Debtors in the Chapter 11 Cases, only six were filed by McDermott, while the remaining hundreds

of other documents filed by the Debtors were filed by Nyemaster, thereby obviating the need for

McDermott to use paralegals, unless Nyemaster was otherwise unavailable to file.

52.    Accordingly, McDermott submits that utilizing Nyemaster in this manner in the

Chapter 11 Cases was the more appropriate course of action, as instructed by this Court, and

McDermott should not be penalized for its decision to follow this Court's instruction.

**b.    Overstaffing / Intra-Office Conferences**

53.    The U.S. Trustee and the Pension Committee complain about McDermott's

purported lack of billing judgment when it comes to "overstaffing" or use of "intra-office

conferences."    UST Obj., ¶ 22 ("Common throughout the McDermott time details [sic] is

significant overstaffing . . ."); Fee Reduction Motion, at 3 ("Pensioners submit that the staffing of

McDermott Will & Emery was excessive[.]").   These objections implicate the requirement of

Bankruptcy Code section 330(a)(4)(A)(i) to avoid *unnecessary* duplication of services.   However,

the standard proposed by the U.S. Trustee and the Pension Committee goes further than the

statutory text requires and discourages conduct beneficial to the Debtors' estates.

54.    Any firm that has multiple attorneys working on a complex chapter 11 case must

coordinate those attorneys' efforts.   This is particularly true in a case where lawyers with different

specialties must work together and collaborate to reach a common goal.   These Chapter 11 Cases

are the perfect example of such a case, as McDermott attorneys were addressing multiple

workstreams in conjunction with the bankruptcy proceedings.   As the MWE Fee Application

illustrates, the McDermott restructuring team was not the only team on this matter—to the

contrary, the MWE Fee Application reflects the collaboration of multiple practice groups within

McDermott that were necessary to the Debtors' efforts in these Chapter 11 Cases, including

restructuring, healthcare, transactions, employment, antitrust, finance, and litigation.   In order to

diligently and capably perform their work for the Debtors, these attorneys had to be kept apprised of developments in the Chapter 11 Cases.  For example, it was essential for the McDermott restructuring team to work alongside and frequently communicate with the McDermott healthcare transactions and antitrust team during the Chapter 11 Cases, as the Debtors' sale process required an intersection of bankruptcy court approval and negotiation as well as regulatory, transactional, and antitrust advice.  Similarly, it was crucial for the McDermott restructuring team to collaborate with the McDermott pension and employment team, given the pension and other employment issues that were present throughout the Chapter 11 Cases.  As such, these collaborative efforts were not *unnecessarily* duplicative as Bankruptcy Code section 330(a)(4)(A)(i) cautions against, but were *necessary* to provide comprehensive legal advice to the Debtors during these Chapter 11 Cases.

55.     Having multiple attorneys involved in a matter, like any other aspect of an attorney's representation, is subject to the possibility of overbilling.  Attorneys must use their discretion, and it is appropriate for this Court to review whether attorneys have exercised that discretion when presented with fee applications.  However, an across-the-board *per se* rule that only one attorney can bill for intra-office conferences or meetings with clients and other parties, which it appears may be the rule both the U.S. Trustee and the Pension Committee would seek to establish, goes well beyond Bankruptcy Code section 330(a)(4)(A)(i)'s requirement.  The standard is not whether multiple lawyers from the same firm were in the same meeting—the standard under Bankruptcy Code section 330(a)(4)(A)(i) is whether there was *unnecessary duplication*.  If lawyers bring different skills to the table, then McDermott submits that their work does not equate to duplication, and if multiple lawyers need to be present to obtain the information necessary to represent the client, it is certainly not unnecessary duplication.

56.     Notably, as admitted by the U.S. Trustee, it "never objected or raised an issue about inter-office conferences between local counsel and out-of-state counsel[,] as "[t]hat wouldn't make sense to the [U.S. Trustee]."[16]    As such, it seems that if lawyers from different firms were collaborating on a case, this *per se* rule would not implicate inter-office conferences between them or meetings with the debtors or other parties where counsel from both firms attended (though these would still be subject to Bankruptcy Code section 330(a)(4)(A)(i) prohibitions on unnecessary duplication).    Put those attorneys' names on the same letterhead, however, and the same activities that the U.S. Trustee would not object to between local and out-of-state counsel run afoul of the U.S. Trustee's own rule.

57.     McDermott recognizes that the views promulgated by the U.S. Trustee and Pension Committee on this issue are largely based on this Court's opinion in *Agriprocessors*, which states that "fees are not allowed for simply reviewing the work product of another or for duplicative billing by attorneys involved in intra-office conferences." *In re Agriprocessors, Inc.*, 2009 WL 4823808, at *5.    However, while McDermott acknowledges its fees are subject to review for unnecessary duplication, McDermott submits that a *per se* rule against intra-office conferences does not reflect the applicable standard of Bankruptcy Code section 330(a)(4)(A)(i).    Notably, neither the Pension Committee nor the U.S. Trustee identify with particularly the entries that they feel are *unnecessarily* duplicative, meaning that they have failed to meet their evidentiary burden to demonstrate the non-compensable nature of the same.

---

[16]    Hr'g Tr. 35:18-21, *In re Mercy Hospital, Iowa City, Iowa*, Case No. 23-00623 (TJC) (Bankr. N.D. Iowa Oct. 7, 2024).

ii.     **Purported "Non-Compensable" Time Entries and/or Billing Categories**

58.     Both the U.S. Trustee and the Pension Committee argue that there are certain categories of time entries in the MWE Fee Application that are not compensable.  As set forth above, McDermott has agreed to voluntarily reduce certain categories of fees, including certain amounts billed for hearing attendance and preparing fee applications; however, certain of the other categories addressed in the UST Objection and the Fee Reduction Motion are compensable and do not merit reduction.

a.     **The U.S. Trustee mischaracterizes the fees billed to the "Fee/Employment Applications" category in the MWE Fee Application.**

59.     Citing to *Agriprocessors*, the U.S. Trustee and the Pension Committee complain of the time McDermott billed to the "Fee/Employment Applications" category.  *See* UST Obj., ¶ 18; Fee Reduction Motion, at 2.  As discussed above, McDermott is willing to write off the entirety of its fees spent preparing its fee applications and reviewing time detail associated therewith, totaling 79 hours and $56,299.00.  However, the U.S. Trustee and the Pension Committee mischaracterize the entries billed by McDermott in this billing category, lump all 115.1 hours together as being billed solely to fee applications, and inexplicably disregard the "Employment" portion of this billing category.

60.     As reflected in paragraph 29 of the MWE Fee Application (which the U.S. Trustee conveniently ignores), McDermott described the time billed to the "Fee/Employment Applications" category and notes that such time included drafting retention applications for certain of the Debtors' professionals, including McDermott, ToneyKorf, H2C, and Epiq.  McDermott also sought approval of procedures for retention of "ordinary course professionals," and worked closely with such professionals to submit the necessary declarations in compliance with the Court's order

approving their retention.  McDermott also drafted supplemental declarations in support of its retention application, at the request of the U.S. Trustee and the Committee.  Without these efforts, the Debtors would have been unable to retain the professionals necessary to complete the work required in these Chapter 11 Cases.  Accordingly, McDermott submits that the hours and fees invoiced to the "Fee/Employment Applications" billing category other than those billed to fee applications are compensable.

> **b.** **The U.S. Trustee and the Pension Committee mischaracterize the fees billed to the "Fee/Employment Objections" category in the MWE Fee Application.**

61.     The U.S. Trustee and the Pension Committee similarly complain that McDermott improperly billed to the "Fee/Employment Objections" category because, among other things, McDermott did not file any fee objection or response to the U.S. Trustee's numerous fee objections.  *See* UST Obj., ¶ 18; Fee Reduction Motion, at 2-3.  The U.S. Trustee and the Pension Committee again mischaracterize the entries billed by McDermott in this billing category and again inexplicably disregard the "Employment" portion of this category.

62.     As reflected in paragraph 31 of the MWE Fee Application (which the U.S. Trustee and the Pension Committee conveniently ignore), McDermott described the time billed to the "Fee/Employment Objections" category and notes that such time included preparing responses to objections to multiple retention applications filed by the Bondholder Representatives, the Committee, and the U.S. Trustee, and negotiations with the U.S. Trustee as well as the Bondholder Representatives, the Committee, and the Pension Committee, regarding the same.  *See* MWE Fee Application, ¶ 31.  Specifically, **_eight_** objections to the Debtors' retention applications were filed in these Chapter 11 Cases.  *See* Docket Nos. 189, 190, 191, 192, 197, 200, 201, 203.  The U.S. Trustee also ignores that it is largely the reason for the majority of the time billed to this category,

as it filed **four** of those objections, while also raising informal issues with McDermott regarding

the Debtors' retention of professionals that it did not formally object to, including the Debtors'

claims and noticing agent. *See* Docket Nos. 189, 190, 191, 192. Recognizing that the Debtors

required skilled professionals to navigate these complex Chapter 11 Cases, McDermott engaged

in good faith with the various objecting parties, including the U.S. Trustee, prepared an omnibus

response to the outstanding retention objections [Docket No. 210], and ultimately resolved the

issues raised by the objecting parties to the benefit of the Debtors and their representation in these

Chapter 11 Cases.

63.     Given the foregoing, the issues raised with respect to the "Fee/Employment

Objections" billing category by the U.S. Trustee and the Pension Committee should be disregarded

and overruled, as the time that McDermott spent dealing with the objections to the Debtors'

retention applications should be compensable.

c.     **If applied, the U.S. Trustee's *per se* rule against conducting legal
research would harm clients and prevent lawyers from doing
their jobs appropriately.**

64.     Though not included in the UST Objection, the U.S. Trustee has previously taken

issue with McDermott's time spent researching various issues in the Chapter 11 Cases, noting that

"[s]urely a firm chosen for its expertise in bankruptcy and healthcare law should not need to be

expending dozens of hours researching issues central to the case or to ongoing discovery." Docket

No. 857, at ¶ 17. If the U.S. Trustee's inflexible standard were to govern, no research would be

compensable, simply because a law firm has expertise in certain fields. This is not, and cannot be,

the standard, as it would be detrimental to debtors and to this Court.

65.     As discussed herein, these Chapter 11 Cases were incredibly complex and contested

at various stages. They involved issues where McDermott, notwithstanding its experience, needed

to conduct legal research to inform themselves and their client on the law and relevant caselaw interpreting it.  While lawyers who are deeply involved in a field will generally know when a relevant statute or court rule changes, to expect even an experienced practitioner to be able to give a comprehensive legal evaluation and advice to a client, another party, or a court *without* conducting research is to expect malpractice.  Legal research, even on more basic concepts, is reasonably likely to benefit the estate because it allows debtors' counsel to formulate plans and positions that have the support of governing case law, advise debtors on how the law applies to the facts of their case, and avoids wasting the time and resources of other parties or this Court with unsound arguments and positions.  While McDermott does not believe that legal research is *carte blanche* to run up a bill, the standard simply cannot be that no research is compensable—the appropriate standard strikes a balance between prohibiting all research on the basis that counsel should already know everything due to their experience and hourly rates and approving all research charges no matter what the topic.  Moreover, the U.S. Trustee has failed to specifically identify research that it views as non-unnecessary or unreasonable, again painting with far too broad of a brush.  Accordingly, McDermott submits that the time spent researching complex, nuanced issues in these Chapter 11 Cases fits well within this standard.

### iii.    Benefit to the Debtors' Estates

66.    The U.S. Trustee's remaining issues with the MWE Fee Application seems to address the requirement set forth in Bankruptcy Code section 330(a)(4)(A)(ii) that the work either be reasonably likely to benefit the estate or be necessary to the case's administration.  *See* UST Obj., ¶ 24 ("Compensation should only be awarded to actions which are shown to actually benefit the bankruptcy estate.").  However, the U.S. Trustee not only fails to provide **any** evidence to suggest that specific services provided by McDermott did not benefit the Debtors' estates, but also

applies a hindsight analysis that is misguided and does not comport with the applicable statutory text.

67.     As set forth above, Bankruptcy Code section 330(a)(4)(A)(ii) makes clear that a bankruptcy professional's services are compensable if they were "reasonably likely to benefit the debtor's estate *at the time they were rendered*, not in 'hindsight.'" *In re Hosp. Partners of Am. Inc.*, 597 B.R. 763, 766–67 (Bankr. D. Del. 2019) (emphasis in original); 3 Collier on Bankruptcy ¶ 330.03 ("The majority of courts have determined the 'necessity' of particular services from the perspective of the time that the services were rendered, rather than based on hindsight after the services had been performed."); *id.* ("Rejecting an actual-material-benefit standard, a number of courts, including the Courts of Appeals for the Second, Third, Fifth, and Ninth Circuits, have determined that section 330 permits a court to compensate a professional not only for 'necessary' services, but also for services that were objectively reasonable at the time they were rendered.").

68.     Consistent with this precedent, the "benefit to the estate" is not measured by success. *See, e.g.*, *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 275 (5th Cir. 2015) ("Section 330 . . . explicitly contemplates compensation for attorneys whose services were reasonable when rendered but which ultimately fail to produce an actual, material benefit."). This principle is based on the fact that "[a]s a practical matter, bankruptcy professionals are not guarantors of the success of a particular theory, proceeding, or strategy." *In re Hosp. Partners of Am., Inc.*, 597 B.R. at 767 (Bankr. D. Del. 2019). As the Fifth Circuit has recognized, "[l]itigation is a gamble and a failed gamble can often produce a large net loss even if it was a good gamble when it was made." *In re Woerner*, 783 F.3d at 275. Bankruptcy Code section 330 therefore "permits a court to compensate an attorney not only for activities that were 'necessary,' but also for good gambles—that is, services that were objectively reasonable at the time they were

made—even when those gambles do not produce an 'identifiable, tangible, and material benefit.' What matters is that, prospectively, the choice to pursue a course of action was reasonable." *Id.* (quoting *In re Taxman Clothing Co.*, 49 F.3d 310, 313 (7th Cir. 1995)).

69.     Accordingly, Bankruptcy Code section 330(a)(4)(A) does not go so far as to require the Court to disallow fees simply because the estate ultimately does not profit from the services of the professionals in question." *In re Hosp. Partners of Am., Inc.*, 597 B.R. at 766.   Moreover, matters that ultimately have been consensually resolved "rarely should be considered to have been 'unnecessary' and therefore usually were 'reasonably likely to benefit' the estate." *In re Cenargo Int'l, PLC*, 294 B.R. 571, 595 (Bankr. S.D.N.Y. 2003).   In sum, the compensability of fees "is not based on whether the services ultimately resulted in a material benefit for the estate, but instead, whether the services were objectively reasonable at the time the services were rendered." *In re Hosp. Partners of Am., Inc.*, 597 B.R. at 767.   This objective inquiry is "based on what services a reasonable lawyer or legal firm would have performed in the same circumstances." *In re Fleming Companies, Inc.*, 304 B.R. 85, 89 (Bankr. D. Del. 2003) (internal citation omitted).

70.     In these Chapter 11 Cases, as discussed above, there were numerous contested matters that the Debtors, through the efforts of McDermott, were able to consensually resolve, as this Court previously encouraged, without further discovery, depositions, and extensive briefing, which saved the Estates significant legal fees in the long run.   This includes, among others, the Examiner Motion, the Foundation Adversary Complaint, the Altera dispute, and the Committee's adversary complaint.   If each of these matters remained contested, the fees incurred to litigate these issues, not to mention the cost of requested discovery and depositions involved with these matters, would have exponentially increased the amounts actually incurred in the Chapter 11 Cases.   While negotiating these contested matters, McDermott necessarily had to prepare the Debtors' response

to certain of these matters (*i.e.*, the Examiner Motion, the Altera dispute, etc.) in the event that a settlement was not reached between the parties. While the U.S. Trustee seemingly does not believe that this type of contingency planning should be compensated, McDermott submits that these are precisely the type of fees that deserve to be compensated, given that (a) a settlement that saved the Estates money ultimately resulted and (b) declining to prepare a response absent settlement would have left the Debtors objectively worse off in many of these situations and would have been unnecessarily exposed to adverse consequences. A *pro se* rule that time spent on objections or responses that are not filed with this Court is not compensable would unnecessarily handicap the work of debtor and committee lawyers, who need to be able to respond to contested matters on an expeditious timeframe and must be prepared for negotiations to break down at any point.

71.     Though this Court has emphasized that "just because it can be done . . . does not mean it's compensable in bankruptcy as reasonably and necessary,"[17] McDermott respectfully submits that its efforts in these Chapter 11 Cases, including those involved with resolving matters consensually without filing or litigating issues before this Court, are compensable because they were reasonably likely to benefit the Debtors' estates at the time they were provided. To hold otherwise would create an untenable standard. Fortunately for professionals applying for fees under Bankruptcy Code section 330 and those they represent, Congress—in its efforts to put bankruptcy on par with other legal fields by allowing compensation like in other fields—set the much more reasonable standard that the work must be either necessary to the case's administration or *reasonably likely* to benefit the estate. McDermott submits that it has met Congress' standard.

---

[17]   Hr'g Tr. 6:7-10, *In re Mercy Hospital, Iowa City, Iowa*, Case No. 23-00623 (TJC) (Bankr. N.D. Iowa Oct. 7, 2024).

**RESERVATION OF RIGHTS**

72.     McDermott hereby reserves all rights with respect to the MWE Fee Application, including the right to supplement this Response and raise additional arguments with respect to the MWE Fee Application at the hearing on the MWE Fee Application.

**CONCLUSION**

73.     For the reasons set forth in the MWE Fee Application and this Response, McDermott respectfully requests that this Court (a) approve the fees and expenses requested in the MWE Fee Application, as modified by the voluntary reductions contained herein, (b) overrule the UST Objection, (c) dismiss the Fee Reduction Motion, and (d) grant any other and further relief as this Court deems just and proper.

Dated: Chicago, Illinois
       October 16, 2024

**MCDERMOTT WILL & EMERY LLP**

*/s/ Daniel M. Simon*
Felicia Gerber Perlman (admitted *pro hac vice*)
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, IL 60606
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:        fperlman@mwe.com
              dsimon@mwe.com
              ekeil@mwe.com

*Counsel to the Debtors and Debtors-in-Possession*

**CERTIFICATE OF SERVICE**

The undersigned certifies, under penalty of perjury, that on this October 16, 2024, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of the Chapter 11 Cases.

*/s/ Daniel M. Simon*

**<u>Exhibit A</u>**

**Summary of Voluntary Writeoffs During Chapter 11 Cases**

**Invoice 3920339 (August 2023)**

| TKPR Name | W/O Hrs | W/O Amt |
|---|---|---|
| Berman, Jennifer | 0.30 | $103.50 |
| Wallace, Monica | 0.50 | $742.50 |
| Weinstein, Scott | 0.70 | $945.00 |
| Doddi, Deepali | 0.30 | $357.00 |
| Perlman, Felicia | 3.50 | $6,475.00 |
| Keil, Emily | 1.80 | $1,989.00 |
| Simon, Daniel | 3.00 | $4,350.00 |
| Haake, Jack | 0.10 | $119.00 |
| Bianchi, Alden | 0.30 | $435.00 |
| Ingolikar, Apurva Jayant | 0.50 | $135.00 |
| | **11.00** | **$15,651.00** |

| Cost | W/O Amt |
|---|---|
| Data Review & Production Software | $19,261.48 |
| Computer Research | $8,200.44 |
| Search Fees | $485.37 |
| | **$27,947.29** |

| | |
|---|---|
| **Total W/O :** | **$43,598.29** |

**Invoice 3920340 (September 2023)**

| TKPR Name | W/O Hrs | W/O Amt |
|---|---|---|
| Dingman, Carmen | 0.90 | $850.50 |
| Keil, Emily | 6.80 | $7,514.00 |
| Northrop, Daniel | 0.80 | $536.00 |
| Perlman, Felicia | 3.00 | $5,550.00 |
| Simon, Daniel | 2.30 | $3,335.00 |
| Wu, Stephen | 0.30 | $477.00 |
| | **14.10** | **$18,262.50** |

| Cost | W/O Amt |
|---|---|
| Data Review & Production Software | $971.04 |
| Computer Research | $1,249.36 |
| Transportation | $23.21 |
| Document Retrieval | $9.70 |
| Search Fees | $475.64 |
| | **$2,728.95** |

| | |
|---|---|
| **Total W/O :** | **$20,991.45** |

| Invoice 3920341 (October 2023) | | |
| --- | --- | --- |
| TKPR Name | W/O Hrs | W/O Amt |
| Kapp, James | 2.00 | $2,900.00 |
| Simon, Daniel | 2.30 | $3,335.00 |
| Wu, Stephen | 0.30 | $477.00 |
| | **4.60** | **$6,712.00** |

| Invoice 3920342 (November 2023) | | |
| --- | --- | --- |
| TKPR Name | W/O Hrs | W/O Amt |
| Kwon, Edward Yoosin | 0.50 | $272.50 |
| Simon, Daniel M | 3.20 | $4,640.00 |
| Wu, Stephen Y. | 0.50 | $795.00 |
| | **4.20** | **$5,707.50** |

| Cost | W/O Amt |
| --- | --- |
| Data Review & Production Software | $939.76 |
| Computer Research | $817.88 |
| Document Retrieval | $926.00 |
| Search Fees | $77.45 |
| Travel | $554.80 |
| Meals | $332.77 |
| | **$3,648.66** |

| Cost | W/O Amt |
| --- | --- |
| Data Review & Production Software | $940.76 |
| | **$940.76** |

**Total W/O :  $6,648.26**

**Total W/O :        $10,360.66**

### Invoice 3920343 (December 2023)

| TKPR Name | W/O Hrs | W/O Amt |
|---|---|---|
| Dizon, Raniel | 1.00 | $545.00 |
| Dow, Haley Mazzei | 1.00 | $725.00 |
| Green, Debbie | 0.20 | $270.00 |
| | **2.20** | **$1,540.00** |

### Invoice 3862631 (January 2024)

| TKPR Name | W/O Hrs | W/O Amt |
|---|---|---|
| Alarif, Nicholas | 0.20 | $270.00 |
| Cannatti, James | 0.60 | $828.00 |
| Casten, Benjamin | 0.30 | $207.00 |
| Gottlieb, Daniel | 0.50 | $792.50 |
| Greathouse, Jay | 1.00 | $1,300.00 |
| Palmer, Emily | 0.20 | $221.00 |
| Rooney, Megan | 0.30 | $438.00 |
| Simon, Daniel | 3.60 | $5,220.00 |
| | **6.70** | **$9,276.50** |

| Cost | W/O Amt |
|---|---|
| Data Review & Production Software | $955.16 |
| Computer Research | $8,212.94 |
| | **$9,168.10** |

| Cost | W/O Amt |
|---|---|
| Data Review & Production Software | $986.80 |
| Computer Research | $9,700.30 |
| Search Fees | $23.49 |
| | **$10,710.59** |

**Total W/O : $10,708.10**

**Total W/O : $19,987.09**

**Invoice 3899085 (February 2024)**

| TKPR Name | W/O Hrs | W/O Amt |
|---|---|---|
| - | 0.00 | $0.00 |

**Invoice 3884311 (March 2024)**

| TKPR Name | WO Hrs | W/O Amt |
|---|---|---|
| Foody, Landon | 0.60 | $501.00 |
| Haake, Jack | 0.70 | $833.00 |
| Perlman, Felicia | 6.00 | $11,100.00 |
| Simon, Daniel | 1.50 | $2,175.00 |
| | **8.80** | **$14,609.00** |

| Cost | W/O Amt |
|---|---|
| Data Review & Production Software | $970.32 |
| Computer Research | $5,550.11 |
| Search Fees | $100.00 |
| | **$6,620.43** |

| Cost | W/O Amt |
|---|---|
| Data Review & Production Software | $967.08 |
| Computer Research | $3,785.52 |
| | **$4,752.60** |

**Total W/O : $6,620.43**

**Total W/O : $19,361.60**

| **Invoice 3897370 (April 2024)** | | |
| --- | --- | --- |
| **TKPR Name** | **W/O Hrs** | **W/O Amt** |
| Haake, Jack | 0.60 | $714.00 |

| **Invoice 3906908 (May 2024)** | | |
| --- | --- | --- |
| **TKPR Name** | **WO Hrs** | **W/O Amt** |
| Greathouse, Jay | 0.80 | $1,040.00 |
| Haake, Jack | 0.40 | $476.00 |
| Perlman, Felicia | 4.00 | $7,400.00 |
| Simon, Daniel | 3.00 | $4,350.00 |
| Trickey, Rebecca | 0.90 | $652.50 |
| | **9.10** | **$13,918.50** |

| **Cost** | **W/O Amt** |
| --- | --- |
| Data Review & Production Software | $967.08 |
| Computer Research | $1,009.45 |
| Search Fees | $69.90 |
| | **$2,046.43** |

| **Cost** | **W/O Amt** |
| --- | --- |
| Data Review & Production Software | $971.76 |
| Computer Research | $1,923.59 |
| Search Fees | $175.84 |
| | **$3,071.19** |

**Total W/O :  $2,760.43**

**Total W/O :  $16,989.69**

**Total W/O:**

**Invoice 3918386 (June 2024)**

| TKPR Name | W/O Hrs | W/O Amt |
|---|---|---|
| Golinghorst, Dexter | 0.20 | $189.00 |
| Holdvogt, Jeffrey | 0.70 | $1,015.00 |
| Wolf, DC Van de Wint | 0.10 | $125.00 |
| | **1.00** | **$1,329.00** |

| Cost | W/O Amt |
|---|---|
| Data Review & Production Software | $967.68 |
| Computer Research | $586.64 |
| Search Fees | $5.00 |
| | **$1,559.32** |

**Total W/O :  $2,888.32**

$160,914.32