**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF IOWA**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, | ) | Case No. 23-00623 (TJC) |
| IOWA, *et al.* | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**MERCYONE'S OBJECTION TO TRUST OVERSIGHT COMMITTEE'S MOTION**
**FOR ENTRY OF ORDER TO PRODUCE RECORDS AND SUBMIT TO**
**EXAMINATION PURSUANT TO BANKRUPTCY RULE 2004 AND**
**CROSS-MOTION FOR PROTECTIVE ORDER**

Mercy Health Network, Inc., d/b/a MercyOne ("MercyOne"), by its attorneys, Foley &

Lardner LLP and Belin McCormick P.C., respectfully submits the following objection and cross-

motion to the *Motion for Entry of Order Requiring MercyOne to Produce Records and Submit to*

*Examination Pursuant to Bankruptcy Rule 2004* [Docket No. 1545] ("Mot.") of the Trust Oversight

Committee ("OC") for entry of an order, substantially in the form of what it attaches as Exhibit A

to its Motion to take discovery of MercyOne.[1] Although MercyOne believes its opposition affords

a sufficient procedural basis to deny the Motion, in an abundance of caution, MercyOne also cross-

moves for a protective order, pursuant to Rule 7026 of the Federal Rules of Bankruptcy Procedure

(the "Rules"), to quash this discovery because it is: (1) unnecessary and duplicative, as the OC

already has most of the documents sought; (2) designed to harass, as shown by its gross

mischaracterization of known facts and complete departure from what Mercy Hospital, Iowa City

and other Debtors in the above captioned bankruptcy case (together, "MIC" or "Debtors"), told

this Court were the causes of their bankruptcy in its First Day Motions—submitted by the OC's

---

[1] Attached to the Motion as Exhibit B are the proposed document and discovery requests (the "Document Requests").

lead counsel, Roy Leaf—which cast no blame whatsoever on MercyOne; and (3) overbroad, unduly burdensome, costly and disproportionate to the needs of the case.

## INTRODUCTION

1.    The OC's Motion should be denied as it seeks costly and burdensome discovery from MercyOne based on false facts and unsupported (and unsupportable) assertions. Additionally, although the OC cites boilerplate law, noting that Rule 2004 permits interested parties to pursue a fishing expedition against a party, its own authority rejects the literal application of that principle. Instead, such authority holds that a movant, like the OC, bears the burden to show it has good cause to examine the material sought to be discovered and that the requested documents are necessary to establish the movant's claim or that denial of the material would cause undue hardship or prejudice. *See In re Youk-See*, 450 B.R. 312, 319-20 (Bankr. D. Mass. 2011). The OC cannot satisfy these standards because the OC already possesses most of the documents the OC seeks from MercyOne.  The OC should not be permitted to force MercyOne to incur significant expenses, potentially in the hundreds of thousands of dollars, or burden simply because the OC failed to review or process what it already has in its possession or control.  The OC additionally lacks good cause because it contains "kitchen sink"-like requests for "all documents" covering seven years of services and seeks documents that are indisputably privileged, would interfere with third parties' rights to privacy and confidentiality and are otherwise irrelevant. The OC's intentional mischaracterization of the facts shows that its real purpose in seeking this onerous and unbounded discovery is to harass MercyOne, drive up its costs and tar its reputation through innuendo, in its requests in the hope of forcing MercyOne to settle baseless claims. Governing law, including that cited by the OC, dictates that Rule 2004 motions should be denied where, as here, they seek discovery that is intended to harass or that is overbroad, unduly burdensome, costly, duplicative and/or disproportionate.

2

2.    These same reasons entitle MercyOne to a protective order quashing this discovery. *Youk-See*, 450 B.R. at 319-20. MercyOne's cross-motion for this relief shifts the burden to the OC to prove the need for the discovery the OC seeks. As shown herein, the OC cannot do so.

## ARGUMENT

### A.    The Motion Should Be Denied Because It Is Knowingly Based On False "Facts" That Flatly Contradict Mr. Leaf's Filings On Behalf Of Debtors In This Bankruptcy

3.    As shown below, when MIC first filed for bankruptcy, MIC did not blame MercyOne for its failure.  Instead, MIC blamed COVID, a disastrous electronic medical records ("EMR") conversion, and overreaching/duplicitous conduct by MIC's lead bondholder, Preston Hollow Community Capital, Inc. ("PH"). (*See* Decl. of Mark E. Toney In Support of Chapter 11 Petitions and First Day Pleadings ("Toney Declaration"), Docket No. 27, ¶¶44-48, 60-69)). At some point in the bankruptcy case, perhaps after the professional fees and administrative expenses skyrocketed relative to the net proceeds generated by the sale, MIC's attorneys decided to unjustly cast MercyOne as the villain responsible for MIC's failure. To date, neither MIC's attorneys nor the OC's attorneys have provided a single fact to support this about-face.  The OC's Motion does not do so either.  Instead, the OC attempts to justify its investigation based on the conclusory statement by Mr. Toney, MIC's Chief Restructuring Officer ("CRO"), at the Plan Confirmation Hearing that an investigation of MIC's potential claims against MercyOne was "warranted." (Mot.¶16). However, the only reason Mr. Toney cited in support of that conclusion was premised on the fact that a few employees "asking at townhall meetings if we would be pursing [sic] claims against MercyOne." (Mot.,¶16).[2] Yet, that is the expected result of the smear campaign the Debtors and their professionals mounted against MercyOne during the bankruptcy.  The OC has yet to

---

[2] Egged on by Debtors' scapegoating and finger-pointing, it is unsurprising that employees would ask at town halls conducted by the Debtors whether they would pursue claims against MercyOne. (Mot.,¶17)

identify any factual foundation whatsoever for these townhall inquiries. Significantly, the OC does not mention **any** finding that Mr. Toney had made as CRO supporting **any** potential claim against MercyOne and does not state that Mr. Toney, despite being CRO, even conducted any investigation of such potential claims. Nonetheless, MercyOne was the only entity singled out in the Plan as not receiving a release. Notably, two of the parties specifically identified in the Toney Declaration (*i.e.*, Altera f/k/a Allscripts, the EMR provider, and PH) as being responsible for MIC's Chapter 11 filing did receive releases in MIC's Plan.

4.      MIC's attorneys, McDermott Will and Emery ("MWE"), and Mr. Toney and ToneyKorf were retained by MIC before the Debtors' bankruptcy and had months prior to bankruptcy to gather documents and evidence, if any existed, implicating MercyOne. They had more than a year to do so prior to Plan confirmation. The OC has now had approximately 8 months post-confirmation to further pursue its own investigation. (*See* Mot.¶3). If the OC had a factual basis to pursue MercyOne, it surely would have presented that in its Motion and would not need to pursue this scorched-earth type of discovery.

5.      Instead, the OC betrays the lack of any investigation or findings by itself and its predecessors, claiming it "needs to understand whether any claims are warranted"—an admission it knows of none to date—and whether it is worth "the incurrence of legal fees" to pursue MercyOne. (Mot.¶3; *see also id.*,¶4 (noting the need of the Liquidation Trust's professionals to "more fully understand the background and events that precipitated MIC's chapter 11 filing"); ¶16 ("the OC continues to investigate to what extent MercyOne performed its obligations under the [Agreement]."); ¶21 (the OC seeks to "identify any causes of action the Liquidation Trust has against MercyOne…and the value of such causes of action.")).

4

6.      The OC's "shoot first, investigate later" strategy must fail.  In its Motion, the OC identifies **nothing** MercyOne did wrong and no way in which MercyOne is or can be responsible for the Debtors' failure. Again, as shown above and below, the Toney Declaration did not blame MercyOne for MIC's bankruptcy, but made that clear that the EMR rollout, PH's misconduct, and COVID were to blame.

7.      The OC does not identify any possible claim that the Liquidation Trust possesses against MercyOne. Instead, the OC relies on the *post hoc ergo propter hoc* fallacy—MercyOne purportedly operated MIC under the Management and Affiliation Agreement for approximately six years and MIC failed, therefore MercyOne must be responsible.   But even the premise for that fallacy is wrong, as MercyOne did not "operate" MIC.  By the express terms of the Management and Affiliation Agreement (the "<u>Agreement</u>"), the MIC Board of Directors ("<u>MIC Board</u>") remained in full and complete control of MIC. MercyOne was an independent contractor to MIC and provided the services of a chief executive officer ("<u>CEO</u>") and for small stretch of time, a chief financial officer ("<u>CFO</u>").   There was no agency, partnership or joint venture created by their relationship. (*Id*., ¶21).  The Agreement was non-exclusive, and MIC at all times was free to obtain management services from others. (*Id*., ¶9).

8.      The OC states MIC entered into the Agreement "following the departure of its long-time chief executive officer, Ronald Reed," in 2016. (Mot.¶1). The Motion omits that, under Mr. Reed, MIC had been facing a slow decline in financial performance over more than 15 years. None of this can be blamed on MercyOne. The OC admits that prior to contracting with MercyOne, MIC needed to "improve . . . financial operations." (*Id.*).

9.      The OC falsely implies that MercyOne was hired after Mr. Reed's retirement. The OC omits that MIC first promoted its then-CFO, Mike Heinrich, to replace Mr. Reed as CEO.

Under Mr. Heinrich, MIC then looked for partners to acquire it, including approaching MercyOne, which declined. Another party that MIC approached, Unity Point, signed a letter of intent but backed out after due diligence.

10.    MIC then reached out to MercyOne asking for its help, which resulted in the Agreement. MIC believed it faced an unwinnable "David versus Goliath" situation in competition with the University of Iowa Hospitals and Clinics ("UIHC").  UIHC, with billions of dollars in revenues, had already demoted MIC from UIHC's preferred tier payor/provider network and routinely acquired key practices at MIC.

11.    During the period of the Agreement, MIC routinely exercised its control and contractual veto power over MercyOne to reject MercyOne's recommendations and kept MercyOne at a distance.[3] This belies the OC's assertion that "[b]etween May 2017 and April 2023, the strategic affairs of MIC *were* largely run and dictated by MercyOne and its agents." (Mot.,¶¶ 1 & ¶19 ("MercyOne also largely controlled the affairs of MIC")).[4] Rather MercyOne and MIC had a "strategic *affiliation* relationship" under the Agreement. (Agreement, p.1) (emphasis added).

12.    Indeed, the OC's own summary of these terms confirms this, showing MercyOne "agreed to provide administrative, clinical and business **SUPPORT** to the operations" of MIC. (Mot.,¶¶14 & 17 (noting that MercyOne was to "**ASSIST** MIC with replacing its existing

---

[3] The OC notes that three individuals from MercyOne served at times on the MIC Board. (Mot.,¶19). MercyOne never had more than a minority of seats on the MIC Board and never controlled the MIC Board. The OC likewise is mistaken that because certain MercyOne employees served as senior officers or Board Members of MIC, pursuant to Agreement, that "MercyOne exercised extensive control over the financial condition, management and operation of MIC." (Mot.,¶31). Again, the Agreement's express terms vested control at all times in the MIC Board and MercyOne was merely an arm's-length, non-exclusive, independent contractor. (Agreement, ¶¶9, 11, 21).

[4] It also belies the OC's statement that MercyOne was a "statutory insider, supervising and directing large portions of MIC's business affairs." (Mot.¶14). The express terms of the Agreement instead made MercyOne solely an independent contractor. (Agreement, ¶21).

4918-6103-4262.10

information technology system and provide consultation regarding changes to MIC medical records management") (emphasis added)).

13.     As but one example of the MIC Board's override of MercyOne, MercyOne recommended that MIC join the Common Spirit Group Purchasing Organization, as 19 of MercyOne's 20 regional hospitals had, to get better pricing. The MIC Board rejected this recommendation.

14.     Nonetheless, under the CEOs hired by MercyOne, MIC was showing signs of financial improvement until COVID and the EMR conversion. Beginning in 2017, when it first was retained by MIC, MercyOne brought in nationally renowned consulting firms, including Insight Health Partners, Navigant, and Vizient, to assist in turning around MIC's financial decline and assist with revenue cycle and operations.

15.     Publicly available information from ProPublica shows that MIC posted net income on its 990s in 2018, 2019, a small loss in 2020, and net income in 2021.  MIC then posted significant losses in 2022 and 2023.   That tracks exactly to the Toney Declaration. MIC's bankruptcy was caused by COVID and the EMR transition.  The below chart was pulled from data on ProPublica:[5]

|  | __2017__ | __2018__ | __2019__ | __2020__ | __2021__ | __2022__ | __2023__ |
|---|---|---|---|---|---|---|---|
| **Revenue** | $156,788,917 | $171,944,431 | $171,927,524 | $173,374,992 | $193,280,238 | $177,018,605 | $164,462,075 |
| **Expenses** | $161,692,850 | $149,532,683 | $157,246,302 | $176,040,298 | $182,828,790 | $193,835,584 | $193,174,817 |
| **Net Income** | -$4,903,933 | $22,411,748 | $14,681,222 | -$2,665,306 | $10,451,448 | -$16,816,979 | -$28,712,742 |

---

[5] Mercy Hospital, PROPUBLICA, https://projects.propublica.org/nonprofits/organizations/420680391 (last visited Feb. 6, 2025).

4918-6103-4262.10

16.    Importantly, while the OC asserts that MercyOne "operated MIC" under the Agreement (Mot.,¶2), MercyOne did not employ the entire MIC senior management team. MercyOne provided a CEO (and a CFO for a limited period of time). Outside of the CEO, every person on MIC's senior management team served as employees of MIC.

17.    Long before MercyOne's engagement, MIC had buildings in need of capital expenditures and a failing EMR system because of years of non-investment due to a lack of available capital and a belief that MIC might be sold. The MIC Board assumed that a purchaser would ultimately purchase MIC and make the necessary capital expenditures on the facility and EMR upgrades; MercyOne had no responsibility for any of this.

18.    As the MIC Board was well aware, the existing EMR system at MIC had to be replaced in order to comply with the "meaningful use" requirements as set forth the Affordable Care Act. By waiting (and waiting), the MIC Board was forced to make a rushed decision.  To help the MIC Board evaluate the EMR alternatives, MIC retained the services of Vizient, whose professionals had specific expertise in EMR conversions and implementation.  With Vizient's assistance and expertise, MIC's senior management team then made recommendations to the MIC Board and went through such factors as the expense of the system and the particular needs of a hospital of MIC's size.  After this evaluation, MIC's senior management team recommended Altera f/k/a Allscripts ("Allscripts") as the EMR provider because, among other things, Allscripts provided a cost model that supported MIC by deferring payment for Allscripts services and products for the first year. Also, Allscripts committed to an accelerated 12-month implementation. Allscripts further committed to making MIC a "luminary," and a national showcase for its best

solutions.  The MIC Board, not MercyOne, made the decision to accept that recommendation.[6]

Under the express terms of the Agreement, MercyOne only had the ability to assist MIC in

evaluating options for a replacement EMR system. Although the MIC Board was to work with the

CEO, the MIC Board had sole discretion in deciding which option to choose. (Agreement, ¶5).

The implementation of the conversion to Allscripts proved a disaster, as billing functions were

disrupted for several months.  But the EMR disaster cannot be blamed on MercyOne, as the OC

now suggests. (Mot.,¶2). Indeed, at the beginning of the chapter 11 cases and throughout, MIC's

attorneys blamed Allscripts for the EMR disaster and used the EMR disaster as a means to drive a

negotiated settlement on the assumption/rejection of the Altera EMR Agreement and to facilitate

the sale of MIC to UIHC.

19.    The OC's Motion also omits that: (a) Altera acquired Allscripts during the MIC

EMR conversion and that MercyOne's designated Acting CEO, Mike Trachta, repeatedly escalated

matters up to Altera; (b) that local MercyOne revenue cycle consultants were engaged (at no cost

to MIC) to assist the MIC revenue cycle staff to attempt to catch up after nearly four months of

delayed billings due to the EMR conversion; and (c) that the cash collections did return to the base

line after the EMR system was fully functioning. The Toney Declaration clearly stated that the

flawed EMR conversion caused the cash collections to crater: "Consequently, the flawed system

caused a precipitous loss of revenue in late 2022 and early 2023, due to delayed patient bill

submissions resulting in a substantial backlog of accounts receivable payments that could not be

collected promptly."   (Toney Decl. ¶ 48).

---

[6] This belies the OC's contention that MercyOne was "supposedly to supply MIC with consultants and vendors to ostensibly implement . . . the EMR system." (Mot., ¶32).

20.     The OC's statement that MIC reported "over $100,000,000 in **operating losses**" is also false. (Mot.,¶2).  As set forth in 990 tax returns, MIC did NOT suffer $100,000,000 in operating losses. MIC's cash reserves went down as their accounts receivables increased, but MIC did not lose $100,000,000. In other words, MIC's balance sheet was impacted by the EMR conversion, but not the income statement.

21.     During these hard times, MercyOne also voluntarily cut its management fee in half in attempt to lessen the negative cash flows. Notably, the other professionals hired by the MIC Board charged capital market rates (which have been the subject of objections in the bankruptcy case) and worsened the cash flows.[7]

22.     The MIC Board—not MercyOne—then decided to sell MIC.  MIC hired H2C Securities, Inc. ("H2C") to market the organization and find a buyer. MercyOne was largely excluded from this process.  MIC and H2C could not find a buyer. This belies the assertion that MercyOne "oversaw the Debtors' failed request for proposal process in 2021," which the OC attributes to Mr. Toney's Declaration submitted in support of Plan Confirmation. (Mot.,¶15).

23.     With MIC now being sold and the operational challenges it was facing, staff began to leave.

24.     UIHC at this time sought a Certificate of Need ("CON") to build a hospital in North Liberty, Iowa. Because this would have imperiled MIC, MercyOne worked tirelessly to oppose that and the CON was not approved at that time. Six months later, however, this CON was approved, precipitating a greater exodus of MIC staff.

---

[7] The OC notes that "during this same period [2016-23], MercyOne was paid "almost $9,000,000 in management fees." (Mot.¶2). MIC claims this was "approximately six years" but as Motion, Paragraph 1 makes clear, it was instead one month short of seven years. Over seven years, this amounted to less than $1.3 million per year. The OC errs in claiming that MIC paid MercyOne "yearly fees exceeding $2,000,000" under the Agreement. (Mot.,¶14).

25.    Following the CON approvals H2C, <u>without MercyOne</u>, was negotiating with UIHC, and the possibility of UIHC making a stalking horse bid in bankruptcy arose. The MIC Board, not MercyOne, then hired MWE and ToneyKorf.

26.    MercyOne strenuously advised MIC not to use a bankruptcy as a means to sell the organization, but, again, was overruled.

27.    MERCYONE SPECIFICALLY TOLD THE MIC BOARD ITS CONCERNS ABOUT THE IMPACT BANKRUPTCY WOULD HAVE ON PENSIONERS, but this fell on deaf ears. This makes the OC's reference to pensioners (who only know what MIC's professionals, the OC and the media has told them) calling for suit against MercyOne (Mot.,¶16) especially outrageous and galling.

28.    MercyOne met with UIHC in January 2023 in a last-ditch effort to convince UIHC that there was enough money in MIC's coffers to make all stakeholders whole and asked UIHC to pursue alternatives to bankruptcy that were cheaper, faster, easier and would protect pensioners; but UIHC could not be swayed.

29.    The MIC Board Chair then asked MercyOne to stay in a relationship with MIC—hardly the move of someone who believed MercyOne caused MIC's troubles.  However, because MercyOne disagreed with choices recommended by consultants and made by the MIC Board and because the MIC Board had excluded MercyOne from information and communications, MercyOne declined. Many substantive conversations occurred in the executive session following MIC Board meetings from which MercyOne was excluded. This included when MIC was meeting with potential buyers.

30.    Contrary to the OC's assertion, MercyOne did not "overs[ee] the Debtors' failed request for proposal process in 2021 in an attempt to sell MIC to another party."  Rather MIC was

excluded from direct negotiations and had to be because of antitrust concerns. In other words, far from "overseeing" these negotiations MercyOne was not even in the room with suitors and could not be.

31.    Contrary to the OC's statement, Heather Campbell, Regional General Counsel of MercyOne, was never counsel for MIC and did not provide legal advice. (Mot.,¶32). The OC betrays its own lack of confidence in this outrageous assertion in stating that "[b]eyond providing executive officers and board members, MercyOne *MAY* **HAVE ALSO SUPPLIED MIC WITH** administrative staff, management staff and **LEGAL COUNSEL** under the [Agreement]. (*Id.*) (emphasis added). To the contrary, MIC had multiple attorneys it relied upon, including many local and national firms.

32.    Importantly, on March 16, 2023, Moody's Investors Service downgraded MIC's revenue bonds to Caa1 from B1. The listed causes blame MIC's new billing system and slow recovery of patient volumes following COVID, and not MercyOne or anything in MercyOne's control. Moody's explained:

> The downgrade to Caa1 follows severe cash flow deterioration from weak levels which has resulted in material and rapid cash burn and is likely to necessitate the funding of a debt service reserve at FYE 2023. Cash flow losses are largely reflective of elevated labor and supply costs and a slowed revenue cycle after implementation of a new billing system. While labor and inflation pressures are sector-wide challenges, the impact to Mercy has been disproportionate and has been exacerbated by the implementation of the new billing system which cased receivables to balloon during the last quarter of FY 2022. Additionally, sluggish recovery of inpatient volumes and ongoing shifts in care to outpatient settings as impaired demand, with inpatient volumes continuing to lag pre-COVID levels.[8]

---

[8] A copy of the Moody's Report is attached hereto as **Exhibit 1**.

33.     Recognizing the value of MercyOne's services at MIC, Moody's warned at the time that there could be a further downgrading were there a "[d]iscontinuation of the relationship with MercyOne before a new partner or affiliation is established." *See* Ex. 1.

34.     Perhaps most significantly, MIC, represented by the OC's lead counsel, Mr. Leaf, told a completely different story in its First Day Motions to this Court, making clear that if any entity was to blame for the ultimate demise of MIC, it was PH.[9] In the Declaration signed by CRO Toney under penalty of perjury, in support of the Debtors' Chapter 11 filings, which Mr. Leaf filed, he represented:

- "The financial difficulties facing Mercy Hospital—and virtually every community and rural hospital in the nation—are neither novel nor surprising," including that "the model of providing healthcare has changed significantly over recent years due to, among other things improvements in treatments, an increased dependency on technology, a transition to outpatient centers, and an increased focus of providers in specialty areas." (Toney Decl., ¶4).

- "[I]n the wake of a global pandemic, the operating costs at Mercy Hospital soared while patient volume and reimbursement rates remained stagnant or declined." (*Id.*,¶4).

- The behavior of PH, which began restructuring discussions with MIC in February 2023, by early June 2023, "abruptly changed" and PH "suddenly demanded that the experienced senior management team be replaced only two months after it took over to stabilize operations" and PH "would not provide

---

[9] While MIC placed blame for its failure squarely on PH, Debtors gave PH a full release of all claims.

any financial support to Mercy Hospital . . . unless they immediately replaced the senior management team." (*Id.*,¶7).

- That PH "on Monday, July 24, 2023, without warning, filed a notice of acceleration and initiated a receivership action in Iowa state court." (*Id.*,¶8).

- This Receivership Action precipitated "[c]oncerns about Mercy Hospital's continuing existence, and the impact of a potential receivership on family livelihoods, resulted in employee resignations, patient cancellations, canceled job interviews and delayed new employee start dates, and ultimately impacted Mercy Hospital's ability to serve its patients" adding that "[i]t is uncontroverted that the careless and callous actions taken by [PH] jeopardized the health and well-being of Mercy Hospital's patients, *the viability of Mercy Hospital's future* and damaged the organization's reputation[.]" (*Id.*,¶9) (emphasis added).

- In the Declaration's section entitled "**EVENTS LEADING UP TO THE CHAPTER 11 CASES,**" the first cause Mr. Toney listed was the "COVID-19 Pandemic," (*id.*,¶¶44-46), noting this "severely impacted (and continues to impact) the Debtors' operations, liquidity, and cash flows." He also noted "the effects of the pandemic, and the after-effect of sharp inflationary pressures, caused an increase in operating expenses, driven primarily by an increasing need for the use of staffing agencies to address an increased shortage of local clinical staffing" while, "at the same time, Mercy Hospital's volume decreased, driven primarily by a decline in more profitable clinical encounters, such as elective surgeries." (*Id.*,¶44).

- The second "event" Mr. Toney listed was the "**Failed Implementation of Electronic Medical Records Upgrade**." (*Id.*,¶¶47-48). As Mr. Toney swore: "The EMR implementation, which went live in March 2022, immediately created significant operational problems. These included difficulties in coding, billing and collecting for patient encounters, an inability to submit regulatory reports on time and misconfigured workflows. Consequently, the flawed system caused a precipitous loss of revenue in late 2022 and early 2023, due to delayed patient bill submissions resulting in a substantial backlog of accounts receivable payments that could not be collected promptly. The Debtors' accounts receivable ballooned by more than 40% during this period despite lower year-over-year net patient revenues. As a result, the Debtors' financial liquidity was severely affected during the latter half of 2022 and the first quarter of 2023." (*Id.*,¶48).

- Mr. Toney also noted the fallout from PH's Receivership Action caused an immediate "onslaught of negative press and other impacts. . . . that hastened the initiation of these Chapter 11 cases." (*Id.*,¶¶67-69).

- Mr. Toney's only mention of MercyOne was to note it was the source of the senior management team that was leading MIC's cash flow and performance improvement plan at the time, that PH insisted that MIC terminate its Management Agreement with MercyOne and instead put in new management suitable to PH. (*Id.*,¶¶54-61).

35.     Notably, MR. TONEY DID NOT QUESTION THE QUALITY OF MERCYONE'S SERVICES OR IDENTIFY MERCYONE AS A CAUSE FOR MIC'S FAILURE

IN HIS FIRST DAY DECLARATION. Rather, Mr. Toney's Declaration is fully consistent with the facts MercyOne describes herein.

36.     In addition to mischaracterizing MercyOne's role in working with MIC and the events leading to MIC's bankruptcy, the OC provides an incomplete history of communications between counsel for the OC and MercyOne about the Document Requests. (Mot.,¶23). The OC notes that on January 9, 2025, undersigned counsel for MercyOne advised they had not yet reviewed the then-draft Document Requests (attached as Ex. B to the Motion). Instead, the OC's decision to serve such Document Requests came as an abrupt shift from what the parties had agreed—which was to discuss whether there was any basis for reasonable resolution of any claims of the OC and defenses, counterclaims and third-party claims of MercyOne.

37.     Thus, when it comes to the question the OC poses of whether it is worth "the incurrence of legal fees" to pursue MercyOne (Mot,¶3), the OC already has enough information to answer with a resoundingly NO!

38.     Because the purported "facts" OC relies upon to demonstrate the need for a Rule 2004 examination against MercyOne are utterly and knowingly false, the foundation for the Motion fails and the Motion should be denied on this basis alone. The OC's parade of misstatements, again, suggests its goal is to harass and burden MercyOne, which is wholly contrary to the OC's obligation to show good cause.

**B.**     **The OC Cannot Show The Requisite Good Cause For Its Unduly Burdensome And Overbroad Rule 2004 To MercyOne**

39.     Bankruptcy courts have discretion to limit or preclude Rule 2004 examinations as justice requires. *See, e.g., In re Kleynerman*, 617 B.R. 122 (Bankr. E.D. Wis. 2020); *In re Kearney*, 590 B.R. 913, 921 (Bankr. D.N.M. 2018).

16

40.     As OC admits and its cases hold, a movant seeking a Rule 2004 exam must demonstrate good cause. (Mot, ¶34) (quoting *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 627 (Bankr. D. Del. 2016); *In re Metiom, Inc.*, 318 B.R. 263, 268 (S.D.N.Y. 2004) (holding that party seeking Rule 2004 examination must show good cause.)). Thus, *Millennium Lab Holdings II*, holds that "parties do not have an absolute right to Rule 2004 examinations," but rather that "[t]he rule requires a balancing of 'the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." 562 B.R. at 626. The court there limited the purpose for which a trustee could pursue a Rule 2004 examination to what affected a corporate trust but not a lender trust. *Id.* at 628-29.

41.     Another case the OC cites to note that a Rule 2004 examination is like a fishing expedition, *Youk-See*, explained what good cause requires:

> The movant must show "some reasonable basis to examine the material sought to be discovered . . . [and] that the requested documents are necessary to establish the movant's claim or that denial of production would cause undue hardship or injustice. . . . " "Good cause is established if the party in interest seeking the Rule 2004 examination has shown that such an examination is reasonably necessary for the protection of its legitimate interests."

*Id.* 450 B.R. at 320 (internal citations omitted). In *Youk-See*, the bankruptcy court held that the United States Trustee could pursue a targeted and limited examination of a Chapter 13 debtor's mortgage loan because the discovery requests were tailored to the procedures for loan modifications "'relative to the Debtor and the Property,'" and thus the scope was "neither intrusive nor abusive." *Id.* at 322. The sprawling multitude of the proposed Document Requests bear no resemblance to this.

42.     Although the OC notes Rule 2004 examinations are sometimes compared to fishing expeditions, it ignores its own authority, which makes clear that, for this reason, requests for such examinations are often denied, or modified before being granted. For instance, while comparing a

Rule 2004 examination to a fishing expedition, the court in *In re Drexel Burnham Lambert Group,*

*Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (cited Mot.,¶¶26-27), did not simply approve such

an examination. Rather, it, too, applied a good cause standard, requiring the movant to show the

documents were necessary to establish the movant's claim and that the movant faced hardship or

prejudice were these not produced. *Id.* at 712. As detailed below, the OC fails this standard.

43.     The burden to establish good cause becomes greater as a request for a Rule 2004

examination becomes more far-reaching, as that brings with it the potential for greater abuse. *See*

*In re Countrywide Home Loans*, 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008). Here, as detailed in

the next subsection the OC's proposed Document Requests (Mot.,Ex.B), seeks 54 broad and

intrusive categories of information from MercyOne, accompanied by byzantine and onerous

requests for metadata and ESI. The potential for abuse here is manifest. *See In re Stambaugh*, 531

B.R.191, 193 (S.D. Ohio.2015) ("Caution, however, must be exercised to not unleash costly and

disruptive procedures that far outweigh the benefit of obtaining the information.")

44.     One case the OC cites, *In re GHR Energy Corp.*, 33 B.R. 451 (Bankr. D. Mass.

1983), rejected a debtor's request for a Rule 2004 exam as to the internal affairs of its creditor

because this was inconsistent with the rule's purpose.

45.     The law instructs bankruptcy courts to protect Rule 2004 targets from abuse or

harassment. *See In re Kearney*, 590 B.R. 913, 925 (Bankr. D.N.M. 2018) (court was concerned

that debtor's "extremely broad Rule 2004 Motion could be motivated, at least in part, by an

improper purpose."). The court in *Kearney* noted that it was "unwilling to require [target] to

produce more documents than it already has, let alone open the flood gates as wide as Debtor

asks," which the court resolved. *Id.* at 926. *See also Martin v. Schaap Moving Systems, Inc.*, 152

F.3d 919 (2d Cir. 1998) ("There are, however, limits to the scope of Rule 2004 examinations.

Significantly, courts may 'limit, condition or even forbid the use of Rule 2004' where is used to 'abuse or harass[]'") (quoting *In re Mittco*, 44 B.R. 35, 36 (Bankr. E.D. Wis. 1984), and finding that movant seeking Rule 2004 exam had "harassed the appellees and Key Bank throughout the bankruptcy proceedings.").

46.      The OC's own authority counsels courts to apply a sliding scale in determining if good cause exists, with the movant's need for information compared against the intrusiveness to the non-movant. *See* Mot.,¶27 (citing *Youk-See*, 450 B.R. 312 (citing *In re Fearn*, 96 B.R. 135, 138 (Bankr.S.D.Ohio 1989) (scope of Rule 2004 examination should not be so broad as to be more disruptive and costly to the party to be examined than beneficial to the party seeking discovery); *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr.E.D.Tex.1998) (same); *In re Eagle–Picher Indus., Inc.*, 169 B.R. 130, 134 (Bankr. S.D. Ohio 1994) (same); *In re Texaco, Inc.*, 79 B.R. 551, 556 (Bankr. S.D.N.Y. 1987) (same)).

47.      Indeed, none of the cases cited by the OC actually approved a "fishing expedition" or anything like the intrusive discovery sought here, which appears to request the exact written requests for document production that it might serve if it actually sued MercyOne, (which it admits it presently has no basis to do). Likewise, the OC seeks three depositions of MercyOne witnesses, including what is akin to a Rule 30(b)(6) corporate representative. MercyOne should not have to spend what it would have to spend if it were sued or face the burdens and intrusions of a litigant in discovery when it is merely the object of an investigation. This is all the more true because this "investigation" rests on spurious grounds.

48.      Thus, in *In re Jasper Pellets, LLC*, 647 B.R. 151, 157 (Bankr. D. S.C. 2022) (cited Mot.,¶35), the court placed significant limits on the use of Rule 2004, including the scope of documents that could be requested and that testimony provided at examination could not be used

in adversary proceeding unless parties consented or unless witness became unavailable to be deposed.[10]

49.     The OC's remaining cases are equally inapplicable. In *In re Rosenberg*, 303 B.R. 172 (B.A.P. 8th Cir. 2004), the 8th Circuit BAP found that the bankruptcy court had good cause to approve a Rule 2004 exam concerning debtor's claim for wrongful termination in the first instance but that a later stipulation on appeal by the parties that the debtor had been terminated post-petition meant that the claim was no longer property of the estate and therefore that exam could not be pursued.[11]

50.     *In re Ionosphere Clubs, Inc.*, 156 B.R. 414 (S.D.N.Y. 1993) (cited Mot.,¶30), likewise is inapposite. There, the court held the public did not have a right of access to an examiner's report prepared after the use of Rule 2004 to investigate assets. *Id.* at 433. The examinations approved there bear no resemblance to what the OC seeks here, which is to, in essence, get full discovery from MercyOne without the limits placed on discovery once litigation commences. Indeed, in *Ionosphere*, the examiner testified that what he was doing was non-adversarial and that he was compiling information to prepare what was akin to a disclosure statement; that it was not discovery; that it was non-binding on the court; that he examined witnesses personally without counsel; and that he did not put certain witnesses under oath. *Id.* at 432-33. The OC, by contrast, is plainly adverse to MercyOne, relies on its counsel to pursue this discovery and seeks three depositions from MercyOne witnesses under oath as part of this.

---

[10] *See also In re Sparc Foundry, LLC*, 663 B.R. 56 (Bankr. D. S.C. 2024) (Court prohibited use of the Rule 2004 examination transcript in any other proceeding unless debtor and its representatives consented, the representatives became unavailable to be deposed, or for impeachment purposes.)

[11] *In re Hughes*, 281 B.R. 224 (Bankr. S.D.N.Y. 2002), approved the use of Rule 2004 to assist in obtaining discovery in a case which was an ancillary proceeding to a foreign (Bermuda) proceeding, a circumstance not presented here.

1.    **The Proposed Document Requests Lack Good Cause Because It They Duplicative, Overbroad And Unduly Burdensome Because The OC Already Has Most Documents**

51.    The OC notes that a Rule 2004 examination process can be "compared to a fishing expedition which can 'net the dolphins as well as the tuna.'" (Mot.,¶27) (quoting *Drexel Burnham*, 123 B.R. at 711). But neither *Drexel* nor any other case would needlessly kill dolphins when the movant already had caught the tuna. That is the better analogy here, where the OC already has most of the documents it seeks including any communications or agreements between MIC and any MercyOne representative.

52.    A majority of the individual requests directed to MercyOne concern its dealings with MIC. These include Document Request Nos. 2-8, 10, 12, 14-16, 19-23, 41-45, 50-51, 53 and 59. As written, these seek a far-reaching intrusion into a nearly 7-year, arm's length independent contractor relationship. It would be unquestionably burdensome, time-consuming and costly for MercyOne to collect, review and produce what the OC wants. This could cost thousands if not hundreds of thousands of dollars and take weeks if not months to complete. **Yet such requests are wholly unnecessary as the OC (or the Liquidation Trustee) succeeded to all of MIC's emails, documents, and ESI.** The OC should verify what it already has before putting MercyOne to the expense and burden of producing these again. Yet, incredibly, the OC admits it has not completed this task, stating that "counsel is in the process of reviewing potentially relevant documents and communications from MIC's computers and servers." (Mot.,¶4). The OC puts the cart before the horse. It wants to burden MercyOne to produce documents to see if it has a claim that it should already know it does not have based on documents it already has. MercyOne is left to guess where "in the process" counsel for the OC is, and it appears as likely to be the starting line as toward the finish line. Regardless, the OC identifies nothing it has found to date which supports pursuit of

MercyOne. Because the OC already has documents, it has no need to burden MercyOne to provide duplicate copies (nor is MercyOne required to produce documents already in the OC's possession).

53.    At present, the OC's Rule 2004 exam is unnecessarily burdensome, wasteful and almost certainly duplicative in great part. Thus, this Motion should be denied, without prejudice to the OC issuing a more tailored and targeted Motion once it determines what it does not possess from MIC and must rely on MercyOne to produce. See *In re Texaco, Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987) (granting request to limit Rule 2004 request to the extent it was, *inter alia*, "duplicative of previously furnished information").

### 2.    <u>The Proposed Document Requests Lack Good Cause Because They Are Overbroad, Unduly Burdensome And Harassing Because It Seeks Private Personal Information Of Third Parties</u>

54.    Five of the proposed Document Requests also lack good cause because they seek personnel files and performance plans of individuals, and thus trespass rights to privacy and confidentiality of third parties not before the Court. *See, e.g.,* Document Request Nos. 38-40, 46-48, 52. Protective orders issue to protect such rights. *See, e.g, Coleman v. Swift Transp. Co.,* 2013 WL 12178160, at **2-3 (N.D. Miss. Aug. 22, 2013) (granting protective order); *Lewin v. Nackard Bottling Co*., 2010 WL 4607402, at *1 (D. Az. Nov. 4, 2010).

### 3.    <u>The Proposed Document Requests Lack Good Cause Because They Are Overbroad, Unduly Burdensome And Harassing Because It Uses Unrestricted Definitions Or Broad Time Periods</u>

55.    At least two requests of the proposed Document Requests lack good cause because, as written, they seek every document over a seven-year period that MercyOne created, possesses or received, as they ask for all documents related to "management support" provided by MercyOne to MIC or "all documents and communications related to MIC" for an entire six-month period—January 1 through June 30, 2023. *See, e.g.*, Document Request Nos 11, 20.

22

4.      **The Proposed Document Requests Lack Good Cause Because They Are Overbroad, Unduly Burdensome And Harassing Because It Seeks To Invade MercyOne's Privilege**

56.     At least two of the proposed Document Requests invariably seek to invade MercyOne's attorney-client privilege. *See, e.g.*, Document Request Nos. 12, 24.

C.      **MercyOne Warrants A Protective Order Quashing The Motion And Attached Proposed Written Document Requests And Discovery**

57.     As the OC's own authority shows, when, as here, a party files a motion for protective order challenging proposed Rule 2004 discovery, the burden shifts to the movant—here the OC—to justify this discovery. As *Youk-See* holds:

> Although a Rule 2004 examination may be ordered ex-parte, once a motion to quash a subpoena is made, the examiner bears the burden of proving that good cause exists for taking the requested discovery. This is so even though the ultimate burden of persuasion on a motion to quash a subpoena duces tecum as oppressive rests on the movant.

450 B.R. at 319-20 (quoting *In re Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985)).

58.     MIC's other authority holds similarly. For instance, *In re Apex Oil*, 101 B.R. 92 (Bankr. E.D. Mo. 1989) (cited Mot., ¶¶26, 27), holds a protective order may issue against a Rule 2004 request for good cause. There, the court entered a partial protective order limiting a newspaper's right to review private information that was used by an examiner to support his report. *Id.* at 104; *see also In re Scherer*, 2019 WL 10733909 (Bankr. M.D. Fla. Feb. 7, 2019) (noting court had previously granted protective order as to Rule 2004 request).

59.     Because here the OC lacks good cause for its Motion and because it seeks to harass

MercyOne and put it to unnecessary and significant expense responding to duplicative, overbroad,

unduly burdensome and disproportionate requests, a protective order should issue.[12]

## NOTICE

60.     In light of the nature of the relief requested in its cross-motion, MercyOne submits

no other or further notice need be given beyond notice to the registered CM/ECF users for this

matter which includes counsel for the OC. MercyOne has therefore provided adequate notice of

its cross-motion under the applicable rules

## NO PRIOR REQUEST FOR RELIEF

61.     No previous request for the relief sought in MercyOne's cross-motion has been

made by MercyOne to this or any other Court.

## CONCLUSION

For the foregoing reasons, this Court should deny the OC's Motion for a Rule 2004 of

MercyOne and grant MercyOne's cross-motion to quash such discovery.


*[The remainder of this page is intentionally left blank]*

---

[12] To the extent the OC is permitted to use Rule 2004 exam to obtain documents from MercyOne, this should be a two-way street.  Consistent with the Local Rules, MercyOne will tender a draft Motion for Examination to the OC's counsel in short order.

4918-6103-4262.10

Dated: February 6, 2025

Respectfully submitted,

*/s/ Christopher J. Jessen*
Michael R. Reck
Christopher J. Jessen
**BELIN McCORMICK, P.C.**
666 Walnut Street, Suite 2000
Des Moines, Iowa 50309
Tel: (515) 243-7100
Fax: (515) 558-0675
mrreck@belinmccormick.com
cjessen@belinmccormick.com

*/s/ David B. Goroff*
Edward J. Green (*Pro Hac Vice*)
David B. Goroff (*Pro Hac Vice*)
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
egreen@foley.com
dgoroff@foley.com

Jake W. Gordon (*Pro Hac Vice*)
**FOLEY & LARDNER LLP**
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Tel: (248) 943-6484
jake.gordon@foley.com

*Counsel to Mercy Health Network, Inc., d/b/a MercyOne*

4918-6103-4262.10

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies, under penalty of perjury, that on February 6, 2025, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of the Chapter 11 Cases.

/s/ David B. Goroff
David B. Goroff

4918-6103-4262.10

**<u>EXHIBIT 1</u>**

# MOODY'S

**Rating_Action:** Moody's downgrades Mercy Hospital (IA) to Caa1 from B1; outlook to stable

16Mar2023

New York, March 16, 2023 -- Moody's Investors Service has downgraded Mercy Hospital's (IA) revenue bonds to Caa1 from B1. The outlook has been revised to stable from negative at the lower rating level. Mercy had $74.4 million of debt outstanding at FYE 2022.

RATINGS RATIONALE

The downgrade to Caa1 follows severe cash flow deterioration, from historically weak levels, which has resulted in material and rapid cash burn and is likely to necessitate the funding of a debt service reserve at FYE 2023. Cash flow losses are largely reflective of elevated labor and supply costs and a slowed revenue cycle after implementation of a new billing system. While labor and inflation pressures are sector-wide challenges, the impact to Mercy has been disproportionate and has been exacerbated by the implementation of the new billing system which caused receivables to balloon during the last quarter of FY 2022. Additionally, sluggish recovery of inpatient volumes and ongoing shifts in care to outpatient settings has impaired demand, with inpatient volumes continuing to lag pre-COVID levels. While the Caa1 incorporates management's implementation of a performance improvement plan in an effort to stabilize operating results, governance is a key driver to the rating action. Mercy has continued to face challenges in securing a long-term strategic partner, high management turnover, and inability to achieve lasting performance improvement. The continuation of all of Mercy's revenue and expenses pressures are expected to be prolonged such that we don't expect operating performance to reach break-even levels for the foreseeable future.

Our Caa1 reflects our view of Mercy's continued weak cash metrics and leverage ratios as well as its small size and limited clinical array relative to a stronger and much larger local competitor. Competition will remain a factor with a large academic medical center in the primary service area. That said, favorably lowering near term default risk is a debt service reserve fund providing assurance that bond payments will be made for the coming year. Though the MADS coverage covenant was breached at FYE 2022, which is an event of default requiring a consultant call in, there is no acceleration risk.

RATING OUTLOOK

The stable outlook at the Caa1 reflects expectations that Mercy will continue to face operating challenges and weak liquidity for the next 12-18 months with the potential for meaningful short-term swings in performance.

FACTORS THAT COULD LEAD TO AN UPGRADE OF THE RATING

- Material and sustained improvements in operating performance which results in positive cash flow

- Substantial rebuild of unrestricted cash and investments that is durable

- Widening and stabilization of headroom to financial covenants

FACTORS THAT COULD LEAD TO A DOWNGRADE OF THE RATING

- Further decline of cash flow or liquidity, beyond current expectations

- Inability to execute upon performance improvement initiatives
- Discontinuation of relationship with MercyOne before a new partner or affiliation is established

LEGAL SECURITY

The bonds are secured by a mortgage pledge on the Hospital, Medical Official building and parking garages. Financial covenants include a 1.15 debt service coverage and 60 days cash on hand. As part of the Series 2018 transaction the system must maintain at least a B2 rating on the Series 2011 bonds. Failure to meet these covenants are events of default but do not result in acceleration.

PROFILE

The Mercy Iowa City and Subsidiaries System includes a 234-bed Mercy Hospital, Mercy Services Iowa City and Mercy Hospital Foundation. The hospital is located in Iowa City, Iowa. Operating revenues were approximately $185 million in fiscal 2022. Mercy currently has a management agreement with MercyOne, a part of Trinity Health Credit Group.

METHODOLOGY

The principal methodology used in this rating was Not-For-Profit Healthcare published in December 2018 and available at https://ratings.moodys.com/api/rmc-documents/70886. Alternatively, please see the Rating Methodologies page on https://ratings.moodys.com for a copy of this methodology.

REGULATORY DISCLOSURES

For further specification of Moody's key rating assumptions and sensitivity analysis, see the sections Methodology Assumptions and Sensitivity to Assumptions in the disclosure form. Moody's Rating Symbols and Definitions can be found on https://ratings.moodys.com/rating-definitions.

For ratings issued on a program, series, category/class of debt or security this announcement provides certain regulatory disclosures in relation to each rating of a subsequently issued bond or note of the same series, category/class of debt, security or pursuant to a program for which the ratings are derived exclusively from existing ratings in accordance with Moody's rating practices. For ratings issued on a support provider, this announcement provides certain regulatory disclosures in relation to the credit rating action on the support provider and in relation to each particular credit rating action for securities that derive their credit ratings from the support provider's credit rating. For provisional ratings, this announcement provides certain regulatory disclosures in relation to the provisional rating assigned, and in relation to a definitive rating that may be assigned subsequent to the final issuance of the debt, in each case where the transaction structure and terms have not changed prior to the assignment of the definitive rating in a manner that would have affected the rating. For further information please see the issuer/deal page for the respective issuer on https://ratings.moodys.com.

Regulatory disclosures contained in this press release apply to the credit rating and, if applicable, the related rating outlook or rating review.

Moody's general principles for assessing environmental, social and governance (ESG) risks in our credit analysis can be found at https://ratings.moodys.com/documents/PBC_1288235.

At least one ESG consideration was material to the credit rating action(s) announced and described above.


Please see https://ratings.moodys.com for any updates on changes to the lead rating analyst and to the Moody's legal entity that has issued the rating.

Please see the issuer/deal page on https://ratings.moodys.com for additional regulatory disclosures for each credit rating.


Beth Wexler
Lead Analyst
PF Healthcare
Moody's Investors Service, Inc.
7 World Trade Center
250 Greenwich Street
New York 10007
JOURNALISTS: 1 212 553 0376
Client Service: 1 212 553 1653

Susan Fitzgerald
Additional Contact
Higher Education
JOURNALISTS: 1 212 553 0376
Client Service: 1 212 553 1653

Releasing Office:
Moody's Investors Service, Inc.
250 Greenwich Street
New York, NY 10007
U.S.A
JOURNALISTS: 1 212 553 0376
Client Service: 1 212 553 1653

© 2023 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S CREDIT RATINGS AFFILIATES ARE THEIR CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND MATERIALS, PRODUCTS, SERVICES AND INFORMATION PUBLISHED BY MOODY'S (COLLECTIVELY, "PUBLICATIONS") MAY INCLUDE SUCH CURRENT OPINIONS. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT OR IMPAIRMENT. SEE APPLICABLE MOODY'S RATING SYMBOLS AND DEFINITIONS PUBLICATION FOR INFORMATION ON THE TYPES OF CONTRACTUAL FINANCIAL OBLIGATIONS ADDRESSED BY MOODY'S CREDIT RATINGS. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS, NON-CREDIT ASSESSMENTS ("ASSESSMENTS"), AND OTHER OPINIONS INCLUDED IN MOODY'S

PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED BY MOODY'S ANALYTICS, INC. AND/OR ITS AFFILIATES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS, ASSESSMENTS AND OTHER OPINIONS AND PUBLISHES ITS PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS, AND PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS AND INAPPROPRIATE FOR RETAIL INVESTORS TO USE MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS OR PUBLICATIONS WHEN MAKING AN INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT INTENDED FOR USE BY ANY PERSON AS A BENCHMARK AS THAT TERM IS DEFINED FOR REGULATORY PURPOSES AND MUST NOT BE USED IN ANY WAY THAT COULD RESULT IN THEM BEING CONSIDERED A BENCHMARK.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the credit rating process or in preparing its Publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses