**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| MERCY HEALTH NETWORK, INC., d/b/a MERCYONE, | No. 24-CV-68-CJW-MAR |
| Appellant, | |
| vs. | **ORDER** |
| MERCY HOSPITAL, IOWA CITY, IOWA; MERCY SERVICES IOWA CITY, INC.; and MERCY IOWA CITY ACO, LLC, | |
| Appellees. | |

_____

**TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................... 3

II.    BACKGROUND ..................................................................... 3

III.   MOTION TO DISMISS.............................................................. 8

       A.    Applicable Law........................................................... 8

       B.    Parties' Arguments...................................................... 9

       C.    Analysis................................................................10

IV.    APPEAL OF CONFIRMATION ORDER.................................................14

       A.    Standard of Review .....................................................15

B.    Confirmability in light of *Harrington v. Purdue Pharma* ...................15

C.    *Master Mortgage* Factors ...............................................................20

    1.    Identity of Interest ......................................................21

    2.    Substantial Contribution ..............................................23

    3.    Essential to Plan ........................................................24

    4.    Support for Plan.........................................................26

    5.    Claim Payments .........................................................27

    6.    Conclusion ...............................................................28

D.    Business Judgment Rule.........................................................28

V.    CONCLUSION ................................................................................29

2

## I.      INTRODUCTION

This matter is before the Court on Mercy Health Network, Inc. d/b/a MercyOne's ("appellant" or "MercyOne") appeal from the United States Bankruptcy Court for the Northern District of Iowa's ("Bankruptcy Court") confirmation of the Joint Chapter 11 Plan of Liquidation (the "Plan"). (Docs. 1 & 19). MercyOne filed an appellant brief (Doc. 19), appellee Trustee of Mercy Hospital Liquidation Trust Dan Childers ("appellee" or "Liquidation Trustee") filed an appellee brief (Doc. 36), and MercyOne filed a reply brief (Doc. 41).

This matter is also before the Court on appellee's Motion to Dismiss Appeal (Doc. 33). MercyOne filed a resistance (Doc. 40), and appellee filed a reply (Doc. 44).

On January 16, 2025, appellee filed a supplement to its motion to dismiss providing a status update on proceedings in the Bankruptcy Court. (Doc. 45).

On January 22, 2025, the Court heard oral argument on the appeal and the motion to dismiss. (Doc. 46).

For the following reasons, the Court **grants** appellee's motion to dismiss the appeal. (Doc. 33). Even if the Court did not grant the motion to dismiss, it would still affirm the Bankruptcy Court's decision.

## II.      BACKGROUND

This appeal arises out of the jointly administered bankruptcy proceedings of Mercy Hospital, Iowa City, Iowa and related entities (collectively the "Debtors"). On August 7, 2023, the Debtors filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. (Bankr. Doc. 1).[1] The Debtors implemented a sales process under

---

[1] References to "Bankr. Doc." are to docket entries in the underlying matter in the Bankruptcy Court, 23-623-TJC. References to "Doc." are to docket entries in this appeal, 24-CV-68. References to AA are to Appellant's Appendix filed in support of the appeal and can be found at Doc. 20.

3

Bankruptcy Code Section 363 to sell substantially all their assets to another entity that would continue to provide medical care out of the Debtor's facilities. (Bankr. Doc. 476, at 2–3). The University of Iowa ("University") purchased substantially all the Debtors' assets and continues to provide medical care out of the Debtors' facilities. (*Id.*). As a result of the sale, Mercy Hospital, Iowa City no longer has any active medical operations and will eventually be completely dissolved as part of the Plan. *See* (Bankr. Doc. 1043, at 3).[2]

MercyOne is Mercy Hospital, Iowa City's former manager. As it relates to the Debtors' bankruptcy, MercyOne is a claimant who has filed a claim for approximately $31,500.00. (Doc. 19, at 8). MercyOne's claim is classified in Class 3 as a general unsecured claim. (*Id.*, at 9). According to MercyOne, they are an impaired creditor, meaning they will not be paid the full amount of their claim.

On May 14, 2024, the Debtors filed their Joint Plan of Liquidation (the "Plan") in the United States Bankruptcy Court for the Northern District of Iowa.[3] AA Exh. 5. The Plan was the "result of extensive compromise and settlement talks between the key parties." AA 479. As relevant to MercyOne's appeal here, the Plan includes two categories of releases: Debtor Releases and Third-Party Releases. AA 202–03.

First, the Plan includes "Debtor Releases" in which the Debtors relinquished their right to pursue claims against specified parties. AA 202. Specifically, under the Debtor Releases, the Debtors, their Estates, and their current, former, and successor Affiliates agree to

---

[2] A complete and thorough explanation of the events leading up to the bankruptcy declaration is contained in the Plan at pages 41-45. AA 123–27.

[3] The May 14, 2024 Plan was the final version of the liquidation plan that was first filed on February 23, 2024, and went through several rounds of review and modification. AA 075. The May 14, 2024 Plan was updated to reflect the changes and technical modifications. *Id.*

> forever release, waive, and discharge each of the Released Parties from any
> claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt,
> right, remedy, liability, action, proceeding, suit [sic], account, controversy,
> agreement, promise, right to legal remedies, right to equitable remedies, or
> right to payment . . . for any act or omission in connection with [or] relating
> to . . . the Debtors.

AA 202.

Second, the Plan includes "Third-Party Releases" in which non-debtor third parties relinquish rights to pursue parties covered by the releases. Specifically, under the "Third-Party Releases,"

> [T]he Releasing Parties shall be deemed to . . . release, waive, and
> discharge the Released Parties from any claim, Claim, Cause of Action,
> obligation, suit, judgment, damages, debt, right, remedy, liability, action,
> proceeding, suit [sic], account, controversy, agreement, promise, right to
> legal remedies, right to equitable remedies, or right to payment . . . for any
> act or omission in connection with [or] relating to . . . the Debtors.

AA 203.

A Releasing Party is defined, in part, as

> the following Entities, each in their respective capacities as such: (a) each
> Holder of a Claim that (i) votes to accept the Plan or (ii) either (1) abstains
> from voting or (2) votes to reject the Plan and, in the case of either (1) or
> (2), does not opt out of the voluntary release by checking the opt-out box
> on the applicable Ballot, and returning it in accordance with the instructions
> set forth thereon, indicating that they are electing to opt out of granting the
> releases provided in the Plan.

AA 111 (Art. II(A)(1.190)). The definition of a "Releasing Party" also provides how a claim holder could either become a Releasing Party or could opt out of being a Releasing Party. A claim holder automatically becomes a Releasing Party if they accept the Plan, or if they either abstain from voting or reject the Plan and, in either of those cases, fail to opt out of the voluntary release by checking the opt-out box on the appropriate form (either ballot or non-voting status notice form) and returning it according to the instructions. A claim holder could opt out of the releases by abstaining from voting or

rejecting the Plan and, in either of those cases, checking the opt-out box on the appropriate form and returning it according to the instructions.  Put another way, those who either did not vote or voted to reject the plan and who failed to affirmatively opt out of the Releases are deemed to be a Releasing Party.

For both the Debtor Releases and the Third-Party Releases, the "Released Parties" include six key parties and eighteen categories associated with each of those key parties, defined as follows:

> **1.189 "Released Parties"** means, collectively, the following Entities, each in their capacity as such: (a) the Debtors; (b) the UCC and each of its members (only in their capacity as such); (c) the Pension Committee and each of its members (only in their capacity as such); (d) the Bondholder Representatives; (e) the Foundation; (f) the Sisters of Mercy; and (g) with respect to any such Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, predecessors, successors, affiliates, principals, members, management companies, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors.

AA 110–11 (Art. II(A)(1.189)).  Categories (a) through (f) are the "Key Parties." Category (g) makes up the "Remote Released Parties."

The Plan also creates a Liquidation Trust and provides funding to the Liquidation Trustee to investigate and bring claims on behalf of the Bankruptcy Estate.  AA 187–92. The Plan funnels all claims not released by the Debtors into the Liquidating Trust, and the Liquidating Trustee has the power to prosecute the claims.

MercyOne objected to the Plan.  AA Exhs. 2 & 3.  MercyOne challenged the Debtor Releases and the Third-Party Releases insofar as they extend to the Remote Released Parties.  MercyOne did not object to the Debtor Releases or the Third-Party Releases as they applied to the Key Parties.  (Doc. 40, at 2 n.2).  The five voting classes voted to approve the plan resulting in approval which ranged, across the respective

classes, from 88.14% to 100% in number of votes and 91.7% to 100% in votes weighted by value of the voters' claims.   AA 051.   On June 7, 2024, Judge Collins, Chief Bankruptcy Judge for the Bankruptcy Court for the Northern District of Iowa, overruled MercyOne's objections and approved the Plan.   AA Exh. 9.   There were no other objections to the Plan pending when Judge Collins entered his order.

MercyOne seeks review of Judge Collins' orders confirming the Plan and overruling MercyOne's objections because MercyOne believes the Debtor Releases and Third-Party Releases, insofar as they extend to the Remote Released Parties, are impermissible and therefore cause the Plan to be unconfirmable.   MercyOne appealed to the Bankruptcy Appeal Panel, but appellees elected to have the case heard in this Court. MercyOne moved for a stay of Judge Collins' confirmation order pending the appeal in both the Bankruptcy Court and this Court.   Both Judge Collins and Magistrate Judge Mark A. Roberts denied the respective motions to stay.   (Bankr. Doc. 1137; Doc. 32). Appellee has moved to dismiss the appeal.

Several things have happened toward consummating the Plan since it was confirmed.   The Liquidating Trustee relayed in status updates that it has, among other things: sold the Debtors' interest in a senior living facility in exchange for approximately $1,650,000.00 for the Trust; continued collections of accounts receivable before the accounts go stale; made efforts to sell an unoccupied building in downtown Iowa City; made distributions of $20,436.600 to the Bond-Holders and $733,333.33 to the Pensioners; dealt with a large number of Administrative Claims; "made various other payments as required"; reviewed and disposed of approximately $4,000,000.00 in administrative liability claims; has commenced payment of various allowed administrative claims; has sought an extension of the deadline to object to general unsecured claims; and has hired a new realtor relative to a building located in downtown

Iowa City.  (Bankr. Doc. 1258); (Doc. 45).  The Trustee indicates efforts to consummate the Plan are ongoing.  (Doc. 45).

### III.    MOTION TO DISMISS

The Court will first address appellee's motion to dismiss MercyOne's appeal for lack of standing.

#### A.    Applicable Law

Article III standing requires a plaintiff "show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted).  "Standing in a bankruptcy appeal is narrower than Article III standing." *In re Wigley*, 886 F.3d 681, 684 (8th Cir. 2018).  In the Eighth Circuit, "only a 'person aggrieved' has standing to bring a bankruptcy appeal." *Id.*  This is a prudential limitation that applies in the bankruptcy context when litigation almost always involves "the interests of numerous persons who are not formally parties to the litigation." *Id.*  The standard allows for efficient judicial administration by limiting appellate review to "those persons whose interests are directly affected." *Id.*

Under this standard, a party is "a 'person aggrieved' with standing to bring a bankruptcy appeal only if she has been 'directly and adversely affected pecuniarily' by an order of a bankruptcy court." *Id.* (quoting *Opportunity Fin., LLC v. Kelley*, 822 F.3d 451, 458 (8th Cir. 2016).  "A person has standing under this doctrine if a 'bankruptcy court order diminishes the person's property, increases the person's burdens, or impairs the person's rights.'" *Id.* (quoting *Opportunity Fin.*, 822 F.3d at 458).  "Th[e] possibility of harm does not satisfy the persons aggrieved standard." *Opportunity Fin.*, 822 F.3d at 458.  "Whether an appellant is a person aggrieved is generally a question of fact for the district court, but where the facts are undisputed" it is a question of law. *Id.* at 457–58.

8

### B.      Parties' Arguments

Appellee moves to dismiss MercyOne's appeal for two main reasons.

First, appellee argues MercyOne does not have standing to appeal the Third-Party Releases because it successfully opted out of the Third-Party Releases.  (Doc. 33, at 3). Thus, even if the Court were to find the Third-Party Releases impermissible and reverse the Bankruptcy Court's confirmation, MercyOne will have the exact same claims available to it because it never released those claims.  (*Id.*).

Second, appellee argues MercyOne does not have standing to challenge either the Debtor Releases or the Third-Party Releases because any potential recovery, or any increased liability, is purely speculative and too attenuated to satisfy the person aggrieved standard.  (*Id.*, at 4).

In response, MercyOne argues it has standing for several reasons.

First, MercyOne argues that its status as an impaired creditor *alone* confers standing because it is not receiving its full recovery under the confirmed Plan.  (Doc. 40, at 6).

Relatedly, MercyOne also argues it has standing because impaired creditors are entitled to a plan that satisfies Title 11, United States Code, Section 1129, but the Third-Party Releases make the Plan unconfirmable under Section 1129.  (*Id.*, at 13).

Last, MercyOne argues it has standing to challenge the Debtor Releases because an increase in what it will recover on their claim if the Debtor Releases are invalidated is not speculative or too far removed.  (*Id.*, at 17).  According to MercyOne, that the parties included releases for the Remote Released Parties shows there must have been claims against them.  (*Id.*, at 6).  MercyOne also argues that because a claim must be litigated and recovered does not indicate a claim is speculative; it is just part of the bankruptcy process.

9

### C.      Analysis

MercyOne does not have standing to challenge the Third-Party Releases.

MercyOne successfully opted out of the Third-Party Releases. Because it did so, MercyOne never gave up its claims against the Released Parties. *See In re Tenopah Solar Energy, LLC*, 657 B.R. 393, 407 (D. Del. 2022) ("Appellants . . . are not impaired by the Plan's consensual third-party release given that they did not opt into this release."). MercyOne had the ability to pursue the claims it had against the Released Parties before the bankruptcy started, throughout the entirety of the bankruptcy proceedings, and— because it opted out of the releases—it still maintains the right to pursue its claims. Nothing in the Plan has altered or diminished MercyOne's right or ability to pursue those claims. Any decision by this Court about the Third-Party Releases will not alter MercyOne's ability to go after claims that it never lost in the first place.

MercyOne argues that even if its rights are not impaired because it opted out of the Third-Party Releases, it still has standing to challenge the Third-Party Releases because it is entitled to a plan that complies with the Bankruptcy Code under Section 1129(a)(1). (Doc. 40, at 13). According to MercyOne, the Third-Party Releases are not permissible after *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), so any plan that includes the Third-Party Releases is not confirmable. The "person aggrieved" standard, however, requires something more than a general objection that a plan is not confirmable. Indeed, the entire purpose of the "person aggrieved" requirement is to efficiently administer bankruptcy proceedings by granting appellate standing only to those parties who have been directly harmed by a bankruptcy court's order. A general objection to a plan as unconfirmable, without showing how the party was harmed, does not meet this standard. As the Court has already discussed, MercyOne opted out of the Third-Party Releases and therefore has not suffered harm by their inclusion in the Plan.

MercyOne also does not have standing to challenge the Debtor Releases.

10

MercyOne argues that the total recovery on claims that could be pursued by the Liquidating Trust is diminished by the Debtors' release of the Remote Released Parties, which impacts MercyOne's distribution of Trust assets. For MercyOne to increase its recovery through the Debtors' claims against the Remote Released Parties, the Liquidating Trustee would have to identify a claim against a Remote Released Party, litigate and prevail on the claim, survive any appeal of the judgment, collect on the judgment, funnel the collection into the Liquidating Trust, and then disburse it to creditors. This is a lengthy process that requires several steps before MercyOne even has a chance of increasing its recovery from the Liquidation Trust. As MercyOne points out, though, this is exactly how bankruptcy proceedings work. The pursuit of such claims is one reason why bankruptcy courts appoint liquidation trustees like the Bankruptcy Court did here. The Court therefore agrees that the lengthy process through which all claims must necessarily go before the proceeds are distributed does not make a creditor's lost recovery on those claims too remote to confer standing under the person aggrieved standard.

The problem here, however, is that it is pure speculation whether there are any claims against the Remote Released Parties at all. MercyOne has not identified a single claim that the Debtors released that would have (or even could have) increased its recovery. "Speculative or hypothetical claims are insufficient to establish standing." *In re Citation Corp.*, 371 B.R. 518, 522 (N.D. Ala. 2007). Even if there is no requirement that MercyOne identify a specific claim to have standing, the record here shows MercyOne is only speculating there may be a claim. When the Bankruptcy Court asked MercyOne whether it had "anything to suggest there's a claim against any of those people you're talking about," MercyOne's counsel responded: "For purposes of today, I don't have anything I could put, concrete, before you. But I believe there are, probably." AA 769. A *belief* that there *probably* are claims is nothing more than speculation. In the

11

eight months following the Plan confirmation, MercyOne was still unable to point to a concrete example of a claim to convince either Judge Roberts in its request for a stay, or the Court here that there is a released claim that would increase its distribution. In fact, the representative for the Pensioners' Committee indicated during the confirmation hearing, admittedly not under oath, that she investigated possible claims against the released parties, but had not found anything that would increase the funds available for distribution. AA 722. The abstract possibility of a claim that might increase MercyOne's recovery does not satisfy the person aggrieved standard. *Opportunity Fin.*, 822 F.3d at 458.

For similar reasons, it is speculative to conclude that either the Debtor Releases or the Third-Party Releases will increase MercyOne's exposure to liability. Under this theory of harm, MercyOne would be the target of litigation because all the other relevant parties have already been released while MercyOne has not. *See* AA 111 (Art. II(A)(1.189)) (excluding MercyOne from definition of "Released Parties"). There is no indication, however, that there are any claims directed at MercyOne that it would not have otherwise faced had the Remote Released Parties not been released. Appellee merely posited this as one way MercyOne might argue it could be harmed by the Releases (although MercyOne has not raised the argument). The abstract possibility of increased claims against MercyOne does not satisfy the person aggrieved standard.

MercyOne argues it is not speculative to claim that it would receive increased distributions if the Debtors had not released the Remote Released Parties. According to MercyOne, that the Remoted Released Parties were included as an essential part of the Plan necessarily means there must have been some claims available or else the release of the Remote Released Parties would not be necessary. The Court disagrees. There are numerous reasons the relevant parties would want to include the Remote Released Parties in the Releases. For instance, releases can prevent frivolous claims from being lodged

12

against the Remote Released Parties.  Including language that enjoins these claims prevents frivolous claims and advances the goals of finality and efficiency sought in bankruptcy proceedings.  It does not necessarily mean there were in fact meritorious claims to be released; and indeed, as explained, MercyOne cannot identify any such claims.

MercyOne makes a final argument that its status as an impaired creditor *alone* confers standing to challenge the Debtor Releases and the Third-Party Releases.  (Doc. 40, at 6–13).  MercyOne primarily cites to Second Circuit caselaw for the proposition that there is a per se rule that automatically grants impaired creditors appellate standing in bankruptcy cases.  *See, e.g.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988) ("As a general rule, creditors have standing to appeal orders of the bankruptcy court disposing of property of the estate because such orders directly affect the creditors' ability to receive payment of their claims."); *In re DBSE N. Am.*, 634 F.3d 79, 89 (2d Cir. 2011) ("We have never demanded more to accord a creditor standing than that it has a valid and impaired claim.").

Other courts, however, have not gone so far as to create an absolute rule conferring standing for impaired creditors.  *In re LTV Steel Co., Inc.*, 560 F.3d 449, 454 (6th Cir. 2009) ("[S]imply holding a claim of any type against the estate does not automatically confer appellate standing under the 'person aggrieved' doctrine.").  While the Eighth Circuit adheres to the "person aggrieved" doctrine, it does not appear to have adopted a per se rule that grants an impaired creditor standing based on its status as an impaired creditor alone because, unlike the broad right of participation reflected in bankruptcy-level standing, the "person aggrieved" standard is much more restrictive and does not automatically apply to an entire class.  *See In re AFY*, 734 F.3d 810, 824 (8th Cir. 2013) (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 & n.21 (3d Cir. 2004) ("contrasting the 'restrictive' 'persons aggrieved' standard for 'bankruptcy appellate

13

standing . . . with the broad right of participation in the early stages of a bankruptcy proceeding' created by [Title 11, United States Code, Section 1109]")).

MercyOne cites a single bankruptcy court case from within the Eighth Circuit to support its claim that the Eighth Circuit follows the per se rule.  (Doc. 40, at 8) (citing *In re Affiliated Foods, Inc.*, 249 B.R. 770 (W.D. Mo. 2000)).  *In re Affiliated Foods* has a single conclusory line without any substantive discussion that states: "It is undisputed that Central States is the holder of an impaired claim and has standing to object to the plan."  249 B.R. at 787.  This single line cannot support MercyOne's conclusion that the Eighth Circuit has a per se rule that all impaired creditors are persons aggrieved.  Further, several Eighth Circuit cases have found creditors must show more than just their status as creditors to satisfy the person aggrieved standard.  Though these cases do not distinguish between impaired and unimpaired creditors, they strongly suggest there is not a per se rule that confers appellate standing based on a class-wide status alone.  *See, e.g.*, *In re Hecker*, 496 B.R. 541, 551 (B.A.P. 8th Cir. 2013) (finding an unsecured creditor did not have appellate standing because it was not specifically harmed by the bankruptcy court's order); *In re Mesaba Aviation, Inc.*, 418 B.R. 756, 761–62 (B.A.P. 8th Cir. 2009) (finding a claimant whose claim was disallowed by the bankruptcy court did not have standing to appeal).  The Court finds that MercyOne's status as an impaired creditor is not enough to confer appellate standing on its own.

Thus, MercyOne does not have appellate standing to challenge either the Debtor Releases or the Third-Party Releases.  Appellee's motion to dismiss the appeal is **granted** and the appeal is dismissed.

## IV.    APPEAL OF CONFIRMATION ORDER

Even if the Court found MercyOne has standing to appeal, the Court would still affirm the Bankruptcy Court's Plan confirmation.

To reiterate, MercyOne seeks review of Judge Collins' orders confirming the Plan and overruling MercyOne's objections because it believes the Debtor Releases and Third-Party Releases, insofar as they extend to the Remote Released Parties, are impermissible. MercyOne makes two main arguments in support of its appeal.  First, MercyOne argues that the Third-Party Releases are barred by a recent Supreme Court case, *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), because the Third-Party Releases apply to parties who did not affirmatively consent to the Releases.  Second, MercyOne argues the Bankruptcy Court erred in overruling MercyOne's objection to the Debtor Releases and the Third-Party Releases because the Remote Released Parties cause the Plan to fail under Title 11, United States Code, Section 1129(a)(1).

Taking MercyOne's standing to appeal as given, the Court has jurisdiction over these questions under Title 28, United States Code, Section 158(a).

### A.    *Standard of Review*

"On appeal from a decision of a bankruptcy court, the court sits as an appellate court and reviews the bankruptcy court's findings of fact for clear error and its conclusions of law de novo." *In re Agriprocessors, Inc.*, 547 B.R. 292, 298 (N.D. Iowa 2016).  "A factual finding is clearly erroneous if, after examining the entire record, [the court is] . . . left with a definite and firm conviction that the bankruptcy court has made a mistake." *Id.* (alterations in original) (quoting *In re Bruess*, 539 B.R. 560, 564 (8th Cir. BAP 2015)).  A bankruptcy court's conclusions involving mixed questions of law and fact are also reviewed de novo. *DeBold v. Case*, 452 F.3d 756, 761 (8th Cir. 2006).

### B.    *Confirmability in light of* **Harrington v. Purdue Pharma**

MercyOne first argues the Third-Party Releases are barred by a recent Supreme Court case, *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), thereby making the Plan unconfirmable.

15

In *Purdue*, the debtor Purdue Pharma L. P. ("Purdue"), "filed for bankruptcy after facing a wave of litigation for its role in the opioid epidemic." 603 U.S. at 209. Purdue's owners were members of the Sackler family, who "confronted a growing number of suits" related to the opioid epidemic as well. *Id*. The Sacklers were not debtors and did not file for bankruptcy, but agreed to contribute several billion dollars to the Purdue bankruptcy estate in exchange for a release and injunction barring current and future opioid-related claims against them. *Id*. at 209–11. The releases extended to lawsuits brought by opioid victims against the Sacklers. The Supreme Court held that the Bankruptcy Code did not endow a bankruptcy court the power to discharge the debts of a non-debtor (Sackler Family) without the consent of the affected non-debtor claimants (the opioid victims with lawsuits against the Sacklers). *Id*. at 227.

The Court in *Purdue*, however, went to great lengths to state that it was narrowly deciding the case based on the circumstances before it. The Court explicitly stated:

> As important as the question we decide today are the ones we do not. Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan; those sorts of releases pose different questions and may rest on different legal grounds than the nonconsensual release at issue here. Nor do we have occasion today to express a view on what qualifies as a consensual release or pass upon a plan that provides for the full satisfaction of claims against a third-party nondebtor. Additionally, because this case involves only a stayed reorganization plan, we do not address whether our reading of the bankruptcy code would justify unwinding reorganization plans that have already become effective and been substantially consummated.

*Id*. at 226 (emphasis in original) (citation omitted). MercyOne encourages the Court to look at the holding and the "spirit" of *Purdue* to determine the Third-Party Releases are unenforceable. The "spirit" of *Purdue*, however, was explicitly limited to the facts of that case. The circumstances here are different from *Purdue* and involve the exact

16

circumstances the *Purdue* Court stated it was not addressing. Thus, *Purdue* does not control here.

For starters, *Purdue* involved a stayed reorganization plan. The *Purdue* Court explicitly stated that it was not addressing whether its decision would justify unwinding a reorganization plan that had already become effective and was substantially consummated. Unwinding a plan after it has been consummated poses serious administrative concerns and difficulties because some of the funds have already been disbursed and claims settled. Clawing back those funds and restarting the reorganization process is both impractical and costly. The *Purdue* Court did not need to determine whether the difficulties of unwinding a consummated plan outweighed the rights of the third parties, and it declined to do so.

Here, unlike in *Purdue*, the Plan was never stayed. MercyOne asked the Bankruptcy Court and this Court to stay the Plan. Both the Bankruptcy Court and the Magistrate Judge denied the stay request because they found any possible relief was speculative. Instead, the Plan moved forward. There is little doubt that the Plan here is broadly effective and has been at least partially consummated. The Debtors filed a Notice of Consummation and at least two status reports in which they report that they have, among other things: sold Debtors' interest in a senior living facility in exchange for approximately $1,650,000.00 for the Trust; continued collections of accounts receivable before the accounts go stale; made efforts to sell an unoccupied building in downtown Iowa City; made distributions of $20,436.600 to the Bond-Holders and $733,333.33 to the Pensioners; dealt with a large number of Administrative Claims; and "made various other payments as required." *See* AA 657; (Bankr. Doc. 1258); (Doc. 45). Unwinding even portions of what has already been consummated presents significant problems, and the circumstances here are thus vastly different than what the Supreme Court confronted in *Purdue*. Indeed, the challenges in unwinding a plan are precisely why the *Purdue*

17

Court did not address whether it would have made the same decision in a case in which those challenges were present.

Next, there is no evidence of pending litigation here like there was in *Purdue*. In *Purdue*, there were pending lawsuits by opioid users against the Sacklers that would have been wiped out by the third-party releases. Given the number of opioid users and overdoses in the United States and across the globe, it is also a virtual certainty that there were more lawsuits coming against the Sacklers. In other words, the third-party releases in *Purdue* released pending and real and identifiable potential claims. Here, there are no pending claims forfeited by the Third-Party Releases, nor is there any identifiable claim that could be brought in the future. As discussed, any claim that exists is purely speculative. Unlike in *Purdue*, the releases here are not giving up anything, and to argue otherwise is purely speculative.

Last, even if *Purdue* controls here, the Third-Party Releases are permissible because they are consensual releases. In *Purdue*, the Court stated it was not calling into question *consensual* releases, and post-*Purdue* parties may still be released through consent. Here, the Third-Party Releases are consensual because they contained a valid opt-out provision and because the voting class did not object to it.

When a claim holder has a clear and prominent explanation of the issues and the opt-out procedure and is given the opportunity to opt out, the release is consensual. *See In re Roman Catholic Diocese of Syracuse, N.Y.*, Case No. 20-30663-5-wak, Doc. 2308, at 5 (Bankr. N.D.N.Y. Nov. 14, 2024) (citing *In re LATAM Airlines Grp. S.A.*, No. 20-11254 (JLG), 2022 WL 2206829, at *46 (Bankr. S.D.N.Y. July 7, 2022)). Here, before a claim holder agreed to be bound by the Third-Party Releases, they received a copy of the Third-Party Releases and a Release Opt-Out Election Form explaining the consequences of opting in or opting out of the Third-Party Releases. AA 146–49. Each claim holder also received a pre-addressed envelope to return the Election Form. A claim

holder, therefore, only needed to check a box on the form, sign it, and return it in the pre-addressed envelope to successfully opt out of the Third-Party Releases. If the claim holder did not return the form, they were deemed to consent. This process provided claim holders and interest holders with a clear and prominent explanation of the opt-out procedure and gave them an opportunity to easily opt out. As another court aptly explained: "Inaction is action under appropriate circumstances. When someone is clearly and squarely told if you fail to act your right will be affected, that person is then given information that puts them on notice that they need to do something or else. That's not a trap." *In re Avianca Holdings S.A.*, 632 B.R. 124, 137 (Bankr. S.D.N.Y. 2021).

Not only did claim holders have the opportunity to decide whether to consent or opt out of the Third-Party Releases, the Unsecured Creditor Committee ("UCC") did not object to the Third-Party Releases. MercyOne is a member of the unsecured creditor class represented by the UCC. "[T]he creditors appointed to the creditors' committee have a fiduciary obligation to act in the interests of the members whom they represent." *In re Haskell-Dawes, Inc.*, 188 B.R. 515, 522 (Bankr. E.D. Pa. 1995); *see also In re Residential Cap., LLC*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2006). In other words, the UCC "as a whole is not just a supporter, but a negotiator and proponent of the Plan and the Solicitation Procedures that include the opt-out mechanism." *In re Roman Catholic Diocese of Syracuse, N.Y.*, Case No. 20-30663-5-wak, Doc. 2308, at 9 (Bankr. N.D.N.Y. Nov. 14, 2024). That the UCC as a representative of an entire class of creditors, including MercyOne, did not object to the opt-out provision or the Third-Party Releases strongly supports a finding that the Plan is consensual and in the best interest of the unsecured creditor class.

Thus, the Court finds *Purdue* does not apply to the facts here, but to the extent *Purdue* applies at all, the Court finds it does not disallow the Third-Party Releases because the opt-out provision and approval by the UCC show the releases were

consensual.  The Third-Party Releases do not make the Plan unconfirmable in light of *Purdue*.

    **C.**   **Master Mortgage *Factors***

Next, MercyOne argues the release of the Remote Released Parties is impermissible because the Remote Released Parties do not satisfy the *Master Mortgage* factors.

Here, the Bankruptcy Court concluded the releases of the Remote Released Parties were permissible.  The Bankruptcy Court relied on the factors set forth in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), to analyze the permissibility of the releases.  The Bankruptcy found all the *Master Mortgage* factors supported the releases.  MercyOne agrees that the *Master Mortgage* factors apply.  (Doc. 19, at 17).

Courts in the Eighth Circuit apply the standards set forth in *Master Mortgage* to determine whether a non-debtor release (or an injunction preventing claims and suits against a non-debtor) is permissible.  *See, e.g.*, *In re Riverbend Leasing LLC*, 458 B.R. 520, 527 (Bankr. S.D. Iowa 2011).  *Master Mortgage* identified five factors that courts should consider, including:

    (1)    There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.

    (2)    The non-debtor has contributed substantial assets to the reorganization.

    (3)    The injunction is essential to reorganization.  Without . . . it, there is little likelihood of success.

    (4)    A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

20

(5)   The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

168 B.R. at 934–35 (footnotes omitted).  "[T]hese factors do not appear to be an exclusive list of considerations, nor are they a list of conjunctive requirements." *Id.* at 935. Rather, they are the factors courts "seem to have balanced . . . most often" when engaging "in a fact specific review, weighing the equities of each case. *Id.*

The Court will consider each factor in turn.

### 1.   Identity of Interest

MercyOne argues the Bankruptcy Court erred in finding there was an identity of interest between the Debtors and Remote Released Parties.  (Doc. 19, at 19–21). According to MercyOne, there is no evidence that the Remote Released Parties shared a "common goal" of affirming the plan.  Not only was there no evidence, MercyOne also asserts that the identities of all the Remote Released Parties are not even known, and that "[t]he vast majority had nothing to do with the Bankruptcy, filed no claim, never appeared and did nothing at the confirmation hearing."  (Doc. 41, at 10–11).

The Bankruptcy Court found there was an identify of interest between the Debtors and all the Released Parties under the Plan because they shared a common goal of confirming the plan and avoiding "immense and complex litigation."  AA 475 (citing *In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011), and *In re Seaside Engineering & Surveying, Inc.*, 780 F.3d 1070, 1079-80 (11th Cir. 2015)).  The Bankruptcy Court also found the Debtors "presented unrefuted evidence and argument . . . that many of the Released Parties under the Debtors' releases had indemnity rights back against the Debtor."  AA 476.  The Bankruptcy Court did not explicitly conduct a separate analysis for the Remote Released Parties distinct from a general analysis of all Released Parties.

Identity of interest is a somewhat flexible concept.  *See, e.g.*, *In re Tribune Co.*, 464 B.R. at 187 (finding that although the "record [was] unclear as to the extent of any

21

identity of interest between the Debtors and the Settling Parties based upon indemnification claims," they had a "common goal of confirming the [Plan]" that resulted in an identity of interest); *Master Mortg.*, 168 B.R. at 937 (finding an identity of interest when there was a settlement agreement that created a right of indemnity between the parties).

The Court agrees with the Bankruptcy Court that there was an identify of interest between the Debtors and the Key Parties who were granted releases.  MercyOne does not appear to dispute the identify of interest between the Key Parties and the Debtors either.  There is no evidence to the contrary, and nothing to suggest the Bankruptcy Court's finding was clearly erroneous as to the Key Parties.

The identity of interest is less clear between the Debtors and the Remote Released Parties.  Chief Restructuring Officer Mark Toney ("Toney") gave unrefuted testimony explaining that the Key Parties would not have agreed to the Plan without releases that extend to the Remote Released Parties.  AA 199–200; AA 379–81.  Toney provided unrefuted testimony that many of the Remote Released Parties had indemnification agreements with the Key Parties, who in turn had indemnification obligations with the Debtors.  Thus, any claim against a Remote Released Party could impact the Debtors and thereby establish an identify of interest.  AA 698–99; *see also Master Mortg.*, 168 B.R. at 937; *In re Mercedes Homes, Inc.*, 431 B.R. 869, 879–80 (Bankr. S.D. Fla. 2009).  Toney also admitted, however, that he had not reviewed each agreement the Key Parties had with the Remote Released Parties.  AA 698–99.  Toney also admitted he did not know the identity of each Remote Released Party.  *See* (Doc. 41, at 11).  It is a fair conclusion that based on this uncontradicted evidence there were at least some Remote Released Parties that had an identity of interest with Debtors.  It is also fair to conclude, however, that there is no evidence that all did.

On balance, the Court finds this factor weighs slightly in favor of upholding the non-debtor releases, including as to the Remote Released Parties. The Bankruptcy Court's factual findings on this factor were erroneous to the extent the Bankruptcy Court found that Toney's testimony applied to all Released Parties when Toney admitted he did not know who all the Remote Released Parties were. Yet, the Bankruptcy Court's conclusion remains sound that all Released Parties share a common interest with the Debtors of confirming the Plan and avoiding immense and complex litigation—including the Remote Released Parties. *See In re Tribune Co.*, 464 B.R. at 187. And there is evidence that at least some Remote Released Parties have indemnification agreements with the Key Parties. *See Master Mortg.*, 168 B.R. at 937. Thus, this factor weighs slightly in favor of upholding the non-debtor releases.

### 2.    *Substantial Contribution*

Next, MercyOne argues the Bankruptcy Court erred in finding that the Remote Released Parties contributed something to the Plan when the Bankruptcy Court found that "most parties receiving the benefit of the Debtors' release agreed to forego some right or possible right of recovery in exchange for the release." AA 476.

The Court agrees there was evidence that the Key Parties substantially contributed to the Plan, and there does not appear to be disagreement on that. Like with the first factor, however, whether the Remote Released Parties substantially contributed to the Plan is a closer call.

The only evidence in the record that the Remote Released Parties contributed to the Plan is, again, Toney's declaration. In his declaration, Toney states that the Key Parties contributed to the Plan in ways other than monetarily. For example, they provided "sweat equity" and helped guide the Debtors through a complex purchase by the University. AA 381–82. Toney does not, however, provide any testimony that the Remote Released Parties also contributed to the Plan. Toney references how some of the

23

Released Parties kept the Debtors' operation running during the University's acquisition. Toney was likely referring to at least some of the Remote Released Parties, who were on the ground keeping operations running during the acquisition.  But again, Toney admits he does not even know the identity of all the Remote Released Parties, so there is no way his testimony about contributions to the Plan included all the Remote Released Parties. In other words, there is some thin evidence that some of the Remote Released Parties contributed to the Plan, but no evidence that others did too.

Much like the first factor, the Bankruptcy Court's factual findings and application of the second factor were not entirely erroneous because there was some unrefuted testimony that some Remote Released Parties contributed to the Plan.  But the Bankruptcy Court erred to the extent it found that *most* Remote Released Parties contributed to the Plan when, in fact, we do not know who or how many released parties there are.  On balance, the Court finds this factor weighs slightly in favor of upholding the non-debtor releases because there is evidence that at least some of the Remote Released Parties contributed to the Plan, albeit in nonmonetary ways.

### 3.    Essential to Plan

MercyOne argues that the Bankruptcy Court erred in finding that the releases of the Remote Released Parties were essential to the reorganization plan.  (Doc. 19, at 22–24).  MercyOne argues that even if the Releases were essential to plan confirmation, there is no evidence that the Remote Released Parties were essential to the efficacy of those Releases.

The Bankruptcy Court found that "[t]he evidence and undisputed arguments also show the Releases were critical to achieving the near-unanimous consent (other than MercyOne) to the Plan and its confirmation."  AA 477.  The evidence included unrefuted testimony that the releases were an essential component of the compromise, which likely would not have been reached without their inclusion.  *See* AA 428.

24

Here, undisputed evidence in the record shows the Released Parties considered the Release as essential to confirmation. Toney provided testimony, subject to cross-examination, that the releases were necessary to getting a Plan confirmed. AA 726. Based on his personal knowledge of the negotiations, Toney testified that "[i]t was made very clear during the negotiations that without those releases, there would not be a settlement . . . I actually verified it with a couple of the key stakeholders." *Id.* Toney testified that the representative for the Pension Committee, Paula Roby, also insisted on the inclusion of the Releases. AA 722.

Toney's testimony extended to the Remote Released Parties. In fact, Toney was explicitly asked about the Remote Released Parties during re-direct examination. Toney responded that it was necessary for the Remote Released Parties to be released as well. AA 730. Toney's testimony shows why that necessity is not "farfetched," as MercyOne suggests. (Doc. 19, at 22). According to Toney, the Key Parties would be negatively impacted if there was a cause or claim against one of the Remote Released Parties "due to the fact that there would be recourse back to the original," i.e., the Key Parties. AA 730. "Especially officers, managers, consultants, attorneys would have recourse back to the original." *Id.* Toney explained that many of the Remote Released Parties had engagement letters with the Key Parties that included indemnification agreements, so the Key Parties may be responsible for claims against the Remote Released Parties. AA 730–31. Last, Toney testified that the Debtors worked with MercyOne to narrow the scope of the Remote Released Parties, but the Debtors were not willing to narrow it down any further than what was ultimately included in the Plan. There is no evidence in the record that refutes Toney's testimony.

Thus, the Court agrees with the Bankruptcy Court that the record shows the Releases, including the releases of the Remote Released Parties, were essential to Plan

25

confirmation.  The Court finds the third factor weighs in favor of upholding the non-debtor releases.

### 4.    Support for Plan

The fourth factor is "the single most important factor" and considers the creditors'—and specifically the impacted class's—approval for the Plan.  *Master Mortg.*, 168 B.R. at 938.  The Bankruptcy Court found that "[a]ll of the Voting Classes voted overwhelmingly in favor of Confirmation of the Plan after information about the releases was widely distributed through the Solicitation Process."  AA 478.

The record is clear that there was overwhelming support for the Plan amongst all voting classes.  AA 051.  Each Voting Class approved of the Plan at rates ranging between 88% and 100%.  *Id.*  The lowest approval rate came from Class 3, which represents the general unsecured claims.  Still, 88% of Class 3 voted in favor of the Plan.  No class rejected the Plan.

MercyOne argues the fourth factor does not weigh in favor of appellees because MercyOne and "multiple other creditors did not vote to accept the Plan," and overwhelming support of the Plan does not save the releases in light of *Purdue*.  (Doc. 41, at 14).  There may be several creditors who did not approve of the Plan, but that does not somehow cancel out that many creditors did approve of the Plan.  The fourth factor considers whether the voting classes "overwhelmingly" voted for the Plan.  Here, they did.

The Court also thinks it is relevant that the United States Trustee supported, or at least did not object to, the Plan.  The United States Trustee's objective is to promote the integrity and efficiency of the bankruptcy system for all stakeholders.  The United States Trustee who currently oversees bankruptcy proceedings in the Northern District of Iowa has held this position for years and has a well-earned reputation of carefully monitoring proceedings and raising objections and concerns whenever warranted.  The Court has

confidence that if the United States Trustee did not object to the Plan, there was likely little basis to do so.[4]

The Court therefore agrees with the Bankruptcy Court that this factor "provides strong support for approval of the release language." AA 478.

### 5.    Claim Payments

The last factor considers "whether the plan provides a mechanism for payment of all, or substantially all, of the claims of the class affected by the injunction." *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012). Courts often find this factor is met when a plan provides for a distribution to impaired creditors affected by releases that is greater than the distribution such creditors would receive under a Chapter 7 liquidation. *See In re Zenith Electronics Corp.*, 241 B.R. 92, 111 (Bankr. Del. 1999) ("The evidence on valuation clearly establishes that the $50 million distribution under the Plan to the bondholders would not be available in liquidation . . .."); *In re Matter of Fansteel Foundry Corp.*, No. 16-01825-als11, 2018 WL 5472928, at *12 (Bankr. S.D. Iowa Oct. 26, 2018) ("The plan provides a mechanism that realizes recovery for creditors who would receive no distribution under [C]hapter [7]."). The Bankruptcy Court found the impaired creditors would receive more under this Plan than they would under a Chapter 7 liquidation plan, and therefore this factor weighed in favor of the releases.

The evidence here shows that if this bankruptcy proceeding were to be converted to a Chapter 7 liquidation, the unsecured creditor class would receive nothing. *See* AA 214; AA 376–77. Indeed, if converted to a Chapter 7 liquidation, only the Bondholders and some secured claims would receive payment. AA 214. The Plan provides greater

---

[4] This case is a far cry from the facts of *Purdue Pharma*, where fewer than 20% of eligible creditors participated in a poll on the proposed plan, "thousands of opioid victims voted against" the plan, and the United States Trustee, "charged with promoting the integrity of the bankruptcy system for all stakeholders, joined in these objections." *Purdue Pharma*, 603 U.S. at 212–13.

27

recovery for the unsecured creditors than it would under a Chapter 7 liquidation, which Toney testified would be the likely alternative if the Plan was not accepted.  AA 376–77.

Thus, the Court agrees with the Bankruptcy Court that the fifth factor favors the releases.

### 6.    *Conclusion*

Although the Court finds here that the Bankruptcy Court did not apply the *Master Mortgage* criteria as it relates to the first two factors without some factual error, the Court finds the Bankruptcy Court did not commit legal error in finding the releases of the Remote Released Parties permissible.  While the first two factors do not clearly support the Releases, the other factors do.  Of particular importance is the fourth and most important factor regarding support of the Plan.  Here, there was such overwhelming support for the Plan that the fourth factor weighs heavily, and nearly insurmountably, in favor of allowing the Releases.

Indeed, courts consider other things as well, like whether the Plan will lead to a truly unfair result.  *U.S. Fidelis*, 481 B.R. at 520 (finding that it would be a "truly unfair result" if an objection to releases in a plan was sustained because doing so would cause the plan to fall apart and the case would be dismissed or converted to a Chapter 7 case).  Achieving the Plan here was unlikely at the outset, but through diligent work and compromise the stakeholders were able to come up with a plan that had near unanimous consent.  To sustain the objection and cause the Plan to fail when the Plan had garnered such significant support would be unfair.

### D.    *Business Judgment Rule*

Last, appellee argues that the releases satisfy the business judgment rule.  (Doc. 36, at 33).  MercyOne, however, argues the releases "cannot be saved by conclusory invocations of 'business judgment'" when the releases otherwise fail the *Master Mortgage* criteria.  (Doc. 41, at 15).

Here, the Court has already found that the releases of the Remote Released Parties satisfy the *Master Mortgage* factors and are enforceable.  The *Master Mortgage* factors are supported by evidence in the record.  There may be situations in which a release is protected by the business judgment rule when the *Master Mortgage* factors otherwise fail, but the Court does not have occasion to review that here because the *Master Mortgage* factors are satisfied.

## V.     CONCLUSION

For these reasons, appellee's motion to dismiss for lack of standing is **granted**. (Doc. 33).  Even if the Court did not grant appellee's motion to dismiss, the Court would still affirm the Bankruptcy Court.

**IT IS SO ORDERED** this 3rd day of March, 2025.

_____
C.J. Williams, Chief Judge
United States District Court
Northern District of Iowa

29