## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, | ) | Case No. 23-00623 (TJC) |
| IOWA, *et al.* | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### MERCY HEALTH NETWORK INC.'S MOTION FOR ENTRY OF AN ORDER REQUIRING THE OC TO PRODUCE RECORDS AND SUBMIT TO EXAMINATION PURSUANT TO BANKRUPTCY RULE 2004

Mercy Health Network Inc., d/b/a MercyOne ("MercyOne"), by its attorneys, Foley & Lardner LLP and Belin McCormick,  respectfully submits this motion (the "Motion"), for entry of an order substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), authorizing discovery of the Mercy Hospital Liquidation Trust Oversight Committee (the "OC") as designee of the Liquidation Trustee (the "Liquidation Trust") regarding certain documents and communications requested in **Exhibit B** (the "Document Requests"). In support of the Motion, MercyOne states as follows:

### INTRODUCTION

1.      MercyOne is indisputably a party in interest, and therefore, a party entitled to pursue an appropriate motion for documents and testimony under Federal Rule of Bankruptcy Procedure ("Rule") 2004. At the telephonic hearing with the parties on February 11, 2025, regarding the OC's corresponding motion [Docket No. 1545] (the "OC Motion"), this Court stated that it was open to a Motion from MercyOne. As detailed below, it is vitally important that MercyOne have this opportunity, and MercyOne has at least four independent bases for seeking documents and an appropriate deposition of a person with knowledge under Rule 2004.  Indeed, the following provide the requisite good cause for this Motion:

1

- Should the OC elect to litigate against MercyOne, such litigation will be more efficient and proceed more rapidly if MercyOne has at least a baseline of the information that the OC plans to rely upon in such litigation. Again, the OC identified its need for that critical mass of information from MercyOne as the key basis for the OC Motion and it applies equally to MercyOne.

- Similarly, the documents that MercyOne seeks can help it identify other parties that are rightful sources of litigation. Not only may the documents reveal entities that the OC could pursue directly (aside from MercyOne), but they could also include entities that MercyOne could bring in as Third Party Defendants who could ultimately be a source of funds to pay any successful claims of the OC, as the actual responsible parties. These documents can also assist MercyOne in supporting counterclaims it might bring and defenses it might raise, which are all rightful subjects of Rule 2004 discovery.

- In the OC Motion, the OC sets forth purported "facts" that it represented support possible litigation against MercyOne and thus the need for a Rule 2004 production. However, that narrative was improperly riddled with falsities that has cast MercyOne in a false light to the public. False statements include that MercyOne "dictated" and "controlled" MercyHospital Iowa City ("MIC") between May 2017 and April 2023 and that MercyOne bore responsibility for failures associated with the implementation of a new electronic medical records ("EMR") system.[1] Meanwhile, while citing and relying upon the Declaration of Debtors' Chief Restructuring Officer, Mark Toney ("Mr. Toney") in support of Debtors' First Day Motions [Docket No. 27] (the "Toney Decl."), the OC Motion ignores the reasons Mr. Toney gave then for MIC's failure—NONE of which involved MercyOne.

---

[1] OC Motion at ¶¶1, 17, 19, 31.

Despite MercyOne calling these falsities to the OC's attention in its opposition to the OC's Motion and in conferrals regarding this Motion, the OC has not corrected or withdrawn any of these falsities. If the OC has factual bases for these assertions, it should provide those to MercyOne, and Rule 2004 is the appropriate means to gain such documentation. If not, MercyOne has the right to confirm this. Rule 2004 is the appropriate vehicle for gathering information where a debtor or its successor has engaged in such impropriety.

- The OC advised this Court that a principal reason for its motion is to determine whether litigation against MercyOne is appropriate or necessary. If there were an opportunity for a reasonable resolution of possible claims, that would avoid the need for such litigation. However, for any such discussions to be meaningful and constructive, they must take place on a level playing field. At present, the OC has not provided MercyOne with a single document supporting any claim. Providing MercyOne with a reasonable baseline of production for such purposes, therefore could serve the interests not merely of MercyOne and the OC but of all who have claims against and interests regarding the debtors' estate. This is another appropriate basis for a Rule 2004 Motion.

2.      During the meet and confers and hearings before the Court, the OC has objected to the burden and expense of providing documents to MercyOne. But production here actually would ease burdens and expenses going forward of both parties, either by facilitating possible resolution or making litigation more efficient and targeted at responsible parties. Importantly, the OC has done nothing to either demonstrate or quantify such burdens or expense for which it complains. Obviously, the OC's Motion also is imposing significant burdens and costs on MercyOne. Yet MercyOne has been cooperating, and will continue to cooperate, with the OC as the parties have spent weeks working together to try to appropriately narrow the OC's Rule 2004 requests. By

3

contrast, the OC simply rejected all of MercyOne's Requests and opposes any Rule 2004 discovery by MercyOne.

3.       As set forth in the Proposed Order attached hereto as **Exhibit A**, MercyOne respectfully asks this Court pursuant to Rule 2004 to (i) authorize MercyOne to serve the attached Document Requests upon the OC; (ii) order the OC to produce responsive non-privileged documents and communications sought by those Requests; and (iii) authorize MercyOne to examine in deposition an appropriate designee of the OC with knowledge of the topics set forth in the Requests.

## JURISDICTION AND VENUE

4.       The United States Bankruptcy Court for the Northern District of Iowa (the "Court") has subject matter jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

5.       This Motion constitutes a core proceeding under 28 U.S.C. 157(b)(2)(A).

6.       Venue is proper in this District pursuant to 28 U.S.C. §1409 and pursuant to United States District Court for the Northern District of Iowa Administrative Order No. 07-AO-00016-P.

## BACKGROUND

7.       MercyOne provided certain services to MIC for approximately six years pursuant to a Management and Affiliation Agreement ("Agreement"). That Agreement expressly provided that MercyOne was an independent contractor to MIC.  (*Id*., ¶21). The Agreement made clear that the partes had no agency, partnership or joint venture relationship. (*Id*.). The Agreement was non-exclusive and MIC at all times was free to obtain management services from others. (*Id*., ¶9). MercyOne was never a "statutory insider" as the OC stated in the OC Motion. (OC Motion, ¶4).[2]

---

[2] MercyOne set forth many of these facts in its opposition to the OC's Motion [Docket No.1554], but for convenience and completeness repeats them here.

4896-9420-9327.2

8.      At the time MIC reached out to MercyOne for assistance, MIC had been facing a slow decline in financial performance for more than 15 years, none of which could be blamed on MercyOne. MIC was also facing what it believed was an unwinnable "David versus Goliath" situation in competition with the University of Iowa Hospitals and Clinics ("UIHC"). UIHC had been acquiring key practices of MIC and had already demoted MIC from UIHC's preferred tier/payor provider network.

9.      Moreover, long before MercyOne's engagement, MIC had buildings in need of capital expenditures and a failing EMR system due to years of non-investment due to a lack of available capital and a belief that MIC might be sold and a purchaser would assume these costs.

10.     MercyOne provided to MIC the services of a Chief Executive Officer and, for a limited time, a Chief Financial Officer and Chief Operating Officer. But at all times, and by the express terms of the Agreement, the MIC Board of Directors (the "Board") remained in full and complete control of MIC. Outside of these officers, every person on MIC's senior management team was an employee of MIC.

11.     During the period of the Agreement, MercyOne had certain representation on the Board, but at all times such representation constituted only a minority of the Board. MercyOne never controlled the Board.

12.     The Agreement expressly vested control of MIC in its Board. Throughout the Agreement period, MIC routinely exercised that control and contractual veto power over MercyOne to reject MercyOne's recommendations and kept MercyOne at distance. A critical example of the Board's veto power was its rejection of MercyOne's recommendation that MIC join the CommonSpirit Group Purchasing Organization, as 19 of MercyOne's 20 regional hospitals had, to get better pricing.

13.     Such actions were far from "dictat[ing]" or "control[ling] MIC,"[3] as MercyOne and MIC had a "strategic affiliation agreement" under the Agreement. (Agreement, p.1). Even so, as the OC admitted in the OC Motion, MercyOne merely "agreed to provide administrative, clinical and business SUPPORT to [MIC's] operations." (OC Motion ¶¶14 & 17). This included assisting MIC with replacing its information technology system and providing consultation regarding changes to MIC medical records management. (*Id*., ¶17).

14.     Prior to COVID and the EMR conversion, MIC was showing signs of financial improvement due to MercyOne's assistance. This assistance included bringing in such nationally renowned consulting firms, including Insight Health Partners, Navigant and Vizient, to assist in turning around MIC's financial decline and assist with revenue cycle and operations.

15.     Publicly available information from ProPublica tracks exactly this. Publicly available information from ProPublica shows that MIC posted net income on its 990s in 2018 ($22,411,748), 2019 ($14,681,222), a small loss in 2020 (-$2,665,306) and net income in 2021 ($10,451,448). It then incurred significant losses in 2022 (-$16,816,979) and 2023 (-$28,712,742) contemporaneous with challenges from COVID and the EMR transition.

16.     Thus, the OC's statement in the OC Motion that MIC reported over $100,000,000 in operating losses is simply false. (OC Mot. ¶2). Yet the OC has never corrected its false submission. The OC confuses apples and oranges. MIC's cash reserves went down as its accounts receivable increased; but it did not lose $100,000,000. In other words, MIC's balance sheet was impacted by the EMR conversion—not its income statement.

17.     As MIC's Board well knew, the existing EMR system at MIC had to be replaced to comply with the "meaningful use" requirements of the Affordable Care Act. By postponing that

---

[3] *See* OC Motion ¶¶1, 17, 19, 31.

replacement for so long, the MIC Board was forced to make a rushed decision. MIC retained the services of Vizient, whose professionals had specific expertise in EMR conversions and implementation. With Vizient's expert assistance and guidance, MIC's senior management team then made recommendations to the MIC Board and also advised on factors including the system's expense and the particular needs of a hospital of MIC's size. After this evaluation, MIC's senior management team recommended Altera, f/k/a Allscripts ("Allscripts") as the EMR provider because, among other things, Allscripts provided a cost model that supported MIC by deferring payment for its services and products for the first year. Allscripts also committed to an accelerated 12-month implementation and committed to making MIC a "luminary"—a national showcase for its best solutions. The Board then had sole discretion to decide which option to choose. (Agreement, ¶5). The implementation of the conversion to Allscripts proved to be a disaster, as billing functions were disrupted for several months. But none of this can be blamed on MercyOne, as the OC falsely asserted in its OC Motion. (OC Mot. ¶2). Indeed, at the beginning of the chapter 11 cases and throughout, MIC's attorneys blamed Allscripts for the EMR disaster and used that disaster as a means to drive a negotiated settlement on the assumption/rejection of Altera EMR Agreement and to facilitate the sale of MIC to UIHC. So did Mr. Toney in his Declaration. *See* Toney Decl. ¶ 48 ("Consequently the flawed system caused a precipitous loss of revenue in late 2022 and early 2023, due to delayed patient bill submissions resulting in a substantial backlog of accounts receivable payments that could not be collected promptly.").

18.    While bearing no responsibility for the disaster, MercyOne went above and beyond any duty in trying to remedy the problem. MercyOne engaged local MercyOne revenue cycle consultants at no cost to MIC to assist MIC in catching up after nearly four months of delayed

4896-9420-9327.2

billings due to the EMR conversion disruption. With MercyOne's help, cash collections returned to baseline after the EMR system was fully functioning.

19.    MercyOne also voluntarily cut its management fee in half in an effort to lessen negative cash flow. By contrast, the other professionals hired by the MIC Board charged capital market rates.

20.    The MIC Board—not MercyOne—then decided to sell MIC and hired H2C Securities, Inc. ("H2C") to market the organization and find a buyer. The OC misleads about this in its OC Motion, asserting that MercyOne "oversaw the Debtors' failed request for proposal process in 2021." (OC Mot. ¶15).

21.    The combination of MIC being sold and its operational challenges led to an exodus of staff. This accelerated once UIHC received a Certificate of Need ("CON") to build a hospital in North Liberty, Iowa. Because of the dire risk that this new hospital posed to MIC, MercyOne worked tirelessly to oppose the CON, and was successful in that opposition on the initial application.  However, UIHC filed a revised application, against which MercyOne again led opposition, but ultimately did not succeed as UIHC's second application was approved.

22.    H2C—without MercyOne—negotiated with UIHC. During these negotiations, the possibility of UIHC making a stalking horse bid in a bankruptcy arose. The MIC Board—not MercyOne—then hired McDermott Will & Emery ("MWE") and ToneyKorf to assist.

23.    MercyOne strenuously advised MIC not to use bankruptcy as a means to sell the organization but was overruled. MercyOne specifically told the Board its fears about the impact a bankruptcy would have on pensioners, but such warning fell on deaf ears. As noted in MercyOne's opposition to the OC Motion, this made it especially unjust and outrageous for the OC to note that

8

pensioners called for suit against MercyOne (OC Mot., ¶16), when these pensioners only know what MIC's professionals and the media told them.

24.     MercyOne also made vigorous efforts to demonstrate to UIHC that there was enough money in MIC's coffers to make all stakeholders whole and to persuade UIHC to pursue alternatives to bankruptcy that were cheaper, faster, easier and would protect pensioners. But UIHC could not be swayed.

25.     The MIC Board Chair asked MercyOne to stay in a relationship with MIC (hardly the move of someone who believed MIC was the cause of MIC's troubles). However, because MercyOne's recommendations had been disregarded, and because MercyOne disagreed with choices recommended by consultants to the Board, and because the Board had excluded MercyOne from information and meetings—including with potential buyers—MercyOne declined.

26.     On March 16, 2023, Moody's Investor Services downgraded MIC's revenue bonds to Caa1 from B1, blaming MIC's new billing system and slow recovery of patient volumes from COVID. Notably, Moody's did not blame MercyOne or anything in MercyOne's control. In fact, Moody's at the time warned that there could be a further downgrading were there "discontinuation of the relationship with MercyOne before a new partner or affiliation is established."[4]

27.     While the OC touted the reliability of Mr. Toney's Declaration in the OC Motion, which was made under penalty of perjury, Mr. Toney blamed MIC's failure on COVID, challenges faced nationwide by community and rural hospitals, and actions by Preston Hollow ("PH") on behalf of bondholders, including bringing a state court receivership action, but not on anything for which MercyOne was responsible:

---

[4] A copy of the Moody's Report is attached as **Exhibit 1** to MercyOne's opposition [Docket No. 1554].

4896-9420-9327.2

- "The financial difficulties facing Mercy Hospital—and virtually every community and rural hospital in the nation—are neither novel nor surprising," including that "the model of providing healthcare has changed significantly over recent years due to, among other things improvements in treatments, an increased dependency on technology, a transition to outpatient centers, and an increased focus of providers in specialty areas." (Toney Decl., ¶4).

- "[I]n the wake of a global pandemic, the operating costs at Mercy Hospital soared while patient volume and reimbursement rates remained stagnant or declined." (*Id.*, ¶4).

- The behavior of PH, which began restructuring discussions with MIC in February 2023, by early June 2023, "abruptly changed" and PH "suddenly demanded that the experienced senior management team be replaced only two months after it took over to stabilize operations" and PH "would not provide any financial support to Mercy Hospital . . . unless they immediately replaced the senior management team." (*Id.*, ¶7).

- That PH "on Monday, July 24, 2023, without warning, filed a notice of acceleration and initiated a receivership action in Iowa state court." (*Id.*, ¶8).

- This Receivership Action precipitated "[c]oncerns about Mercy Hospital's continuing existence, and the impact of a potential receivership on family livelihoods, resulted in employee resignations, patient cancellations, canceled job interviews and delayed new employee start dates, and ultimately impacted Mercy Hospital's ability to serve its patients" adding that "[i]t is uncontroverted that the careless and callous actions taken by [PH] jeopardized the health and well-being of Mercy Hospital's patients, the viability of Mercy Hospital's future and damaged the organization's reputation[.]" (*Id.*, ¶9) (emphasis added).

- In the Declaration's section entitled "EVENTS LEADING UP TO THE CHAPTER 11 CASES," the first cause Mr. Toney listed was the "COVID-19 Pandemic," (*id*., ¶¶44-46), noting this "severely impacted (and continues to impact) the Debtors' operations, liquidity, and cash flows." He also noted "the effects of the pandemic, and the after-effect of sharp inflationary pressures, caused an increase in operating expenses, driven primarily by an increasing need for the use of staffing agencies to address an increased shortage of local clinical staffing" while, "at the same time, Mercy Hospital's volume decreased, driven primarily by a decline in more profitable clinical encounters, such as elective surgeries." (*Id*., ¶44).

- The second "event" Mr. Toney listed was the "Failed Implementation of Electronic Medical Records Upgrade." (*Id*., ¶¶47-48). As Mr. Toney swore: "The EMR implementation, which went live in March 2022, immediately created significant operational problems. These included difficulties in coding, billing and collecting for patient encounters, an inability to submit regulatory reports on time and misconfigured workflows. Consequently, the flawed system caused a precipitous loss of revenue in late 2022 and early 2023, due to delayed patient bill submissions resulting in a substantial backlog of accounts receivable payments that could not be collected promptly. The Debtors' accounts receivable ballooned by more than 40% during this period despite lower year-over-year net patient revenues. As a result, the Debtors' financial liquidity was severely affected during the latter half of 2022 and the first quarter of 2023." (*Id.*, ¶48).

- Mr. Toney also noted the fallout from PH's Receivership Action caused an immediate "onslaught of negative press and other impacts. . . . that hastened the initiation of these Chapter 11 cases." (*Id*., ¶¶67-69).

- Mr. Toney's only mention of MercyOne was to note it was the source of the senior management team that was leading MIC's cash flow and performance improvement plan at the time, that PH insisted that MIC terminate its Management Agreement with MercyOne and instead put in new management suitable to PH. (*Id*., ¶¶54-61).

28.     Notably, MR. TONEY DID NOT QUESTION THE QUALITY OF MERCYONE'S SERVICES OR IDENTIFY MERCYONE AS A CAUSE FOR MIC'S FAILURE IN HIS FIRST DAY DECLARATION. Rather, Mr. Toney's Declaration is fully consistent with the facts MercyOne describes herein.

29.     In fact, MWE and ToneyKorf had months to investigate possible claims against MercyOne before the MIC bankruptcy. They then had approximately a year and a half during the bankruptcy to investigate. They did not identify anything, nor was MercyOne advised of any. Nonetheless, while PH, which <u>was</u> identified as a cause of the bankruptcy, was given a release, the Debtors and their professionals made a point of singling out MercyOne in the plan as the only named entity not being released.  The OC in the OC Motion and elsewhere have now insinuated that MercyOne bears blame for MIC's failure.

30.     The OC has had nearly 10 months to pursue its own investigation, yet still the OC has not provided a single document or stated a single fact that supports any purported claim against MercyOne. It will now soon receive documents from MercyOne, pursuant to the OC Motion, as modified by the parties' agreement.

31.     For the reasons set forth herein, MercyOne also has a right to documents and testimony under Rule 2004.

32.     MercyOne has met its meet and confer obligations. On February 21, 2025, MercyOne sent its draft proposed document requests to OC counsel of record. (*See* email from D.

Goroff to R. Leaf *et al.* dated Feb. 21, 2025, attached as **Exhibit C**). On March 4, 2025, Mr. Roy

Leaf, one of the OC's attorneys, challenged whether MercyOne had any right to a seek information

and documents pursuant to Rule 2004. (*See* email and letter from R. Leaf *et al.* to D. Goroff dated

March 4, 2025, attached as **Exhibit D**). Mr. Goroff responded with the grounds that supported

MercyOne's Rule 2004 exam. (*See* email and letter from D. Goroff to R. Leaf *et al*. dated Mar. 6,

2025, attached as **Exhibit E**). The parties then had two extensive Zoom conferral sessions on

March 10 and March 13, 2025, wherein counsel for MercyOne explained its bases under Rule

2004 for each individual Request. However, after this, the OC refused to agree to ***any*** Request or

any pursuit by MercyOne under Rule 2004. (*See* email and letter from R. Leaf to D. Goroff dated

March 19, 2025, attached as **Exhibit F**).

**RELIEF REQUESTED**

33.     Pursuant to Rule 2004, MercyOne requests entry of an order, substantially in the

form attached hereto as **Exhibit A**: (i) authorizing counsel for MercyOne to serve the OC with the

Document Request attached hereto as **Exhibit B**; (ii) directing the OC to produce responsive, non-

privileged documents requested in the Document Requests within 60 days of the Court's order and

(iii) authorizing counsel for MercyOne to serve a notice for a Federal Rule 30(b)(6), made

applicable by Bankruptcy Rule 7030, deposition to the OC on matters related to those raised in the

Document Requests, including its contractual relationship with MercyOne and the circumstances

that led to its failure.

**BASES FOR RELIEF REQUESTED**

A.     **Rule 2004 Entitles MercyOne To The Discovery It Seeks**

34.     As the OC admits, Rule 2004 authorizes discovery of any entity by motion of any

party in interest. (OC Mot. ¶25). Rule 2004 states that "[o]n motion of any party in interest, the

court may order examination of any entity." Fed. R. Bankr. P. 2004(a). The OC admits that MercyOne is a party in interest. *See* Ex. F (March 19 Letter, admitting MercyOne is a creditor).

35.      Indeed, courts have widely recognized that **anyone** "whose pecuniary interest is directly affected by the bankruptcy" is a party in interest. *In re Martino*, 2011 WL 5856327, at *2 (D. Colo. Nov. 17, 2011); *see also In re Pantazelos*, 2016 WL 2342905, at *2 (Bankr. N.D. Ill. Apr. 29, 2016). (noting any pecuniary interest that could be affected by a bankruptcy proceeding gives rise to right to pursue Rule 2004 discovery). This of course includes creditors, as MercyOne is. *Martino*, 2011 WL 5856327, at *2.  But it is not limited to creditors.  It additionally includes, *inter alia*, those who may pursue suits on behalf of the estate, *id.* (bank could investigate possible claims that could be brought on behalf of the estate); shareholders, *see Matter of M4 Enters., Inc.*, 190 B.R. 471, 474 (Bankr. N.D. Ga. 1994); those asserting improprieties in a bankruptcy, *id.*; and bidders for assets, *In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989) (bidder on assets of a corporation in bankruptcy as a party in interest for purposes of Rule 2004).

The OC also admits that courts have "[c]onsistently recognized the extremely broad scope of Bankruptcy Rule 2004, which authorizes discovery on a far broader basis than that permitted by the Federal rules of Civil Procedure." (OC Mot. ¶26) (citing authority). The OC admits that this is often analogized to a "fishing expedition." (*Id.*, ¶27) (citing authority); *see also In re 3 Kings Constr. Residential LLC*, 2024 WL 2264338, at *2.  (Bankr. N.D. Ga. May 17, 2024) (stating that "the scope of a Rule 2004 examination or request for production is 'very broad and great latitude of inquiry is ordinarily permitted" and also noting that Rule is "necessarily broad" to serve the purposes of, *inter alia*, "examining transactions" and "determining whether wrongdoing has occurred."). Rule 2004 contemplates a broad and far-reaching inquiry into the debtor's affairs. *See In re GHR Energy Corp.,* 33 B.R. 451, 453 (Bankr. D. Mass.1983).

37.     The OC further admits that Rule 2004 allows a Court to "order the examination of any entity relating to the acts, conduct, liabilities or financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate…." (OC Mot. ¶28) (citing authority).

38.     "Any entity" means that Rule 2004 may be used to obtain discovery from the debtor itself (or its successors). *See, e.g., In re Antonini,* 2012 WL 112978, at *12 (Bankr. S.D. Fla. Jan 12, 2012) (Rule 2004 "permits a creditor or any party in interest to investigate the acts, conduct and financial affairs of a debtor."); *In re Hoffman*, 2025 WL 108250, at *4 (D. Kan. Jan. 24, 2025) ("Under [Rule 2004] the Court may order the examination of any entity and may order a debtor to be examined at any designated time or place 'for cause shown and on terms as it may impose[;]'" and permitting the examination of a debtor by a creditor to determine the existence and amount of debt owed to that creditor); *In re Lang*, 107 B.R. 130, 132 (Bankr. N.D. Ohio 1989) (noting debtor had been examined in a Rule 2004 process prior to the filing of an adversary proceeding).

39.     The right to use Rule 2004 for pre-litigation investigation ends once an adversary proceeding is filed. *See Matter of M4*, 190 B.R. at 475; *In re 3 Kings*, 2024 WL 2264338, at *3; *Martino*, 190 B.R. at 475. Here, no adversary proceeding has been filed.

40.     Courts have specifically upheld the use of Rule 2004 for purposes that MercyOne raises here:

41.     <u>*Pre-Litigation Investigation*</u>. "One of the primary purposes of a Rule 2004 examination is as a pre-litigation device." *Martino*, 2011 WL 5856327 at *2 (citing *In re Washington Mut., Inc.*, 408 B.R. 45, 53 (Bankr. D. Del. 2009), in turn, citing *In re Table Talk, Inc.*, 51 B.R. 143, 145 (Bankr. D. Mass. 1985)). As the Court stated in *In re Wilson*, 413 B.R. 330, 336 (Bankr. E.D. La. 2009):

> Bankruptcy Rule 2004 is a pre-litigation discovery device unique to bankruptcy proceedings. It allows for the discovery of evidence and examination of parties before an adversary proceeding has been initiated. For example, a creditor may use a Rule 2004 examination to investigate the financial affairs of a debtor in order to discover estate assets and identify fraudulent conduct.

42.     Just like the OC is attempting to learn about the potential claims, if any, it may have against MercyOne before it initiates an adversary proceeding or other suit (and MercyOne strenuously denies that it has any claim), MercyOne has the right to learn, not only of what documents the OC might have to support a claim, but also whether the documents show that the OC relies on incorrect information or assertions and whether MercyOne has possible counterclaims, including, for example, for corporate disparagement, defenses, or third party claims, including possibly against PH, MWE, H2C, ToneyKorf, UIHC, Allscripts and others.

43.     _Administration of Estate_. As the OC admits and courts have held, matters potentially affecting the administration of the estate are proper areas for Rule 2004 investigation. _See, e.g., In re Brooke Corp._, 2013 WL 3948866, at \*2 (Bankr. D. Kan. July 29, 2013). Here, if there is to be litigation, having MercyOne at a large information disadvantage at the outset, besides being unfair, would delay any litigation, as MercyOne would begin its investigation of the OC's claims from ground zero, while the OC will have received discovery from MercyOne on more than 40 topics. Here, again, it also makes sense to allow MercyOne the opportunity to investigate counterclaims it may have against the debtors' estate and affirmative defenses as well as claims against third parties. Even if certain of these parties may have been released by the Debtors, such claims have not been released by MercyOne, and therefore, would likely become part of any suit, causing the currently requested discovery to thereby increase the efficiency and value of any potential litigation.

4896-9420-9327.2

44.    _Settlement Possibility_. Courts have recognized that Rule 2004 may be used to assess the possibility of settlement. _Cf. In re Gaddy_, 622 B.R. 440, 449 & n.3 (Bankr. S.D. Ala. 2020) (noting that creditor could have conducted Rule 2004 examination of debtor to evaluate possible settlement proposal but had not done so). Here, the OC Motion represents that the purpose of its 2004 examination is to consider whether it makes sense to pursue suit against MercyOne. Any proper assessment of that question would likely also assess whether there is a reasonable opportunity for settlement or other resolution. Absent the requested information, MercyOne will be unable to properly assess its risks and also would be at an information disadvantage against the OC. Allowing MercyOne Rule 2004 discovery, might also allow it to identify flaws in the OC's position, which might also discipline the OC from making unproductive or outlandish demands, making a potential settlement more likely. With the OC advising the Court that it must file claims against MercyOne by the deadline of August 7, 2025, it is especially important that MercyOne promptly obtain the documents and information it seeks in this Motion.

45.    _Potential Impropriety_. Courts have recognized that Rule 2004 is a proper vehicle for assessing whether those who act for an estate have engaged in improper conduct. For instance, in _Matter of M4_, the Court permitted a sole shareholder to take discovery of the Chapter 7 Trustee on issues relating to a conditional settlement of controversies with creditors where that shareholder believed that the bankruptcy trustee engaged in bankruptcy partisanship to the detriment of the estate itself. 190 B.R. at 476. The Court held that the shareholder had a right to question the Trustee on the value of the claims he proposed to release as well as how this would benefit the estate. The Court noted that the shareholder had raised an issue of potential impropriety if the bankruptcy trustee had shown partisanship. _Id_. The Court held that to completely forbid such a Rule 2004 exam "would substantially contravene the policy behind the Rule and compromise bankruptcy's

general predilection for open-aired examination." *Id.* at 474 (collecting authority). So here, the OC acknowledges in the OC Motion that MercyOne believes it has been scapegoated. (OC Mot. ¶37). Indeed. The OC has made false assertions, as noted that (1) MercyOne dictated or controlled MIC from 2017-23 (*id.* ¶¶1, 19, 31); (2) MercyOne bears responsibility for the EMR failures (OC Mot. ¶¶1, 2, 17); (3) MercyOne caused losses of operating income (*id.* ¶2); (4) MercyOne bears responsibility for the decision to pursue bankruptcy (*id.*, ¶16); and (5) MercyOne "oversaw" the MIC's failed request for proposal process in 2021. (*id.*, ¶15). None of this is true, but, as the OC notes, such accusations have inflamed the public against MercyOne, with "employees…asking at townhall meetings if we would be pursing [sic] claims against MercyOne." (*id.*, ¶16). MercyOne has the right to investigate whether the OC has any factual basis for these claims or whether the debtors before it did. If not, MercyOne likely has counterclaims and other relief it may seek and has a right to determine this. Moreover, the OC continues the smear campaign Debtors waged pre-confirmation to this day.

46.     Based on the foregoing, MercyOne respectfully submits that good cause exists for this Court to grant this Motion.

## NOTICE

47.     MercyOne submits that, in light of the nature of the relief requested, no other or further notice need be given beyond notice to the registered CM/ECF users for this matter, which includes counsel for the OC. MercyOne has therefore provided adequate notice of this Motion under the applicable rules.

## NO PRIOR REQUEST FOR RELIEF

48.     No previous request for the relief sough has been made by MercyOne to this or any other Court.

4896-9420-9327.2

## **CONCLUSION**

49.      MercyOne respectfully requests entry of an order, substantially in the form attached

hereto as **Exhibit A**, (i) authorizing counsel for MercyOne to direct Document Requests, attached

hereto as **Exhibit B**, to the OC for the production of documents and communications; (ii) directing

the OC to produce responsive, non-privileged documents requested in the Document Requests

within 60 days from entry of the order; (iii) authorizing MercyOne to issue a notice to the OC for

a Federal Rule 30(b)(6) deposition on matters related to those raised in the Document Requests;

and (iv) granting further relief that the Court deems just and proper.

*[The remainder of this page is intentionally left blank]*

4896-9420-9327.2

Dated: March 28, 2025                    Respectfully submitted,

*/s/ Christopher J. Jessen*
Michael R. Reck
Christopher J. Jessen
**BELIN McCORMICK, P.C.**
666 Walnut Street, Suite 2000
Des Moines, Iowa 50309
Tel: (515) 243-7100
Fax: (515) 558-0675
mrreck@belinmccormick.com
cjessen@belinmccormick.com

*/s/ David B. Goroff*
Edward J. Green (*Pro Hac Vice*)
David B. Goroff (*Pro Hac Vice*)
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
egreen@foley.com
dgoroff@foley.com

Jake W. Gordon (*Pro Hac Vice*)
**FOLEY & LARDNER LLP**
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Tel: (248) 943-6484
jake.gordon@foley.com

*Counsel to Mercy Health Network, Inc., d/b/a
MercyOne*

## CERTIFICATE OF COUNSEL

The undersigned certifies, under penalty of perjury, that on this March 28, 2025, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.


_/s/ David B. Goroff_
David B. Goroff

4896-9420-9327.2