## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, | ) | Case No. 23-00623 (TJC) |
| IOWA, *et al.* | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**MERCY HEALTH NETWORK INC.'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER REQUIRING THE OC TO PRODUCE RECORDS AND SUBMIT TO EXAMINATION PURSUANT TO BANKRUPTCY RULE 2004**

Mercy Health Network Inc., d/b/a MercyOne ("MercyOne"), by its attorneys, Foley & Lardner LLP and Belin McCormick, respectfully submits this reply (the "Reply") in support of its *Motion for Entry of an Order Requiring the OC to Produce Records and Submit to Examination Pursuant to Bankruptcy Rule 2004* [Dkt No. 1858] (the "Motion" or "Mot.") and in response to the OC's resistance and objection to the Motion [Dkt No. 1869] (the "Resistance").[1]  In support of this Reply, MercyOne respectfully states as follows:

### INTRODUCTION

1.     The OC's Resistance disregards and cannot overcome the facts and law showing that MercyOne is acting in good faith and has at least four independent bases for seeking the requested documents and testimony. Indeed, the OC's own authority confirms that it is a proper use of Rule 2004 to allow a movant, such as MercyOne, to explore possible claims that a debtor or trustee may raise against it[2] and to explore conduct of the debtors in bankruptcy.[3]

---

[1] Capitalized terms used but not defined herein shall have the same meanings as defined in the Motion.

[2] *See In re Drexel, Burnham, Lambert Grp., Inc*., 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991) (cited Resistance ¶27), discussed below.

[3] *See In re Symi*ngton, 209 B.R. 678 (Bankr. D. Md. 1997) (D. Mass. 1997) (cited Resistance, ¶27), discussed below.

2.       While MercyOne amply demonstrates good cause for its Rule 2004 Motion, the OC has refused to provide a single document. The OC's Resistance disingenuously tries to hide that fact, stating that the OC did not object to producing documents, but would not do so "absent MercyOne's threshold identification of a proper legal basis for production within the scope of Rule 2004." (Resistance, ¶36).  As Exhibits C-F to its Motion show, MercyOne amply met that threshold and spent hours conferring with OC counsel to no avail. Deciding it was judge and jury, the OC unilaterally decided that MercyOne had no proper legal basis to receive even one document.

**MercyOne Has Demonstrated Good Cause For A Rule 2004 Examination**

3.       The four independent bases that MercyOne identifies for seeking a Rule 2004 examination each satisfies the "good cause" requirement. These are:

**A.       Administrative Efficiency And Fairness**: The OC cannot dispute that it presently possesses substantial relevant documents of MIC that MercyOne does not have and that it might rely upon to file suit. The OC has all of Debtors' records and has spent months investigating claims against MercyOne, even before it served its Rule 2004 motion. It succeeded to the work the Debtors and their counsel did in more than one year before that. The OC stands to receive MercyOne's documents in the coming weeks. The OC therefore already has a substantial information advantage. Any litigation will move faster and more efficiently if MercyOne correspondingly receives a baseline of information from the OC concerning its potential claims, so MercyOne has the ability to begin assessing its potential counterclaims, defenses and third-party claims.

**B.       Identifying Additional Sources Of Recovery And Defenses/Counterclaims**: Documents possessed by the OC concerning the role that various third parties played in MIC's failure are crucial for potential third-party claims that MercyOne may bring should the OC sue it. The OC cannot dispute that, should it sue MercyOne, MercyOne has the right to implead such

2

third parties as defendants, and those third-party defendants could be additional sources of litigation recoveries. The OC argues erroneously that because *the Debtors* have released certain third parties, such as PH and UIHC, Rule 2004 discovery would be a "colossal waste of time and money[.]" (Resistance, ¶ 31). This forgets that MercyOne has not released ANY of these third parties. The OC/Debtors' releases do not release independent claims *that MercyOne might have* against those parties or preclude MercyOne from bringing third-party claims against them. Nor can the OC dispute that documents regarding these third parties' activities would assist MercyOne with its defenses and counterclaims against any claims that the OC might raise against it.

C.      **Confirming If Debtors And The OC Have Improperly Portrayed MercyOne In A False Light**: The OC's own authority holds that a proper purpose of Rule 2004 is to obtain information about potentially improper conduct in the bankruptcy by Debtors or their representatives or successors.[4] Here, MercyOne has identified multiple false statements made by Debtors in the bankruptcy and by the OC in its own Rule 2004 motion. The OC should not be allowed to withhold documents which evidence a possible smear campaign[5] and which therefore show the need for the OC to correct the record through appropriate retraction of misstatements. Such documents would also support potential counterclaims by MercyOne, such as for corporate disparagement, and defenses, such as unclean hands or estoppel.

D.      **Facilitating Settlement Discussions**: Having a baseline of the documents that the OC believes support claims against MercyOne would also facilitate possible pre-litigation settlement discussions, which would avoid litigation costs for the Estates (and potential

---

[4] *See In re Symi*ngton, 209 B.R. 678 (Bankr. D. Md. 1997) (D. Mass. 1997) (cited Resistance, ¶27), discussed below.

[5] Having publicly tarnished MercyOne through its outrageous false statements in its own Rule 2004 Motion and elsewhere, the OC cynically labels MercyOne's efforts to correct the record as a "public relations campaign for MercyOne." (Resistance, ¶7). The OC's opposition to MercyOne's Motion is entirely based on the incorrect premise that MercyOne should not be able to do anything to defend itself as the OC prepares to sue it.

counterclaim risk) and thus benefit to all creditors and claimants. If the parties can settle, it would conserve the resources, time and expense the OC would otherwise have to spend litigating. It would also recoup any settlement amount for the estate, enabling faster payment on claims.

After demanding documents from MercyOne that the OC plainly possessed, the OC then incorrectly argues that MercyOne "should already have access to the bulk of the information requested" in its Motion. (Resistance, ¶ 6). The OC forgets, *inter alia*, that MercyOne was excluded from closed sessions of MIC Board meetings and was uninvolved in most activities of the vast a majority of MIC's senior officers—who were MIC and not MercyOne employees. MercyOne also was not involved in H2C's sale process, or in discussions with PH about ousting MercyOne or in discussions with UIHC about its stalking horse bid, among many other relevant topics as to which it rightfully seeks documents and information.

## The OC Admits A Failure To Investigate Possible Claims Against MercyOne, While Failing To Show Any Undue Burden In MercyOne's Request

4.      The OC submits the Declaration of Monica Schultz, a Nyemaster paralegal, who admits that presently all documents from MIC are offline and inaccessible to OC counsel. [Dkt No.1869-1] (the "Schultz Decl.," ¶¶6, 12). This is shocking, as the OC previously advised that it has spent months evaluating whether it has claims against MercyOne[6] and apparently caused MercyOne to agree to make onerous production before it had even analyzed whether the MIC documents it already possesses sufficed for any decision about a potential cause of action.

5.      Ms. Schultz's Declaration rests on the false premise that the OC would need counsel to hand review every document pulled from its large database. (Schultz Decl. ¶¶7-8). Rather, MercyOne would expect any production by the OC to follow the same agreed rules that apply to

---

[6] *See* Trust Oversight Committee's Motion for Entry of Order Requiring MercyOne to Produce Records and Submit to Examination Pursuant to Bankruptcy Rule 2004 (the "OC Rule 2004 Motion") (Dkt No. 1545, ¶3).

the production it asks MercyOne to make, including on limiting searches to an agreed number of

custodians, using search terms, and excluding from production emails and communications with

MercyOne's domain names. Ms. Schultz's estimate that 20 custodians might need to be searched

is pulled from thin air. MercyOne and the OC have had no opportunity to discuss (much less agree)

on search methodology, given the OC's flat-out refusal to produce even one document.

6.      Ms. Schultz also suggests that reviewing for privilege and relevance necessitates

laborious review. (Schultz Decl. ¶¶7, 10-12). Despite her expertise, Ms. Schultz appears unaware

that AI can simplify and expedite privilege and subject matter review, as can a simple search for

attorney and firm names in the case of privilege and key words for subject matter. This need not

all be done by hand.

7.      Ms. Schultz also speculates on the number of documents that would be hit if the

OC ran MercyOne's searches. (Schultz Decl., ¶12). Her 500,000 "estimate" lacks any empirical

foundation, and she offers none. Ms. Schultz never worked at MIC, did not actually run any

searches, and appears not to know the contents of MIC's documents or how many documents

would be deemed responsive to MercyOne's various requests.

8.      In fact, as the OC asked MercyOne to produce documents on a larger and wider-

ranging group of topics, as well as to produce witnesses for three depositions, including a corporate

representative deposition that seeks testimony on 37 topics and tens of additional subtopics, it is

unpersuasive for the OC to now claim it should be shielded because of the lesser burden it would

bear to make production of its own to MercyOne, its target. It is particularly important that

MercyOne have access to the OC's documents it seeks when the OC's subpoena for that corporate

representative deposition lists the H2C request for proposal process and proposals from the State

University of Iowa to merge with or buy MIC among desired topics.

**ARGUMENT**

**I.     The OC's Own Authority Supports MercyOne's Right To A Rule 2004 Examination**

9.      The OC cites *Drexel*, 123 B.R. at 712 (cited Resistance, ¶27), which held that FDIC/RTC as receivers for institutions holding claims *against the debtor* were entitled to obtain through Rule 2004 documents obtained by the creditors committee in its own Rule 2004 examinations, even though FDIC could use these documents to bolster its own claims, holding:

> It is also no defense that FDIC/RTC might use the 2004 examination to bolster its claims. FDIC/RTC's claims may well have an effect on the administration of the estate. It is not the debtors' or committees' function to prevent discovery of a claim, but rather one of their functions as fiduciaries is to see that substantial justice is provided to all estate claimants

*Id*. at 712. Thus, the OC's own authority disproves its contention that use of Rule 2004 for pre-litigation discovery "is limited to determining whether there are grounds to bring an objection to discharge or determine whether claims beneficial for the estate exist." (Resistance, ¶27).[7] Here, "substantial justice" to MercyOne requires that it be placed on a more level playing field regarding information potentially relevant to claim against it, as well as its affirmative defenses, counterclaims and third-party claims.

10.     *Drexel* also cited *In re Larkham*, 24 B.R. 70 (Bankr. D. Vt. 1982),[8] which is directly on point. There, the court held that the fact that a creditor's examination of debtors is for the purpose of securing information regarding prosecution of suits by trustee is no ground to render that 2004 examination objectionable, stating:

---

[7] The other cases the OC cites also do not support these constraints on Rule 2004. Rather, these either merely provide illustrative examples, *see id.*, citing *In re Roman Cath. Church of Diocese of Gallup*, 513 B.R. 761, 764 (Bankr. D.N.M. 2014) (giving examples of uses of Rule 2004 by the debtor, trustee or creditors' committee), or do not address the point at all. *See also id., citing In re Welch*, 2015 WL 65307 (B.A.P. 9th Cir. Jan. 5, 2015) (creditor failed to timely request Rule 2004 exam and admitted having no excuse for this and relied on "pure speculation" to suggest it might be able to show assets hidden by debtor if examination were allowed).

[8] Cited in *Drexel*, 123 B.R. at 710.

> *The Debtors seem to be unduly concerned over the fact that the claims that they are asserting are against the banks who, as secured creditors, seek to examine, as they allege, for their own benefit in defending against these claims. This is no ground for foreclosing the examination.* The fact that the examination is for the purpose of securing information regarding the prosecution of suits by the trustee (a debtor under Chapter 11 is in the same position as a trustee), will not render the inquiry objectionable.

*Id*. at 72 (emphasis added). *Larkham*, in turn, cited *Colliers on Bankruptcy* and five additional cases dating back now nearly 90 years which support this principle. *See also In re Isis Foods*, 33 B.R. 45, 46 n.2 (Bankr. W.D. Mo. 1983) (citing same principle).

11.     So, too, another case relied on by the OC, *In re Good Hope Refineries, Inc*., 9 B.R. 421, 423 (Bankr. D. Mass. 1981) (cited Resistance, ¶28), strongly supports MercyOne's Motion, as it describes the need for parties to have a level playing field and counsels against giving a post-confirmation debtor an advantage in litigation. As the court stated:

> [Rule 205, the predecessor to Rule 2004] is not intended to give the rehabilitated debtor post confirmation a strategic advantage in fishing for potential private litigation. Our basic concept of fair play expressed in the constitutional legalese of equal protection and due process should require all litigants to use the same discovery and procedural rules when not directly engaged in those activities that call for the bankruptcy umbrella, namely, that collection of activities characterized as the administration of the estate.

*Id*.[9]

12.     Likewise, *Symington*, 209 B.R. 678 (cited in Resistance, ¶27), holds that one purpose of Rule 2004 is to permit threshold inquiry into the "conduct of debtors' bankruptcy."[10]

---

[9] The OC attempts to distinguish the facts of *In re Wilson*, 413 B.R. 330, 336 (Bankr. E.D. La. 2009) (cited in MercyOne Mot., ¶¶39, 41 & Resistance, ¶26), but not its recognition that creditors may use Rule 2004 as a "prelitigation discovery device" to explore, for example, a debtor's financial condition.

[10] The OC miscites *Symington* as holding that Rule 2004 does not provide a mechanism for reciprocal discovery. (Resistance, ¶27). Rather, *Symington* states that where one party has been granted the right to take a Rule 2004 examination, "the authorization to conduct prelitigation discovery under Rule 2004 belongs exclusively to the movant. The examinee has no reciprocal right to make a discovery demand upon the movant." *Id*. at 685. In other words, an

Here, such conduct includes the false accusations made throughout the bankruptcy against MercyOne, which continued into the OC's briefing on the Rule 2004 process.

13.     There, the law plainly supports MercyOne's right to a Rule 2004 examination and discovery of the OC.

## II.   The OC's Attacks On MercyOne's Independent Reasons Why It Has Good Cause For Rule 2004 Examination Each Fail

### A.   Administrative Efficiency And Fairness

14.     The OC "agrees that Rule 2004 permits discovery of matters potentially affecting the administration of the estate," (Resistance, ¶33), but then quarrels over whether making litigation faster or less expensive goes to estate administration. It does—MercyOne has noted how the Rule 2004 information it seeks would enable the case to move faster and would potentially enhance distributions and recoveries for creditors.

15.     As noted, any litigation the OC may bring would move faster and be more efficient if MercyOne does not have to wait until after a case is filed to first see any of the OC's records. This serves the OC's interests and those of MercyOne and all creditors, claimants and interested parties. By contrast, if the OC can keep MercyOne from seeing documents until after it sues,[11] this will also delay by months its ability to implead third party defendants who might be sources of additional estate recoveries, by, for example, participating in a global settlement. Thus, contrary to the OC's argument, *In re Martino*, 2011 WL 58556327 (Bankr. D. Colo. Nov. 17, 2011) (cited Mot., ¶36 & Resistance, ¶26), is directly on point.[12]

---

examinee that has not had its own Rule 2004 motion granted has no right to obtain discovery from the examining party. It does not mean that an examinee may not itself move for and receive the right to pursue Rule 2004 discovery.

[11] Moreover, as the Court knows, even after a suit begins it sometimes takes months before parties can exchange documents.

[12] The OC claims that MercyOne includes an incorrect cite for *Martino*. MercyOne includes the correct cite in Paragraphs 35 and 41 of its Motion but its cite in paragraph 39 is erroneous. (Mot., ¶¶35, 39, 41). MercyOne apologizes for that oversight.

16.     The OC also ignores that two purposes of its investigation of claims against MercyOne should be to assess whether the OC has factual justification for such claims and whether bringing them makes economic sense in light of MercyOne's possible defenses and counterclaims. MercyOne's Motion directly serves that interest by enabling MercyOne to receive documents and information which will help it demonstrate the existence of defenses and counterclaims to the OC, potentially before the OC brings any suit.

17.     The OC also ignores that, by helping MercyOne demonstrate the claims it may bring against third parties if the OC sues, MercyOne can identify entities who can help fund any possible settlement with the OC and thus provide funds to pay creditors.  Third-party defendants regularly participate in discussions about globally resolving claims.

18.     Also, while the OC treats MercyOne's interests in not bearing the cost of losses caused by others as an illegitimate concern, MercyOne's right to be compensated fairly by third parties who are the real culprits of losses promotes the interest of "substantial justice" for potential litigants recognized by *Drexel* as a basis for Rule 2004 examinations.

19.     The OC cites *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614 (Bankr. D. Del. 2016), to note that a trustee may use Rule 2004 to investigate claims and recognizes that this goes to the question of estate administration. (Resistance, ¶¶33-34). *Drexel*, *Larkham* and other cases cited above do show this purpose is also served by allowing putative defendants to investigate their interests in litigation.

20.     Finally, while an affirmative answer seems self-evident, the OC erroneously disputes whether the potential for more efficient litigation impacts estate administration. (Resistance ¶¶22, n.2, 29). The OC mistakenly cites *In re Enron*, 281 B.R. 836, 843 (S.D.N.Y. 2002), to argue it does not. Rather, the *Enron* bankruptcy court held that the lead plaintiff in an

existing securities suit arising out of Enron's collapse could not use Rule 2004 process to take

discovery in the Enron bankruptcy that it was barred from taking in that separate securities suit.

The bankruptcy court held that "Rule 2004 examinations should not be used to obtain information

for use in an unrelated case or proceeding pending before another tribunal." *Id*. at 842 (cleaned

up). The bankruptcy court was upset that the movants there—the Regents—were "seeking to

use Rule 2004 for discovery in the Newby [securities] Action." *Id.* Here, MercyOne is not seeking

information from the OC for a separate suit against another party. It is seeking information

regarding the OC's threatened suit against it. The OC already conceded that Rule 2004 applies to

its pursuing information in this action. *Drexel* and *Larkham* hold that MercyOne also has a right

to pursue information.

### B.   Investigating Additional Sources Of Recovery And Defenses/Counterclaims

21.     The OC argues Rule 2004 does not allow a party to "supplant its judgment for that

of the liquidation trustee or the OC." (Resistance, ¶31). This is a straw man argument. MercyOne

is not trying to "supplant" the OC—it already spent hours negotiating and agreeing to produce

documents responsive to the OC's Rule 2004 Motion. The question is whether MercyOne has the

independent right to obtain documents from the OC for, among other reasons, evaluating its own

third-party claims, counterclaims and defenses. *Drexel*, *Larkham* and other authority

unequivocally answer that question "yes." The OC's "supplanting" argument is also disingenuous

because the OC cannot be expected to research MercyOne's potential third-party claims (or to

share anything it has about claims against potential third parties like PH and UIHC) and has already

admitted it has no interest in bringing claims of its own against such parties because the Debtors

have released them.

22.     The OC relies on inapposite authority to contest MercyOne's rights. In *In re J&R

Trucking, Inc*., 431 B.R 818 (Bankr. N.D. Ind. 2010) (cited Resistance, ¶31), for example, the court

held that a pension fund could not use Rule 2004 to investigate potential fraudulent transfers belonging to the estate where the litigation of such transfers *belonged exclusively to the trustee*, meaning the pension fund could not act on any information it received. MercyOne, by contrast, <u>is the only party</u> that could assert the affirmative defenses, counterclaims and third-party claims it seeks to investigate.

23.    *In re AOG Ent., Inc.*, 558 B.R. 98, 109 (Bankr. S.D.N.Y. 2016) (Resistance, ¶31), likewise does not support the OC, and turned on mootness. There, the court rejected a Rule 2004 request by a party who sought to challenge the validity of security interests, where that party had a prior chance to investigate this subject but agreed to defer to the creditor's committee's "thorough" investigation, mooting its request. Here, there has been no other investigation of possible third-party claims.

24.    *Millennium Lab*, 562 B.R. 614 (cited Resistance, ¶¶32-34), also supports MercyOne, as it distinguishes between a Rule 2004 examination directed at matters within the bankruptcy court's ongoing jurisdiction (as MercyOne's requests are, *see infra*) and those outside that jurisdiction. There, the court allowed a trustee for debtors to use Rule 2004 post-confirmation to investigate potential claims of the creditor trust created by the chapter 11 plan to obtain information from third parties that were potentially culpable for causing harm to debtors but denied that trustee's request to use Rule 2004 to investigate claims of a different trust--the lender trust-- that was outside the court's jurisdiction. *Id.* at 629. The court explained that Rule 2004 was not intended to provide private litigants with a "strategic advantage in fishing for potential private litigation." *Id.* Here, MercyOne's inquiry is solely directed at investigating matters pertinent to a suit the OC is contemplating, which, under the Plan, is within this Court's post-confirmation jurisdiction.

25.     The OC misstates *In re Defor Ctr., LLC*, 634 B.R. 630 (Bankr. M.D. Fla., 2021), which instead supports MercyOne. (Resistance ¶32). There, in connection with the debtor's request for post-confirmation discovery under Rule 2004, the court discussed principles governing such post-confirmation motions, reiterating that it could not be used to support private litigation outside the court's jurisdiction.  *Id.* at 638.  *Defor* affirmed that post-confirmation, a Rule 2004 motion must have a "close nexus" to the bankruptcy, stating, "[a]t least one court has suggested that the requisite 'close nexus' may exist if the plan specifically enumerated a cause of action over which the bankruptcy court had jurisdiction." *Id.*  As discussed below, the Plan here does. While finding that it could consider the merits of debtor's motion, the *Defor* court then denied it based on its conclusion that the debtor already had sufficient information to file causes of action, as it already identified facts supporting these in its case management summary and identified such claims in its plan, matters immaterial here.  *Id.* at 639-40.

### C.     Investigating Impropriety In The Bankruptcy Cases

26.     The OC does not dispute it would be improper to spread untruths about a potential litigation rival or to scapegoat a party for another's misdeeds or performance failures. The OC also does not dispute that falsely accusing a party of responsibility for failures can damage their business or reputation. Here, MercyOne has identified multiple, specific falsities in the OC's Rule 2004 Motion that should be retracted and corrected.  Yet, the OC has not done so.  It is also clear from statements in the OC's Rule 2004 Motion regarding various town hall meetings and the like, that pre-confirmation, too, Debtors caused falsities to spread about MercyOne in other fora.

27.     The OC all but ignores the 25 paragraphs of facts that MercyOne lists in its Rule 2004 Motion that demonstrate MercyOne's good cause to seek documents and testimony from the OC so it may set the record straight, which is additional good cause for its Motion. (Mot., ¶¶7-32). Again, these false allegations may support defenses, counterclaims and third-party claims of

MercyOne. For example, as MercyOne has consistently maintained, the OC appears to blame MercyOne for the actions of others, including PH and UIHC, thereby portraying MercyOne in a false light (as Debtors did previously).

28.    MercyOne has a right to investigate how the OC comes to its incorrect conclusions and to explore whether the OC, Debtors, or MIC made similar misstatements. By failing to address these in its Resistance, the OC concedes their relevance as a basis for a Rule 2004 examination.

29.    The OC argues "there is no *finding of* impropriety by the OC for which an adversary proceeding may be brought." (Resistance ¶26) (emphasis added). That has things backwards—an investigation is what leads to a finding, not vice versa. There is no exception when the subject of investigation is impropriety by the debtors or their successors.

30.    Moreover, MercyOne demonstrated the falsity of these accusations by its lengthy list of key facts in its Motion, which the OC fails to dispute and therefore concedes. These include:

- MercyOne had a non-exclusive, independent contractor relationship with MIC.
- When MIC reached out to MercyOne to provide services, MIC had been facing a slow decline in financial performance for 15 years, including because of a "David versus Goliath" situation with UIHC, which had been acquiring key practices of MIC.
- Long before MercyOne's engagement, MIC had buildings in need of capital expenditures and a failing EMR system.
- MIC's Board at all times remained in full and complete control of MIC.[13]
- Other than a CEO and at times a CFO or COO whose services MercyOne provided to MIC pursuant to contract, every other member of MIC's senior management was an MIC employee.

---

[13] The OC acknowledges that MercyOne objects to its assertion that MercyOne controlled MIC as false (Resistance, ¶29), yet the OC's Response continues to identify no fact demonstrating any such control. Rather, the OC dismisses this and its other misstatements as "differences of opinion regarding the factual and legal conclusions of the parties." (*Id.*). But whether, for example, MercyOne was an independent contractor to MIC is empirically verifiable and not a matter of "opinion."

- MercyOne never controlled MIC's Board and any MercyOne officers who served on MIC's Board constituted only a minority.[14]

- The Board routinely vetoed MercyOne recommendations, including that MIC join the CommonSpirit Group Purchasing Organization, which would have benefitted MIC financially.

- Due to MercyOne's efforts to enlist nationally-renowned consulting firms including Insight Health Partners, Navigant and Vizient to turn around MIC's financial decline, MIC was showing signs of financial improvement prior to COVID and the EMR conversion.

- The OC's statement that MIC reported over $100,000,000 in operating losses is absolutely false. Yet the OC fails to acknowledge this error or retract its misstatement.

- With the expert assistance of Vizient, which had specific expertise in EMR conversions, MIC's senior management recommended Altera, f/k/a Allscripts ("Allscripts") as the EMR provider because of its willingness to defer payment for services for one year, to accelerate implementation and to make MIC a "luminary"—a national showcase for its best solutions. MIC's attorneys in the Chapter 11 proceeding had blamed Allscripts for the failure of this conversion, not MercyOne.

- Despite having no responsibility for the disaster, MercyOne valiantly worked to remedy the problem, including retaining revenue cycle consultants at its own cost and voluntarily cutting its management fee.

- MIC's Board then decided to sell MIC and hired H2C Securities, Inc. to market the organization and find a buyer.

- The anticipated sale of MIC and its operational challenges led to an exodus of staff, one that accelerated when UIHC received a Certificate of Need to build a hospital in North Liberty, Iowa.

- H2C, without involving MercyOne, negotiated with UIHC and such negotiations led to the notion that UIHC would make a stalking horse bid in a bankruptcy.

- MercyOne strenuously advised MIC not to use bankruptcy as a means to sell the organization, and raised the alarm that this would put pensioners at risk.

- MercyOne made vigorous efforts to demonstrate to UIHC that there were alternatives to bankruptcy that were faster and easier and would protect pensioners, but UIHC would not be swayed.

- MIC Board Chair asked MercyOne to stay on—which shows the value of its work was recognized at the time—but MercyOne declined, because its recommendations were not followed.

---

[14] The OC notes that MercyOne admits its officers assigned to MIC "held multiple positions on MIC's board of directors during relevant periods of time," (Resistance, ¶29), but this leaves unrebutted the fact that MercyOne NEVER controlled the Board and only employed a minority of members.

- On March 16, 2023, Moody's Investor Services downgraded MIC's revenue bonds, blaming MIC's new billing system and slow recovery of patient volumes due to COVID. Moody's did not blame MercyOne for any of MIC's problems. To the contrary, Moody's warned that there could be a further downgrading if MercyOne's relationship with MIC were discontinued before a new partner or affiliation was established.

- At the outset of the Bankruptcy, in a First Day Declaration made under oath, the Debtors' Chief Restructuring Officer, Mark Toney, attributed MIC's bankruptcy to the following causes: a) the COVID-19 Pandemic; 2) the failed EMR conversion; 3) the fallout from a state court receivership action filed by PH. He did not blame MercyOne for MIC's failure.

- Toney also noted that PH insisted that MIC terminate its relationship with MercyOne and replace it with management suitable to PH.[15]

31.     As MercyOne has made clear: if the OC's accusations, for example, that there were $100 million in operating losses at MIC under MercyOne, prove false, that may support counterclaims for corporate disparagement or tortious interference or defenses of unclean hands or estoppel in any suit the OC might bring. This is especially true if the Debtors or the OC itself had earlier made similar false statements elsewhere.

32.     The OC makes the absurd argument that the issue of impropriety already was resolved by this Court's entry of the parties' agreed order granting the OC's Rule 2004 Motion. (Resistance, ¶30, n.5). This fails for multiple reasons. **First**, the only issue that order resolved was whether the OC could pursue its own Rule 2004 examination on agreed topics.[16] Whether the OC engaged in improprieties was not among the topics the OC raised in its own Rule 2004 Motion. **Second**, the factual issue of whether the OC engaged in improprieties (or whether the Debtors as its predecessors did) was not "raised and litigated," as preclusion requires. *See, e.g., Charleston v.*

---

[15] The OC dismisses these facts as "unsupported and unfounded accusations" against the OC and its counsel. (Resistance, ¶28). Rather, as MercyOne made clear in its Opposition to the OC's Rule 2004 Motion, MercyOne relied on the First Day Declaration of Debtors' CRO; the Management Agreement between MercyOne and MIC; the OC's admissions in its Rule 2004 Motion, MIC's financial filings and press releases of Standard & Poors, among other proof. (*See* Dkt. No. 1554). By contrast, the OC did not include one jot of proof supporting its accusations against MercyOne.

[16] Similarly, here, if the Court grants MercyOne's Rule 2004 Motion, that will not be a determination on the merits that the OC or Debtors engaged in improprieties, merely that MercyOne can investigate that possibility.

*McCarthy*, 8 F.4th 772, 778 (8th Cir. 2021). There was no evidentiary hearing. The Court did not hear from witnesses or take evidence, nor did it make any factual findings on the record regarding this issue. Instead, as the OC admits, the parties negotiated an agreed order that the Court then entered. (Resistance, ¶30). ***Third***, the matters were not "necessarily decided," as preclusion requires. The Court made no factual findings regarding these improprieties and the agreed order does not mention the subject. (*See* OC 2004 Order, Dkt No. 1854).  Whether the OC (or Debtors) in fact engaged in improprieties was not necessary to decide whether the OC could pursue Rule 2004 discovery. Since the issue was not decided on the merits, MercyOne had no need to seek relief under Bankruptcy Rule 9023, as the OC suggests, nor ability to appeal that OC 2004 Order. *In re Justice Oaks II, Ltd*., 898 F.2d 1544 (11th Cir. 1990) (Resistance, ¶30), supports MercyOne, as it confirms preclusion does not apply when a matter has not been finally decided on the merits.[17] The decision on Rule 2004 discovery is, if anything, more like that portion of the *Justice Oaks* decision that approved a settlement agreement. That was held not to be subject to preclusion because the court did not have to decide the merits of the underlying issues to approve the settlement, and those merits-related issues were only some of the many the court considered in evaluating settlement. *Id*. at 1549. While *Justice Oaks* found that a separate order approving the plan had preclusive effect, that was because, unlike here, that resulted from a hearing where the parties had the opportunity to litigate the issues they only raised belatedly afterwards.

33.     The OC cites *In re GHR Energy Corp.*, 35 B.R. 534 (Bankr. D. Mass. 1983), as a case denying investigation into improprieties, (Resistance, ¶30), but it is distinguishable. ***First***, the court found it did not appear the proposed examinees had any properly discoverable information.

---

[17] For this same reason, *In re Phillips*, 553 B.R. 536 (Bankr. E.D.N.C. 2016), and *In re marchFirst, Inc*., 448 B.R. 499 (Bankr. N.D. Ill. 2011) (order in prior adversary proceeding barred lessor's amended requests for administrative expenses) (each cited Resistance, ¶30, n.5), do not assist the OC.

*Id.* at 538. The OC, which succeeds to MIC's and the Debtors' records, plainly does. Indeed, the

OC's claim of burden rests on its claim that it has an extremely large amount of responsive

information. ***Second***, the court found that debtor already appeared to have enough information to

file suit against these parties if it wished and appeared to try to use Rule 2004 instead to circumvent

the procedural protections afforded a litigant under the Federal Rules of Civil Procedure. *Id.* Here,

there is no contention MercyOne has sufficient information to bring third-party claims or

counterclaims. Moreover, MercyOne seeks a Rule 2004 examination for at least four good faith

reasons, none of which is to harass.

### D.    Facilitating Settlement

34.    The OC argues that because MercyOne believes the OC has no valid claim against

it, it would not facilitate possible settlement discussions if the OC were to provide MercyOne with

documents supporting potential claims. (Resistance, ¶24). Unless the OC is conceding MercyOne

is right, this is nonsense. The OC's present posture—effectively telling MercyOne to "take our

word for it, we have potential claims" lacks any credibility.  It is hard to discuss, much less settle,

potential claims when MercyOne has received no information about their bases and lacks even a

hint of a good faith basis. MercyOne has the same interest in assessing viable defenses,

counterclaims and third-party claims that the OC has in investigating claims against it. Again, the

OC's "take our word for it" stance precludes meaningful settlement discussions or any litigation

progress.[18] It also is wholly one-sided and inconsistent with fair play.

35.    The OC fails to distinguish MercyOne's cases showing Rule 2004 may be used to

assess settlement opportunities. The OC admits that *In re Gaddy*, 622 B.R. 440, 449 & n.3 (Bankr.

---

[18] The OC's position also potentially impairs the interests of the Estates' creditors. If the OC sues and MercyOne prevails, the Estates would have wasted time and money when they might have received funds in settlement. If MercyOne were to prevail on a counterclaim, the estate may have to pay funds to MercyOne that it could have distributed to creditors.

S.D. Ala. 2020) (cited at Mot. ¶44 & Resistance, ¶25), noted that a creditor objecting to a settlement "had the opportunity to investigate" the claim being settled "including through use of a Rule 2004 examination." But the OC then suggests *Gaddy* is inapposite because the OC has not offered any settlement. (Resistance, ¶25). Based on the same illogic, the OC tries to wave away *Matter of M4 Enterprises, Inc.*, 190 B.R. 471, 473, 476-77 (Bankr. N.D. Ga. 1995) (cited Mot., ¶45 & Resistance, ¶25), which allowed a shareholder to use Rule 2004 to explore the value of claims being resolved in a proposed settlement offer and the benefit of that settlement to the estate.[19] If it is proper under Rule 2004 to investigate an existing settlement offer, it is an equally proper objective to use the Rule to investigate whether settlement is possible, and if so, for what amount and on what terms.

36.    *In re Kleynerman*, 617 B.R. 122 (Bankr. E.D. Wis. 2020) (cited Resistance, ¶24), is not to the contrary. *Kleynerman* agrees that "a movant party in interest may be a creditor," *id.* at 127, but is otherwise wholly distinguishable and has no bearing on whether facilitation of settlement is a valid Rule 2004 objective. There, the debtor's former business partner sought a Rule 2004 examination to investigate transactions from years earlier. Unlike MercyOne's specific and targeted requests here, movant's requests in *Kleynerman* were sweeping, boundless and jammed into one incoherent, run-on paragraph. That open-endedness led the court to observe that "a Rule 2004 examination is not a window to the world, or for all time," *id.* at 124, which has no application here. Moreover, the movant there procrastinated and failed to seek this information during the bankruptcy when it could have. By contrast, until it received the OC's Rule 2004

---

[19] The OC misleadingly suggests that MercyOne cited *M4* as authority for the proposition that Rule 2004 is a pre-litigation device. (Resistance, ¶26). It did not. Rather, it cited *M4* for the propositions that generally the use of Rule 2004 for prelitigation discovery ends once an adversary proceeding is filed and as an example where a party—there, debtor's shareholder—was able to use Rule 2004 to investigate a trustee's possible impropriety by showing partisanship. *M4* did allow Rule 2004 to be used after an adversary proceeding was filed, but noted this was atypical. *Id.* at 475. The *M4* court rejected that movant was seeking a fishing expedition, holding that "[t]o completely forbid pursuit of a Rule 2004 examination of the Trustee under such justification would substantially contravene the policy behind the Rule and compromise bankruptcy's general predilection for open-aired examination." *Id.* at 474. The goal of "open-aired examination" supports giving MercyOne equal opportunity.

Motion, MercyOne did not know it was the subject of an active investigation into possible claims. MercyOne had no reason or opportunity to assess settlement of what were then entirely hypothetical and remote claims.

37.     The OC says it is "far fetched" to assume that estate administration is enhanced by spending "hundreds of thousands" of dollars to allow MercyOne to "rummag[e] through the Debtors' files" (Resistance, ¶25). As shown above, Ms. Schultz's estimate of costs is without foundation and almost certainly grossly exaggerated. A better question is how the interests of the estate and its creditors are benefitted by keeping MercyOne in the dark. The OC has put MercyOne through tremendous expense of exploring claims that it now claims MercyOne cannot be allowed to understand.  The law is not so one-sided.

38.     Indeed, if pre-litigation costs are a worry for the OC, its statements in its own Rule 2004 Motion and the press suggest that it already has enough information to bring suit against MercyOne, if that is its intent. It appears to use Rule 2004 instead as a means to avoid the constraints of the Federal Rules of Civil Procedure.

39.     Further, even if Ms. Schultz' estimated expenses were assumed to be accurate, this just shows how expensive litigation would be for the OC—especially since permissible discovery in actual litigation would be much broader—suggesting the OC is short-sighted in refusing to facilitate evaluation of claims and discussion of potential resolution.

## III.    This Court Has The Same Post-Confirmation Jurisdiction Over MercyOne's Motion That It Had Over The OC's Rule 2004 Motion

40.     The OC argues this Court should consider its post-confirmation jurisdiction in deciding whether to grant MercyOne's Rule 2004 Motion. It states that "post-confirmation Rule 2004 examinations must be tailored to produce information germane to the post confirmation administration of the case, including, for example . . . **causes of action a liquidation trust may**

possess." (Resistance, ¶34) (emphasis added). Yet this analysis wholly supports MercyOne's Motion.

41.     The OC admitted in its own motion that it is investigating whether the Liquidation Trust has claims against MercyOne. (OC Rule 2004 Mot., ¶36). While MercyOne vigorously disputes that the OC has any possible viable claim against MercyOne, MercyOne's Motion pertains to these same possible claims that the OC might assert, including possible defenses, counterclaims and third-party claims that MercyOne might raise and possibilities for resolving claims.

42.     The same jurisdiction that supports the OC's investigation of claims against MercyOne equally supports MercyOne's Motion

43.     Here, too, the OC's authority regarding post-confirmation Rule 2004 examinations supports MercyOne and permits creditors or other parties in interest to also conduct such examinations. Thus, in *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) (cited Resistance, ¶¶17, 19, 22), the court noted that when a Rule 2004 examination is sought post-confirmation, "the examination must be limited to issues that the court still has the power to entertain." *Id.* The court granted a creditor's motion to examine the debtor to determine if the debtor was setting aside funds to pay its claims as the plan required.

44.     Applying the same principle, the court in *In re Cinderella Clothing Indus., Inc*., 93 B.R. 373, 377 (Bankr. E.D. Pa. 1998) (Resistance, ¶34), also permitted an estate creditor to rely on Rule 2004 for post-confirmation discovery, there to examine debtor's principals to see if they complied with the plan but held that they could not use the Rule to examine a possible modification to the plan that was time-barred.

45.     Again, in *In re Vox II, LLC*, 2008 WL 596697, at *2 (Bankr. D. Md. Mar. 4, 2008) (Resistance, ¶34), the court noted that "ordinarily, Rule 2004 examinations are granted as a matter

of course, and objections are heard generally in the form of motions for protective orders." The

court cited *Express One* and *Cinderella Clothing* in emphasizing the importance of the fact that

the court had power to entertain the subject of the examination. *Id*. It held that a party, which was

part of a settlement agreement with the debtors, could pursue a Rule 2004 examination post-

confirmation to determine if they were complying with the plan. As in the OC's own cases, this

Court should grant "as a matter of course" MercyOne's Motion.

## IV.     The OC's Remaining Challenges To MercyOne's Motion Each Fail

### A.     The OC Relies On Inapt, Often Mischaracterized, Authority

46.     As noted above, the OC's principal authority strongly supports MercyOne.

However, the OC relies on other cases that simply have no application or that it mischaracterizes

in trying to suggest relevance.

47.     Thus, The OC cites *In re SunEdison, Inc.*, 572 B.R. 482 (Bankr. S.D.N.Y. 2017)

(cited Resistance, ¶¶17, 19), to note that a creditor may not use Rule 2004 "to deal with issues

pending in other litigation or contested matters or to deal with the special issues that arise in the

case." (Resistance, ¶19). As to issues pending elsewhere, MercyOne agrees; but the point has no

bearing here. As to issues in this case, the OC is wrong. *SunEdison*, to begin with, addressed limits

on how *a debtor* could use Rule 2004 and held that it was not an "appropriate purpose" for the

debtor to seek discovery for matters outside its purview, holding that, "Rule 2004 does not reach

so far as to allow a debtor to take discovery from participants in third-party litigation involving

claims it does not own or defenses it will not assert simply because the outcome may affect the

value of an asset the debtor does own." *Id.* at 491. By contrast here, MercyOne seeks documents

and testimony that indisputably concern potential litigation by the OC itself. Contrary to the OC's

claim (Resistance, ¶19) (citing *id*.), *SunEdison* draws no distinction between a Rule 2004 Motion

of a creditor and of a debtor or trustee.[20]

48.     The OC miscites *In re Metiom*, 318 B.R 263 (S.D.N.Y. 2004) (Resistance, ¶17), as

holding that a movant "must demonstrate the existence, not the mere possibility of a right to

payment stemming from a legal claim against the bankruptcy estate." *Id*. at 270. *Metiom* says

nothing of the sort. The word "payment" is not even in the opinion. Rather, in *Metiom*, the district

court affirmed the bankruptcy court's order of a Rule 2004 examination of a party that was alleged

to have misappropriated the debtor's intellectual property obtained while it explored possible

purchase of debtor's assets.

49.     Several of the OC's cases do not even mention Rule 2004. *See In re Ruti-*

*Sweetwater, Inc*., 836 F.2d 1263 (10th Cir. 1988) (holding that non-voting, non-objecting

lienholder had accepted plan); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987)

(holding that res judicata barred creditor's suit to enforce guaranty that had been released in plan);

*Matter of Gregory*, 705 F.2d 1118 (9th Cir. 1983) (creditor could not challenge legality of final

order confirming plan in proceeding to determine dischargeability of claim).

## B.     MercyOne's Motion Only Became Ripe After The OC Served Its Own

50.     The OC stresses that MercyOne did not move for a Rule 2004 examination until

after the OC filed its Rule 2004 Motion.   (*See* Resistance, ¶¶2-4). This is no reason to deny

MercyOne's Motion.

51.     ***First***, the OC ignores that, until the OC filed its own 2004 Motion, it was not clear

that MercyOne was a target of imminent litigation. Until then, MercyOne was not facing harm

---

[20] The OC also cited *Express One* and *Millennium Lab* for this proposition. (Resistance, ¶19). As shown above, these cases support allowing a creditor to pursue Rule 2004 discovery over matters within a bankruptcy court's post-confirmation jurisdiction, as those raised by MercyOne are.

from the massive information disadvantage it has relative to the OC, which succeeds to the Debtors' and MIC's records. Now MercyOne faces imminent harm.

52. **Second**, it was only after MercyOne learned that litigation might be imminent, that it became relevant and necessary for MercyOne to investigate possible third-party claims, counterclaims and defenses.

53. **Third**, it was only with the imminence of such litigation, that the issue of potential settlement of any such litigation became relevant.

54. **Fourth**, the OC forgets that it was only in its own Rule 2004 Motion, that the OC first made its series of false and injurious statements about MercyOne, including that MercyOne had "controlled" MIC, that it was responsible for MIC's EMR failure, and that during the period when MercyOne was providing services, MIC purportedly suffered $100 million in operating losses. These (and many other) misrepresentations remain uncorrected and unretracted and entitle MercyOne to put the OC to its proof. There was no reason to do this before the OC made these misrepresentations.

55. **Fifth**, it was only in its own Rule 2004 Motion, that the OC cited—but ignored— CRO Mark Toney's First Day Declaration in the Chapter 11 Bankruptcy, which enumerates the several causes of MIC's failure, **none** of which had **anything** to do with MercyOne. That Declaration also made clear that an entity which Toney did hold accountable at the time—PH— was also behind the attempt to oust MercyOne.

### C.    It Was Equitable And Reasonable For MercyOne To Serve A Similar Number Of Requests As The OC Had On MercyOne

56. The OC notes that "[i]t is not coincidental that that the OC's Rule 2004 motion contained 54 requests for production of documents and MercyOne's contains 53." (Resistance, ¶3). The OC implies that the similar number suggests something nefarious by MercyOne. The OC

knows better. As counsel for MercyOne explained in conferral to counsel for the OC, the 53 Document Requests represented a number that the OC had already demonstrated it thought was reasonable and defensible, as it had asked for 54 requests from MercyOne originally. Thus, MercyOne believed that limiting requests to this number would eliminate controversy over MercyOne' Motion and thereby accelerate its ability to obtain the necessary information. Moreover, MercyOne was (and is) open to negotiating for a smaller number. The OC simply refused to agree to even a single topic.

57.     Contrary to the OC's mischaracterization, MercyOne is not seeking a "tit for tat" examination of the Debtors and OC. (Resistance, ¶4). Rather, MercyOne's topics are specific to its different concerns and have little to no overlap with the OC's topics. If the point is that MercyOne has responded to the OC's Motion by seeking information it needs for possible litigation, *Drexel*, *Larkham* and other authority fully support this.

**D.     The Size Of MercyOne's Claim Is No Basis For Denying It Information Under Rule 2004**

58.     The OC, as it has in every brief and pleading about MercyOne, notes that MercyOne has a $31,524.63 claim. But the dollar amount of a claim is irrelevant.  The OC cannot dispute that Rule 2004 only requires a pecuniary interest; there is no dollar threshold. MercyOne's impaired and unpaid claim alone provides sufficient basis for its Rule 2004 Motion. Again, if the OC thought this claim were so trivial, it could have paid it long ago.

59.     Importantly, however, the OC also ignores that MercyOne's status as a target of potential litigation gives it a second, distinct pecuniary interest. As the OC even admitted in its Rule 2004 Motion, MercyOne believes it is being scapegoated. Notably, the OC never provided a single fact to rebut MercyOne's justly-held belief. That is the natural conclusion from, among other facts, that at the outset of the bankruptcy Debtors held out PH, but not MercyOne, as a cause of

MIC's failure, only to later release PH. Only after releasing PH, did Debtors' public stance about MercyOne change, as Debtors then singled out MercyOne by name in the Plan as the only individual party which would not receive a release. Now, MercyOne appears to be the only party to be subject to a Rule 2004 examination by the OC.

60.    MercyOne was further scapegoated in that it strove mightily to protect the pensioners' interests, making clear to UIHC that a sale of MIC through bankruptcy would harm the pensioners. Yet Debtors and UIHC would not listen. Sure enough, during the bankruptcy proceedings, the pensioners claimed they were harmed by MIC's going bankrupt.  But despite this fact, after meeting with Debtors' CRO and hearing from Debtors' attorneys, the pensioners suddenly blamed MercyOne for their losses—losses MercyOne believes were preventable had UIHC and MIC accepted its recommendations. MercyOne thus faces unjust ire from the pensioners and others for poor choices made by MIC and Debtors over its objections.

### E.    MercyOne Does Not Seek "Carte Blanche" To Pursue The OC

61.    The OC makes the straw man argument that "Rule 2004 does not give *carte blanche* authorization to any party in interest to ask any question of the debtor it wants." (Resistance, ¶4). True enough, but, again, irrelevant here. The OC knows that MercyOne is not seeking "*carte blanche*." In numerous phone calls and written communications, MercyOne's counsel went one-by-one with OC counsel as to each of the 53 Document Requests, explaining why each is tied to one of the four bases for good cause discussed above. (*See also* Mot., Exs. C-F).  But the OC did not approach this process in good faith, as it never proposed an alternative to any request (as MercyOne had in resolving its objections to the OC's Rule 2004 requests). The OC never moved from its initial refusal to provide even a single document to MercyOne.

F.      **MercyOne Seeks Necessary Information; It Is The OC That Seeks Roadblocks**

62.      The OC claims that MercyOne's Motion is part of a "common thread . . . aimed at creating roadblocks for the estate's fiduciaries to investigate and pursue causes of action against MercyOne." (Resistance, ¶7). The argument is an exercise in projection, as it is the OC that is imposing indefensible roadblocks to disadvantage MercyOne in litigation it is readying.

63.      As this Court knows, MercyOne's counsel spent hours working with the OC's counsel to create an agreed set of terms for searching documents to respond to the OC's Rule 2004 requests. MercyOne is now running and reviewing these searches. By contrast, the OC never has agreed to run even one search.

64.      The OC has claimed in Court that it must file any suit by early August 2025. The strategy of the OC—which already has ALL of MIC's data and documents and has had months to review any of this it wished—is thus to place MercyOne at a deep information disadvantage when that case begins. As MercyOne's Motion shows, the desire to do some pre-suit investigation is a principal purpose of Rule 2004. MercyOne has as strong an interest in that as does the OC.

V.      **MercyOne Faces Undue Hardship And Injustice If Its Motion Is Denied**

65.      The OC disingenuously argues that MercyOne would receive an "advantage" if its Rule 2004 Motion is granted because it would be able to get discovery related to a possible case that the OC might pursue against it. (Resistance, ¶23). This is another example of the OC's "up is down" reasoning. To receive what courts, including *Drexel* and *Larkham*, hold is rightful is not to receive an advantage. Rather, withholding this would unfairly place MercyOne *at a disadvantage*.

66.      The OC's claim of burden is really an acknowledgement that it possesses a wealth of documents relevant to whether it may sue MercyOne. The OC has had these for 2/3 of a year and the Debtors had them for approximately 1 1/2 years before that. If MercyOne must wait until litigation before it may even request relevant documents it will be at a great disadvantage in

26

preparing its defenses, counterclaims, and third-party claims. This is all the more true since the OC plans to take three depositions of MercyOne witnesses, including a detailed corporate representative deposition on 37 topics and tens of subtopics, but would leave MercyOne with no ability to investigate its defenses, counterclaims or third-party claims before being named in the OC's suit.

67.     In addition, and critically, as MercyOne noted in its Motion, the OC's public statements of why it believes it may have a claim against MercyOne, including in its own Rule 2004 Motion, are false. (Mot. ¶42). MercyOne must have access to the documents the OC believes support these allegations. If none exists or if the OC misreads what it has, that will help MercyOne counter the public misconception that the OC is fostering as well help MercyOne minimize further reputational harm.

68.     Finally, unless MercyOne has proper knowledge of documents on which the OC relies to support possible claims, it cannot evaluate the strength or possible value of such claims. Thus, it will continue to be in no position to make or respond to a settlement offer.

## VI.     MeryOne's 2004 Examination of the OC Does Not Impose An Undue Burden

69.     As noted above, the OC does not face an undue burden. Ms. Schultz's declaration lacks any empirical foundation or credible methodology. The OC's claim of burden is just a pretext for refusing to produce a single document.

70.     Until its Resistance, the OC never attempted to quantify or explain the basis for any claim of burden to MercyOne and made no effort to work collaboratively with MercyOne counsel to minimize any burden.  The OC's conclusory assertion of burden can carry no weight. *See, e.g.*, *In re Wade*, 2012 WL 5449308, at *4 (Bankr. S.D. Tex. Nov. 7, 2012); *In re Tollefson*, 2015 WL 3897533, at *10 (Bankr. D. Colo. May 13, 2015) ("'An objecting party cannot sustain this burden [of showing burdensomeness] with boilerplate claims that the requested discovery is oppressive,

burdensome or harassing.'" (quoting *Klesch & Co., Ltd. v. Liberty Media Corp.*, 217 F.R.D. 517, 524 (D. Colo. 2003)).

71.    The OC mischaracterizes efforts by MercyOne to ease the OC's burdens as instead increasing them, for example by asking for documents "evidencing" topics. (Resistance, ¶35). MercyOne believes that to ask for documents that "evidence" a fact is narrower than to ask for documents that "relate to" a topic.  Yet if the OC prefers a different term, the parties could have negotiated and still can. That is no excuse for the OC's flat-out refusal to produce any document under any scenario.

72.    The OC also disingenuously argues that discovery would be burdensome as to MIC's reasons for not joining the CommonSpirit Group Purchasing Organization and for rejecting MercyOne's recommendation to pursue alternatives to bankruptcy because this would implicate privilege. (Resistance, ¶35). As noted above, the OC's conclusory assertion of burden can carry no weight. The argument also fails on the merits.  Again, the OC can use AI and word searches to identify and any possibly privileged documents and not produce these.

73.    What is really happening is that the OC simply wants to hide the fact of MercyOne's non-involvement in these momentous and damaging decisions, which evidence MIC's and Debtors' own bad judgment and folly. The OC also wants to resist this discovery because it confirms that, contrary to the OC's constant drumbeat, MercyOne DID NOT control MIC.  Indeed, the fact that MIC has privilege independent of MercyOne shows MercyOne was in fact not making the decisions for which the OC wants to hold it responsible.[21]

---

[21] The OC also cites *In re Kearney*, 590 B.R. 913, 921-22 (Bankr. D.N.M. 2018) (Resistance, ¶19), for the proposition that 2004 examinations are unavailable when requests may be too burdensome. MercyOne agrees, but that is not the case here. In *Kearney*, the court was concerned about the debtor possibly having an improper motivation for an overbroad Rule 2004 request where it was considering additional litigation against the targets, was pursuing issues that were barred by issue and claim preclusion and gave shifting reasons for the need for the discovery. *Id.* Nonetheless, the court permitted debtor to receive documents that had been produced in a state court action. *Id.*  MercyOne agrees

## CONCLUSION

74.    For the foregoing reasons and those in MercyOne's Motion, this Court should permit MercyOne's examination of the OC.

Dated: April 23, 2025                    Respectfully submitted,

                                         */s/ Christopher J. Jessen*
                                         Michael R. Reck
                                         Christopher J. Jessen
                                         **BELIN McCORMICK, P.C.**
                                         666 Walnut Street, Suite 2000
                                         Des Moines, Iowa 50309
                                         Tel: (515) 243-7100
                                         Fax: (515) 558-0675
                                         mrreck@belinmccormick.com
                                         cjessen@belinmccormick.com

                                         */s/ David B. Goroff*
                                         Edward J. Green (*Pro Hac Vice*)
                                         David B. Goroff (*Pro Hac Vice*)
                                         **FOLEY & LARDNER LLP**
                                         321 N. Clark Street, Suite 3000
                                         Chicago, IL 60654
                                         Tel: (312) 832-4500
                                         Fax: (312) 832-4700
                                         egreen@foley.com
                                         dgoroff@foley.com

                                         Jake W. Gordon (*Pro Hac Vice*)
                                         **FOLEY & LARDNER LLP**
                                         500 Woodward Avenue, Suite 2700
                                         Detroit, MI 48226
                                         Tel: (248) 943-6484
                                         jake.gordon@foley.com

                                         *Counsel to Mercy Health Network, Inc., d/b/a
                                         MercyOne*

---

that 2004 examinations should not be too burdensome and remains open to negotiate with the OC on this topic.  But as noted repeatedly, the OC has refused to do so.

4900-2814-7002.2

## <u>CERTIFICATE OF COUNSEL</u>

The undersigned certifies, under penalty of perjury, that on this April 23, 2025, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

*/s/ David B. Goroff*
David B. Goroff