## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, | ) | Case No. 23-00623 (TJC) |
| IOWA, *et al.* | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### MERCY HEALTH NETWORK, INC.'S RESPONSE TO EXPEDITED CONTEMPT MOTION, EXPLANATION OF WHY NO EVIDENTIARY HEARING IS PROPER, AND CROSS-MOTION FOR SANCTIONS

Mercy Health Network Inc., d/b/a MercyOne ("MercyOne"), by its attorneys, Foley & Lardner LLP and Belin McCormick P.C., respectfully submits this response (the "Response") to the Trust Oversight Committee's ("OC") *Expedited Motion for an Order (I) Setting an Evidentiary Hearing; (II) Requiring MercyOne to Appear and Show Cause At the Evidentiary Hearing and (III) Suspending and Equitably Tolling Certain Statutes Of Limitations* [Docket No.1941] (the "Motion"),[1] explains why no evidentiary hearing is proper, where the OC has not met any of the four factors necessary to meet its burden of showing civil contempt, and cross-moves for sanctions against the OC and its counsel seeking costs and fees related to the Motion under 28 U.S.C. § 1927, 11 U.S.C. § 105 and this Court's inherent authority because the Motion is vexatious and unnecessarily multiplies proceedings, and is legally and factually frivolous. MercyOne respectfully states as follows:

### INTRODUCTION

1.  The OC's Motion seeks an evidentiary hearing where MercyOne would have to prove it is not in contempt of this Court's order granting the OC Rule 2004 discovery [Docket No.

---

[1] Capitalized terms used but not defined herein shall have the same meanings as defined in the Motion.

1854] (the "<u>OC Rule 2004 Order</u>"). This Motion is meritless, and this Court should deny the Motion in its entirety, including the request for an evidentiary hearing.

2.      The OC does not acknowledge that the United States Supreme Court has held that a movant seeking an order of civil contempt bears the burden of showing by clear and convincing evidence that there is "no fair ground for doubt" that MercyOne has knowingly violated a clear order of this Court and that this caused injury to the OC. *Taggart v. Lorenzen*, 587 U.S. 554, 560-61 (2019). *See also Sisney v. Kaemingk,* 15 F.4th 1181, 1200 (8th Cir. 2021) (recognizing that "'civil contempt should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'") (quoting *Taggart*, 587 U.S. at 561); *Clearent, LLC v. Nacion*, 2019 WL 2503699, *1 (E.D. Mo. June 17, 2009) (applying *Taggart* and denying motion for civil contempt); *Pipeline Prods., Inc. v. S&A Pizza, Inc.*, 2022 WL 17252595 (W.D. Mo. Nov. 18, 2022) (same). The Supreme Court in *Taggart* held that "civil contempt is a 'severe remedy' and …principles of basic fairness requir[e] that those enjoined receive explicit notice of 'what conduct is outlawed' before being held in civil contempt." *Taggart*, 587 U.S. at 561 (cleaned up). The contempt power is a most potent weapon, and therefore it must be carefully and precisely employed." *Iowa Protection & Advocacy Servs., Inc. v. Gerard Treatment Programs, L.L.C.*, 274 F. Supp. 2d 1063, 1072 (N.D. Iowa 2003) (cleaned up).

3.      Rather than "clear and convincing evidence," the OC provides no evidence that MercyOne acted in contempt of this Court's OC Rule 2004 Order.

4.      Despite failing its threshold burden, the OC nonetheless attempts to shift the onus to MercyOne to show why it is not in contempt. Such a request is unprecedented. The OC cites no case where a court has freed a movant from its burden to provide clear and convincing evidence

or required a non-movant to prove the absence of civil contempt when the threshold showing has not been met.

5.     The OC's Motion is premature under Local Rule 7037-1, because the OC's counsel did not confer with MercyOne's counsel regarding specific relief it seeks here, in particular, tolling the statute of limitations and whether there are alternate means to locate the emails the OC seeks. The parties have not had the opportunity to confer on these issues without Court intervention. As the three exhibits attached to the Motion show, the OC conferred with MercyOne on whether MercyOne had spoliated electronic discovery and the parties' disagreement regarding the extent of ESI documents and communications produced. *See* Mot., Ex. B (the "Leaf Decl." and emails attached thereto as Ex. 1); Ex. C (letter from R. Leaf to D. Goroff on June 20, 2025 (the "June 20 Letter")); Ex. D. (letter from D. Goroff to R. Leaf on June 26, 2025 (the "June 26 Letter")). As MercyOne counsel explained during this meet and confer, in 2023 MercyOne was following its Document Retention Policy, under which emails were retained by MercyOne for 180 days after their creation.[2] This caused emails from the time it provided services to Mercy Hospital Iowa City ("MIC") under a Management and Affiliation Agreement (the "Agreement"), which began in 2017 ended in April 2023, to no longer be retained by MercyOne no later than October 2023—approximately 15 months before the OC filed its *Motion for Entry of Order Requiring Mercy One To Produce Records and Submit Examination Pursuant to Bankruptcy Rule 2004* [Docket No. 1545] (the "OC Rule 2004 Motion"). This procedure was in place long before any litigation was imminent or reasonably certain. The OC ignores this dispositive fact.

6.     Instead of working to avoid involving the Court in this discovery dispute, the OC moved for an expedited hearing where it proposes it would not have to meet its threshold "clear

---

[2] *See* MercyOne Document Retention Policy, attached hereto as **Exhibit 1** (the "Document Retention Policy").

4924-9993-7619.2

and convincing" burden, and non-movant MercyOne would have to prove the negative—that it did not act in contempt of the OC Rule 2004 Order—and where the OC's own behavior and communications are immune from scrutiny. Such a hearing would deny MercyOne due process.

7.      The OC's Motion omits the full context of MercyOne's reasonable efforts to comply with the Court's OC Rule 2004 Order and the OC's subpoena.  Belying its allegations, **the OC omits that MercyOne produced more than 8,000 pages of <u>electronically stored information</u> ("<u>ESI</u>") and 11,000 pages of documents overall, including communications and documents maintained in hard copy files**. The OC's Motion states seven times that MercyOne "destroyed" all electronic communications, (*see*, *e.g.*, <u>Mot</u>. ¶¶7-8, 28, 32, 36-37), but there is no factual basis for this allegation and MercyOne's production disproves it.

8.      The OC incorrectly attempts to redefine electronic communications as only emails. The OC, however, defined the term "communications" to mean "any Document constituting, reflecting or evidencing any oral or written transmission or receipt of words or information, by whatever manner or means, regardless of how or by whom the communication was initiated…." (*see* OC Discovery Requests, Docket No. 1545-2, p.2). Thus, MercyOne reviewed and produced documents and communications consistent with this definition.

9.      The OC also incorrectly suggests that MercyOne and its counsel refused to confirm if searches were run as ordered by this Court in the Rule 2004 Order and as negotiated between the parties in multiple sessions. To the contrary, MercyOne counsel not only confirmed they had been run but advised that he was not averse to providing a declaration from IT personnel who assisted MercyOne in the searches. MercyOne counsel merely objected to the OC counsel's demand that IT personnel include information about the policy choices behind MercyOne's Document Retention Policy and the legal determinations for its use and explained to OC counsel

that this was outside the purview of IT personnel.  (*See* Leaf Decl. Ex. 1 at p. 7 (email from D. Goroff to R. Leaf on June 26, 2025 at 12:13 p.m.). Nor is a policy choice relevant that was made long before any filing in this case.  MercyOne counsel asked OC counsel either to limit this inquiry or provide legal support why such inquiry was appropriate and necessary (*id.*), but the OC refused.

10.    The OC tries to characterize its unfounded motion for contempt sanctions against MercyOne as a virtue, suggesting it is not "intimidated by threats raised by MercyOne." (Mot., ¶11). Yet MercyOne's only "threat" was that if the OC filed such a motion, it would cross-move to recover the additional costs and fees this would create for MercyOne. Under similar circumstances, courts have awarded sanctions under 28 U.S.C. §1927, 11 U.S.C. § 105(a) and a court's inherent authority. So rather than being a threat, the recovery of unnecessary fees and costs is a rightful remedy.

11.    This Court should deny in full the request for an evidentiary hearing on July 14, 2025. However, if the Court is inclined to hear MercyOne witnesses, it should also make clear that the OC must produce relevant witnesses who may be examined under oath on the issues raised in the OC's Motion and the matters MercyOne notes below.

## **ARGUMENT**

### A.    **The OC Fails Its High Burden To Justify The Extraordinary Relief It Seeks**

12.    Courts hold that the burden is on the movant seeking a finding of civil contempt to show by clear and convincing evidence a violation of a specific order of the court. Only if a movant meets this burden, does it shift to the alleged contemnor to demonstrate why it was unable to comply with that order. *See In re Bennett*, 298 F.3d 1059 (9th Cir. 2002); *United States v. Hefti*, 688 F. Supp. 1367 (E.D. Mo. 1988) (same).

13. As the Supreme Court articulated in *Taggart*, bankruptcy courts may hold a party in civil contempt under 11 U.S.C. §105(a) if there is "no fair ground of doubt" as to whether an order barred the party's conduct. 587 U.S. at 560-61 (applying the traditional civil contempt principles to holding a creditor in contempt under §105(a) for violating a discharge order).

14. The Eighth Circuit, citing *Taggart*, emphasized, too, that "civil contempt should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Sisney*, 15 F.4th at 1200 (quoting *Taggart*, 587 U.S. at 561). The Eighth Circuit held that a movant must establish "among other things, that the alleged contemnor has not diligently attempted to comply in a reasonable manner." *Sisney*, 15 F.4th at 1200 (quoting *King v. Allied Vision, Ltd.,* 65 F.3d 1051, 1058 (2d Cir. 1995)).[3]

15. In the bankruptcy context, recent bankruptcy courts, following *Taggart*, have adopted a four-part test to determine whether the "no fair ground for doubt standard" is satisfied, requiring a movant to establish that 1) there must be a valid decree of which the contemnor has actual or constructive knowledge; 2) the decree must have been in the movant's favor; 3) the contemnor must have violated that decree and had actual or constructive knowledge that it was doing so and 4) the movant must have suffered harm as a result. *In re Baek,* 661 B.R. 126, 129-30 (Bankr. E.D. Va. 2024). Because the OC seeks to hold MercyOne in contempt under §105(a), the *Taggart* standard applies.

16. Indeed, even before *Taggart*, this Court affirmed that a movant for civil contempt in the bankruptcy context bears the burden of showing a violation of a court order by clear and convincing evidence and must show that 1) the other party was aware of the order and 2) the order

---

[3] Indeed, the Eighth Circuit has held for 82 years that for a finding of civil contempt "a 'degree of certainty' is required which leaves no fair ground of doubt." *Kansas City Power & Light v. N.L.R.B.*, 137 F.2d 77, 79 (8th Cir. 1943).

4924-9993-7619.2

was specific and definite before the burden shifts to the nonmovant. *In re Legassick*, 528 B.R. 777, 781 (Bankr. N.D. Iowa 2015) (Collins, J.).

17.     Here, the OC does not acknowledge the standard or make any effort to satisfy it. It cannot do so.

18.     *First*, while MercyOne had knowledge of the OC Rule 2004 Order, MercyOne, as a matter of law, did not violate it.  The purported "violation" asserted by the OC is that emails do not exist in MercyOne's custodians' files. Yet this has been true at least since October 2023— almost a year and a half before the OC Rule 2004 Order was entered on March 25, 2025. Docket No. 1854. As noted above, in 2023 and prior MercyOne was rightfully following its Document Retention Policy (Ex. 1) and could not have knowingly violated an order that was not entered until 2025—at a minimum 17 months later. The failure to show a knowing violation of the OC Rule 2004 Order, without more, causes the OC's Motion to fail.

19.     *Second*, because MercyOne did not violate the Rule 2004 Order, it follows that it did not knowingly violate that Order.

20.     *Third*, the OC Rule 2004 Order was not in the OC's favor as it was an agreed order. As the OC noted in its Motion, the OC Rule 2004 Order represented an agreed order proposed by the parties following weeks of negotiation and compromise and observations by this Court in both parties' favor. Thus, the OC cannot meet *Taggart*'s second element.

21.     *Finally*, the OC has presented no proof of harm because emails do not exist in MercyOne's custodians' files. As detailed below, the OC disregards that it succeeded to all documents and communications that MIC possessed. This includes emails that were sent or received by all MercyOne personnel who worked with MIC pursuant to the Agreement, including all custodians, so long as such emails include an MIC domain address, as most would. Thus, much

7

of what the OC seeks is cumulative of what is already in its possession and control. Indeed, the OC appears to have used certain documents it has from MIC as exhibits in the depositions it took of MercyOne witnesses.

22.    Indicating that the OC was not prejudiced is the fact that it received MercyOne's document production by May 23, 2025, approximately six weeks before filing its Motion, and knew that next to no emails had been produced from electronic files but did not complain until now.

23.    Thus, because the OC fails to show by clear and convincing evidence that MercyOne violated the Court's OC Rule 2004 Order, the OC's Motion should be denied. Further, because the OC failed to satisfy its threshold burden, the burden does not shift to MercyOne and there is no need for an evidentiary hearing. Rather the issue can be resolved on the papers.

**B.    MercyOne Made No Mistakes of Material Fact**

24.    The OC requests an evidentiary hearing purportedly so that MercyOne witnesses may be examined as to "why it is not in civil contempt for violating the OC Rule 2004 Order and why it did not correct mistakes of material fact related to the OC Rule 2004 Order during proceedings related thereto." (Mot., ¶1; *see also* Heading p.7, ¶19).

25.    The OC, however, identifies no "mistake of material fact" related to the OC Rule 2004 Order. The OC's accusation is baseless.

26.    Rather, the OC merely cites selective communications between counsel about the OC's specious spoliation allegations and about the possibility of a declaration from IT experts who acted for MercyOne, a route the OC abandoned. (*See* June 20 Letter, Mot. Ex. C; June 26 Letter, Mot. Ex. D; Ex. 1 to Leaf Decl., Mot. Ex. B.).

27.    While several paragraphs of the Motion suggest that the OC believes it was a "mistake of fact" that it did not know that emails might not exist prior to MercyOne's production

8

(Mot., ¶¶19, 22-26) the OC identifies no mistake. The OC Rule 2004 Order did not require MercyOne to make any representations about what it was producing in advance of production, nor did the instructions of the OC's document requests require this, nor did the OC ask MercyOne about quantity of emails prior to its production. The OC identifies no case or legal authority that requires MercyOne to detail what documents it has in which categories ***before*** a document production and MercyOne knows of none.

**C.**     **The OC's Proposed Hearing Would Deny Due Process**

28.    In asking for a one-sided hearing where only MercyOne witnesses are examined, the OC would deny MercyOne due process and would unfairly insulate those who acted for the OC from cross-examination about their false assertions. *See Matter of Kitchen*, 706 F.2d 1266, 1272-73 (2d Cir. 1987) (contemnor accused of civil contempt must have full right to cross-examine other side's witnesses and examine other side's documents).

**D.**     **The OC Withholds From The Court That MercyOne Produced 8000+ Pages of ESI Documents And Communications, Among 11,000 Pages Overall**

29.    The OC states that "[a]t no point prior to these depositions [of three MercyOne witnesses] did counsel for MercyOne inform the Court or counsel for the OC that nearly all of MercyOne's electronic communications related to MIC had been lost, deleted or destroyed." (Mot.,¶8). However, **"[n]early all" of MercyOne's communications were not "destroyed."** The OC's assertion is wrong. Rather, MercyOne produced more than 8,000 pages of responsive ESI documents and communications. Moreover, MercyOne produced emails in its possession that were responsive to the Rule 2004 subpoena. MercyOne produced copies of emails that were saved in physical folders. Additionally, MercyOne produced the categories of electronic communications it possessed including letters, meeting minutes and memoranda.

30.     Relatedly, the OC repeatedly states that MercyOne never advised it that it no longer possesses "electronic communications from the time periods that it agreed in the OC Rule 2004 Order." (Mot., ¶¶24-26, 28; ¶44 (suggesting the possibility that MercyOne "misled the OC about its possession of relevant and material electronic communications"); *cf.* ¶37 ("in the event that substantially all of MercyOne's electronic communications related to MIC have been lost, deleted or destroyed, MercyOne should be required to explain why at no point during negotiation or compliance with the OC Rule 2004 Order it made the OC or Court aware that MercyOne no longer had electronic communications related to MIC in its possession.")). Again, MercyOne produced all ESI communications it possessed that were responsive to agreed search terms pursuant to the definitions used by the OC. Further, although MercyOne was aware its retention policy may mean certain communications may no longer exist, it could not know what documents existed until the search terms were finalized and run. Thus, MercyOne made no misrepresentation.

31.     For purposes of its Motion, the OC appears to conflate "electronic communications" with emails in custodian electronic files, but that is contrary to how the OC defined that term in Rule 2004 discovery requests [Docket No. 1545-2] (the "OC Rule 2004 Requests"). There, the OC defines "communications" as:

> Any Document constituting, reflecting or evidencing any oral or written transmission or receipt of words or information, by whatever manner or means, regardless of how or by whom the communication was initiated, including without limitation: i) any written contact by means such as letter, email, instant message or facsimile and ii) oral contact by means including face-to-face meetings and telephone. Communications with any entity includes, but is not limited to, communications by or with its subsidiaries, divisions, subdivisions, affiliates, predecessor and successor entities, partners, officers, directors, employees, agents, legal counsel, financial advisor, investment banker, or any other person acting on its behalf. (OC Rule 2004 Requests, at p.2, ¶4).

32.     The OC, in turn, defines the term "Document" as

10

> used in the broadest sense permitted by the Federal Rules of Civil
> Procedure, including tangible things, correspondence, internal or
> external memoranda, letters, drafts, non-identical copies, notes,
> including handwritten notes, minutes of meetings, computer records
> (*e.g.*, email messages), any electronically stored information,
> records (*e.g.*, voicemail records), diaries, exhibits, sketches, designs,
> catalogs, newspapers, magazines, appointments or telephone
> records, banking records and notices. (*Id.*, pp.2-3, ¶5).

33.     The ESI Production Protocol attached to the OC Rule 2004 Requests, likewise, refers to each "Document." (*Id.* at pp.7-11, ¶¶13-15).

34.     Emails, in other words, are merely one of a multitude of categories of documents comprising "ESI" or electronic communications.

35.     MercyOne did not agree to "email custodians," as the OC misstates. (Mot., ¶8). Rather, as a review of the several orders that the OC cites in Motion show, MercyOne agreed to custodians whose files would be searched for all ESI or electronic information, not simply emails. (Mot., ¶8).  The OC asserts that it is common practice in dealing with ESI matters for parties to agree to "email custodians" whose accounts will be searched. (Mot., ¶23). This is inaccurate. It is common practice in ESI discovery for parties to agree to custodians whose ESI files will be searched. Such files encompass far more than merely emails, as, again, the OC's own definition of "communications" recognizes.

36.     The other filings that the OC cites from this case do not show otherwise. (Mot., ¶22).  For example, in MercyOne's Status Report, dated February 25, 2025, MercyOne counsel explained that the OC's Rule 2004 Requests, as written, required the search of MercyOne's entire employee files—more than 20,000 people overall—whereas only those pertinent to MIC, a minute fraction of this number, would have relevant information. (Docket No. 1567, at ¶¶3-4). That Status Report does not mention emails. (*Id.*).

37.     The OC cites two paragraphs of a Joint Status Report, dated March 17, 2025 [Docket No. 1801]. (*See* Mot., ¶22). The OC first cites a paragraph that refers to an agreement *not to make* MercyOne's General Counsel an "email custodian," (in other words an agreement that the General Counsel <u>would not</u> produce documents). (*See* Docket No. 1801, ¶ 2). Yet both parties understood that MercyOne's general counsel is not and would not be a custodian regarding <u>any ESI</u> and that no ESI (or other documents) would be produced from her files whether these were emails or other forms of electronic or non-electronic communications.

38.     The OC's intent in referring to the second referenced paragraph of the March 17, 2025 Joint Status Report is puzzling, as that paragraph simply describes the requested format for producing ***all*** documents, without referring to emails specifically. (*See id.* ¶ 5).

39.     Similarly, while the OC refers to the email from MercyOne counsel to OC counsel dated May 8, 2025, advising that it was too early to advise on the volume of emails/ESI (Mot., ¶8) (citing Docket No. 1894-3),[4] this encompassed all electronic communications, not just emails. Moreover, the context of MercyOne's counsel's email also matters, as the principal topic of that correspondence concerned the fact that the OC had disavowed its prior agreement to extend the date for MercyOne's production of documents that MercyOne had requested due to unexpected challenges MercyOne faced because of its transition to a new EMR system. In that email, MercyOne's counsel also expressed displeasure that OC changed its position only ***after*** MercyOne rearranged its witnesses' schedules to accommodate the OC's requested dates for depositions. (*See* Docket No. 1894, Ex. B (email from D. Goroff to R. Leaf on May 6, 2025 at 9:15 p.m.)).

---

[4] The OC describes this Docket Entry erroneously as Docket No.18894-3. (Mot., ¶8). The OC refers to these exact same communications in Mot. paragraph 22 to assert that "search parameters were being discussed with relevant people in MercyOne's technology department to assess burden and scope." But that does not provide the full picture. Search parameters that for example asked MercyOne to search 20,000 employees' files when only 12 employees' files might be relevant did not need discussion with IT personnel. To be sure, when it came to results of searches or estimates of results, MercyOne counsel did receive information from IT professionals running the searches, and advised the OC accordingly, which the OC omits.

12

**E.    MercyOne Strictly Followed This Court's Order In Running Searches Against Agreed Custodian Files**

40.    The OC notes that it and MercyOne spent months negotiating search terms and agreed custodians. (Mot., ¶¶4-5). The OC tries to create the misimpression that MercyOne did not run these searches as agreed and ordered. It absolutely did. This is described in detail in the Declaration of Angie Brenizer, attached hereto as **Exhibit 2**; *see also* Declaration of Brandon Gladstone, attached hereto as **Exhibit 3**.

41.    Moreover, until MercyOne ran searches as it had agreed and as the OC Rule 2004 Order directs, it could not know the volume of responsive documents that would be produced. Here, MercyOne applied search terms against more than 100,000 documents, (Brenizer Dec., ¶4), from which approximately 8,000+ pages were responsive.

**F.    MercyOne Cannot Have Acted In Contempt Of This Court's OC Rule 2004 Order, *Entered In 2025*, Because *In 2023 And Prior* It Adhered To Its Document Retention Policy**

42.    While the OC juxtaposes the looming expiration of the statute of limitations with the fact that it is "without critical communications from MercyOne that counsel for the OC believed MercyOne possessed…." (Mot., ¶9), it describes no such communication, and the assertion is wholly self-serving and speculative. The OC states no basis for its belief that any specific "critical communication" no longer exists but once did. Because the OC identifies no such document, it follows that it can identify no prejudice from anything that was lost due to MercyOne's Document Retention Policy. Again, the OC possesses all documents and communications that MIC had, including any emails from MercyOne officers who provided services to MIC that used the MIC domain name in the email address, as most surely would. The OC has yet to produce any of these to MercyOne. Indeed, the OC likely has far greater knowledge today of the emails of MercyOne personnel regarding MIC than MercyOne itself has. That the OC

13

does not believe this body of emails in its possession suffices to state any potential claim is revealing.

43.    The OC may mean that MercyOne witnesses did not have emails in their custodial files. But the OC could have had no legitimate belief on January 23, 2025, when it filed its Rule 2004 Motion, that such emails existed. Counsel for MercyOne made this clear to the OC's counsel both in conferral communications and by letter sent June 26, 2025. (*See* June 26 Letter, Mot. Ex. 3). While the OC attached MercyOne counsel's letter to its Motion, it fails to address and cannot overcome the law and facts MercyOne counsel referenced in that letter.

44.    Indeed, as the OC cannot dispute, it has never provided a hold letter or notice to MercyOne. Likewise, it never advised MercyOne that it would face imminent or reasonably certain claims. While the OC vaguely referred to MercyOne being advised of possible litigation by MIC's "restructuring advisors" in February 2023 (when MercyOne was still providing management and affiliation services to MIC), *see* June 20 Letter, Mot. Ex. 2, the OC has produced no such communications, despite MercyOne counsel's repeated requests, suggesting they do not exist, and certainly precluding any such communications being a basis for a civil contempt motion.

45.    Having no knowledge of imminent or reasonably certain litigation, MercyOne had full legal right to adhere to its Document Retention Policy in 2023 and prior, which, again retained documents on the MercyOne server for six months. *See* Ex. 1.

46.    Indeed, in its Rule 2004 Motion, the OC seemingly admitted litigation *could not have been* either imminent or reasonably certain as of February 2023 because it still was not reasonably certain on January 23, 2025—23 months later—whether any claims existed or what those claims might be. The OC's uncertainty as to whether claims existed was its stated motivation for its Rule 2004 Motion. (*See* OC Rule 2004 Motion, Docket No.1545).

47. For example, in Paragraph 3 of that Rule 2004 Motion, the OC represented:

> Since its retention in September 2024, counsel for the OC has undertaken an investigation into the prepetition relationship between MIC and MercyOne in order to evaluate any and all claims that the Liquidation Trust may have against MercyOne on behalf of the Debtors. **The OC needs to understand whether claims against MercyOne are warranted** and whether the incurrence of legal fees to pursue those claims is in the best interests of the Debtors' creditors who hold interests in the Liquidation Trust. (*Id.*, ¶3) (emphasis added).

48. Likewise, in Paragraph 18, the OC stated:

> It is unclear at this time to what extent MercyOne performed other services required by it by the Management and Affiliation Agreement and whether MIC benefitted from those services. Pursuant to this Motion, **the OC seeks this information so that it can more properly weigh the costs of any potential litigation against MercyOne** with the benefits to the Debtors' creditors. (*Id.*, ¶18) (emphasis added).

49.    The OC emphasized that its counsel was "investigat[ing]" "the background and events that precipitated MIC's chapter 11 filing. (*Id.*, ¶4) (emphasis added). *See also id.*, ¶16 ("The OC continues to investigate to what extent MercyOne performed its obligations under the Management and Affiliation Agreement."). Thus, the OC admits that, as of January 2025, it was merely investigating whether it even has claims against MercyOne and, even if so, whether it would be cost-effective or sensible to bring these. Litigation certainly therefore was not "imminent" 23 months earlier, in February 2023.

50.    Indeed, the OC admits that, even today, in July 2025, it still has not ascertained what claims it may assert against MercyOne. In paragraph 2 of the Motion, the OC states that it seeks Rule 2004 discovery from MercyOne "so that the OC could evaluate potential claims the estates possess against MercyOne." (Mot., ¶2).[5]

---

[5] Despite not completing its investigation of claims, the OC reveals that "the OC will be filing a complaint against MercyOne on or prior to August 7, 2025. (¶44). In light of that, the OC cannot explain why it needs relief from the

51.     Other facts belie any assertion that MercyOne should have known that litigation was imminent or near certain in February 2023. MIC's restructuring counsel at the time, McDermott Will and Emery ("MWE") is a highly sophisticated firm. Its attorneys plainly know the essential importance of a litigation hold letter if one party wants another to preserve documents and information and how to draft one. Yet neither MIC nor MWE ever sent any litigation hold letter to MercyOne. Nor did the Debtors or either the Liquidation Trust or the OC after their appointment.

52.     Moreover, as of February 2023, MercyOne was still performing under the Agreement and continued to do so until it terminated the Agreement in April 2023. If MIC and its agents believed that MercyOne had engaged in actionable conduct, they would not have continued performance with MercyOne after that time. Nor would MercyOne have done so.

53.     In addition, if MIC believed that MercyOne was in default of its obligations under the Agreement, it was required to give MercyOne notice and an opportunity to cure, but never did that either.

54.     Also, as MercyOne has continually emphasized in opposing the OC's Rule 2004 Motion [Docket No.1554] and in its own Rule 2004 motion [Docket No. 1858], Mark Toney, who was Debtors' CRO, in his First Day Declaration in support of Debtors' Bankruptcy, did not identify MercyOne as a cause of Debtors' failure and bankruptcy. (*See generally* First Day Decl., Docket No. 27).  He identified no breach or failure by MercyOne.

55.     Further, the OC's counsel's June 20 Letter spoke of "MIC or its successor(s) pursuing litigation," (Mot. Ex. C), yet in February 2023, it was not certain that MIC would have

---

statute of limitations, as claims arising from a common nucleus of operative facts relate back to the date a complaint is filed. *See Zimmer v. United Dominion Indus., Inc.*, 193 F.R.D. 620 (W.D. Ark., 2000)

successors or, if so, who they would be, what powers they would have or whether MWE and Mr. Toney could speak for or act for them.

56.    Finally, it is self-evident that when nearly 30 months have passed since February 2023, litigation was neither "imminent" nor "certain" back then.

57.    While there can be exceptions when a party knows litigation is imminent, generally the duty to preserve documents only arises when a lawsuit is filed. *See, e.g., Cache le Poudre Feeds, LLC v. Land O Lakes, Inc.*, 244 F.R.D. 614, 621 (D. Colo. 2007); *Phillips Elecs. N. Am. Corp v. BC Technical*, 773 F. Supp. 2d 1149 (D. Utah 2011); *San Francisco Residence Club, Inc. v. Park Tower, LLC*, 2011 WL 13233320 (N.D. Ala. Mar. 31, 2011) ("The motion fails also because CBRE had no obligation to preserve documents through a litigation hold prior to June 2009. Only at that time did plaintiffs add claims against CBRE, doc. 64, and perfect service of the Second Amended Complaint, doc. 66."); *E*Trade Secs. LLC v. DeutscheBank AG*, 230 F.R.D. 582, 588 (D. Minn. 2005) ("[C]ourts look for significant signs of imminent litigation prior to the filing of a complaint and only impose a duty to preserve evidence when the signs are clear.")[6]

58.    Until that time, a party is free to adhere to its document retention policy. In *Gladue v. St. Francis Med. Ctr.*, 2015 WL 1359091, at *1 (E.D. Mo. Mar. 24, 2015), at the time when plaintiff's personnel file was purged pursuant to ordinary procedure there was no lawsuit or charge of discrimination. Thus, the court held that, "[a] litigation hold was not required at the time plaintiff's emails were deleted. Defendant has shown that emails were deleted as part of a routine maintenance procedure rather than in bad faith." *Id.*

---

[6] All of this law was cited in MercyOne counsel's June 26 Letter. *See* Mot. Ex. D. The OC elected not to respond to this prior to filing this Motion. It also elected to avoid responding to it in the Motion itself, even though this law is part of its own Motion's Exhibit. These litigation choices have consequences. Should the OC attempt to have the last word on this law in its reply, MercyOne will respectfully seek leave to file a surreply.

59.     Courts also hold that communications about potential suit do not substitute for a litigation hold letter. For instance, in *Keller v. Pepsi Bottling Grp.*, 2007 WL 9735622, at **4-5 (D. Minn. Aug. 27, 2007), the court found that a report of grievance from plaintiff to defendant claiming that his termination was unjust did not with certainty "constitute[] a clear sign of imminent litigation," making it legally permissible for defendant to destroy documents, holding:

> If documents existed and were destroyed in this case, such destruction was legally permissible for several reasons. As the Court previously stated and contrary to Plaintiff's assertions, Defendants did not have a pre-litigation duty to retain information. Any destruction of documents before litigation began was thereby a valid exercise of their records retention policy.

*Id. See also Point Blank Solutions v. Toyobo Am., Inc.*, 2011 WL 1456029 (S.D. Fla., Apr. 5, 2011) (letter from opposing counsel listing documents wanted for litigation created no duty to preserve where "[t]his counsel-prepared list, however, is not a 'litigation hold.' It does not instruct Toyobo to retain and not to delete the documents collected, nor does it provide a specific directive not to destroy future emails and other documents concerning the same subjects.").

60.     Thus, MercyOne had full legal right to comply with its Document Retention Policy. The OC complains it was not told MercyOne had done so until it asked about emails in depositions, but no case requires a party to affirmatively advise about its historic earlier reliance on a Document Retention Policy and the OC has no authority otherwise. Again, having never told MercyOne to preserve documents, the OC cannot reasonably complain that a corporate entity follows a document retention policy. Indeed, a document retention policy is a commonly requested document in discovery.

61.     MercyOne gave accurate estimates about ESI to be produced. (Indeed, it produced more pages than first expected).

62.     The OC's counsel knew full well about all this authority before moving for contempt, yet neither acknowledged nor rebutted this authority in its Motion. This shows that the OC defies controlling legal authority in accusing MercyOne of contempt in not producing emails.

63.     The OC took three depositions of MercyOne witnesses this Court had ordered. From June 18 to 20, 2025, the OC deposed Bob Ritz and Mike Trachta in their individual capacities and it deposed each of them as co-designees for the Rule 30(b)(6) deposition of MercyOne.

64.     Contrary to the OC's apparent contention, neither Mr. Ritz nor Mr. Trachta was responsible for gathering documents for MercyOne's counsel to review for production in response to the Rule 2004 subpoena. Rather, the IT Department, as is common practice with organizations and ESI, was responsible for document collection. MercyOne's counsel, in conjunction with the IT Department, ran the searches set forth in the subpoena. Mr. Ritz and Mr. Trachta's search of their own emails was merely in addition to the document gathering the IT Department conducted. *See generally* Gladstone Declaration, Ex.3.

**G.     The OC Did Not Confer In Good Faith**

65.     The OC misstates its conferral with MercyOne about MercyOne's production and its adherence to its Document Retention Policy. (Mot., ¶10). At that conferral, MercyOne counsel asked OC counsel, Roy Leaf, for copies of the documents referenced in his June 20 letter accusing MercyOne of spoliation, but he refused to provide this and said any such document would be produced only if it is responsive to MercyOne's Rule 2004 document requests. *See* Declaration of David B. Goroff, attached hereto as **Exhibit 4**; Declaration of Christopher J. Jessen, attached hereto as **Exhibit 5**. As noted above, to date, the OC has not produced any such document.

66.     MercyOne did not respond with "threats" to the OC's inquiry, as the OC falsely suggests. (Mot., ¶32).  MercyOne counsel advised OC counsel that if it moved for contempt sanctions based on alleged spoliation for following a pre-existing policy before any notice of

imminent litigation, it would counter-move because a frivolous sanctions motion is itself subject

to sanctions. (*See* June 26 Letter). MercyOne counsel also explained why such a motion by the OC

would be frivolous. *Id.* The OC never responded to these points. It is reasonable for MercyOne to

try to defend itself against frivolous claims and this is supported by ample law.

67.     The OC characterizes its pursuit of this baseless contempt motion as not being

"intimidated by the threats raised by MercyOne." (Mot., ¶11). Rather, as the Motion demonstrates,

it is the OC that is trying to burden and disadvantage MercyOne without legal or factual

justification.

**H.      The OC Improperly Moved For Contempt Sanctions Regarding The Tolling Of The Statute Of Limitations Without Conferring On This With MercyOne**

68.     The relief sought by the OC in its Motion includes a request that this Court toll the

OC's statute of limitations for filing any claim against MercyOne. (*See, e.g.,* Mot., p.1 & ¶¶19, 39-

46). Notably, the OC has never discussed such a toll with MercyOne and thus failed to follow

Local Rule 7037-1 before asking the Court for such relief.[7]

69.     Moreover, if MercyOne had been consulted, it might have agreed to a toll or

extension of time for a short, defined period (and still might), so long as this applied reciprocally

to extend the time for MercyOne to pursue discovery from the OC under its own Rule 2004 Motion.

The OC never conferred with MercyOne about an issue that might have been avoidable.

**I.      The OC Improperly Raises Alternative Means For Searching For Emails Outside Of The OC Rule 2004 Order Without Conferring With MercyOne**

70.     The OC claims it does not seek relief based on spoliation. (Mot., ¶12). Yet if not, it

is unclear what basis it possibly has for a contempt finding, since that was the only basis OC

Counsel discussed with MercyOne counsel prior to the Motion, as the exchange of correspondence

---

[7] Again, paragraph 44 of the Motion belies this because the OC will be filing a complaint on August 7, 2025, against MercyOne regardless of what claims it thinks it has.

4924-9993-7619.2

between OC counsel and MercyOne counsel attached to the Motion, demonstrates. (*See, e.g.,* June 20 Letter; June 26 Letter; Emails attached to Leaf Decl.).

71.     Nonetheless, the OC repeatedly tries to falsely suggest that MercyOne destroyed documents during the period after it filed its Rule 2004 Motion, which amounts to a scurrilous, false spoliation argument. (*See, e.g.*, Mot. ¶12 (suggesting the OC seeks an evidentiary hearing "to understand whether MercyOne complied *with the OC Rule 2004 Order* and the circumstances behind the deletion, loss or destruction of any electronic communications *subject to the OC Rule 2004 Order*."); ¶14 (noting the OC seeks an evidentiary hearing "related to [MercyOne's] failure to produce electronic communications *requested by the OC Rule 2004 order*."); ¶19 (stating that it seeks an evidentiary hearing as to why MercyOne "failed to correct mistakes of fact regarding its possession of electronic communications")). The OC Rule 2004 Order did not (and could not) require MercyOne to produce documents that ceased be in MercyOne's possession at least a year and half before the OC's Rule 2004 Motion was even filed.

72.     The OC asks this Court to require a MercyOne witnesses to testify at a contempt hearing so that the OC can "understand whether MercyOne complied with the OC Rule 2004 Order." (Mot., ¶12).  The OC does not identify any way in which MercyOne did not comply with that Order or provide any fact or evidence of non-compliance. Having not met its burden as movant, it has not satisfied the legal standard for a hearing.

73.     While the OC claims its counsel wrote his June 20 Letter so that he could "assess whether MercyOne or another party (like its parent company) may still have access to responsive electronic communications," the letter does not mention this. (Mot. ¶ 30 & Ex. C). Nor were MercyOne's parents discussed in conversation. (*See* Goroff Decl., Ex.4, ¶6).

74.     While the OC notes it asked for a declaration (from a MercyOne's IT employee) explaining how electronic documents were collected and why only one email file was included in the production[8] and if email communications in MercyOne's possession were previously "deleted/destroyed," and that MercyOne "declined to provide this declaration" (Mot.,¶¶32-33), this is untrue and belied by emails attached to the Leaf Declaration. (*See* Leaf Decl., at pp.7-10).

75.     *First*, the OC's description does not accurately describe the declaration that it insisted be provided by an IT Department witness or why this caused MercyOne to request additional information. The OC also wanted that declaration from an IT witness to explain "*why large numbers of electronic communications were deleted, destroyed or otherwise unavailable as a result of the merger with Trinity*." (*Id.* at p. 10 (email from R. Leaf to D. Goroff on June 25, 2025 at 3:52 p.m.)) (emphasis original). That made the erroneous assumption that MercyOne's adherence to a Document Retention Policy was "as a result of the merger with Trinity." That also made the erroneous assumption that an IT person was qualified to speak to the implications of a merger or the legal requirements of a retention policy.

76.     *Second*, as the same email string shows, MercyOne counsel <u>did not</u> refuse to provide a declaration from an IT person. (*See id.* at p.8 (email from D. Goroff to R. Leaf on June 26, 2025, at 12:00 p.m.: "I did not refuse. I asked for additional information and explanation. Are you refusing to provide this?")). OC counsel did not provide this information, but instead provided a response which inaccurately described the parties' conferral. (*Id.*, at p.7 (email from R. Leaf to D. Goroff on June 26, 2025 at 12:05 p.m.)).  MercyOne's counsel then wrote that "Your summary is not entirely accurate. I said you were asking about policy choices behind the Document Retention Policy and its use and that is not in the purview of an IT person and if you believed

---

[8] Again, the production included numerous hard copies of emails.

otherwise provide reasons and law, which you have not." (*Id.* (email from D. Goroff to R. Leaf on June 26, 2025, at 12:13 p.m.)). OC counsel never responded to these questions. Instead, it filed this Motion.

**J.     The Parties' Conferral Process Provide No Basis For An Evidentiary Hearing**

77.     As the OC notes, the parties spent six weeks negotiating search terms and custodians and modifications to the original document request served on MercyOne with the OC's Rule 2004 Motion, and often had the assistance of the Court through multiple telephonic hearings. (Mot., ¶¶3, 22, 25). Yet, the OC suggests MercyOne's participation in this process was somehow disingenuous or improper.

78.     The OC misstates the parties' conferral process. (Mot., ¶¶24-25).  As originally written, the OC's request for documents indisputably required the search of the files of 20,000 MercyOne employees, while only a few worked with MIC. It required the search of the files of MercyOne's parents, who were not parties to the Agreement. It required the production of private information from personnel files, such as children's surgeries or spouse's deaths. It required that files for every one of MercyOne's many hospitals be searched, despite none being involved with MIC. It required that MercyOne produce documents using MIC's domain name, even though, again, the OC already had this. It included topics that were improperly argumentative, vague or overbroad. Fixing these and other flaws in order to reach a mutually agreeable set of searches is what took weeks to negotiate.

**K.     There Should Be No Evidentiary Hearing, But If There Is MercyOne Must Have The Right To Examine The OC And Any Supporting Documents It Has**

79.     Even though the OC seeks civil and not criminal contempt, as it acknowledges, this is significant relief. This demands that MercyOne not merely have to answer the OC's questions, but that it be able to defend against these and pursue cross-relief, here the right to sanctions for

vexatious litigation under 28 U.S.C §1927 and this Court's inherent authority. *See Matter of Kitchen*, 706 F.2d at 1272-73

80.    This, to begin with, requires the OC to produce ANY evidence it has that its predecessors had provided a litigation hold notice or letter to MercyOne or any other communication that the OC contends makes clear to MercyOne that litigation against it will be imminent or reasonably certain. The OC should be ordered to produce this in advance of any scheduled evidentiary hearing—by July 11, 2025, if a hearing is scheduled for July 14, 2025.

81.    The OC should also be ordered to present a witness or witnesses to speak to:

- Any hold notice/letter that the OC or its predecessors provided to MercyOne and, if none, why not.

- Familiarity with the purpose of hold notices/letters and the consequences of not providing one.

- Any communications that the OC contends created a duty on MercyOne's part to preserve records prior to October 2023.

- The understanding of a corporation's right to adhere to its document retention policy in the absence of a hold notice or equivalent communication.

- The definition of "communication" in the OC's Document Requests to MercyOne.

- The definition of "Document" in the OC's Document Requests.

- The ESI Protocol attached to those requests.

- The date the OC realized that MercyOne had not produced emails and the reason for any delay in raising any question about this with MercyOne.

- The OC's understanding of the term "electronic communication."

- The OC's understanding of what a "custodian" is for purposes of electronic discovery.

- ANY evidence the OC has that MercyOne destroyed documents after receiving the Rule 2004 Motion, and, if none, the reason it is suggesting this might have occurred in its Motion.

- The emails the OC already has in its possession written or sent by or to any MercyOne employee who provided services to MIC during the term of the Agreement, including, but not limited to, Michael Trachta and Robert Ritz.

- The reasons why the OC never answered the questions raised by MercyOne counsel David Goroff concerning the OC's request for a declaration from an IT witness.

- The reasons why the OC did not approach MercyOne about its request to extend the statute of limitation or to modify the Rule 2004 Order to expand possible means for finding additional emails.

82.    Given that MercyOne has completed its document production, and the OC has not yet produced *any* documents (merely telling MercyOne it will complete its document production by August 28, 2025), it would be an additional affront on due process to allow for a one-way hearing in which the OC is not required to present any witnesses or produce documents.

83.    Again, MercyOne strongly believes that no evidentiary hearing would be proper. MercyOne seeks to examine a witness (or witnesses) presented by the OC only in the event such a hearing is ordered.

## MercyOne's Cross Motion Should Be Granted Because It Is Entitled To Its Costs And Attorneys' Fees Because The OC's Motion Is Baseless And Contrary To Law

84.    Under 28 U.S.C. §1927, a party may recover its costs and attorneys' fees from another party's counsel that has acted vexatiously and multiplied proceedings in pursuing litigation. As shown above, especially where the OC has made no effort to satisfy its burden as movant, this Motion falls within this rule.  All MercyOne wants is its costs and fees in having to defend against this Motion. Authority holds that MercyOne is entitled to this relief. *See Sangi Biotech Intern., Inc. v. Kappes*, 179 F. Supp.2d 1240 (D. Colo. 2002) (holding that pursuit of contempt motion was vexatious and unreasonable where alleged contemnor had complied with court order).

85.     In addition, this Court, under its inherent authority, may order that the OC itself pay these fees in addition to or instead of counsel. *See In re Crystal Cathedral Ministries*, 2020 WL 1649619, at *46 (Bankr. C.D. Cal. Mar. 31, 2020).

86.     Such relief is also permissible under this Court's powers under 11 U.S.C. §105(a).

87.     As such, MercyOne respectfully requests that the Court award MercyOne's reasonable costs and attorneys' fees associated with the OC's Motion.

## **CONCLUSION**

Therefore, for the foregoing reasons, MercyOne respectfully requests that this Court:

1)     Deny the OC's Motion in its entirety;

2)     In the alternative, if it is inclined to allow the motion to proceed, order that no evidentiary hearing is necessary and permit MercyOne to also pursue relief as to the OC's conduct;

3)     In the additional alternative, if it permits an evidentiary hearing to be scheduled, permit MercyOne to examine OC witnesses on the topics listed above and require the OC to produce any documents it plans to use to MercyOne no later than July 11, 2024 (if the evidentiary hearing is scheduled for July 14, 2024);

4)     Award MercyOne its costs and fees associated with the Motion;

5)     Award such other relief as this court deems just.

Dated: July 7, 2025                          Respectfully submitted,

                                             */s/ Christopher J. Jessen*
                                             Michael R. Reck
                                             Christopher J. Jessen
                                             **BELIN McCORMICK, P.C.**
                                             666 Walnut Street, Suite 2000
                                             Des Moines, Iowa 50309
                                             Tel: (515) 243-7100
                                             Fax: (515) 558-0675
                                             mrreck@belinmccormick.com
                                             cjessen@belinmccormick.com

26

4924-9993-7619.2

– and –

*/s/ David B. Goroff*
Edward J. Green (admitted *Pro Hac Vice*)
David B. Goroff (admitted *Pro Hac Vice*)
**FOLEY & LARDNER LLP**
321 N. Clark Street, Suite 3000
Chicago, IL 60654
Tel: (312) 832-4500
Fax: (312) 832-4700
egreen@foley.com
dgoroff@foley.com

– and –

Jake W. Gordon (admitted *Pro Hac Vice*)
**FOLEY & LARDNER LLP**
500 Woodward Avenue, Suite 2700
Detroit, MI 48226
Tel: (248) 943-6484
jake.gordon@foley.com

4924-9993-7619.2

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies, under penalty of perjury, that on this July 7, 2025, the foregoing document was electronically filed with the Clerk of Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

<em>/s/ David B. Goroff</em>
David B. Goroff

4924-9993-7619.2