## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MERCY HOSPITAL, IOWA CITY, IOWA, *et al.*, | ) | Case No. 23-00623 (TJC) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## MOTION OF IOWA CITY AMBULATORY SURGICAL CENTER, LLC FOR ENTRY OF AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY TO <u>PURCHASE UNITS AS A RESULT OF A PERMISSIVE REDEMPTION EVENT</u>

Iowa City Ambulatory Surgical Center, LLC ("<u>ICASC</u>"), by its undersigned attorney, respectfully files this motion for entry of an order granting relief from the automatic stay, pursuant to section 362(d), of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"); Rule 4001 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>"); and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Northern District of Iowa (the "<u>Local Rules</u>"), to allow ICASC to redeem the units of ICASC held by the Mercy Hospital Chapter 11 Liquidation Trust (the "<u>Liquidation Trust</u>").  In support of the Motion, ICASC respectfully states as follows:

### <u>SUMMARY</u>

ICASC was organized, and its sole business is, to own and operate a licensed, outpatient ambulatory surgery center located in Iowa City, Iowa (the "<u>ASC</u>").  Johnson County Surgeon Investors, LLC ("<u>JCSI</u>"), a special purpose entity owned solely by physicians who use the ASC's operating and procedure rooms for their patients as an extension of their professional medical practices, and Mercy Hospital, Iowa City, Iowa ("<u>Mercy</u>"), together caused ICASC to be organized and were joint venture ("<u>JV</u>") partners in ICASC for more than 18 years.  As discussed in greater detail below, JCSI's selection of Mercy as its JV partner was made

strategically and the JV itself was the result of considerable negotiations between JCSI and Mercy.

Selection of the proper JV partner was of such critical importance that the parties agreed that no partner could transfer its ownership interest without approval of the JV's Management Board and no new Member could be admitted without the approval of all Members (and such decision to approve or not approve is unqualified and in the sole discretion of each Member).

Further, Mercy and JCSI, as JV partners, agreed that, upon the occurrence of certain events affecting a Member's ability to contribute meaningfully to the JV going forward (each a "Permissive Redemption Event," as described in ICASC's governing documents), the other Member has the right to buy-out the affected Member's ownership interest. Mercy's sale of substantially all of its assets and the loss of its hospital license triggered JCSI's right to cause ICASC to redeem Mercy's ownership interest in ICASC (the "Mercy Units"). ICASC previously came to this Court and, via that certain *Stipulated Order Granting Motion of Iowa City Ambulatory Surgical Center, LLC for Entry of an Order Granting Relief from the Automatic Stay to Issue a Notice of Intent to Obtain a Purchase Price Determination* [D.I. 932] (the "Stipulated Order"), began the process to reach a Purchase Price Determination, so that ICASC could pursue its right to redeem the Mercy Units.[1]

In accordance with the Stipulated Order and ICASC's governing documents, the Liquidation Trust and JCSI, following prolonged discussions and negotiations to select a mutually agreed upon appraiser, mutually agreed to retain, and executed an engagement letter with, VMG (as defined below), a nationally recognized financial services firm experienced in appraising outpatient ambulatory surgery centers across the United States. Following the

---

[1] As described below, the Mercy Units were transferred to the Liquidations Trust on June 24, 2024.

DMS_US.371697879.6

opportunity for both the Liquidation Trust and JCSI to provide input to VMG and to comment on the financial assumptions to be used by VMG, VMG rendered, and distributed to counsel for the Liquidation Trust, ICASC and JCSI VMG's fair market value appraisal of ICASC and of the Mercy Units (the "VMG Appraisal").  Specifically, the VMG Appraisal determined that the fair market value of the Mercy Units is $4,620,000 ("FMV Purchase Price").  As mutually agreed to by the JV parties and memorialized in ICASC's governing documents, (a) if either Member disagreed with the VMG Appraisal, it had fifteen days to object to the VMG Appraisal and its determination of the FMV Purchase Price by providing notice to the other Member and to ICASC and (b) if neither Member timely made such an objection, the VMG Appraisal became final and binding upon the parties and the purchase price for ICASC's redemption of the Mercy Units "shall be based on such appraisal" (i.e., it definitively must be the FMV Purchase Price). If an objection to the VMG Appraisal had been timely made, the appraisal process would have continued to a second stage requiring the Members to obtain two additional appraisals, and then to abide by a process to reconcile the appraisals and determine a fair market value purchase price for ICASC's redemption of the Mercy Units.

Neither the Liquidation Trust nor JCSI timely objected to the VMG Appraisal.  As a result, the price to be paid by ICASC to redeem the Mercy Units from the Liquidation Trust was determined to be the FMV Purchase Price, and such determination is final and binding upon the Liquidation Trust and JCSI.  ICASC is ready, willing and able to exercise its redemption right and to purchase the Mercy Units from Mercy's successor, the Liquidation Trust, for a purchase price in an amount equal to the FMV Purchase Price, as established in the final and binding VMG Appraisal.

- 3 -

Per §3.1(p) of the Liquidation Trust Agreement (D.I. 993-3) ("LTA"), the Liquidation

Trustee, with the approval of the member of the Trust Oversight Committee designated by the

Bondholder Representatives (each term as defined in the LTA), is empowered to sell the Mercy

Units without further Court approval; however, through their respective counsel, the Liquidation

Trustee and the Bondholder Representative have informed ICASC that, despite their failure to

object to the VMG Appraisal, they will resist the redemption of the Mercy Units by ICASC.

Accordingly, as a result of the Permissive Redemption Event, ICASC comes to this Court

seeking to lift the automatic stay for cause and to exercise ICASC's right under ICASC's

governing documents to redeem the Mercy Units at the FMV Purchase Price, which was

determined by procedures set forth in the Stipulated Order and ICASC's governing documents.

## BACKGROUND

### A. Formation & Development of ICASC

1.      As set forth above, Mercy and JCSI organized ICASC as a JV more than 18 years

ago to own and operate the ASCs. The physician-hospital co-ownership model used by Mercy and

JCSI is common nationally and advantageous in many ways to various community stakeholders:

(a) patients benefit from reduced wait times and the convenience and lower cost of receiving

surgical services in an outpatient setting; (b) employers and health plans benefit from the lower

cost of surgical services in an outpatient setting; (c) physician investors benefit from (i) using an

ASC as an extension of their medical practices, often times in a setting proximate to their medical

practices, which provides increased efficiencies because the physicians are familiar with, and often

have a role in selecting, the ASC's staff, (ii) being able to have more control over when their cases

are scheduled, including block scheduling, (iii) improving the patient experience, (iv) having more

control over the selection of specialized equipment and staff needed for their surgical practices,

- 4 -

(v) the ability to better pursue and receive value-based care incentives increasingly being offered by health plans, (vi) entering into an ASC JV with a hospital because (A) the hospital co-venturer can provide access to important clinical, administrative and support services that can be accessed conveniently and economically, (B) the hospital co-venturer provides, through the participation of its executive and physician leadership in ASC management, important experience and perspective to enhance ASC clinical quality and operational and financial performance, (C) physicians employed by the hospital co-venturer, and members of the medical staff of the hospital co-venturer, frequently perform procedures at or refer cases to the ASC, and (d) hospital investors benefit from (i) being able to offer procedures in a lower cost setting, which is attractive to patients, employers and health plans, (ii) partnering with and receiving the economic benefits of co-investing with specialist physicians who are not employed by the hospital, (iii) coordinating the delivery of care with community-based physicians, including services provided by those physicians in the hospital setting, and (iv) the ability to better pursue and receive value-based care incentives increasingly being offered by health plans.

2.      Because of the close strategic and mutually beneficial relationship between physician investors and hospital investors that co-invest in ASCs, the terms of an ASC JV are heavily negotiated and contain expectations of the Members.  For instance, in ICASC's governing documents, the parties agreed to abide by certain non-competition covenants, require on-going certifications and other operational standards, and to implement and follow an agreed upon governance structure.  The parties also agreed that neither Member could sell or transfer its ownership interests without the consent of the other Member, and that no new Member could be admitted without the approval of both Members.[2]  All of these agreements and covenants, among

---

[2]      "[a] Member may not assign the Member's Units, in whole or in part, or pledge, grant a security interest, lien, or other encumbrance in or against any or all of the Member's Units unless the other Member provides written

- 5 -

others, were memorialized in that certain *Amended & Restated Operating Agreement of Iowa City Ambulatory Surgical Center*, dated as of March 6, 2022, which amended and restated ICASC's original operating agreement, dated January 3, 2007 (as amended, "ICASC's Operating Agreement") [attached hereto as **Exhibit A**].

3.      Under the January 3, 2007, Operating Agreement of ICASC ("ICASC's Original Operating Agreement"), Mercy initially held 70% and JCSI held 30% of ICASC's Membership Interests.  The Liquidation Trust's adversary complaint makes several inaccurate statements, including its statement that Mercy continued to own 70% of ICASC's Membership Interests until 2022.  In fact, consistent with the provisions in Section 3.2 of ICASC's Original Operating Agreement, during the 90-month period following ICASC's organization, JCSI purchased Membership Interests from Mercy such that, prior to the end of 2014, Mercy owned 51% and JCSI owned 49% of ICASC's Membership Interests.  As detailed in the adversary complaint brought by the Liquidation Trust against JCSI[3] earlier this year, some of the physician members of JCSI were employed by Steindler Orthopedic Clinic, P.L.C. ("SOC").[4]   In 2022, JCSI learned and alleged that these SOC-employed physicians, in violation of non-compete covenants they had made pursuant to JCSI's Operating Agreement for the benefit of JCSI and ICASC, taken actions to develop their own competing ambulatory surgical center ("Steindler ASC").  *See* Adv. Proc. at D.I. 1 at para. 21-23. Also, as reported in the adversary complaint, JCSI learned and alleged that

---

consent." *Operating Agreement* § 9.1; see also id. at 6.10(h) (100% of the membership units most vote to affirmatively "approve new Members.")

[3]      *Dan R. Childers, as Trustee of the Mercy Hospital Chapter 11 Liquidation Trust v. Johnson County Surgeon Investors LLC,* Case No. 25-09012 (Bankr. N. Dist. Iowa, filed Feb. 28, 2025) (the "Adv. Proc.")

[4]      The Liquidation Trust's adversary complaint makes numerous inaccurate statements, including its statement that physicians, including SOC physicians are employed by ICASC.  ICASC does not employ, and never has employed, any physicians. As the Court may be aware, SOC was appointed as a member of the Committee of Unsecured Creditors ("UCC") in the Mercys' bankruptcy cases (Main Case D.I. 107), with its president and CEO Edward Patrick Magallanes acting as its representative to the UCC.  SOC, with Mr. Magallanes as representative, serves as the UCC-designated member of the three-member Liquidation Trust Oversight Committee.  *See* Main Case D.I. 993 at Sch. 1 to Ex. C (Liquidation Trust Agreement).

- 6 -

Mercy, in violation of non-compete provisions in ICASC's Operating Agreement and in violation of Mercy's fiduciary duties to ICASC as the controlling Member of ICASC, had secretly conspired with SOC and the Steindler physicians to partner with SOC in development of the Steindler ASC and development of the medical campus on which the Steindler ASC would be constructed.[5] Following intense negotiations among them, as stated in the adversary complaint, "JCSI, [Mercy], and ICASC were able to resolve the dispute by entering into a Membership Interests Adjustment Agreement and Non-Competition Covenant Waiver" (the "Mercy Settlement Agreement").  Under the Mercy Settlement Agreement, among other things, Mercy transferred 11% of its ICASC Membership Interests to JCSI, resulting in an ownership split of 60% for JCSI and 40% for Mercy as of March 1, 2022, and Mercy agreed to transfer an additional 2.5% to JCSI on March 1, 2024, resulting in an ownership split of 62.5% for JCSI and 37.5% for Mercy as of March 1, 2024.[6]

## B.  Valuation Triggers and Procedures

4.      In ICASC's Operating Agreement, JCSI and Mercy agreed that, upon the occurrence of certain events affecting a Member (each a "Permissive Redemption Event"), ICASC's Management Board could direct ICASC to have that Member's ownership interests valued and, once a fair market value was established under the agreed upon process set forth in ICASC's Operating Agreement, ICASC could redeem the ownership interest of the Member subject to the Permissive Redemption Event at the determined fair market value price.

5.      Following a Permissive Redemption Event,  ICASC has the right to provide a notice to the Member undergoing a Permissive Redemption Event (no form for such notice is specified),

---

[5]      Mercy ultimately rejected the development agreement and certain other agreements related to Mercy's partnership with SOC based upon concerns about construction and management of the Steindler ASC. *See* Main Case D.I. 769.

[6]      In its adversary complaint, the Liquidation Trustee inaccurately states that, pursuant to the Mercy Settlement Agreement, (a) Mercy transferred a 30% interest in ICASC to JCSI on March 1 2022, when in fact Mercy only transferred an 11% interest in ICASC to JCSI at that time and (b) JCSI's interest in ICASC increased from 30% to 60% at that time, when in fact it increased from 49% to 60% at that time.

stating that ICASC intends to obtain a Purchase Price Determination for the ownership interest

subject to redemption. *Op. Ag.* at § 5.6. The Purchase Price Determination notice triggers a

mutually agreed upon process for determining and verifying the fair market value of the ownership

interest that ICASC has a right to redeem. Subsequently, following the Purchase Price

Determination, ICASC has the right to provide an additional notice if ICASC decides to exercise

its right to redeem the ownership interest. *Id.*

6.      The process for determining the fair market value of, and thus the purchase price

for, the ownership interest is set forth in Section 3.2 of ICASC's Operating Agreement (the

"Valuation Process"). The purchase price for the ownership interest determined by the Valuation

Process is referred to as the "Purchase Price Determination."

7.      Under the terms of Section 3.2 of ICASC's Operating Agreement, the fair market

value of the ownership interest is determined either by (a) the "Unit Purchase Price Formula,"

which is defined as six (6) times the value of ICASC's Adjusted EBITDA for the preceding

twelve (12) month period, or (b) if the Unit Purchase Price Formula is determined not to provide

for a fair market value of the ownership interest, by an independent appraiser mutually agreed

upon by the Members (the "Company Appraiser"). *Id.* at § 3.2(a)–(b)

8.      The Company Appraiser is required to complete its appraisal (the "Initial

Appraisal") and, if a Member objects to the Initial Appraisal, it must notify the other Member and

ICASC of its objection within fifteen (15) days of receiving the Initial Appraisal. *Op. Ag.* at §

3.2(c). Failure to provide such a timely notice will result in the Initial Appraisal becoming the

final and binding Purchase Price Determination.

9.      If the Unit Purchase Price Formula is not used and a Member timely objects to the

Initial Appraisal, Section 3.2(c) of Operating Agreement allows the objecting Member to request

- 8 -

that the Members obtain separate appraisals from new independent appraisers — one selected by each Member — and supplies a formula for determining the purchase price of the ownership interest based upon the average of the separate Member appraisals, or if the discrepancy between the Member appraisals is greater than a prescribed 10% threshold, then, as among the Initial Appraisal and the Member appraisals, the average of the two appraisals that are nearest to one another (the "Disputed Company Appraisal Process").  If the Disputed Company Appraisal Process is initiated, the result of the formula cited above will become the final and binding Purchase Price Determination.

10.   Once the Purchase Price Determination is made and noticed to the Members, ICASC has forty-five (45) days to make a determination as to whether it will purchase the ownership interest subject to redemption for the prescribed purchase price by delivering a notice to the Member subject to the Permissive Redemption Event (the "Intent to Purchase Notice").

**C.  The Permissive Redemption Event and Purchase Price Determination**

11.   Mercy's sale of substantially all of its assets to the University of Iowa resulted in a Permissive Redemption Event,[7] entitling ICASC to issue a notice to have the Mercy Units valued using the Valuation Process. On April 5, 2024, after ICASC petitioned the Court for stay relief, the Court entered a stipulated order [Docket No. 932] (the "Stipulated Order") that lifted the automatic stay to permit ICASC to issue its Purchase Price Determination notice to Mercy, and the Liquidation Trust and JCSI began the process to obtain a Purchase Price Determination (as defined in ICASC's Operating Agreement at 1.1(ddd)) for the Mercy Units.

---

[7]   Pursuant to ICASC's Operating Agreement at 1.1(yy)(i)(F)): "'Permissive Redemption Event' with respect to any Member, shall occur: The sale, lease, exchange or other transfer or disposition of, all or substantially all, of the assets of the Member, the merger or consolidation of the Member with or into another Person in which the Member is not the surviving entity."  It also provides that a Permissive Redemption Event with respect to Mercy occurs "If Mercy's license as a general acute care hospital is terminated, suspended, revoked or relinquished (whether voluntary, under the threat of disciplinary action or involuntary, and whether temporary or permanent)."

DMS_US.371697879.6

12.     On June 7, 2024, the Court confirmed *Mercy's First Amended Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidating* [Docket No. 1050] (as amended, modified, or supplemented, the "Plan"). Under the terms of the Plan, which went into effect on June 24, 2024 (the "Plan Effective Date"), Mercy was deemed to have transferred and assigned all of its rights, title, and interests in and to all of the Liquidation Trust Assets (as defined in the Plan), which assets included the Mercy's Units, to the Liquidation Trust.

13.     Pursuant to the Stipulated Order and § 3.2 of ICASC's Operating Agreement, ICASC and Dan Childers, in his capacity as the trustee of the Liquidation Trust (the "Liquidation Trustee"), thereafter agreed to jointly retain, and did jointly retain, VMG Holdings LLC d/b/a VMG Health ("VMG") as the independent "Company Appraiser" to value the Mercy Units and render a Purchase Price Determination. VMG is a nationally recognized valuation firm experienced in preparing valuation opinions for ambulatory surgical centers throughout the United States.  VMG, following its professional review and analysis, including interviews with representatives of ICASC, JCSI and the Liquidation Trust, and an opportunity for each of them to comment on a draft report, delivered the VMG Appraisal to ICASC, JCSI and the Liquidation Trustee on March 14, 2025. The VMG Appraisal determined that the Purchase Price Formula does not provide a fair market valuation of the Mercy Units, and that the fair market value of the Mercy Units was $4,620,000 (the "FMV Purchase Price").

14.     Under § 3.2 of ICASC's Operating Agreement, JCSI and the Liquidation Trustee were afforded fifteen (15) days to object to the VMG Appraisal by providing notice to the other Member.  If either JCSI or the Liquidation Trust had provided a timely notice that they objected to VMG's FMV Purchase Price determination, the Disputed Company Valuation Procedures would have been activated and VMG's determination of the FMV Purchase Price would not have

- 10 -

been final and binding upon ICASC and the Liquidation Trust; however, no such notice was provided by either JCSI or the Liquidation Trust. As a result, as of the expiration of the referenced fifteen (15) day period, the FMV Purchase Price set forth in the VMG Appraisal became the final and binding Purchase Price Determination. As a result, the Liquidation Trust no longer has a right to object to such Purchase Price Determination, which is final and binding upon the Liquidation Trust, ICASC, and JCSI.

**D. Stay Relief and Intent to Purchase Notice**

15.    The Stipulated Order stated "[t]he Motion is granted as set forth herein and that the automatic stay shall be and is hereby modified only for the purposes of permitting the Movant to i) issue a notice of intent to obtain a Purchase Price Determination to Mercy Hospital, Iowa City, Iowa and ii) act in accordance with the Operating Agreement to obtain a Purchase Price Determination." [D.I. 932 at ¶ 1].

16.    ICASC issued the notice of intent to obtain a Purchase Price Determination and followed the procedures proscribed in § 3.2 of ICASC's Operating Agreement, including collaborating with the Liquidation Trustee, to mutually agree upon and engage VMG – setting in motion the process to make a Purchase Price Determination and, thereafter, to enable ICASC to redeem the Mercy Units held by the Liquidations Trustee. VMG issued the VMG Appraisal to ICASC, JCSI, and the Liquidation Trustee, and all parties were on notice that any failure to object would result in the FMV Purchase Price for the Mercy Units set forth in the VMG Appraisal being recognized by all parties as the final and binding Purchase Price Determination.

17.    Reaching a Purchase Price Determination was the stated goal of this Court and all parties to the Stipulated Order. Now, pursuant to the Stipulated Order, and with the knowledge that the Liquidation Trustee and Bondholder Representative have elected not to accept the sale

DMS_US.371697879.6

process available via §3.1(p) of the LTA, ICASC now returns to the Court and requests modification of the automatic stay to permit ICASC to issue the Liquidation Trust an Intent to Purchase Notice and redeem the Mercy Units at the fair market value Purchase Price Determination, as arrived at using the contractually binding process set forth in ICASC's Operating Agreement.  ICASC does not seek to deprive the Liquidation Trust of any property – ICASC merely wants the benefit of its bargain to pay fair market value for the Mercy Units and not be forced to continue in a JV with a party that provides no value whatsoever to the ASC enterprise.

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334 and this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (G).

19.    Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

20.    The statutory predicates for the relief requested herein are section 362(d)(1) of the Bankruptcy Code, and Rule 4001 of the Bankruptcy Rules.

## RELIEF REQUESTED

21.    Movant requests the Court enter an order, pursuant to Section 362(d)(1) of the Bankruptcy Code, modifying and terminating the automatic stay to the extent necessary to issue a Price Determination Notice.

## BASIS FOR RELIEF REQUESTED

22.    Section 362(d)(1) of the Bankruptcy Code provides, in relevant part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . such as by terminating,

- 12 -

> annulling, modifying, or conditioning such stay . . . for cause,
> including the lack of adequate protection of an interest in property
> of such party in interest . . . .

11 U.S.C. § 362(d)(1).

23.    Although the Bankruptcy Code does not expressly define "cause," the legislative
history of section 362 explains that "[o]ne example of such "cause" is the rule that where the
creditor's action is not connected with or interfering with the bankruptcy procedure, continued
imposition of the stay would not foster congressional policy." *In re Steffens Farm Supply, Inc.*, 35
B.R. 73, 75 (Bankr. N.D. Iowa 1983).  Further, bankruptcy courts have found that cause is defined
as "any reason whereby a creditor is receiving less than [its] bargain from a debtor and is without
a remedy because of the bankruptcy proceeding."  *In re Dittrick*, 2016 WL 7742158, *2 (Bankr.
N.D. Iowa Nov. 1, 2016) (quoting *In re Cornish*, Bankr., 2013 WL 1755485, *1 (Bankr. N.D. Iowa
Apr. 24, 2013)) (alteration in original).  Further, the Eighth Circuit holds that the Bankruptcy Court
must grant relief from the automatic stay if the movant shows cause. *See In re Martens*, 331 B.R.
395, 398 (B.A.P. 8th Cir. 2005); *see also In re Dittrick*, 2016 WL 7742158 at *2.

24.    JCSI's chosen co-venturer made certain promises and owed certain obligations to
ICASC and its JV partner JCSI.  Among those were to maintain its state license as a hospital and
to refrain from selling substantially all of its assets.  Mercy has done both of these things and,
accordingly, no longer provides the same value to ICASC that attracted JCSI to Mercy as co-
venturer in the first instance.  At the inception of their JV relationship, JCSI negotiated for the
right to end the JV relationship if these specific triggering events occurred and further negotiated
with Mercy the terms for a process by which the relationship would end, namely JCSI purchasing
Mercy's Units for fair market value.  JCSI is unjustifiably being denied its rights by Mercy/the
Liquidation Trust.

- 13 -

25.     Accordingly, sufficient cause exists to lift the stay and allow ICASC to redeem the

Mercy Units for the FMV Purchase Price.

**I.    ICASC's Operating Agreement Is an Executory Contract That Cannot Be Assumed or Assigned Without JCSI's Consent**

26.     "[B]roadly speaking, if an operating agreement is found to be an executory contract,

Section 365(c) permits a non-debtor party to enforce specific transfer restrictions contained in it

against the trustee." *In re Garbinski (Cardiello v. United States)*, 465 B.R. 423, 426 (Bankr. W.D.

Pa. Feb. 16, 2012).

27.     The Eighth Circuit has adopted the "Countryman Test" to determine if a contract is

executory. *In re Interstate Bakeries Corp.*, 751 F.3d 955, 962 (8th Cir. 2014) *In re Knutson*, 563

F.2d 916, 917 (8th Cir.1977). Under the Countryman definition, contracts are executory if they are

so far unperformed that the failure of either party to complete performance would constitute a

material breach excusing the performance of the other. *In re Interstate Bakeries Corp.*, 751 F.3d

at 962.

28.     Here, ICASC's Operating Agreement imposes material, ongoing obligations on

both JCSI and Mercy/the Liquidation Trust. These include, among others, governance rights,

regulatory compliance obligations, and appointment rights to the Clinical Operations Committee.

Courts have found similar obligations sufficient to render LLC agreements executory. *See In re

Daughtrey Constr., Inc.*, 188 B.R. 607, 612 (Bankr. D. Neb. 1995) (finding that LLC agreement

was executory because all members had continuing obligations to participate in management,

contribute capital, and some members were required to contribute specified assets and services);

In *re Allentown Ambassadors, Inc.*, 361 B.R. 422, 444 (Bankr. E.D. Pa. 2007) (determining that

where an operating agreement both requires ongoing capital contributions and imposes

management duties, it is often executory); *In re DeLuca*, 194 B.R. 65, 77 (Bankr. E.D. Va. 1996)

- 14 -

(concluding that LLC operating agreement was an executory contract because the "object of the agreement — the development of the Parc City Center project — has not yet been accomplished and the parties have on-going duties and responsibilities" to finish the project); *In re Strata Title, LLC*, 2013 WL 1773619, at *2 (Bankr. D. Ariz. Apr. 25, 2013) (finding that manager-managed operating agreement was executory because certain actions, including removal of the manager and sale of property owned by the company, required approval by a super majority of the members, that these actions were material, and that the possibility of a vote on one or more of the issues was not remote, thereby requiring the participation of the members); *In re DeVries*, 2014 WL 4294540 (Bankr. N.D. Tex. 2014) (finding that member's obligation to contribute capital and guarantee the company's debt are executory obligations).

29.     Where, as here, an operating agreement is executory, it may not be assumed or assigned without compliance with § 365(c)(1) of the Bankruptcy Code. Section 365(c) provides that, although a trustee may generally assume and assign an executory contract, a trustee may not assume a contract if (a) applicable law would excuse the counterparty to the contract from accepting performance from a person other than the debtor, and (b) the counterparty objects to the trustee's effort to assume or assign the contract. *See In re Soderstrom*, 484 B.R. 874, 880 (M.D. Fla. 2013) (recognizing that if the operating agreement for a limited liability company in which debtor had interest qualified as "executory" contract, it triggered the Section 365(c)(1) exception to the trustee's ability to assume and assign debtor's management interest thereunder if applicable law would excuse other parties to the contract from accepting performance from someone other than debtor). *See also In re Minton*, 2017 WL 354319, at *6 (Bankr. C.D. Ill. Jan. 24, 2017) (recognizing that nothing in the language of § 541(c)(1) addresses, much less authorizes, the transfer by the trustee of assets that are subject to prohibitions or restrictions on transfer" (quoting

- 15 -

*Caymus Ventures, LLC v. Jundanian (In re Jundanian)*, 2012 WL 1098544, at *6 (Bankr. D. Md. Mar. 30, 2012)); *In re Kramer*, 2022 WL 17176411, at *8 (B.A.P. 10th Cir. Nov. 23, 2022) (holding that section 541(c)(1) did not invalidate the transfer restrictions in the LLC agreement and that because the transfer restrictions "do not restrict the LLC Interests from entering the bankruptcy estate, we conclude they do not violate § 541, and are therefore enforceable against the Trustee.")

30.     Applicable Iowa law and the terms of ICASC's Operating Agreement enforce the longstanding principle of *delectus personae* — the right not to be forced into a JV with an unchosen party. Mercy was JCSI's chosen co-venturer in a physician-hospital ASC JV. The substitution of an unknown third party would fundamentally alter the bargain. JCSI does not and will not consent to such an assignment. Thus, under § 365(c)(1), the Liquidation Trust may not assume and assign the Mercy Units.

## II.     The Permissive Redemption Events Are Uncurable Defaults

31.     Even if the Liquidation Trust wished to assume the Mercy Units, and ICASC's Operating Agreement permitted the Liquidation Trust assign or sell the Mercy Units to a third party over JCSI's objection, it could not do so unless all defaults were cured. *See* 11 U.S.C. § 365(b)(1). That is not possible here. The triggering events — namely, the termination of Mercy's hospital license and its disposition of substantially all of its assets — are structural, final, and incapable of cure. *See* ICASC's Operating Agreement § 1.1(yy)(ii)(A), (F).  Courts have held that incurable defaults bar assumption. *See In re Escarent Entities, L.P.*, 423 F. App'x 462, 465 (5th Cir. 2011) ("It follows that if a default is incurable, assumption is necessarily precluded by the plain meaning of § 365."). Accordingly, the Liquidation Trust cannot assume ICASC's Operating

- 16 -

Agreement in connection with the sale of Mercy's Units and therefore cannot assign the Mercy Units to any party other than ICASC.

## III.   Even If ICASC's Operating Agreement Is Not Executory, the Redemption Right Remains Enforceable

32.     Regardless of whether an operating agreement is an executory contract, "sale restrictions in LLC operating agreements are generally enforced in bankruptcy where they do not significantly impair a trustee's ability to obtain the fair market value of the estate's interest in the LLC." *In re Minton*, 2017 WL 354319, at *6 (Bankr. C.D. Ill. Jan. 24, 2017). Under section 541(c)(1), property enters the estate "notwithstanding any provision" that would otherwise restrict its transfer. However, as numerous courts have held, section 541 does not nullify valid and enforceable contract rights such as redemption rights or rights of first refusal. *In re Capital Acquisitions & Mgmt. Corp.*, 341 B.R. 632 (Bankr. N.D. Ill. Apr. 27, 2006) (finding that even though operating agreement was not an executory contract, right of first refusal was still enforceable because it was not an *ipso facto* clause — it was not triggered by the debtor's insolvency or by the filing of a bankruptcy case); *In re The IT Group, Inc., Co.*, 302 B.R. 483 (D.Del.2003) (right of first refusal under operating agreement for limited liability company in which debtors were members, which was triggered by any transfer, other than a transfer to an affiliate, and not by a member filing for bankruptcy, was not *ipso facto* clause and was not rendered unenforceable by provision of Bankruptcy Code barring termination or modification of executory contract or unexpired lease, or rights or obligations thereunder, due to debtor's commencement of bankruptcy case); *In re LaGroux*, 2019 WL 3933797, at *7 (Bankr. N.D. Ohio Aug. 19, 2019) (finding that a right of first refusal in an operating agreement is enforceable against a trustee regardless of whether the operating agreement is an executory contract — a right of first refusal is not an *ipso facto* clause as it was not triggered by the debtor's insolvency; if the member was

- 17 -

required to comply with the provision pre-bankruptcy, then the trustee is required to comply with the provision in bankruptcy). As the Bankruptcy Court in *Capital Acquisitions* recognized, the exercise of a right of first refusal in an LLC agreement, like the exercise of ICASC's redemption right here, does not "hamper the Debtor's ability to assign the property or foreclose the estate from realizing the full value of the Debtor's interest in the limited liability company" where the operating agreements has a mechanism for determining fair market value and that the mechanism has been followed. *In re Cap. Acquisitions & Mgmt Corp.* at 638.

33.     The Debtor will suffer no deprivation, as the mechanism is the safeguard that the estate receives fair market value. Here, ICASC's redemption right was validly triggered and properly exercised under ICASC's Operating Agreement. The FMV Purchase Price has been established through a stipulated and contractually compliant appraisal process. The Liquidation Trustee failed to object and is now estopped from contesting the result. ICASC does not seek to dispossess the estate of property without process — it seeks only to complete a redemption to which it is contractually entitled.

34.     Judge Hollis in *In re Cap. Acquisitions & Mgmt Corp.* efficiently summarized a very similar the factual scenario where she stated: "Could [the Debtor] achieve a higher price for its interest in [the LLC] without the right of first refusal? Possibly. But [the Debtor] knew when it signed the LLC Operating Agreement that any sale of its interest at any time, whether or not it was in bankruptcy, would be subject to the right of first refusal held by the other members. The Receiver took [the Debtor]'s property rights as it found them on the date of the petition. [the Debtor]'s interest in [the LLC] is subject to this right of first refusal, and that is how the Receiver must sell it." *Id.*

DMS_US.371697879.6

35.     Where a third party's right to specific performance survives bankruptcy and where the estate has acquiesced in the contractual process, courts routinely grant stay relief. See *In re Anton*, 145 B.R. 767, 770 (Bankr. E.D.N.Y. 1992).

## <u>CONCLUSION</u>

WHEREFORE, for the reasons set forth above, Movant respectfully requests that the Court enter an order granting this Motion, modifying and terminating the automatic stay to the extent necessary to permit ICASC to Purchase the Mercy Units from the Liquidation Trust for the FMV Purchase Price, waiving the stay of effectiveness of an order granting this Motion as imposed by Bankruptcy Rule 4001(a)(3) and granting such further and other relief as this Court deems just.

DMS_US.371697879.6

Dated: August 8, 2025

Respectfully submitted,

/s/ Michael T. Gustafson
Michael T. Gustafson (*Admitted pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
320 S. Canal Street, Suite 3300
Chicago, IL 60606
Phone: (312) 569-1000
Fax: (312) 569-3000
Email: mike.gustafson@faegredrinker.com

*Counsel to Iowa City Ambulatory Surgical
Center, LLC*

DMS_US.371697879.6

## **Certificate of Service**

The undersigned certifies, under penalty of perjury, that on this 8th day of August 2025, the foregoing document was electronically filed with the Clerk of Bankruptcy Court using the Northern District of Iowa CM/ECF and the document was served electronically through the CM/ECF system to the parties of this case.

*/s/ Michael T. Gustafson*
Michael T. Gustafson

DMS_US.371697879.6